**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
CIVIL DIVISION**

UNITED STATES OF AMERICA
AND STATE OF TENNESSEE
*ex rel.*
[UNDER SEAL]
Relator

                                        **TO BE FILED IN
                                        CAMERA AND UNDER
                                        SEAL**

vs.                                     DO NOT PUT IN PRESS BOX
                                        DO NOT ENTER ON PACER


[UNDER SEAL]

Defendants.

**DOCUMENT TO BE KEPT UNDER SEAL**


**DO NOT ENTER ON PACER**


Jerry E. Martin
Seth Hyatt
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219

**Lead Counsel:**
Bryan A. Vroon, Esq.
(Motion for *pro hac* admission to be submitted)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327

Edward D. Robertson, Jr.
(Motion for *pro hac* admission to be submitted)
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109

1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF TENNESSEE**

**CIVIL DIVISION**

UNITED STATES OF AMERICA
AND STATE OF TENNESSEE
*ex rel.*
JEFFREY H. LIEBMAN
Relator

                                   **TO BE FILED IN**
                          **CAMERA AND UNDER SEAL**

vs.                             DO NOT PUT IN PRESS BOX

                                 DO NOT ENTER ON PACER

METHODIST LE BONHEUR HEALTHCARE,
THE WEST CLINIC, WEST CANCER CENTER,
UT METHODIST PHYSICIANS, LLC,
METHODIST HEALTHCARE---MEMPHIS HOSPITALS,
AND JOHN DOES 1-100

Defendants.

**<u>Relator's Complaint Under the Federal and State False Claims Acts</u>**

**Parties** ........................................................................................................................ **5**

**Jurisdiction and Venue** .......................................................................................... **8**

**Methodist Has Paid Kickbacks and Excessive Compensation to West
Clinic Physicians** ...................................................................................................... **9**

   **Introduction to the Lucrative Profits Under the 340B Drug Discount
   Program** ...................................................................................................................... **9**

   **Since 2012, Methodist Has Paid Over $270 Million to West Clinic Physicians** .......... **12**

   **Methodist Has Given West Clinic Physicians the Use of a $50 Million Office
   Complex for Free** .................................................................................................... **20**

   **The West Cancer Center Steering Committee Meetings in 2015** .................................. **21**

   **The Terms of the Past, Ongoing, and Future Financial Windfall Required by
   West Clinic Physicians** ........................................................................................... **23**

   **Methodist Has Also Committed Over $55 Million in "Mission Support Funds"
   for West Cancer Center** .......................................................................................... **27**

   **Methodist's Excessive Payments to West Clinic Physicians Have Induced
   Increased Referrals to the Hospital System** .......................................................... **27**

**Methodist Has Excessively Paid Many Employed Physicians Based on
the Value of Their Referrals** ................................................................................ **29**

   **Introduction** .......................................................................................................... **29**

   **Excessive Compensation of Employed Physicians Has Generated Financial
   Losses in Excess of $100 Million Over the Last 5 Years** ....................................... **31**

   **Methodist Has Tracked and Monitored the Value and Volume of Referrals
   from All Physicians** ............................................................................................... **32**

   **Methodist Has Budgeted for Major Losses from Physician Practices** ......................... **33**

   **In 2016, Methodist Paid 43 Employed Physicians Compensation Per wRVU
   in Excess of National 90th Percentiles** ................................................................ **35**

      Methodist Has Excessively Paid Transplant Surgeons ................................................... 35

      Methodist Has Excessively Paid Oncology Surgeons .................................................... 36

      Methodist Has Excessively Paid Employed Cardiologists ............................................. 38

      Methodist Has Excessively Paid Employed Hospitalists and Internists.......................... 39

      Summary of Excessive Compensation to Employed Physicians .................................... 39

**Methodist Healthcare, West Clinic, and West Cancer Center Have
Violated the Federal Anti-Kickback Statute** ................................................... **40**

**Methodist Healthcare, West Clinic, and West Cancer Center Have
Violated Federal *Stark* Laws** .............................................................................. **43**

   **The *Stark* Statute's Broad Definition of "Referral"** ............................................... **46**

   **Physician Compensation Must be "Consistent with the Fair Market Value of
   the Services" Personally Performed by the Physician** ........................................... **47**

   **Physician Compensation Must Not be "Determined in a Manner that Takes
   into Account (Directly or Indirectly) the Volume or Value of any Referrals by
   the Referring Physician"** ....................................................................................... **48**

   **The *Stark* Statute Requires that Physician Compensation Must be
   "Commercially Reasonable Even if No Referrals" Were Made to the Hospital** .......... **49**

   **Summary of Methodist's Violations of Federal *Stark* Laws** ............................... **50**

**Methodist's Excessive Payments to Physicians Are Not Protected by the
"Academic Medical Center" Safe Harbor Under *Stark* Regulations** ..................... **52**

3

**Federal Healthcare Programs** ................................................................................. **53**
    **Introduction to the Medicare Program** .......................................................... **53**
    **Introduction to Medicaid Program** ................................................................ **59**
    **Introduction to TRICARE** ............................................................................... **61**

**Introduction to the Federal False Claims Act** ......................................... **62**

**The Tennessee Medicaid False Claims Act** ............................................... **65**

**Certifying Compliance with the Federal _Stark_ Law and Anti-Kickback Statute Is A Condition of Payment under Federal Healthcare Programs and False Certifications Are Actionable under the Federal and State False Claims Acts** .......................................................................................... **66**

**Count I---Presenting False Claims in Violation of 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code § 71-5-82(a)(1)(A) Against All Defendants** ..................... **68**

**Count II--- Use of False Statements in Violation of 31 U.S.C. 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All Defendants** ................................................................................................... **69**

**Count III--- Conspiring to Submit False Claims in Violation of 31 U.S.C. § 3729(a)(1)(C) and Tenn. Code Ann. § 71-5-182(a)(1)(C) Against All Defendants** ................................................................................................... **71**

**Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All Defendants** .......................................................... **72**

**Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) and Tenn. Code Ann. § 71-5-182(a)(1)(D) Against All Defendants** .......................................................... **73**

**Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants** ................................................................................................... **74**

**Prayers for Relief** ........................................................................................ **75**

**Certificate of Service** ................................................................................. **77**

1.      Under the Federal False Claims Act, 31 U.S.C. § 3729 _et seq._, as amended ("FCA"), and the Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-182 _et seq._, Relator Jeffrey H. Liebman ("Liebman") states his Complaint against Defendants Methodist Le Bonheur Healthcare, Methodist Healthcare---Memphis Hospitals, UT Methodist Physicians, LLC, The West Clinic, West Cancer Center and John Does 1-100 filed under seal with the Court as follows.

4

2. This *qui tam* case is brought against the Defendants for knowingly defrauding the federal and state governments in connection with Medicare, Medicaid, TRICARE, and other government healthcare programs. As discussed in detail below, since at least 2012, Methodist Healthcare has engaged in a scheme to pay (1) kickbacks and excessive compensation to independent oncologists (the West Clinic) who generated significant referrals and profits to the hospital system, and (2) excessive compensation to certain employed physicians who generated significant referrals to the hospital system.

3. The Defendants' scheme has deliberately violated the Federal Anti-Kickback Statute and Federal *Stark* laws discussed below.

## Parties

4. Liebman is the President of Methodist University Hospital, the largest hospital in the Methodist Healthcare system. He held the position of Chief Executive Officer of Methodist University Hospital from February of 2014 through early May of 2017. The current Chief Executive Officer of the Methodist Healthcare system, Michael Ugwueke, recently directed that all hospital CEOs within the Methodist system would receive a new title of "President."

5. Through his work and experience, Liebman has direct, detailed, and personal knowledge that Methodist Healthcare, West Clinic, and West Cancer Center have violated the Federal Anti-Kickback Statute and Federal *Stark* Laws. Liebman also has direct, detailed, and personal knowledge that the Methodist Healthcare has violated Federal *Stark* laws in its excessive payments to many employed physicians based on the value of their referrals to the hospital system.

6.     Defendant Methodist Le Bonheur Healthcare is an integrated healthcare system based in Memphis, Tennessee, with locations and partners across the Mid-South.  The healthcare system includes:

- 6 adult hospitals
- 1 children's hospital
- 2 wound healing center
- 2 sleep centers
- 52 physician and specialty practices
- 7 minor med and urgent care clinics
- 5 surgery centers
- 7 diagnostic centers
- 7 cancer treatment sites
- 1 hospice and palliative care facility
- Transplant Institute
- Sickle Cell Center
- 7 work-site Clinics
- Home Health
- Home Medical Equipment

7.     Methodist Healthcare---Memphis Hospitals is a wholly owned subsidiary of Methodist Le Bonheur Healthcare.  According to the Methodist Healthcare website, Methodist University Hospital is the principal teaching hospital of the University of Tennessee Health Science Center ("UTHSC"). UTHSC has provided academic appointments and research infrastructure for some physicians employed by Methodist. Methodist Healthcare has publicly referred to UTHSC as its "academic partner." The relationship is not a legal partnership, but rather an affiliation among institutions.

8.     UTHSC is not a defendant to this action and the claims asserted in this action are not directed in any way against UTHSC. UTHSC has not employed or controlled Methodist executives or West Clinic physicians and is not liable for their conduct discussed below.

9.     UT Methodist Physicians, LLC is also a wholly owned subsidiary of Methodist

Le Bonheur Healthcare. UT Methodist Physicians, LLC is a "nonprofit" limited liability corporation organized under Section 501(c)(3) of the Internal Revenue Code of 1986. Methodist Healthcare owns and controls the operations of UT Methodist Physicians, including the employment and compensation terms offered and paid to employed physicians. Launched in September 2013, UT Methodist Physicians is an "academic physician practice group created to enhance primary care and hospital-based medical services in the Memphis area" according to Methodist Healthcare's website.

10.     In this Complaint, Methodist Le Bonheur Healthcare, Methodist Healthcare---Memphis Hospitals, and UT Methodist Physicians, LLC are collectively referred to as "Methodist Healthcare" or "Methodist."

11.     The West Clinic is a private practice group of medical oncologists, radiation oncologists, and other physician specialists based in Memphis, Tennessee.

12.     In 2012, Methodist entered into what it has publicly described as an "innovative partnership" with the West Clinic to create West Cancer Center. According to its website, West Cancer Center is "the region's comprehensive leader in adult cancer care and research, delivering comprehensive care to more than 30,000 patients each year."

13.     The identities of the remaining Doe defendants who knowingly submitted or caused the submission of false claims to the United States and/or State of Tennessee are presently unknown to Relator. All listed Defendants and such additional Doe defendants have served as contractors, agents, partners, and/or representatives of one and another in the submission of false claims to the United States and/or the State of Tennessee and were acting within the course, scope and authority of such contract, conspiracy, agency, partnership and/or representation for the conduct described below.

**Jurisdiction and Venue**

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

15.     Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) and Tenn. Code Ann. § 71-5-185, as Defendants can be found, reside, transact business, or otherwise engaged in the illegal conduct at issue within the District.

