**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
CIVIL DIVISION**

UNITED STATES OF AMERICA
AND STATE OF TENNESSEE
*ex rel.*
[UNDER SEAL]
Relator

**TO BE FILED IN
CAMERA AND UNDER
SEAL**

vs.

DO NOT PUT IN PRESS BOX
DO NOT ENTER ON PACER

[UNDER SEAL]

Defendants.

**DOCUMENT TO BE KEPT UNDER SEAL**

**DO NOT ENTER ON PACER**

Jerry E. Martin
Seth Hyatt
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219

Lead Counsel:
Bryan A. Vroon, Esq.
(Admitted *pro hac*)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road
Suite 2270
Atlanta Georgia 30327

Edward D. Robertson, Jr.
(Admitted *pro hac*)
Bartimus, Frickleton & Robertson
715 Swifts Highway
Jefferson City, MO. 65109

1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF TENNESSEE**

**CIVIL DIVISION**

UNITED STATES OF AMERICA
AND STATE OF TENNESSEE
*ex rel.*
JEFFREY H. LIEBMAN
Relator

Case No. 3:17-CV-00902

**TO BE FILED IN
CAMERA AND UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER

METHODIST LE BONHEUR HEALTHCARE,
THE WEST CLINIC, WEST CANCER CENTER,
UT METHODIST PHYSICIANS, LLC,
METHODIST HEALTHCARE---MEMPHIS HOSPITALS,
SPECIALTY PHYSICIAN GROUP, LLC,
PRIMARY CARE GROUP, LLC,
AND JOHN DOES 1-100

Defendants.


**Relator's First Amended Complaint Under the Federal and State
False Claims Acts**

Parties.................................................................................................................... 8

Jurisdiction and Venue .................................................................................... 11

Methodist's Excessive Payments to West Clinic Physicians .................... 12
    The Origins and Objectives of the Scheme................................................... 12
    Methodist Has Paid Over $350 Million to West Clinic Physicians Since 2012 .......... 17
    $52 Million Office Complex for Free ........................................................... 20
    West Cancer Center Steering Committee Meetings in 2015.......................... 22
    The Financial Windfall Required by West Clinic Physicians........................ 27
    Methodist's Payments Have Rewarded and Induced Referrals ..................... 30

Methodist Has Excessively Paid Many Employed Physicians................... 34
    Introduction ................................................................................................. 34
    Over $180 Million in Financial Losses in Last 5 Years .............................. 35
    Methodist Budgeted for Major Losses ........................................................ 36
    Methodist Tracked and Monitored Referrals to Offset Losses..................... 40
    Methodist Has Excessively Paid Cardiologists and Cardiovascular Surgeons........... 43
    Methodist Has Excessively Paid Transplant Surgery Physicians ................ 51
        Examples of Excessive Payments within Transplant Surgery Group..................54
    Methodist Has Overpaid Oncology Surgeons.............................................. 56
        Examples of Excessive Payments to Oncology Surgeons.............................57
    Methodist Excessively Paid Hospitalists .................................................... 60
        Examples of Excessive Payments to Hospitalists........................................61

Applicable Laws ............................................................................................... 62
    Introduction to Federal *Stark* Laws .......................................................... 62
    Introduction to Federal Anti-Kickback Statute .......................................... 66
    Compliance with *Stark* and AKS Is Condition of Each Federal Payment.................. 69
        Compliance with AKS and *Stark* is Condition of Each Medicare Payment ........70
        Compliance with AKS and *Stark* is Condition of Each Medicaid Payment........74
        Compliance with AKS and *Stark* is Condition of Each TRICARE Payment........76

The Federal False Claims Act ........................................................................ 77

The Tennessee Medicaid False Claims Act.................................................. 79

Count I---Presenting False Claims in Violation of 31 U.S.C. § 3729(a)
(1)(A) and Tenn. Code § 71-5-82(a)(1)(A) Against All Defendants ...................... 80

Count II--- Use of False Statements in Violation of 31 U.S.C.
3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All
Defendants ........................................................................................................ 81

Count III--- Conspiring to Submit False Claims in Violation of 31 U.S.C. §
3729(a)(1)(C) and Tenn. Code Ann. § 71-5-182(a)(1)(C) Against All
Defendants ........................................................................................................ 83

Count IV---Submission of Express and Implied False Certifications in
Violation of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-

**182(a)(1)(B) Against All Defendants** ........................................................................... **84**

**Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) and Tenn. Code Ann. § 71-5-182(a)(1)(D) Against All Defendants** ................................................................................... **85**

**Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants** ................................................................................................................... **86**

**Prayers for Relief** ........................................................................................................... **87**

**Certificate of Service** ................................................................................................... **88**

1.     Under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended ("FCA"), and the Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-182 *et seq.*, Relator Jeffrey H. Liebman ("Liebman") states his First Amended Complaint against Defendants Methodist Le Bonheur Healthcare, Methodist Healthcare---Memphis Hospitals, UT Methodist Physicians, LLC, Specialty Physician Group, LLC, Primary Care Group, LLC,[1] The West Clinic, West Cancer Center and John Does 1-100 filed under seal with the Court as follows.

2.     This *qui tam* case is brought against the Defendants for knowingly defrauding the federal and state governments in connection with Medicare, Medicaid, TRICARE, and other government healthcare programs.  As discussed in detail below, since at least 2012, the Methodist Defendants have engaged in a scheme to pay (1) financial inducements and excessive compensation to independent oncologists (the West Clinic physicians) who generated referrals and lucrative profits to the hospital system, and (2) excessive compensation to certain employed physicians who generated significant referrals to the hospital system.

---

[1] Defendants Methodist Le Bonheur Healthcare, Methodist Healthcare---Memphis Hospitals, UT Methodist Physicians, LLC, Specialty Physician Group, LLC, and Primary Care Group are sometimes collectively referred to as "the Methodist Defendants" or "Methodist."

3. The Defendants' scheme has deliberately violated the Federal Anti-Kickback Statute ("AKS") and Federal *Stark* laws discussed below.

4. The AKS prohibits a healthcare provider from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

5. The *Stark* laws prohibit the United States from paying for designated health services ("DHS") prescribed by physicians who have improper financial relationships with the DHS provider. In addition to prohibiting the hospital from submitting claims under these circumstances, the *Stark* laws also prohibit payments by federal health care programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[2]

6. From 2012 through the present, the Methodist Defendants paid West Clinic physicians over $350 million in cash payments in a scheme to reward and induce referrals of cancer patients for hospital admissions, infusion drug therapy, outpatient procedures, and ancillary services. The payments are ongoing. In violation of federal *Stark* laws and the AKS, Methodist has paid West Clinic physicians far in excess of "the fair market value of the services" personally performed by such physicians. 42 U.S.C.S. § 1395nn

---

[2] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

(e)(2). A major portion of these payments were profits from drug prescriptions written by West Clinic physicians for cancer drugs obtained by Methodist at deep discounts under the 340 Drug Pricing Program ("340B Program").

7.     Methodist has also paid numerous employed physicians at levels far in excess of the fair market value of their personal services. Under *Stark* laws, a hospital employing and paying a physician who refers Medicare and Medicaid patients must satisfy the four statutory requirements for "bona fide employment relationships": (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2). Methodist has repeatedly violated these requirements of federal law and excessively paid multiple physician specialists based in part on the referral revenues they generated for the hospital system.

8.     The Defendants' scheme of illegal remuneration to referring physicians has been financed in part by profits from the 340B Program. Methodist's profits from the 340B Program totaled approximately $74.3 million in 2015 and $112.1 million in 2016. In the past five years, Methodist's profits from the 340B Program have exceeded $400 million.

9.     The Defendants' scheme has caused major damages to federal and state health care programs, including patients covered under Medicare, Medicaid, or TRICARE in addition to federal employees and retired federal employees. Since 2012, the Methodist

Defendants have received over $1.7 billion from Medicare. Medicare payments account for approximately 22-27 percent of the Methodist Defendants' net revenues each year. Additionally, Medicaid covers approximately 20-23 percent of all patient visits each year at Methodist hospitals.

10.     A significant portion of such payments from Medicare and Medicaid derived from inpatient and outpatient referrals by physicians receiving excessive payments from the Methodist Defendants in violation of the AKS and/or *Stark* laws. Between 2012 and the present, the Defendants submitted thousands of false claims both for specific services provided to beneficiaries of federal healthcare programs and claims for general and administrative costs incurred in treating such beneficiaries.

11.     The scheme has resulted in massive financial enrichment to all parties at the expense of Medicare and Medicaid. Senior Methodist executives have profited from this scheme to boost hospital system revenues because they have been paid bonuses based in part on the financial performance of the hospital system.[3] Over the past six years, the Methodist system has obtained over $1 billion in increased revenues from increased referrals of cancer patients in the region and West Clinic physicians have received a financial windfall of over $350 million in cash payments from Methodist plus free office space and additional funding for operations, staff, and research. Medicare payments for cancer patients have largely funded the financial windfall to all parties.

---

[3] Methodist's senior executives have been compensated at extraordinary levels for a "non-profit" hospital system. For example, in 2015, Methodist Healthcare's Chief Executive Officer received compensation in excess of $5.3 million (including a bonus of $485,684.00), the Chief Operating Officer received compensation in excess of 1.3 million (including a bonus of $205,974.00), and the Chief Financial Officer received compensation in excess of 1.1 million (including a bonus of $258,856.00).

## Parties

12.     Relator Liebman is the former President of Methodist University Hospital,[4] the largest hospital in the Methodist Healthcare system. He held the position of Chief Executive Officer of Methodist University Hospital from February of 2014 through early May of 2017 when his title became President. Liebman resigned from Methodist in late August 2017.

13.     Through his work and experience, Liebman has direct, detailed, and personal knowledge that the Methodist Defendants, West Clinic, and West Cancer Center have violated the AKS and *Stark* laws. Liebman also has direct, detailed, and personal knowledge that the Methodist Defendants have violated *Stark* laws in their excessive payments to many employed physicians based in part on the value of their referrals to the hospital system.

14.     Defendant Methodist Le Bonheur Healthcare is an integrated healthcare system based in Memphis, Tennessee, with locations and partners across the Mid-South.  The healthcare system includes:

- 6 adult hospitals

---

[4]  According to the Methodist Healthcare website, Methodist University Hospital is the principal teaching hospital of the University of Tennessee Health Science Center ("UTHSC"). UTHSC has provided academic appointments and research infrastructure for some physicians employed by Methodist. Methodist Healthcare has publicly referred to UTHSC as its "academic partner." The relationship is not a legal partnership, but rather an affiliation among institutions. **UTHSC is not a defendant to this action and the claims asserted in this action are not directed against UTHSC. UTHSC has not employed or controlled Methodist executives or West Clinic physicians.**

- 1 children's hospital
- 2 wound healing center
- 2 sleep centers
- 52 physician and specialty practices
- 7 minor med and urgent care clinics
- 5 surgery centers
- 7 diagnostic centers
- 7 cancer treatment sites
- 1 hospice and palliative care facility
- Transplant Institute
- Sickle Cell Center
- 7 work-site Clinics
- Home Health
- Home Medical Equipment

15. Defendant Methodist Healthcare---Memphis Hospitals ("MHMH") is a wholly owned subsidiary of Methodist Le Bonheur Healthcare. MHMH is organized as a Section 501(c)(3) entity consisting of five hospitals within an integrated healthcare delivery system. MHMH includes five Memphis hospitals---Methodist Germantown Hospital, Le Bonheur Children's Hospital, Methodist North Hospital, Methodist South Hospital, and Methodist University Hospital. The Board of Methodist Healthcare---Memphis Hospitals is comprised of the same persons as Methodist Le Bonheur Healthcare, the sole member and controlling parent organization.

16. Defendant UT Methodist Physicians, LLC ("UTMP") is a physician practice group and wholly owned subsidiary of Methodist Le Bonheur Healthcare. UTMP is a "nonprofit" limited liability corporation organized under Section 501(c)(3) of the Internal Revenue Code of 1986. Methodist Healthcare owns, manages, and controls the operations of UT Methodist Physicians, including the employment and compensation terms offered and paid to employed physicians.

17. Defendant Specialty Physician Group, LLC is a physician practice group and

wholly owned subsidiary of Methodist Le Bonheur Healthcare. Methodist Healthcare owns, manages, and controls the operations of Specialty Physician Group, LLC, including the employment and compensation terms offered and paid to employed physicians.

18. Defendant Primary Care Group, LLC is a physician practice group and wholly owned subsidiary of Methodist Le Bonheur Healthcare. Methodist Healthcare owns, manages, and controls the operations of Primary Care Group, LLC, including the employment and compensation terms offered and paid to employed physicians.

19. In this First Amended Complaint, Methodist Le Bonheur Healthcare, Methodist Healthcare---Memphis Hospitals, UT Methodist Physicians, LLC, Specialty Physician Group, LLC, and Primary Care Group, LLC are sometimes collectively referred to as "Methodist Defendants" or "Methodist."

20. The West Clinic is an independent practice group of medical oncologists, radiation oncologists, and other physician specialists based in Memphis, Tennessee.

21. In 2012, Methodist entered into what it has publicly described as an "innovative partnership" with the West Clinic to create West Cancer Center. According to its website, West Cancer Center treats "more than 30,000 patients each year."

