# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

UNITED STATES OF AMERICA
AND STATE OF TENNESSEE
*ex rel.*
[UNDER SEAL]

Civil Action No.

Relators

**TO BE FILED IN CAMERA AND UNDER SEAL**

vs.                                  DO NOT PUT IN PRESS BOX
                                     DO NOT ENTER ON PACER

[UNDER SEAL]

Defendants.

## DOCUMENT TO BE KEPT UNDER SEAL

## DO NOT ENTER ON PACER

Jerry E. Martin
Seth Hyatt
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219

Lead Counsel:
Bryan A. Vroon, Esq.
(Admitted *pro hac*)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road
Suite 2270
Atlanta Georgia 30327

Edward D. Robertson, Jr.
(Admitted *pro hac*)
Bartimus Frickleton Robertson & Rader, P.C.
109b East High Street
Jefferson City, MO. 65101
(573)659-4454

1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF TENNESSEE**

**NASHVILLE DIVISION**

UNITED STATES OF AMERICA
AND STATE OF TENNESSEE
*ex rel.*
JEFFREY H. LIEBMAN
And DAVID M. STERN, M.D.

Relators

Case No. 3:17-CV-00902

**TO BE FILED IN**
**CAMERA AND UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER

METHODIST LE BONHEUR HEALTHCARE,
METHODIST HEALTHCARE-MEMPHIS HOSPITALS,
THE WEST CLINIC, PLLC d/b/a WEST CANCER CENTER,
WEST PARTNERS, LLC, LEE SCHWARTZBERG, M.D.,
ERICH MOUNCE, CHRIS MCLEAN,
GARY SHORB,
AND JOHN DOES 1-100 Defendants.

**Second Amended Complaint Under the Federal and State False Claims Acts**

2

PARTIES ................................................................................................................................ 7

JURISDICTION AND VENUE ............................................................................................ 14

APPLICABLE LAWS ........................................................................................................... 16

    INTRODUCTION TO FEDERAL ANTI-KICKBACK STATUTE ........................................................... 16
    INTRODUCTION TO FEDERAL STARK LAWS ............................................................................ 21
    COMPLIANCE WITH AKS AND STARK IS CONDITION OF EACH FEDERAL AND STATE PAYMENT ............................ 27
    COMPLIANCE WITH AKS AND STARK LAWS IS CONDITION OF EACH MEDICARE PAYMENT .................................. 27
    COMPLIANCE WITH AKS AND STARK IS CONDITION OF EACH MEDICAID PAYMENT ........................................ 32
    COMPLIANCE WITH AKS AND STARK IS CONDITION OF EACH TRICARE PAYMENT ........................................ 34

METHODIST'S KICKBACKS TO WEST CLINIC PHYSICIANS ........................................ 36

    FROM THE BEGINNING METHODIST INTENDED TO BUY WEST CLINIC'S REFERRALS ........................................ 36
    THE WEST CLINIC DRAMATICALLY INCREASED METHODIST'S DRUG PROFITS FROM THE 340B PROGRAM AND
    METHODIST SHARED THOSE PROFITS WITH THE WEST CLINIC PHYSICIANS IN SECRETIVE PAYMENTS ................. 47
    METHODIST PAID OVER $25 MILLION TO WEST CLINIC PHYSICIANS FOR SUPPOSED MANAGEMENT SERVICES ..... 73
    METHODIST OVERPAID FOR WEST CLINIC'S RESEARCH ENTITY AS A COST OF BUYING THEIR REFERRALS .......... 88
    WEST CLINIC PHYSICIANS RECEIVED INCOMES FAR IN EXCESS OF THE NATIONAL 90TH PERCENTILES FOR THEIR
    SPECIALTIES .................................................................................................................. 94
    METHODIST COVERED ALL OVERHEAD AND PRACTICE EXPENSES FOR WEST CLINIC PHYSICIANS ...................... 97
    DEFENDANTS CONTINUOUSLY MONITORED THE VALUE AND VOLUME OF REFERRALS FROM WEST CLINIC
    PHYSICIANS ................................................................................................................. 100
    METHODIST'S SCHEME TARGETED AND DAMAGED FEDERAL AND STATE HEALTHCARE PROGRAMS ................. 105
    THE ARRANGEMENT WAS DETRIMENTAL TO PATIENT CARE ........................................................... 111

FINANCIAL DAMAGES TO THE MEDICARE AND MEDICAID PROGRAMS ............... 114

    STARK LAWS REQUIRE FULL REFUND OF MEDICARE AND MEDICAID PAYMENTS ARISING FROM REFERRALS BY
    WEST CLINIC PHYSICIANS FOR DESIGNATED HEALTH SERVICES .................................................... 114
    THE AKS REQUIRES REFUND OF CLAIMS ARISING FROM REFERRALS AFTER KICKBACKS PAID ...................... 115
    WEST CLINIC'S REFERRALS OF MEDICARE AND MEDICAID INPATIENTS TO METHODIST HOSPITALS ................ 116
    WEST CLINIC'S REFERRALS OF OUTPATIENTS COVERED BY MEDICARE OR MEDICAID PROGRAMS .................. 117
    SUMMARY OF DAMAGES TO THE MEDICARE AND MEDICAID PROGRAMS ........................................... 118

LEGAL REMEDIES FOR DEFENDANTS' FALSE CLAIMS ............................................. 118

    THE FEDERAL FALSE CLAIMS ACT ...................................................................................... 118
    THE TENNESSEE MEDICAID FALSE CLAIMS ACT ...................................................................... 120

COUNT I---PRESENTING FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(A) (1)(A) AND TENN.
CODE § 71-5-82(A)(1)(A) AGAINST ALL DEFENDANTS ......................................................... 121

COUNT II--- USE OF FALSE STATEMENTS IN VIOLATION OF 31 U.S.C. 3729(A)(1)(B) AND TENN.
CODE ANN. § 71-5-182(A)(1)(B) AGAINST ALL DEFENDANTS ............................................... 123

COUNT III--- CONSPIRING TO SUBMIT FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(A)(1)(C)
AND TENN. CODE ANN. § 71-5-182(A)(1)(C) AGAINST ALL DEFENDANTS ............................ 124

COUNT IV---SUBMISSION OF EXPRESS AND IMPLIED FALSE CERTIFICATIONS IN VIOLATION
OF 31 U.S.C. § 3729(A)(1)(B) AND TENN. CODE ANN. § 71-5-182(A)(1)(B) AGAINST ALL
DEFENDANTS .......................................................................................................... 125

COUNT V---KNOWINGLY CAUSING AND RETAINING OVERPAYMENTS IN VIOLATION OF 31
U.S.C. § 3729(A)(1)(G) AND TENN. CODE ANN. § 71-5-182(A)(1)(D) AGAINST ALL DEFENDANTS ..... 126

3

**COUNT VI--- FALSE RECORD TO AVOID AN OBLIGATION TO REFUND AGAINST ALL DEFENDANTS** ...........................................................................................................................**127**

**PRAYERS FOR RELIEF** ........................................................................................................**128**

**CERTIFICATE OF SERVICE** ...............................................................................................**129**

1.      Under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, ("FCA"), and the Tennessee Medicaid False Claims Act, Tenn. Code § 71-5-182 *et seq*., Relators Jeffrey H. Liebman ("Liebman") and David M. Stern, M.D.("Stern") state the Second Amended Complaint against Defendants Methodist Le Bonheur Healthcare, Inc., Methodist Healthcare-Memphis Hospitals, Inc.,[1] The West Clinic, PLLC d/b/a West Cancer Center, West Partners, LLC, Lee Schwartzberg, M.D., Erich Mounce, Chris McLean, Gary Shorb, and John Does 1-100 filed under seal with the Court as follows.

2.      This *qui tam* case is brought against the Defendants for knowingly defrauding federal and state healthcare programs. As discussed in detail below, from 2012 through 2018, the Methodist Defendants paid financial inducements, excessive compensation, and kickbacks to independent physicians (the West Clinic Defendants) for generating referrals and lucrative profits to the hospital system.

3.      The Defendants' strategy to generate revenues deliberately violated the federal Anti-Kickback Statute ("AKS") and federal Stark laws discussed below.

4.      The AKS prohibits a healthcare provider from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health

---

[1] Defendants Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals are sometimes collectively referred to as "the Methodist Defendants" or "Methodist."

4

care program."  42 U.S.C. § 1320a-7b(b).

5.      The Stark laws prohibit the United States from paying for designated health services ("DHS") prescribed by physicians who have improper financial relationships with the DHS provider. In addition to prohibiting the hospital from submitting claims under these circumstances, the Stark laws also prohibit payments by federal health care programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[2]

6.      From 2012 through 2018, the Methodist Defendants paid West Clinic physicians over $400 million in cash payments in a scheme to induce and reward referrals of cancer patients for hospital admissions, infusion drug therapy, radiation therapy, outpatient procedures, and ancillary services.

7.      The Methodist Defendants' illegal payments to West Clinic physicians included sharing drug profits with these physicians. During the years 2012-2018, Methodist participated in the 340B Drug Discount Program[3] that gives deep discounts on outpatient drugs to eligible hospitals. During

---

[2] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

[3] The 340B Program requires drug manufacturers that participate in the Medicaid drug rebate program to extend discounts on drugs administered in the outpatient setting, including physician-administered infusion drugs such as those used to treat cancer. The typical discount ranges from 30% to 50% off the drug's list price. As of January 1, 2015, there were 644 drug manufacturers participating in the 340B Program.

For hospitals to qualify for the 340B program, they must meet three requirements. *See* 42 U.S.C. § 256b(a)(4)(L)(i). The first requirement, known as the government ownership or government control requirement, mandates that the qualifying hospital —

    "[be] owned or operated by a unit of state or local government, [be] a public or private non-profit corporation which has been formally granted governmental powers by a unit of state or local government, or [be] a private non-profit hospital with a contract with a state or local government to provide health care services to low-income individuals who are not entitled to benefits under [Medicare or Medicaid]."
    42 U.S.C. § 256b(4)(L)(i).

The second criterion requires that the hospital have a sufficient Medicare disproportionate share hospital (DSH) adjustment percentage. The magnitude of a hospital's DSH adjustment depends on the number of inpatient days of its Medicaid and Supplemental Security Income (SSI) patients. This criterion also includes hospitals qualifying for Medicare disproportionate share payments by virtue of their large uninsured patient populations.

the years of its "partnership" with West Clinic physicians, Methodist's profits from the 340B Program exceeded $500 million and West Clinic physicians' referrals accounted for over 50 percent of these drug profits.

8.      As kickbacks to induce and reward the West Clinic physicians' referrals, Methodist shared the 340B drug profits with West Clinic physicians each year in addition to guaranteed payments at premium rates for wRVUs and guaranteed payments for supposed "management" or administrative services. From 2012-2018, Methodist's payments to West Clinic physicians exceeded $400 million.

9.      In addition, Methodist paid approximately $7 million to West Clinic physicians, including $3.5 million for personal debts, as a supposed "investment" in their for-profit research company. That payment was inflated and a disguised kickback to reward the West Clinic physicians' referrals to the Methodist system.

10.      The Defendants' scheme has resulted in massive financial enrichment to all parties at the expense of the Medicare and Medicaid Programs. Senior Methodist executives profited from bonuses based on the financial performance of the healthcare system. The Methodist system profited with over $1.5 billion in increased revenues from business generated by West Clinic

---

Third, DSH hospitals, children's hospitals and free-standing cancer hospitals that meet the first two criteria are eligible to participate in the 340B program if they sign a written certification stating that they will not obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement in compliance with the third criterion. Rural hospitals are not subject to this GPO prohibition.

"Off-site outpatient facilities and clinics (child sites) not located at the same physical address as the parent hospital covered entity will be listed on the public 340B database, and are able to purchase and use 340B drugs for eligible patients, if the hospital covered entity provides its most recently filed Medicare cost report demonstrating that: (1) each of the facilities or clinics is listed on a line of the cost report that is reimbursable under Medicare; and (2) the services provided at each of the facilities or clinics have associated outpatient Medicare costs and charges." Federal Register, Vol. 80, No. 167, p. 52302 (August 28, 2015).

6

physicians. The Methodist system has become one of the wealthiest "non-profit" and tax-exempt hospital systems in the United States with cash reserves and investments in excess of $1 billion. West Clinic physicians profited with over $400 million in cash payments and additional funding for benefits, staff, expenses, and offices.

11.    The Medicare and Medicaid Programs have largely funded the illegal financial windfall. As addressed in detail below, the Defendants' scheme caused estimated single damages to the Medicare and Medicaid Programs exceeding $800 million.

12.    The Second Amended Complaint first introduces the parties to this action and the jurisdiction of this Court. The Second Amended Complaint then addresses the applicable laws and Defendants' illegal business strategies to generate revenues and income in violation of the federal Anti-Kickback Statute and Stark laws.

## Parties

13.    Co-Relator Dr. Stern did his undergraduate training at Yale University (B.S., 1973), followed by medical training at Harvard Medical School (M.D., 1978). He then went to the College of Physicians & Surgeons of Columbia University for training in internal medicine (1978-81) and hematology fellowship (1981-83). He joined Columbia's faculty in 1983 and was appointed Assistant Professor in the Department of Medicine at the College of Physicians & Surgeons of Columbia University in the Division of Hematology (1983).  His attention was focused on the properties of endothelial cells, the cells that form the inner lining of blood vessels.  His research purview expanded steadily over the years as his work entered the area of blood vessel (vascular) complications of diabetes, Alzheimer's disease, inflammation and cancer.  Dr. Stern was the principal investigator of numerous grants from the National Institutes of Health and private

7

foundations, as well as philanthropic contributions to his laboratory. His laboratory grew into the Center for Vascular and Lung Pathobiology at the College of Physicians and Surgeons. Dr. Stern was the founding Director and was appointed the Carrus-endowed Professor and then full Professor with tenure at Columbia. This Center was a large enterprise as it occupied 25,000 square feet of laboratory space and involved multiple faculty members and research trainees. As a result of his research, Dr. Stern authored several hundred peer-reviewed papers, and was a frequent speaker at national and international meetings. He was recognized as a leader in the biology of blood vessels (vascular biology).

14.     Following his time at Columbia, Dr. Stern entered healthcare administration and served as the Dean and Chief Clinical Officer at Medical College of Georgia (2002-2005) and Dean (2005-2010) and Vice-President for Health Affairs (2008-2010) at the University Cincinnati College of Medicine. As leader of the faculty practice plan (University of Cincinnati Physicians), he consolidated 15 departmental practice corporations into a unified entity. He led the development of the new health system which became the foundation of the University of Cincinnati's participation in regional healthcare.

15.     He then became the Executive Dean and Vice-Chancellor of Clinical Affairs at the University of Tennessee Health Sciences Center ("UTHSC"). As Executive Dean, Dr. Stern was responsible for clinical, research, educational and administrative activities of the College of Medicine at UTHSC on four campuses, Memphis (main campus) and three satellites (Chattanooga, Knoxville, and Nashville). His responsibilities included formulating the strategic plan, budget, recruitment plans, developing programs and other activities (faculty promotions, overseeing student activities, etc.). As Vice-Chancellor for Health Affairs, Dr. Stern was charged with

overseeing the clinical programs of the Colleges of Pharmacy, Nursing and Health Professions in addition to the College of Medicine.

16.     He was also Chairman of the Board of the University of Tennessee Medical Group (the faculty practice plan that was later renamed University Clinical Health), Co-Chair of the University-LeBonheur Pediatrics Specialists (the pediatrics faculty practice plan), and Co-Chair of University of Tennessee Methodist Physicians (an adult faculty practice plan associated with Methodist).

17.     Dr. Stern served on the Board of Directors of Defendant Methodist LeBonheur Healthcare from 2011 to 2017 and the Methodist Board Finance Committee. He also served as Methodist's Executive Vice President of Medical Affairs from 2011 to 2016.

18.     Dr. Stern served as Executive Dean and Vice Chancellor at UTHSC from 2011 to 2017--- during the years that West Clinic, Methodist, and UTHSC negotiated and implemented a three-way oncology "affiliation" arrangement.

19.     From 2011 through 2017, Dr. Stern attended over 200 meetings in person or by phone with Methodist and West Clinic executives. Dr. Stern was one of 12 members of the Executive Cancer Operations Council, composed of primarily West Clinic physicians, Methodist senior executives, and West Clinic senior executives. Dr. Stern also had regularly scheduled calls with West Clinic's senior partner, Dr. Lee Schwartzberg, West Clinic CEO Erich Mounce, and Dr. Guy Reed, Chair of the UTHSC Department of Medicine.  Dr. Stern also attended many meetings with Methodist's senior executives called "Kitchen Cabinet Meetings" usually held at the office of Methodist CEO Gary Shorb. These meetings were commonly scheduled on a weekly basis. These meetings were usually attended by Methodist's CEO Gary Shorb, CFO Chris McLean, COO Michael Ugwueke,

Executive Vice-President Donna Abney, Chief of HR Carol Ross-Spang, Healthchoice CEO Mitch Graves, and Senior Vice President of Public Policy and Regulatory Affairs Cato Johnson.

20.     Dr. Stern was also a member of the West Cancer Center---Strategy and Partnership Model Steering Committee and attended meetings of that Committee along with Co-Relator Jeff Liebman.

21.     Dr. Stern opposed Methodist's business practices at issue in this case and his opposition ultimately led to Methodist's senior executives, including Methodist CEO Gary Shorb, orchestrating his removal from the Board in 2017 and ultimately from his position as Executive Dean at the College of Medicine at UTHSC.

22.     Co-Relator Jeff Liebman is the former President of Methodist University Hospital, the largest hospital in the Methodist Healthcare system. He held the position of Chief Executive Officer of Methodist University Hospital from February of 2014 through early May of 2017 when his title became President. Liebman resigned from Methodist in late August 2017.

23.     As CEO of the largest Methodist hospital, Liebman's responsibilities included overseeing the operations of all inpatient and outpatient clinical activities at University Hospital.  His office was responsible for the clinical as well as financial performance of all programs at the hospital. His monthly reviews included profit and loss results for all aspects of the 617-bed hospital. This hospital had the sickest patients in the entire Methodist network and the busiest emergency room. On a routine basis, Liebman reported to the Quality Committee of the Methodist Board and provided leadership for the development of all new clinical services including patient care, facilities, and physician recruitment for the hospital. A significant part of his duties included the development of new clinical services and strategic plans for the future growth of the institution as well as considering improvements in quality of care.

24.     Liebman also attended monthly meetings with Chief Executive Officers of all Methodist hospitals and other senior Methodist executives. At those meetings there were typically quarterly updates by West Clinic CEO Erich Mounce regarding new initiatives and activities by the West Clinic physicians.  Liebman also attended weekly senior management meetings for all Methodist hospital Chief Executive Officers and Vice Presidents. At these meetings, there were commonly extensive discussions about hospital management issues and initiatives.

25.     Liebman was also a member of the West Cancer Center---Strategy and Partnership Model Steering Committee.

26.     Through their work and experience, Liebman and Stern have direct, detailed, and personal knowledge that the Defendants deliberately violated the AKS and Stark laws as a calculated cost of increasing their mutual revenues.

27.     Defendant Methodist Le Bonheur Healthcare is an integrated healthcare system based in Memphis, Tennessee, with locations and partners across the Mid-South.  The healthcare system includes:

- 4 adult hospitals
- 1 children's hospital
- 2 wound healing centers
- 2 sleep centers
- 52 physician and specialty practices
- 7 minor medical and urgent care clinics
- 5 surgery centers
- 7 diagnostic centers
- 7 cancer treatment sites
- 1 hospice and palliative care facility
- Transplant Institute
- Sickle Cell Center
- 7 work-site Clinics
- Home Health
- Home Medical Equipment

11

28.     Defendant Methodist Healthcare-Memphis Hospitals, ("MHMH") is a wholly owned subsidiary of Methodist Le Bonheur Healthcare. MHMH is organized as a Section 501(c)(3) entity consisting of five hospitals within an integrated healthcare delivery system. MHMH includes five Memphis hospitals---Methodist Germantown Hospital, Le Bonheur Children's Hospital, Methodist North Hospital, Methodist South Hospital, and Methodist University Hospital. The Board of Methodist Healthcare---Memphis Hospitals is comprised of the same persons as Methodist Le Bonheur Healthcare, the sole member and controlling parent organization.

29.     The West Clinic, PLLC d/b/a West Cancer Center is an independent for-profit private practice group of medical oncologists, gynecologic oncologists, radiologists and other physician specialists based in Memphis, Tennessee. During the 7-year term of the "partnership" with Methodist, most West Clinic physicians were medical oncologists.

30.     In 2011, West Clinic had 8 clinic sites which provided physician visits and outpatient services to cancer patients.  Beginning in January of 2012, 5 of the 8 West Clinic sites became part of a "partnership" with Methodist and these 5 clinic sites were renamed "West Cancer Center."

31.     Methodist publicly described its relationship with the outpatient cancer clinic---West Cancer Center--- as an "innovative partnership" with the West Clinic physicians. The relationship was not a legal partnership, but rather an alliance to enter into business agreements described below.

32.     According to the Tennessee Secretary of State, the West Clinic has operated its outpatient cancer clinic under the assumed names of (1) West Cancer Center and Research Institute, (2) West Surgery Center, and (3) West Cancer Center Co.

33.	During the alliance with Methodist, the West Clinic physicians did not become employees of Methodist but continued operating as a for-profit private practice group.

34.	Defendant West Partners, LLC is an affiliated and related entity to the West Clinic formed and controlled by the West Clinic physicians for the purposes of operating and conducting West Clinic business.

35.	Defendants also include the individuals who were the leaders in formulating and implementing the illegal schemes at issue to generate revenues in violation of the Anti-Kickback Statute and Stark laws. [4]

36.	Defendant Lee Schwartzberg, M.D., was a senior partner and Medical Director of West Clinic from the beginning of negotiating the illegal arrangement with Methodist in 2011 through the end of the alliance in 2018.

37.	Defendant Erich Mounce was the Chief Executive Officer of West Clinic from the beginning of negotiating the illegal arrangement with Methodist in 2011 through the end of the alliance in 2018.

---

[4] On September 9, 2015, the Department of Justice issued a memorandum to all United States Attorneys and top federal law-enforcement officials regarding "individual accountability for corporate wrongdoing." The Memorandum was issued by Sally Yates, Deputy Attorney General, and became known as the "Yates Memo." The Memo states in part, "Fighting corporate fraud and other misconduct is a top priority of the Department of Justice…One of the most effective ways to combat corporate misconduct is by seeking accountability from individuals who perpetrated the wrongdoing. Such accountability is important for several reasons: it deters future illegal activity, it incentivizes changes in corporate behavior, it ensures that the proper parties are held responsible for their actions, and it promotes the public's confidence in our system."

The "Yates Memo" addressed "six key steps to strengthen our pursuit of individual corporate wrongdoing," including "criminal and civil corporate investigations should focus on individuals from the inception of the investigation" and "civil attorneys should consistently focus on individuals as well as the company and evaluate whether to bring suit against an individual based on considerations beyond that individual's ability to pay."

38.     Defendant Gary Shorb was the Chief Executive Officer of Methodist from the beginning of negotiating the illegal arrangement with West Clinic physicians in 2011 through his resignation at the end of 2016.

39.     Defendant Chris McLean was the Chief Financial Officer of Methodist from the beginning of negotiating the illegal arrangement with West Clinic physicians in 2011 through his resignation at the end of 2018.