16.     This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

17.     Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Tenn. Code § 71-5-185 provides similar venue rules.

18.     Methodist Healthcare is the largest Medicaid provider in the State of Tennessee. The Tennessee Medicaid Program is based within this District in Nashville, Tennessee. As discussed below, Defendants have submitted thousands of false claims to the Tennessee Medicaid Program in Nashville and such claims have been processed and paid with federal and state funds administered by the Tennessee Medicaid Program. Venue is proper in this District where Defendants have submitted false claims in violation of the Federal Anti-Kickback Statute and Federal *Stark* Laws discussed below.

19.     Relator has filed this action within the 6-year statute of limitations under the Federal and State False Claims Acts. As discussed below, this action seeks recovery under the Federal False Claims Act and Tennessee Medicaid False Claims Act for violations of Federal *Stark* and Anti-Kickback Laws with respect to Defendants' claims for payments by State and Federal Healthcare Programs at least from 2012 through the present.

20.     Prior to filing this case, Liebman, through his counsel, delivered a draft copy of the Complaint and his written Disclosure of substantially all material evidence and information in his possession to the United States Attorney's Office for the Middle District of Tennessee, the United States Attorney General's Office, and the Tennessee Attorney General's Office.

### Methodist Has Paid Kickbacks and Excessive Compensation to West Clinic Physicians

### Introduction to the Lucrative Profits Under the 340B Drug Discount Program

21.     The Defendants' kickback scheme has been financed in part by profits from the 340B Drug Discount Program. Methodist's profits from the 340B Program totaled $74,295,639.00 in 2015 and $112,100,936.00 in 2016. In the past five years, Methodist's profits from the 340B Program have exceeded $350 million.

22.     The 340B Program requires drug manufacturers that participate in the Medicaid drug rebate program to extend discounts on drugs administered in the outpatient setting, including physician-administered infusion drugs such as those used to treat cancer. The typical discount ranges from 30% to 50% off the drug's list price.

23.     By way of brief background to the 340B Drug Discount Program, Section 340B of the Public Health Service Act instructs HHS to enter into a pharmaceutical pricing agreements (PPA) with certain drug manufacturers. If a drug manufacturer signs a PPA, it agrees that the prices charged for covered outpatient drugs to covered entities will not exceed ceiling prices as defined by statute. HRSA calculates the ceiling prices quarterly using pricing data reported by to the Centers for Medicare and Medicaid Services (CMS).

24.     As of January 1, 2015, there were 644 drug manufacturers participating in the 340B Program.

25.     "Section 340B(a)(4) of the PHSA (42 U.S.C. 256b(a)(4)) lists the entity types eligible to participate in the 340B Program and further requires that such entities must meet the requirements of section 340B(a)(5) of the PHSA." Federal Register, Vol. 80, No. 167, p. 52300, 52301 (August 28, 2015). "An entity participating in the 340B Program is referred to as a covered entity." *Id.* HHS lists all covered entity sites registered for the 340B Program on the public 340B database. *Id.*

26.     Section 340B(a)(4)(L) of the PHSA establishes the 340B Program eligibility requirements for hospitals defined in section 1886(d)(1)(B) of the Social Security Act (commonly referred to as "subsection (d) hospitals"). Section 340B(a)(4)(L)(i) specifies three categories of hospital eligibility. The first category of hospital eligibility requires hospital ownership or operation by a state or local government. HHS will list hospitals qualifying under this category if they are wholly-owned by a state or local government and recognized as such in Internal Revenue Service filings or other documentation from Federal entities. HHS will also list hospitals operated through an arrangement in which the state or local government is the sole operating authority of a hospital.

27.     The second category of hospital eligibility requires a hospital to be a public or private non-profit corporation that is formally granted governmental powers by a unit of state or local government.

28.     The third category of hospital eligibility includes a private non-profit hospital that has a contract with a state or local government to provide health care services to low-income individuals who are not eligible for Medicare or Medicaid.

29.     "In addition to the requirements of section 340B(a)(4)(L)(i) of the PHSA, certain hospitals are required to exceed a Medicare disproportionate share hospital adjustment percentage to be eligible for the 340B Program." 80 Fed. Reg. at 52301.

30.     "Off-site outpatient facilities and clinics (child sites) not located at the same physical address as the parent hospital covered entity will be listed on the public 340B database, and are able to purchase and use 340B drugs for eligible patients, if the hospital covered entity provides its most recently filed Medicare cost report demonstrating that: (1) each of the facilities or clinics is listed on a line of the cost report that is reimbursable under Medicare; and (2) the services provided at each of the facilities or clinics have associated outpatient Medicare costs and charges." Federal Register, Vol. 80, No. 167, p. 52302 (August 28, 2015).

31.     "When an eligible entity voluntarily decides to enroll and participate in the 340b Program, it accepts responsibility for ensuring compliance with all provisions of the 340B Program…" Federal Register, Vol. 80, No. 167, p. 52300 (August 28, 2015).

32.     This action does not seek remedies based on Defendants' violations of the 340B Program. Rather, these violations are background information to the focus of this case--- Defendants' excessive payments to referring physicians and extensive violations of

Federal *Stark* law and the Federal Anti-Kickback Statute discussed below.

### Since 2012, Methodist Has Paid Over $270 Million to West Clinic Physicians

33.     In 2012, Methodist implemented a business plan to increase revenues to the hospital system through expanding its market share of oncology services in the Memphis region.

34.     For multiple reasons, oncology has been and is a lucrative service line for Methodist. First, cancer is a disease of aging and the Medicare Program covers most cancer patients. Medicare is a reliable and prompt payer of medical bills.

35.     Second, many treatments for cancer patients have been particularly profitable for Methodist, including inpatient admissions with extensive ancillary services and outpatient visits for drug infusion therapy.

36.     Third, profits from cancer drugs have been lucrative for Methodist because of its participation in the Federal 340B Drug Discount Program that gives participating hospitals deep discounts on outpatient drugs.

37.     In 2011, Methodist sought to further capitalize on profits from the 340B Program and sought to expand its cancer services through a "partnership" or alliance with the leading group of oncologists in the Memphis region---the West Clinic.

38.     Methodist's financial strategists wanted the referral stream of cancer patients from West Clinic. This referral stream would lead to increased inpatient admissions, increased profits from infusion therapy drugs acquired at a discount and sold at retail rates, and increased profits from outpatient visits, imaging studies, and other ancillary services.

39.     In 2011, the managing oncologists of West Clinic and executive leaders of Methodist began discussing a business relationship or "alliance."

40.     The leaders of West Clinic were looking for a hospital "partner" to create an outpatient cancer center called West Cancer Center. West Clinic proposed to co-manage the cancer center with the hospital in exchange for a management fee paid by the hospital. West Clinic physicians also proposed that the hospital system would pay a premium rate of $120 per wRVU for all West Clinic physicians regardless of credentials, experience or collections. West Clinic negotiators also proposed that key personnel of the West Clinic would be appointed to leadership positions within Methodist.

41.     West Clinic physicians also wanted the "ability to capitalize on" the 340B Drug Discount Program by using Methodist's status as a "covered entity." West Clinic physicians wanted to be paid the lucrative profits from prescription oral cancer drugs to be acquired at deep discounts through Methodist. Under this financial strategy, Methodist would acquire oral cancer drugs at discounts through the 340B Program, West Clinic physicians would prescribe the oral medications, the prescriptions would be filled at a designated pharmacy controlled by Methodist, the retail drug prices would be far higher than acquisition costs through the 340B Program, and Methodist would channel the profits from drug sales to West Clinic physicians.

42.     In return, West Clinic physicians would agree to an arrangement of referring their patients to the West Cancer Center and Methodist as often as possible (unless West Clinic physicians were obligated to make referrals to other venues under prior managed care contracts).

43.     Such referrals would include cancer patients in need of infusion drugs to be administered at Methodist facilities. Infusion therapy involves the administration of medication through a needle or catheter. It is prescribed when a patient's condition is so

severe that it cannot be treated effectively by oral medications. Such infusion medications could also be acquired at deep discounts through the 340B Program and sold at high profits to the Medicare Program and commercial insurers.

44.    The leaders of West Clinic advised Methodist's leadership that they were also considering "partnerships" with Baptist Healthcare and Tenet. As the leading oncology practice in the region, West Clinic's negotiators sought to leverage the threat of entering into an exclusive alliance with a competitor of Methodist such as Tenet or Baptist Healthcare.

45.    On April 28, 2011 Methodist's executives met to discuss the overall terms of the arrangement with West Clinic. At this meeting, Methodist's executives discussed a personal services agreement under which Methodist would pay $120 per wRVU for all physicians of West Clinic regardless of experience, credentials or collections. There were 27 physicians at West Clinic at the time. Their collective annual wRVUs were approximately 259,000.

46.    At this meeting, Methodist executives estimated that under the proposed arrangement with West Clinic, hospital profits from the sale of cancer drugs acquired under the 340B Program would increase by $30 million per year. Of this $30 million, Methodist's executives discussed giving West Clinic doctors approximately $10 million per year or the profits from prescription drugs to be acquired at discounts by Methodist under the 340B Program and prescribed by West Clinic physicians.

47.    Methodist's executives also discussed hospital profits from increased referrals by West Clinic estimated at $10 million per year.

48.    Methodist's executives wanted to increase the hospital system's market share of

cancer patients and wanted to further capitalize on increasing profits under the 340B Program. At this meeting, Methodist's senior executives stated their view that West Clinic was a leading community-based oncology practice with the ability to shift significant market share to Methodist.

49.     In the months after this meeting Methodist's executives finalized the following agreements with West Clinic effective December 31, 2011: Professional Services Agreement ("PSA"), Co-Management Agreement, Leased Employee and Administrative Services Agreement, and Unwind Agreement that govern operation of the Cancer Center Sites as defined in the PSA.  The Agreements have an initial term of seven years ending on December 31, 2018.

50.     Methodist also entered into a 340B Contract Pharmacy Services Agreement with AnovoRX Group, LLC for the purpose of providing a pharmacy service dedicated to filling prescriptions and managing collections for oral cancer medications ordered by West Clinic physicians.

51.     At a Methodist Board meeting in December of 2011, Methodist executives projected that the deal with West Clinic would increase the hospital system's annual net revenues by approximately $200 million.

52.     Since 2012, Methodist has paid excessive amounts to West Clinic physicians as kickbacks to capture the revenue stream and profits from referrals by these physicians. These payments were far in excess of the fair market value of the physicians' personal services.

53.     In 2012, Methodist paid $54,861,765.00 to West Clinic. In that year, West Clinic

physicians' wRVUs[1] only represented approximately $34.6 million of this $54 million payment from Methodist.

54. In 2013, Methodist paid $51,962,569.00 to West Clinic. In that year, West Clinic physicians' wRVUs only represented approximately $36.7 million of this $52 million payment from Methodist. The additional payment amounts of $15 million represented profits of approximately $10-$11 million from prescription drugs written by West Clinic physicians and inflated "management" fees discussed below.