22. The identities of the remaining Doe defendants who knowingly submitted or caused the submission of false claims to the United States and/or State of Tennessee are presently unknown to Relator. All listed Defendants and such additional Doe defendants have served as contractors, agents, partners, and/or representatives of one and another in the submission of false claims to the United States and/or the State of Tennessee and were acting within the course, scope and authority of such contract, conspiracy, agency,

partnership and/or representation for the conduct described below.

**Jurisdiction and Venue**

23.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

24.    Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) and Tenn. Code Ann. § 71-5-185, as Defendants transacted business or otherwise engaged in illegal conduct at issue within the District.

25.    This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

26.    Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." The Tennessee Medicaid False Claims Act provides similar venue rules. *See* Tenn. Code § 71-5-185.

27.    Methodist is the largest Medicaid provider in the State of Tennessee with over 13,000 inpatient admissions each year covered by TennCare, the state of Tennessee's Medicaid Program. TennCare is based within this District in Nashville, Tennessee. As discussed below, Defendants have submitted thousands of false claims to TennCare in Nashville and such claims have been processed and paid with federal and state funds administered by TennCare in Nashville. Venue is proper in this District where

11

Defendants have submitted false claims in violation of the federal AKS and *Stark* laws.

28.     Relator has filed this action within the 6-year statute of limitations under the False Claims Act and Tennessee Medicaid False Claims Act. This action seeks recovery under the False Claims Act and Tennessee Medicaid False Claims Act for violations of the AKS and *Stark* laws with respect to Defendants' claims for payments by state and federal healthcare programs at least from 2012 through the present.

29.     Prior to filing this case, Liebman, through his counsel, delivered a draft copy of the Complaint and his written Disclosure of substantially all material evidence and information in his possession to the United States Attorney's Office for the Middle District of Tennessee, the United States Attorney General's Office, and the Tennessee Attorney General's Office.

## Methodist's Excessive Payments to West Clinic Physicians
### The Origins and Objectives of the Scheme

30.     In 2012, Methodist implemented a business plan to increase revenues to the hospital system through expanding its market share of cancer patients in the Memphis region.

31.     For multiple reasons, oncology has been and is a lucrative service line for Methodist. First, cancer is a disease of aging and Medicare covers most cancer patients. Medicare is a reliable and prompt payer of medical bills.  Second, many treatments for cancer patients have been particularly profitable for Methodist, including inpatient admissions with extensive ancillary services and outpatient visits for drug infusion therapy. Third, profits from cancer drugs have been lucrative for Methodist because of its participation in the 340B Program that gives participating hospitals deep discounts on

outpatient drugs.

32.    Starting in approximately 2011, Methodist sought to further capitalize on profits from the 340B Program and sought to expand its cancer services through a "partnership" or alliance with the leading group of oncologists in the Memphis region---the West Clinic.

33.    Methodist's financial strategists wanted the referral stream of cancer patients from West Clinic physicians. This referral stream would lead to increased inpatient admissions, increased profits from infusion therapy drugs acquired at a discount and sold at retail rates, and increased profits from outpatient visits, imaging studies, and other ancillary services for cancer treatment.

34.    In 2011, the managing oncologists of West Clinic and executive leaders of Methodist began discussing a business relationship or "alliance." The leaders of West Clinic were looking for a hospital "partner" to create an outpatient cancer center called West Cancer Center. West Clinic leaders presented six primary financial requirements to Methodist's executives. First, West Clinic physicians proposed to co-manage the cancer center with Methodist in exchange for a management fee paid by Methodist. Secondly, West Clinic physicians proposed that Methodist would pay a premium rate of $120 per wRVU [5] for all West Clinic physicians regardless of credentials, experience or collections. Third, West Clinic negotiators proposed that key personnel of West Clinic would be appointed to leadership positions within Methodist. Fourth, West Clinic

---

[5] The most common measure of physician productivity is Work Relative Value Units (wRVUs). These units reflect the level of time, skill, training, and intensity required of a physician to provide a given service. These units are the leading method for calculating the volume of work or effort expended by a physician in treating patients. Under this relative scale, a physician seeing two or three complex or high acuity patients per day would accumulate more RVUs than a physician seeing lower acuity patients each day.

physicians wanted Methodist's commitment of capital for West Cancer Center's operations, office, staffing, and expenses. Fifth, West Clinic physicians wanted Methodist to fund their research. Sixth, West Clinic physicians wanted the "ability to capitalize on" the 340B Program by using Methodist's status as a "covered entity." West Clinic physicians knew that they did not quality as eligible entities to receive drug discounts under the 340B Program so they sought to capitalize on Methodist's eligibility to receive discounts. West Clinic physicians wanted to be paid the lucrative profits from prescription cancer drugs to be acquired at deep discounts through Methodist.

35.     Under this financial strategy, Methodist would acquire oral cancer drugs at discounts through the 340B Program, West Clinic physicians would prescribe the oral medications, the prescriptions would be filled at a designated pharmacy controlled by Methodist, the retail drug prices would be far higher than acquisition costs through the 340B Program, and Methodist would channel the profits from drug sales to West Clinic physicians. [6]

---

[6] The 340B Program requires drug manufacturers that participate in the Medicaid drug rebate program to extend discounts on drugs administered in the outpatient setting, including physician-administered infusion drugs such as those used to treat cancer. The typical discount ranges from 30% to 50% off the drug's list price. As of January 1, 2015, there were 644 drug manufacturers participating in the 340B Program. Section 340B(a)(4)(L) of the PHSA establishes the 340B Program eligibility requirements for hospitals defined in section 1886(d)(1)(B) of the Social Security Act (commonly referred to as "subsection (d) hospitals"). There are three categories of hospital eligibility. *See* 42 U.S.C. 256b(a)(4)(L)(i). The first category of hospital eligibility requires hospital ownership or operation by a state or local government. The second category of hospital eligibility requires a hospital to be a public or private non-profit corporation that is formally granted governmental powers by a unit of state or local government. The third category of hospital eligibility includes a private non-profit hospital that has a contract with a state or local government to provide health care services to low-income individuals who are not eligible for Medicare or Medicaid. "Off-site outpatient facilities and clinics (child sites) not located at the same physical address as the parent hospital covered entity will be listed on the public 340B database, and are able to purchase and

36.     In return, West Clinic physicians would agree to an arrangement of referring their patients to West Cancer Center and the Methodist hospital system.[7] Such referrals would include cancer patients in need of inpatient admissions for surgeries or treatment, outpatient procedures and services, imaging services, laboratory services, infusion drugs[8] to be administered at Methodist facilities, and the host of ancillary services required for cancer treatment.

37.     West Clinic's leaders advised Methodist's executives that they were also considering "partnerships" with Baptist Healthcare and Tenet. As the leading oncology practice in the region, West Clinic's leaders sought to leverage the threat of entering into an exclusive alliance with a competitor of Methodist such as Tenet or Baptist Healthcare.

38.     On April 28, 2011 Methodist's executives met to discuss the overall terms of the arrangement under consideration with West Clinic. At this meeting, Methodist's executives discussed a personal services agreement under which Methodist would pay $120 per wRVU for all physicians of West Clinic regardless of experience, credentials or

---

use 340B drugs for eligible patients, if the hospital covered entity provides its most recently filed Medicare cost report demonstrating that: (1) each of the facilities or clinics is listed on a line of the cost report that is reimbursable under Medicare; and (2) the services provided at each of the facilities or clinics have associated outpatient Medicare costs and charges." Federal Register, Vol. 80, No. 167, p. 52302 (August 28, 2015). This action does not seek remedies based on Defendants' violations of the 340B Program. Rather, these violations are background information to the focus of this case--- Defendants' excessive payments to referring physicians and extensive violations of *Stark* laws and the AKS.

[7] West Clinic physicians committed their referrals to Methodist unless they were obligated to make referrals to other venues under prior managed care contracts.

[8] Infusion therapy involves the administration of medication through a needle or catheter. It is prescribed when a patient's condition is so severe that it cannot be treated effectively by oral medications. Such infusion medications were also acquired at deep discounts through the 340B Program and sold at high profits to the Medicare Program and commercial insurers.

collections. There were 27 physicians at West Clinic at the time. Their collective annual wRVUs were approximately 259,000.

39.    At this meeting, Methodist executives estimated that under the proposed arrangement with West Clinic, hospital profits from the sale of cancer drugs acquired under the 340B Program would increase by $30 million per year. Of this $30 million, Methodist's executives discussed giving West Clinic physicians approximately $10 million per year or the profits from oral drugs prescribed by West Clinic physicians to be acquired at discounts by Methodist under the 340B Program.

40.    Methodist's executives also discussed hospital profits from increased referrals by West Clinic physicians.

41.    Methodist's executives wanted to increase the hospital system's market share of cancer patients and wanted to further capitalize on increasing profits under the 340B Program. At this meeting, Methodist's senior executives stated their view that West Clinic was a leading community-based oncology practice with the ability to shift or refer significant market share of cancer patients to Methodist.

42.    In the months after this meeting Methodist's executives finalized the following agreements with West Clinic physicians effective December 31, 2011: Professional Services Agreement ("PSA"), Co-Management Agreement, Leased Employee and Administrative Services Agreement, and Unwind Agreement that have governed operation of the Cancer Center Sites as defined in the PSA.  The Agreements have an initial term of seven years ending on December 31, 2018.

43.    Methodist also subsequently entered into a 340B Contract Pharmacy Services Agreement with AnovoRX Group, LLC for the purpose of providing pharmacy services

dedicated to filling prescriptions and managing collections for oral drugs ordered by West Clinic physicians.

44.     At a Methodist Board meeting in December of 2011, Methodist executives projected that the deal with West Clinic would increase the hospital system's annual net revenues by approximately $200 million.

## Methodist Has Paid Over $350 Million to West Clinic Physicians Since 2012

45.     Since 2012, Methodist has paid over $350 million in cash directly to West Clinic physicians in addition to other benefits discussed below. These payments were far in excess of the fair market value of the physicians' personal services.

46.     In 2012, Methodist paid approximately $54.8 million to West Clinic physicians. In that year, West Clinic physicians' wRVUs only represented approximately $34.6 million of this $54.8 million payment from Methodist. The additional payment amounts of approximately $19 million largely represented profits from prescription cancer drugs written by West Clinic physicians and inflated "management" fees.

47.     In 2013, Methodist paid $51.9 million to West Clinic physicians. In that year, West Clinic physicians' wRVUs only represented approximately $36.7 million of this $51.9 million payment from Methodist. The additional payment amounts of approximately $15 million represented profits of approximately $10-$11 million from prescription cancer drugs written by West Clinic physicians and inflated "management" fees.

48.     In 2014, Methodist paid $56.3 million to West Clinic physicians. In that year, West Clinic physicians' wRVUs only represented $38.4 million of this $56.3 million payment from Methodist. The additional payment amounts of approximately 18 million

represented profits from prescription cancer drugs written by West Clinic physicians and inflated "management" fees.

49.    In 2015, Methodist paid $53.1 million to West Clinic physicians. In FY 2016 Methodist's payments to West Clinic physicians escalated to $68.0 million.

50.    At the start of the deal Methodist's executives estimated that increased profits from selling cancer drugs under the 340B Program would be approximately $20 million per year. Methodist contemplated paying an additional $10 million per year to West Clinic physicians---this $10 million estimate represented projected profits from prescriptions for cancer drugs written by West Clinic physicians.

51.    In 2015 the profits from prescriptions filled by AnnovoRX[9] totaled approximately $10,061,455.00 and Methodist transferred this entire amount to West Clinic physicians in addition to payments for supposed wRVUs and "management fees."

52.    In 2016 the profits from prescriptions filled by AnnovoRX totaled approximately $10,554,251.00 and Methodist transferred this entire amount to West Clinic physicians in addition to payments for supposed wRVUs and "management fees."

53.    Year after year since 2012, Methodist has shared those profits from the 340B Program with West Clinic physicians as financial inducements to capture the revenue stream from referrals of cancer patients by these physicians. This profiteering scheme was a deliberate violation of *Stark* laws and the AKS.  This scheme was also contrary to patient care because physicians were rewarded and incentivized to (1) increase referrals to the hospital system, and (2) to increase prescriptions for oral cancer drugs.

---

[9]  AnovoRX filled prescriptions and managed collections for oral drugs ordered by West Clinic physicians.

54.     Some of Methodist's overpayments to West Clinic physicians were disguised as supposed "management fees." In 2012, Methodist paid $3.0 million to West Clinic physicians for "management fees." In 2013, Methodist paid $3.2 million to West Clinic physicians for management fees. The annual management fees increased to $4.4 million in 2014 and continued to be paid by Methodist in 2015, 2016, 2017, and 2018.

55.     From 2012-2018, Methodist has paid West Clinic physicians over 25 million dollars in "management" fees for West Cancer Center. West Cancer Center is jointly managed with Methodist. West Clinic physicians are not handling management responsibilities without assistance from the hospital system. These "management fees" are excessive and far beyond any legitimate fair market valuation of management services.

56.     On May 23, 2014, Liebman met with Erich Mounce, West Clinic's Chief Executive Officer, at Mounce's request to discuss several issues.  At this meeting, Mounce informed Liebman that eventually more cancer related services would be moved under his direction in order to "justify" the management fees that West Clinic physicians were receiving from Methodist.

57.     In addition to the massive direct payments to West Clinic physicians, Methodist has also committed approximately $58.8 million in "cancer mission support funds" for West Cancer Center during the term of the parties' original agreements---2012-2018.