40.     The identities of the remaining Doe defendants who knowingly submitted or caused the submission of false claims to the United States and/or State of Tennessee are presently unknown to Relators. All listed Defendants and such additional Doe defendants have served as contractors, agents, partners, affiliated companies, affiliated entities, and/or representatives of one and another in the submission of false claims to the United States and/or the State of Tennessee and were acting within the course, scope and authority of such contract, conspiracy, agency, partnership and/or representation for the conduct described below.

**Jurisdiction and Venue**

41.     This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

42.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

14

43. Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) and Tenn. Code Ann. § 71-5-185, as Defendants transacted business or otherwise engaged in illegal conduct at issue within the District.

44. Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." The Tennessee Medicaid False Claims Act provides similar venue rules. *See* Tenn. Code § 71-5-185.

45. Methodist is the largest Medicaid provider in the State of Tennessee with over 13,000 inpatient admissions each year covered by Tennessee Department of Finance and Administration's Division of Health Care Finance and Administration Bureau of TennCare ("TennCare"), the state of Tennessee's Medicaid Program. TennCare is headquartered in Nashville, Tennessee within this judicial district. As discussed below, Defendants have submitted thousands of false claims to TennCare in Nashville and such claims have been processed and paid with federal and state funds administered by TennCare in Nashville. TennCare's services are offered through managed care organizations. In its contracts with managed care organizations for the administration of Medicaid claims, there is an agreed venue provision for Davidson County, Tennessee. The contracts state, "[T]he place of proper venue shall be Davidson County, Tennessee." During the years 2012-2018, all claims to TennCare submitted by the Defendants were administered through contracts with this agreed venue provision and all claims were ultimately processed by TennCare with its headquarters in Nashville, Tennessee.

46. Venue is proper in this District where Defendants have submitted false claims in violation of the AKS and Stark laws. This action seeks recovery under the False Claims Act and Tennessee

Medicaid False Claims Act for violations of the AKS and Stark laws with respect to Defendants' claims for payments by federal and state healthcare programs for fiscal years 2012 through 2018.

47. Prior to filing the original Complaint, Liebman, through counsel, delivered a draft copy of the Complaint and his written Disclosures of substantially all material evidence and information in his possession to the United States Attorney's Office for the Middle District of Tennessee, the United States Attorney General's Office, and the Tennessee Attorney General's Office. Prior to filing the Second Amended Complaint, Liebman and Stern, through counsel, delivered a draft copy of the Second Amended Complaint and Dr. Stern's written Disclosure of substantially all material evidence and information in his possession to the United States Attorney's Office for the Middle District of Tennessee, the United States Department of Justice in Washington, D.C., and the Tennessee Attorney General's Office.

## **Applicable Laws**

### **Introduction to Federal Anti-Kickback Statute**

48. Physicians primarily control patient referrals because they prescribe medical services. In an effort to contain soaring healthcare costs and reduce conflicts of interest, the AKS provides important protections against the corruption of medical providers offering or paying inducements to influence referrals.

49. The AKS applies to all providers and covers referrals of all services to patients insured by federal healthcare programs.[5]

---

[5] The Stark law applies to compensation arrangements with physicians and covers the referrals of "designated health services" for patients insured by federal healthcare programs as discussed above.

50.     The AKS prohibits "knowingly and willfully" offering or paying remuneration to induce a referral "for an item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

51.     The AKS specifies that "remuneration" includes "any kickback, bribe or rebate" and broadly applies to benefits provided "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1320a-7b(b)(1) & (2). "Remuneration" is defined elsewhere to include "transfers of items or services for free or for other than fair market value." 42 U.S.C. §1320a-7a(i)(6).

52.     The AKS arose out of Congressional concern that financial inducements to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, of poor quality or potentially harmful to a vulnerable patient population.

53.     The AKS was based in part on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there was a financial incentive to generate business.

54.     To protect the integrity of federal healthcare programs, Congress enacted a *per se* prohibition against financial inducements in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

55.     First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that financial inducements masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

56.     The AKS prohibits a hospital from offering "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b).

57.     The AKS has two separate liability provisions, the violation of *either* of which subjects a person to liability. *See* 42 U.S.C. § 1320a-7b(b)(1)(A) (prohibiting the solicitation and receipt of remuneration in exchange for referrals; 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration to induce referrals). The AKS is violated if a hospital knowingly and willfully offered remuneration to induce referrals even if the doctors were not actually induced. *See* 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration for the purpose of inducing referrals). Under the AKS, any amount of inducement is illegal.

58.     The AKS prohibitions do not apply to "any payment practice specified by the Secretary in regulations promulgated pursuant to 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987." 42 U.S.C. §1320a-7b(b)(3)(E). The Secretary has issued approximately 24 "exceptions" or safe harbors to the criminal prohibitions of 42 U.S.C. §1320a-7b(b).

59.     Payment practices falling within either the statutory exceptions or the regulatory safe harbors to the AKS are protected from criminal prosecution. 42 U.S.C. §1320a-7b(b)(3); 42 C.F.R. § 1001.952. For such protection, the OIG has required strict compliance with each provision of an applicable safe harbor.

60.     The arrangement between Methodist and West Clinic physicians included a professional services contract and management services contract. The AKS regulations provide a "safe harbor" for personal services and management contracts if all seven of the following requirements are met:

18

Personal services and management contracts. As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following seven standards are met --

> (**1**) The agency agreement is set out in writing and signed by the parties.
> (**2**) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.
> (**3**) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.
> (**4**) The term of the agreement is for not less than one year.
> (**5**) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.
> (**6**) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.
> (**7**) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42. C.F.R. §1001.952(d).

61.     As discussed in detail below, the arrangement between Methodist and West Clinic physicians did not comply with these seven requirements. The compensation paid by Methodist to West Clinic physicians was not "consistent with fair market value in arms-length transactions" and was "determined in a manner that [took] into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs."

62.     A violation of the safe harbor's requirements does not make the arrangement per se illegal. Rather, the arrangement must be examined under the terms of the AKS. If any one purpose of remuneration is to induce or reward referrals, the AKS is violated. Federal courts have confirmed

19

that the AKS is violated when one purpose of the payment in question was to induce referrals, irrespective of other legitimate purposes.

63.    As addressed in detail below, Methodist' payments to West Clinic physicians were deliberate violations of the AKS---the calculated costs of a lucrative business strategy to escalate revenues for the hospital system. Methodist intentionally violated the AKS by rewarding West Clinic physicians with (1) drug profits derived from their referrals, (2) "management" services fees based on the value of the oncology service line revenues largely generated by their referrals, (3) an aggregate compensation package far in excess of fair market value and based on the value of West Clinic physicians' referrals to the Methodist system, and (4) $7 million payment to West Clinic's research company, including $3.5 million for paying off West Clinic physicians' personal indebtedness, as a disguised reward to the West Clinic physicians for their referrals.

64.    Violation of the AKS may subject the perpetrator to exclusion from participation in federal health care programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. *See* 42 U.S.C. § 1320-7(b) (7) and 42 U.S.C. § 1320a-7a (a) (7).

65.    Any party convicted under the AKS must be excluded from federal healthcare programs for a term of at least five years. *See* 42 U.S.C § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from federal healthcare programs for a discretionary period and may consider imposing administrative sanctions of $50,000 per kickback violation. *See* 42 U.S.C. § 1320a-7(b).

66.    Compliance with the AKS is a prerequisite to a provider's right to receive and retain payments from Medicare, Medicaid and other federal healthcare programs. Similarly, compliance

with the AKS and comparable state anti-kickback statutes is a prerequisite to a provider's right to receive and retain payments from state-funded healthcare programs.

67.     Claims for payment for services tainted by financial inducements for referrals prohibited by the AKS are false or fraudulent under the False Claims Act because providers of such services are ineligible to participate in government healthcare programs, and the government would not have paid such claims had it known of the inducements for referrals. *See* 31 U.S.C. §§ 3729(a) & (b); 42 U.S.C. §§ 1320a-7b(b), (f) & (g).

68.     Effective March 23, 2010, the Patient Protection and Affordable Care Act confirmed that claims submitted in violation of the AKS automatically constitute false claims for purposes of the False Claims Act. The statute states, "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

69.     Congress also eliminated the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. *See* 42 U.S.C. § 1320a-7b(h).

## Introduction to Federal Stark Laws

70.     Enacted in 1989 to contain health care costs and reduce conflicts of interests, the Stark laws generally prohibit physicians from referring[6] their Medicare patients to business entities, such as

---

[6] The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A). The accompanying regulations also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

hospitals or laboratories, with which the physicians or their immediate family members have a "financial relationship." 42 U.S.C. §1395nn(a)(1); *see* generally 42 C.F.R. §§ 411.350-.389 ("Subpart J---Financial Relationships Between Physicians and Entities Furnishing Designated Services"). Subsequent amendments extended Stark laws to Medicaid patients. *See* 42 U.S.C. §1396b(s).

71.     Congress enacted Stark laws to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial arrangement. The Third Circuit recently summarized the important public interests underlying Stark laws:

> "Healthcare spending is a huge chunk of the federal budget. Medicare and Medicaid cost roughly a trillion dollars per year. And with trillions of dollars comes the temptation for fraud. Fraud is a particular danger because doctors and hospitals can make lots of money from one another. When doctors refer patients to hospitals for services, the hospitals make money. There is nothing inherently wrong with that. But when hospitals pay their doctors based on the number or value of their referrals, the doctors have incentives to refer more. The potential for abuse is obvious and requires scrutiny. The Stark Act and the False Claims Act work together to ensure this scrutiny and safeguard taxpayer funds against abuse. The Stark Act forbids hospitals to bill Medicare for certain services when the hospital has a financial relationship with the doctor who asked for those services, unless an exception applies."

*United States ex rel. Bookwalter v. UPMC*, 2019 U.S. App. LEXIS 27937, at 2-3, 938 F.3d 397 (3rd Cir. 2019)

72.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

73.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

74.    As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

75.    In contrast to the AKS which applies to all providers and covers referrals of all services to patients insured by federal healthcare programs, the Stark law applies to compensation arrangements with physicians and covers the referrals of "designated health services" for patients insured by federal healthcare programs.

76.    The Stark statute and regulations prohibit any entity from submitting a Medicare claim for services rendered pursuant to a prohibited referral, 42 U.S.C. §1395nn(a)(1)(B); 42 C.F.R. §411.353(b), prohibit Medicare from paying any such claims, 42 U.S.C. §1395nn(g)(1); 42 C.F.R. §411.353(c), and require an entity that receives payment for such a claim to reimburse the funds to the United States, 42 C.F.R. §411.353(d).

77.    The Stark laws define a "financial relationship" to include a "compensation arrangement," 42 U.S.C. §1395nn(a)(2), which means "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity." 42 U.S.C. §1396nn(H)(1)(A); 42 C.F.R. § 411.354.

78.    In turn, "remuneration" is broadly defined to include "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1395nn(h)(1)(B); *see also* 42 C.F.R.

§411.351 ("Remuneration means any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind").

79. "An 'under arrangements' contract between a hospital and an entity providing DHS 'under arrangements' to the hospital creates a compensation arrangement for purposes of these regulations." 42 C.F.R. § 411.354(c).

80. "Compensation arrangements can be either direct or indirect." 42 C.F.R. § 411.354(c).[7] "A physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if--(A) [t]he only intervening entity between the physician and the entity furnishing DHS is his or her physician organization; and (B) [t]he physician has an ownership or investment interest in the physician organization." *Id.* § 411.354(c)(1)(ii).

81. The West Clinic oncologists had ownership or investment interests in West Clinic and stood in the shoes of West Clinic for purposes of Stark laws. Therefore, the arrangement was a direct compensation arrangement with the Methodist Defendants.

82. Once the plaintiff or the government has established proof of each element of a *Stark* violation, the burden shifts to the defendant to establish that the conduct was protected by an exception.[8] If no exception or safe harbor applies to a Stark violation or if a defendant fails to

---

[7] An "indirect compensation arrangement" requires three elements. First, there must be "an unbroken chain . . . of persons or entities that have financial relationships" connecting the referring doctor with the provider of the referred services. *Id.* § 411.354(c)(2)(i). Second, the referring doctor must get "aggregate compensation . . . that varies with, or takes into account, the volume or value of referrals." *Id.* § 411.354(c)(2)(ii). And third, the service provider must know, recklessly disregard, or deliberately ignore that the doctor's compensation "varies with, or takes into account, the volume or value of referrals." *Id.* § 411.354(c)(2)(iii).

[8] Among the multiple requirements of the "academic medical center" safe harbor provided in *Stark* regulations, the referring physician must be a bona fide full-time or "substantial" part-time employee of the center. *See* 42 C.F.R. §411.355(e)(1)(i)(A). West Clinic physicians are a private practice group. They are not employees of any academic medical center. For employees of an academic medical center, the total compensation at the center cannot "exceed the fair market value of all of the services provided" and cannot be "determined in a manner that takes account the volume or value of any referrals." *See* 42 C.F.R. §411.355(e)(1)(ii). Even if Methodist could qualify as an academic medical

comply with the requirements of an applicable safe harbor, then all referrals from the referring physician to the DHS entity are subject to prohibition.

83.    Subsections (b), (c), (d) and (e) of 42 U.S.C. §1395nn set forth 18 exceptions or "safe harbors" to the subsection (a) referral prohibitions. One of the "safe harbors" is the personal services safe harbor which applies to the arrangement between Methodist and West Clinic physicians.

84.    Methodist and West Clinic entered into a professional services contract and management services contract. Both contracts required the West Clinic physicians' personal services.

85.    Similar to the AKS discussed above, Stark laws establish seven requirements for an entity providing remuneration or any benefit to a physician through a "personal service" or management services agreement. Among those seven requirements, the compensation paid over the term of the arrangement must be "set in advance," must not "exceed fair market value," and must "not [be] determined in a manner that takes into account the volume and value of any referrals or other business generated between the parties." 42 U.S.C.S. §1395nn(e)(3)(A)(v); 42 C.F.R. §411.357 (d)(1)(v).  These requirements apply to any "[r]emuneration from an entity under an arrangement or multiple arrangements to a physician….or to a group practice." 42 C.F.R. §411.357 (d).

---

center, Methodist violated these regulatory requirements under the *Stark* laws. Likewise, West Clinic d/b/a West Cancer Center cannot qualify as a component of an "academic medical center." The regulations define component of an **academic medical center** as "an affiliated medical school, faculty practice plan, hospital, teaching facility, institution of higher education, departmental professional corporation, or nonprofit support organization whose primary purpose is supporting the teaching mission of the academic medical center." *See* 42 C.F.R. §411.355(e)(1)(i)(A). The primary purpose of West Cancer Center was not "supporting the teaching mission of an academic medical center." Among other requirements, all transfers of money between components of the center must "directly or indirectly support the missions of teaching, indigent care, research, or community service." *See* 42 C.F.R. §411.355(e)(1)(iii)(A). In this case, Methodist has transferred massive amounts of money to West Clinic physicians **not** for the purposes of teaching or indigent care, research or community service---but rather to reward and enrich these private physicians for their referrals to the hospital system.

86.     The Stark statute defines "fair market value" as "the value in arms-length transactions, consistent with the general market value, and, with respect to rentals or leases, the value of rental property for general commercial purposes (not taking into account its intended use) and, in the case of a lease of space, not adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor where the lessor is a potential source of patient referrals to the lessee." 42 U.S.C. §1395nn(h)(3).

87.     In pertinent part, the Stark regulation defines "fair market value" as "the value in arm's-length transactions, consistent with the general market value…or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party." 42 C.F.R. §411.351.

88.     Under the definition of "fair market value," any remuneration or benefit given by a hospital system to a physician must be based solely on the physician's personal labor and not based on his or her ability to generate business for the system.

89.     As addressed in detail below, Methodist did not comply with the requirements of the "personal services" safe harbor. Methodist violated Stark laws by rewarding West Clinic physicians with (1) drug profits derived from their referrals, (2) "management" services fees based on the value of the oncology service line revenues largely determined by their referrals, (3) an aggregate compensation package far in excess of fair market value and based on the value of West Clinic physicians' referrals to the Methodist system, and (4) $7 million to "invest" in West Clinic's research company, including $3.5 million for paying off West Clinic physicians' personal indebtedness, which was of little or no benefit to Methodist and a disguised reward to the West Clinic physicians for their referrals.

26

90.     Stark laws also establish that when a hospital leases office space to referring physicians, "the space rented or leased does not exceed that which is reasonable and necessary for the legitimate business purpose of the lease arrangement" and the "rental charges" must be "consistent with fair market value." 42 C.F.R. §411.357(a)(3) and (4). The "lease arrangement [must] be commercially reasonable even if no referrals were made between the lessee and the lessor." 42 C.F.R. §411.357(a)(6).

**Compliance with AKS and Stark Is Condition of Each Federal and State Payment**

91.     Compliance with the AKS and Stark laws is a mandatory condition of healthcare providers' enrollment in federal health care programs, a mandatory condition of every claim submitted by providers to federal health care programs, and a mandatory condition of every payment made to providers by federal health care programs.

92.     Federal health care programs include patients covered under Medicare, Medicaid, or TRICARE in addition to federal employees and retired federal employees.

**Compliance with AKS and Stark Laws is Condition of Each Medicare Payment**

93.     Medicare covers the costs of certain medical services for persons aged 65 years or older and those with disabilities.

94.     Medicare is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

27

95.     HHS is responsible for the administration and supervision of Medicare. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of Medicare.

96.     CMS makes Medicare payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in Medicare. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

97.     Each Defendant has executed at least one provider agreement with CMS in which they agreed to abide by the Medicare laws, regulations and program instructions…" CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B.  In the provider agreement, each Defendant certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)…" *Id.*

98.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. *See* 42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments electronically on a CMS UB-04 Form.

99.     The UB-04 Form contains the following notice in bold capital letters: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON

28

CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

100.    The UB-04 Form requires the provider to certify the following:

"Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."
"For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws."
"For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient."

101.    As a condition of payments by Medicare, CMS also requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

102.    After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

103.    Each cost report contains mandatory certifications of compliance with the AKS and *Stark* laws. Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

104.	For each of the fiscal years between 2012 and 2018, each cost report certification page submitted by the Methodist Defendants included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result**." (Emphasis added).

105.	On each cost report for each fiscal year from 2012 through 2018, the responsible officer(s) on behalf of the Methodist Defendants certified as follows:  "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report….and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (Emphasis added).

106.	The Methodist Defendants were required to certify that their filed cost reports were  (1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, (4) **that the services provided in the cost report were not linked to kickbacks**, **and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the Stark laws and AKS.**

30

107.  In the months following the end of each fiscal year, the Methodist Defendants submitted annual cost reports to CMS and attested to the certifications stated above. The Methodist Defendants submitted cost reports with the certifications stated above for Fiscal Years 2012, 2013, 2014, 2015, 2016, 2017, and 2018.

108.  Methodist filed its Cost Reports electronically each year with CMS. There is no paper submission, but there is an electronic record created by the Medicare Administrative Contractor ("MAC") each time a change was made to the cost reports filed by the hospital and/or by the MAC.

109.  Attached to this Second Amended Complaint as Exhibit A is a summary of the electronic record numbers submitted by Methodist in which it falsely certified compliance with the AKS and Stark Laws. This summary includes the dates that the MAC received the cost reports (the MAC create date) and the dates the MAC processed the report (i.e., the "official" date of the report).

110.  For Fiscal Years 2012-2018, Methodist repeatedly falsely represented and certified to the federal government that it had complied with the AKS and Stark Laws.

111.  In addition to the in-patient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

112.  Form CMS-1500 requires the physician to certify that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

113.  For claims arising from Fiscal Years 2012 through 2018, the Defendants orchestrated the submission of thousands of CMS-1500 forms to CMS for Medicare payments. In the CMS-1500 forms, West Clinic physicians certified that they were eligible for participation in Medicare and

that they complied with all applicable regulations and laws governing Medicare, including Stark laws and the AKS.

## Compliance with AKS and Stark is Condition of Each Medicaid Payment

114.    Medicaid is a joint federal-state program that provides healthcare benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

115.    The federal Medicaid statute sets forth minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq.*  As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. *See* 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

116.    During the years 2012-2018, the federal matching rate for TennCare (the Tennessee Medicaid Program) was approximately 65 percent.

117.    TennCare's Master Contract requires compliance with Stark laws and the AKS as a condition of each payment to Medicaid providers.  Each claim submitted by providers to TennCare "constitutes a certification that the provider, subcontractor or any other entity has complied with all applicable Medicaid laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), in connection with such claims and the services provided therein." TennCare Master Contract, Paragraph 2.12.9.40.

118.    In Tennessee, provider hospitals participating in the Medicaid Program must file annual cost reports with the State's Medicaid agency, or its intermediary, in a protocol similar to that

32

governing the submission of Medicare cost reports. Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

119. Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the AKS and Stark laws.

120. The Tennessee Medicaid Program uses the Medicaid patient data in the cost reports to determine the payments due each facility.

121. The Methodist Defendants submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with the AKS and Stark laws. The Tennessee Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims.

122. Although Stark originally applied only to Medicare claims, it was later expanded to apply to Medicaid claims. The Medicaid statute imposes limits on referrals and reimbursements similar to Stark laws. Specifically, 42 U.S.C. 1396b(s) titled "Limitations on certain physician referrals," provides,

> No payment shall be made to a State under this section for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in subsection (h)(6) of section 1395nn of this title) furnished to an individual on the basis of a referral that would result in the denial of payment for the service under subchapter XVIII of this chapter if such subchapter provided for coverage of such service to the same extent and under the same terms and conditions as under the State plan.

123. Subchapter XVIII governs the Medicare program, including Stark laws. The substantive prohibitions contained in the Stark laws are therefore applicable to claims submitted to Medicaid.

124. CMS cannot pay federal financial participation funds for services provided under Medicaid if the payment would be prohibited under Medicare due to an illegal referral in violation of Stark

33

laws or the AKS. The only difference between holding a defendant liable for Stark-predicated FCA violations based on Medicare claims and those based on Medicaid claims is that the former are submitted to the federal government directly, while the latter are submitted to the states, which in turn receive federal funding to help pay the claims. It does not matter for purposes of the False Claims Act whether a claim is submitted to an intermediary or directly to the United States. *See* 31 U.S.C. 3729(b)(2) (defining an FCA "claim" to include requests for payments submitted "to a contractor, grantee, or other recipient, if the money . . . is to be spent or used . . . to advance a Government program or interest").

125.    Moreover, even if its own Medicaid claims to Tennessee did not create FCA liability, Defendants would still be liable for causing Tennessee to submit a claim in violation of Stark laws and the AKS to the federal government. Causing a third party to present a false claim or use a false record creates FCA liability just as if the defendant had presented or used the claim or record itself. *See* 31 U.S.C. 3729(a)(1)(A-B).

126.    A false claim submitted to the Medicaid program is a false claim presented to the United States. Given the structure of the Medicaid, Medicare, and TRICARE systems, the natural and foreseeable consequence of submitting a false claim to any of them is that the United States will provide funds to pay the false claim. Given the comprehensive funding and reimbursement structure between the states and federal government under the Medicaid scheme, claims that are submitted to Medicaid are claims to the federal government.

### Compliance with AKS and Stark is Condition of Each TRICARE Payment

127.    The Methodist Defendants also enrolled in and sought payments from the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

34

128. TRICARE is a federally funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. *See* 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a). Methodist has received revenue from the TRICARE Program.

129. In addition to individual patient costs, TRICARE pays hospitals for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs. *See* 32 C.F.R. § 199.6.

130. A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement"), in which the provider sets forth the number of patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

131. The Request for Reimbursement requires that the provider certify that the information contained therein "is accurate and based upon the hospital's Medicare cost report."

132. Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

133. The Methodist Defendants submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports of Methodist contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

134.    On each occasion when Methodist's Requests for Reimbursement were false due to falsity in its Medicare cost reports, Methodist falsely certified that the information contained in its Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

135.    The Methodist Defendants knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.

### Methodist's Kickbacks to West Clinic Physicians

### From the Beginning Methodist Intended to Buy West Clinic's Referrals

136.    On or about April 28, 2011 Methodist CEO Gary Shorb and Methodist CFO Chris McLean met with UTHSC Chancellor Dr. Steve Schwab to discuss the overall terms of an arrangement between Methodist, West Clinic physicians, and the University of Tennessee. The meeting was at Chancellor Schwab's office. Also in attendance at this meeting was Co-Relator Dr. Stern. This was the first month of Dr. Stern's appointment as Executive Dean and Vice-Chancellor of Clinical Affairs at UTHSC.

137.    At this meeting McLean and Shorb stated that West Clinic doctors would end their relationship with Baptist Healthcare, a competitor of Methodist, and bring their patients and referrals to Methodist. McLean and Shorb were enthusiastic about this strategy because of the significant increased revenues that West Clinic physicians' referrals would generate for the Methodist system.

138.    At this meeting, McLean and Shorb described a financial "windfall" from West Clinic physicians' referrals of cancer patients for chemotherapy/infusion therapy using expensive drugs. Shorb and McLean stated that Methodist would make significant drug profits under the 340B

36

Program from West Clinic's referrals, the West Clinic doctors would share in the drug profits, and UTHSC would also receive part of the drug profits. McLean and Shorb described the deal as a "windfall" and "win-win" for everybody.

139. At this meeting, Shorb and McLean described a professional services agreement under which Methodist would pay $120 per wRVU[9] for all physicians of West Clinic regardless of experience, credentials or collections. McLean stated that there were 27 physicians at West Clinic at the time and their collective annual wRVUs were approximately 259,000.

140. Methodist CEO Shorb and CFO McLean stated that Methodist was also considering a professional services agreement with another group of oncologists---UTCI or University of Tennessee Cancer Institute. McLean told Dr. Stern and Dr. Schwab that UTCI had 13 physicians and produced 100,000 wRVUs per year. McLean told Dr. Stern and Dr. Schwab that UTCI would generate revenues from referrals in the amount of $50 million per year and wanted payments for professional services at the rate of $70 per wRVU.

141. In contrast, McLean stated that West Clinic physicians wanted payment per wRVU at the higher rate of $120, but West Clinic would generate revenues from referrals in the amount of $120 million per year.[10]

142. Methodist CEO Shorb and CFO McLean knew that West Clinic's higher rate per wRVU was above the Memphis market rates for oncologists, but Shorb and McLean were focused on the

---

[9] The most common measure of physician productivity is Work Relative Value Units (wRVUs). These units reflect the level of time, skill, training, and intensity required of a physician to provide a given service. These units are the leading method for calculating the volume of work or effort expended by a physician in treating patients. Under this relative scale, a physician seeing two or three complex or high acuity patients per day would accumulate more RVUs than a physician seeing lower acuity patients each day.

[10] In the subsequent months, Methodist also attempted to enter a professional services agreement with UTCI; however, West Clinic senior partner Dr. Schwartzberg objected and told Methodist CEO Shorb that UTCI physicians must be employed by or subordinate to West Clinic. Shorb yielded to Dr. Schwartzberg's objection and Methodist did not enter into a professional services agreement with UTCI.

higher revenues ($120 million) that West Clinic's referrals would generate for the Methodist system.

143.    At this meeting, McLean stated that West Clinic physicians' referrals would increase Methodist's drug profits under the 340B Program by an estimated $15 million per year. Of this $15 million, Methodist CEO Shorb and Methodist CFO McLean described an arrangement of giving each entity one-third or $5 million. The University of Tennessee would receive one-third or $5 million, Methodist would receive one-third or $5 million, and West Clinic physicians would receive one-third or $5 million of the projected $15 million per year.

144.    The one-third of 340B drug profits to be paid to West Clinic physicians was in addition to Methodist's payments per wRVU to the physicians. Shorb and McLean stated that the drug profits generated by the West Clinic physicians' referrals would directly bolster the physicians' incomes in addition to payments per wRVU.

145.    Dr. Stern responded to both Methodist CEO Shorb and UTHSC Chancellor Schwab that based on his experience with a cancer center at Columbia and what he knew of Dana Farber Cancer Institute in Boston, it was very unusual for 340B drug profits to be used to increase physician incomes.  Dr. Stern believed that the 340B drug profits should be used to bolster programs at the nascent cancer center----recruitment, equipment, clinical trials, and infrastructure. He disagreed with using the drug profits to enrich the incomes of referring physicians.

146.    Shorb wanted to increase the Methodist system's market share of cancer patients. Shorb stated that West Clinic was a leading community-based oncology practice with the ability to direct or refer significant market share of cancer patients to Methodist.

147. Prior to the "alliance" with West Clinic, Methodist already offered inpatient and outpatient services to cancer patients.[11] West Clinic physicians did not offer new oncology services needed by the Methodist system. West Clinic physicians offered referrals of patients to generate more revenues for Methodist's oncology service line, including lucrative drug profits for chemotherapy infusion drugs and oral cancer drugs. Those referrals were the focus of Shorb and McLean in their financial analysis of the "alliance" with West Clinic.

148. Three weeks later on May 17, 2011, UTHSC Chancellor Schwab sent an email to Methodist CEO Shorb and stated with respect to the proposed Professional Services Agreement ("PSA") with West Clinic physicians: "Gary, My understanding of the Cancer Center based on our discussions…The financial lift created by this PSA will be distributed as follows…a. 33% Cancer PSA, b. 33% Methodist c. 33% UT COM."

149. The "financial lift" referred to 340B drug profits "created by this PSA" with West Clinic physicians.

150. "Cancer PSA" referred to the "cancer" physicians at West Clinic under the Professional Services Agreement.

151. "UT COM" referred to the University of Tennessee College of Medicine.

---

[11] Methodist's largest hospital, University Hospital, had the highest acuity of oncology patients in the greater Memphis area. For outpatient oncology services, University Hospital had a busy radiation therapy center, infusion center and sickle cell therapy center that provided high level infusion services as well. There was also significant outpatient surgery and ancillary testing done there for cancer patients. This included follow up care as well as routine ancillary testing. Many cancer patients came to the University Hospital emergency room for emergency care. For inpatient oncology services, University Hospital had a dedicated inpatient cancer unit. Highly complex surgical oncology was also provided in University Hospital operating rooms with a significant presence of surgeons dedicated to treating surgical oncology patients.

152. The email sent by UTHSC Chancellor Schwab to Methodist CEO Shorb on May 17, 2011 confirmed that the business strategy at Methodist was to "distribute" 33 percent of the 340B drug profits to the referring physicians at West Clinic.

153. On July 11, 2011 at the request of Chancellor Schwab, Dr. Stern drafted a letter which memorialized the discussions between Methodist CEO Shorb and UTHSC Chancellor Schwab. The letter confirmed the commitments between Methodist and the University of Tennessee regarding a "collaborative comprehensive cancer center." That draft letter stated in pertinent part: "The initial 'lift' for the Methodist system provided by this cancer center has been determined to be approximately $18 million. We (Methodist system) will provide one third of this 'lift' to UT to spend on cancer-related projects per year. It is our mutual intention (UT and Methodist) that these funds will be expended to develop the cancer center with the advice of the above governing board. As the 'lift' of the cancer center changes over time, this amount will be duly altered not to fall below $5 million per year."

154. Instead of a letter agreement, Methodist and UT entered into a more formal Memorandum of Understanding ("MOU") on July 19, 2011. Methodist CEO Shorb signed this MOU on behalf of Methodist and Chancellor Schwab signed this MOU on behalf of the University of Tennessee.

155. The MOU stated: "One third of the annual contribution of the defined cancer service line will be provided to UT through the affiliation agreement to reinvest in cancer-related programs and in particular the expansion of oncologic research. The parties will work in good faith to define this contribution margin, the term of such an arrangement and related matters."

156. A few months later Methodist and UT entered into the Fourth Amendment to Addendum A to the Amended and Restated Master Affiliation Agreement.

157.   The Fourth Amendment referenced the MOU which "set forth the guiding principles for the development of the premier academic-affiliated cancer program in the region…"

158.   The Fourth Amendment stated that Methodist "shall make an annual payment of 'Base Mission Support' to UT" in the amount of "five million dollars ($5,000,000) or one third (1/3) of the cancer service line contribution margin (whichever is greater) per year."

159.   Despite the original agreement for UT to receive 33 percent of the 340B drug profits and despite the drug profits rising to over $60 million per year by 2016, UT only received $5 million per year from 2012-2018.

160.   After paying UT the $5 million, Methodist and West Clinic divided the balance of drug profits between them each year. For example, in 2015, Methodist and West Clinic divided approximately $35 million in drug profits between them after paying UT the $5 million. In 2016, Methodist and West Clinic divided approximately $58 million in drug profits between them after paying UT the $5 million.

161.   West Clinic physicians knew that they did not qualify as eligible entities to receive drug discounts or drug profits under the 340B Program so they sought to capitalize on Methodist's 340B eligibility. Specifically, West Clinic physicians wanted to enhance their personal incomes with lucrative profits from chemotherapy infusion drugs and oral cancer drugs that Methodist could acquire  at deep discounts as a covered entity under the 340B Program.

162.   Under this financial strategy, Methodist would acquire chemotherapy infusion drugs and oral cancer drugs at discounts through the 340B Program. West Clinic physicians would then order the drugs and chemotherapy services, but the retail drug prices charged to the patients and their insurance carriers would be far higher than acquisition costs resulting in large profits to Methodist. Methodist would then channel part of the profits from drug sales to West Clinic physicians.

41

163.   In return, West Clinic physicians agreed to an arrangement of exclusively referring their patients to West Cancer Center and the Methodist hospital system instead of Baptist Healthcare where West Clinic physicians had historically sent referrals.[12] Such referrals would include cancer patients in need of inpatient admissions for surgeries or treatment, outpatient procedures and services, imaging services, laboratory services, radiation therapy, chemotherapy infusion services,[13]oral cancer drugs, and the host of ancillary services required for cancer treatment.

164.   The physician leaders of West Clinic were looking for a hospital "partner" to create an outpatient cancer center called West Cancer Center. West Clinic leaders presented six primary financial requirements to Methodist's senior executives. First, West Clinic physicians wanted the "ability to capitalize on" the 340B Program by using Methodist's status as a "covered entity" to acquire cancer drugs at deep discounts and share in the profits from retail sales. Second, West Clinic physicians demanded premium rates per wRVU for all West Clinic physicians regardless of credentials, experience or collections. Third, West Clinic physicians wanted payments for "co-management" fees to manage the oncology service line at Methodist. Fourth, West Clinic required that key personnel of West Clinic would be appointed to leadership positions within Methodist. Fifth, West Clinic physicians wanted Methodist to fund all expenses, operations, offices, and staffing at the West Clinic sites to be included in the "partnership." Sixth, West Clinic physicians wanted to be bailed out of their personal debts related to their for-profit research entity call ACORN (subsequently renamed Vector).

---

[12] West Clinic physicians committed their referrals to Methodist unless they were obligated to make referrals to other venues under prior managed care contracts.

[13] Infusion therapy involves the administration of medication through a needle or catheter. It is prescribed when a patient's condition is so severe that it cannot be treated effectively by oral medications. Such infusion medications were also acquired at deep discounts through the 340B Program and sold at high profits to the Medicare Program and commercial insurers.

165.   West Clinic's leaders advised Methodist's executives that they were also considering "partnerships" with Methodist's competitors, Baptist [14] and Tenet. As the leading oncology practice in the region, West Clinic's leaders sought to leverage the threat of entering into an exclusive arrangement with a competitor of Methodist.

166.   Methodist's senior executives led by CEO Shorb and CFO McLean agreed to all of West Clinic's demands.

167.   In 2011, Methodist's executives finalized the following agreements with West Clinic physicians effective December 31, 2011: Professional Services Agreement ("PSA"), Co-Management Agreement, Leased Employee and Administrative Services Agreement, and Unwind Agreement.[15] The Agreements had an initial term of seven years ending on December 31, 2018.

168.   In 2011, Dr. Stern attended multiple meetings with senior Methodist executives and West Clinic executives when they discussed the negotiation and terms of these agreements.

169.   The final terms of the agreements included multiple components of compensation to West Clinic physicians as previously discussed by Shorb and McLean at the meeting attended by Dr. Stern in April 2011. Methodist agreed to pay premium rates per wRVU for all physicians of West Clinic regardless of experience, credentials or collections. In addition to premium rates per wRVU, Methodist also agreed to pay a share of the 340B drug profits to West Clinic physicians generated by their referrals of patients for chemotherapy infusion services and oral cancer drugs to the Methodist system. Methodist also agreed to pay "co-management" fees to the West Clinic

---

[14] Baptist did not qualify under the 340B Drug Discount Program. West Clinic leaders chose to "partner" with Methodist primarily because they wanted a percentage of 340B drug profits in addition to other guaranteed payments per wRVU and for management services.

[15] Methodist also subsequently entered into a 340B Contract Pharmacy Services Agreement with AnovoRX Group, LLC for the purpose of providing pharmacy services dedicated to filling prescriptions and managing collections for oral drugs ordered by West Clinic physicians.

physicians for managing the entire oncology service line at all Methodist hospitals, facilities, and the cancer center sites. Methodist also agreed to "invest" $7 million in West Clinic's for-profit research company called ACORN, including a $3.5 million payment for ACORN's indebtedness personally guaranteed by West Clinic physicians.

170.    On September 30, 2011, Dr. Stern attended the weekly scheduled "Strategy Meeting" with senior Methodist executives at Methodist CEO Shorb's office. In attendance at this meeting was Bill Breen, Methodist's Senior Vice-President of Physician Alignment. Breen reported that the valuation of West Clinic's planned management services under the Co-Management Agreement was "about $500,000 lower than expected." Breen, Methodist CEO Shorb, and Methodist CFO McClean discussed ways to paper over the difference by stating that Methodist would also pay West Clinic for unspecified "billing services."

171.    Instead of accepting the fair market valuation, Methodist's senior executives schemed of ways to exceed the valuation number and add $500,000 more cash "expected" by West Clinic physicians and disguised as "billing" services.

172.    In negotiating and finalizing these agreements, West Clinic physicians did not become employees of the Methodist system. They negotiated to retain their autonomy and repeatedly asserted their autonomy as a private practice during the course of the 7-year alliance with Methodist.

173.    After the agreements were finalized, Dr. Stern attended a Methodist Board meeting in December of 2011. At that Board meeting, Methodist CFO McLean projected that the West Clinic's referrals would increase the hospital system's net revenues by approximately $200 million each year.

174. On January 27, 2012, West Clinic CEO Mounce made a PowerPoint presentation at the Methodist "Strategy" meeting usually scheduled for Friday mornings. Dr. Stern attended this "strategy" meeting. The meeting was usually held at 1211 Union, in Methodist's Administrative Suite, 7th floor conference room.

175. The PowerPoint was called "The West Clinic Methodist Le Bonheur Healthcare and The University of Tennessee Health Science Center--- An Innovative Partnership in Cancer Care."

176. Slide Number 5 described seven major terms of the "Provider Service Agreement" between Methodist and West Clinic: (1) "West Physicians not acquired and maintain PC infrastructure," (2) "MLH Owns and Leases Infusion Areas and Imaging/Surgery Center Areas," (3) "West's clinical employees become MLH employees (Approx. 100 clinical)," (4) "MLH orders all supplies using current relationships and in some sites a 340 B drug pricing mechanism," (5) "West Bills and Collects under provider based billing (Hybrid model),"[16] (6)"All collections are swept to MLH," and (7) "MLH responsible for West's operational expenses."

177. Slide Number 6 described the Management Services Agreement and stated, "West contracted to manage the Cancer Service Line for all Cancer Services at MLH." "This includes but is not limited to…All Services at West Clinic Outpatient Sites, All Inpatient and Outpatient Services at MLH Hospitals, Radiation Oncology, Participation and operational oversight for many management and quality categories."

---

[16] One of Methodist's strategies was to bill the West Cancer Center as hospital outpatient services and/or exploit the provider-based billing status under Medicare reimbursement rules. "Provider based" is a Medicare payment designation that allows facilities owned by and integrated within a hospital to bill Medicare as a hospital outpatient department, resulting in these facilities generally receiving higher payments than freestanding facilities. Medicare payments for services performed at provider-based facilities are often more than 50 percent higher than payments for the same services performed at a freestanding facility.

178. At the same time as the Professional Services Agreement and Management Services Agreement, effective January 1, 2012, the University of Tennessee and West Clinic, P.C. entered into the Affiliation Agreement. In July of 2012, the Affiliation Agreement was signed by Chancellor Schwab on behalf of UTHSC and by Dr. Lee Schwartzberg, senior partner and Medical Director of West Clinic.

179. The Affiliation Agreement recites that West Clinic, Methodist Healthcare---Memphis Hospitals ("MHMH"), and the University of Tennessee "through its Health Science Center…intend to memorialize the advancement of patient care delivery, quality clinical research and clinical education, and community service programs in the fields of oncology and hematology, gynecologic oncology and such other medical disciplines and specialties as may be hereby affected."

180. The Affiliation Agreement states that "the Parties agree to collaborate in the management of MHMH's hospital inpatient and outpatient cancer service lines."

181. The Agreement further states that the University of Tennessee and West Clinic "desire for [West Clinic] to serve as UT's primary faculty group practice for the delivery of academically-related cancer patient care services…" The Agreement provides for "part-time faculty compensation" for West Clinic physicians.

182. The parties further agreed to "form in cooperation with MHMH the Tennessee Cancer Council…to serve as an advisory board to enhance the patient care delivery and quality of inpatient and outpatient Cancer Patient Care Activities, including MHMH's system-wide cancer service line…"

46

183. The Agreement also states that the "Parties will endeavor to cause the UT hematology/oncology program to receive designation as a National Cancer Institute ('NCI') Cancer Center."

184. The term of the Affiliation Agreement is also 7 years through December of 2018.

185. The Affiliation Agreement was amended in January of 2014 to increase the faculty compensation to West Clinic physicians and increase their reimbursements for "costs associated with the advancement of academically-related cancer patient care services."

**The West Clinic Dramatically Increased Methodist's Drug Profits from the 340B Program and Methodist Shared Those Profits with the West Clinic Physicians in Secretive Payments**

186. From 2011 through 2017, Dr. Stern regularly attended weekly or monthly meetings with senior Methodist executives regarding the "alliance" with West Clinic. These meetings usually included Methodist CEO Gary Shorb, Methodist CFO Chris McLean, and Methodist COO Michael Ugwueke.

187. Dr. Stern was a member of the Methodist Board of Directors during the time period of 2011-2017. He was also a member of the Methodist Finance Committee.

188. Dr. Stern was one of 12 members of the Executive Cancer Operations Council, composed of primarily West Clinic physicians, Methodist senior executives, and West Clinic senior executives. Dr. Stern also had weekly or monthly scheduled calls with West Clinic's senior physician leader, Dr. Lee Schwartzberg, West Clinic CEO Erich Mounce, and Dr. Guy Reed, Chair of the UTHSC Department of Medicine. Dr. Stern was also a member of the West Cancer Center---Strategy and Partnership Model Steering Committee.

47

189. During the time period 2011-2017, Dr. Stern also attended many meetings with Methodist's senior executives called "Kitchen Cabinet Meetings" usually held at the office of Methodist CEO Gary Shorb. These meetings were commonly scheduled on a weekly basis. These meetings were usually attended by Methodist CEO Gary Shorb, CFO Chris McLean, COO Michael Ugwueke, Executive Vice-President Donna Abney, Chief of HR Carol Ross-Spang, Healthchoice CEO Mitch Graves, and Senior Vice President of Public Policy and Regulatory Affairs Cato Johnson.

190. In approximately 2011, Methodist CFO McLean and Methodist CEO Shorb told Dr. Stern that West Clinic physicians demanded that they be paid above the national 90th percentile income for oncologists each year and the drug profit distributions would assure their demand was met.

191. Initially, Methodist CFO McLean projected that in the first year of the alliance, West Clinic physicians would generate $15 million in 340B profits as a direct result of these physicians' referrals for chemotherapy infusion and oral cancer drugs. At the beginning of the deal, Methodist CEO Shorb and UTHSC Chancellor Schwab agreed that the University of Tennessee would receive $5 million each year or one-third share of the projected $15 million in annual 340B profits.

192. The actual 340B profits from West Clinic physicians' referrals were much higher than originally projected and increased to $63.73 million by 2016. Yet the University of Tennessee only received $5 million per year and the balance was divided between Methodist and West Clinic physicians.

193. During the years 2011 through 2016, at meetings with Methodist and West Clinic executives (including Methodist CEO Shorb, Methodist CFO McLean, West Clinic CEO Mounce, and West Clinic senior partner Dr. Schwartzberg), Dr. Stern repeatedly objected to the payment of 340B drug profits to West Clinic physicians as inappropriate and excessive. Dr. Stern argued

that the 340B drug profits should be used for indigent care, cancer research, and for the development of an NCI-designated cancer center in Memphis. Dr. Stern was repeatedly rebuffed by Shorb, McLean, Mounce, and Schwartzberg.

194.    During Liebman's tenure as CEO of Methodist University Hospital there were weekly Friday morning senior management meetings held at the Methodist corporate office as well as many planning meetings for the Methodist oncology service line. In those meetings there were many discussions about the importance of 340B profits to the finances of the entire Methodist system as well as the relationship between West Clinic physicians and the Methodist system.

195.    During these meetings in Liebman's presence, Methodist CFO Chris McLean stated that the reason Methodist decided to partner with West Clinic versus other physicians was their ability to direct cancer patients away from the Baptist Healthcare system -- where the West Clinic physicians had referred patients for almost twenty years -- to the Methodist system whose facilities were further away and less convenient. In addition, McLean stated this private practice group was valuable to Methodist because they could drive up radiation therapy volumes by again redirecting patients away from Baptist to Methodist.

196.    Additionally, McLean stated that he had calculated drug profits under the 340B Program from the West Clinic's referrals and how to use those new profits to move the main focus of the cancer service line to the wealthier suburbs despite the intent of the 340B program to assist vulnerable or uninsured patients' access to prescription medicines and health services.

197.    McLean boasted that this strategy was the way to incentivize the doctors to join with Methodist, make more money, and move away from the urban campus to the wealthiest suburb with higher reimbursement rates from more cancer patients with commercial insurance, Medicare, and Medigap coverage. McLean and Shorb redirected significant investments in the cancer

49

program to the Germantown market, including new equipment, new buildings, and the relocation of physicians away from the inner city to the wealthier suburbs.

198.    Methodist CFO McLean and Methodist University Hospital CFO Chuck Lane told Liebman that Methodist "bought the 340B business and the radiation therapy business" by over-paying the West Clinic doctors to leave their former relationship of referrals with Baptist Healthcare.

199.    Liebman met with McLean on a quarterly basis. In the third quarter of 2014, McLean told Liebman that the complexities of the 340B program itself and the "lack of sophistication" of the federal government to detect this arrangement of sharing 340B drug profits with West Clinic made this strategy a "safe" way to move forward. At Friday morning Methodist strategy meetings, McLean, who was not an attorney, often made joking reference to the fact that he was the law firm of "McLean and associates" that was in control of Methodist's strategies. His attitude was defiance of federal laws that apply to hospitals and physicians. These meetings were held at 1211 Union Avenue, Methodist's Administrative Conference suite.