55. In 2014, Methodist paid $56,353,087.00 to West Clinic. In that year, West Clinic physicians' wRVUs only represented $38.4 million of this $56 million payment from Methodist. The additional payment amounts of approximately 18 million represented profits from prescription drugs written by West Clinic physicians and inflated "management" fees discussed below.

56. Payments at these levels continued in 2015, 2016, and 2017.

57. Since 2012, Methodist has paid over $270 million to West Clinic physicians.

58. Some of these overpayments were disguised as supposed "management fees." In 2012, Methodist paid $3.0 million to West Clinic physicians for "management fees." In 2013, Methodist paid $3.2 million to West Clinic physicians for management fees. The annual management fees increased to $4.4 million in 2014 and have continued to be paid by Methodist in 2015, 2016, and 2017.

59. From 2012-2017, Methodist paid West Clinic physicians approximately 20

---

[1] The most common measure of physician productivity is Work Relative Value Units (wRVUs). These units reflect the level of time, skill, training, and intensity required of a physician to provide a given service. These units are the leading method for calculating the volume of work or effort expended by a physician in treating patients. Under this relative scale, a physician seeing two or three complex or high acuity patients per day would accumulate more RVUs than a physician seeing lower acuity patients each day.

million dollars in supposed "management" fees for West Cancer Center. West Cancer Center is jointly managed with Methodist. West Clinic physicians are not handling management responsibilities without assistance from the hospital system. These "management fees" are excessive and far beyond any legitimate fair market valuation of management services.

60.     On May 23, 2014, Liebman met with Erich Mounce, Chief Executive Officer of West Clinic, at his request to discuss several issues. At this meeting, Mounce informed Liebman that eventually more cancer related services would be moved under his direction in order to "justify" the excessive management fees that West Clinic physicians were receiving from Methodist.

61.     On June 25, 2014, Liebman met with Dr. Ballo, Director of Radiation Oncology at West Cancer Center. Dr. Ballo stated that Methodist executives promised to move patients "out of downtown" to a new location for the convenience of West Clinic physicians. Dr. Ballo also stated that Methodist was funding construction of a new building for West Clinic physicians and that profits from the 340B Drug Discount Program were the economic "engine" for the relationship between West Clinic and Methodist.

62.     On August 7, 2014, Liebman again met with Erich Mounce, the Chief Executive Officer of West Cancer Center, to discuss space options on the campus for a new oncology building. Mounce made it clear that the costs of this project would not be assigned to the cancer program but to Methodist University Hospital to make sure that the financials of West Cancer Center would look as strong as possible. He also indicated that West Clinic would determine who could practice in the building even though the hospital

had an open medical staff. Liebman told him that the medical staff bylaws would not allow that.

63. Under the alliance with West Clinic, Methodist also agreed to pay $7 million to Vector Oncology (formerly known as Acorn), a research entity controlled by West Clinic physicians. West Clinic's managing physicians required this $7 million payment as a condition of entering into the "alliance" with Methodist.

64. As a result of the extraordinary payments from Methodist, the oncologists of West Clinic have each received annual salaries exceeding $1 million and the managing oncologists of West Clinic have been paid annual salaries of approximately $3 million. These income levels are far in excess of the national 90th percentile levels of compensation for medical and radiation oncologists in the United States.

65. Many physicians of West Clinic have enjoyed salaries at levels that are double, triple, or four times the national 90th percentile for radiation and medical oncologists in the United States. The national 90th percentile compensation for radiation oncologists was $746,507 in 2013, $754,356 in 2014, and $781,545 in 2015 according to MGMA Physician Compensation and Production Survey Data.[2] The national 90th percentile compensation for medical oncologists was $777,940 in 2013, $922,244 in 2014, and $762,970 in 2015 according to MGMA Physician Compensation and Production Survey Data.

---

[2] Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are leading benchmarking resources for physician compensation in the United States.

66.     At the start of the deal Methodist's executives estimated that increased profits from selling cancer drugs under the 340B Program would be approximately $20 million per year and increased profits from referrals by West Clinic physicians would be approximately $10 million per year. Methodist contemplated paying an additional $10 million per year to West Clinic physicians---this $10 million estimate represented projected profits from prescriptions for cancer drugs written by West Clinic physicians.

67.     The estimate of $10 million has proven accurate. In 2015 the profits from prescriptions filled by AnnovoRX totaled approximately $10,061,455.00 and Methodist transferred this entire amount to West Clinic physicians in addition to payments for supposed wRVUs and "management fees."

68.     In 2016 the profits from prescriptions filled by AnnovoRX totaled approximately $10,554,251.00 and Methodist transferred this entire amount to West Clinic physicians in addition to payments for supposed wRVUs and "management fees."

69.     If a hospital qualifies as a "covered entity" under the 340B Program and wishes to include its clinics or off-site outpatient facilities as eligible to participate in the 340B Program, the hospital must list each clinic or outpatient facility on a line of its cost report that is reimbursable under Medicare. Yet since 2012, Methodist has never listed West Clinic or West Cancer Center on its cost reports.

70.     Methodist's executives have listed numerous clinic and outpatient facilities as "child sites" in its eligibility documentation submitted to HHS. Based on such submissions, there is a public database of covered entities and their outpatient facilities called HRSA Office of Pharmacy Affairs 340B Database. The West Clinic and West Cancer Center are not in the database.

71.     Under the 340B Program, the eligibility to participate and purchase drugs at deep discounts belongs to the "covered entity." West Clinic physicians are not "covered entities" under the 340B Program and yet they have received enormous profits from Methodist's acquisition of outpatient oral cancer drugs at deep discounts.

72.     Year after year since 2012, Methodist has shared those profits from the 340B Drug Program with the physicians of West Clinic as kickbacks to capture the revenue stream from referrals of cancer patients by these physicians. This profiteering scheme was a deliberate violation of Federal *Stark* Laws and the Anti-Kickback Statute discussed below.  This scheme was also contrary to patient care because physicians were rewarded and incentivized to (1) increase referrals to the hospital system, and (2) to increase prescriptions for oral cancer drugs.

### Methodist Has Given West Clinic Physicians the Use of a $50 Million Office Complex for Free

73.     In December of 2013, Methodist Healthcare---Memphis Hospitals purchased the Germantown Multi-Specialty Center at 7945 Wolf River Boulevard in Memphis for approximately $22.5 million from UT Medical Group, Inc. The building when purchased was approximately 116,865 square feet of space located on 9.6 acres of land.  In the following year, Methodist spent approximately $30 million dollars to renovate the building.

74.     In 2015, West Clinic physicians moved their office operations to this location. Since that time, West Clinic physicians have enjoyed free office space compliments of Methodist.

75.     42 C.F.R. §411.357(a)(3) and (4) require that "the space rented or leased does not exceed that which is reasonable and necessary for the legitimate business purpose of the lease arrangement" and the "rental charges" must be "consistent with fair market value." 42 C.F.R. §411.357(a)(6) requires that the "lease arrangement would be commercially reasonable even if no referrals were made between the lessee and the lessor."

76.     A hospital system spending $50 million on office property and then letting non-employed physicians use that property for free is not commercially reasonable or consistent with fair market values.

**The West Cancer Center Steering Committee Meetings in 2015**

77.     In early 2015, Methodist's executives who engineered the deal with the West Clinic became more anxious about the risks of losing the $50 million investment into the new West Clinic office space and the risks of losing revenues from referrals by West Clinic physicians if they chose to opt out of the alliance as allowed by their existing agreements with 6-month notice.  Methodist's strategists sought to reach a longer term "deal" with West Clinic and they formed a "Steering Committee" composed of executives at Methodist, West Clinic, West Cancer Center, and University of Tennessee Health Science Center ("UTHSC").

78.     On January 8, 2015, at Michael Ugwueke's (Methodist COO) request, Liebman arranged a conference call with The Chartis Group ("Chartis"), a health care consulting firm. The purpose of the conference call was to discuss that firm assisting in developing a mutually agreeable business plan for Methodist and West Clinic to continue their "deal" longer into the future.  The conference call was at 10:00 am Central Time on January 8, 2015.

79.     On February 3, 2015, Liebman attended a meeting with Ugwueke (Methodist COO), David Stern, the Executive Dean and Vice-Chancellor for Clinical Affairs for the University of Tennessee's Health Sciences Center ("UTHSC"), attorney Chris Jedrey who was making a pitch to represent UT, Chris Regan and Pamela Damsky from Chartis, and Eric Mounce, CEO of West Cancer Center, to discuss forming a steering committee to extend the "alliance" between Methodist and West Clinic physicians.

80.     At that meeting, Mounce stated that West Clinic physicians had some "non-negotiable" requirements, including  (1) keeping their income levels at or above the 90th percentile, and (2) protecting their income levels in the event of any change in the 340B Drug Discount Program which Methodist was using to channel profits from cancer drug sales to the prescribing West Clinic physicians.

81.     Mounce subsequently insisted on using a different consulting firm---PricewaterhouseCoopers (PwC).  That firm was hired to conduct interviews and develop a business plan mutually agreeable for the parties to extend the duration of the "alliance."

82.     After this meeting, Ugwueke told Dr. Stern that he could he not bring legal counsel on behalf of UTHSC to the Steering Committee meetings.

83.     Throughout the history of their relationship, UTHSC did not control or participate in Methodist's senior management decisions to pay kickbacks to West Clinic physicians or pay excessive compensation to employed physicians. UTHSC has never managed, operated or controlled Methodist, West Cancer Center or West Clinic physicians.

84.     The West Cancer Center---Strategy and Partnership Model Steering Committee ("Steering Committee) met several times in the summer of 2015. Liebman attended several of these meetings.

85.     At a meeting in July 2015, Liebman questioned Methodist's payments of 340B drug profits to West Clinic physicians. West Clinic physicians at that meeting insisted that if the 340B payments were reduced, they wanted the option to leave the "partnership." Liebman told them that "we were dealing with a wobbly three legged stool" and the parties needed a deeper commitment to compliance.

86.     At the Steering Committee meeting on August 20, 2015, several members of West Clinic insisted that any new business arrangement had to guarantee physician salaries at the 90th percentile or above no matter what happened to future revenues, profits and losses for the hospital system or 340B drug profits. Liebman questioned the legality of such an arrangement and openly expressed his concerns in that meeting.

87.     Liebman became the Chief Executive Officer of Methodist University Hospital in February of 2014. Prior to this time, Liebman had no association with Methodist.

88.     As he learned of Methodist's excessive payments and kickback arrangement with West Clinic physicians, Liebman questioned and objected to the legality of the scheme in meetings with other Methodist executives.

89.     Due to his objections, in the fall of 2015, senior executives at Methodist excluded Liebman from meetings regarding West Clinic or West Cancer Center.

**The Terms of the Past, Ongoing, and Future Financial Windfall Required by West Clinic Physicians**

90.     Over the last 18 months, Methodist and West Clinic have negotiated a longer "alliance" and the new agreements are in the process of being finalized and signed. The terms of the new deal continue with the same core terms that have given a financial windfall to West Clinic physicians since 2012.