58.     Under the alliance with West Clinic, Methodist also agreed to pay $7 million to Vector Oncology (formerly known as Acorn), a research entity controlled by West Clinic physicians. West Clinic's managing physicians required this $7 million payment as a condition of entering into the "alliance" with Methodist. West Clinic physicians used part

of this $7 million payment to Vector to pay off Vector's prior debts.

59.     As a result of the extraordinary payments from Methodist, the oncologists of West Clinic have each received annual salaries exceeding $1 million and the managing oncologists of West Clinic have been paid annual salaries of approximately $3 million. Many physicians of West Clinic have enjoyed salaries at levels that are double, triple, or four times the national 90th percentile for radiation and medical oncologists in the United States. The national 90th percentile compensation for radiation oncologists was $746,507 in 2013, $754,356 in 2014, $781,545 in 2015, $758,720.92 in 2016, and $835,697.81 in 2017 according to MGMA Physician Compensation and Production Survey Data.[10] The national 90th percentile compensation for medical oncologists was $777,940 in 2013, $922,244 in 2014, $762,970 in 2015, $693,452.28 in 2016, and $646,226.73 in 2017 according to MGMA Physician Compensation and Production Survey Data.

### $52 Million Office Complex for Free

60.     In December of 2013, Methodist Healthcare---Memphis Hospitals purchased the Germantown Multi-Specialty Center at 7945 Wolf River Boulevard in Memphis for approximately $22.5 million from UT Medical Group, Inc. The building when purchased was approximately 116,865 square feet of space located on 9.6 acres of land.  In the following year, Methodist spent approximately $30 million dollars to renovate the

---

[10] Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are leading benchmarking resources for physician compensation in the United States. The annual MGMA Surveys are based on physician compensation and productivity data in the prior year. For example, the 2017 MGMA Survey reports physician compensation data from 2016.

building.

61.     On June 25, 2014, Liebman met with Dr. Ballo, Director of Radiation Oncology at West Cancer Center.  Dr. Ballo stated that Methodist executives promised to move patients "out of downtown" to a new location for the convenience of West Clinic physicians.  Dr. Ballo also stated that Methodist was funding construction of a new building for West Clinic physicians and that profits from the 340B Program were the economic "engine" for the relationship between West Clinic and Methodist.

62.     On August 7, 2014, Liebman again met with Erich Mounce, the Chief Executive Officer of West Cancer Center, to discuss space options on the campus for a new oncology building.  Mounce stated that the costs of this project would not be assigned to the cancer program but to Methodist University Hospital to make sure that the financials of West Cancer Center would look as strong as possible.  He also indicated that West Clinic would determine who could practice in the building even though the hospital had an open medical staff.  Liebman told him that the medical staff bylaws would not allow that.

63.     In 2015, West Clinic physicians moved their office operations to the Germantown Multispecialty Center at 7945 Wolf River Boulevard purchased and renovated by Methodist at a cost of approximately $52 million. Since that time, West Clinic physicians have enjoyed free office space compliments of Methodist.

64.     Federal regulations under the *Stark* laws require that "the space rented or leased does not exceed that which is reasonable and necessary for the legitimate business purpose of the lease arrangement" and the "rental charges" must be "consistent with fair market value." *See* 42 C.F.R. §411.357(a)(3) and (4). The "lease arrangement [must] be

commercially reasonable even if no referrals were made between the lessee and the lessor." 42 C.F.R. §411.357(a)(6).

65.  A hospital system spending $52 million on office property and then letting non-employed physicians use that property for free is not commercially reasonable or consistent with fair market values.

## West Cancer Center Steering Committee Meetings in 2015

66.  In early 2015, Methodist's executives who engineered the deal with the West Clinic became more anxious about the risks of losing the $50 million investment into the new West Clinic office space and the risks of losing revenues from referrals by West Clinic physicians if they chose to opt out of the alliance as allowed by their existing agreements with 6-month notice. Methodist's strategists sought to reach a longer term "deal" with West Clinic and they formed a "Steering Committee" composed of executives at Methodist, West Clinic, West Cancer Center, and University of Tennessee Health Science Center ("UTHSC").

67.  On January 8, 2015, at Michael Ugwueke's (Methodist COO) request, Liebman arranged a conference call with Chartis Group` ("Chartis"), a health care consulting firm. The purpose of the conference call was to discuss that firm assisting in developing a mutually agreeable business plan for Methodist and West Clinic to continue their "alliance" into the future. The conference call was at 10:00 am Central Time on January 8, 2015.

68.  On February 3, 2015, Liebman attended a meeting with Ugwueke (Methodist COO), David Stern (Executive Dean for UTHSC), attorney Chris Jedrey who was making a pitch to represent UT, Chris Regan and Pamela Damsky from Chartis, and Eric

Mounce (CEO of West Cancer Center) to discuss forming a steering committee to extend the "alliance" between Methodist and West Clinic physicians.

69.    At that meeting, Mounce stated that West Clinic physicians had some "non-negotiable" requirements, including  (1) keeping their income levels above the 90th percentile, and (2) protecting their income levels in the event of any change in the 340B Program that Methodist was using to channel profits from cancer drug sales to West Clinic physicians.

70.    Mounce subsequently insisted on using a different consulting firm---PricewaterhouseCoopers (PwC).  That firm was hired to conduct interviews and develop a business plan mutually agreeable for the parties to extend the duration of the "alliance."

71.    After this meeting, Ugweuke told Dr. Stern that he could he not bring legal counsel on behalf of UTHSC[11] to the Steering Committee meetings.

72.    The West Cancer Center---Strategy and Partnership Model Steering Committee ("Steering Committee) met several times in the summer of 2015. Liebman attended several of these meetings.

73.    As part of the Steering Committee's work, PwC consultants interviewed numerous Methodist executives, West Clinic physicians, and West Cancer Center leaders, including: Gary Shorb, CEO of Methodist; Michael Ugweuke, COO of Methodist; Chris McLean, CFO of Methodist; Jeff Liebman, CEO of Methodist University Hospital; William Kenley, CEO of Germantown Hospital; Eric Mounce, CEO

---

[11]  Throughout the history of their relationship, UTHSC did not control or participate in Methodist's senior management decisions to make excessive payments to West Clinic physicians or employed physicians. UTHSC has not managed, operated or controlled Methodist, West Cancer Center or West Clinic physicians.

of West Cancer Center; Dr. Kurt Tauer, COS of West Cancer Center; Dr. Lee Schwartzberg, CMO of West Cancer Center; Dr. Matt Ballo, Medical Director of West Cancer Center; and Ari Vanderwalde, Director of Clinical Research at West Cancer Center.

74. On June 3, 2015, the Steering Committee held its first meeting. In attendance were executives from Methodist, UTHSC, and West Clinic. Methodist did not have legal counsel in attendance at this meeting.

75. At this meeting, Methodist senior executives confirmed that they wanted to use 340B drug profits and other methods to incentivize the West Clinic physicians to help Methodist capture more market share of cancer patients in the region. Methodist's executives confirmed that they wanted to maximize referrals of cancer patients to the Methodist system because of high profits associated with oncology services and they would continue to pay West Clinic for that objective in multiple ways and would help expand West Clinic with Methodist capital. West Clinic executives and physicians represented that they had the ability to shift even more cancer "market share" or cancer patients to Methodist in exchange for "financial support." During the meeting, Liebman asked several times if there were any regulatory risks with this business arrangement.

76. As discussed at the Steering Committee meeting, West Clinic's goals in originally forming the "alliance" included the desire to obtain 340B drug profits and to align with a hospital system for financial "capital." Methodist's goals included increased profits from 340B drug sales and increased market share of cancer patients. The Steering Committee meeting confirmed that Methodist made massive payments to West Clinic physicians because they had the ability to send major volumes of cancer patients to

Methodist. In return, Methodist offered its eligibility to capitalize on 340B drug profits and willingness to give drug profits to West Clinic physicians in addition to other capital as financial inducements for their patient referrals.

77.     At the Steering Committee meeting, Methodist executives discussed the financial terms and profits to date from the deal with West Clinic physicians. The original projections by Methodist executives at the beginning of the "alliance" with West Clinic contemplated increased annual 340B drug profits of approximately $15 million. Actual 340B drug profits had been higher at approximately $25-30 million dollars per year from referrals by West Clinic physicians. The original terms contemplated "management fees" of approximately $3 million per year paid to West Clinic physicians.  The actual management fees paid to West Clinic in FY 2014 were approximately $4.4 million. The original terms also provided for Methodist to pay $7 million to Vector (formerly known as Acorn), the research company controlled by West Clinic physicians. West Clinic physicians required these payments to Vector for the "alliance" between Methodist and West Clinic to continue. Methodist executives also discussed increased profits to the hospital system from West Clinic physicians' referrals of cancer patients for hospital admissions.

78.     At the Steering Committee meeting, Methodist executives and West Clinic executives further confirmed that the funding of the deal with West Clinic was heavily reliant on 340B drug profits. Payments to West Clinic physicians were not simply based on the physicians' collections, wRVUs or personal services.  Rather, payments to West Clinic physicians were substantially based on lucrative profits from cancer drug sales under the 340B Program. For example, in FY 2014 the wRVUs billed by West Clinic

physicians totaled approximately $38 million and management fees totaled approximately 4.4 million. Yet in that year, Methodist paid West Clinic over $56.3 million.

79.     On July 15, 2015, the Steering Committee met again and Liebman attended this meeting along with executives from West Clinic and Methodist. At this meeting, Methodist executives discussed Methodist's data demonstrating that referrals from West Clinic physicians to Methodist had increased market share to Methodist since the financial payments to West Clinic began. Between 2012 and the 2014, inpatient oncology volume at Methodist more than doubled as hospital discharges for cancer patients moved from 7,320 discharges in 2012 to 15,834 discharges in 2014. Outpatient oncology volume at Methodist moved from 27,890 visits in 2012 to 31,253 visits in 2014.

80.     Between 2012 and 2014, the oncology payor mix at Methodist remained similar with 43 percent of oncology inpatient cases covered by Medicare and 13 percent covered by Medicaid. Medicare covered approximately 43 percent of oncology outpatients at Methodist and Medicaid covered approximately 8 percent.

81.     At this meeting in July 2015, Liebman again questioned the legality of Methodist's payments of 340B drug profits to West Clinic physicians. West Clinic physicians at that meeting insisted that if the 340B payments were reduced, they wanted the option to leave the "partnership." Liebman told them that "we were dealing with a wobbly three legged stool" and the parties needed a deeper commitment to compliance.

82.     At the Steering Committee meeting on August 20, 2015, several members of West Clinic insisted that the new business arrangement had to guarantee physician salaries at the 90th percentile or above no matter what happened to future revenues, profits and

losses for the hospital system or 340B drug profits. Liebman again openly questioned the legality of such requirements in that meeting.

## The Financial Windfall Required by West Clinic Physicians

83.    Methodist and West Clinic have negotiated a longer "alliance" and the new agreements were in the process of being finalized and signed when Liebman left Methodist in August of 2017. The terms of the new deal continue with the same core terms that have given a financial windfall to West Clinic physicians since 2012.

84.    In the summer of 2016, Eric Mounce, CEO of West Cancer Center, circulated a memo called "Deal Points" to Methodist executives and Dr. David Stern, Executive Dean at UTHSC.

85.    The "Deal Points" contemplated a new professional corporation to replace the structure of West Cancer Center. The financial payments to West Clinic physicians remained essentially the same as in the parties' agreements starting in 2012.

86.    First, West Clinic physicians required a "5 year strategic plan and business plan, and associated capital and operating budget commitments, for WCC." The "Deal Points" stated, "As part of such strategic and business plans, MLH will commit to re-invest a mutually agreed portion of MLH's oncology service contribution margin back into its oncology service line."

87.    This deal term reflected an ongoing agreement for Methodist to reward West Clinic physicians with a "mutually agreed portion" of the hospital system's revenues from referrals or "oncology service contribution margin" generated by West Clinic physicians. Since 2012, Methodist has given West Clinic physicians the enormous profits from oral drugs prescribed by West Clinic physicians and acquired at discounts by

27

Methodist under the 340B Program. Such payments have been a central focus of West Clinic physicians' requirements to enter and continue the agreements with Methodist.

88. The "Deal Points" also included an agreement for Methodist to continue paying management fees to West Clinic physicians under the Co-Management Agreement.

89. The "Deal Points" also guaranteed income to West Clinic physicians at a level "at or above the 90th percent" compensation per wRVU. "The specialty-specific wRVU rate, and the CMA fees will be periodically re-appraised in accordance with the revaluation schedule in the Current Agreements." The Deal Points further stated, "If the revaluation identifies a fair market value range for the specialty-specific wRVU rate, MLH and the PC agree to select the value that is at or above the 90th percent of that fair market value range." This "deal point" guaranteed that West Clinic physicians would be paid at a level of compensation per wRVU at or above the national 90th percentile.

90. West Clinic physicians also required the option to "unwind" and walk out of the deal with Methodist if their income decreased "10% or more in any given year over life of Master Transaction Agreement."

91. This "unwind" option in effect obligated Methodist to ensure that the physicians' income will not decrease by more than 10% in any given year. Methodist invested over $50 million in the office complex for West Cancer Center and the hospital system has received enormous profits from referrals by West Clinic physicians each year. West Clinic physicians and executives have repeatedly told Methodist's executives that the physicians will opt out of or "unwind" the deal if Methodist stops paying them profits derived from the physicians' prescriptions for oral cancer drugs. Methodist responded to the physicians' fears about losing the profits under the 340B Program by agreeing that

they could "unwind" the deal if their income decreased by more than 10 percent in any given year. Due to West Clinic's leverage as the source of lucrative referrals to the hospital system, Methodist in effect guaranteed the physicians' income would not significantly decrease.