200.    McLean intimidated others from raising any questions about what he was reporting or doing with the West Clinic finances and payments from Methodist.  McLean made intimidating remarks to third persons in the presence of both Methodist CEO Shorb and Methodist COO Ugwueke who would agree verbally, smile and laugh in agreement, or remain silent and nod.

201.    During monthly review or annual budget meetings for Fiscal Years 2015 and 2016 in the late summers of those years, McLean did not distribute financial reports for West Cancer Center (as he did with other service lines) to the rest of the management team including Liebman. During the budget planning process in the late summer of 2015 at the Methodist Administrative Conference Room at 1211 Union, Liebman asked him why and McLean told Liebman "don't

50

worry" and the "in-house law firm of McLean and Associates" was handling all things related to the cancer program.

202.    McLean also told Liebman that he was an expert in creating financial statements to make numbers "look any way" he wanted them to look, including line items on the Medicare cost reports.

203.    On one occasion, McLean informed Stern that Methodist was not interested in Stern's ideas or any proposals that originated from Stern and UTHSC. He indicated that whatever plan Stern would bring forward, McLean would manipulate the numbers so that it would fail and the plan would never be considered by Methodist's leadership.  Methodist CEO Shorb insisted that any time Dr. Stern wanted to make a business plan, he had to do it with McLean and his staff. Invariably, no staff was assigned or the plan was never made.

204.    McLean made it clear to Dr. Stern that his sole objective when it came to the West Clinic was to make the "partnership" as profitable as possible and that any programmatic interests that Dr. Stern might have in expanding healthcare to the poor and uninsured or enhancing teaching and research would be viewed as an unwelcome distraction.

205.    Whenever the discussion came up about increased funding for UT consistent with the terms of the original agreement to share one-third of the 340B drug profits with UT, Mclean told Dr. Stern that no additional funds were available beyond the $5 million per year.

206.    During the budget planning process in the late summer of 2015, Liebman also asked McLean why the West Cancer Center doctors were receiving a much lower allocation of corporate overhead than the employed physician practices or any other entity in the system. McLean dodged that question and simply said, "That's a different deal."

51

207.    During the meetings McLean repeatedly exhibited an attitude of not caring about issues related to compliance with federal laws.  His focus was monitoring and increasing referrals and revenues.

208.    When Methodist and West Clinic senior leaders were negotiating an extension of the "alliance" in 2016,  both McLean and Methodist CEO Gary Shorb stated that Methodist would not have any business relationship with any medical oncologists in the community unless West Clinic CEO Mounce and West Clinic's senior partner Dr. Schwartzberg approved the relationship. McLean and Shorb also stated that employed oncologists at UTHSC would be transitioned under the West Clinic's control as soon as possible.  Dr. Stern strongly objected to this plan.

209.    West Clinic wanted to control all physicians and revenues in the area of oncology. Dr. Stern told Methodist CEO Shorb that West Clinic's attempt to form a monopoly was against the interests of Methodist and UTHSC and was not consistent with the goals of outstanding cancer care or building an NCI-designated cancer center.

210.    Methodist CFO Chris McLean closely guarded the secrecy of payments Methodist made to West Clinic physicians and manipulated the accounting reports to conceal the actual payments made to these physicians.

211.    Dr. Stern served on the Methodist Board from 2011 to 2017 and also served on the Methodist Board Finance Committee. During his service on the Methodist Board and Finance Committee, Methodist CFO McLean provided reports and presentations on the healthcare system's finances each year to the Board and the Finance Committee. In these reports and presentations, at no time did McLean disclose to the Board that West Clinic physicians were receiving 340B drug profits from their referrals to the Methodist system. Nor did McLean ever disclose to the Board the amounts of drug profits distributed to West Clinic physicians.

52

212.   In 2012 on its Form 990, Methodist Healthcare-Memphis Hospitals reported paying $54.8 million to West Clinic for "physician services." Yet in in that year, Methodist's payments to West Clinic physicians for wRVUs only represented approximately $34.6 million. Methodist's payments to West Clinic physicians for "co-management" services in 2012 were approximately $3.0 million.

213.   In 2013 on its Form 990, Methodist Healthcare-Memphis Hospitals reported paying $51.9 million to West Clinic for "physician services." Yet in in that year, Methodist's payments to West Clinic physicians for wRVUs only represented approximately $36.7 million. Methodist's payments to West Clinic physicians for "co-management" services in 2013 were approximately $3.2 million.

214.   In 2014 on its Form 990, Methodist Healthcare-Memphis Hospitals reporting paying $56.3 million to West Clinic for "physician services." Yet in that year, Methodist's payments to West Clinic physicians for wRVUs only represented approximately $38.4 million. Methodist's payments to West Clinic physicians for "co-management" services in 2014 were approximately $4.4 million.

215.   In each of these years, Methodist reported paying millions of dollars more for "physician services" to West Clinic physicians than the amounts paid for wRVUs and co-management services.

216.   The truth is that the amounts reported by Methodist on its 990s as payments for "physician services" to West Clinic were not accurate. Methodist deliberately understated the payments to West Clinic physicians. Over the term of the "partnership" between 2012 and 2018, Methodist paid tens of millions of dollars to West Clinic physicians above and beyond payments for "physician services," wRVUs or co-management fees. Between 2012 and 2018, Methodist paid

53

tens of millions in drug profits to West Clinic physicians. These drug profits were generated by West Clinic's referrals for chemotherapy infusion therapy and oral cancer drugs.

217.    Methodist's senior executives----Methodist CEO Shorb and Methodist CFO McLean---concealed the specific amounts of drug profits paid to West Clinic physicians in each of the years 2012 through 2018. Methodist's senior executives, including Methodist CEO Shorb and Methodist CFO McLean, knew that paying drug profits to West Clinic's referring physicians violated the Anti-Kickback Statute and Stark laws and they devised an accounting arrangement to conceal the payments. McLean and Shorb concealed the payments from the Methodist Board and Finance Committee.

218.    Within months of finalizing the "partnership" with West Clinic, one of Methodist's maneuvers was to contract with a separate outside pharmacy service to dispense oral drugs prescribed by West Clinic physicians. That pharmacy was AnovoRX Group.

219.    This maneuver was illogical because Methodist already had a major pharmacy service within its hospital system and that pharmacy service was capable of filling any prescriptions for oral cancer drugs ordered by West Clinic physicians at minimal additional cost since Methodist already had the pharmacy department services and infrastructure in place. Methodist also had a pharmacy residency program operated out of Methodist University Hospital and Methodist Germantown Hospital.

220.    Yet Methodist's financial strategists bypassed their own pharmacy services and contracted with AnovoRX at a cost of paying AnovoRX "a fee equal to $196.00 per prescription for services provided pursuant to this Agreement." Under the Pharmacy Services Agreement, AnovoRX performed "billing and collections function to the associated third-party payors and perform[ed] accurate financial reporting" to Methodist on a "monthly basis."

221.   The arrangement with AnovoRX created the false appearance of West Clinic physicians ordering oral cancer drugs and making referrals to an "independent" pharmacy service.

222.   Methodist was able to contract with the outside pharmacy to dispense oral cancer medications for prescriptions written by West Clinic physicians. The infusion therapy drugs, however, were different because infusion drugs were administered intravenously through a needle or catheter at the hospital or outpatient clinic and had to be mixed and supplied from Methodist's internal pharmacy as part of its hospital services for cancer patients. Therefore, Methodist was not able to create a separate accounting system with an outside pharmacy to fill infusion therapy drug prescriptions.

223.   At the start of the deal Methodist's executives estimated that increased drug profits from West Clinic's referrals would be approximately $15-20 million per year. That estimate turned out to be low. The actual drug profits in subsequent years were much higher and Methodist shared these profits with West Clinic physicians.

224.   For example, in 2015 the profits from oral cancer drug prescriptions ordered by West Clinic physicians and filled by AnnovoRX[17] totaled $10.06 million. In 2015, profits from chemotherapy infusion drugs ordered by West Clinic physicians totaled $30.60 million. In 2015, total drug profits from West Clinic's referrals were $40.66 million. In that year, Methodist's drug profits under the 340B Drug Discount Program totaled $74.29 million. West Clinic's referrals represented approximately 54 percent of these 340B drug profits.

225.   In 2016 the profits from oral cancer drug prescriptions ordered by West Clinic physicians and filled by AnnovoRX totaled $10.55 million. Profits from chemotherapy infusion drugs ordered

---

[17] AnovoRX filled prescriptions and managed collections for oral drugs ordered by West Clinic physicians.

by West Clinic physicians totaled $53.19 million. In 2016, total drug profits from West Clinic's referrals were $63.74 million. In that year, Methodist's drug profits under the 340B Drug Discount Program totaled $112.10 million. West Clinic's referrals represented approximately 56 percent of these profits.

226. The trend was significantly increasing drug profits each year due to West Clinic physicians being incentivized to increase their referrals or prescriptions for chemotherapy infusion drugs and oral cancer drugs.

227. Dr. Stern attended Methodist Board and Finance Committee meetings in which Methodist CFO McLean stated that Methodist's 340B drug profits were in the range of $70-100 million each year. When Dr. Stern heard this, he proposed to the Methodist leaders (CEO Gary Shorb, CFO Chris McLean, and COO Michael Ugwueke) and West Clinic CEO Mounce to "put all the 340B profits in a pot" and distribute more to UTHSC for research, indigent care, and the development to an NCI-designated cancer center[18] in Memphis. They refused to do this and directed Dr. Stern to silence his views.

228. Dr. Stern repeatedly argued that the 340B drug profits should serve the purposes of indigent care and the development of an NCI-designated cancer center. Methodist's senior executive team---Shorb, McLean, and Ugwueke--- and West Clinic CEO Mounce opposed that objective and focused on using the drug profits to enrich Methodist's revenues and West Clinic physicians' incomes.

---

[18] The National Cancer Institute (NCI) Cancer Centers Program was created as part of the National Cancer Act of 1971. Through this Program, NCI recognizes centers around the country that meet rigorous standards for research focused on developing new and better approaches to preventing, diagnosing, and treating cancer.

229.  Dr. Stern was charged with recruiting the research leadership of the cancer center.  One of the most promising recruitments was a trio of three high-profile scientists from Ohio State University which had an excellent NCI-designated comprehensive cancer center.

230.  When these three investigators visited Memphis at Dr. Stern's invitation, they met with West Clinic, UT (Stern and others in the UT College of Medicine), and Methodist leadership.  The package being offered was $15 million along with $2 million per year for 5 years from the "lift" (340B dollars paid to the University).

231.  The three investigators met with West Clinic CEO Mounce who informed them that the Cancer Center generated $200 million+ per year and had large profits, far in excess of $25 million per year.  The Ohio State potential recruits asked why Dr. Stern was offering such a small portion of Cancer Center revenues. Dr. Stern stated that he was offering what was available to UT ($3 million of the $5 million was encumbered due to previous commitments for other recruits and research priorities). When Dr. Stern asked Mounce about what he told the Ohio State visitors--- that there were very large profits in the Cancer Center---Mounce refused to continue the discussion.

232.  Shortly after the West Cancer Center was formed (in about 2013), there was a disagreement over spending UTHSC's "share" ($5 million) of the 340B drug profits.

233.  The Cancer Council was the ostensible governing body of the West Cancer Center. Dr. Schwartzberg, who co-chaired the Cancer Council ostensibly with Dr. Stern, insisted that the West Clinic should control all 340B profits because the West Clinic ordered the drugs which resulted in the  profits. Dr. Schwartzberg told Dr. Stern that the 340B drug profits belonged to the West Clinic physicians.

57

234.	Dr. Stern reminded Dr. Schwartzberg that under the Affiliation Agreement, West Clinic did not have the power to control how UT invested the $5 million payment in cancer research and medical education.  Dr. Stern offered for UTHSC to work in collaboration with the Cancer Council in making decisions to advance cancer research and medical education.

235.	However, despite a dinner meeting with Dr. Schwartzberg, Dr. Stern never obtained an agreement with West Clinic or Dr. Schwartzberg.  Dr. Schwartzberg and West Clinic continued to claim that all 340B drug profits from their referrals were subject to West Clinic's control.

236.	For example, in August of 2016, West Clinic CEO Mounce sent an email to Tim Mashburn, the Executive Associate Dean for the UT College of Medicine. Mounce claimed that UT was required to pay an invoice for over $100,000 to a search firm, Korn Ferry, for finding the new Pathology Director at West Cancer Center. Mounce wrote, "I have spoken to Chris McLean [Methodist CFO], who in turn has spoken with Michael [Michael Ugwueke, Methodist CEO] and the team. They all agree this invoice needs to be paid for out of the lift by UT." The lift refers to the $5 million payment to UT from 340B drug profits.

237.	Mashburn objected to UT paying the invoice in his reply to Mounce: "The Cancer Mission Support Fund (lift) is a UT account subject to the same fiscal policies that apply to all University of Tennessee funds. If any UT funds were going to be used for the KF [Korn Ferry] engagement, there would have to be an executed contract resulting from a state-mandated bid process, all occurring prior to commencement of the work. The University did not conduct a bid process or execute a contract with KF. Therefore, UT cannot pay a KF invoice for which there is no contract."

238.	Mashburn  further stated by email to Chancellor Schwab, Dr. Stern, and Tony Ferrara (UTHSC Chief Financial Officer) on September 10, 2016: "We amended the affiliation agreement to allow UT to reimburse West for miscellaneous expenses up to $400,000 per year, including

58

faculty recruitment costs. They want us to pay this bill (greater than $100,000) in ADDITION to the $400K. We should not allow. If Steve [Schwab] and Dave [Stern] think otherwise, Tony [Tony Ferrara, UTHSC Chief Financial Officer] will have to tell us how. I do not have the authority to break the rules so blatantly." *Id.*

239. Dr. Stern also opposed paying this expense and objected to West Clinic's continuing attempts to control how UT spent the cancer "lift" payment of $5 million each year. Throughout the years of the "alliance" with Methodist, West Clinic's senior leaders acted as if the oncology 340B drug profits belonged to West Clinic because West Clinic physicians made the referrals that largely generated the profits.

240. On October 29, 2016, Dr. Stern sent an email to UTHSC Chancellor Schwab and Dr. Kennard Brown (UTHSC Executive Vice-Chancellor and Chief Operations Officer) regarding "Cancer Discussion." Dr. Stern objected to West Clinic senior partner Dr. Schwartzberg refusing to "compromise on anything" and insisting on "controlling" the "cancer lift payment" which was the 340B drug profits from West Clinic's referrals.

241. Dr. Stern also wrote that West Clinic CEO Mounce and Methodist CFO McLean "are closely aligned and agree on everything ahead of time." Dr. Stern further stated: "We cannot compromise on the principles that allow cancer care and the university to move forward in Memphis and the region. A deal which simply guarantees West Clinic salaries and seeks to make West Clinic the Semmes-Murphey of cancer is not of any interest to me/us."

242. For each year from 2012 through 2018, Methodist shared drug profits from the 340B Program with West Clinic physicians as a financial incentive to capture the revenue stream from referrals of cancer patients by these physicians. This profiteering scheme was a deliberate violation of Stark laws and the AKS. This scheme was also contrary to patient care because the physicians

59

were rewarded and incentivized to (1) increase referrals to the hospital system, and (2) to increase prescriptions for expensive chemotherapy drugs and oral cancer drugs.

243. In early 2015, Methodist's senior executives who engineered the deal with the West Clinic became more anxious about the risks of losing Methodist's $50+ million investment into the new West Cancer Center office space and the risks of losing revenues from referrals by West Clinic physicians if West Clinic chose to opt out of the alliance as allowed by their existing agreements with 6-month notice. Methodist's senior executives sought to reach a longer term "deal" with West Clinic and they formed a "Steering Committee" composed of executives at Methodist, West Clinic, and UTHSC.

244. On January 8, 2015, at Michael Ugwueke's (Methodist COO) request, Liebman arranged a conference call with Chartis Group` ("Chartis"), a health care consulting firm. The purpose of the conference call was to discuss that firm assisting in developing a mutually agreeable business plan for Methodist and West Clinic to continue their "alliance" into the future. The conference call was at 10:00 am Central Time on January 8, 2015.

245. On February 3, 2015, Liebman and Stern attended a meeting with Ugwueke (Methodist COO), attorney Chris Jedrey (who was making a pitch to represent UT), Chris Regan and Pamela Damsky from Chartis, and Eric Mounce (West Clinic CEO) to discuss forming a steering committee to extend the "alliance" between Methodist and West Clinic physicians.

246. At that meeting, Mounce stated that West Clinic physicians had some "non-negotiable" requirements, including (1) keeping their income levels above the 90th percentile, and (2) protecting their income levels in the event of any change in the 340B Program that Methodist was using to channel profits from cancer drug sales to West Clinic physicians.

247.   Mounce confirmed that the West Clinic physicians were worried about their incomes declining if there were changes in the 340B Program. Mounce recognized that West Clinic physicians had been receiving a share of drug profits from Methodist and adamantly argued that the physicians' incomes must continue at the same level calculated to include drug profits even if there were future regulatory changes in the 340B Program.

248.   After this meeting, Ugweuke told Dr. Stern that there could be no legal counsel on behalf of UTHSC[19] at the Steering Committee meetings.  Ugwueke insisted that only West Clinic's legal counsel would be allowed to participate.

249.   Stern ran into resistance in securing outside legal counsel during these discussions even though the University of Tennessee routinely retained outside counsel on various matters. Chancellor Schwab told Dr. Stern that it was a "complicated process" for the University to have outside legal counsel present at these meetings.

250.   Mounce subsequently insisted on using a different consulting firm, PricewaterhouseCoopers (PwC). Methodist hired that firm to conduct interviews and develop a business plan mutually agreeable for the parties to extend the duration of the "alliance."

251.   The West Cancer Center---Strategy and Partnership Model Steering Committee ("Steering Committee) met multiple times in the summer of 2015. Liebman and Stern attended these meetings.

252.   As part of the Steering Committee's work, PwC consultants interviewed numerous Methodist executives, West Clinic physicians, and West Cancer Center executives, including:

---

[19] Throughout the history of their relationship, UTHSC did not control or participate in Methodist's senior management decisions to make any of the payments to West Clinic physicians. UTHSC has not managed, operated or controlled Methodist, West Cancer Center or West Clinic physicians.

Gary Shorb, CEO of Methodist; Michael Ugweuke, COO of Methodist; Chris McLean, CFO of Methodist; Jeff Liebman, CEO of Methodist University Hospital; William Kenley, CEO of Germantown Hospital; Eric Mounce, CEO of West Cancer Center; Dr. Kurt Tauer, Chief of Staff of West Cancer Center; Dr. Lee Schwartzberg, CMO of West Cancer Center; Dr. Matt Ballo, Medical Director of West Cancer Center; and Ari Vanderwalde, Director of Clinical Research at West Cancer Center.

253.   On June 3, 2015, the Steering Committee held its first meeting. In attenda nce were executives from Methodist, UTHSC, and West Clinic, including Liebman and Stern. Methodist did not have legal counsel in attendance at this meeting.

254.   The other individuals in attendance included:  PwC consultants, Gary Shorb (CEO of Methodist), Michael Ugweuke (COO of Methodist), Chris McLean (CFO of Methodist), Erich Mounce (CEO of West Cancer Center), Dr. Kurt Tauer (Chief of Staff of West Cancer Center), and Dr. Lee Schwartzberg (Chief Medical Officer of West Cancer Center).

255.   At this meeting, the PwC consultants presented their findings after "conduct[ing] 22 interviews" of Methodist executives and West Clinic executives and physicians. PwC consultants also performed an "[a]ssessment of partnership financials and funds flow."

256.   During the meeting, PwC consultants reported that the interviews confirmed that Methodist was using 340B drug profits and other compensation to incentivize the doctors to help Methodist capture more market share of oncology patients in the region. The consultants repeatedly said that West Clinic physicians had the ability to shift even more cancer market share to Methodist in exchange for "financial support."

257.   The consultants from PwC presented a series of slides that included the following statements based on PwC's interviews of Methodist and West Clinic executives.

258.   Slide Number 9 stated that "West Clinic Goals" in originally forming the "alliance" included "[g]ain ability to capitalize on 340b opportunity" and "[a]lign with strong hospital partner for capital and growth."

259.   Methodist's "Goals" also included "[c]apitalize on 340b opportunity." Methodist further wanted to "[e]nhance market share and brand."

260.   Slide Number 10 listed the "strengths/capabilities" that each "partner" has brought to the "partnership." West Clinic's "strengths" included "ability to shift significant market share to Methodist." Methodist's "strengths" included "ability to capitalize on 340b."

261.   Slide Number 11 addressed "Success to Date" and stated in part, "Tangible financial benefits to all parties" and "market share growth."

262.   Slide Number 12 listed financial numbers of the original "structure" and operating model and compared these original numbers to "current" numbers.

263.   On Slide Number 12, there was a section titled, "Funds Flow & Comp Structure." That section compared "Original Terms/Structure" with "Current State." For "Original Terms/Structure," the first item listed was "340b Benefit estimate" of approximately $15 million. Under "Current State," the "340b Benefit Actual" was listed as "~$25-$30" million. **The presentation listed these 340B drug profits in the section titled "Funds Flow & Comp Structure."**

264.   The actual 340B profits given to West Clinic physicians were not itemized on the slideshow, but Slide Number 13 confirmed, **"The funds flow between entities runs primarily through Methodist and is heavily reliant on 340b savings."** (emphasis added). The term "savings" meant profits.

265. Liebman and Stern believe that Methodist's senior executives instructed PwC consultants not to list the amounts of drug profits paid to West Clinic physicians in writing or in their presentation as part of their strategy of concealing the actual financial numbers. The presentation confirmed that the compensation package to West Clinic physicians did not simply include payments per wRVUs. In addition to payments per wRVU, Methodist shared the lucrative profits from cancer drug sales with the West Clinic physicians.

266. Slide Number 15 further confirmed that Methodist "distributed" 340B drug profits: "340b savings are made possible by Methodist (payer mix and provider number), however due to the nature of the program, the benefit runs through the Methodist P & L before being **distributed** or reinvested." (emphasis added).

267. At this meeting, Methodist senior executives---including CEO Gary Shorb and CFO Chris McLean---confirmed that they wanted to use 340B drug profits and other methods to incentivize the West Clinic physicians to help Methodist capture more market share of cancer patients in the region. Shorb and McLean confirmed that they wanted to maximize referrals of cancer patients to the Methodist system because of high profits associated with oncology services and they would continue to pay West Clinic for that objective in multiple ways.

268. West Clinic CEO Mounce and West Clinic's senior physician partner, Dr. Lee Schwartzberg, stated that they had the ability to shift even more cancer "market share" or cancer patients to Methodist in exchange for "financial support." During the meeting, Liebman asked several times if there were any regulatory risks with this business arrangement.

269. As discussed at the Steering Committee meeting, West Clinic physicians' goals in originally forming the "alliance" with Methodist included the desire to obtain 340B drug profits and to align with a hospital system for financial "capital." Methodist's goals included increased

profits from 340B drug sales and increased market share of cancer patients. The Steering Committee meeting confirmed that Methodist made massive payments to West Clinic physicians because they had the ability to send major volumes of cancer patients to Methodist. In return, Methodist offered its eligibility to capitalize on 340B drug profits and willingness to share drug profits with West Clinic physicians in addition to other guaranteed payments as financial inducements for their referrals.

270.    At these meetings, Dr. Stern objected to the focus of the meetings being on West Clinic's dominance in the Cancer Center from the standpoint of control and financial considerations. Stern was focused on following an NCI-designated cancer center model and recruiting cancer center leadership and faculty physicians/researchers who could improve cancer care for Memphis and the mid-South.