Case 3:17-cv-00902   Document 1   Filed 05/30/17   Page 23 of 77 PageID #: 23

91.     In the summer of 2016, Eric Mounce, CEO of West Cancer Center, circulated a memo called "Deal Points" to Methodist executives and Dr. David Stern, Executive Dean at UTHSC.

92.     The "Deal Points" contemplated a new professional corporation to replace the current structure of West Cancer Center. The financial terms of payments to West Clinic physicians remained essentially the same as in the parties' agreements starting in 2012.

93.     First, West Clinic physicians required a "5 year strategic plan and business plan, and associated capital and operating budget commitments, for WCC. The "Deal Points" stated, "As part of such strategic and business plans, MLH will commit to re-invest a mutually agreed portion of MLH's oncology service contribution margin back into its oncology service line."

94.     This deal term reflected an ongoing agreement for Methodist to reward West Clinic physicians with a "mutually agreed portion" of the hospital system's revenues from referrals or "oncology service contribution margin" generated by West Clinic physicians. Since 2012, Methodist has given West Clinic physicians the enormous profits from oral cancer drugs prescribed by West Clinic physicians and acquired at discounts by Methodist under the 340B Program.  Such payments have been a central focus of West Clinic physicians' requirements to enter the agreements with Methodist.

95.     The "Deal Points" also included an agreement for Methodist to continue paying fees to West Clinic physicians under the Co-Management Agreement.

96.     The "Deal Points" also guaranteed income to West Clinic physicians at a level "at or above the 90th percent" compensation per wRVU. "The specialty-specific wRVU rate, and the CMA fees will be periodically re-appraised in accordance with the revaluation

schedule in the Current Agreements." The Deal Points further stated, "If the revaluation identifies a fair market value range for the specialty-specific wRVU rate, MLH and the PC agree to select the value that is at or above the 90th percent of that fair market value range." This "deal point" guaranteed that West Clinic physicians would be paid at a level of compensation per wRVU at or above the national 90th percentile.

97.    West Clinic physicians also required the option to "unwind" and walk out of the deal with Methodist if their income decreased "10% or more in any given year over life of Master Transaction Agreement."

98.    This "unwind" option in effect forced Methodist to ensure that the physicians' income will not decrease by more than 10% in any given year. Methodist invested over $50 million in the office complex for West Cancer Center and the hospital system has received enormous profits from referrals by West Clinic physicians each year. With the high financial stakes, Methodist agreed to give West Clinic physicians the right to "unwind" from the deal only if their income declined by more than 10% in any given year.

99.    West Clinic physicians and executives have had two major concerns: (1) exposure of the scheme in which Methodist has paid them over $50 million each year, and (2) actions by federal agencies or Congress to curb abuses or modify eligibility under the 340B Drug Discount Program.

100.    The parties have created a firewall of secrecy with respect to the payments from Methodist to West Clinic and have created a limited inner circle of individuals with knowledge of the financial terms.  When Liebman questioned the legality of payments to West Clinic physicians, senior executives at Methodist removed him from the inner circle

of communications regarding West Clinic and West Cancer Center.

101. West Clinic physicians and executives have repeatedly told Methodist's executives that the physicians will opt out of or "unwind" the deal if Methodist stops paying them profits derived from the physicians' prescriptions for oral cancer drugs. Methodist responded to the physicians' fears about losing the profits under the 340B Program by agreeing that they could "unwind" the deal if their income decreased by more than 10 percent in any given year.

102. Due to West Clinic's leverage as the source of lucrative referrals to the hospital system, Methodist in effect guaranteed the physicians' income would not decrease.

103. Throughout the course of their "alliance," Methodist and West Clinic physicians have achieved massive financial gains at the expense of compliance with federal laws. Methodist's primary objective was to achieve greater market share of cancer patients in the region and the attendant profits from cancer infusion drugs, hospital admissions, outpatient visits, and ancillary services. West Clinic physicians' primary objective was massive income guarantees through receipt of 340B drug discount profits based on the volume and value of their referrals for oral cancer drugs, inflated compensation per wRVU, and inflated management fees. The deal has been a guaranteed financial windfall to West Clinic physicians without any financial risks except the risk of exposure for violating federal laws.

104. The parties have achieved their objectives over the last five years and have sought to conceal the truth about their financial arrangement through a series of tactics to ensure secrecy and "confidentiality."

105. In orchestrating the kickbacks, Methodist's objectives included the referral of

thousands of cancer patients insured by the Medicare Program.

106. The Defendants' scheme was and is illegal and harmful to patient care. Such physicians knew that Methodist was paying them at high levels not based on personal productivity, but rather based on their ability to generate revenues and profits for themselves and the hospital system through drug prescriptions, drug sales, inpatient admissions, outpatient visits, and ancillary services.

## Methodist Has Also Committed Over $55 Million in "Mission Support Funds" for West Cancer Center

107. In addition to the massive direct payments to West Clinic physicians, Methodist has also committed approximately $58.8 million in "cancer mission support funds" for West Cancer Center during the term of the parties' original agreements---2012-2018.

## Methodist's Excessive Payments to West Clinic Physicians Have Induced Increased Referrals to the Hospital System

108. Since the beginning of the "alliance" between West Clinic and Methodist, increased referrals from West Clinic physicians to Methodist have led to massive profits for the hospital system.

109. The effect of the "alliance" is seen in the volume and value of referrals over the course of the contracts between West Clinic physicians and Methodist.

110. Between 2012 and the 2014, inpatient oncology volume at Methodist more than doubled as hospital discharges for oncology admissions moved from 7,320 discharges in 2012 to 15,834 discharges in 2014. Outpatient oncology volume at Methodist moved from 27,890 visits in 2012 to 31,253 visits in 2014. Between 2012 and 2014, the oncology payor mix at Methodist remained similar with 43 percent of oncology inpatient

cases covered by the Medicare Program and 13 percent of oncology inpatient cases covered by the Medicaid Program.

111.   For many years Methodist has maintained an accounting system to track and monitor the volume and value of referrals from all physicians to all hospitals and all service lines or departments of the hospital system. For example, in 2011, Methodist maintained "balanced scorecard" records that tracked monthly referrals for radiation therapy to University Hospital. In 2011, the year before the  "innovative partnership," West Clinic physicians referred 345 patients to University Hospital for radiation therapy.

112.   In 2012, West Clinic physicians referred 441 patients to University Hospital for radiation therapy.

113.   In 2014, West Clinic physicians referred 535 patients to University Hospital for radiation therapy. And in 2015, referrals from West Clinic physicians to University Hospital for radiation therapy increased to 646.

114.   In addition to radiation therapy, West Clinic's referrals to Methodist have included thousands of patients for infusion cancer therapy. Methodist has received enormous profits from such referrals because Methodist has acquired infusion therapy medications at deep discounts under the 340B Program and then sold the drugs at retail rates.

115.   For example, in 2015, referrals from West Clinic physicians to Methodist generated profits to the hospital system of approximately $30,602,566.00 under the 340B Drug Program. In 2015 referrals from West Clinic physicians to Methodist also generated millions of dollars in hospital revenues for inpatient admissions, outpatient procedures, and ancillary services for cancer treatment.

116.  In 2016, referrals from West Clinic physicians to Methodist generated profits to the hospital system of approximately $53,187,639.00 under the 340B Drug Program. In that year, referrals from West Clinic physicians to Methodist also generated millions of dollars in hospital revenues for inpatient admissions, outpatient procedures, and ancillary services for cancer treatment.

## Methodist Has Excessively Paid Many Employed Physicians Based on the Value of Their Referrals

### Introduction

117.  Methodist's financial strategies to boost hospital revenues were not limited to the arrangement with the West Clinic.  Methodist's scheme has included paying excessive compensation to numerous employed physicians who make significant referrals to the hospital system. Methodist has excessively rewarded and paid employed specialists who are more profitable in producing ancillary hospital revenues.

118.  Revenues from perioperative services or ancillary revenues related to surgical procedures and admissions account for a major portion of annual profits at Methodist. Methodist's strategy includes multiple physician specialties discussed below, especially surgeons or specialists in position to order inpatient admissions or outpatient procedures, tests, services, studies, and surgeries.

119.  In determining compensation to such physicians, Methodist has paid such physicians not based on the value of their personal services. Rather Methodist has paid such physicians based in part on the historical and projected value of referrals from each physician to the hospital system. Based on revenues from referrals, Methodist's financial strategists have agreed to pay such specialists excessive compensation.

120. Senior executives have profited from this scheme to boost revenues because they are paid bonuses based in part on the financial performance of the hospital system.

121. This scheme has been a lucrative strategy of mutual enrichment for Methodist's senior executives and these employed specialists, and a deliberate violation of Federal *Stark* laws.

122. With respect to most of these physicians, Methodist has agreed to pay them (1) a fixed salary not based on any measure of calculating each physician's personal productivity or (2) compensation based on an inflated dollar amount per wRVU discussed below.

123. Most of these physicians did not work full-time schedules and their personal production was low.

124. The most common measure of physician productivity is Work Relative Value Units (wRVUs). These units reflect the level of time, skill, training, and intensity required of a physician to provide a given service. These units are the leading method for calculating the volume of work or effort expended by a physician in treating patients. Under this relative scale, a physician seeing two or three complex or high acuity patients per day would accumulate more RVUs than a physician seeing lower acuity patients each day.

125. In the United States the leading model of physician compensation is based on personal wRVU production. Such compensation formula is the most common way for hospitals to pay employed physicians in the United States.

126.  Yet for many specialists with high referrals, Methodist has not based physician compensation on wRVUs. Rather, Methodist has given them high compensation with no minimum requirements for wRVUs or any other measure of personal productivity.  For other specialists with high referrals, Methodist has paid them at inflated rates per wRVU. Examples of Methodist's excessive payments are provided below.

### Excessive Compensation of Employed Physicians Has Generated Financial Losses in Excess of $100 Million Over the Last 5 Years

127.  The employed physician group, UT Methodist Physicians ("UTMP"), has generated significant losses for Methodist due to excessive physician compensation. Launched in September 2013, UTMP is an "academic physician practice group created to enhance primary care and hospital-based medical services in the Memphis area" according to Methodist's website.

128.  For 2016, the employed physicians of UTMP generated collections of approximately $23,289,675. (These financial figures were projected for 2016 as of October 2016). Yet the total operating expenses of the physician practices were approximately $46,684,667, including physician salaries of approximately $29,165,108. In 2016, the employed physician practices operated at a financial loss of approximately $24,413,859.

129.  The net revenue per wRVU for the employed physicians of UTMP was approximately $53.36 in 2016. Yet Methodist's cost per wRVU were approximately $109.91.

130.   In the past five years, the employed physicians at Methodist have generated financial losses in excess of $100 million if revenues from referrals are not considered.

131.   A major hospital system with physician costs approximately double the net revenues from physician services cannot survive financially unless there is another major source of revenue in the calculation. For Methodist, that major source of revenue has been referrals from employed physicians to the hospital system.