92. Throughout the course of their "alliance," Methodist and West Clinic physicians have achieved massive financial gains at the expense of compliance with federal laws. Methodist's primary objective was to achieve greater market share of cancer patients in the region and the attendant profits from cancer infusion drugs, hospital admissions, outpatient visits, and ancillary services. West Clinic physicians' primary objective was massive income guarantees through receipt of drug profits based on the volume and value of their referrals for oral cancer drugs, inflated compensation per wRVU, and inflated management fees. The deal has been a guaranteed financial windfall to West Clinic physicians without any financial risks except the risk of exposure for violating federal laws.

93. The parties have achieved their objectives over the last six years and have sought to conceal the truth about their financial arrangement through a series of tactics to ensure secrecy and "confidentiality." West Clinic physicians and executives have had two major concerns: (1) exposure of the scheme in which Methodist has paid them over $50 million each year, and (2) actions by federal agencies or Congress to curb abuses or modify eligibility under the 340B Program. The parties have created a firewall of secrecy with respect to the payments from Methodist to West Clinic and have created a limited inner circle of individuals with knowledge of the financial terms. When Liebman questioned the legality of payments to West Clinic physicians, senior executives at Methodist

removed him from the inner circle of communications regarding West Clinic physicians and West Cancer Center.

94.     In orchestrating the kickbacks and illegal remuneration, Methodist's objectives included the referral of thousands of cancer patients insured by Medicare. The Defendants' scheme was and is illegal and harmful to patient care. Such physicians knew that Methodist was paying them at high levels not based on personal productivity, but rather based on their ability to generate revenues and profits for themselves and the hospital system through drug prescriptions, drug sales, inpatient admissions, outpatient visits, and ancillary services.

## Methodist's Payments Have Rewarded and Induced Referrals

95.     Since the beginning of the "alliance" between West Clinic and Methodist, increased referrals from West Clinic physicians to Methodist have led to massive profits for the hospital system.

96.     The effect of the "alliance" has been seen in the volume and value of patient referrals over the course of the contracts between West Clinic physicians and Methodist.

97.     Between 2012 and the 2014, inpatient oncology volume at Methodist more than doubled as hospital discharges for oncology admissions moved from 7,320 discharges in 2012 to 15,834 discharges in 2014. Outpatient oncology volume at Methodist moved from 27,890 visits in 2012 to 31,253 visits in 2014.

98.     For many years Methodist has maintained an accounting system to track and monitor the volume and value of patient referrals from all physicians to all hospitals and all service lines or departments of the hospital system. For example, in 2011, Methodist maintained "balanced scorecard" records that tracked monthly referrals for radiation

therapy to University Hospital. In 2011, the year before the "innovative partnership," West Clinic physicians referred 345 patients to University Hospital for radiation therapy. In 2012, West Clinic physicians referred 441 patients to University Hospital for radiation therapy. In 2014, West Clinic physicians referred 535 patients to University Hospital for radiation therapy. And in 2015, referrals from West Clinic physicians to University Hospital for radiation therapy increased to 646.

99. In addition to radiation therapy, West Clinic's referrals to Methodist have included thousands of patients for infusion cancer therapy. Methodist has received enormous profits from such referrals because Methodist acquired infusion therapy medications at deep discounts under the 340B Program and then sold the drugs at retail rates.

100. For example, in 2015, referrals from West Clinic physicians to Methodist generated drug profits to the hospital system of approximately $30.6 million under the 340B Program. In 2015 referrals from West Clinic physicians to Methodist also generated millions of dollars in hospital revenues for inpatient admissions, outpatient procedures, and ancillary services for cancer treatment.

101. In 2016, referrals from West Clinic physicians to Methodist generated drug profits to the hospital system of approximately $53.1 million under the 340B Program. In that year, referrals from West Clinic physicians to Methodist also generated millions of dollars in hospital revenues for inpatient admissions, outpatient procedures, and ancillary services for cancer treatment.

102. In forming the alliance with West Clinic and paying massive kickbacks to West Clinic physicians for their referrals, Methodist targeted increased revenues from

oncology services. For example, Methodist's revenues from cancer infusion therapy performed at Methodist hospitals increased from $6.1 million in the first quarter of 2015 to $10.3 million in the second quarter, $10.7 million in the third quarter, and $11.1 million in the fourth quarter.

103. In 2016, Methodist's revenues from cancer infusion therapy continued rising, moving from $14 million in the first quarter of 2016 to $16 million in the second quarter, $17 million in the third quarter, and $17.6 million in the fourth quarter.

104. Since the onset of the alliance, West Cancer Center and Methodist executives have regularly tracked and monitored the value of patient referrals from West Clinic physicians to Methodist. For example at a Methodist Strategy Committee meeting on August 1, 2014, top executives of Methodist met to discuss the "strategic priority" of a comprehensive cancer center. At this meeting, Erich Mounce, the West Cancer Center CEO, gave a presentation in which he stated that West Clinic physicians were "working on increasing admissions in all parties (MUH=4,582/ GTN=2,166/ North=937/ South=114/ OB=23)." Mounce listed the numbers of referrals by West Clinic physicians for inpatient admissions at each Methodist hospital. He stated that the West Cancer Center was "working on increasing admissions" to Methodist hospitals. He stated that each 1% increase in inpatient surgeries "will bring about $1.5 million" in profits to Methodist.

105. Mounce also provided the numbers of referrals by West Clinic physicians to Methodist for radiation therapy. In 2013, West Clinic physicians referred 1,544 patients to Methodist for radiation therapy. In 2014 as of August, West Clinic physicians referred 785 patients to Methodist for radiation therapy. Mounce stated that the West Clinic

"represents 59% of referrals" to Methodist for radiation therapy.

106.   Mounce also stated that "regulation changes" with the 340B Program were a "threat" to West Cancer Center.

107.   In response to Mounce's presentation, Gary Shorb, the Methodist CEO, stated "cancer is a real opportunity for us."

108.   During the Strategy Committee Meeting, Methodist executives discussed the fact that each referral for radiation therapy represented an "average contribution margin of $5,255 per patient per course (22-25 daily sessions)."

109.   Executives at Methodist and West Cancer Center have had an ongoing focus on the value of referrals from West Clinic physicians to Methodist. For example, at the meeting of the West Cancer Center Executive Operations Council on July 13, 2016, Erich Mounce, West Cancer Center CEO, and Chris McLean, Methodist CFO, "reviewed the first quarter financial results for the oncology service line with the committee members." "Specific discussion around 340B funds and the future effect of any 340B guideline changes were also discussed."[12]  Mounce also "discussed the great revenue results for medical oncology, gyn oncology, radiation oncology, and surgical oncology." All of these specialties are recipients of patient referrals by West Clinic physicians.

---

[12] The West Cancer Center CEO repeatedly discussed the 340B Program and potential regulatory changes because the profits from cancer drugs sold through Methodist's registration in the 340B Program were a major source of income to West Clinic physicians.

## Methodist Has Excessively Paid Many Employed Physicians

### Introduction

110.    Methodist's financial strategies to boost hospital revenues were not limited to the "alliance" with West Clinic physicians. Methodist's scheme has included paying excessive compensation to numerous employed physicians whose referrals generated high revenues for the hospital system.

111.    Revenues from perioperative services or ancillary revenues related to surgical procedures and admissions account for a major portion of annual profits at Methodist. Methodist's strategy to reward physicians for referrals includes multiple specialties discussed below, particularly physicians in position to order inpatient admissions or outpatient procedures.

112.    In determining compensation, the Methodist Defendants have paid such physicians not based on the value of their personal services but rather based in part on the historical and projected value of their referrals to the hospital system. Senior executives have profited from this scheme to boost revenues because they are paid bonuses based in part on the financial performance of the hospital system. This scheme has been a lucrative strategy of mutual enrichment for Methodist's senior executives and employed specialists, and a deliberate violation of *Stark* laws.

## Over $180 Million in Financial Losses in Last 5 Years

113.    UTMP is one of four physician groups employed by Methodist. The other physician groups are Specialty Physicians Group, Primary Care Group, and Le Bonheur Pediatrics.

114.    For all four employed physician groups, the financial losses were approximately $24.4 million in 2013, $45.6 million in 2014, $43.6 million in 2015, and $42 million in 2016.

115.    As of April of 2017, the Methodist employed physician groups were on track to lose approximately $54 million in that fiscal year. As of April 2017, the losses from the employed physician practices were as follows: $7.4 million loss for Specialty Physician Group, $8.1 million loss for UT Methodist Physicians, $695,000 loss for Primary Care Group, and $1.7 million loss for Le Bonheur Pediatrics.

116.    Prior to his departure from Methodist in September 2017, Liebman served as Co-Chairman of UTMP in addition to his other responsibilities as Senior Vice-President of Methodist Healthcare and Chief Executive Officer and then President of Methodist University Hospital.

117.    For 2016, the employed physicians of UTMP generated collections of approximately $23,289,675. (These financial figures were projected for 2016 as of October 2016). Yet the total operating expenses of UTMP were approximately $46,684,667, including physician salaries of approximately $29,165,108. In 2016, UTMP operated at a financial loss of approximately $24,413,859.

118.   The net revenue per wRVU for the employed physicians of UTMP was approximately $53.36 in 2016. Yet Methodist's cost per wRVU were approximately $109.91.

119.   In 2014, UTMP generated patient revenue of $19.4 million. Yet their salaries totaled $26.5 million. Including other operating expenses of the physician practices, UTMP generated losses of approximately $16.1 million in 2014.

120.   In 2014, the Specialty Physician Group generated patient revenue of $19.4 million. Yet their salaries totaled $26.8 million. Including other operating expenses of the physician practices, the Specialty Physician Group generated losses of approximately $17.2 million in 2014.

121.   In the prior year, the Specialty Physician Group generated patient revenue of $15.8 million. Yet their salaries totaled $22.6 million. Including other operating expenses of the physician practices, the Specialty Physician Group generated losses of approximately $14.1 million in 2013.

122.   In the past five years, the employed physicians at Methodist have generated financial losses in excess of $180 million if revenues from referrals are not considered.

**Methodist Budgeted for Major Losses**

123.   Financial losses related to the physician practices were not unexpected or unforeseen by Methodist's executives. Year after year, Methodist's senior strategists have budgeted for major losses from physician practices because their focus was revenues from referrals by these physicians.

124. Substantial budgeted losses stem from physicians that Methodist has designated as the "Specialty Physician Group." This Group has included cardiology and various surgical specialties.

125. For example, in 2016, Methodist budgeted losses of $18,693,000.00 related to the Specialty Physician Group. Actual losses were higher at approximately $21,489,000.00.

126. For surgical oncologists in 2016, financial losses were approximately $2,915,047 and budgeted losses for 2017 were $3,012,851.

127. For transplant surgeons, financial losses were approximately $3,982,365.00 in 2016. Net patient revenue from services of employed transport surgeons totaled $4,795,952, yet Methodist paid its transplant surgeons approximately $6,905,388.00. For 2017, Methodist budgeted losses of $3,985,650.00 related to the transplant surgeons.

128. For general surgeons in 2016, financial losses were approximately $1,347,124.00. Net patient revenues from the general surgeons' services were approximately $934,177.00 in 2016. Yet Methodist paid them $1,529,476.00. Methodist budgeted losses of $1,499,775 for the general surgeons in 2017 with physician salaries rising to $1,871,964 and anticipated net patient revenue of $1,282,568.00.

129. For gastroenterologists in 2016, financial losses were approximately $1,419,812.00. The net patient revenues from physician services were approximately $1,051,525.00 in 2016. Yet Methodist paid the gastroenterologists $1,314,965.00. Methodist budgeted losses of $1,418,348.00 for the gastroenterologists in 2017.

130.   Methodist also budgeted for major financial losses related to its employment of hospitalists who are in the clinical position to order tests, studies, and ancillary services that generate revenues for the hospital system.

131.   At University Hospital, Methodist budgeted losses of $2,221,819.00 in 2017 for its employed hospitalists. In 2017 budgeted patient revenues for the hospitalists' services were $1,781,229.00, while the hospitalists' salaries were budgeted at $3,170,666.00 for University Hospital. In 2016, net patient revenues for the hospitalists' services at University Hospital were approximately $1,789,064, while the hospitalists' salaries were approximately $3,077,777.00.

132.   At North Hospital in 2017, Methodist budgeted losses of $1,400,921.00 for its employed hospitalists. Budgeted patient revenues for the hospitalists' services were $1,319,116.00, while the hospitalists' salaries were budgeted at $2,296,236.00 in 2017. In 2016, net patient revenues for the hospitalists' services at North Hospital were $1,324,981.00, while the hospitalists' salaries were more than double net revenues at approximately $2,871,947.00.

133.   At Olive Branch Hospital, Methodist budgeted losses of $1,003,694 in 2017 for its employed hospitalists. Budgeted patient revenues for the hospitalists' services were $644,721.00, while the hospitalists' salaries were budgeted at $1,373,699.00 in 2017. In 2016, net patient revenues for the hospitalists' services at North Hospital were approximately $647,455.00, while the hospitalists' salaries were nearly double net revenues at approximately $1,254,786.00.