271.    Dr. Stern did not agree with the "captive PC [professional corporation] model" that West Clinic physicians and Methodist executives supported. The "captive PC" would be governed by West Clinic physicians, would shield West Clinic physicians' incomes from disclosure, and would serve as the entity to receive undisclosed funding from Methodist for the physicians' incomes. West Clinic's leaders also insisted the that the UTHSC physicians who were part of the Cancer Center would join the "captive PC" and would be controlled by West Clinic. Dr. Stern strongly objected to this arrangement.

272.    At the Steering Committee meeting on June 3, 2015, PwC consultants and Methodist executives discussed the financial terms and profits to date from the "alliance" with West Clinic physicians. The original projections by Methodist CFO McLean at the beginning of the "alliance" with West Clinic contemplated increased annual 340B drug profits of approximately $15 million.

65

Actual 340B drug profits had been higher at approximately $25-30 million dollars per year from referrals by West Clinic physicians.

273. The original terms contemplated "management fees" of approximately $3 million per year paid by Methodist to West Clinic physicians. The actual management fees paid to West Clinic physicians in FY 2014 were approximately $4.4 million.

274. The original terms also provided for Methodist to pay $7 million to Vector (formerly known as ACORN), the research company controlled by West Clinic physicians.

275. Methodist executives also discussed increased profits to the hospital system from West Clinic physicians' referrals of cancer patients for hospital admissions.

276. On July 15, 2015, the Steering Committee met again and the PwC consultants led the discussion based on their interviews of West Clinic and Methodist executives. Liebman and Stern attended this meeting along executives from West Clinic and Methodist. The consultants circulated another slide presentation and reported hospital financial data.

277. At this meeting, Methodist executives discussed the healthcare system's financial data demonstrating that referrals from West Clinic physicians to Methodist had increased market share to Methodist since the financial payments to West Clinic began. Between 2012 and the 2014, inpatient oncology volume at Methodist more than doubled as hospital discharges for cancer patients moved from 7,320 discharges in 2012 to 15,834 discharges in 2014.

278. Between 2012 and 2014, the oncology payor mix at Methodist remained consistent with 43 percent of oncology inpatient cases covered by Medicare and 23-25 percent covered by Medicaid. With respect to outpatients, Medicare covered approximately 43 percent of oncology patients at Methodist and Medicaid covered approximately 8 percent.

279.   At this meeting in July 2015, Liebman again questioned the legality of Methodist's payments of 340B drug profits to West Clinic physicians. West Clinic physicians at that meeting insisted that if the 340B payments were reduced, they wanted the option to leave the "partnership." Liebman told them that the parties needed a deeper commitment to compliance and the mission of developing an NCI-designated cancer center could not be about enriching private physicians for referrals.

280.   There is extensive documentation of West Clinic physicians' anxiety about potential changes to the 340B drug program. In the slide presentation at the West Cancer Center---Strategy and Partnership Model Steering Committee Meeting on July 15, 2015, multiple slides addressed potential changes in the 340B Program. Slide Number 7 listed "executive summary of insights to be shared today" and one of the "insights" stated,  "A deterioration in 340b funding is possible over the mid-to-long term (3-5 years) as the definition of an 'eligible patient' and other tenants of the legislation are debated." (Slide Number 7). Slide Number 35 stated, "The 340b program provides notable benefits to the partnership, but changes are expected with intense Pharma opposition (next 3-5 years?)." (Slide Number 35).  Slide Number 36 stated, "The rapid growth of 340b over the past decade has created intense scrutiny on the program and pharma opposition." (Slide Number 36).  Slide Number 38 stated, "The initial Steering Committee meeting highlighted four critical areas to address…" (Slide Number 38).  One of these four "critical areas" was listed as "340b risk mitigation (revenue growth opportunities): How will the partnership reduce reliance on 340b for financial stability…?" *Id.*

281.   At the Steering Committee meeting on August 20, 2015, West Clinic CEO Mounce insisted that any extension of the "partnership" must guarantee physician compensation above the 90th percentile no matter regulatory changes in the 340B Drug Program or Methodist's eligibility to

participate. West Clinic physicians knew that 340B drug profits were a lucrative component of their income in addition to Methodist's payments per wRVU and payments for "management services. The physicians worried about losing their payments from 340B drug profits.

282. Liebman again openly questioned the legality of such an arrangement and openly expressed his concerns in that meeting.

283. Prior to one of the Steering Committee meetings, Cindy Vanderline, a PWC consultant, informed Dr. Stern of the divergent views held by Stern versus Methodist leadership (CEO Shorb and CFO McLean) and West Clinic leadership. She stated that West Clinic was strictly in the Cancer Center to obtain 340B drug profits and high incomes, and that Methodist supported this view. Programmatic development, cancer research, and medical education were not the primary focus for Methodist or West Clinic physicians. This was diametrically opposed to Dr. Stern's view on behalf of UTHSC.

284. Stern's opposition subsequently led to Methodist executives marginalizing him from West Cancer Center discussions. UTHSC Chancellor Schwab also warned Dr. Stern that his job was "on the line" if he could not "get along with Methodist and West Clinic."

285. Chancellor Schwab was a part of these discussions to extend the West Clinic agreements with Methodist. Methodist executives were concerned that Dr. Stern's objections would be detrimental to a renewed agreement with West Clinic. Methodist executives sought Chancellor Schwab's presence was an attempt to neutralize Dr. Stern's opposition to the "captive PC model" in which West Clinic physicians would continue controlling West Cancer Center through a professional corporation.

286.    In October of 2015, Methodist and West Clinic executives exchanged a document called "West Cancer Center Deal Terms and Methodist Response." This "document contains a summary of feedback from UT and the West Clinic on the initial deal framework and Methodist's response."

287.    In discussing the continuation of their "partnership," one of the "new model imperatives" was "[s]tructure must not jeopardize 340b benefit."

288.    Another slide provided "notable feedback" from West Clinic's physicians regarding a new business model for the alliance with Methodist. The "West Clinic Feedback" included a requirement for Methodist's "funding and capital investments [to] continue at existing rates even if 340b benefit is lost."

289.    One of West Clinic's requirements was "[n]o disclosure of individual physician incomes." One of the "new model imperatives" was "[n]o disclosure of individual physician compensation for West Clinic shareholders in short term" and "[l]imit disclosure of other individual physician compensation through transition period."

290.    West Clinic also insisted that UTHSC physicians who were part of the Cancer Center join the "captive PC" that was being formed and would be governed by West Clinic physicians.  Stern strongly objected to this.

291.    When Liebman and Stern objected to sharing drug profits with West Clinic physicians, Methodist CEO Shorb removed them from the inner circle of communications. In approximately December of 2016, Chancellor Schwab told Dr. Stern not to attend Methodist Board meetings or Cancer Center meetings. After a meeting between UTHSC surgical oncologists, Dr. Stern, and Methodist CEO Shorb, Shorb ostracized and excluded Dr. Stern from Methodist/West Clinic communications because of his refusal to support the model of UTHSC surgical oncologists being controlled by the West Clinic in the "captive PC."

292.   The Defendants had a coordinated mutual strategy to conceal the actual payments of drug profits to the West Clinic physicians and avoid direct references in writing to these payments. The Defendants used code terms to disguise their actual agreement to share drug profits.

293.   For example, in the summer of 2016, Eric Mounce, CEO of West Cancer Center, circulated a memo called "Deal Points" to Methodist executives and Dr. Stern.

294.   On July 28, 2016, Methodist COO Michael Ugwueke sent updated "Deal Points" to Dr. Stern, Dr. Steve Schwab (the Chancellor and CEO of UTHSC), and Dr. David Shibata (Chair of the Department of Surgery at UTHSC).   In his cover email, Ugwueke stated, "Please find an updated West Cancer deal points that Gary [Methodist CEO Gary Shorb] and I would like to discuss with you."

295.   Stern was repeatedly warned by Schwab not to raise questions about the Deal Points.   The deal would be struck by a small group of insiders without any input by Dr. Stern or others.

296.   The "Deal Points" contemplated a new professional corporation to replace the structure of West Cancer Center. The financial payments to West Clinic physicians remained essentially the same as in the parties' agreements starting in 2012.

297.   In the "Deal Points" circulated by West Clinic CEO Mounce and in the updated "Deal Points" circulated by Ugwueke, the arrangement between Methodist and West Clinic included continuing payments of 340B drug profits to West Clinic physicians. The document described a "5-year strategic plan and business plan, and associated capital and operating budget commitments, for WCC." The "Deal Points" stated, "As part of such strategic and business plans, MLH will commit to re-invest a mutually agreed portion of MLH's oncology service contribution margin back into its oncology service line."

298.    The Deal Points state, "The development of such plans will be a condition precedent to the closing to the transaction." This "condition precedent" refers to the same position that West Clinic executives and physicians repeatedly stated in meetings attended by Stern and Liebman---if the 340B drug profit distributions ended, they would walk away from the "alliance."

299.    This deal point reflected an ongoing agreement for Methodist to reward West Clinic physicians with a "mutually agreed portion" of the hospital system's 340B drug profits or "oncology service contribution margins" generated by referrals from West Clinic physicians.

300.    The  "Deal Points" also included a paragraph titled "Entrepreneurship." That paragraph stated that West Clinic "physicians will have the opportunity to participate or invest in WCC/MLH oncology ventures, to extent permitted by law." Likewise, Methodist "will have reciprocal opportunity to participate or invest in TWC [The West Clinic] oncology ventures in Tennessee."

301.    This paragraph evidenced the parties' ongoing arrangements of profit sharing with the oncology service line at Methodist and agreement to continue sharing profits.

302.    The "Deal Points" also included an agreement for Methodist to continue paying management fees to West Clinic physicians.

303.    The "Deal Points" also guaranteed payments to West Clinic physicians "at or above the 90th percent" compensation per wRVU.  "The specialty-specific wRVU rate, and the CMA [Co-Management Agreement] fees will be periodically re-appraised in accordance with the revaluation schedule in the Current Agreements." The Deal Points further stated, "If the revaluation identifies a fair market value range for the specialty-specific wRVU rate, MLH and the PC agree to select the value that is at or above the 90th percent of that fair market value range." This "deal point" was a continuation of the same commitment that Methodist executives made at the beginning of the

71

"alliance" in which they guaranteed that West Clinic physicians would be paid above the national 90th percentile.

304.   West Clinic physicians also required the option to "unwind" and walk out of the deal with Methodist if their income decreased "10% or more in any given year over life of Master Transaction Agreement."

305.   Methodist and West Clinic negotiated over a longer "alliance" and the negotiations were ongoing when Liebman left Methodist in August of 2017.

306.   Throughout the course of their "alliance," Methodist and West Clinic physicians shared massive profits at the expense of compliance with federal laws. Methodist's primary objective was to achieve greater market share of cancer patients in the region and the attendant profits from cancer drugs, hospital admissions, outpatient visits, and ancillary services. West Clinic physicians' primary objective was massive income guarantees through receipt of drug profits, premium payments per wRVU, and inflated management fees. The deal was a guaranteed financial windfall to West Clinic physicians without any financial risks except the risk of exposure for violating federal laws.

307.   The Defendants achieved their objectives and concealed the truth about their financial arrangement through a series of tactics to ensure "confidentiality." West Clinic physicians and executives had two major concerns: (1) exposure of the scheme in which Methodist has paid them over $50 million each year, and (2) actions by federal agencies or Congress to curb abuses or modify eligibility under the 340B Program. The parties created a firewall of secrecy with respect to the payments from Methodist to West Clinic and created a limited inner circle of individuals with knowledge of the financial terms.

308.  The "alliance" ended in 2018, the same year that changes to the 340B Program went into effect reducing the Medicare payment rates for drugs purchased by hospitals through the Program. Under the final rule implemented in January 2018, Medicare payments for outpatient drugs to hospitals in the 340B Program were reduced by approximately 28.5%.

## Methodist Paid Over $25 Million to West Clinic Physicians for Supposed Management Services

309.  As CEO of the largest Methodist hospital, Liebman's responsibilities included overseeing the operations of all inpatient and outpatient clinical activities at University Hospital.  His office was responsible for the clinical as well as financial performance of all programs at the hospital. His monthly reviews included profit and loss results for all aspects of the 617-bed hospital. This hospital had the sickest patients in the entire Methodist network and the busiest emergency room. On a routine basis, Liebman reported to the Quality Committee of the Methodist Board and provided leadership for the development of all new clinical services including patient care, facilities and physician recruitment for the hospital. A significant part of his duties included the development of new clinical services and strategic plans for the future growth of the institution as well as considering improvements in quality of care.

310.  Liebman also attended monthly meetings with Chief Executive Officers of all Methodist hospitals and other senior Methodist executives. At those meetings there were typically quarterly updates by West Clinic CEO Erich Mounce regarding new initiatives and activities by the West Clinic physicians.  Liebman also attended weekly senior management meetings for all Methodist hospital Chief Executive Officers and Vice Presidents. At these meetings, there were commonly extensive discussions about hospital management issues and initiatives.

311.   The chronology of meetings Liebman attended regarding oncology services include the following.

312.   On or about May 23, 2014, Liebman met with West Clinic CEO Mounce. At this meeting, Mounce informed Liebman that eventually more cancer related services would be moved under Mounce's direction in order to "justify" the management fees that West Clinic physicians were receiving from Methodist.

313.   Liebman was surprised by Mounce's comment. At that time, Liebman did not know the exact dollar amounts Methodist paid to West Clinic physicians for supposed "management" services, but he knew that the physicians were not actually providing any management services at University Hospital or the other three Methodist hospitals. Mounce's statements to Liebman were admissions of this fact.

314.   On or about July 3, 2014, Liebman met with Dr. Ballo, Chair of the UTHSC Department of Radiation Oncology, at University Hospital to discuss radiation oncology services.  At that meeting Dr. Ballo indicated that he was confused about the relationship between him as Chair of the Department and the West Clinic.  Dr. Ballo stated that the West Clinic physicians had little interest in performing services at the downtown University Hospital location because patients in the wealthier suburbs had commercial insurance or Medicare coverage with higher payment rates.

315.   On July 30, 2014, Liebman met with Methodist COO Michael Ugwueke to review Methodist's relationship with West Clinic physicians and other items. In this meeting, Liebman questioned how West Clinic physicians fit into the clinical coverage and future needs of the hospital as well as the system.  Ugwueke indicated to Liebman that the West Clinic deal came about because the group was having "financial problems" and needed funding. Ugwueke expressed concerns about the ability of West Clinic to leave the "partnership" at any time without

74

cause on 6 month-notice. He said that he would include Liebman in future discussions. Ugwueke was concerned because Methodist was "investing" high levels of funds in the West Clinic relationship and they could leave at any time. Ugwueke explained to Liebman that this was a "unique partnership" with the West Clinic. He also stated that West Clinic CEO Mounce was not a Methodist employee but worked for the West Clinic. At this meeting, Ugwueke had no response to Dr. Ballo's concerns about the lack of West Clinic's involvement in the oncology service line at University Hospital.

316.    Shortly thereafter Dr. Ballo relocated to Germantown as his primary location. At a later meeting, Dr. Ballo told Liebman meeting that there was no real business strategy for University Hospital's oncology services because West Clinic physicians were not interested in being involved in hospital management issues. Dr. Ballo also stated that he and Liebman had to be "very considerate" of the wishes of the referring physicians at West Clinic.

317.    On or about August 1, 2014, Liebman met with the UTHSC Chief of Thoracic Surgery, Dr. Benny Weksler. At this meeting and in subsequent meetings, Dr. Weksler indicated that he was being pressured to join the West Clinic and move his practice to the suburbs.

318.    On or about September 9, 2014, Liebman met again with Dr. Ballo. Dr. Ballo told Liebman that he believed that the downtown location for radiation therapy should be the main location for his department but West Clinic physicians disagreed and wanted to move that department to the wealthier suburb of Germantown.

319.    On or about September 26, 2014, Liebman met with Methodist COO Ugwueke again. This meeting was a follow up to Liebman's meeting with Dr. Weksler. Liebman reviewed with Ugwueke that Dr. Weksler was feeling pressured by West Clinic CEO Mounce and other Methodist executives (including William Kinley) to move his surgical practice to the wealthy

suburb of Germantown.  Liebman expressed his concerns about the impact this move might have

on the teaching programs located at University Hospital and the expectations of the ACGME for

surgical training programs. The ACGME is the accrediting body for residents and fellows.

320.   Ugwueke would not agree that the majority of Dr. Weksler's work should be done in

downtown Memphis rather than Germantown and explained that it was of "extreme importance"

that they keep the referring West Clinic physicians happy.  Ugwueke directed Liebman to stay in

touch with West Clinic CEO Mounce about this issue.  Subsequently, some of Dr. Weksler's

practice was moved to Germantown.

321.   In follow up conversations, Mounce told Liebman that West Clinic wanted high level

oncology services in the Germantown area as a high  priority and had no interest in managing

services in downtown Memphis at University Hospital.

322.   Liebman followed up with Dr. Ballo at UTHSC and he told Liebman that it was not his

intent to move the UTHSC radiation oncology department under the control of West Clinic.  This

statement by Dr. Ballo was consistent with the offer letter/contract that was signed by Stern and

Schwartzberg pursuant to which Dr. Ballo would transition over approximately a 3-year period to

be an employee of a UTHSC Practice Plan.   In addition, Dr. Ballo would transition radiation

oncologists who were part of his group to become faculty at UTHSC and members of a UTHSC

Practice Plan if they were appropriate to join an academic track. Dr. Ballo confirmed on multiple

occasions with Dr. Stern that he would stay with UTHSC.  However, he ultimately left and joined

the West Clinic.

323.   On or about October 28, 2014, Liebman had a conference call with Dr. Lee Schwartzberg,

senior partner and Medical Director of the West Clinic.  Liebman asked Dr. Schwartzberg for an

organizational chart of the West Clinic and asked him who would be the clinical leader to oversee

oncology services at University Hospital. Liebman told Dr. Schwartzberg that he wanted to have regular weekly or monthly meetings regarding oncology services and management of those services at University Hospital. Schwartzberg did not comply with Liebman's requests and there were no weekly or monthly meetings.

324.    On or about January 6, 2015, Liebman met with Methodist's administrative director for radiation therapy, Genia Nipp. She informed Liebman that Methodist's senior executives had decided that future investments in radiation oncology would be for the Germantown location solely because that location was where the West Clinic doctors wanted it to be. She indicated that the Methodist corporate leadership had already agreed to this and West Clinic CEO Mounce would decide which radiation therapy equipment to buy and Methodist would pay for all equipment.

325.    On or about February 26, 2015, Liebman had a conference call with Dr. Ballo who confirmed that he was moving to Germantown where future radiation therapy investments would be for the next several years. He also indicated that he would spend limited time in downtown Memphis.

326.    On or about April 15, 2015, Liebman met with Dr. Martin Fleming to discuss surgical oncology. Dr. Fleming indicated he was concerned about taking very sick patients out of the University Hospital environment to do complex surgical care in the Germantown facility where there was limited night coverage, no teaching service, and fewer ICU beds. Dr. Fleming said pressure was coming from the West Clinic physicians because they had no interest in developing a comprehensive inpatient program in downtown Memphis at University Hospital. Liebman also shared a comprehensive clinical study showing that difficult surgeries should be concentrated in one campus for better clinical outcomes. Liebman sent that study to West Clinic CEO Shorb and COO Ugwueke.

77

327.　On or about April 23, 2015, Liebman had a conference call with Methodist COO Ugwueke to discuss various items.　Liebman expressed his concerns about the lack of participation by the West Clinic physicians in any oncology services or inpatient programs at University Hospital.

328.　During the week of June 3, 2015, Liebman attended the first West Cancer Center---Strategy and Partnership Model Steering Committee meeting.

329.　During the week of July 15, 2015, Liebman attended the second West Cancer Center---Strategy and Partnership Model Steering Committee meeting. The individuals in attendance included (but were not limited to) Price Waterhouse Cooper representatives (Dr. Chin and Cindy Vanderline), Drs. Schwartzberg, Ballo, Weksler, and Tauer, Methodist CEO Shorb, Methodist CFO Chris McLean, West Clinic CEO Mounce, Dr. Stern and Liebman.

330.　During the week of August 20, 2015, Liebman attended the third West Cancer Center---Strategy and Partnership Model Steering Committee meeting.

331.　During the week of September 2, 2015, Liebman attended the fourth West Cancer Center---Strategy and Partnership Model Steering Committee meeting.

332.　On or about October 12, 2015, there was a cancer leadership dinner.　UTHSC physicians-- including Dr. Fleming, Dr. Stern, and Dr. Wecksler---expressed concerns about the governance model and the fact that West Clinic insisted that medical oncologists have a different and higher compensation model than the surgeons because they generated 340B drug profits.

333.　Stern was also present at this meeting and objected to the governance model in which West Clinic physicians (i.e. Dr. Schwartzberg) ran the Cancer Center and UTHSC physicians worked for them. Stern also objected to the "captive PC" which was explained as a way to not reveal income or financial data about West Clinic physician compensation. The response from West

78

Clinic senior partner Dr. Schwartzberg and CEO Mounce was that the West Clinic physicians' referrals drove the Cancer Center and they would do as they saw fit.

334. On or about October 30, 2015, Liebman had a meeting with West Clinic CEO Erich Mounce at 8:00 a.m. in Liebman's office. Mounce informed Liebman that the "deal" was always for the West Clinic oncologists to get paid more because they generated 340B drug profits through referrals for chemotherapy infusion and oral cancer drugs.

335. During the week of November 16, 2015, Liebman attended the fifth West Cancer Center---Strategy and Partnership Model Steering Committee meeting.

336. On or about January 20, 2016, Liebman met with Methodist COO Ugwueke and again expressed his concerns about there being no plan for West Clinic physicians managing oncology clinical services at University Hospital, Methodist North, or Methodist South hospitals. Ugwueke suggested that Liebman meet with Dr. Shibata from "time to time." Dr. Shibata was the Chair of the UTHSC Department of Surgery.

337. On or about April 11, 2016, the Steering Committee met again at the West Cancer Center in Germantown and Liebman attended. At that meeting, a model was shared and discussed regarding governance and administrative responsibilities going forward for the cancer program.

338. On or about April 18, 2016, Liebman attended a meeting at 7:00 a.m. in Methodist CEO Gary Shorb's office. In attendance were Drs. Shibata, Stern, Fleming, Methodist COO Michael Ugwueke, Methodist CEO Shorb, and Liebman. Dr. Fleming was the Division Chief of the UTHSC Department of Surgical Oncology. The UTHSC physicians (Drs. Shibata, Stern, and Fleming) expressed their concerns about the future direction of the cancer program and the lack of interest by West Clinic physicians in anything other than 340B money and suburban patients with

higher payment rates. The UTHSC physicians presented thoughts on a different model going forward.

339. Methodist leaders considered Dr. Stern as the "behind the scenes" organizer of the resistance by UTHSC physicians against West Clinic's control. Chancellor Schwab and Methodist COO Ugwueke told Dr. Stern that his resistance would have "serious consequences" for him. Dr. Stern was increasingly excluded from meetings by Methodist executives, removed from the Methodist Board, and fired as Executive Dean on July 31, 2017.

340. In the spring of 2017, Liebman reviewed the contract terms for the supposed "management" arrangement with West Clinic physicians.

341. The contract contained extensive terms requiring West Clinic physicians to manage the oncology service line at all four Methodist hospitals.