**Methodist Has Tracked and Monitored the Value and Volume of Referrals from All Physicians**

132.   Methodist has established and implemented an accounting system of tracking the value and volume of referrals from every physician and physician group.  Methodist's executives have generated regular reports that tracked the volume and value of referrals each month from every employed physician or physician group. These reports are called "balanced scorecards" in Methodist's accounting system.

133.   At each hospital and at each department within the Methodist system, accounting reports have regularly tracked the volume of referrals each month from all physicians. For example, in 2015, Methodist tracked referrals for radiation therapy to Methodist University Hospital. West Clinic physicians led all sources of referrals for radiation therapy with 656 referrals to University Hospital in 2015. In 2016, West Clinic physicians again led all sources of referrals to University Hospital for radiation therapy with 546 referrals to University Hospital.

134.   Month after month and year after year, Methodist has tracked the volume and value of referrals from all physicians. Methodist's executives have used such referral data to determine and justify payments to physicians.

**Methodist Has Budgeted for Major Losses from Physician Practices**

135.   Financial losses related to the physician practices were not unexpected or unforeseen by Methodist's executives. For 2017, Methodist budgeted financial losses of $24,289,782.00 related to employed physician practices.

136.   Year after year, Methodist's senior strategists have budgeted for major losses from physician practices because their focus was revenues from referrals by these physicians.

137.   Most of the budgeted losses stem from physicians that Methodist has designated as the "Specialty Physician Group." This Group has included cardiology and various surgical specialties.

138.   For example, in 2016, Methodist budgeted losses of $18,693,000.00 related to the Specialty Physician Group. Actual losses were even higher---$21,489,000.00.

139.   For surgical oncologists in 2016, financial losses were approximately $2,915,047 and budgeted losses for 2017 are $3,012,851.

140.   For transplant surgeons, financial losses were approximately $3,982,365.00 in 2016. Net patient revenue from services of employed transport surgeons totaled $4,795,952, yet Methodist paid its transplant surgeons approximately $6,905,388.00. For 2017, Methodist has budgeted losses of $3,985,650.00 related to the transplant surgeons.

141.   For general surgeons in 2016, financial losses were approximately $1,347,124.00. Net patient revenues from the general surgeons' services were approximately $934,177.00 in 2016. Yet Methodist paid them $1,529,476.00. Methodist has budgeted

33

losses of $1,499,775 for the general surgeons in 2017 with physician salaries rising to $1,871,964 and anticipated net patient revenue of $1,282,568.00.

142. For gastroenterologists in 2016, financial losses were approximately $1,419,812.00. The net patient revenues from physician services were approximately $1,051,525.00 in 2016. Yet Methodist paid the gastroenterologists $1,314,965.00. Methodist has budgeted losses of $1,418,348.00 for the gastroenterologists in 2017.

143. Methodist has also budgeted for major financial losses related to its employment of hospitalists who are in the clinical position to order tests, studies, and ancillary services that generate revenues for the hospital system.

144. At University Hospital, Methodist budgeted losses of $2,221,819.00 in 2017 for its employed hospitalists. In 2017 budgeted patient revenues for the hospitalists' services are $1,781,229.00, while the hospitalists' salaries are budgeted at $3,170,666.00 for University Hospital. In 2016, net patient revenues for the hospitalists' services at University Hospital were approximately $1,789,064, while the hospitalists' salaries were approximately $3,077,777.00.

145. At North Hospital in 2017, Methodist budgeted losses of $1,400,921.00 for its employed hospitalists. Budgeted patient revenues for the hospitalists' services are $1,319,116.00, while the hospitalists' salaries are budgeted at $2,296,236.00 in 2017. In 2016, net patient revenues for the hospitalists' services at North Hospital were $1,324,981.00, while the hospitalists' salaries were more than double net revenues at approximately $2,871,947.00.

146.  At Olive Branch Hospital, Methodist budgeted losses of $1,003,694 in 2017 for its employed hospitalists. Budgeted patient revenues for the hospitalists' services are $644,721.00, while the hospitalists' salaries are budgeted at $1,373,699.00 in 2017. In 2016, net patient revenues for the hospitalists' services at North Hospital were approximately $647,455.00, while the hospitalists' salaries were nearly double net revenues at approximately $1,254,786.00.

### In 2016, Methodist Paid 43 Employed Physicians Compensation Per wRVU in Excess of National 90th Percentiles

147.  In 2016 Methodist through its wholly owned subsidiary, UT Methodist Physicians, LLC, paid 43 physicians compensation per wRVU in excess of the most recent national 90th percentile benchmarks published by MGMA.  All of these physicians are clinical decision makers in a position to generate revenues for the hospital system from inpatient surgeries, outpatient procedures, laboratory tests, imaging studies, or other ancillary services.  This pattern of excessive compensation to multiple physicians reflects Methodist's prevalent strategy to pay physicians not simply based on their personal services, but rather based in part on their ability to generate revenues for the hospital system.

### Methodist Has Excessively Paid Transplant Surgeons

148.  For example, in 2016, Methodist paid $1,699,520.00 to Dr. Eason, a transplant surgeon. Dr. Eason was paid over double the national 90th percentile for transplant surgeons in the United States as tracked by MGMA ($801,946). Yet his wRVUs or personal productivity were just above the national 25th percentile. Methodist paid Dr.

Eason at a level of $388.09 per wRVU---2.7 times the most recent national 90th percentile compensation per wRVU for transplant surgeons ($144.33).

149.   In 2016, Methodist paid $136,399.56 to Dr. Agbin who worked only 300.02 wRVUs. Methodist paid Dr. Agbin at a level of $454.63 per wRVU---3.15 times the most recent national 90th percentile compensation per wRVU for transplant surgeons ($144.33).

150.   In 2016, Methodist paid $283,854.00 to Dr. Maliakkal who worked only 569.54 wRVUs. Methodist paid Dr. Maliakkal at a level of $498.39 per wRVU---3.45 times the most recent national 90th percentile compensation per wRVU for transplant surgeons ($144.33).

151.   In 2016, Methodist paid $320,004.80 to Dr. Puri who worked 1,209.96 wRVUs. Methodist paid Dr. Puri at a level of $264.48 per wRVU---nearly double the most recent national 90th percentile compensation per wRVU for transplant surgeons ($144.33).

**Methodist Has Excessively Paid Oncology Surgeons**

152.   In 2016, Methodist paid $77,690.00 to Dr. Daugherty who worked only 420.43 wRVUs. Methodist paid Dr. Daugherty at a level of $184.79 per wRVU---2.1 times the most recent national 90th percentile compensation per wRVU for oncology surgeons ($87.93).

153.   In 2016, Methodist paid $77,998.32 to Dr. Glazer who worked only 781.39 wRVUs. Methodist paid Dr. Glazer at a level of $99.82 per wRVU as compared to the national 90th percentile of $87.93.

154. In 2016, Methodist paid $453,469.60 to Dr. Shibata who worked 2,368.18 wRVUs. Methodist paid Dr. Shibata at a level of $191.48 per wRVU---2.18 times the national 90th percentile compensation per wRVU for oncology surgeons ($87.93).

155. In 2016 Methodist paid $815,374.00 to Dr. Khaled, a medical oncologist who specializes in bone and marrow transplant procedures. His wRVUs were 4,994.35---just over the national median. Yet his cash compensation of $815,374.00 exceeded the national 90th percentile ($762,970.00). He was paid at the level of $163.26 per wRVU as compared to the national 90th percentile of $137.34 per wRVU for medical oncologists.

156. On July 24, 2014, Liebman attended a dinner meeting to help recruit Dr. Khaled from Orlando. After the meeting, Donna Abney, Executive Vice-President of Methodist, and Michael Ugwueke, the Chief Operating Officer at the time, informed Liebman that Dr. Khaled would be paid in excess of fair market value and because his practice would lose money, the losses would be kept out of the financial statements for West Cancer Center and instead his salary and losses would be allocated to the employed medical group for Methodist University Hospital. Liebman objected that this did not make sense and requested to see Dr. Khaled's final employment contract before it was signed. Liebman's objection and request were ignored.

157. In the Physician Employment Agreement with Dr. Khaled effective May 1, 2015, there is no requirement for Dr. Khaled's productivity. There is no contract provision requiring Dr. Khaled to work any set hours or days or produce any level of wRVUs. The Physician Employment Agreement simply states, "Physician agrees to devote substantial time and energy from and after the Effective Date to the delivery of patient care

services…" (Physician Employment Agreement, Par. 1, p. 1). Yet his cash compensation was set at $800,000 in year one of his contract and $850,000 in years two and three.

158. Gary Shorb, the former Chief Executive Officer of Methodist, authorized and directed the excessive payments to Dr. Khaled because of the hospital system's lucrative revenues from expanding the oncology service line with bone marrow transplant procedures.

**Methodist Has Excessively Paid Employed Cardiologists**

159. In 2016, Methodist paid Dr. Levine, a cardiac electrophysiologist, $484,626.24 for only 1,184.82 of wRVUs. His wRVUs were far below the national 10th percentile of wRVUs (6,357). He was a paid at a level of $409.03 per wRVU as compared to the national 90th percentile compensation of $94.85 per wRVU.

160. In 2016, Methodist paid Dr. Himmelstein, a noninvasive cardiologist, $109,617.60 for only 578.49 wRVUs. Methodist paid him at the level of $189.49 per wRVU as compared to the national 90th percentile of $109.08 per wRVU.

161. In 2016, Methodist paid Dr. Reed, a noninvasive cardiologist, $75,004.80 for only 443.26 wRVUs. Methodist paid him at the level of $169.21 per wRVU as compared to the national 90th percentile of $109.08 per wRVU.

162. In 2016, Methodist paid Dr. Sidhu, a noninvasive cardiologist, $143,558.80 for only 196.90 wRVUs. Methodist paid him at the level of $729.09 per wRVU as compared to the national 90th percentile of $109.08 per wRVU.

163. In 2016, Methodist paid Dr. Yedlapati, a noninvasive cardiologist, $126,497.60 for only 552.55 wRVUs. Methodist paid him at the level of $228.93 per wRVU as compared to the national 90th percentile of $109.08 per wRVU.

**Methodist Has Excessively Paid Employed Hospitalists and Internists**

164. In 2016 Methodist paid $219,781.88 to Dr. Brown, an internist, for only 41.75 of wRVUs. Dr. Brown was paid on the level of $5,268.02 per wRVU. In 2016 the national 90th percentile compensation per wRVU for internists was $94.86.

165. In 2016 Methodist paid $103,074.00 to Dr. Johnson, an internist, for only 717.05 wRVUs. Dr. Johnson was paid on the level of $143.75 per wRVU as compared to the national 90th percentile compensation per wRVU of $94.86.

166. In 2016 Methodist paid $205,271.52 to Dr. Edwards, an internist, for only 1,648.83 wRVUs. Dr. Edwards was paid on the level of $124.50 per wRVU as compared to the national 90th percentile compensation per wRVU of $94.86.