134. For 2014 Methodist budgeted losses of $11.7 million for UT Methodist Physicians. Methodist labeled the losses as "physician margin allocation" which was a transfer of funds by Methodist "allocated" to cover the losses from the physician practices.

135. Although budgeted losses were $11.7 million for UT Methodist Physicians in 2014, the actual losses were $16.1 million. The financial losses were broken down by specialty with transplant surgery leading the losses at $4.6 million. Urology generated losses of $1.1 million in 2014, general surgery generated losses of $1.3 million, surgical oncology generated losses of $1.3 million, and "hospitalist-north" generated losses of $1.2 million.

136. In 2015 Methodist budgeted losses of $16.2 million for UT Methodist Physicians. Methodist again labeled the losses as "physician margin allocation."

137. Although budgeted losses were $16.2 million for UT Methodist Physicians in 2015, the actual losses were $19.1 million. The losses were broken down by specialty with transplant surgery leading the losses at $2.4 million. Urology generated losses of $1.1 million in 2015, general surgery generated losses of $1.4 million, surgical oncology generated losses of $2.2 million, gastroenterology generated losses of $1.6 million, vascular surgery generated losses of $1.1 million, neurology generated losses of $1.1 million, pulmonary generated losses of $1.0 million, and "hospitalist-north" generated losses of $1.1 million.

138.   The same trend of budgeted major losses continued into 2016.  In 2016 Methodist budgeted losses of $22.7 million for UT Methodist Physicians. Methodist again labeled the losses as "physician margin allocation."

139.   Although budgeted losses were $22.7 million for UT Methodist Physicians in 2016, the actual losses were $24.3 million. The losses were broken down by specialty with transplant surgery again leading the losses at $3.6 million. Urology generated losses of $1.1 million in 2016, general surgery generated losses of $1.2 million, surgical oncology generated losses of $2.7 million, gastroenterology generated losses of $1.4 million, vascular surgery generated losses of $1.8 million, neurology generated losses of $1.0 million, "hospitalist-north" generated losses of $2.0 million, and "hospitalist-university" generated losses of $2.1 million.

## Methodist Tracked and Monitored Referrals to Offset Losses

140.   Methodist's strategy for physician compensation was to budget for major financial losses while tracking revenues from physician referrals that more than offset the losses.

141.   Methodist has established and implemented an accounting system of tracking the value and volume of patient referrals from every physician and physician group. Methodist's executives have generated regular reports that tracked the volume and value of referrals each month from every employed physician or physician group. These reports are called "balanced scorecards" in Methodist's accounting system.

142.   At each hospital and at each department within the Methodist system, accounting reports have regularly tracked the volume of patient referrals each month from all

physicians. For example, in 2015, Methodist tracked referrals for radiation therapy to Methodist University Hospital. West Clinic physicians led all sources of patient referrals for radiation therapy with 656 referrals to University Hospital in 2015. In 2016, West Clinic physicians again led all sources of referrals to University Hospital for radiation therapy with 546 patient referrals to University Hospital.

143.  Each month, Methodist tracked the volume and value of patient referrals from all physicians. Methodist's executives have used such referral data to determine and justify payments to physicians.

144.  For example, the volume and value of referrals from employed physicians was the focus of the Methodist "CEO Retreat" on July 11, 2014. This retreat for Methodist's top executives included a slide presentation titled, "CEO Retreat Service Line Assessment." The presentation focused on the values of referrals from employed physicians to Methodist hospitals. The analysis used 2013 data and excluded "surgery centers, West Clinic, hospital-based services at clinic and other freestanding systems."

145.   The slide presentation used the term "contribution margin" to describe the value of referrals from various physician specialty groups.

146.  Five specialties represented 57 percent of the value of physician referrals to the Methodist system: women's health, cardiology, orthopedic/neurosurgery, oncology, and psychiatry. "CV [cardiovascular services] and oncology contribute the most (42% of total CM)."

147.  The slide presentation stated, "Sutherland and West Clinic critical to sustaining our margin, give their commercial base (32% Sutherland, 41% percent West)."

Sutherland Cardiology is the employed cardiology group at Methodist. Commercial base refers to the percentage of patients with commercial insurance at Sutherland Cardiology and West Clinic.

148.   In 2013 the total profits from physician referrals to Methodist was $204.1 million. Cardiology/cardiovascular was the largest source of referrals among all physician specialties with $57.2 million in profits from referrals to the Methodist system, representing 78,284 patients. Oncology was second in the rankings of physician referrals by specialty with profits of $28.8 million in 2013, representing 65,557 patients.

149.   The presentation evidenced Methodist's extensive tracking and monitoring system to evaluate the volumes and values of physician referrals. That focus was the reason Methodist overpaid many physicians in relation to their personal productivity.

150.   Liebman attended many Physician Recruitment Committee meetings at Methodist. These meetings were generally held on Friday mornings every few weeks. Liebman attended these meetings because many physician losses were charged as expenses to Methodist University Hospital where Liebman served as CEO.

151.   At these meetings, Methodist executives regularly evaluated physician recruits based on the value of their potential referrals to the Methodist system and regularly prepared proformas with actual or projected revenues from referrals by physicians being recruited. Methodist's executives used these proformas with historical or projected referral revenues to determine salary packages for physicians.

152.   The Methodist Defendants have given excessive salaries to numerous physicians based on the value of inpatient admissions, outpatient procedures, and related ancillary

services generated by these physicians for the Methodist system. All of these physicians are clinical decision makers in a position to generate revenues for the hospital system from inpatient surgeries, outpatient procedures, tests, studies, or other ancillary services.

153.   In 2016 the Methodist Defendants paid at least 43 physicians compensation per wRVU in excess of the most recent national 90th percentile benchmarks published by MGMA.  All of these physicians were clinical decision makers in a position to generate revenues for the hospital system from inpatient surgeries, outpatient procedures, laboratory tests, imaging studies, or other ancillary services.

154.   This pattern of excessive compensation to multiple physicians reflects Methodist's prevalent strategy to pay physicians not simply based on their personal services, but rather based in part on their ability to generate revenues for the hospital system.

### Methodist Has Excessively Paid Cardiologists and Cardiovascular Surgeons

155.   Excessive physician compensation generally can be traced to the physician groups generating the highest losses each year. Such financial losses reflect physician compensation in excess of revenues for physician services. At Methodist, it is no coincidence that employed cardiologists and cardiovascular surgeons receiving the most excessive salaries (relative to productivity) and generating the highest losses are also the leading sources of profitable referrals to the Methodist system. Increasing cardiology referrals has been at the center of Methodist's strategy and the major losses from over-compensation of cardiologists and cardiovascular surgeons evidence Methodist's strategy to reward physicians in these specialties for referrals.

156.    Methodist has organized their employed physicians into four groups: UT Methodist Physicians ("UTMP"), Specialty Physician Group, Primary Care Group, and Le Bonheur Pediatrics. The financial losses for all four physician groups were approximately $24.4 million in 2013, $45.6 million in 2014, $43.6 million in 2015, and $42.0 million in 2016.

157.    In 2015 the losses for Specialty Physician Group were $18.6 million. In 2016 the losses for Specialty Physician Group were $21.4 million.

158.    Each year, the financial losses from excessively paid cardiologists have dominated the physician practice losses for Specialty Physician Group. From Physician Specialty Group in 2016, Sutherland Cardiology had $7.9 million in losses, UTMP Cardiology had $4.7 million in losses and CV (cardiovascular surgery) had $4.0 million in losses. In 2015, Sutherland Cardiology had $8.0 million in losses, UTMP Cardiology had $3.6 million in losses and CV (cardiovascular surgery) had $3.1 million in losses.

159.    These major losses were planned and budgeted by Methodist. In 2016, Methodist budgeted for financial losses from Sutherland Cardiology in the amount of $7.8 million, from UTMP Cardiology in the amount of $3.6 million, and from cardiovascular surgery in the amount of $3.1 million.

160.    These financial losses for cardiology practices were stunning in view of the substantial base of commercial insured patients and Medicare patients receiving cardiac care at Methodist as discussed at the Methodist CEO Retreat. Poor collections or indigent services did not explain the financial losses. Rather, the financial losses were due to

excessive physician compensation that Methodist paid while its executives tracked and monitored lucrative revenues from physician referrals that more than offset the losses.

161.   Sutherland Cardiology has included the following physicians:

Interventional Cardiologists

Javed Abdullah
Keith Anderson
Brian Borkowski
Ajay Dalal
Claro Diaz
Matthew Lyons
Michael McDonald

EP cardiologists

Yosef Kahn
James Litzow
Mehu Patel
Galen Van Wyhe

Non-Interventional Cardiologists

Steve Atkins
Eduardo Basco
Beverly Daniel
Jack Hopkins
Manavjot Sidhu
Maureen Smithers
James Stamper
David Stewart
Lisa Young

162.   UTMP Cardiology has included 11 cardiologists:

Interventional cardiologists

Shadwah Alsafwah
Raza Askari
Dwight Dishmon
Stevan Himmelstein
Uzoma Ibebougo

Rami Khouzam

EP Cardiologists

Rajesh Kabra
Joseph Levine

Non-Interventional Cardiologists

Sunil Jha
Timothy Woods
Neeraja Yedlapati

163.   CV has included 5 cardiovascular surgeons: Drs. Edmond Owen, Gregory Fink, Anthony Holden, Eva Proctor, and Samuel Robbins.

164.   Methodist's senior management has engaged in a campaign of misinformation to conceal the actual compensation of employed cardiologists. Liebman attended several meetings in 2016 and 2017 with Bill Breen, Methodist's Senior Vice President of Physician Alignment, Chris Jenkins, Executive Director of UT Methodist Physicians, and Dr. David Stern, Vice-Chancellor for Clinical Affairs at UT College of Medicine. In these meetings, Breen represented that all employed cardiologists at Methodist were paid $54 per wRVU. In additional meetings with Liebman and Dr. James Porterfield, Breen again confirmed that same rate of compensation for all employed cardiologists.

165.   The reality is that many cardiologists at Methodist have been paid at far higher levels. There are multiple examples of excessive compensation to employed interventional cardiologists, cardiovascular surgeons, and non-invasive cardiologists at Methodist.

166.   The compensation of Dr. Owen, a cardiovascular surgeon, is a good example of Methodist's strategy to control and reward patient referrals. In 2011 and 2012, Dr.

Owen's salary in private practice was just over $400,000. Yet in 2014, Methodist hired Dr. Owen with a salary package of approximately $1.3 million. The reason for this triple increase in income was the value of his referrals to the Methodist system.

167.    Methodist gave Dr. Owen a base compensation package valued at approximately $1,083,000 with no productivity requirements. The compensation package included base salary, faculty appointment salary, quality bonus, call pay, and medical director payments. In addition, Methodist agreed to pay him $60 per wRVU above 11,000 wRVUs each year.

168.    In 2013 the national 90th percentile compensation for cardiovascular surgeons was $1,051,084.49 according to the 2014 MGMA Survey.[13] Methodist gave Dr. Owens a base compensation package in excess of the national 90th percentile with no productivity requirements. In addition, Methodist gave him productivity incentives that would take his compensation far in excess of the national 90th percentile.

169.    One trick Methodist used to boost his salary package was to give him call pay of $850 per day for 365 days a year or $310,250. No physician can realistically take 12-hour call coverage every day of the year plus work a full-time schedule.

170.    The call pay was for being "on call" at Methodist North Hospital, but that hospital rarely has cardiovascular surgery emergencies.

---

[13] Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are leading benchmarking resources for physician compensation in the United States. The annual MGMA Surveys are based on physician compensation and productivity data in the prior year. For example, the 2017 MGMA Survey reports physician compensation data from 2016.

171.  In addition to Dr. Owen, Methodist has overpaid other invasive cardiologists, interventional cardiologists, and cardiovascular surgeons.

172.  In 2016, Methodist hired Dr. Stevan Himmelstein, an interventional cardiologist. The Physician Employment Agreement does not require Dr. Himmelstein to work full-time and contemplates that Dr. Himmelstein would have a separate employment agreement "relating to Physician's faculty appointment or other duties" with UT College of Medicine.

173.  For less than full-time work, Methodist agreed to pay Dr. Himmelstein a flat salary of $950,000.00 "guaranteed" for his first year of employment with no productivity requirements. This amount was at the national 90th percentile compensation for interventional cardiologists ($953,189.97) according to the 2017 MGMA Physician Survey based on 2016 data. Methodist also paid Dr. Himmelstein a "one-time retention bonus" of $500,000.00 payable within 30 days of the contract's effective date.

174.  The initial term of the Agreement with Dr. Himmelstein is 5 years. After the first year of his employment, his compensation would supposedly be adjusted based on his wRVUs in relation to a threshold level of production of 17,790 wRVUs. The Employment Agreement requires that the wRVUs must be "personally performed" by the physician.

175.  The reality at Methodist is that interventional cardiologists have been commonly credited and compensated for the wRVUs of nurse practitioners. To manipulate physician compensation at excessive levels but appear to be paying physicians based on wRVUs, Methodist has given some cardiologists credit for the wRVUs of their nurse practitioners.

This credit was a reward to the interventional cardiologists and cardiovascular surgeons who generated lucrative inpatient admissions and outpatient procedures for cardiac care. They were not paid based only on their personal productivity. Both Sutherland Cardiology and UTMP Cardiology have had a significant problem of inflated wRVUs being calculated and paid by Methodist.