342. The contract terms began by recognizing that Methodist Healthcare-Memphis Hospitals "owns and operates four acute care hospitals in the Memphis area, including Methodist University, Methodist South Hospital, Methodist North Hospital, [and] Methodist Le Bonheur Germantown." The contract further confirmed that these four hospitals "provide a wide range of inpatient, outpatient and clinic oncology services (including, but not limited to, radiation, medical hematology, surgical and specialty oncology services, and related ancillary services, used in the treatment of oncology patients and those services described in Section 1.2 and Exhibit A) to adult oncology patients at MHMH, including the Cancer Center Sites, and the other Methodist Hospitals (the 'Service Line')."

343. The contract terms required West Clinic to "provide management and performance improvement services for and on behalf of MLH and MHMH with respect to the Methodist Hospitals, the Cancer Center sites, and such other off-campus oncology care sites as may in the

80

future be operated under the license of or managed by any of the Methodist Hospitals… (Paragraph 1.1). The scope of engagement included the "following clinical oncology service lines: inpatient, outpatient, and clinic services at the Managed Sites, including hospitalist services for oncology inpatients." (Paragraph 1.2).

344.    The contract required West Clinic physicians to "assist the applicable Methodist Hospital in overseeing and managing all Hospital Service Line clinical staff including clinical personnel, nurse practitioners, and physician assistants other than physicians employed by Manager who provide services in connection with the Service Line as either Methodist Hospital employees or leased employees…and assist the applicable Methodist Hospital in its recruitment, hiring, evaluation, termination, discipline, reprimand, and establishment of terms of employment for the Service Line Employees." (Par. 1.5). "As of the Effective Date, the parties agree that the initial Service Line Employees shall consist of the following positions: Oncology personnel involved with the Service Line; Nursing staff involved with the Service Line; Hospitalists involved with the Service Line; and Other clinical staff involved with Service Lines." *Id.*

345.    As CEO of University Hospital with management responsibility over all hospital operations, Liebman knew that West Clinic physicians were not performing these management services at University Hospital or the other three Methodist hospitals.

346.    The contract further required West Clinic physicians to perform extensive specific management services at the Methodist hospitals, including the following:

- "Manager shall evaluate and make recommendations to MHMH and the Methodist Hospitals with respect to the subject matter of material contracts, leases, and purchases pertaining to the Service Line" (Par. 1.7)
- "Manager shall assist the Methodist Hospitals in the negotiation of reimbursement and fee payment arrangements for the Service Line with third party payors and/or state or federal agencies."(Par. 1.8)
- "Manager shall assist the Methodist Hospitals in complying with the standards and

requirements of accrediting agencies, including, but not limited to, The Joint Commission and other applicable accreditations specific to the oncology-related services as requested by MHMH or MLH on behalf of the Methodist Hospitals, including, but not limited to, MLH's goal of the Service Line receiving NCI/NCCN designation. (Par. 1.9).

- "Manager shall assist the Methodist Hospitals in formulating, implementing, monitoring and managing hospital quality assurance, utilization review, educational and risk management programs for the Service Line." (Par. 1.10).

- "Manager shall assist the Methodist Hospitals in the development of educational training materials and the training and educating of employees assigned to the Service Line." (Par. 1.11).

- "Manager shall assist the Methodist Hospitals in the credentialing process regarding appointments and re-appointments to the Medical Staffs of practitioners who provide professional services in connection with the Service Line through the evaluation of relevant data." (Par. 1.12).

- "Working with MHMH and Methodist Hospitals, Manager shall design and seek to implement stipulated documentation, including, but not limited to, charts, forms, clinical notes and other documents for the Service Line, and shall seek to ensure compliance with the Methodist Hospitals' documentation standards and process." (Par. 1.13).

- "Manager shall assist MHMH and the Methodist Hospitals in evaluating the physical facilities at the Managed Sites (e.g., site layout, space planning) to improve patient care, increase efficiency and improve patient and practitioner experience." (Par. 1.17).

- "Manager will engage in pre-bill review of Service Line designated cases pursuant to the Methodist Hospitals' internal control processes for the Service Line. Manager shall also assist in the formation of such processes, which shall include medical records reviews to ensure appropriate documentation is in place to support the services billed for." (Par. 1.18).

- "Manager shall assist MHMH and the Methodist Hospitals in the selection and criteria for clinical usage of chemotherapy drugs and supportive pharmaceutical agents and make recommendations with respect thereto." (Par. 1.19).

- "Manager shall monitor and evaluate the use of intensive care services by Service Line patients of the Methodist Hospitals." (Par. 1.23).

- "Manager shall assist the Methodist Hospitals in monitoring and evaluating patient, physician and staff satisfaction within the Service Line, and, as needed, develop, implement and manage programs and plans for improvement." (Par. 1.24).

- "Manager shall be responsible for overseeing the delivery of outpatient pre-procedure/visit communications with Service Line patients to ensure that (i) all required paperwork and consents are completed; and (ii) Service Line patients' questions have been answered and that patients are reasonably informed and prepared for his/her procedure or visit. Manager will oversee the development of pre-procedure visit communications protocols for inpatients in the Service Line." (Par. 1.25).

- "Manager will assist in the Methodist Hospitals' case management activities

82

necessary for the proper operation of the Service Line. The case management activities may include, but are not limited to, discharge planning, appointment scheduling, development of patient educational materials and discharge instructions, facilitating the ordering of appropriate services and supplies upon discharge, and the establishment, and implementation and monitoring of a patient call-back process that meets applicable regulatory standards for Service Line patients." (Par. 1.27).

347. Most of these management services required the services of physicians with clinical oncology expertise. As CEO of University Hospital with management oversight over all hospital operations, Liebman knew that West Clinic physicians did not perform any of these contract requirements for the oncology service line at University Hospital or at the other three Methodist hospitals.

348. Exhibit A to the Management Services/Performance Improvement Agreement also listed 24 separate management responsibilities of the West Clinic physicians.

349. Exhibit A stated that West Clinic physicians "shall assist MLH, MHMH and the Methodist Hospitals in operating the Service Line by providing the following general management services" at the Methodist hospitals:

- "direct and coordinate the Service Line in accordance with recognized standards to promote quality and efficient care to be given to patients,"
- "develop and update" best practice standards for the Service Line,
- "develop, implement and regularly update" patient care "protocols, pathways and guidelines for the delivery of Service Line services and assure consistency with national best practice standards,
- "assist as a liaison among administrative departments and committees as well as the Medical Staffs," "assist in strategic, financial and operational planning for future oncology-related services provided by the Methodist Hospitals,"
- "develop and present, on at least a semi-annual basis, educational programs to physicians providing services within the Service Line,"
- "develop and present, on at least a semi-annual basis, educational and informational programs to community-based physicians,"
- "assist MHMH and the Methodist Hospitals in the development, implementation and monitoring of programs and plans to reduce adverse events, including medication errors,"
- "assist MHMH and the Methodist Hospitals in negotiating, retaining and managing

83

of services that may be furnished through contractual arrangements (e.g. anesthesia services, radiology services, pathology services and other services as appropriate),"

- "in conjunction with MHMH and the Methodist Hospitals, develop, implement and, as appropriate, update and recommend additions and/or revisions in the administrative operating policies and procedures pertaining to the Service Line,"
- "assist MHMH and the Methodist Hospitals in the development of community awareness and educational programs providing information regarding Service Line services,"
- "assist MHMH and Methodist Hospitals by managing the Service Line quality and productivity in furtherance of and consistent with the objectives of the Agreement by…monitoring, evaluating and, as needed, restructuring delivery of care processes, evaluating job descriptions and realigning responsibilities as appropriate, establishing, monitoring and maintaining productivity standards,"
- and "assist MHMH and the Methodist Hospitals in the development and implementation of patient care protocols for the delivery of the Service Line."

350. Most of these additional contract terms for management services in Exhibit A also required the services of physicians with clinical expertise in oncology. As CEO of University Hospital with management oversight over all hospital operations, Liebman knew that West Clinic physicians did not perform any of these contract requirements listed above at University Hospital or at the other three Methodist hospitals.

351. West Clinic physicians were also required to perform additional management services listed on Exhibit A at the request of MHMH.

352. Additionally, Exhibit A to the Management Services/Performance Improvement Agreement listed over 600 specific procedure and diagnosis codes for management services "to be covered by this Agreement." Many of these procedure and diagnosis codes did not pertain to oncology such as "cardiac arrhythmia," "coronary bypass," "other vascular procedures," "peripheral vascular disorders," "G.I. obstruction," "soft tissue procedures," "hip and femur procedures except major joint," "alcohol/drug abuse or dependence w/o rehabilitation therapy w/o

mcc," "traumatic injury w/o mcc,"[20] "rehabilitation w cc/mcc," and "extensive O.R. procedure unrelated to principal diagnosis w/mcc."

353.   Throughout the time frame 2012 through 2018, West Clinic did not have physicians with expertise to perform these management functions for clinical conditions outside the field of oncology.

354.   Despite the extensive contract requirements for West Clinic physicians to provide management services at Methodist's hospitals, the truth is that West Clinic actually had little to no involvement in co-managing any oncology services at Methodist's four hospitals.

355.   West Clinic physicians were absent despite extensive oncology services provided at Methodist hospitals. During the years of 2012-2017, Methodist University Hospital had the highest acuity of oncology patients in the greater Memphis area. For outpatient oncology services, University Hospital had a busy radiation therapy center, infusion center and sickle cell therapy center that provided high level infusion services as well.  There was also significant outpatient surgery and ancillary testing done there for cancer patients. These services included follow-up care as well as routine ancillary testing.  Many cancer patients came to the University Hospital ER for emergency care. For inpatient oncology services, University Hospital had a dedicated inpatient cancer unit. Highly complex surgical oncology was also provided in University Hospital operating rooms with a significant presence of surgeons dedicated to treating surgical oncology patients.

356.    The West Clinic physicians did not manage any inpatient or outpatient oncology services at University Hospital during Liebman's tenure as CEO of University Hospital from 2014 through 2017.

357.   West Clinic physicians did not meet with Liebman to discuss improvements in oncology

---

[20] "MCC" is an acronym for major complication or comorbidity.

85

services or to review the existing programs that were in place.

358.  West Clinic physicians generally did not attend medical staff meetings at University Hospital and they did not serve on standing committees such as the Medical Executive Committee or peer review.

359.  Liebman did not see or authorize any time sheets or attendance records for West Clinic physicians performing any "management" or clinical services during his entire time at University Hospital.  As CEO of University Hospital, if such time sheets or records existed, their approval and payment would be subject to Liebman's oversight.

360.  During Liebman's tenure as CEO of University Hospital, there was minimal interaction between West Clinic physicians and the hospital's administrative leadership.  West Clinic CEO Erich Mounce only occasionally attended construction meetings at University Hospital regarding a new addition for the hospital.

361.  Prior to the "alliance" with Methodist, West Clinic operated and managed 8 clinical sites. 5 of the 8 clinical sites became part of the "partnership" with Methodist.

362.  Starting in 2012, West Clinic continued managing these 5 clinical sites just as it had done in prior years--- only Methodist paid West Clinic physicians 3-4 million per year to "manage" their 5 clinic sites and changed the name to West Cancer Center.

363.  At the June 3, 2015 the Steering Committee meeting discussed above, the PwC consultants presented their findings after "conduct[ing] 22 interviews" of Methodist and West Clinic executives. On Slide Number 12 of the presentation at that meeting compared the "original terms" with the "current state" of the "partnership model and operating structure" between Methodist and West Clinic. The "original terms" provided "co-management for oncology service line with quality and performance metrics jointly determined" and "West Clinic leadership holds SVP [senior vice-

86

president] of service line position." The "current state" was "West Clinic leadership maintains SVP position, **but primary focus to date on outpatient activities**." (emphasis added).

364. This statement was a confirmation that West Clinic physicians did not actually manage the Methodist Hospitals' oncology service line. The statement "primary focus to date on outpatient activities" referred to West Clinic's focus on outpatient services at its 5 clinic sites subject to the "partnership" with Methodist.

365. Methodist disguised a component of its overpayments to West Clinic physicians as "management fees" for supposedly managing the entire Methodist oncology service line. In 2012, Methodist paid approximately $3.0 million to West Clinic physicians for "management fees." In 2013, Methodist increased the payments for "management services" to $3.2 million.

366. From 2012 to 2013, there was no legitimate basis to increase the management fees to West Clinic physicians because they were not performing the management services at Methodist hospitals as required under the Management Services Agreement.

367. From 2012 to 2013, the oncology service line revenues increased from $139.9 million in 2012 to $151.7 million in 2013. These oncology service line revenues were largely generated by West Clinic physicians' referrals to the Methodist system.

368. Methodist's payments for "management" services increased in sync with the rising oncology service line revenues largely generated by the West Clinic physicians' referrals. In 2012, the management fees of $3.0 million were 2.1 percent of the oncology service line net revenue of $139.9 million. In 2013, the management fees of $3.2 million were 2.1 percent of the oncology service line net revenues of $151.7 million.

369. In 2014, the management fees jumped to $4.4 million. The payment of $4.4 million represented 2.6 percent of the rising oncology service line net revenues of $164.5 million. Also by

87

2014, the 340B profits from West Clinic's referrals approximately doubled from $15 million estimated originally in 2012 to approximately $30 million in 2014.

370.    There was no legitimate basis to increase the management fees in 2014 because West Clinic physicians were not performing the management services at Methodist hospitals as required under the Management Services Agreement. They were not performing more management services to justify increasing the management fees to $4.4 million in 2014.

371.    The rising co-management fees paid by Methodist corresponded with the rising revenues from West Clinic's referrals to the Methodist oncology service line. The rising co-management fees were not based on actual management services performed by West Clinic physicians at Methodist hospitals as required by the contract.

372.    With the financial incentives paid to West Clinic in percentage management fees and drug profits, the oncology service line net revenues continued to rise, moving to $192.26 million in 2015 and $224.70 million in 2016.

373.    From 2012-2018, Methodist paid West Clinic physicians over 25 million dollars in "co-management" fees. These "management fees" were far higher than any legitimate fair market valuation of actual management services. The management fees were not based on time records or actual time performing management services. The "management" fees increased in sync with the rising oncology service line revenues generated by the West Clinic's referrals. In reality, the "management" fees were financial rewards for the revenues generated by the West Clinic's referrals to the Methodist oncology service line.

**Methodist Overpaid for West Clinic's Research Entity as A Cost of Buying Their Referrals**

374.    Under the "partnership" with West Clinic, in 2011, Methodist also agreed to pay or "invest" $7 million in Vector Oncology (formerly known as ACORN), a for-profit research entity

controlled by West Clinic physicians. West Clinic's managing physicians required this $7 million payment as a condition of entering into the "partnership" with Methodist. Approximately 50 percent of the $7 million payment by Methodist was to pay off Vector's debts.[21]

375.    On November 29, 2011 at a meeting with Dr. Tauer, Dr. Schwartzberg, Methodist CEO Shorb, and Dr. Stern, Shorb asked Dr. Stern to join the Vector Board. Shorb told Dr. Stern that because he had extensive experience in research, he would be a valuable Board member and adviser to Vector.[22]

376.    In subsequent years Vector Board meetings were generally scheduled quarterly and Dr. Stern attended these meetings.

377.    When he joined the Board, Dr. Stern learned that West Clinic's Medical Director, Dr. Schwartzberg, and his partners at West Clinic had been personally financing losses at Vector for

---

[21] At the June 3, 2015 meeting of the West Cancer Center Steering Committee, one of the slides presented confirmed that the original terms provided for "Methodist investment in Vector; $7m (50-50 debt, equity)." The slide also listed the current state as "Equity investment in Vector diminished, with $3.5m balloon payment for debt in 2017."

[22] Dr. Stern started his career as a faculty member after completing a fellowship in hematology at the College of Physicians & Surgeons of Columbia University (1981-1983). He was appointed Assistant Professor in the Department of Medicine at the College of Physicians & Surgeons of Columbia University in the Division of Hematology (1983). His attention was focused on the properties of endothelial cells, the cells that form the inner lining of blood vessels. His research purview expanded steadily over the years as his work entered the area of blood vessel (vascular) complications of diabetes, Alzheimer's disease, inflammation and cancer. Dr. Stern was the principal investigator of numerous grants from the National Institutes of Health and private foundations, as well as philanthropic contributions to his laboratory. His laboratory grew into the Center for Vascular and Lung Pathobiology at the College of Physicians and Surgeons. Dr. Stern was the founding Director and was appointed the Carrus-endowed Professor and then full Professor with tenure at Columbia. This Center was a large enterprise as it occupied 25,000 square feet of laboratory space and involved multiple faculty members and research trainees. As a result of his research, Dr. Stern authored several hundred peer reviewed papers, and was a frequent speaker at national and international meetings. He was recognized as a leader in the biology of blood vessels (vascular biology).

In 2002, Dr. Stern became the Dean (of the College of Medicine) and Chief Clinical Officer at the Medical College of Georgia, and then moved on to become the Dean and Vice-President of Health Affairs at the University of Cincinnati. At each place where Dr. Stern served in a leadership position, he was extensively involved in promoting research at the institution.

On moving to the University of Tennessee Health Sciences Center as Executive Dean and Vice-Chancellor for Health Affairs, Dr. Stern also championed the research mission of the College of Medicine. When the University was without a Vice-Chancellor for Research, he served in that role as an interim Vice-Chancellor for Research from 2011-2012. At Methodist, Dr. Stern's research background was recognized as unique among the medical and hospital leadership.

a number of years. West Clinic physicians wanted to get out of this debt obligation. They wanted Methodist's "investment" to cover the debt and provide operating capital. Dr. Schwartzberg had personally underwritten some of Vector's debts.

378.   Vector's primary business model revolved around three ideas. First, Vector would serve as a contract research organization or CRO. This is a function whereby Vector proposed to secure clinical trials funded by drug companies to test new drugs or drug combinations.  The clinical trials would then be given to Vector sites under a financial arrangement. The CRO function was intended as the financial driver in the short-term, as potential contracts with pharmaceutical companies would generate revenues for Vector.

379.   This idea of being a CRO was not unique or proprietary. Many organizations serve as CROs and Vector did not offer any unique or original position or strategy to serve as a CRO. The role of CRO required labor-intensive execution in a crowded marketplace already providing these services.

380.   West Clinic predominately did pharmaceutical-sponsored research in which the innovation takes place at the level of drug discovery. The West Clinic was generally one of many sites that was paid to recruit patients into a previously designed trial and determine the results of exposure to the drug in a manner that would be reported in the trial. The West Clinic functioned in the role of a subcontractor.  For this reason, the West Clinic was paid by the industry sponsor based on the number of patients they recruited to the trial.

381.   Vector was not able to easily secure contracts for clinical trials with pharmaceutical companies and had only limited contracts producing limited revenues. Vector did not have any revenue-producing assets. Rather, Vector's revenues were dependent on labor-intensive pharmaceutical contracts with pharmaceutical companies.

382. Dr. Stern found that the bigger problem was that Vector's clinical research sites were not effective in recruiting patients. Recruiting patients to a research study slows down an oncology clinical practice that is focused on treating as many patients as possible. Physicians must spend time convincing patients that the clinical trial is "right for them" and potentially beneficial. Because of this limitation, Vector realized quickly that sites aside from the home base (West Clinic) were not effective in recruitment.

383. Thus, Vector decided to pull back and focus on West Clinic sites. This approach also did not work because West Clinic physicians were not focused primarily on clinical research. Most West Clinic physicians had no significant background in clinical research. The West Clinic business strategy was focused primarily on patient volumes and revenues, not research.

384. Under the CRO idea, Vector also discussed expanding their relationships to clinical sites with international locations. This idea was originally proposed by Dr. Schwartzberg. The idea did not make financial sense because the CRO mechanism was to be the underpinning of the strategy and Vector was already struggling to execute the strategy of being a CRO. Mike Choukas presented this "global" expansion idea at a Vector Board meeting and Choukas ultimately became Vector's CEO. The idea of "global" expansion was not implemented while Dr. Stern served on the Vector Board.

385. Vector's second business idea was centralized management of community sites but Vector brought nothing original or unique to this concept and there were larger established organizations already performing this service effectively.

386. Vector's third business idea was HOPE or "health outcomes pharmaco-economics." The idea revolved around using "clinical and financial databases with patient outcomes and comparative effectiveness questions." This idea required collecting "PRO" or patient reported

outcomes. The key to this idea was Dr. Amy Abernathy of Duke (at the time). She was a collaborator of Dr. Schwartzberg. But this idea was not implemented while Dr. Stern served on the Board.

387.    Another idea discussed at Vector Board meetings was for Vector to provide research infrastructure for clinical trials to the University of Tennessee and Methodist. This would be done on a fee for service basis. This idea never advanced to execution except on a small scale and limited amount of time with a few investigators from the University of Tennessee during the time Dr. Stern was on the Vector Board.

388.    From the start in 2011, there was no legitimate business reason for Methodist to "invest" in Vector. Methodist's mission was not research. Methodist's mission was clinical care. Methodist employed physicians for clinical medical treatment. Methodist did not employ researchers except in an unusual situation for a short amount of time related to a particular project and usually as a consultant. Methodist had no operations or infrastructure for conducting or staffing research. Methodist had no executives with significant experience in managing clinical research.

389.    From the start, there was no legitimate business reason for Methodist to pay approximately $3.5 million for the debts of Vector. Paying off Vector's debts was of no benefit to Methodist. Instead, this was a disguised financial benefit given to West Clinic partners as a further inducement and reward for referrals.

390.    The arrangement also did not make sense with Vector as a distinct "for profit" entity controlled by private physicians separate from Methodist and the University of Tennessee. There was no legitimate business reason why Methodist would subsidize a for-profit research entity controlled by private physicians that did not offer any unique strategy or intellectual property for cancer research. There was no legitimate business reason why a public university such as the

92

University of Tennessee would work with a for-profit research entity controlled by private physicians that did not offer any unique business strategy or services for cancer research.

391.  Vector did not offer anything of significant legitimate value to Methodist or the University of Tennessee. Methodist's $7 million payment to Vector benefited no one other than the individual physician partners of West Clinic. These individuals were all instrumental in West Clinic negotiating the referral "alliance" with Methodist.

392.  From his experience and knowledge serving on the Vector Board, Dr. Stern found that the company was a failing enterprise with no intellectual property of significant value and no viable business strategy. In the end, Vector had no viable business strategy that generated revenues to sustain its operation. Vector had no intellectual property, no patents, and no original business strategy. The company was encumbered with a history of significant debts. These are the facts Dr. Stern found in 2012 after Methodist had agreed to pay $7 million as an "investment" in Vector.

393.  Dr. Stern told Methodist CFO McLean and Methodist CEO Shorb that Methodist should cut its losses and get out of the Vector deal.

394.  In response, McLean told Dr. Stern that Methodist's investment in Vector was the "cost of doing business" with West Clinic physicians.

395.  West Clinic partners, including senior partner Dr. Schwartzberg, were personally liable for Vector's debts and Methodist's payment of approximately $3.5 million to retire the debts was a direct benefit and kickback to West Clinic physicians for entering the "partnership" with Methodist and bringing their referrals to Methodist facilities.

396.  Because of Dr. Stern's concerns about Vector being a failed enterprise, Methodist CFO McLean and Methodist CEO Shorb orchestrated the removal of Dr. Stern from the Vector Board

and McLean replaced him on the Board. CFO McLean had no medical training and no experience with cancer research.

## West Clinic Physicians Received Incomes Far in Excess of the National 90th Percentiles for Their Specialties

397.    Between 2012 and 2018, Methodist paid over $400 million in cash payments directly to West Clinic physicians.

398.    Over the course of the "alliance" between 2012-2018, West Clinic had specialists in four primary areas: medical oncology, gynecological oncology, radiation oncology, and diagnostic radiology.