167. In 2016 Methodist paid $347,678 to Dr. Mancell, a hospitalist. His wRVUs were only 1,577.73---less than the national 10th percentile. His compensation per wRVU was $220.37 as compared to the national 90th percentile of $123.83.

168. In 2016 Methodist paid $237,684.00 to Dr. Okafor, a hospitalist. Her wRVUs were only 1,590.28---less than the national 10th percentile. Her compensation per wRVU was $149.46 as compared to the national 90th percentile of $123.83.

**Summary of Excessive Compensation to Employed Physicians**

169. For these 43 physicians, if Methodist had paid them at the 90th percentile level for compensation per wRVU, then they would have collectively been paid $4,566.93 per wRVU. Instead, Methodist collectively paid these 43 physicians at levels that total $19,382.62 per wRVU.

170. A hospital employing and paying a physician who makes referrals to that hospital of Medicare and Medicaid patients must satisfy the statutory exception for "bona fide employment relationships." Under the *Stark* Statute, a "bona fide employment relationship" must satisfy the following four relevant requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

171. Methodist has repeatedly violated these requirements of federal law.

**Methodist Healthcare, West Clinic, and West Cancer Center Have Violated the Federal Anti-Kickback Statute**

172. The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that kickbacks to those who can influence health care decisions corrupt medical decision-making and result in goods and services being provided that are medically unnecessary, too costly, of poor quality or even harmful to a vulnerable patient population.

Case 3:17-cv-00902   Document 1   Filed 05/30/17   Page 40 of 77 PageID #: 40

173.   To protect the integrity of federal health care programs, Congress enacted a *per se* prohibition against kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

174.   The Anti-Kickback Statute was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful…and which contribute appreciably to the cost of the Medicare and Medicaid Programs." *See* H.R. Rep. No. 92-231, 92nd Cong., 1st Sess. 108 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5093.

175.   First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

176.   In 1977, Congress amended the Anti-Kickback Statute to prohibit paying or receiving "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail. *See* Social Security Amendment of 1972, Pub. L. No. 92-603, 241 (b) and (c); 42 U.S.C. § 1320a-7b.

177.   The Anti-Kickback Statute prohibits any person or entity from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b).

41

178.   The Anti-Kickback Statute has two separate liability provisions, the violation of *either* of which subjects a person to liability. *See* 42 U.S.C. § 1320a-7b(b)(1)(A) (prohibiting the solicitation and receipt of remuneration in exchange for referrals; 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration to induce referrals).

179.   The Anti-Kickback Statute is violated if a party or entity offers remuneration to induce referrals even if the intended target is not actually induced. *See* 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration for the purpose of inducing referrals).

180.   The OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), define "remuneration" as "anything of value in any form whatsoever." The Department of Health and Human Services Office of the Inspector General (HHS-OIG) has repeatedly confirmed "remuneration" means "anything of value." *See, e.g*., Safe Harbor Provisions Under the Anti-Kickback Statute, 64 Fed. Reg. 63518 (1999), and HHS OIG Fact Sheet: Federal Anti-kickback Law and Regulatory Safe Harbors (Nov. 18, 1999).[3]

181.   Under federal law, if any one purpose of remuneration is to induce or reward referrals, the Anti-Kickback Statute is violated.

182.   Effective March 23, 2010, the Patient Protection and Affordable Care Act changed the language of the Anti-Kickback Statute to provide that claims submitted in violation of the statute automatically constitute false claims for purposes of the False Claims Act. The new language provides that "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes

---

[3]   http://www.oig.hhs.gov/fraud/docs/safeharborregulations/safefs.htm

of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

183.   Congress also added a new section that eliminates the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. *See* 42 U.S.C. § 1320a-7b(h).

184.   Federal courts have held that because Anti-Kickback Statute violations render the providers ineligible for compensation, they are not entitled to any reimbursement, even for non-fraudulent services performed.


**Methodist Healthcare, West Clinic, and West Cancer Center Have Violated Federal *Stark* Laws**

185.   The Federal *Stark* Law "was enacted to address over-utilization, anti-competitive behavior, and other abuses of health care services that occur when physicians have financial relationships with certain ancillary service entities to which they refer Medicare or Medicaid patients." 69 Federal Register 16124 (March 26, 2004).

186.   "The approach taken by the Congress in enacting section 1877 of the Act is preventive because it essentially prohibits many financial arrangements between physicians and entities providing DHS." 66 Federal Register 859. "Specifically, Section 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States of FFP under the Medicaid program) for certain DHS when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several relatively specific exceptions." *Id.*

187.   Congress enacted the *Stark* Statute in two parts, commonly known as *Stark I* and

43

*Stark II.* Enacted in 1989, *Stark I* applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

188. In 1993, Congress extended the *Stark* Statute (*Stark II*) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. As of January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

189. The *Stark* Law broadly defines prohibited "financial relationships" to include "compensation arrangements" in which any "remuneration" is paid by a hospital to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn (a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c).

190. The *Stark* Law broadly defines a prohibited "compensation arrangement":

> (A) The term "compensation arrangement" means any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and any entity other than an arrangement involving only remuneration described in subparagraph (C).
> (B) The term "remuneration" includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind.

42 U.S.C. § 1395nn(h)(1).

191. The definition of "financial relationship" includes any type of financial relationship in which physicians receive any remuneration or any kind from a hospital, directly or indirectly, overtly or covertly.

192. The *Stark* Law provides that if a physician has a financial relationship with a hospital or entity, then:

> (A) The physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

42 U.S.C. § 1395nn (a)(1).

193. In addition to prohibiting the hospital from submitting claims under these circumstances, the *Stark* Law also prohibits payments by Federal Healthcare Programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1). [4] If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

---

[4] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

## The *Stark* Statute's Broad Definition of "Referral"

194.    The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A).

195.    The accompanying regulations applying the *Stark* Statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

196.    As discussed above, the *Stark* Statute broadly defines prohibited "financial relationships" to include any "compensation" paid directly or indirectly to a referring physician. The *Stark* Statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. To avoid the referral and billing prohibitions in the *Stark* Statute, a hospital's financial relationship with a physician must satisfy one of the exceptions.

197.    Once the plaintiff or the government has established proof of each element of a violation under the Act, the burden shifts to the defendant to establish that the conduct was protected by an exception. If no exception applies to a *Stark* violation, then all referrals from the referring employed physician to the DHS entity are subject to

46

prohibition.

## Physician Compensation Must be "Consistent with the Fair Market Value of the Services" Personally Performed by the Physician

198.   As mentioned above, Methodist's executives entered into the following agreements with West Clinic effective December 31, 2011: Professional Services Agreement ("PSA"), Co-Management Agreement, Leased Employee and Administrative Services Agreement, and Unwind Agreement that govern operation of the Cancer Center Sites as defined in the PSA.  The Agreements have an initial term of seven years ending on December 31, 2018.

199.   Federal *Stark* laws establish the requirements for an entity paying remuneration to a physician through a "personal service arrangement." Among those requirements, the compensation to be paid the physician over the term of the arrangement "is set in advance," "does not exceed fair market value," and "is not determined in a manner that takes into account the volume and value of any referrals or other business generated between the parties." *See* 42 U.S.C.S. §1395nn(e)(3)(A)(v); 42 C.F.R. §411.357 (d)(1)(v).

200.   In pertinent part, the statutory language focuses on "the fair market value of the services" personally performed by the physician.  42 U.S.C.S. § 1395nn (e)(2).

201.   "[S]ection 1877 of the Act contemplates that physicians---whether group practice members, independent contractors or employees---**can be paid in a manner that directly correlates to their own personal labor…**" 66 Federal Register 876 (emphasis added). "[T]he amount of compensation for personal productivity is limited to fair market value for the services they personally perform." *Id.*  **"In other words, 'productivity,' as**

used in the statute, refers to the quantity and intensity of a physician's own work,
but does not include the physician's fruitfulness in generating DHS performed by
others..." *Id.* (emphasis added).

202.    The *Stark* Statute provides that "[t]he term 'fair market value' means the value in
arm's length transactions, consistent with the general market value . . ." 42 U.S.C. §
1395nn(h)(3). Federal regulations amplify this definition as follows**:**

> Fair market value means the value in arm's-length transactions, consistent with
> the general market value. "General market value" means the price that an asset
> would bring as the result of bona fide bargaining between well-informed buyers
> and sellers *who are not otherwise in a position to generate business for the other*
> *party*, or the compensation that would be included in a service agreement as the
> result of bona fide bargaining between well-informed parties to the agreement
> *who are not otherwise in a position to generate business for the other party*, on
> the date of acquisition of the asset or at the time of the service agreement." 42
> C.F.R. § 411.351 (emphasis added).

203.    The *Stark* Statute "establishes a straightforward test that compensation
arrangements should be at fair market value for the work or service performed….not
inflated to compensate for the physician's ability to generate other revenues." 66 Fed.
Reg. at 877.

<u>**Physician Compensation Must Not be "Determined in a Manner that Takes into
Account (Directly or Indirectly) the Volume or Value of any Referrals by the
Referring Physician"**</u>

204.    The *Stark* Law also requires that "the amount of the remuneration...is not
determined in a manner that takes into account (directly or indirectly) the volume or

48

value of any referrals by the referring physician." 42 U.S.C.S. § 1395nn (e)(2); *see also* 42 U.S.C.S. §1395nn(e)(3)(A)(v); 42 C.F.R. §411.357 (d)(1)(v).

205.    If physicians are paid "per service" or "per time period," the "per service" amount "must reflect fair market value at inception not taking into account the volume or value of referrals and must not change over the term of the contract based on the volume or value of DHS referrals…" 66 Federal Register 878.  Compensation based on a unit of service or time must be "fair market value for services or items actually provided" and personally performed by an employed physician. 69 Federal Register 16069.

206.    Apparent fixed payments to physicians may also violate Federal *Stark* laws. "If the payments reflect or take into account non-personally performed services, they may raise concerns under the statute and would merit case-by-case determination, regardless of the apparent fixed determination." 69 Federal Register 16088.

207.    The *Stark* Statute prohibits a hospital from determining compensation "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. §1395nn(e)(2). Methodist Healthcare has repeatedly and deliberately violated this Federal law.

**The *Stark* Statute Requires that Physician Compensation Must be  "Commercially Reasonable Even if No Referrals" Were Made to the Hospital**

208.    The *Stark* Statute also requires that physician remuneration must be "provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

209.    "An arrangement will be considered 'commercially reasonable' in the absence of referrals if the arrangement would make commercial sense if entered into by a reasonable

entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, even if there were no potential DHS referrals." 69 Federal Register 16093.

210.    A negotiated agreement between interested parties does not by definition reflect fair market value. The *Stark* Laws are predicated on the recognition that, when one party is in a position to generate business for the other, negotiated agreements between such parties are often designed to disguise the payment of compensation in excess of fair market value.