176.   As mentioned, the most recent national 90th percentile compensation for interventional cardiologists was $953,189.97 according to the 2017 MGMA Survey based on 2016 data. Yet in 2016 Methodist paid three other interventional cardiologists at UTMP Cardiology----Dr. Khouzam, Dr. Alsafwah, and Dr. Ibebuogu---in excess of $1 million each. In 2016 Methodist paid $1,043,166 to Dr. Khouzam, $1,168,616 to Dr. Alsafwah, and $1,015,703 to Dr. Ibebuogu. Their wRVUs were reportedly in the range of 14,557-16,340 in that year. But if the interventional cardiologists were producing at high levels to justify their extraordinary compensation, then UTMP Cardiology should not be generating such major financial losses year after year. [14]

177.   In 2016, Methodist paid another interventional cardiologist, Dr. Jack Hopkins, $415,422.00 for only 3,450.11 wRVUs.  Methodist paid him at the level of $120 per wRVU---above the national 90th percentile for interventional cardiologists ($94.64) according to the 2017 MGMA Survey based on 2016 data.

178.   In 2016, Methodist paid Dr. Levine, a cardiac electrophysiologist, $484,626.24 for only 1,184.82 of wRVUs. His wRVUs were far below the national 10th percentile of wRVUs (5,741.55) according to 2017 MGMA data. He was a paid at a level of $409.03

---

[14]  In 2016 UTMP Cardiology had $4.7 million in financial losses. In the prior year, UTMP Cardiology had $3.6 million in financial losses.

per wRVU as compared to the national 90th percentile compensation of $87.63 per wRVU according to the 2017 MGMA Survey.

179. In 2016, Methodist paid Dr. Reed, a noninvasive cardiologist, $75,004.80 for only 443.26 wRVUs. Methodist paid him at the level of $169.21 per wRVU as compared to the national 90th percentile of $99.77 per wRVU for noninvasive cardiologists according to the 2017 MGMA Survey.

180. In 2016, Methodist paid Dr. Sidhu, a noninvasive cardiologist, $143,558.80 for only 196.90 wRVUs. Methodist paid him at the level of $729.09 per wRVU as compared to the national 90th percentile of $99.77 per wRVU for noninvasive cardiologists according to the 2017 MGMA Survey.

181. In 2016, Methodist paid Dr. Yedlapati, a noninvasive cardiologist, $126,497.60 for only 552.55 wRVUs. Methodist paid him at the level of $228.93 per wRVU as compared to the national 90th percentile of $99.77 per wRVU.

182. In 2016, Methodist paid Dr. Maureen Smithers, a noninvasive cardiologist, $327,516.00 for 2,991.62 wRVUs (below the national 10th percentile of 3,881 wRVUs). Methodist paid her at the level of $109.47 per wRVU compared to the national 90th percentile of $99.77 per wRVU. Her compensation was excessive for a cardiologist producing wRVUs at a level below the national 10th percentile.

183. With respect to all physicians within Specialty Physician Group, Methodist tracked the values and volumes of their patient referrals, including the value of drug prescription profits under the 340B Program. Within Specialty Physician Group, Sutherland Cardiology was the leading source of referrals for drug prescriptions leading

to 340B profits of $2.27 million for Methodist in 2016. In that year Methodist budgeted for 340B profits from Sutherland Cardiology's referrals in the amount of $1.9 million.

## Methodist Has Excessively Paid Transplant Surgery Physicians

184.    Among the four physician groups organized at Methodist, UT Methodist Physicians has also generated major financial losses from excessive physician compensation. For example, in 2016 Methodist budgeted losses of $22.7 million for UT Methodist Physicians. The actual losses were $24.3 million.

185.    The losses within UT Methodist Physicians were broken down by specialty with transplant surgery leading the losses at $3.6 million. Surgical oncology generated losses of $2.7 million, gastroenterology generated losses of $1.4 million, vascular surgery generated losses of $1.8 million, "hospitalist-North" generated losses of $2.0 million, and "hospitalist-University" generated losses of $2.1 million.

186.    Year after year, the transplant surgery group and the oncology surgery group have led the financial losses within UT Methodist Physicians.

187.    In the summer of 2017, Chris McLean, Chief Financial Officer at Methodist, wrote a report regarding the financial losses caused by over-compensation of the UTMP transplant surgeons.

188.    In his report, McLean wrote, "Transplant has lost $2.5 million in the first five months of the year and is $520,000 worse than budget." "The practice is on track to lose $5.0 million for the year which will be worse than the budgeted loss of $3.9 million and the loss in 2016 of $3.6 million."

189.  McLean listed the "key factors driving lower margin." Three of these factors listed were "lower [physician] rvu's." "lower 340b savings," and "higher prof fee expense."

190.  The phrase "lower 340b savings" meant lower profits from prescription drugs written by these physicians. McLean's analysis confirmed again Methodist's compensation system that evaluated and rewarded physicians based on the value of their referrals, including referrals for prescription drugs under the 340B Program.

191.  The primary reason for the multi-million dollar losses of the UTMP transplant practice was that physician salaries far exceeded the revenues for physician services. As of June 2017, the transplant surgeons' salaries were $3,791,000 while net revenues from their services were  $2,383,000.00.

192.  This loss was budgeted and planned by Methodist. The June year-to-date budgeted physician salaries were $3,897,000.00 while budgeted net revenues from the transplant surgeons' services were $2,692,000.00.

193.  The net revenues per physician wRVU as of June 2017 were $71.00 while the physician salaries per wRVU were $115.00. The budgeted revenue per physician wRVU was $78.00 while the budgeted physician salary per wRVU was $117.00.

194.  The significant losses from over-compensation of transplant surgeons have been ongoing at Methodist for numerous years. In his report, McLean listed the losses from prior years. In 2015, the transplant surgeons generated net revenues of $5.1 million, yet they were paid $7.2 million. In 2015, the transplant surgeons' net revenue per wRVU was

$83 on average, yet they were paid $121 per wRVU on average and had total practice expenses of $147 per wRVU. Their practice losses totaled $2.4 million in 2015.

195.   In 2016, the transplant surgeons generated net revenues of $4.7 million, yet they were paid $7.2 million. The transplant surgeons' net revenue per wRVU was $76 on average, yet they were paid on average $122 per wRVU. Their total practice expenses were $159 per wRVU. Their practice losses totaled $3.63 million in 2016.

196.   In 2015 and 2016, their salaries stayed at approximately $7.2 million regardless of productivity or revenues from their personal services.

197.   Even with years of significant losses from the transplant surgeons' practice, Methodist budgeted bonuses of $1.075 million for these physicians in 2017.

198.   In his analysis, McLean wrote, "We are assuming the lower 340b revenues are due to the shortage of nephrologists and will improve when the new physicians start---is this a reasonable assumption?" Methodist's executives again focused on the value of referrals, including the value of prescription drug referrals from nephrologists, to offset the planned losses from excessive physician compensation within the transplant surgery group.

199.   McLean further wrote, "The key issue that we have to address is that we are seeing lower revenues (net patient, 340b, and St. Thomas) with higher operating costs especially physician salaries." "There does not appear to be enough volume to support the number of physicians and the physician salaries we have in several specialties."

200. This statement revealed a detrimental consequence of Methodist's business model: physicians know that they are overpaid and must generate sufficient volumes of referrals and ancillary revenues to justify their salaries.

**Examples of Excessive Payments within Transplant Surgery Group**

*Dr. Eason---Transplant Surgeon*

201. In 2016, Methodist paid $1,699,520.00 to Dr. Eason, a transplant surgeon. Each year Methodist has paid this range of salary to Dr. Eason despite low personal productivity at the national 25th percentile level. His wRVUs were only 3,791 in 2015, 4,370 in 2016, and budgeted at 4,369 in 2017. Methodist has paid Dr. Eason over double the national 90th percentile for transplant surgeons in the United States as tracked by MGMA ($780,817.74 in 2016 MGMA Survey and $761,134.36 in 2017 MGMA Survey).

202. Through May of 2017, Methodist paid Dr. Eason at a level of $298 per wRVU--- far above the most recent 2017 national 90th percentile compensation per wRVU for transplant surgeons ($182.35). For 2017 Methodist budgeted Dr. Eason's salary even higher at $367 per wRVU.

*Dr. Puri---Transplant Surgeon*

203. In 2016, Methodist paid $320,004.80 to Dr. Puri who worked only 1,209.96 wRVUs. Methodist paid Dr. Puri at a level of $264.48 per wRVU---far above the 2017 MGMA national 90th percentile compensation per wRVU for transplant surgeons ($182.35). For 2017 Methodist budgeted Dr. Puri's salary at $243 per wRVU---again far above the most recent national 90th percentile of $182.35.

### Dr. Maliakkal---- Hepatologist (Part of Transplant Surgery Group)

204.  In 2016, Methodist paid $283,854.00 to Dr. Maliakkal who worked only 569.54 wRVUs. Methodist paid Dr. Maliakkal at a level of $498.39 per wRVU---3.97 times the most recent 2017 MGMA national 90th percentile compensation per wRVU for hepatologists ($125.30).

205.  In 2017, Dr. Maliakkal's annualized wRVUs were 4,577 or just below the national 25th percentile (4,584.42), yet Methodist paid him approximately $549,993--- above the national 75th percentile for hepatologists ($531,987.46) according to the 2017 MGMA Survey.

### Dr. Bilal Ali, Hepatologist (Part of Transplant Surgery Group)

206.  In 2017, Methodist budgeted compensation to Dr. Ali at the rate of $271 per wRVU. This rate was more than double the 90th percentile compensation per wRVU for hepatologists ($125.30) according to the 2017 MGMA Survey.

### Dr. Vinaya Rao, Nephrologist

207.  In 2016, Methodist paid $308,294.80 to Dr. Rao who worked 2,865.11 wRVUs. Methodist paid Dr. Rao at a level of $107.60 per wRVU--- above the national 90th percentile compensation per wRVU for nephrologists ($83.16) according to the 2017 MGMA Survey.

55

*Dr. Manish Talwar, Nephrologist*

208.   According to McLean's report, Methodist was on track in 2017 to pay annualized compensation to Dr. Talwar in the amount of $438,000. His wRVUs were annualized at 4,896. His compensation was at the level of $89 per wRVU---above the 90th percentile compensation per wRVU for nephrologists ($83.16) according to the 2017 MGMA Survey.

## Methodist Has Overpaid Oncology Surgeons

209.   In the summer of 2017, McLean also wrote a recent report evaluating the financial losses of the UT Methodist Physicians oncology surgeons.

210.   McLean began the report by stating, "Surgical Oncology in [sic] on track in 2017 to lose $3.3 million once the cancer lift support[15] is removed and the full salary costs for Dickson and Deneve are paid by UTMP." "In comparison, Methodist has six employed general surgeons that will lose $1.5 million which is $1.8 million below the losses for the surgical oncology department."

211.   For the oncology surgeons in 2017, the net revenues per wRVU were $68. Yet their total practice salary per wRVU was $84 and their total practice expenses per wRVU were $140.

---

[15]   "Cancer lift support" refers to the massive funding Methodist has poured into the West Cancer Center and oncology service line. This funding is discussed in detail in Liebman's original Disclosure.

212. The discrepancy was worse in 2016. For the oncology surgeons in 2016, the net revenues per wRVU were $68. Yet their total practice salary per wRVU was $91 and their total practice expenses per wRVU were $147.

213. McLean focused on the surgeons' excessive fixed salaries that were not based on personal productivity. McLean wrote, "So the key conclusion that I draw from this data is the production levels as measure by rvus of the surgical oncologists are good but the cost is higher given the compensation levels and the fixed salary structure which does not adjust salary based on volume production." The oncology surgeons have not been paid based on their personal productivity.

214. McLean ended his report with the statement: "[W]e probably need to discuss compensation models and any potential concerns on comp per rvu levels."

**Examples of Excessive Payments to Oncology Surgeons**

*Dr. Daugherty*

215. In 2016, Methodist paid Dr. Daugherty at a level of $477 per wRVU---4.13 times the national 90th percentile compensation per wRVU for oncology surgeons ($115.49) according to the 2017 MGMA Survey.

*Dr. Glazer*

216. In 2016, Methodist paid Dr. Glazer at a level of $170 per wRVU as compared to the MGMA national 90th percentile of $115.49 for oncology surgeons.

### *Dr. Shibata*

217.   According to Methodist's 2016 statement of physician compensation and wRVUs, Methodist paid $453,469.60 to Dr. Shibata who generated only 2,368.18 wRVUs. Methodist paid Dr. Shibata at a level of $191.48 per wRVU---1.65 times the national 90th percentile compensation per wRVU for oncology surgeons ($115.49).

218.   According to the Chief Financial Officer's analysis of financial losses from oncology surgeons, Methodist paid Dr. Shibata at a level of $152 per wRVU in 2016---- far above the national 90th percentile compensation per wRVU for oncology surgeons ($115.49). Through May of 2017, Methodist paid Dr. Shibata at a level of $121 per wRVU.

### *Dr. Khaled*

219.   In 2016 Methodist paid $815,374.00 to Dr. Khaled, a medical oncologist who specializes in bone and marrow transplant procedures. His wRVUs were 4,994.35---over the national median of 4,442.77 but below the national 75th percentile (5,933.41) according to the 2017 MGMA Survey. Yet his cash compensation of $815,374.00 far exceeded the national 90th percentile ($646,226.73). He was paid at the level of $163.26 per wRVU---just below the national 90th percentile of $169.34 per wRVU for medical oncologists according to the 2017 MGMA Survey.