399.    Most of the physicians at West Clinic were medical oncologists. The income received by West Clinic physicians from the Methodist "alliance" greatly exceeded the MGMA national 90th percentile compensation for this specialty.

400.    As a result of the extraordinary payments from Methodist, each oncologist of West Clinic received an annual income exceeding $1 million and the senior oncologists of West Clinic were each paid an annual salary exceeding $3 million. In approximately 2014 or 2015, Methodist CEO Shorb and CFO McLean told Dr. Stern these income numbers for West Clinic physicians. This conversation occurred in the context of Shorb and McLean expressing difficulty finding a "fair market" valuation that would support West Clinic physicians' incomes.

401.    Many oncologists of West Clinic received salaries at levels that were double, triple, or four times the national 90th percentile for medical oncologists in the United States.[23] The national 90th

---

[23] Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are leading benchmarking resources for physician compensation in the United States. The annual MGMA Surveys are based on physician compensation and productivity data in the prior year. For example, the 2017 MGMA

94

percentile compensation for medical oncologists was $777,940 in 2013, $922,244 in 2014, $762,970 in 2015, $693,452.28 in 2016, and $646,226.73 in 2017 according to MGMA Physician Compensation and Production Survey Data.

402.　One of the issues that Liebman and Stern openly opposed at executive meetings was Methodist CEO Shorb and CFO McLean guaranteeing to pay West Clinic physicians above the 90th percentile compensation levels regardless of the physicians' personal productivity. Liebman and Stern openly questioned this arrangement because the industry norm is to pay physicians based on personal productivity.

403.　Shorb and McLean said that defining physician compensation at any percentile was something that was just a matter of finding the "right" compensation consultants who would get the answer that Short and McLean wanted. When they found a company that agreed that paying the West Clinic physicians at exorbitant rates was "fair market value," they admitted they would probably never be able to get such an opinion again. Shorb and McLean knew that the compensation package to West Clinic physicians was far out of the bounds of reasonable compensation.

404.　At the beginning of the "affiliation" agreement in 2011, McLean stated that he could "alter the numbers in any way necessary" to get a deal done with the West Clinic. This statement was made by McLean in Dr. Stern's presence and in Shorb's presence. Shorb agreed with McLean's statement.

405.　Methodist was able to guarantee West Clinic oncologists with incomes above the national 90th percentile by artificially constructing multiple components to their compensation.

---

Survey reports physician compensation data from 2016.

406. First, from the beginning of the alliance, the oncologists were paid a premium rate of compensation per wRVU. In April of 2011, Methodist CFO McLean told Dr. Stern that the rate would be $120 per wRVU.

407. Although the agreed deal starting in 2012 had multiple components of cash income to West Clinic physicians, the rate of $120 compensation per wRVU alone exceeded the MGMA national 90th percentile compensation per wRVU ($118.53) for medical oncologists in 2012.

408. Secondly, Methodist also guaranteed payments to West Clinic physicians for supposedly "co-managing" the Methodist oncology service line. These payments increased from 3.0 million in 2012 to $3.2 million in 2013 and $4.4 million in 2014. These payments for supposed "management" services continued in 2015, 2016, 2017, and 2018 under the 7-year term of the "alliance."

409. Third, Methodist shared 340B drug profits with West Clinic physicians. These drug profits were largely generated by West Clinic physicians' referrals for chemotherapy infusion services and oral cancer drugs. West Clinic physicians could ensure that their incomes escalated even higher by referring more patients for chemotherapy infusion services and oral cancer drugs. That is exactly what happened as the 340B drug profits from West Clinic's referrals escalated from approximately $30 million in 2014 to $40.66 million in 2015 and $63.74 million in 2016.

410. From the beginning, Methodist CFO McLean and other senior executives knew that paying West Clinic physicians at these levels would lead to major financial losses for Methodist if revenues from their referrals were not considered. Methodist knew that nearly 50 percent of West Clinic's patient population was insured by the Medicare Program and Methodist executives knew that the Medicare reimbursement rate per wRVU was far lower than $120. The Medicare

reimbursement rate per wRVU was $34.03 in 2012 and stayed between $34-35 per wRVU[24] throughout the 7-year term of the alliance.

411.    Yet Methodist guaranteed payments of at least $120 per wRVU to the oncologists regardless of collections. That rate was approximately 350 percent above the Medicare reimbursement rate. In addition, Methodist guaranteed payments to the physicians for "co-management" services and a share of the enormous drug profits each year.

## Methodist Covered All Overhead and Practice Expenses for West Clinic Physicians

412.    Another component of the funding provided to West Clinic physicians was that Methodist paid all expenses and overhead costs, including staff and office space, for the West Cancer Center locations.

413.    Prior to the "alliance" with Methodist, West Clinic operated and managed 8 clinical sites and paid all expenses related to operations at these sites, including commercial property expenses and lease payments. As mentioned above, 5 of the 8 clinical sites became part of the "partnership" with Methodist and were renamed "West Cancer Center."

414.    Starting in January of 2012, West Clinic continued managing these 5 clinical sites just as it had done in prior years---only the name of these sites changed to West Cancer Center and Methodist paid for all overhead expenses at these sites.

415.    West Clinic's original terms proposed in 2011 provided that Methodist would employ the nurses, lab technicians, and mid-level practitioners at West Clinic and lease West Clinic's clerical, administrative, and other support staff. Methodist agreed to West Clinic's demands.

---

[24] The Medicare reimbursement rate per wRVU was $34.0376 in 2012, $35.0230 in 2013, $35.8228 in 2014, $35.7547 from January 1, 2015 through June 30, 2015, $35.9335 from July 1, 2015 through December 31, 2015, $35.8043 in 2016, $35.8887 in 2017, and $35.9996 in 2018.

97

416.   One of the West Clinic sites was located at 100 North Humphreys Boulevard close to Baptist Healthcare in downtown Memphis. As part of Methodist's strategy for West Clinic physicians to refer patients to Methodist instead of Baptist, Methodist closed the North Humphreys location and spent approximately $52 million on a new facility located on Wolf River Boulevard in Germantown, the wealthiest suburb of Memphis. This location was more convenient for West Clinic physicians and offered a patient population with higher payments through commercial insurance coverage, Medicare coverage, and Medigap supplemental coverage than the payments for poorer patients in downtown Memphis.

417.   In December of 2013, Methodist purchased the Germantown Multi-Specialty Center at 7945 Wolf River Boulevard in Memphis for approximately $22.5 million from UT Medical Group, Inc. The building when purchased was approximately 116,865 square feet of space located on 9.6 acres of land. In the following year, Methodist spent approximately $30 million dollars to renovate the building.

418.   On June 25, 2014, Liebman met with Dr. Ballo, Director of Radiation Oncology at West Cancer Center. Dr. Ballo stated that Methodist executives promised to move patients "out of downtown" to a new location for the convenience of West Clinic physicians.  Dr. Ballo also stated that Methodist was funding construction of a new building for West Clinic physicians and that profits from the 340B Program were the economic "engine" for the relationship between West Clinic and Methodist.

419.   On August 7, 2014, Liebman again met with West Clinic CEO Mounce to discuss space options on the Methodist campus for a new oncology building.  Mounce stated that the costs of this project would not be assigned to the cancer program but to Methodist University Hospital to "make sure" that the financials of West Cancer Center would "look as strong as possible."  He also

98

indicated that West Clinic physicians would determine who could practice in the building even though the hospital had an open medical staff. Liebman told him that the medical staff bylaws would not allow that.

420. In 2015, West Clinic physicians moved their main office operations to the Germantown Multispecialty Center at 7945 Wolf River Boulevard that had been purchased and renovated by Methodist at a cost of approximately $52 million. After that time until the end of the "alliance," West Clinic physicians enjoyed free office space compliments of Methodist.

421. Liebman confirmed with Marigay Miller, Methodist's Vice President of Primary Care and Practice Support, that West Clinic physicians did not pay any rent for the use of this $50 million office complex.

422. On June 15, 2017, Miller sent a text message to Liebman in which she stated, "Short answer---no we do not charge West rent. MH [Methodist Healthcare] bought building and paid for build out. Depreciation charges against the cost center. We do not charge rent, we provide space for West Docs to provide care to our patients."

423. This statement reflected Methodist's overall scheme for West Clinic's patients to become Methodist's patients (but still being treated by physicians employed by West Clinic) with Methodist covering all costs of the West Clinic sites and developing a new facility for West Clinic physicians to practice with no overhead expenses.[25]

---

[25] Federal regulations under the Stark laws require that "the space rented or leased does not exceed that which is reasonable and necessary for the legitimate business purpose of the lease arrangement" and the "rental charges" must be "consistent with fair market value." *See* 42 C.F.R. §411.357(a)(3) and (4). The "lease arrangement [must] be commercially reasonable even if no referrals were made between the lessee and the lessor." 42 C.F.R. §411.357(a)(6).

**Defendants Continuously Monitored the Value and Volume of Referrals from West Clinic Physicians**

424. Throughout the "partnership," Methodist senior executives led by Methodist CFO McLean monitored the value and volume of referrals from West Clinic physicians. West Clinic physicians also continuously monitored the value of their referrals to the Methodist system.

425. For many years Methodist has maintained an accounting system to track and monitor the volume and value of patient referrals from all physicians to all hospitals and all service lines or departments of the hospital system.

426. For example, in 2011, Methodist maintained "balanced scorecard" records that tracked monthly referrals for radiation therapy to University Hospital. In 2011, the year before the "innovative partnership," West Clinic physicians referred 345 patients to University Hospital for radiation therapy.

427. In 2012, West Clinic physicians referred 441 patients to University Hospital for radiation therapy. In 2014, West Clinic physicians referred 535 patients to University Hospital for radiation therapy. And in 2015, referrals from West Clinic physicians to University Hospital for radiation therapy increased to 646.

428. As CEO of the University Hospital from 2014-2017, Liebman's responsibilities included overseeing the operations of all inpatient and outpatient clinical activities at the hospital, including radiation therapy. Liebman received historical and current data to track trends for each service line, including oncology and radiation therapy. Between 2012 and 2015, over 50 percent of these increased referrals by West Clinic physicians for radiation therapy were Medicare or Medicaid patients.

429.   In addition to radiation therapy, West Clinic's referrals to Methodist have included thousands of patients for chemotherapy infusion therapy billed and collected by Methodist. Methodist has received enormous profits from such referrals because Methodist acquired infusion therapy drugs at deep discounts under the 340B Program and then sold the drugs at retail rates.

430.   For example, in 2015, referrals for chemotherapy services from West Clinic physicians to Methodist generated drug profits to the hospital system of approximately $30.60 million.

431.   In 2016, referrals for chemotherapy services from West Clinic physicians to Methodist generated drug profits to the hospital system of approximately $53.18 million.

432.   In forming the alliance with West Clinic and paying massive kickbacks to West Clinic physicians for their referrals, Methodist targeted increased revenues from oncology services and large profits from prescription oncology drugs. For example, after the alliance began, all payments for chemotherapy infusion services generated by West Clinic physicians belonged to Methodist. For example, Methodist's net revenues from chemotherapy infusion therapy increased from $6.1 million in the first quarter of 2015 to $10.3 million in the second quarter, $10.7 million in the third quarter, and $11.1 million in the fourth quarter.

433.   In 2016, Methodist's net revenues from chemotherapy infusion therapy continued rising, moving from $14 million in the first quarter of 2016 to $16 million in the second quarter, $17 million in the third quarter, and $17.6 million in the fourth quarter.

434.   Throughout the 7-year alliance, West Clinic and Methodist executives regularly tracked and monitored the value of patient referrals from West Clinic physicians to Methodist. For example at a Methodist Strategy Committee meeting on August 1, 2014, Methodist and West Clinic senior executives met to discuss the "strategic priority" of a comprehensive cancer center. At this meeting, West Clinic CEO Mounce gave a presentation in which he stated that West Clinic

physicians were "working on increasing admissions in all parties (MUH=4,582/ GTN=2,166/ North=937/ South=114/ OB=23)." Mounce listed the numbers of referrals by West Clinic physicians for inpatient admissions at each Methodist hospital. "MUH" stands for Methodist University Hospital, "GTN" stands for Methodist Germantown Hospital, "North" stands for Methodist North Hospital, "South" stands for Methodist South Hospital, and "OB" stands for Methodist Olive Branch Hospital. Mounce stated that West Clinic physicians were "working on increasing admissions" to Methodist hospitals. He stated that each 1% increase in inpatient surgeries "will bring about $1.5 million" in profits to Methodist.

435. Mounce also provided the numbers of referrals by West Clinic physicians to Methodist for radiation therapy. In 2013, West Clinic physicians referred 1,544 patients to Methodist for radiation therapy. In 2014 as of August, West Clinic physicians referred 785 patients to Methodist for radiation therapy. Mounce stated that the West Clinic "represents 59% of referrals" to Methodist for radiation therapy.

436. During the Strategy Committee Meeting on August 1, 2014, Methodist executives discussed the fact that each referral for radiation therapy represented an "average contribution margin of $5,255 per patient per course (22-25 daily sessions)."

437. West Clinic and Methodist executives had an ongoing joint focus on the value of referrals from West Clinic physicians to the Methodist oncology service line. For example, at the meeting of the West Cancer Center Executive Operations Council on July 13, 2016, West Clinic CEO Mounce and Methodist CFO McLean "reviewed the first quarter financial results for the oncology service line with the committee members." "Specific discussion around 340B funds and the future effect of any 340B guideline changes were also discussed." Mounce also "discussed the great revenue results for medical oncology, gyn oncology, radiation oncology, and surgical oncology."

438.    Methodist implemented an accounting system of tracking the value and volume of patient referrals from West Clinic physicians and all physicians affiliated with the Methodist system. Methodist's executives generated regular reports that tracked the volume and value of referrals each month from every employed physician or physician group. These reports are called "balanced scorecards" in Methodist's accounting system.

439.    At each hospital and at each department within the Methodist system, accounting reports regularly tracked the volume of patient referrals each month from all physicians. For example, in 2015, Methodist tracked referrals for radiation therapy to Methodist University Hospital where Liebman served as CEO. West Clinic physicians led all sources of patient referrals for radiation therapy in 2015 with 656 referrals to University Hospital. In 2016, West Clinic physicians again led all sources of referrals to University Hospital for radiation therapy with 546 patient referrals to University Hospital.

440.    The volume and value of referrals from physicians was the focus of the Methodist "CEO Retreat" on July 11, 2014. This retreat for Methodist's top executives included a slide presentation titled, "CEO Retreat Service Line Assessment." The presentation focused on the values of referrals from different physician specialties to Methodist hospitals. The analysis used 2013 data and included the West Clinic physicians' referrals to Methodist hospitals but did not include outpatient referrals to West Cancer Center.

441.    Five specialties represented 57 percent of the value of physician referrals to the Methodist system: women's health, cardiology, orthopedic/neurosurgery, oncology, and psychiatry. "CV [cardiovascular services] and oncology contribute the most (42% of total CM)." The acronym "CM" stands for contribution margin or hospital profits.

442.    The slide presentation stated, "Sutherland and West Clinic critical to sustaining our margin, give their commercial base (32% Sutherland, 41% percent West)." Sutherland Cardiology was the employed cardiology group at Methodist. Commercial base refers to the percentage of patients with commercial insurance at Sutherland Cardiology and West Clinic.

443.    In 2013 the total profits from physician referrals to Methodist was $204.1 million. Oncology was second in the rankings of physician referrals by specialty with profits of $28.8 million in 2013, representing 65,557 patients.

444.    The presentation evidenced Methodist's extensive tracking and monitoring system to evaluate the volumes and values of physician referrals. That focus was the reason Methodist overpaid West Clinic physicians in relation to their personal productivity.

445.    Liebman and Stern attended many Physician Recruitment Committee meetings at Methodist. These meetings were generally held on Friday mornings at least once a month. Liebman attended these meetings because the financial losses from physician compensation packages were commonly charged as expenses to Methodist University Hospital where Liebman served as CEO. At these meetings, Methodist executives regularly evaluated physician recruits based on the value of their potential referrals to the Methodist system and regularly prepared proformas with actual or projected revenues from referrals by physicians being recruited. Methodist CFO McLean used these proformas with historical or projected referral revenues to determine salary packages for physicians.

446.    There was also pressure on Dr. Stern to require that all referrals from UTHSC physicians go to the West Clinic for chemotherapy and radiation oncology.  As an example, Dr. Sandeep Samant was an accomplished head and neck surgeon.  His referrals for radiation oncology were

split between Baptist Memorial Healthcare and Methodist. West Clinic CEO Mounce directed Dr. Stern to require Dr. Sandeep to send all of his referrals for chemotherapy and radiation oncology to the West Clinic. Dr. Stern objected to Mounce's instruction and told him that referrals should go to the place that could help the patient the most. Dr. Samant told Dr. Stern that he was aware of this pressure and had heard about it from many sources. Dr. Samant also disagreed with the aggressive pressure from Mounce telling Dr. Samant where to send his patients. Dr. Samant left UTHSC shortly thereafter. He was a leading physician at the University. His loss resulted in the necessity to find a new chair of otolaryngology/head and neck surgery, and to build anew the head and neck cancer surgery program.

### Methodist's Scheme Targeted and Damaged Federal and State Healthcare Programs

447.    The Defendants' scheme targeted federal and state health care programs, including patients covered under Medicare and Medicaid.

448.    As discussed above, at the meeting of the West Cancer Center---Strategy and Partnership Model Steering Committee on June 3, 2015, one of the slides in the presentation addressed the original goals of Methodist and West Clinic in forming the "partnership."

449.    Methodist's goals included "enhance market share" and "strong market share among government entities."

450.    The reference to Methodist's "strong market share among government entities" was Methodist's goal to increase its revenues from the Medicare and Medicaid Programs. Cancer incidence increases with age and the Medicare Program is the largest insurer of patients for cancer care in the Memphis region and the United States. Methodist is also the largest provider of Medicaid services in the State of Tennessee.

451.  Methodist achieved its goal of "strong market share among government entities" as its payments from the Medicare and Medicaid Programs escalated in the years after the "alliance" with West Clinic began.

452.  During the years of the "alliance" with West Clinic physicians, Medicare payments to Methodist for outpatient services increased by approximately 300 percent.

453.  Before the West Clinic "partnership" in the years 2008-2011, Medicare payments to Methodist for outpatient services averaged $40.0 million per year. After the West Clinic "partnership" in the years 2012-2017, Medicare payments to Methodist for outpatient services averaged $87.72 million per year.

454.  Medicare payments to Methodist for outpatient services increased from $40.14 million in 2011 to $68.73 million in 2012, $74.03 million in 2013, $84.65 million in 2014, $91.39 million in 2015, $83.88 million in 2016, and $123.65 million in 2017.

455.  Methodist's overall net patient revenues[26] moved from $1.17 billion in 2011 to $1.39 billion in 2012, $1.44 billion in 2013, $1.51 billion in 2014, $1.62 billion in 2015, $1.70 billion in 2016, and $1.77 billion in 2017. A substantial portion of this escalation in revenues represented payments from the Medicare and Medicaid Programs for cancer services generated by referrals from West Clinic physicians to the Methodist system.

456.  Methodist's senior executives personally benefitted from this escalation in revenues generated by West Clinic's referrals because the executives received significant annual bonuses based in large part on the net revenues of the system.

---

[26] Medicare defines "net revenue" as total or gross revenue decreased by "bad debts, contractual adjustments, charity discounts, teaching allowances, policy discounts, administrative adjustments, and other deductions from revenue." Net revenues are the actual payments a hospital collects from all sources for patient services.

457.   With respect to the oncology service line at Methodist during 2012-2018, the Medicare and Medicaid Programs covered the majority of patients at Methodist and West Cancer Center.

458.   Between 2012 and the 2014, inpatient oncology volume at Methodist more than doubled as hospital discharges for oncology admissions moved from 7,320 discharges in 2012 to 15,834 discharges in 2014 or an annual increase of 8,514 admissions.  At University Hospital, inpatient oncology admissions increased from 3,486 admissions in 2012 to 7,149 admissions in 2014.

459.   These numbers are consistent with West Clinic CEO Mounce's presentation in August of 2014 at a Methodist Strategy Committee meeting. At this meeting, Mounce gave a presentation in which he stated that West Clinic physicians were "working on increasing admissions in all parties (MUH=4,582/ GTN=2,166/ North=937/ South=114/ OB=23)." Mounce listed the numbers of referrals by West Clinic physicians for inpatient admissions at each Methodist hospital. The total annual number of patients referred for inpatient admissions touted by Mounce was 7,822. This tally indicates that of the annual increase of 8,514 oncology admissions at Methodist hospitals between 2012 and 2014, West Clinic's referrals represented 91 percent of these increased admissions.

460.   As CEO of University Hospital starting in 2014, Liebman's responsibilities included overseeing the operations of all inpatient and outpatient clinical activities at University Hospital. As CEO, Liebman received extensive historical and current financial data regarding inpatient admissions for every service line, including oncology. He also received regular financial reports regarding the payor mix for each service line, including oncology. Liebman knew that West Clinic's referrals had generated a major increase in inpatient admissions for oncology services at University Hospital between 2012 and 2014

461.   As CEO, Liebman had direct oversight of the University Hospital's finances, and he routinely was involved in oversight of revenue cycle management including claims processing, claims payment and revenue generation at the hospital. Specifically, Liebman stayed abreast on at least a monthly basis of any changes in the hospital's payor mix (i.e. Medicare, Medicaid and private insurance) as even a small change in the distribution of payors could have a tremendous impact on the hospital's finances.

462.   The Chief Financial Officer of University Hospital, Chuck Lane, reported directly to Liebman.  Lane had direct oversight of the hospital's Billing Department and he kept Liebman constantly abreast of the hospital's revenue cycle management.  Liebman led a monthly Financial Review Meeting that was attended by Lane and all of the department heads at University Hospital. One of the first agenda items of each monthly Financial Review Meeting was an analysis of the previous month's payor mix.

463.    At this monthly meeting, each department head would  discuss the revenue generated by their respective departments, describe any change in payor mix, discuss any material matters related to revenue collection, and report on any significant developments pertaining to referral sources.  Of particular interest, the department heads of Imaging Services, Surgical Cases, Bone Marrow Therapy, and Radiation Therapy frequently reported on the impact of the "alliance" with West Clinic and how referrals from West Clinic physicians impacted each of those department's bottom line on a monthly basis.

464.   Based on the monthly payor mix data and the monthly financial review, it was clear to Liebman that during his tenure as CEO both the Medicare and Medicaid Programs were receiving and paying more and more claims that were directly attributable to West Clinic physicians' referrals. Any drop or increase in any referrals would be noted by the department heads and the West Clinic referrals were a frequent topic of conversation due to the significant increase in revenue, including Medicare and Medicaid revenue, directly attributable to those physicians.

465.   For example, the head of the Radiation Therapy department maintained a report of each referring doctor, the numbers of referrals made by doctor, and the type of  radiation treatment that was administered at University Hospital.  The number of referrals from West Clinic oncologists was routinely noted and tracked.  Based on these reports, it was clear that during Liebman's tenure

as CEO that the West Clinic continually increased its referrals of cancer payment for radiation treatment to University Hospital. Based on the revenue reports reviewed by Liebman and the monthly assessments of payor mix, it was also clear to Liebman that University Hospital was submitting an increased volume of Medicare and Medicaid claims for radiation therapy due to West Clinic referrals.