## Summary of Methodist's Violations of Federal *Stark* Laws

211.    Methodist has excessively paid West Clinic physicians in a scheme to induce referrals of cancer patients for hospital admissions, infusion drug therapy, outpatient procedures, and ancillary services. In violation of Federal *Stark* Laws, Methodist has paid West Clinic physicians far in excess of "the fair market value of the services" personally performed by such physicians.  42 U.S.C.S. § 1395nn (e)(2).

212.    Methodist has also paid numerous employed physicians at levels far in excess of the fair market value of their personal services. A hospital employing and paying a physician who makes referrals to that hospital of Medicare and Medicaid patients must satisfy the statutory exception for "bona fide employment relationships." Under the *Stark* Statute, a "bona fide employment relationship" must satisfy the following four relevant requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any

referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

213. Methodist Healthcare has repeatedly violated these requirements of federal law.

214. Further, despite knowing that millions of dollars in payments from the federal government have been received in violation of the *Stark* statute's prohibition on receipt of payments, Methodist has failed to refund these payments as required by the *Stark* statute. Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G)(2009), this conduct constitutes a knowing and improper avoidance of an obligation to transmit money to the government.

215. To conceal their unlawful conduct and to avoid refunding payments made on false claims, Methodist also falsely certified, in violation of the False Claims Act, that the services identified in its annual cost reports were provided in compliance with federal laws, including the prohibition against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications made with each annual cost report were part of Methodist's unlawful scheme to defraud federal and state healthcare programs.

216. The *Stark* laws prohibit the United States from paying for designated health services ("DHS") prescribed by physicians who have improper financial relationships with the DHS provider. In addition to prohibiting the hospital from submitting claims under these circumstances, the *Stark* Law also prohibits payments by Federal Healthcare Programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this

section." 42 U.S.C. §1395nn (g)(1).[5]

<u>**Methodist's Excessive Payments to Physicians Are Not Protected by the "Academic**</u>
<u>**Medical Center" Safe Harbor Under *Stark* Regulations**</u>

217.   Among the multiple requirements of the "academic medical center" safe harbor

provided in *Stark* regulations, the referring physician must be a bona fide full-time or

"substantial" part-time employee of the center. *See* 42 C.F.R. §411.355(e)(1)(i)(A). West

Clinic physicians are a private practice group. They are not employees of any academic

medical center.

218.   For employees of an academic medical center, the total compensation at the

center cannot "exceed the fair market value of all of the services provided" and cannot be

"determined in a manner that takes account the volume or value of any referrals." *See* 42

C.F.R.   §411.355(e)(1)(ii).   Even if Methodist could qualify as an academic medical

center, Methodist has repeatedly violated these regulatory requirements under the *Stark*

Statute.  Methodist has repeatedly paid physicians in excess of fair market values based

in part on the volume and value of their referrals or ability to generate revenues for the

hospital system.

219.   The "academic medical center" safe harbor also requires that the referring

physician's compensation agreement does not violate the anti-kickback statute. *See* 42

C.F.R. §411.355(e)(1)(iv).  As discussed above, Methodist's scheme and compensation

of West Clinic physicians has violated the Anti-Kickback Statute.

---

[5] "Designated health services" include "any of the following items or services: "clinical
laboratory services, physical therapy services, occupational therapy services, radiology
services...radiation therapy services and supplies, durable medical equipment and
supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics
and prosthetic devices and supplies, home health services, outpatient prescription drugs,
inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

220.   Likewise, West Cancer Center cannot qualify as a component of an "academic medical center." The regulations define component of an academic medical center as "an affiliated medical school, faculty practice plan, hospital, teaching facility, institution of higher education, departmental professional corporation, or nonprofit support organization whose primary purpose is supporting the teaching mission of the academic medical center." *See* 42 C.F.R. §411.355(e)(1)(i)(A).   West Cancer Center and West Clinic physicians are a profiteering enterprise. The primary purpose of West Cancer Center is not "supporting the teaching mission of an academic medical center."

221.    Among other requirements, all transfers of money between components of the center must "directly or indirectly support the missions of teaching, indigent care, research, or community service." *See* 42 C.F.R. §411.355(e)(1)(iii)(A). In this case, Methodist has transferred massive amounts of money to West Clinic physicians **not** for the purposes of teaching or indigent care, research or community service---but rather to reward and enrich private physicians for their referrals to the hospital system.

## Federal Healthcare Programs

## Introduction to the Medicare Program

222.   Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs discussed below in addition to federal employees and retired federal employees.

223.   Since 2012, Methodist has received over $1.7 billion from the Medicare Program. Payments from the Medicare Program account for approximately 22-27 percent of Methodist Healthcare's net revenues each year.

224. A significant portion of such payments from the Medicare Program derived from inpatient and outpatient referrals by physicians receiving excessive payments from Methodist Healthcare as described above.

225. Between 2012 and the present, Methodist has submitted thousands of claims both for specific services provided to Medicare beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

226. The Medicare Program covers the costs of certain medical services for persons aged 65 years or older and those with disabilities.

227. The Medicare Program is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled, nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

228. HHS is responsible for the administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

229. Under the Medicare Program, CMS makes payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in the Medicare Program. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

230. Methodist has executed at least one provider agreement with CMS in which it agreed to abide by the Medicare laws, regulations and program instructions…" CMS

Provider/Supplier Enrollment Application, Forms 855-A and 855-B.

231. In the provider agreement, Methodist certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulation and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)…" *Id.*

232. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

233. Hospitals submit claims for interim reimbursement for items and services delivered to Medicare beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-04.

234. As a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries. As discussed above and below, each cost report contains mandatory certifications of compliance with *Stark* and Anti-Kickback Laws.

235. After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid

and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f) (1).

236. Methodist was required to submit cost reports to their fiscal intermediary for each Fiscal Year between 2011 and the present.

237. Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically UB-04 Forms) during the course of the fiscal year. On the cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider are subtracted to determine the amount due Medicare or the amount due the provider.

238. At all times relevant to this Complaint, the Medicare Program, through its fiscal intermediaries, had the right to audit the cost reports and financial representations made by Methodist to ensure their accuracy and protect the integrity of the Medicare Program. This includes the right to adjust cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

239. Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

240. For each of the Fiscal Years between 2011 and the present, each cost report certification page submitted by Methodist included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or where**

**otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result**." (Emphasis added).

241. On each cost report for each Fiscal Year from 2011 through the present, the responsible officer of Methodist was required to certify, in pertinent part, as follows: "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report….and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (Emphasis added).

242. Methodist was required to certify that their filed cost reports were (1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, (4) **that the services provided in the cost report were not linked to kickbacks**, **and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the *Stark* and Anti-Kickback Statutes.**

243. Methodist was also required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b (a) (3) specifically confirms the duty to disclose known errors in

cost reports. "Whoever....having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...shall in the case of such a ....concealment or failure...be guilty of a felony."

244.    In the months following the end of each fiscal year, Methodist submitted annual cost reports to the Centers for Medicare and Medicaid Services (CMS) and attested to the certifications stated above. Methodist submitted cost reports with the certifications stated above for Fiscal Years 2011, 2012, 2013, 2014, 2015, and through the present.

245.    CMS issued a Notice of Provider Reimbursement (NPR) based on the financial data submitted in the cost reports by Methodist for each Fiscal Year.

246.    In accordance with 42 C.F.R. § 415.1885, a cost report may be reopened within three (3) years of the Notice of Program Reimbursement date. The Federal regulations establish that the cost report may be reopened due to false claims or if the provider has provided inaccurate cost report data.

247.    After the submission of their cost reports each year to CMS, Methodist had ongoing duties and opportunities to request the reopening of their previous cost reports which contained false information submitted to Federal healthcare programs.

248.    In addition to the in-patient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

249.    Form CMS-1500 requires the physician to certify that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that

any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

250. By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and laws governing the Program, including the *Stark* and Anti-Kickback Laws.

## Introduction to Medicaid Program

251. The Medicaid Program covers approximately 20-23 percent of all patient discharges each year at Methodist.

252. The Medicaid Program is a joint federal-state program that provides health care benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with Federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

253. The Federal Medicaid statute sets forth minimum requirements for State Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq.* As part of such minimum requirements, each State's Medicaid program must cover hospital and physician services. 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

254. The Federal matching rate for the Tennessee Medicaid Program is approximately 65 percent.

255. "Section 13624 of OBRA 1993, entitled 'Application of Medicare Rules Limiting Certain Physician Referrals,' added a new paragraph (s) to section 1903 of the Act, that extends aspects of the Medicare prohibition on physician referrals to Medicaid." 66 Federal Register 857. "This provision bars FFP in State expenditures for DHS furnished to an individual based on a physician referral that would result in denial of payment for the services under the Medicare program if Medicare covered the services to the same extent and under the same terms and conditions as under the State Medicaid plan." 66 Federal Register 858.

256. "The statute also made certain reporting requirements in section 1877(f) of the Act and a civil monetary penalty provision in section 1877(g)(5) (related to reporting requirements) applicable to providers of DHS for which payment may be made under Medicaid in the same manner as they apply to providers of such services for which payment may be made under Medicare." 66 Federal Register 858.

257. In Tennessee, provider hospitals participating in the Medicaid Program file annual cost reports with the State's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports. Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

258. Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the *Stark* and Anti-kickback laws.

259. The Tennessee Medicaid Program uses the Medicaid patient data in the cost reports to determine the payments due each facility.

260. The Methodist Healthcare Defendants submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with Federal *Stark* and Anti-Kickback Laws. The Tennessee Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims.

## Introduction to TRICARE

261. Methodist was also enrolled in and sought payments from the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

262. TRICARE is a federally-funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. *See* 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a). Methodist has received revenue from the TRICARE Program.

263. In addition to individual patient costs, TRICARE pays hospitals for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs. *See* 32 C.F.R. § 199.6.

264. A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement"), in which the provider sets forth the number of patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

265. The Request for Reimbursement requires that the provider certify that the

Case 3:17-cv-00902   Document 1   Filed 05/30/17   Page 61 of 77 PageID #: 61

information contained therein is "is accurate and based upon the hospital's Medicare cost report."

266.    Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

267.    Methodist submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports of Methodist contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

268.    On each occasion when Methodist's Requests for Reimbursement were false due to falsity in its Medicare cost reports, Methodist falsely certified that the information contained in its Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

269.    Methodist knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.[6]

## Introduction to the Federal False Claims Act

270.    The False Claims Act establishes liability, *inter alia,* for anyone who

---

[6] Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and TRICARE Programs in addition to federal employees and retired federal employees.

"knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material [7] to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation[8] to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

271.    The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

272.    Statutory liability under the False Claims Act includes a civil penalty "not less than $5,500 and not more than $11,000" per false claim "plus 3 times the amount of

---

[7] "The term 'material' means having a natural tendency to influence. Or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

[8] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

273.    Under the Federal False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud." 31 U.S.C. 3729 (b)(1).

274.    In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required.  *Id.* Under the False Claims Act, a defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information."  *Id.*

275.    Protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law. Participants in Federal Healthcare Programs have a duty to familiarize themselves with the legal requirements for payment and ensure compliance. A defendant who fails to inform himself of those requirements acts in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question. Likewise, a defendant who fails to verify and evaluate the accuracy of information or investigate the accuracy of information when on notice of questions concerning the accuracy of such information acts in reckless disregard or deliberate ignorance sufficient to charge him with knowledge of the falsity of the claims in question.