220.   The compensation package paid to Dr. Khaled was a typical business strategy at Methodist in recruiting and compensating physicians who would generate substantial

revenues to the hospital system. On July 24, 2014, Liebman attended a dinner meeting to help recruit Dr. Khaled from Orlando. After the meeting, Donna Abney, Executive Vice-President of Methodist, and Michael Ugwueke, the Chief Operating Officer at the time, informed Liebman that Dr. Khaled would be paid in excess of fair market value and because his practice would lose money, the losses would be kept out of the financial statements for West Cancer Center, and instead his salary and losses would be allocated to the employed medical group for Methodist University Hospital. Liebman objected that this approach did not make sense and requested to see Dr. Khaled's final employment contract before it was signed. Liebman's objection and request were ignored.

221.   In the Physician Employment Agreement with Dr. Khaled effective May 1, 2015, there is no requirement regarding Dr. Khaled's productivity. There is no contract provision requiring Dr. Khaled to work any set hours or days or produce any level of wRVUs. The Physician Employment Agreement simply states, "Physician agrees to devote substantial time and energy from and after the Effective Date to the delivery of patient care services…" (Physician Employment Agreement, Par. 1, p. 1). Yet his cash compensation was set at $800,000 in year one of his contract and $850,000 in years two and three.

222.   Gary Shorb, the former Chief Executive Officer of Methodist, authorized and directed the excessive payments to Dr. Khaled because of the hospital system's lucrative revenues from his referrals for bone marrow transplant procedures and admissions.

**Methodist Excessively Paid Hospitalists**

223.   As mentioned above, among the four physician groups organized at Methodist, UT Methodist Physicians has also generated major financial losses from excessive physician compensation. For example, in 2016 Methodist budgeted losses of $22.7 million for UT Methodist Physicians. The actual losses were $24.3 million.

224.   The losses within UT Methodist Physicians were broken down by specialty with transplant surgery leading the losses at $3.6 million. Surgical oncology generated losses of $2.7 million, gastroenterology generated losses of $1.4 million, vascular surgery generated losses of $1.8 million, "hospitalist-North" generated losses of $2.0 million, and "hospitalist-University" generated losses of $2.1 million.

225.   "Hospitalist-North" refers to the hospitalists employed by Methodist at Methodist North Hospital in Memphis. "Hospitalist-University" refers to Methodist University Hospital where Liebman served as Chief Executive Officer and President.

226.   Hospitalists or internal medicine physicians are commonly responsible for ultimately deciding whether a patient should be admitted to a hospital. *See* Medicare Benefit Policy Manual 100-02, Ch. 1, Sec. 10. The model for determining inpatient admissions at Methodist hospitals commonly revolves around the decision-making of hospitalists or internal medicine physicians. Methodist has excessively paid many employed hospitalists as rewards and inducements for ordering increased admissions to the hospital system.

**Examples of Excessive Payments to Hospitalists**

227. There are numerous examples of excessive payments by Methodist to employed hospitalists and internal medicine physicians.

228. In 2016 Methodist paid $219,781.88 to Dr. Brown, an internist, for only 41.75 of wRVUs. Dr. Brown was paid on the level of $5,268.02 per wRVU. In 2016 the national 90th percentile compensation per wRVU for internal medicine was $86.66 according to the 2017 MGMA Survey.

229. In 2016 Methodist paid $103,074.00 to Dr. Johnson, an internist, for only 717.05 wRVUs. Dr. Johnson was paid on the level of $143.75 per wRVU as compared to the national 90th percentile compensation per wRVU of $86.66 for internal medicine according to the 2017 MGMA Survey.

230. In 2016 Methodist paid $205,271.52 to Dr. Edwards, an internist, for only 1,648.83 wRVUs. Dr. Edwards was paid on the level of $124.50 per wRVU as compared to the national 90th percentile compensation per wRVU of $86.66 for internal medicine.

231. In 2016 Methodist paid $347,678 to Dr. Mancell, a hospitalist. His wRVUs were only 1,577.73---less than the national 10th percentile. Yet his compensation exceeded the national 75th percentile for hospitalists ($337,051.35) according to the 2017 MGMA Survey based on 2016 data. His compensation per wRVU was $220.37 as compared to the national 90th percentile of $125.78 for hospitalists.

232. In 2016 Methodist paid $237,684.00 to Dr. Okafor, a hospitalist. Her wRVUs were only 1,590.28---less than the national 10th percentile. Her compensation per wRVU was $149.46 as compared to the national 90th percentile of $125.78 for hospitalists.

## Applicable Laws

## Introduction to Federal *Stark* Laws

233.    Enacted in 1989 to contain health care costs and reduce conflicts of interests, the *Stark* laws generally prohibit physicians from referring[16] their Medicare patients to business entities, such as hospitals or laboratories, with which the physicians or their immediate family members have a "financial relationship." 42 U.S.C. §1395nn(a)(1); *see generally* 42 C.F.R. §§ 411.350-.389 ("Subpart J---Financial Relationships Between Physicians and Entities Furnishing Designated Services").  Subsequent amendments later extended certain aspects of *Stark* Laws to Medicaid patients. *See* 42 U.S.C. §1396b(s).

234.    The statute and regulations further prohibit any entity from submitting a Medicare claim for services rendered pursuant to a prohibited referral, 42 U.S.C. §1395nn(a)(1)(B); 42 C.F.R. §411.353(b), prohibit Medicare from paying any such claims, 42 U.S.C. §1395nn(g)(1); 42 C.F.R. §411.353(c), and require an entity that receives payment for such a claim to reimburse the funds to the United States, 42 C.F.R. §411.353(d).

235.    The *Stark* laws define a "financial relationship" to include a "compensation arrangement," 42 U.S.C. §1395nn(a)(2), which means "any arrangement involving any

---

[16] The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A).  The accompanying regulations also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

remuneration between a physician (or an immediate family member of such physician) and an entity." *See* 42 U.S.C. §1396nn(H)(1)(A).

236.   In turn, "remuneration" is broadly defined to include "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1395nn(h)(1)(B); *see also* 42 C.F.R. §411.351 ("Remuneration means any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind").

237.   Congress enacted the *Stark* Statute in two parts, commonly known as *Stark I* and *Stark II.*  Enacted in 1989, *Stark I* applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

238.   In 1993, Congress extended the *Stark* Statute (*Stark II*) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.  As of January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

239.   As discussed above, Methodist entered into a Professional Services Agreement with West Clinic physicians effective December 31, 2011. The Agreement has an initial

term of seven years ending on December 31, 2018.

240. *Stark* laws establish the requirements for an entity providing remuneration or any benefit to a physician through a "personal service arrangement." Among those requirements, the remuneration over the term of the arrangement "is set in advance," "does not exceed fair market value," and "is not determined in a manner that takes into account the volume and value of any referrals or other business generated between the parties." *See* 42 U.S.C.S. §1395nn(e)(3)(A)(v); 42 C.F.R. §411.357 (d)(1)(v).

241. Any remuneration or benefit given by a hospital to a physician must be based solely on the physician's personal labor. In pertinent part, the statutory language focuses on "the fair market value of the services" personally performed by the physician. 42 U.S.C.S. § 1395nn (e)(2). The *Stark* law prohibits a hospital from offering or giving remuneration or benefits to referring physicians "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. §1395nn(e)(2).

242. The *Stark* law also requires that physician remuneration must be "provided pursuant to an agreement which would be commercially reasonable even if no referrals were made" to the hospital. 42 U.S.C.S. § 1395nn (e)(2).

243. A hospital employing a physician who makes referrals to that hospital of Medicare and Medicaid patients must satisfy the statutory requirements for "bona fide employment relationships." Under the *Stark* laws, a "bona fide employment relationship" must satisfy the following four relevant requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment...is consistent with the fair market value of the services" personally provided by the

physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

244.  *Stark* laws also establish that when a hospital leases office space to referring physicians, "the space rented or leased does not exceed that which is reasonable and necessary for the legitimate business purpose of the lease arrangement" and the "rental charges" must be "consistent with fair market value." *See* 42 C.F.R. §411.357(a)(3) and (4). The "lease arrangement [must] be commercially reasonable even if no referrals were made between the lessee and the lessor." *See* 42 C.F.R. §411.357(a)(6)

245.  Methodist has repeatedly and deliberately violated these well-established requirements of federal *Stark* laws.

246.  Once the plaintiff or the government has established proof of each element of a *Stark* violation, the burden shifts to the defendant to establish that the conduct was protected by an exception.[17] If no exception applies to a *Stark* violation, then all referrals

---

[17]     Among the multiple requirements of the "academic medical center" safe harbor provided in *Stark* regulations, the referring physician must be a bona fide full-time or "substantial" part-time employee of the center. *See* 42 C.F.R. §411.355(e)(1)(i)(A). West Clinic physicians are a private practice group. They are not employees of any academic medical center.

          For employees of an academic medical center, the total compensation at the center cannot "exceed the fair market value of all of the services provided" and cannot be "determined in a manner that takes account the volume or value of any referrals." *See* 42 C.F.R. §411.355(e)(1)(ii). Even if Methodist could qualify as an academic medical center, Methodist has repeatedly violated these regulatory requirements under the *Stark* laws. Methodist has repeatedly paid physicians in excess of fair market values based in part on the volume and value of their referrals or ability to generate revenues for the hospital system.

from the referring physician to the DHS entity are subject to prohibition.

## **Introduction to Federal Anti-Kickback Statute**

247.   The AKS prohibits "knowingly and willfully" offering or paying remuneration to induce a referral "for an time or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

248.   The AKS specifies that "remuneration" includes "any kickback, bribe or rebate" and broadly applies to benefits provided "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1320a-7b(b)(1) & (2). "Remuneration" is defined elsewhere to include "transfers of items or services for free or for other than fair market value." 42 U.S.C. §1320a-7a(i)(6). Courts have construed this definition to include intangible remuneration, such as the opportunity to earn a fee.

249.   The AKS arose out of Congressional concern that financial inducements to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, of poor quality or even harmful to a vulnerable patient population.

---

   Likewise, West Cancer Center cannot qualify as a component of an "academic medical center." The regulations define component of an academic medical center as "an affiliated medical school, faculty practice plan, hospital, teaching facility, institution of higher education, departmental professional corporation, or nonprofit support organization whose primary purpose is supporting the teaching mission of the academic medical center." *See* 42 C.F.R. §411.355(e)(1)(i)(A). The primary purpose of West Cancer Center is not "supporting the teaching mission of an academic medical center."

   Among other requirements, all transfers of money between components of the center must "directly or indirectly support the missions of teaching, indigent care, research, or community service." *See* 42 C.F.R. §411.355(e)(1)(iii)(A). In this case, Methodist has transferred massive amounts of money to West Clinic physicians **not** for the purposes of teaching or indigent care, research or community service---but rather to reward and enrich private physicians for their referrals to the hospital system.

250. The AKS was based in part on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there was a financial incentive to generate business.

251. To protect the integrity of federal health care programs, and realizing the difficulty of regulators and law enforcement to review every case for medically unnecessary procedures, Congress enacted a *per se* prohibition against financial inducements in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

252. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that financial inducements masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

253. The AKS prohibits a hospital from offering "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

254. The AKS broadly prohibits the exchange of referrals for remuneration, which is defined to include "any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind." See 42 U.S.C. §1320a-7b(b)(1).

255. Under federal law, if any one purpose of remuneration is to induce or reward

referrals, the AKS is violated.

256. The AKS has two separate liability provisions, the violation of *either* of which subjects a person to liability. *See* 42 U.S.C. § 1320a-7b(b)(1)(A) (prohibiting the solicitation and receipt of remuneration in exchange for referrals; 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration to induce referrals). The AKS is violated if a hospital knowingly and willfully offered remuneration to induce referrals even if the doctors were not actually induced. *See* 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration for the purpose of inducing referrals). Under the AKS, any amount of inducement is illegal.

257. Violation of the AKS may subject the perpetrator to exclusion from participation in federal health care programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. *See* 42 U.S.C. § 1320-7(b) (7) and 42 U.S.C. § 1320a-7a (a) (7).

258. Any party convicted under the AKS must be excluded from federal health care programs for a term of at least five years. *See* 42 U.S.C § 1320-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from federal healthcare programs for a discretionary period and may consider imposing administrative sanctions of $50,000 per kickback violation. *See* 42 U.S.C. § 1320a-7(b).

259. Compliance with the AKS is a prerequisite to a provider's right to receive and retain payments from Medicare, Medicaid and other federal health care programs. Similarly, compliance with the federal AKS and comparable state anti-kickback statutes

is a prerequisite to a provider's right to receive and retain payments from state-funded health care programs.

260.   Claims for payment for services tainted by financial inducements for referrals prohibited by the AKS are false or fraudulent under the False Claims Act because providers of such services are ineligible to participate in government health care programs, and the government would not have paid such claims had it known of the inducements for referrals. *See* 31 U.S.C. §§ 3729(a) & (b); 42 U.S.C. §§ 1320a-7b(b), (f) & (g).

261.   Effective March 23, 2010, the Patient Protection and Affordable Care Act confirmed that claims submitted in violation of the AKS automatically constitute false claims for purposes of the False Claims Act. The statute states, "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

262.   Congress also eliminated the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. *See* 42 U.S.C. § 1320a-7b(h).

### Compliance with *Stark* and AKS Is Condition of Each Federal Payment

263.   Compliance with the AKS and *Stark* laws is a mandatory condition of healthcare providers' enrollment in federal health care programs, a mandatory condition of every claim submitted by providers to federal health care programs, and a mandatory condition of every payment made to providers by federal health care programs.