466.    From review of the historical payor mix and trends of payor mix at Methodist hospitals, Liebman knew that between 2012 and 2015, the Medicare Program insured approximately 43 percent of the oncology inpatient admissions at Methodist hospitals and the Medicaid Program insured 23-25 approximately percent. The escalation in inpatient oncology admissions at Methodist hospitals generated by West Clinic physicians were largely funded by the Medicare and Medicaid Programs.

467.    In addition to inpatient referrals, based on the revenue reports reviewed by Liebman and the monthly assessments of payor mix, it was also clear to Liebman that the Methodist system and University Hospital were submitting an increased volume of Medicare and Medicaid claims for outpatient services due to West Clinic referrals.

468.    The Medicare claims data confirms a dramatic increase in referrals to the Methodist system for outpatient oncology services after the "alliance" with West Clinic began in January of 2012.

469.    The Medicare claims data analyses reviewed approximately 550 oncology diagnosis codes submitted by Methodist in their claims for payment to the Medicare program. An Excel spreadsheet listing these diagnoses codes and the detailed Medicare claims data is attached to this Second Amended Complaint as Exhibit B.

470.  In 2011, the year before the "alliance" began, Methodist submitted 31,981 claims to the Medicare Program for outpatient oncology services based on these 550 oncology diagnosis codes. Medicare paid Methodist $7.686 million for these claims.

471.  In the first year of the "alliance," Methodist's outpatient oncology claims jumped from 31,981 cases in 2011 to 84,952 cases in 2012. The single year increase was 265 percent.

472.  In 2013, there were 90,763 cases of Medicare outpatient oncology claims, 94,748 cases in 2014, and 74,032 cases through September of 2015.[27]

473.  There was a corresponding increase in Medicare payments for outpatient oncology services at Methodist. Medicare payments for outpatient oncology services at Methodist moved from at least $7.686 million in 2011 to $29.148 million in 2012, $33.191 million in 2013, $34.518 million in 2014, and $29.475 million through September of 2015.

474.  In 2012 (the first year of the alliance), Medicare payments to Methodist for outpatient oncology services increased by 379 percent over the prior year. This increase in Medicare payments was caused by the referrals of West Clinic physicians. In subsequent years Medicare payments for oncology outpatient services at Methodist continued to rise as a result of increasing referrals by West Clinic physicians.

475.  One of Methodist's strategies was to bill the West Cancer Center as hospital outpatient services and/or exploit the provider-based billing status under Medicare reimbursement rules. "Provider based" is a Medicare payment designation that allows facilities owned by and integrated within a hospital to bill Medicare as a hospital outpatient department, resulting in these facilities

---

[27] The Medicare outpatient data is on a calendar year and 2015 contains only three quarters of data through September of 2015 for these diagnoses codes because of the transition from ICD-9 to ICD-10 diagnosis coding system in the fourth quarter of 2015. The evaluation of the Medicare outpatient claims data included only claims from 2011 through September of 2015 to ensure comparison of the same diagnoses codes under the ICD-9 coding system.

generally receiving higher payments than freestanding facilities. Medicare payments for services performed at provider-based facilities are often more than 50 percent higher than payments for the same services performed at a freestanding facility.

476.    The referrals from West Clinic physicians to Methodist also generated facility fees paid by Medicare to Methodist. When a physician provides a service to a patient in a location that legitimately qualifies as part of a hospital, Medicare's payment rules permit the hospital to submit a claim for provider-based facility charges. Facility fees are commonly higher than the cost of the physician's actual services and commonly exceed the cost of providing the same service in a private practice setting.

477.    The dramatic increase in Medicare and Medicaid revenues to the Methodist oncology service line was the result of referrals by West Clinic physicians. From the beginning of negotiations, Methodist executives targeted these government payments.

478.    During the 7-year term of the "alliance," Methodist's oncology service line revenues largely derived from inpatient and outpatient referrals by West Clinic physicians. For fiscal years 2012 through 2018, the Defendants submitted thousands of false claims both for specific services provided to beneficiaries of federal healthcare programs and claims for general and administrative costs incurred in treating such beneficiaries.

**The Arrangement Was Detrimental to Patient Care**

479.    During the course of this "partnership," the escalation in oncology service line revenues, drug prescriptions, and drug profits evidence an arrangement in which the West Clinic physicians were financially incentivized to generate referrals. Stark laws and the AKS were enacted based on extensive studies demonstrating that physicians incentivized to generate referrals cause

111

unnecessary costly care for vulnerable patients and government healthcare programs. While medical necessity is not an element of this case, the illegal arrangement between Methodist and West Clinic physicians caused significant financial damages to government programs.

480. The drug profits shared by Methodist with West Clinic physicians were based in part on the volume and value of the business they generated in referrals of cancer patients for oral drugs and chemotherapy infusion services. The more drugs they prescribed, the more money the West Clinic physicians made in drug profits.

481. This arrangement was a blatant violation of the AKS and Stark laws.

482. When physicians are financially incentivized to generate referrals, healthcare costs escalate as demonstrated in the financial data for the Methodist system.

483. A review of Methodist's revenues reported in its cost reports submitted to CMS reveals why Methodist would pay such extraordinary amounts of cash to a private group of oncologists. The "partnership" with West Clinic was enormously profitable for Methodist as it received the referral stream of patients from West Clinic oncologists and the associated revenues discussed above.

484. Analyses of Methodist's cost reports reveal the escalation in revenues to the Methodist system after the "partnership" with West Clinic physicians began in 2012.

485. Methodist's overall net patient revenues[28] moved from $1.17 billion in 2011 to $1.39 billion in 2012, $1.44 billion in 2013, $1.51 billion in 2014, $1.62 billion in 2015, $1.70 billion in 2016, and $1.77 billion in 2017.

---

[28] Medicare defines "net revenue" as total or gross revenue decreased by "bad debts, contractual adjustments, charity discounts, teaching allowances, policy discounts, administrative adjustments, and other deductions from revenue." Net revenues are the actual payments a hospital collects from all sources for patient services.

486. These numbers from Methodist's cost reports submitted to CMS are consistent with Methodist's internal projections. At a December 2011 Board meeting of Methodist Healthcare, Methodist executives projected that the partnership with West Clinic physicians would increase the hospital system's annual net revenues by approximately $200 million, moving from "1.25 B [billion] before West Clinic acquisition" to "$1.45B [billion] revenues w [with] West Clinic acquisition."

487. Before the West Clinic "alliance" from 2008-2011, Methodist's average net patient revenues were $1.07 billion per year. After the West Clinic "alliance" from 2012-2017, Methodist's average net patient revenues were $1.56 billion per year.

488. Comparing the years before and after the West Clinic alliance, the average difference in Methodist's net patient revenues was approximately $484 million per year. Multiplying that annual number over 7 years would equal $3.388 billion.

489. On the annual cost reports submitted by Methodist to CMS, there is a line item for "other net income." The number listed on that line item increased dramatically after the "partnership" with West Clinic physicians began in 2012. That line item includes profits from the 340B Program.

490. The "other net income" total listed by Methodist moved from $16.91 million in 2011 to $62.23 million in 2012, $86.61 million in 2013, $100.08 million in 2014, $154.40 million in 2015, $174.40 million in 2016, and $187.26 million in 2017. The increase in "other net income" exceeded $700 million over the time period 2012-2018.

491. Methodist's gross charges from outpatient services escalated after the "partnership" with West Clinic. In the first year of the West Clinic "partnership," Methodist's gross charges from outpatient services increased from $1.67 billion in 2011 to $2.34 billion in 2012. By 2017, Methodist's gross charges from outpatient services had increased to $3.91 billion.

492.    Before the West Clinic "alliance" from 2008-2011, Methodist's average gross charges for outpatient services were $1.38 billion per year. After the West Clinic "alliance" from 2012-2017, Methodist's average gross charges for outpatient services were $3.07 billion per year. The gross charges are not net reimbursement, but the rising charges indicate rising net revenues. During this time period, Methodist's overall collection rate was 24-27% of gross charges.

493.    Another indication of the enormous profits to Methodist from the "alliance" with West Clinic physicians is the escalation in outpatient drug charges reported by Methodist on its cost reports under the category "drugs charged to patients." In 2011, Methodist reported $130.10 million in outpatient "drugs charged to patients department charges." In 2012, the first year of the "alliance" with West Clinic physicians, the outpatient drug charges skyrocketed to $446.83 million---an increase of $316.73 million over the prior year. The increases continued in subsequent years with drug charges of $456.88 million in 2013, $475.58 million in 2014, $512.27 million in 2015, $605.70 million in 2016, and $713.14 million in 2017. These numbers are gross charges but the rising gross charges evidence rising net revenues.

### Financial Damages to the Medicare and Medicaid Programs

### Stark Laws Require Full Refund of Medicare and Medicaid Payments Arising from Referrals by West Clinic Physicians for Designated Health Services

494.    The Stark statute and the AKS establish the measure of damages. The Stark statute provides, "If a person collects any amounts that were billed in violation of subsection (a)(1), the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amounts so collected." 42 U.S.C. §1395nn(g)(2). "An entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected

114

amounts on a timely basis, as defined at § 1003.101 of this title." 42 C.F.R. §411.353(d). The statutory language requires refund of "any amounts so collected" from federal healthcare programs. The regulatory language requires refund of "all collected amounts."

## The AKS Requires Refund of Claims Arising from Referrals After Kickbacks Paid

495.   As discussed above, compliance with the AKS is a mandatory condition of healthcare providers' enrollment in federal healthcare programs, a mandatory condition of every claim submitted by providers to federal healthcare programs, and a mandatory condition of every payment made to providers by federal healthcare programs.

496.   Most courts have ruled that the Anti-Kickback Statute makes all claims made after a kickback a false claim because the claimant falsely certifies that it has complied with the AKS as a material condition of submitting claims for payment to the Medicare and Medicaid Programs.

497.   Effective March 23, 2010, the Patient Protection and Affordable Care Act confirmed that claims submitted in violation of the AKS automatically constitute false claims for purposes of the False Claims Act. The statute states, "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

498.   Under the statutory language, all claims arising from referrals by West Clinic physicians to Methodist after Methodist began making the overpayments to West Clinic physicians were false claims and are subject to recovery or refund plus penalties under the False Claims Act.

499.   Congress eliminated the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. *See* 42 U.S.C. § 1320a-7b(h).

115

500.   Whether the payment of excessive remuneration or kickbacks affected patient care is irrelevant and not a defense to violations of the AKS.

**West Clinic's Referrals of Medicare and Medicaid Inpatients to Methodist Hospitals**

501.   The financial data available in Methodist's cost reports submitted to CMS and its Medicare claims data do not reveal the fraud at issue in this case. But the financial data can be used in a model for estimating the scope of damages to the Medicare and Medicaid Programs caused by the Defendants' illegal schemes.

502.   Medicare payments for hospital admissions to treat cancer vary by diagnoses but over the time period 2012-2018, the average Medicare payment for oncology admissions at Methodist hospitals was approximately $13,500 per admission. This payment estimate was determined from reviewing oncology diagnoses codes and payment rates for inpatient admissions in Methodist's claims data available in the MEDPAR file.

503.   As discussed above between 2012 and the 2014, inpatient oncology volume at Methodist hospitals more than doubled. Methodist hospital discharges for oncology admissions increased from 7,320 discharges in 2012 to 15,834 discharges in 2014. The increase was 8,514 oncology admissions per year.

504.   This number is also consistent with West Clinic CEO Erich Mounce's presentation in August of 2014 touting the total annual number of patients referred by West Clinic for inpatient admissions as 7,822. This tally indicates that the annual increase of 8,514 oncology admissions at Methodist hospitals between 2012 and 2014 was largely due to West Clinic's referrals.

505.   Between 2012 and 2014, the oncology payor mix at Methodist remained similar with 43 percent of oncology inpatient cases covered by Medicare and 23-25 percent covered by Medicaid.

Among outpatients, Medicare covered approximately 43 percent of oncology outpatients at Methodist and Medicaid covered approximately 8 percent during this time period.

506. Using the number of 7,822 referrals per year for inpatient admissions, over the 7-year period of 2012-2018, the total number of patients referred by West Clinic physicians to Methodist hospitals for inpatient admissions would be approximately 54,754. Assuming Medicare insured 43 percent of these patients and Medicaid insured 23 percent, then 66 percent of the 54,754 admissions would be covered by the Medicare or Medicaid Programs. That 66 percent translates to 36,137 admissions. Applying the average Medicare payment rate of $13,500 for each oncology admission at Methodist hospitals over the time period 2012-2018, single damages to Medicare and Medicaid from **inpatient** referrals would total approximately $487.85 million.

### West Clinic's Referrals of Outpatients Covered by Medicare or Medicaid Programs

507. The "partnership" with West Clinic physicians also generated significant numbers of **outpatient** referrals to Methodist facilities, including Methodist hospitals and the West Cancer Center sites billed as outpatient departments of the hospital system.

508. Medicare payments to Methodist for outpatient services increased from $40.14 million in 2011 to $68.73 million in 2012, $74.03 million in 2013, $84.65 million in 2014, $91.39 million in 2015, $83.88 million in 2016, and $123.65 million in 2017. During the years of the "alliance" with West Clinic physicians, Medicare payments to Methodist for outpatient services increased by approximately 300 percent.

509. During this time period, the average annual increase in Medicare payments to Methodist for outpatient services was approximately $48 million. Multiplying the average increase of $48 million over 7 years, the total is approximately $336 million dollars in increased Medicare

117

payments for outpatient services. This number does not include increased Medicaid payments for outpatient services. Damages to Medicaid from tainted referrals for outpatient services by West Clinic physicians would be an additional component of damages.

### Summary of Damages to the Medicare and Medicaid Programs

510.    Over the time period 2012-2018, single estimated damages to Medicare and Medicaid from tainted **inpatient** referrals total approximately $487.85 million. Over the time period 2012-2018, single estimated damages to Medicare from tainted **outpatient** referrals by West Clinic physicians to Methodist total approximately $336 million. This number does not include damages to the Medicaid Program from tainted outpatient referrals by West Clinic physicians to Methodist.

511.    The Methodist-West Clinic "partnership" was richly rewarding to both parties at the expense of the Medicare and Medicaid Programs. From 2012-2018, Methodist paid over $400 million in cash directly to West Clinic physicians. Methodist' net revenues escalated from West Clinic's referrals, including enormous 340B drug profits from expensive cancer drugs. Methodist's senior executives personally profited through annual bonuses based on system revenues. It was a shrewd "investment" by Methodist and deliberate calculated strategy to capture massive profits gained from secretive violations of federal laws.

512.    The Defendants' scheme caused estimated single damages to the Medicare and Medicaid Programs exceeding $800 million.

### Legal Remedies for Defendants' False Claims

### The Federal False Claims Act

118

513.    The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material[29] to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation[30] to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

514.    The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

515.    Statutory liability under the False Claims Act includes a civil penalty "not less than $5,500 and not more than $11,000" per false claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

---

[29] "The term 'material' means having a natural tendency to influence. Or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

[30] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

516.     Under the federal False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud." 31 U.S.C. 3729 (b)(1).

517.     In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required.  *Id.* A defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information."  *Id.*

## The Tennessee Medicaid False Claims Act

518.     The Tennessee Medicaid False Claims Act contains similar provisions as the federal False Claims Act.

519.     The Tennessee Medicaid False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the [M]edicaid program," Tenn. Code Ann. § 71-5-182(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the [M]edicaid program," Tenn. Code Ann. § 71-5-182(a)(1)(B), "conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D)," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids or decreases an obligation to pay or transmit money or property to the state, relative to the [M]edicaid program." Tenn. Code Ann. § 71-5-182(a)(1)(D).

520.     Under the Tennessee Medicaid False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." Tenn. Code Ann. § 71-5-182(b).

521.　Statutory liability under the Tennessee Medicaid False Claims Act includes a civil penalty "not less than $5,000 and not more than $25,000…plus 3 times the amount of damages which the state sustains because of the act of that person." Tenn. Code Ann. § 71-5-182(a)(1)(D).

### Count I---Presenting False Claims in Violation of 31 U.S.C. § 3729(a) (1)(A) and Tenn. Code § 71-5-82(a)(1)(A) Against All Defendants

522.　Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

523.　In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A); Tenn. Code Ann. § 71-5-182(a)(1)(A).

524.   Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States and State of Tennessee in violation of 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code Ann. § 71-5-182(a)(1)(A).

525.   This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A).

526.   Through the acts described above, Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government and State of Tennessee, within the meaning of 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code Ann. § 71-5-182(a)(1)(A).

527.   The United States and the State of Tennessee were unaware of the falsity of the records, statements and claims made or caused to be made by Defendants.  In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States and the State of Tennessee paid claims that would not be paid if Defendants' illegal conduct was known.

528.   As a result of Defendants' acts, the United States and the State of Tennessee have sustained damages in a substantial amount to be determined at trial.

529.   Additionally, the United States and State of Tennessee are entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

**<u>Count II--- Use of False Statements in Violation of 31 U.S.C. 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All Defendants</u>**

530.   Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

531.   In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B); Tenn. Code Ann. § 71-5-182(a)(1)(B).

532.   This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B).

533.   Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements. Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B). The records were false in that they purported to show compliance with the AKS and Stark laws.

534.   Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States and State of Tennessee.

535.   The United States and State of Tennessee were unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Defendants.  The United States

and State of Tennessee paid claims that would not be paid if Defendants' illegal conduct was known.

536.   By virtue of the false records or false claims made by Defendants, the United States and State of Tennessee sustained damages and therefore are entitled to treble damages under the federal False Claims Act and Tennessee Medicaid False Claims Act respectively to be determined at trial.

537.   Additionally, the United States and State of Tennessee are entitled to civil penalties for each false claim made and caused to be made by Defendants arising from their illegal conduct as described above.

## Count III--- Conspiring to Submit False Claims in Violation of 31 U.S.C. § 3729(a)(1)(C) and Tenn. Code Ann. § 71-5-182(a)(1)(C) Against All Defendants

538.   Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

539.   In pertinent part, the federal False Claims Act establishes liability for "any person who….conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C). The Tennessee Medicaid False Claim Act contains a similar provision. *See* Tenn. Code Ann. § 71-5-182(a)(1)(C).

540.   This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(C).

541.   Through the acts described above, Defendants acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and State of Tennessee and knowingly made, used, or

caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

542. Defendants conspired to withhold information regarding excessive and illegal payments to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees to the Methodist system.

543. As a result, the United States and State of Tennessee were unaware of the false claims submitted and caused by Defendants and the United States and State of Tennessee paid claims that would not be paid if the Defendants' illegal conduct was known to the United States and State of Tennessee.

544. By reason of Defendants' acts, the United States and State of Tennessee have been damaged in a substantial amount to be determined at trial.

545. By virtue of Defendants' conspiracy to defraud the United States and State of Tennessee, the United States and State of Tennessee sustained damages and are entitled to treble damages under the Federal False Claims Act and Tennessee Medicaid False Claims Act, to be determined at trial, plus civil penalties for each violation.

**Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B) Against All Defendants**

546. Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

547. In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a

125

false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B).

548.    Compliance with the AKS and Stark laws was an explicit condition of each payment under federal healthcare programs. For each of the years between 2012 and the present, Defendants explicitly and implicitly certified compliance with the AKS and Stark laws.

549.    Defendants' certifications of compliance with the AKS and Stark laws were knowingly false.

550.    In reliance on the Defendants' express and implied certifications, the United States and State of Tennessee made payments to Defendants under federal and state health care programs. If the United States and State of Tennessee had known that Defendants' certifications were false, their payments would not have been made to Defendants for each of the years in question.

551.    By virtue of the false records, false statements, and false certifications made by Defendants, the United States and State of Tennessee sustained damages and are entitled to treble damages under the federal False Claims Act and the Tennessee Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.


**Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) and Tenn. Code Ann. § 71-5-182(a)(1)(D) Against All Defendants**


552.    Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

553.    The federal False Claims Act and Tennessee Medicaid False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G); Tenn. Code

126

Ann. § 71-5-182(a)(1)(D).  The False Claims Act and Tennessee Medicaid False Claims Act define "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *See* 31 U.S.C. § 3729(b)(3); Tenn. Code Ann. § 71-5-182(d).

554.   "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

555.   "The OIG may impose a penalty, and where authorized, an assessment against any person…whom it determines…[h]as not refunded on a timely basis….amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

556.   Defendants have knowingly caused and retained overpayments from federal and state health care programs arising from Defendants' violations of the Stark laws and AKS.

557.   By virtue of Defendants causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other federal health care programs, the United States and State of Tennessee sustained damages and are entitled to treble damages under the False Claims Act and Tennessee Medicaid False Claims Act respectively, to be determined at trial, plus a civil penalty for each violation.

### Count VI--- False Record to Avoid an Obligation to Refund Against All Defendants

558.   Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

127

559.    The False Claims Act and Tennessee Medicaid False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); Tenn. Code Ann. § 71-5-182(a)(1)(D).

560.    Defendants knowingly made and used, or caused to be made or used, false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and State of Tennessee.

561.    By virtue of the false records or false statements made by the Defendants, the United States and State of Tennessee sustained damages and therefore are entitled to treble damages, to be determined at trial, plus civil penalties for each violation.

## **Prayers for Relief**

562.    On behalf of the United States and State of Tennessee, Relators request and pray that judgment be entered against Defendants in the amount of the United States' and State of Tennessee's respective damages, trebled as required by law, such civil penalties as are required by law, for a *qui tam* relator's share as specified by 31 U.S.C. §3730(d) and Tenn. Code Ann. § 71-5-183(d), for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d) and Tenn. Code Ann. § 71-5-183(d), and for all such further legal and equitable relief as may be just and proper.

## **Jury trial is hereby demanded.**

This 16th of December, 2019.

/s/ Jerry E. Martin
Jerry E. Martin (TNBPR No. 20193)

128

Seth Hyatt (TNBPR No. 31171)
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219
(615) 244-2202

Lead counsel:

/s/ Bryan A. Vroon
Bryan A. Vroon, Esq.
(Admitted *Pro Hac*)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road
Suite 2270
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com


Edward D. Robertson, Jr.
(Admitted *Pro Hac*)
Bartimus Frickleton Robertson & Rader, P.C.
109b East High Street
Jefferson City, MO. 65101
(573)659-4454

Counsel for Relators Jeff Liebman and David M. Stern, M.D.


## Certificate of Service


This is to certify that I have this day served a copy of the Relators' Second Amended Complaint

by depositing a true and correct copy of same by Certified Mail in the United States Mail, postage

prepaid, addressed as follows:


The Honorable Attorney General William P. Barr
Attorney General of the United States
Attention: Seal Clerk
United States Department of Justice
950 Pennsylvania Avenue NW

Washington, D.C.  20530-0001

The Honorable Donald Q. Cochran
United States Attorney for the Middle District of Tennessee
Attention: Seal Clerk
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203

The Honorable Herbert H. Slatery III
Attorney General of the State of Tennessee
Attention: Seal Clerk
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202-0207

David Cohen
Senior Trial Counsel
United States Department of Justice
Civil Division/Fraud Section
175 N Street, N.E.
9th Floor
Washington, D.C. 20002

Linda McMahon
Senior Trial Counsel
United States Department of Justice
Civil Division/Fraud Section
175 N Street, N.E.
9th Floor
Washington, D.C. 20002

Kara Sweet
Assistant United States Attorney
United States Attorney's Office
Middle District of Tennessee
110 9th Avenue South, Suite A-961
Nashville, TN 37203

Scott Corley
Assistant Attorney General
Medicaid Fraud and Integrity Division
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207

This 16th of December, 2019.

/s/ Jerry E. Martin
Jerry Martin