## The Tennessee Medicaid False Claims Act

276.  The Tennessee Medicaid False Claims Act contains similar provisions as the Federal False Claims Act.

277.  The Tennessee Medicaid False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the [M]edicaid program," Tenn. Code Ann. § 71-5-182(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the [M]edicaid program," Tenn. Code Ann. § 71-5-182(a)(1)(B), "conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D)," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids or decreases an obligation to pay or transmit money or property to the state, relative to the [M]edicaid program." Tenn. Code Ann. § 71-5-182(a)(1)(D).

278.  Under the Tennessee Medicaid False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." Tenn. Code Ann. § 71-5-182(b).

279.  Statutory liability under the Tennessee Medicaid False Claims Act includes a civil penalty "not less than $5,000 and not more than $25,000…plus 3 times the amount of damages which the state sustains because of the act of that person." Tenn. Code Ann. § 71-5-182(a)(1)(D).

**Certifying Compliance with the Federal *Stark* Law and Anti-Kickback Statute Is A Condition of Payment under Federal Healthcare Programs and False Certifications Are Actionable under the Federal and State False Claims Acts**

280. Federal law establishes that falsely certifying compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (b), and *Stark* Statute, 42 U.S.C. § 1395nn, in a Medicare cost report is actionable under the False Claims Act. False claims to Medicare, including Medicare cost reports and UB-04 forms[9] are actionable under the False Claims Act.

281. The *Stark* Laws state that compliance is a mandatory condition of Medicare payments. Likewise, compliance with the Anti-Kickback Statute is a mandatory condition of payment by the Medicaid Program. 42 U.S.C. § 1320a-7b (b).

282. On their annual cost reports submitted to CMS for each of the fiscal years in question, Methodist certified that none of the services billed Federal Healthcare Programs were "provided or procured through the payment directly or indirectly of a kickback." Each cost report states, "**If services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.**" (Emphasis added).

283. For each year from 2012 through the present, the annual cost report was signed by a Methodist officer or administrator who certified "**that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (Emphasis added). The certifications were a prerequisite to payment under Federal Healthcare Programs. Methodist's express certifications were and continue to be

---

[9] The UB-04 form is a claim form for hospitals to submit claims for payment to the Medicare Program.

knowingly false for the reasons stated in this Complaint.

284. Methodist has also violated the Federal False Claims Act through other certifications of compliance with the Anti-Kickback Statute and *Stark* Laws, which certifications are prerequisites to enrollment in Federal Healthcare Programs and Defendants' receipt of Medicare and Medicaid payments.

285. The enrollment application that providers must execute to participate in the Medicare Program, Form CMS-855A, contains the following certification: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law),** and on the provider's compliance with all applicable conditions of participation in Medicare."  (Emphasis added).

286. After violating the Federal *Stark* and Anti-Kickback Laws, Methodist violated the Federal False Claims Act through their knowingly false express and implied certifications that were conditions of payment from Federal Healthcare Programs.

287. For the time period of claims arising from 2012 through the present, Methodist has submitted thousands of claims to Federal Healthcare Programs arising from referrals by physicians receiving excessive compensation or payments in violation of Federal *Stark* and Anti-Kickback Laws.

288. Methodist is exclusively in possession of the entire body of evidence exposing their violations of *Stark* and Anti-Kickback Laws.

289. Methodist is in possession of the UB-O4 forms, Medicare Cost Reports and corresponding Medicaid or TRICARE forms used to make claims for services arising from referrals from physicians receiving excessive compensation or payments from Methodist.

290. Additionally, Methodist's certifications of compliance with Federal *Stark* and Anti-Kickback Laws were express conditions of all payments made by Federal Healthcare Programs, including Medicare and Medicaid.

### Count I---Presenting False Claims in Violation of 31 U.S.C. § 3729(a) (1)(A) and Tenn. Code § 71-5-82(a)(1)(A) Against All Defendants

291. Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

292. In pertinent part, the Federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *See* 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code Ann. § 71-5-182(a)(1)(A).

293. Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States or State of Tennessee in violation of 31 U.S.C. § 3729(a)(1)(A) or Tenn. Code Ann. § 71-5-182(a)(1)(A),

294. This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A).

295. Through the acts described above, Defendants knowingly or in reckless disregard

or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government and State of Tennessee, within the meaning of 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code Ann. § 71-5-182(a)(1)(A),

296.    The United States and the State of Tennessee were unaware of the falsity of the records, statements and claims made or caused to be made by Defendants.  In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States and the State of Tennessee paid and continue to pay claims that would not be paid if Defendants' illegal conduct was known.

297.    As a result of Defendants' acts, the United States and the State of Tennessee have sustained damages, and continue to sustain damages, in a substantial amount to be determined at trial.

298.    Additionally, the United States and State of Tennessee are entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

### Count II--- Use of False Statements in Violation of 31 U.S.C. 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All Defendants

299.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

300.    In pertinent part, the Federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B).

69

301. This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B).

302. Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements. Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B). The records were false in that they purported to show compliance with Federal *Stark* Laws and the Anti-kickback Statute.

303. Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States and State of Tennessee.

304. The United States and State of Tennessee were unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Defendants. The United States and State of Tennessee paid and continue to pay claims that would not be paid if Defendants' illegal conduct was known.

305. By virtue of the false records or false claims made by Defendants, the United States and State of Tennessee sustained damages and therefore are entitled to treble damages under the Federal False Claims Act and Tennessee Medicaid False Claims Act respectively to be determined at trial.

306. Additionally, the United States and State of Tennessee are entitled to civil penalties for each false claim made and caused to be made by Defendants arising from

70

their illegal conduct as described herein.

### Count III--- Conspiring to Submit False Claims in Violation of 31 U.S.C. § 3729(a)(1)(C) and Tenn. Code Ann. § 71-5-182(a)(1)(C) Against All Defendants

307.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

308.    In pertinent part, the Federal False Claims Act establishes liability for "any person who….conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).  The Tennessee Medicaid False Claim Act contains a similar provision. *See* Tenn. Code Ann. § 71-5-182(a)(1)(C).

309.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(C).

310.    Through the acts described above, Defendants acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and State of Tennessee and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

311.    Defendants conspired to withhold information regarding excessive payments to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees to Defendants.

312.    As a result, the United States and State of Tennessee were unaware of the false claims submitted and caused by Defendants and the United States and State of Tennessee

paid and continue to pay claims that would not be paid if the Defendants' illegal conduct was known to the United States and State of Tennessee.

313.   By reason of Defendants' acts, the United States and State of Tennessee have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

314.   By virtue of Defendants' conspiracy to defraud the United States and State of Tennessee, the United States and State of Tennessee sustained damages and are entitled to treble damages under the Federal False Claims Act and Tennessee Medicaid False Claims Act, to be determined at trial, plus civil penalties for each violation.

## Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All Defendants

315.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

316.   In pertinent part, the Federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B).

317.   Compliance with *Stark* and Anti-kickback Laws were explicit conditions of payment under Federal Healthcare Programs. For each of the years between 2012 and the present, Defendants explicitly and/or implicitly certified compliance with Federal *Stark* Laws and the Anti-kickback Statute.

318.   Defendants' certifications of compliance with Federal *Stark* Laws and the Anti-

Kickback Statute were knowingly false.

319.   In reliance on the Defendants' express and implied certifications, the United States and State of Tennessee made payments to Defendants under Federal and State Healthcare Programs. If the United States and State of Tennessee had known that Defendants' certifications were false, their payments would not have been made to Defendants for each of the years in question.

320.   By virtue of the false records, false statements, and false certifications made by Defendants, the United States and State of Tennessee sustained damages and are entitled to treble damages under the Federal and State False Claims Acts, to be determined at trial, plus a civil penalty for each violation.

## Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) and Tenn. Code Ann. § 71-5-182(a)(1)(D) Against All Defendants

321.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

322.   The Federal False Claims Act and Tennessee Medicaid False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G) and Tenn. Code Ann. § 71-5-182(a)(1)(D).  The Federal False Claims Act and Tennessee Medicaid False Claims Act define "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  *See* 31 U.S.C. § 3729(b)(3) and Tenn. Code Ann. § 71-5-182(d).

323. "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

324. "The OIG may impose a penalty, and where authorized, an assessment against any person…whom it determines…[h]as not refunded on a timely basis….amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

325. Defendants have knowingly caused and retained overpayments from Federal and State Healthcare Programs arising from Defendants' violations of the *Stark* and Anti-Kickback Laws addressed above.

326. By virtue of Defendants causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other Federal Healthcare Programs, the United States and State of Tennessee sustained damages and are entitled to treble damages under the Federal False Claims Act and Tennessee Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants**

327. Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

328. The Federal False Claims Act and Tennessee Medicaid False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G) and Tenn. Code Ann. § 71-5-182(a)(1)(D).

329.   Defendants knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants in submitting the cost reports, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and State of Tennessee.

330.   By virtue of the false records or false statements made by the Defendants, the United States and State of Tennessee sustained damages and therefore are entitled to treble damages, to be determined at trial, plus civil penalties for each violation.

## Prayers for Relief

331.   On behalf of the United States and State of Tennessee, Relator requests and prays that judgment be entered against Defendants in the amount of the United States' and State of Tennessee's respective damages, trebled as required by law, such civil penalties as are required by law, for a qui tam relator's share as specified by 31 U.S.C. §3730(d) and Tenn. Code Ann. § 71-5-183(d), and for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d) and Tenn. Code Ann. § 71-5-183(d), and for all such further legal and equitable relief as may be just and proper.

**Jury trial is hereby demanded.**

This 30 of May, 2017.

_Seth M Hyatt_

Jerry E. Martin (TBR No. 20193)
Seth M. Hyatt (TBR No. 31171)
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219
(615) 244-2202
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

**Lead Counsel:**
Bryan A. Vroon, Esq.
(Motion for *Pro Hac* Admission to be submitted)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Edward D. Robertson, Jr.
(Motion for *Pro Hac* Admission to be submitted)
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454
chiprob@earthlink.net

## Certificate of Service

This is to certify that I have this day served a copy of the Relator's Complaint by depositing a true and correct copy of same by Certified Mail in the United States Mail, postage prepaid, addressed as follows:

The Honorable Attorney General Jeff Sessions
Attorney General of the United States
Attention: Seal Clerk
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

The Honorable Herbert H. Slatery III
Attorney General of the State of Tennessee
Attention: Seal Clerk
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202-0207

and by hand delivering a true and correct copy of the Relator's Complaint to the following:

The Honorable Jack Smith
United States Attorney for the Middle District of Tennessee
Attention: Seal Clerk
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203

This _30_ day of May, 2017.

Seth M. Hyatt