264.   Federal health care programs include patients covered under Medicare, Medicaid,

or TRICARE in addition to federal employees and retired federal employees.

**Compliance with AKS and *Stark* is Condition of Each Medicare Payment**

265.  Medicare covers the costs of certain medical services for persons aged 65 years or older and those with disabilities.

266.  Medicare is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled, nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

267.  HHS is responsible for the administration and supervision of Medicare. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of Medicare.

268.  CMS makes Medicare payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in Medicare. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

269.  Each Defendant has executed at least one provider agreement with CMS in which they agreed to abide by the Medicare laws, regulations and program instructions…" CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B.  In the provider agreement, each Defendant certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying

with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)…" *Id.*

270.  Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. *See* 42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments electronically on a CMS UB-04 Form.

271.  The UB-04 Form contains the following notice in bold capital letters: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

272.  The UB-04 Form requires the provider to certify the following:

- "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."
- "For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws."
- "For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient."

273.  As a condition of payments by Medicare, CMS also requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and

services rendered to Medicare beneficiaries.

274. After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f) (1).

275. Each cost report contains mandatory certifications of compliance with the AKS and *Stark* laws. Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

276. For each of the fiscal years between 2012 and the present, each cost report certification page submitted by the Methodist Defendants included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result**." (Emphasis added).

277. On each cost report for each fiscal year from 2012 through the present, the responsible officer(s) on behalf of the Methodist Defendants certified as follows: "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report….and

that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (Emphasis added).

278.    The Methodist Defendants were required to certify that their filed cost reports were  (1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, (4) **that the services provided in the cost report were not linked to kickbacks**, **and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the *Stark* laws and AKS.**

279.    In the months following the end of each fiscal year, the Methodist Defendants submitted annual cost reports to CMS and attested to the certifications stated above. The Methodist Defendants submitted cost reports with the certifications stated above for Fiscal Years 2012, 2013, 2014, 2015, 2016, and 2017.

280.    In addition to the in-patient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

281.    Form CMS-1500 requires the physician to certify that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that

any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

282.   Between 2012 and the present, West Clinic physicians and West Cancer Center submitted thousands of CMS-1500 forms to CMS for Medicare payments. In the CMS-1500 forms, West Clinic physicians and West Cancer Center certified that they were eligible for participation in Medicare and that they complied with all applicable regulations and laws governing Medicare, including the *Stark* laws and AKS.

## Compliance with AKS and *Stark* is Condition of Each Medicaid Payment

283.   Medicaid is a joint federal-state program that provides health care benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with Federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

284.   The federal Medicaid statute sets forth minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq.*  As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. *See* 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

285.   The federal matching rate for TennCare (the Tennessee Medicaid Program) is approximately 65 percent.

286. Tenncare's Master Contract for all managed care organizations requires compliance with *Stark* laws and the AKS as a condition of payment to Medicaid providers. Each claim submitted by providers to TennCare "constitutes a certification that the provider, subcontractor or any other entity has complied with all applicable Medicaid laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), in connection with such claims and the services provided therein." TennCare Master Contract, Paragraph 2.12.9.40.

287. In Tennessee, provider hospitals participating in the Medicaid Program file annual cost reports with the State's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports. Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

288. Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the AKS and *Stark* laws.

289. The Tennessee Medicaid Program uses the Medicaid patient data in the cost reports to determine the payments due each facility.

290. The Methodist Defendants submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with the AKS and *Stark* laws. The Tennessee Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims.

**Compliance with AKS and *Stark* is Condition of Each TRICARE Payment**

291.    The Methodist Defendants also enrolled in and sought payments from the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

292.    TRICARE is a federally funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. *See* 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).  Methodist has received revenue from the TRICARE Program.

293.    In addition to individual patient costs, TRICARE pays hospitals for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs.  *See* 32 C.F.R. § 199.6.

294.    A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement"), in which the provider sets forth the number of patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

295.    The Request for Reimbursement requires that the provider certify that the information contained therein "is accurate and based upon the hospital's Medicare cost report."

296.    Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

297.    The Methodist Defendants submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports of Methodist contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

298.    On each occasion when Methodist's Requests for Reimbursement were false due to falsity in its Medicare cost reports, Methodist falsely certified that the information contained in its Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

299.    The Methodist Defendants knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.

### The Federal False Claims Act

300.    The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or

statement material [18] to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation [19] to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

301.   The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

302.   Statutory liability under the False Claims Act includes a civil penalty "not less than $5,500 and not more than $11,000" per false claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

303.    Under the federal False Claims Act, "'knowing' and 'knowingly' mean that a

---

[18] "The term 'material' means having a natural tendency to influence. Or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

[19] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud." 31 U.S.C. 3729 (b)(1).

304.    In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required.  *Id.* A defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information."  *Id.*

## The Tennessee Medicaid False Claims Act

305.    The Tennessee Medicaid False Claims Act contains similar provisions as the federal False Claims Act.

306.    The Tennessee Medicaid False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the [M]edicaid program," Tenn. Code Ann. § 71-5-182(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the [M]edicaid program," Tenn. Code Ann. § 71-5-182(a)(1)(B), "conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D)," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids or decreases an obligation to pay or transmit money or property to the state, relative to the [M]edicaid program." Tenn. Code Ann. § 71-5-182(a)(1)(D).

307.    Under the Tennessee Medicaid False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." Tenn. Code Ann. § 71-5-182(b).

308.    Statutory liability under the Tennessee Medicaid False Claims Act includes a civil penalty "not less than $5,000 and not more than $25,000…plus 3 times the amount of damages which the state sustains because of the act of that person." Tenn. Code Ann. § 71-5-182(a)(1)(D).

## Count I---Presenting False Claims in Violation of 31 U.S.C. § 3729(a) (1)(A) and Tenn. Code § 71-5-82(a)(1)(A) Against All Defendants

309.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

310.    In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *See* 31 U.S.C. § 3729(a)(1)(A); Tenn. Code Ann. § 71-5-182(a)(1)(A).

311.    Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States and State of Tennessee in violation of 31 U.S.C. § 3729(a)(1)(A) or Tenn. Code Ann. § 71-5-182(a)(1)(A).

312.    This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended and Tennessee Medicaid False Claims Act,

Tenn. Code Ann. § 71-5-182(a)(1)(A).

313.    Through the acts described above, Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government and State of Tennessee, within the meaning of 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code Ann. § 71-5-182(a)(1)(A).

314.    The United States and the State of Tennessee were unaware of the falsity of the records, statements and claims made or caused to be made by Defendants.  In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States and the State of Tennessee paid claims that would not be paid if Defendants' illegal conduct was known.

315.    As a result of Defendants' acts, the United States and the State of Tennessee have sustained damages in a substantial amount to be determined at trial.

316.    Additionally, the United States and State of Tennessee are entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

**Count II--- Use of False Statements in Violation of 31 U.S.C. 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All Defendants**

317.    Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

318.    In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  *See*

31 U.S.C. § 3729(a)(1)(B); Tenn. Code Ann. § 71-5-182(a)(1)(B).

319.   This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B).

320.   Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements. Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B). The records were false in that they purported to show compliance with *Stark* laws and the AKS.

321.   Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States and State of Tennessee.

322.   The United States and State of Tennessee were unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Defendants. The United States and State of Tennessee paid claims that would not be paid if Defendants' illegal conduct was known.

323.   By virtue of the false records or false claims made by Defendants, the United States and State of Tennessee sustained damages and therefore are entitled to treble damages under the federal False Claims Act and Tennessee Medicaid False Claims Act respectively to be determined at trial.

324.   Additionally, the United States and State of Tennessee are entitled to civil

penalties for each false claim made and caused to be made by Defendants arising from their illegal conduct as described above.

### Count III--- Conspiring to Submit False Claims in Violation of 31 U.S.C. § 3729(a)(1)(C) and Tenn. Code Ann. § 71-5-182(a)(1)(C) Against All Defendants

325.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

326.   In pertinent part, the federal False Claims Act establishes liability for "any person who....conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).  The Tennessee Medicaid False Claim Act contains a similar provision. *See* Tenn. Code Ann. § 71-5-182(a)(1)(C).

327.   This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(C).

328.   Through the acts described above, Defendants acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and State of Tennessee and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

329.   Defendants conspired to withhold information regarding excessive and illegal payments to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees to the Methodist system.

330.   As a result, the United States and State of Tennessee were unaware of the false

claims submitted and caused by Defendants and the United States and State of Tennessee paid claims that would not be paid if the Defendants' illegal conduct was known to the United States and State of Tennessee.

331. By reason of Defendants' acts, the United States and State of Tennessee have been damaged in a substantial amount to be determined at trial.

332. By virtue of Defendants' conspiracy to defraud the United States and State of Tennessee, the United States and State of Tennessee sustained damages and are entitled to treble damages under the Federal False Claims Act and Tennessee Medicaid False Claims Act, to be determined at trial, plus civil penalties for each violation.

## Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All Defendants

333. Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

334. In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B).

335. Compliance with *Stark* laws and the AKS was an explicit condition of each payment under federal healthcare programs. For each of the years between 2012 and the present, Defendants explicitly and implicitly certified compliance with *Stark* laws and the AKS.

336. Defendants' certifications of compliance with *Stark* laws and the AKS were

knowingly false.

337.   In reliance on the Defendants' express and implied certifications, the United States and State of Tennessee made payments to Defendants under federal and state health care programs. If the United States and State of Tennessee had known that Defendants' certifications were false, their payments would not have been made to Defendants for each of the years in question.

338.   By virtue of the false records, false statements, and false certifications made by Defendants, the United States and State of Tennessee sustained damages and are entitled to treble damages under the federal False Claims Act and the Tennessee Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) and Tenn. Code Ann. § 71-5-182(a)(1)(D) Against All Defendants**

339.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

340.   The federal False Claims Act and Tennessee Medicaid False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G); Tenn. Code Ann. § 71-5-182(a)(1)(D).   The False Claims Act and Tennessee Medicaid False Claims Act define "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *See* 31 U.S.C. § 3729(b)(3); Tenn.

Code Ann. § 71-5-182(d).

341. "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." *See* 42 C.F.R. § 411.353(d).

342. "The OIG may impose a penalty, and where authorized, an assessment against any person…whom it determines…[h]as not refunded on a timely basis….amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." *See* 42 C.F.R. § 1003.102(b)(9).

343. Defendants have knowingly caused and retained overpayments from federal and state health care programs arising from Defendants' violations of the *Stark* laws and AKS.

344. By virtue of Defendants causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other federal health care programs, the United States and State of Tennessee sustained damages and are entitled to treble damages under the False Claims Act and Tennessee Medicaid False Claims Act respectively, to be determined at trial, plus a civil penalty for each violation.

**Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants**

345. Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

346. The False Claims Act and Tennessee Medicaid False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G);

Tenn. Code Ann. § 71-5-182(a)(1)(D).

347.   Defendants knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants in submitting the cost reports, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and State of Tennessee.

348.   By virtue of the false records or false statements made by the Defendants, the United States and State of Tennessee sustained damages and therefore are entitled to treble damages, to be determined at trial, plus civil penalties for each violation.

## Prayers for Relief

349.   On behalf of the United States and State of Tennessee, Relator requests and prays that judgment be entered against Defendants in the amount of the United States' and State of Tennessee's respective damages, trebled as required by law, such civil penalties as are required by law, for a *qui tam* relator's share as specified by 31 U.S.C. §3730(d) and Tenn. Code Ann. § 71-5-183(d), for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d) and Tenn. Code Ann. § 71-5-183(d), and for all such further legal and equitable relief as may be just and proper.

**Jury trial is hereby demanded.**

This 24th of May, 2018.

/s/ Jerry E. Martin
Jerry E. Martin (TNBPR No. 20193)
Seth Hyatt (TNBPR No. 31171)
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219
(615) 244-2202

87

Lead counsel:

/s/ Bryan A. Vroon
Bryan A. Vroon, Esq.
(Admitted *Pro Hac*)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road
Suite 2270
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com


Edward D. Robertson, Jr.
(Admitted *Pro Hac*)
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454
chiprob@earthlink.net


## Certificate of Service

This is to certify that I have this day served a copy of the Relator's First Amended

Complaint by depositing a true and correct copy of same by Certified Mail in the United

States Mail, postage prepaid, addressed as follows:

The Honorable Attorney General Jeff Sessions
Attorney General of the United States
Attention: Seal Clerk
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C.  20530-0001

The Honorable Donald Q. Cochran
United States Attorney for the Middle District of Tennessee
Attention: Seal Clerk
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203

The Honorable Herbert H. Slatery III
Attorney General of the State of Tennessee

Attention: Seal Clerk
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202-0207

Linda McMahon
Senior Trial Counsel
United States Department of Justice
Civil Division/Fraud Section
175 N Street, N.E.
9th Floor
Washington, D.C. 20002

Christopher Sabis
Assistant United States Attorney
United States Attorney's Office
Middle District of Tennessee
110 9th Avenue South, Suite A-961
Nashville, TN 37203

Kelly M. Horejs
Assistant Attorney General
Medicaid Fraud and Integrity Division
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207

This 24th day of May, 2018.

/s/ Jerry E. Martin
Jerry E. Martin