**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **AND STATE OF TENNESSEE** *ex rel.* | ) | |
| **JEFFREY H. LIEBMAN AND** | ) | |
| **DAVID M. STERN, M.D.,** | ) | **Case No. 3:17-CV-902** |
| | ) | |
| **Plaintiffs/Relators,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Judge William L. Campbell, Jr.** |
| **METHODIST LE BONHEUR** | ) | |
| **HEALTHCARE,** *et al.*, | ) | **Magistrate Judge Barbara D.** |
| | ) | **Holmes** |
| **Defendants.** | ) | |
| | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF WEST DEFENDANTS' MOTION TO
DISMISS THE SECOND AMENDED COMPLAINT**</u>

John-David Thomas, TN BPR # 027582
Andrew F. Solinger, TN BPR # 036943
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
jd.thomas@wallerlaw.com
andrew.solinger@wallerlaw.com

*Attorneys for Defendants The West Clinic, PLLC, West Partners, LLC, Lee Schwartzberg, M.D., and Erich Mounce*

# TABLE OF CONTENTS

Table of Authorities.................................................................................................ii

Summary of the Argument.......................................................................................1

Factual and Procedural Background.......................................................................3

Argument.................................................................................................................5

    I.    STERN IS BARRED AS A RELATOR AND THE SAC SHOULD BE DISMISSED.....5

        a.   The First-to-File Rule ...........................................................................5

        b.   The SAC Must Be Dismissed Because Stern Is Barred as a Relator Pursuant to the First-to-File Rule..............................................................................6

    II.   THE SAC LACKS THE REQUIRED SPECIFICITY AND MUST BE DISMISSED PURSUANT TO RULE 9(B) .......................................................................10

        a.   The Rule 9(b) Legal Standard for FCA Claims ....................................11

        b.   Relators Insufficiently Plead Underlying Violations of the AKS and/or Stark Law .......................................................................................................12

            i.   The AKS and Stark Law Legal Framework ...............................12

           ii.   Relators Fail to Sufficiently Plead any Underlying Violations of the AKS or Stark Law .....................................................................14

                  a.   Merely Exceeding the MGMA 90th Percentile in Compensating Highly-Qualified Specialists Does Not Render the Remuneration Above Fair Market Value ........16

          iii.   Relators Rely on Their Own Unsupported Opinions and Assertions of Knowledge.................................................................................20

          iv.   Because Relators Fail to Sufficiently Allege any Violations of the AKS or Stark Law, They Cannot Properly Assert a resulting Violation of the FCA .....................................................................................21

        c.   The SAC Fails to Identify a Single Claim with the Required Specificity that Was Presented to the Government.....................................................21

        d.   Counts II and IV Must Be Dismissed Because Relators Fail to Identify a False Record or Statement with the Required Particularity ...........................23

e. Relators Fail to Sufficiently State a Claim for Reverse False Claims Under § 3729(a)(1)(G), and Counts V and VI Must Be Dismissed.................................24

f. Relators Fail to State a Conspiracy Claim Under § 3729(a)(1)(C), and Count III Must Be Dismissed ................................................................................26

g. Relators Fail to Allege that the West Defendants Made any Certifications, Express or Implied, and Count IV Must Be Dismissed........................................28

III. BOTH THE WEST CLINIC, PLLC AND WEST PARTNERS, LLC MUST BE DISMISSED PURSUANT TO BOTH RULE 12(b)(6) AND 9(b).................................29

a. The SAC Fails to Connect The West Clinic, PLLC to any of the Underlying Actions Complained of in the SAC ...................................................................30

b. The SAC Contains No Allegations as to West Partners, LLC.............................32

CONCLUSION................................................................................................34

Case 3:17-cv-00902   Document 82   Filed 03/09/20   Page 3 of 44 PageID #: 985

# TABLE OF AUTHORITIES

**C**ASELAW

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................... 29-30, 33

*Bell Atlantic* Corp*. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................29

*Bingham v. HCA, Inc.*,
    783 Fed. App'x 868 (11th Cir. 2019) ...........................................................18

*Chesbrough v. VPA. P.C.*,
    655 F.3d 461 (6th Cir. 2011) ...............................................10-12, 21, 24-25, 29

*Coffey v. Foamex L.P.*,
    2 F.3d 157 (6th Cir. 1993) ...........................................................................11

*Craighead v. E.F. Hutton & Co. Inc.*,
    899 F.2d 485 (6th Cir. 1990) .......................................................................20

*Feldstein v. Nash Cmty. Health Servs., Inc.*,
    51 F. Supp. 2d 673 (E.D.N.C. 1999)............................................................13

*Grynberg ex rel. United States v. Exxon Co., USA (In re Nat. Gas Royalties Qui Tam Litig.)*,
    566 F.3d 956 (10th Cir. 2009) .......................................................................6

*Hanlester Network v. Shalala*,
    51 F.3d 1390 (9th Cir. 1995) .......................................................................13

*Jenkins v. Metro Bd. of Educ.*,
    No. 3:12-cv-62, 2012 WL 874718 (M.D. Tenn. Mar. 14, 2012)......................33

*Jones-McNamara v. Holzer Health Sys.*,
    630 Fed. App'x 394 (6th Cir. 2015) .............................................................13

*Olivier v. Williams*,
    No 3:17-cv-32, 2017 WL 5653888 (M.D. Tenn. Jan. 26, 2017) ......................30

*Pencheng Si v. Laogai Research Found.*,
    71 F. Supp. 3d 73 (D.D.C. 2014)..................................................................27

*Pruitt v. McConnell*,
    No. 3:13-cv-1003, 2013 WL 5493490 (M.D. Tenn. Oct. 2, 2013)...................30

Case 3:17-cv-00902   Document 82   Filed 03/09/20   Page 4 of 44 PageID #: 986

*Silverstein v. Percudani*,
    422 F. Supp. 2d 468 (M.D. Pa. 2006) ...................................................................29

*Smoky Mt. Freightliner, LLC v. DaimlerChrysler Vans, LLC*,
    No. 2:05-CV-173, 2006 WL 8442968 (E.D. Tenn. Mar. 7, 2006) ...................................29

*United States ex rel. Ahumada v. NISH*,
    756 F.3d 268 (4th Cir. 2014) .........................................................................26

*United States ex rel. v. Bay State Ambulance & Hosp. Rental Serv.*,
    874 F.2d 20 (1st Cir. 1989)...........................................................................16

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
    342 F.3d 634 (6th Cir. 2003) .................................................................. 11, 26-27

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
    501 F.3d 493 (6th Cir. 2007) ....................................................................20, 22

*United States ex rel. Branch Consultants v. Allstate Ins. Co.*,
    560 F.3d 371 (5th Cir. 2009) .....................................................................7, 10

*United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*,
    No. 3:09-cv-484, 2013 WL 146048 (M.D. Tenn. Jan. 14, 2013) ...............1, 15, 21, 23, 26

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
    579 F.3d 13 (1st Cir. 2009)............................................................................6

*United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*,
    No. 2:14-cv-02426, 2015 WL 13174966 (W.D. Tenn. June 2, 2015).............................28

*United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*,
    642 Fed. App'x 547 (6th Cir. 2016) ............................................................. 11-12

*United States ex rel. Fry v. Guidant Corp.*,
    No. 3:03-0842, 2006 WL 1102397 (M.D. Tenn. Apr. 25, 2006) ................................. 6-8

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
    880 F.3d 89 (3d Cir. 2018)...........................................................................12

*United States ex rel. Groat v. Boston Heart Diagnostics Corp.*,
    255 F. Supp. 3d 13 (D.D.C. 2017)....................................................................25

*United States ex rel. Holbrook v. Brink's Co.*,
    336 F. Supp. 3d 860 (S.D. Ohio 2018) ...............................................................27

Case 3:17-cv-00902   Document 82   Filed 03/09/20   Page 5 of 44 PageID #: 987

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
    694 F. Supp. 2d 48 (D. Mass. 2010) ....................................................................8

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
    874 F.3d 905 (6th Cir. 2017) .....................................................................21, 26

*United States ex rel. Kreipke v. Wayne State Univ.*,
    No. 12-14836, 2014 WL 6085704 (E.D. Mich. Nov. 13, 2014).........................29

*United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*,
    149 F.3d 227 (3d Cir. 1998).............................................................. 6, 9-10

*United States ex rel. LaCorte v. Wagner*,
    185 F.3d 188 (4th Cir. 1999) ...........................................................................7

*United States ex rel. Ligai v. ETS-Lindgren Inc.*,
    No. CIV. A. H-112973, 2014 WL 4649885 (S.D. Tex. Sept. 16, 2014) ..........24

*United States ex rel. Little v. Triumph Gear Sys.*,
    870 F.3d 1242 (10th Cir. 2017) ......................................................................5

*United States ex rel. Lujan v. Hughes Aircraft Co.*,
    243 F.3d 1181 (9th Cir. 2001) ......................................................................6-7

*United States ex rel. Marlar v. BWXT Y-12, LLC*,
    525 F.3d 439 (6th Cir. 2008) ....................................................................12, 21

*United States ex rel. McKenzie v. BellSouth Telecomm., Inc.*,
    123 F.3d 935 (6th Cir. 1997) .......................................................................5-6

*United States ex rel. Mooney v. Americare, Inc.*,
    No. 06-cv-1806, 2013 WL 1346022 (E.D.N.Y. Apr. 3, 2013).........................30

*United States ex. rel. Nowak v. Medtronic, Inc.*,
    806 F. Supp. 2d 310 (D. Mass. 2011) ...........................................................7-9

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
    519 Fed. App'x 890 (5th Cir. 2013) ................................................................28

*United States ex rel. Obert-Hong v. Advocate Health Care*,
    211 F. Supp. 2d 1045 (N.D. Ill. 2002) ..........................................................16

*United States ex rel. Osheroff v. Tenet Healthcare Corp.*,
    No. 09-cv-22253, 2012 WL 2871264 (S.D. Fla. July 12, 2012) ................15, 19

*United States ex rel. Poteet v. Medtronic, Inc.*,
    552 F.3d 503 (6th Cir. 2009) ......................................................... 5-6

*United States ex rel. Simmons v. Meridian Surgical Partners, LLC*,
    No. 3:11-cv-439, 2013 WL 4098663 (M.D. Tenn. May 2, 2013) ....................................13

*United States ex rel. Singh v. Bradford Reg. Med. Ctr.*,
    752 F. Supp. 2d 602 (W.D. Pa. 2010)................................................12

*United* States *ex rel. Taxpayers Against Fraud v. GE*,
    41 F.3d 1032 (6th Cir. 1994) ........................................................5

*United States ex rel. Thomas v. Siemens AG*,
    708 F. Supp. 2d 505 (E.D. Pa. 2010) ...............................................25

*United States ex rel. Villafane v. Solinger*,
    543 F. Supp. 2d 678 (W.D. Ky. 2008)................................................12, 14, 17

*United States ex rel. Williams v. Bell Helicopter Textron Inc.*,
    417 F.3d 450 (5th Cir. 2005) .......................................................20

*United States ex rel. Winkler v. BAE Sys., Inc.*,
    957 F. Supp. 2d 856 (E.D. Mich. 2013)................................................25, 27

*United States v. Greber*,
    760 F.2d 68 (3d Cir. 1985)..........................................................13

*United States v. Kats*,
    871 F.2d 105 (9th Cir. 1989) .......................................................13

*United States v. Miles*,
    360 F.3d 472 (5th Cir. 2004) .......................................................13

*United States v. N.Y. Soc. for the Relief of the Ruptured & Crippled, Maintaining the Hospital for Special Surgery*, No. 07-cv-292, 2014 WL 3905742 (S.D.N.Y. Aug. 7, 2014) .........18

*United States v. Pfizer, Inc.*,
    188 F. Supp. 3d 122 (D. Mass. 2016) ...............................................14

*United States v. UT Med. Grp., Inc.*,
    No. 2:12-cv-2139, 2014 WL 12611244 (W.D. Tenn. May 21, 2014) ................. 1, 26-27

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
    136 S. Ct. 1989 (2016)............................................................11

*Walburn v. Lockheed Martin Corp.*,
    431 F.3d 966 (6th Cir. 2005) ........................................................................... 5-6

*Wood ex rel. United States v. Applied Research Assocs., Inc.*,
    328 Fed. App'x 744 (2d Cir. 2009)...................................................................33

*Yuhasz v. Brush Wellman, Inc.*,
    341 F.3d 559 (6th Cir. 2003) ...........................................................................11

<u>**STATUTES AND REGULATIONS**</u>

31 U.S.C. § 3729 *et seq.*............................................................................ *passim*

42 U.S.C. § 1320a-7b *et seq.* ..................................................................... *passim*

42 U.S.C. § 1395nn *et seq.* ......................................................................... *passim*

42 C.F.R. § 411.357(d)(1)............................................................................ 13-14

42 C.F.R. § 1001.952(d)......................................................................................14

*OIG Anti–Kickback Provisions,* 56 Fed. Reg. 35952 (July 29, 1991) ..................... 13-14

Tenn. Code Ann. §§ 71-5-181–185 ..............................................................................1

<u>**RULES**</u>

Federal Rules of Civil Procedure 8........................................................26-27, 32-33

Federal Rules of Civil Procedure 9(b) ......................1-2, 10-11, 16, 19-22, 25-29, 32-34

Federal Rules of Civil Procedure 12(b)(1)..............................................................1, 10

Federal Rules of Civil Procedure 12(b)(6)..............................................................1, 29

Defendants The West Clinic, PLLC d/b/a West Cancer Center (the "West Clinic"), West

Partners, LLC ("West Partners"), Lee Schwartzberg, M.D. ("Schwartzberg"), and Erich Mounce

("Mounce") (collectively, the "West Defendants"), respectfully submit this Memorandum of Law

in support of their Motion to Dismiss the Second Amended Complaint ("SAC") filed by relators

Jeffrey H. Liebman ("Liebman") and David M. Stern, M.D. ("Stern") (collectively the "Relators"),

pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6).

## SUMMARY OF THE ARGUMENT

Despite years of supposed investigation, two amendments to the complaint over the past

33 months, access to copious notes maintained by Stern, and being granted access to voluminous

documents produced to the Government by the West Defendants, Relators do not allege sufficient

facts with the necessary particularity required by Rule 9(b) that demonstrate that the arrangement

between Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals

(collectively "Methodist") and the West Defendants was anything more than a legitimate business

arrangement designed to increase access to high-quality cancer care in the Memphis area. Faced

with a lack of substantive allegations, Relators spend the balance of 562 paragraphs attempting to

manufacture False Claims Act ("FCA") and Tennessee Medicaid False Claims Act claims through

the use of secondhand information, innuendo, speculation, false equivalencies, and their own sour-

grape impressions of an otherwise appropriate and legal business arrangement.[1]  Merely

---

[1] The SAC sets forth alleged violations of both the federal False Claims Act (31 U.S.C. §§ 3729-33) and the Tennessee Medicaid False Claims Act (Tenn. Code Ann. §§ 71-5-181 to -185). The elements of these statutes are "virtually identical" and courts analyze the sufficiency of pleadings under both statutes in the same manner. *United States v. UT Med. Grp., Inc.*, No. 2:12-cv-2139, 2014 WL 12611244, at *4 n.2 (W.D. Tenn. May 21, 2014); *United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-cv-484, 2013 WL 146048, at *17-18 (M.D. Tenn. Jan. 14, 2013) (noting that claims pursuant to the Tennessee Medicaid False Claims Act are "analogous" and "co-extensive" with those asserted under the FCA). For this reason, the West Defendants refer to both statutes collectively as the "False Claims Act" or "FCA" and move to dismiss all claims brought pursuant to each statute in this motion.

1

disagreeing with the way the Defendants ran their businesses is not enough to show a violation of the FCA or any other law. Much more is required.

As set forth below, the SAC should be dismissed for a host of reasons. First, Stern is not a proper relator. While Liebman could theoretically make use of information learned from Stern, they are not free to make a private agreement to add Stern as a relator in this action. Doing so turns the public policy of the FCA on its head, violates the well-established first-to-file bar, and ignores the weight of caselaw, including a decision from this district. Second, the SAC fails to satisfy Rule 9(b)'s strict pleading requirements. None of the excess of minutia about everyday business dealings added by Stern relates to how, when, why, or by whom any alleged false claims were submitted. Indeed, in 131 pages of allegations, Relators fail to identify a single alleged false claim with the specificity demanded by Rule 9(b). Finally, even assuming the SAC meets the requirements of Rule 9(b), it lacks fundamental allegations as to The West Clinic, PLLC and West Partners, LLC, which results in a failure to state a claim upon which relief could be granted.

At base, Relators are dissatisfied former employees who were unsuccessful in their respective positions at Methodist and the University of Tennessee ("UT"), and are upset that their respective employers did not agree with their views on how the arrangement should have operated. Relators' beliefs are immaterial, however. Relators must demonstrate, with specificity, why the Defendants' business decisions violated the AKS and/or Stark Law. Unconnected minutiae of various meetings, contracts, presentations, and business affairs are insufficient.[2]

---

[2] For instance, Relators list numerous meetings at which they were present, but fail to make any allegations about how those meetings related to any of the underlying allegations of fraud, or how they were related in any way to other allegations in the SAC. (SAC ¶¶ 19-20, 24, 168-70, 186, 189, 194, 328-31). Relators also spend several paragraphs providing detailed financial figures about Medicare payments to Methodist and overall net patient revenue for the Methodist system, but fail to explain why revenue for the entire Methodist system has any bearing on their allegations of fraud against the Defendants. (*Id.* ¶¶ 452-55).

## FACTUAL AND PROCEDURAL BACKGROUND

Liebman, the former President of Methodist University Hospital, initially filed his *qui tam* complaint in May 2017. That initial complaint alleged that the West Defendants knowingly defrauded federal and state healthcare programs through an alleged scheme in which Methodist Le Bonheur Healthcare, Methodist Healthcare-Memphis Hospitals, Chris McLean, and Gary Shorb (collectively, the "Methodist Defendants") allegedly paid illegal kickbacks and excess compensation to the West Defendants in violation of the Anti-Kickback Statute ("AKS") and Stark Law. It also included 77 pages of allegations that Methodist had entered into improper arrangements with numerous employed physicians unrelated to the West Defendants. (*See* D.E. 1). Approximately one year later, on May 24, 2018, Liebman filed a First Amended Complaint ("FAC") to add two new defendants unrelated to the West Defendants as well as 12 additional pages of allegations. (*See* D.E. 20). Shortly after filing the FAC, and presumably after conducting its own preliminary investigation of Liebman's allegations, the United States issued a Civil Investigative Demand ("CID") to Methodist. (*See* D.E. 40, p. 1). That CID contained 65 document requests and nine interrogatories relating not just to the arrangement between Methodist and The West Clinic, P.C., but also the additional allegations related to physicians directly employed by Methodist. After receiving Methodist's initial responses to that CID in July 2018, the Government made the decision that it needed additional documentation from The West Clinic, P.C. and the West Clinic P.C. agreed to respond to informal requests for documents and information. (*See id.*). In September 2018, counsel for the United States sent a letter to The West Clinic, P.C.[3] setting

---

[3] The West Clinic, P.C. is not a named party in this action, but it was the party that entered into each of the agreements at issue with Methodist and UT (*See* SAC ¶ 178) and the party from whom the government sought information as part of its investigation. Instead of naming The West Clinic, P.C., Relators have named The West Clinic, PLLC as a defendant. As discussed further in Section III, *infra*, Relators fail to allege any connection between these two legal entities.

forth 20 requests for documents and six interrogatories relating to the arrangement between Methodist and The West Clinic, P.C. (*See id.*). Over the next 15 months, Methodist and The West Clinic, P.C. collectively produced many thousands of pages of documents—including internal and external correspondence, financial records, spreadsheets containing detailed data, meeting minutes, notes, and a myriad of other categories of documents—and provided written interrogatory responses.

During the course of this production, the Government sought permission to provide Relators' counsel with access to these documents "for the purpose of obtaining their assistance with the United States' investigation of Relator's allegations. (*Id.*). That permission was granted on June 3, 2019. (*See* D.E. 42). Following more than 14 months of document review, the United States and the State of Tennessee notified the Court that they were unable to reach a decision regarding intervention in this matter. (*See* D.E. 44, 45). That same day, Liebman requested the Court to extend the seal on the case until filing of the SAC. (*See* D.E. 46). Liebman also moved for a partial lifting of the seal in order to share the Complaint and First Amended Complaint with Stern "for the purpose of potentially adding Dr. Stern as a Co-Relator in this case." (D.E. 51). Relators' counsel had access to the Defendants' productions to the Government for several months, from at least June 2019, when a protective order was signed, through filing of the SAC in December 2019. Relators filed an "unopposed"[4] motion for leave to file the SAC on December 10, 2019 (*see* D.E. 56, 57), which was granted on December 13, 2019. (*See* D.E. 59). This second amendment added a new relator, Stern, the former Vice-Chancellor of Clinical Affairs at the University of Tennessee Health Science Center, along with an additional 213 paragraphs and 42

---

[4] Relators' motion was "unopposed" because this action was still sealed and Defendants were not provided with notice of the expedited filing of a SAC despite the fact the United States previously asked the Court to lift the seal on this action (*see* D.E. 45) and had provided a copy of the FAC to Defendants. (*See* D.E. 30). Had the West Defendants been aware of Relators' motion for leave to file the SAC, they would have opposed it.

pages of allegations. Despite the addition of both a new relator and voluminous additional factual allegations, the SAC did not add any additional claims. Six days later, on December 19, 2019, the Court directed the Clerk to lift the seal on this action. (*See* D.E. 61). On January 9, 2020, the SAC was served on the West Defendants. (*See* D.E. 64-65, 68-69).

**ARGUMENT**

**I.    STERN IS BARRED AS A RELATOR, AND THE SAC SHOULD BE DISMISSED**

    **a.    The First-to-File Rule**

In order to bring an action under the FCA, a relator must be a true "whistleblower," meaning that he or she "is precluded from collecting a bounty [under the FCA] if the case is brought on the basis of information that has already been publicly disclosed, or if someone else has filed the claim first." *United States ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 942 (6th Cir. 1997) (quoting *United States ex rel. Taxpayers Against Fraud v. GE*, 41 F.3d 1032, 1035 (6th Cir. 1994)). Said another way, a relator (or relators) must be the "first to file" a claim; otherwise they may not proceed. *See United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 516 (6th Cir. 2009) (quoting *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 971 (6th Cir. 2005)) (noting that the first-to-file bar removes jurisdiction for any suit alleging "'all the essential facts' of the underlying fraud [of an] earlier filed action . . . even if [the latter] complaint 'incorporates somewhat different details'").

The Sixth Circuit has held that the first-to-file rule is jurisdictional.[5] *See id.* at 507 ("[T]he FCA places a number of jurisdictional limitations on *qui tam* actions [including] the first-to-file

---

[5] The West Defendants acknowledge decisions from other circuits questioning whether the first-to-file rule is jurisdictional. *See e.g. United States ex rel. Little v. Triumph Gear Sys.*, 870 F.3d 1242, 1245 (10th Cir. 2017). Nonetheless, both *Walburn* and *Poteet* remain good law in the Sixth Circuit. Moreover, even "if the first-to-file rule were non-jurisdictional, [a] violation of the rule would nevertheless afford a basis for dismissal. *Little*, 870 F.3d at 1251.

5

provision [which] denies standing to certain potential relators by directing that once a *qui tam* action is filed 'no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.'"). If a *qui tam* action includes claims that have already been filed by another relator, the district court is "required to dismiss the action." *Walburn,* 431 F.3d at 970. This first-to-file rule is "'exception-free' . . . and does not permit [a court] to consider . . . [i]nformation . . . provided *after* the filing of [a complaint]." *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 33 (1st Cir. 2009) (quoting *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001)).

The first-to-file rule serves an important public policy to "restrict the number of persons who can bring *qui tam* actions and thereby avoid parasitic suits." *McKenzie*, 123 F.3d at 940; *see also United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998) ("[D]uplicative claims do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds."); *Grynberg ex rel. United States v. Exxon Co., USA (In re Nat. Gas Royalties Qui Tam Litig.),* 566 F.3d 956, 961 (10th Cir. 2009) ("The first-to-file bar thus functions both to eliminate parasitic plaintiffs who piggyback off the claims of a prior relator, and to encourage legitimate relators to file quickly by protecting the spoils of the first to bring a claim."). In short, "the purpose of the FCA's first-to-file provision is to prevent the filing of more *qui tam* suits once the government already has been made aware of the potential fraud perpetrated against it." *Poteet*, 552 F.3d at 517.

### b. The SAC Must Be Dismissed Because Stern Is Barred as a Relator Pursuant to the First-to-File Rule

This Court has previously ruled that allowing a relator to be added to a *qui tam* complaint without additional "underlying facts" violates the first-to-file rule. *United States ex rel. Fry v.*

*Guidant Corp.*, No. 3:03-0842, 2006 WL 1102397, at *6 (M.D. Tenn. Apr. 25, 2006) ("Section 3730(b)(5) strictly forbids private parties . . . from being added as additional party relators with claims based on the same underlying facts ('intervening') *after* a qui tam action has been filed and the government has already been made aware of the essential facts of the alleged fraud"); s*ee also United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 378 (5th Cir. 2009) ("[A] relator who merely adds details to a previously exposed fraud does not help 'reduce fraud or return funds to the federal fisc . . . once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds.'"). As the *Fry* decision noted, permitting the addition of a second relator without a corresponding addition of new claims "would permit any potential relator to circumvent the first-to-file doctrine by seeking entrance to an action via amended complaint, thereby undermining a central purpose of Section 3730(b)(5)—the preclusion of plaintiffs with merely duplicative claims." *Fry*, 2006 WL 1102397, at *6.

*Fry* is no outlier. Both the Fourth and Ninth Circuits "have explicitly rejected the notion of reading exceptions into the [FCA's] plain language" regarding the first-to-file rule. *Id.* (citing *Lujan*, 243 F.3d at 1187 ("Section 3730(b)(5)'s plain language unambiguously establishes a first-to-file bar, preventing successive plaintiffs from bringing related actions based on the same underlying facts."); *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999) ("Section 3730(b)(5) protects the government and the original qui tam plaintiffs by preventing other private parties from intervening.")).

*Fry* is also not the most recent court to consider this issue. The District Court for the District of Massachusetts carefully analyzed the first-to-file rule and concluded that the addition of a new relator, without the corresponding addition of new claims, is improper. *See United States ex. rel. Nowak v. Medtronic, Inc.,* 806 F. Supp. 2d 310 (D. Mass. 2011). In *Nowak*, the first relator,

7

Nowak, filed her complaint under seal in the District of Massachusetts in March 2008. *Id.* at 325. Almost a year later, in a separate federal district, the second relator, Dodd, filed his action. *Id.* In September 2009, Dodd's action was transferred to the District of Massachusetts and consolidated with Nowak's first-filed action. *Id.* Then, much like here, relators reached a private relator-share agreement and filed a consolidated complaint against Medtronic in the original *Nowak* action. *Id.* Medtronic moved to dismiss the consolidated complaint on various grounds, including that Dodd's later-filed claims were barred by the first-to-file rule pursuant to § 3730(b)(5). *Id.* at 326.

In analyzing whether the addition of Dodd as a relator violated the first-to-file rule, the *Nowak* court examined both relators' complaints and concluded that "while Dodd added some detail about the false-certification scheme and clearly had access to further information regarding the scheme, he failed to allege any new 'essential facts' or 'elements of the fraud.'" *Id.* at 335. Based on its examination of the complaints, and relying on First Circuit precedent, the *Nowak* court concluded that "Nowak offered sufficient allegations and evidence 'to put the government on notice of the essential facts of a fraudulent scheme.'" *Id.* (quoting *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 694 F. Supp. 2d 48, 57 (D. Mass. 2010)).

The facts here are strikingly similar to *Fry* and *Nowak*. Liebman initially filed his *qui tam* complaint on May 30, 2017. (*See* D.E. 1). That complaint together with the FAC, filed almost a year later, (*see* D.E. 20) set forth all of the "essential facts" contained in the SAC. *See Nowak*, 806 F. Supp. 2d at 335. The Court need not look further than Liebman's own motion for leave to file the SAC where he admits that the addition of Stern as a relator adds only "new facts." (D.E. 57, p. 3). There Liebman notes that the SAC "adds Dr. David Stern as co-relator *because his addition as a party adds important and incriminating new facts* regarding the kickback scheme." (*Id.*) (emphasis added). The only new "claim" that Liebman points to is "related to a kickback scheme

involving Methodist's $7 million 'investment' in Vector Oncology (formerly known as ACORN)."
(*Id.*, pp. 3-4). But that same claim appears in *both* the original complaint *and* the amended
complaint. (*Compare* D.E. 1 ¶ 63 ("Under the alliance with West Clinic, Methodist also agreed to
pay $7 million to Vector Oncology (formerly known as Acorn), a research entity controlled by
West Clinic physicians. West Clinic's managing physicians required this $7 million payment as a
condition of entering into the 'alliance' with Methodist"), *with* D.E. 20 ¶ 58 ("Methodist also
agreed to pay $7 million to Vector Oncology (formerly known as Acorn), a research entity
controlled by West Clinic physicians. West Clinic's managing physicians required this $7 million
payment as a condition of entering into the 'alliance' with Methodist. West Clinic physicians used
part of this $7 million payment to Vector to pay off Vector's prior debts.") and ¶ 77 ("The original
terms also provided for Methodist to pay $7 million to Vector (formerly known as Acorn), the
research company controlled by West Clinic physicians. West Clinic physicians required these
payments to Vector for the 'alliance' between Methodist and West Clinic to continue.")). These
allegations are more than sufficient to "put the government on notice of the essential facts" of the
alleged "fraudulent scheme."[6] *See Nowak*, 806 F. Supp. 2d at 335. As Relators acknowledge in
their motion for leave to amend, all Stern adds, if anything, is additional "detail."

Stern's addition as a relator also fails to satisfy the rationale of the FCA because it does
nothing to "reduce fraud or return funds to the federal fisc" since the Government was already
aware of allegations regarding Vector during the entirety of its multi-year investigation before
ultimately concluding that Liebman's claims did not warrant intervention. *See LaCorte*, 149 F.3d

---

[6] Indeed, during a meeting with the government on February 25, 2019, counsel for the United States told counsel for
the West Defendants that the Government expected The West Clinic, P.C. to produce documents related to Vector in
response to the Government's informal requests. (*See* D.E. 40). Presumably, Relators and their counsel had access
to these very same documents, further throwing into question what of the "additional facts" about Vector in the SAC
came from Stern and which, if any, came from a review of documents produced to the Government.

at 234 (reasoning "as a matter of fairness," that latter-in-time relators should not share in a *qui tam* award "because their allegations are unlikely to increase the total recovery"). Indeed, had the SAC and the addition of Stern added any new claims that the Government was unaware of from Liebman's two prior complaints, the Government would have had "good cause" to seek an extension of the seal pursuant to 31 U.S.C. § 3730(b)(3). The Government did not do so, either after receiving a copy of the SAC, (*see* D.E. 56) or before this Court unsealed this action.

Stern "merely adds details to a previously exposed [alleged] fraud" that the Government was already well aware; claims that are based on the same underlying facts as those previously raised by Liebman in two prior iterations of the complaint. *Branch*, 560 F.3d at 378. As a result, Stern's addition as a relator, and the SAC are jurisdictionally barred by the FCA's first-to-file rule, and the SAC should be dismissed under Rule 12(b)(1).

## II.   THE SAC LACKS THE REQUIRED SPECIFICITY AND MUST BE DISMISSED PURSUANT TO RULE 9(B)

FCA "[c]omplaints . . . must comply with Fed. R. Civ. P. 9(b)'s requirement that fraud be pled with particularity . . . ." *Chesbrough v. VPA. P.C.*, 655 F.3d 461, 472 (6th Cir. 2011). While the SAC contains certain specifics, it contains none of the detail that matters for purposes of Rule 9(b). Instead, the SAC dedicates page after page to the minutia of various meetings and events, facts and figures that are publically available that relate to the day-to-day operations of a complex, multi-faceted cancer center that provided care to over 37,000 patients per year during a seven-year arrangement between Methodist and The West Clinic, P.C. This specificity has nothing to do with alleged false claims. (*Compare* SAC ¶¶ 160-72 (alleging violations of the FCA, but failing to specifically identify a single "West Clinic physician[]" or "physician leaders of West Clinic") *with* ¶¶ 173-85 (detailing the day-to-day operations of the Methodist/West cancer center and naming defendants Mounce and Schwartzberg but not detailing any allegedly improper conduct). Most

telling, the SAC does not allege even a *single exemplar* of a supposedly false claim paid by the Government. This particularly glaring deficiency is indicative of the lack of specificity inherent throughout the SAC and alone serves as a basis for dismissal pursuant to Rule 9(b). *Chesbrough*, 655 F.3d at 470.

### a. The Rule 9(b) Legal Standard for FCA Claims

False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b). *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016). Federal Rule of Civil Procedure 9(b) requires that a party "alleging fraud or mistake . . . state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b)'s requirement is applied to claims brought pursuant to the FCA because "defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts." *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003). This accomplishes the important policy goal of the FCA by "alert[ing] defendants 'as to the particulars of their alleged misconduct' . . . prevent[ing] 'fishing expeditions,' protect[ing] defendants' reputations from allegations of fraud [and] narrow[ing] potentially wide-ranging discovery to relevant matters"). *See Chesbrough*, 655 F.3d at 467.

To survive a motion to dismiss pursuant to Rule 9(b), the complaint "must 'allege the time, place, and content of the alleged misrepresentation on which [the government] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) ("*Bledsoe I*") (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993)); *see also United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*, 642 Fed. App'x 547, 550 (6th Cir.

2016) (same); *United States ex rel. Marlar v. BWXT Y-12, LLC*, 525 F.3d 439, 447 (6th Cir. 2008) ("[A] fraudulent claim is 'the *sine qua non* of a False Claims Act violation.'").

### b. Relators Insufficiently Plead Underlying Violations of the AKS and/or Stark Law

Violations of the AKS or Stark Law may serve as a predicate for a claim under the FCA. *See United States ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 682-83 (W.D. Ky. 2008) ("FCA actions may be predicated upon . . . violations of the Stark law and the so-called Anti-Kickback [statute]."); *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 95 (3d Cir. 2018) ("Congress amended the [AKS] in 2010 to provide 'a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA].'"). Here, the entirety of Relators' claims are predicated on alleged violations of either the AKS or Stark Law, which in turn result in alleged violations of the FCA. (*See, e.g.*, SAC ¶¶ 2-3, 35, 66, 97, 104, 106, 117, 496, 533, 542, 548-49, 556) (alleging that Defendants' arrangement that "deliberately violated the federal Anti-Kickback Statute ('AKS') and federal Stark laws" led to violations of the FCA. To sustain these claims, Relators must plead violations of the AKS or the Stark Law with particularity. *See Chesbrough*, 655 F.3d at 472. They do neither.

### i. The AKS and Stark Law Legal Framework

The AKS prohibits the exchange of remuneration to induce or reward the referral of federal health care program goods or services. *See* 42 U.S.C. § 1320a-7b. In order to allege a violation of the AKS,[7] a relator must "show that a defendant (1) knowingly and willfully made a payment or offer of payment, (2) as an inducement to the payee, (3) to refer an individual (4) to another for

---

[7] The AKS is an intent-based statute that requires a defendant to *intend* to violate the law and a complaint must allege facts sufficient to show that the defendants acted *both* "knowingly and willfully." In other words, the relator must show that defendants acted with intent to violate AKS *and* with the intent to pay or receive remuneration in exchange for federal healthcare program referrals. *See United States ex rel. Singh v. Bradford Reg. Med. Ctr.*, 752 F. Supp. 2d 602, 640 (W.D. Pa. 2010) ("In determining whether a violation of the [AKS] occurred we focus on whether the payments made by [the hospital] were knowingly intended to induce or reward referrals from [the physicians].").

the furnishing of an item or service that could be paid for by a federal health care program." *United States ex rel. Simmons v. Meridian Surgical Partners, LLC*, No. 3:11-cv-439, 2013 WL 4098663, at *3 n.6 (M.D. Tenn. May 2, 2013) (citing *United States v. Miles*, 360 F.3d 472, 479-80 (5th Cir. 2004)). The fact "that a hospital offers a physician remuneration for his services and that the physician refers patients to that hospital do not, in and of themselves, constitute a violation of the [AKS]"; rather the "statute is aimed at the inducement factor." *Feldstein v. Nash Cmty. Health Servs., Inc.*, 51 F. Supp. 2d 673, 681 (E.D.N.C. 1999).[8] Payments can violate the AKS if "one purpose of the payment was to induce future referrals . . . even if the payments were also intended to compensate for professional services." *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) (quoting *United States v. Greber*, 760 F.2d 68, 69 (3d Cir. 1985)).

Similarly, the Stark Law prohibits physicians (and immediate family members) who have a financial relationship[9] with entities providing "designated health services" from referring Medicare patients to such entities. 42 U.S.C. § 1395nn(a). The Stark Law differs in that it affirmatively prohibits payment of Medicare or Medicaid claims arising out of prohibited physician referrals. *Id.* In addition to requiring that such payments be for "fair market value," the Stark Law also requires that they be commercially "reasonable." 42 C.F.R. § 411.357(d)(1).

The AKS and Stark Law are complicated statutes and provide for certain categorical safe harbors and exceptions from liability. Relevant here, the AKS provides a safe harbor for payments

---

[8] The AKS does not define the phrase "in return for," but courts widely agree that the "gravamen of Medicare fraud is inducement." *Jones-McNamara v. Holzer Health Sys.*, 630 Fed. App'x 394, 400 (6th Cir. 2015). The Department of Health and Human Services Office of Inspector General has explained that the term "induce," requires the necessary intent "to lead or move by influence or persuasion." *Id.* (quoting *OIG Anti–Kickback Provisions*, 56 Fed. Reg. 35952, 35938 (July 29, 1991)). Although this definition applies to the party offering the remuneration, it sheds light on its application to the recipient as well. Based on this guidance, the recipient must be "moved" to make prohibited referrals. *See Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (defining "to induce" for purposes of AKS to require "an intent to exercise influence over the reason or judgment of another in an effort to cause the referral of program-related business").

[9] A physician has a "financial relationship" if the physician has "an ownership or investment interest in the entity" or "a compensation arrangement" with an entity providing designated health services. 42 U.S.C. § 1395nn(a)(2).

made to physicians for services that are personally performed—42 C.F.R. § 1001.952(d)—and the Stark Law contains a similar "personal services" exception that shields particular financial arrangements. 42 C.F.R. § 411.357(d)(1).[10] As the Department of Health and Human Services explained, "[i]f a person participates in an arrangement that fully complies with a given [safe harbor] provision, he or she will be assured of not being prosecuted criminally or civilly for the arrangement that is the subject of that provision." *OIG Anti–Kickback Provisions*, 56 Fed. Reg. 35952, 35954 (July 29, 1991). Similarly, if an agreement falls within a Stark Law exception, a claim based on that arrangement's violation of the Stark Law "cannot proceed." *See Villafane*, 543 F. Supp. 2d at 698 (holding that defendants qualified for a Stark Law exception and granting defendants summary judgment on relator's FCA claims on that basis).

### ii. Relators Fail to Sufficiently Plead any Underlying Violations of the AKS or Stark Law

Relators broadly allege that the West Defendants violated the FCA by receiving "financial inducements, excessive compensation, and kickbacks" in exchange "for generating referrals and lucrative profits" for Methodist in contravention of the AKS and Stark Law. (SAC ¶¶ 2, 63, 89). The SAC lacks any particularity about how the West Defendants violated either statute, however.

As the SAC sets forth, Methodist contracted for The West Clinic, P.C. to provide professional and management services for Methodist's oncology service line. (*Id.* ¶¶ 60, 84, 167, 341). Physicians employed by The West Clinic, P.C. performed professional services under a Professional Services Agreement ("PSA") with compensation determined on a "per-wRVU" basis,

---

[10] Both statutes include similar conditions that must be met in order to fall within the protection, including that the arrangement be set in advance in a writing signed by both parties; the arrangement must cover all services provided under the arrangement; the aggregate services cannot exceed those reasonable and necessary for the legitimate business purpose of the arrangement; the duration of the agreement must exceed one year; the services provided must not involve promoting activities that otherwise violate federal or state law; and the compensation paid under the arrangement must be set in advance, not exceed fair market value, and not vary based on the volume or value of referrals generated between the parties. 42 C.F.R. § 1001.952(d); 42 C.F.R. § 411.357(d)(1); *see also United States v. Pfizer, Inc.*, 188 F. Supp. 3d 122, 135 (D. Mass. 2016).

14

meaning that The West Clinic, P.C. was paid a predetermined rate for each instance of personally performed professional services. (*Id.* ¶ 139 n.9). Under a separate Management Services Agreement ("MSA"), Methodist also agreed to pay The West Clinic, P.C. to co-manage Methodist's oncology service line. (*Id.* ¶ 346, 349). Relators do not take issue with the nature or structure of either of these agreements. Rather they complain that the "aggregate compensation package [under both agreements was] far in excess of fair market value." (*Id.* ¶ 63) (*see also id.* ¶ 373 (alleging that the amount paid for management services was "far higher than any legitimate fair market valuation of actual management services")). Because Relators have not mounted a facial challenge to any agreement, they must demonstrate with particularity why payments under the agreements violated the AKS or the Stark Law. In this regard, Relators fail. Most importantly, there is no citation to the specific amounts The West Clinic, P.C. was paid or what Relators contend The West Clinic, P.C. should have been paid. (*See id.* ¶¶ 141, 406-07) (referencing a conversion rate of $120 per wRVU but failing to reference the *actual* wRVU conversion rates applied for the various sub-specialties of physicians employed by The West Clinic, P.C.). A relator must allege more than conclusory allegations that the financial arrangement included payments of remuneration that was not fair market value. *See United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-cv-484, 2013 WL 146048, at *13-14 (M.D. Tenn. Jan. 14, 2013) (dismissing relator's complaint where it made "conclusory allegations about arrangements" being "far in excess of the fair market value" but failed to allege anything "about what [the physician's] duties were or why [the compensation] would exceed fair market value compensation for those duties"). The same is true for alleged underlying Stark Law violations. *See United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-cv-22253, 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012) (noting that to sufficiently plead the "fair market value" allegations in an FCA case

predicated on Stark Law violations, the relator must plead a benchmark of fair market value in "the same market"); *United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 (N.D. Ill. 2002) (dismissing relator's *qui tam* complaint under Rule 9(b) because alleged AKS violation was unsupported by particularized allegations as to *why* the transaction was commercially unreasonable). Relators fail to allege with the necessary specificity that the compensation paid to The West Clinic P.C. was in excess of fair market value or was not commercially reasonable.

> ### a. Merely Exceeding the MGMA 90th Percentile in Compensating Highly-Qualified Specialists Does Not Render the Remuneration Above Fair Market Value

Because Relators do not allege that the contracted services *were not* performed,[11] they must show that Methodist somehow overpaid for those services. *See United States ex rel. v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20, 30 (1st Cir. 1989) (noting that "remuneration" under the AKS "includes not only sums for which no actual service was performed" but also where "*a particular payment was a remuneration (which implies that a service was rendered)*").

With respect to payments made pursuant to the PSA, the only attempt Relators make are allegations that "West Clinic physicians" were paid in excess of benchmarks published by the Medical Group Management Association ("MGMA"). (*See* SAC ¶ 399 ("Most of the physicians at West Clinic were medical oncologists. The income received by West Clinic physicians from the Methodist 'alliance' greatly exceeded the MGMA national 90th percentile compensation for this specialty.")). These allegations are insufficient. First, the SAC makes clear that this solitary

---

[11] There is no dispute that The West Clinic, P.C. and Methodist together provided high-quality, integrated care to tens of thousands of cancer patients over the course of the agreements at issue in the action. Relators' only support for their contention that services were not performed was that they did not personally observe or supervise those services. (SAC ¶ 345). This is unsurprising given that neither Stern nor Liebman had direct involvement with the day-to-day management of the cancer service line. The SAC provides no additional detail to support these contentions, and any argument that either the West Defendants or Methodist failed to do exactly what they agreed to do must be dismissed out of hand.

benchmark relates only to "medical oncologists."  (*Id.*).  But as Relators acknowledge, "West Clinic had specialists in four primary areas: medical oncology, gynecological oncology, radiation oncology, and diagnostic radiology."  (*Id.* ¶ 398).  Relators offer no allegations that this MGMA benchmark has any application to these other three specialties they identify, nor do they allege what benchmark should have applied to these other specialties.

Second, merely citing to MGMA data compensation survey data is insufficient to support a claim that compensation was above fair market value.  Without particularized facts about either why the physicians employed by The West Clinic, P.C. were similarly situated to those included within the self-reported MGMA data cited by Relators, and why the particular details of these physicians' practice, reputation, and qualifications do not entitle them to compensation in excess of the 90th percentile of that data, Relators' claims lack the necessary particularity.[12]  *See Villafane,* 543 F. Supp. 2d at 691-92 (conclusions that physician compensation is "consistently above the 75th percentile and, in [one] case . . . consistently above the 90th percentile" are "merely . . . statistical observations" that are "unremarkable given the myriad of [one physician's] other duties and responsibilities" and because "every one [of the other defendant physicians] appears to be highly qualified and arguably at or near the top of his profession.").  While *Villafane* involved a decision on summary judgement, it is instructive of the type of allegations Relators must make.  The SAC cannot generally allege that the compensation arrangements at issue here were in "excess of fair market value" or were "commercially unreasonable."  It must at least allege, with

---

[12] Other inconsistencies in Relators allegations bely their lack of plausibility.  For example, Relators allege that The West Clinic, P.C. was paid "above the 90th percentile compensation levels regardless of the physicians' personal productivity."  (SAC ¶ 402).  This is inconsistent with Relators' prior allegations that acknowledge that The West Clinic, P.C. was paid pursuant to a wRVU-based compensation model that accounts for each physician's personal productivity, only increasing as the provider increases the number and complexity of personally performed services.  (*See id.* ¶ 139 n.9 ("Under this relative scale, a physician seeing two or three complex or high acuity patients per day would accumulate more wRVUs than a physician seeing lower acuity patients each day")).  Logically, compensation that takes into account the personal productivity of each physicians will vary based on their individual productivity.

specificity, how the *West Clinic, P.C.*, with its multiple specialties and specific rates of productivity was overpaid as compared to a benchmark within the Memphis market. *See Bingham v. HCA, Inc.*, 783 Fed. App'x 868, 873 (11th Cir. 2019) (defining "remuneration" to mean "something of value" or a "benefit" conferred on one party, which requires "comparing the contracted rates with fair market value"[13]); *United States v. N.Y. Soc. for the Relief of the Ruptured & Crippled, Maintaining the Hospital for Special Surgery*, No. 07-cv-292, 2014 WL 3905742, at *20 (S.D.N.Y. Aug. 7, 2014) (dismissing FCA claims based on alleged excessive physician compensation where the complaint failed to "allege with particularity that the two [physicians] were similarly situated, to a point where their salary difference could be explained only by their generation of derivative [referral] revenue").

The same is true regarding Relators' allegations concerning payments pursuant to the MSA. The SAC baldly asserts that the management fees[14] "were far higher than any legitimate fair market valuation of actual management services." (SAC ¶ 373). However, Relators fail to allege what is a correct amount to pay for the management of a large hospital-based oncology service line or even point to a specific benchmark. Instead the SAC asserts that because "Methodist paid West Clinic physicians over 25 million dollars in 'co-management' fees," and because these management fees allegedly increased as the oncology service line's revenues increased, the West Defendants were compensated above fair market value and were paid for referrals generated for Methodist. (*Id.*). These allegations are insufficient. First, they lack

---

[13] The court in *Bingham* went on to state that the issue of whether remuneration is fair market value "is not limited to [a defendant]'s safe harbor defense, . . . but is rather something Relator must address in order to show that [the defendant] offered or paid remuneration to [the physicians]." *Id.*

[14] Additionally, Relators fail to acknowledge the complete set of management services actually provided by The West Clinic, P.C. The SAC only lists approximately half of the management services provided pursuant to the MSA (SAC ¶¶ 346, 349), and fails to acknowledge the important Performance Improvement Initiative metrics under which The West Clinic, P.C. consistently provided operational and quality improvements to the Methodist oncology service line. The SAC fails to acknowledge the extensive non-clinical activities provided under the MSA.

specificity as to what *actual* amount was paid. (*See id.* ¶¶ 273, 362, 408) (alleging that The West Clinic. P.C. was paid "3-4 million per year" and not alleging *any* amounts that were paid in 2015, 2016, 2017, or 2018). Moreover, standing alone, the aggregate amount paid is meaningless without allegations that demonstrate, with specificity, why that amount was too high. Methodist's oncology service line was expansive, covering over 130 providers, and servicing more than 37,000 patients per year, but Relators offer no support to show that paying "over $25 million" to manage this service line over a seven-year period was excessive. *Osheroff*, 2012 WL 2871264, at *7 (dismissing FCA claims based on alleged AKS and Stark Law violations due to relator's failure to allege any "particular examples" of comparable payments "during the same market that can be contrasted against the alleged benchmark," since benchmarks must be contrasted against the actual amounts paid). Relators also illogically find fault in the MSA by alleging that management fees increased as the service line grew. (*See* SAC ¶ 373). These allegations ignore common sense; as any enterprise grows, the cost of managing it increases. Without more, these allegations defy logic and do not rise to the level required by Rule 9(b). *See Osheroff*, 2012 WL 2871264, at *7.

Relators also allege that Methodist's payments to the West Defendants varied based on the volume and value of referrals by the West Defendants. (*See, e.g.*, SAC ¶¶ 277, 427, 458) ("Between 2012 and . . . 2014, inpatient oncology volume at Methodist more than doubled," referrals from the West Clinic to University Hospital for radiation therapy increased from 441 patients in 2012 to 646 patients in 2015, and University Hospital "inpatient oncology admissions increased from 3,486 admissions in 2012 to 7,149 admissions in 2014."). These allegations do not provide the necessary support that the West Defendants violated the AKS or Stark Law. By entering into the arrangement with The West Clinic, P.C., Methodist added the services of numerous highly qualified medical and gynecologic oncologists, interventional and diagnostic

radiologists, radiation oncologists, advanced practice providers, genetic counselors, palliative care providers, and breast surgeons to the community. It is axiomatic that the services provided by Methodist would increase.

### iii. Relators Rely on Their Own Unsupported Opinions and Assertions of Knowledge

Apparently recognizing the dearth of specific allegations of fraud or false claims, Relators turn to their "beliefs" and as to how the Defendants acted. (*See, e.g.*, SAC ¶ 265) ("Liebman and Stern *believe* that Methodist's senior executives instructed PwC consultants not to list the amounts of drug profits paid to West Clinic physicians in writing or in their presentation as part of their strategy of concealing the actual financial numbers.") (emphasis added). Relators also alleged that Defendants possessed certain knowledge and were aware of certain facts without support. (*See, e.g.*, *id.* ¶ 142 ("CEO Shorb and CFO McLean *knew* that West Clinic's higher rate per wRVU was above the Memphis market rates for oncologists.") (emphasis added))

Allegations about a relator's "belief" are meaningless, and without more, fail to satisfy the requirements of Rule 9(b). *See Craighead v. E.F. Hutton & Co. Inc.*, 899 F.2d 485, 489 (6th Cir. 1990) (affirming dismissal of fraud claim und Rule 9(b) where plaintiff based his allegations upon "information and belief"); *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 512 (6th Cir. 2007) (*Bledsoe II*) (citing *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005) (noting that although "fraud may be pled on information and belief when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief"). Allegations based on a relator's "belief . . . must plead a particular statement of facts upon which his belief is based." *Craighead*, 899 F.2d at 489. Relators provide no "particular statement of facts" that they base their beliefs on. *Id.*; (SAC ¶ 265). This is simply not enough to withstand Rule 9(b) scrutiny.

### iv. Because Relators Fail to Sufficiently Allege any Violations of the AKS or Stark Law, They Cannot Properly Assert a Resulting Violation of the FCA

Relators fail to establish that the West Defendants' financial arrangement with Methodist, and related business practices, were improper as a matter of law. Relators references to meetings, presentations, and emails in which arrangements were discussed alone are not sufficient to allege a violation of either the AKS, the Stark Law, or the FCA. *See Dennis*, 2013 WL 146048, at *17 (dismissing relator's FCA complaint predicated on alleged violations of the AKS and Stark Law and noting that because those underlying statutes were not violated they could not "give rise to a false claim to the government"). Relators make clear that all six of their FCA claims are based on Defendants' alleged violations of the AKS and Stark Law. (*See* SAC ¶¶ 2-3, 35, 66, 97, 104, 106, 117, 496, 533, 542, 548-49, 556). A failure to sufficiently allege a violation of these two underlying statutes is fatal to all six claims.

### c. The SAC Fails to Identify a Single Claim with the Required Specificity that Was Presented to the Government

To sustain a cause of action under the FCA, the SAC "must identify the *specific claims* that were submitted to the [Government]." *Marlar,* 525 F.3d at 445 ("[A]lleging that the defendants must have submitted fraudulent claims to the government does not satisfy a plaintiff's duty to plead with particularity under Rule 9(b).") (internal quotations omitted) (emphasis added). Courts have loosened this requirement where relators allege large and complex fraud schemes; but even then a complaint must identify at least one representative "exemplar" claim. *See United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905 (6th Cir. 2017) (affirming dismissal of FCA *qui tam* complaint where relators failed to identify a single, exemplar false claim with specificity); *Chesbrough*, 655 F.3d at 470 (noting the strict requirement for relators who allege a "complex and

far-reaching fraudulent scheme" to "also identify a representative false claim that was actually submitted to the government"). The SAC fails to meet this burden.

Instead, the SAC contains precisely the type of allegations the Sixth Circuit has held are insufficient—generalized, non-specific allegations that Defendants collectively have submitted "thousands of false claims" without specifically identifying a single one. (SAC ¶¶ 45, 478). This lack of specificity is even more problematic since Relators claim these "thousands of claims" were "both for specific services provided to beneficiaries of federal healthcare programs and claims for general and administrative costs incurred in treating such beneficiaries." (*Id.* ¶ 478). Without at least a general identification of the claims Relators allege are at issue there is no "notice" to the West Defendants about their specific alleged conduct. *See United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 197 (4th Cir. 2018) ("Rule 9(b)'s purposes of providing defendants notice of their alleged misconduct, preventing frivolous suits, and eliminating fraud actions in which all the facts are learned after discovery apply with special force to FCA claims and the accompanying presentment requirement."). Even if the SAC sets forth "a complex and far-reaching fraudulent scheme with particularity" it still must "provide[] examples of specific false claims submitted to the government pursuant to that scheme." *Bledsoe II,* 501 F.3d 493, 512.

The only allegations that reference a specifically identified document are those that point to a one-page spreadsheet that purports to show a list of Medicare Cost Reports filed by the Methodist Defendants, attached as Exhibit A to the SAC. (SAC ¶ 108, Ex. A). As Relators' own allegations make clear, however, Exhibit A *does not* constitute a list of claims and *was not* submitted by the West Defendants. (*Id.* ¶ 109 ("Exhibit A [to the SAC] is a summary of the *electronic record numbers submitted by Methodist* in which *it* falsely certified compliance with the AKS and Stark Laws.")). Even more egregious, there is no allegation that there is any

connection between this "summary of electronic record numbers submitted by Methodist" and any action undertaken, or record or statement created by, any of the West Defendants. (*See id.* ¶¶ 101-10). Thus, any attempt by Relators to rely on Exhibit A as an "exemplar" of the false claims they contend were submitted is a tacit admission that the SAC lacks allegations sufficient to identify a single false claim submitted by the West Defendants. As a result, Relators' claims pursuant to 31 U.S.C. § 3729(a)(1)(A) must be dismissed.

### d. Counts II and IV Must Be Dismissed Because Relators Fail to Identify a False Record or Statement with the Required Particularity

Section 3729(a)(1)(B) imposes liability on any person or entity who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Just like a claim under subsection (a)(1)(A), a claim for relief under § 3729(a)(1)(B) "must provide sufficient detail regarding the time, place and content of the defendant's allege[d] false statements and the claim for payment." *Dennis*, 2013 WL 146048, at *17 (dismissing a claim under § 3729(a)(1)(B) where relator made nothing more than "bare-bones allegations about the alleged submission of false claims, devoid of any particularized facts"); *United States ex rel. Woods v. N. Ark. Reg. Med. Ctr.*, No. 03-cv-3086, 2006 WL 2583662, at *3-4 (W.D. Ark. Sept. 7, 2006) (dismissing with prejudice relator's § 3729(a)(1)(B) claims where the relator failed to provide details about "who was involved in submitting the fraudulent claims and cost reports[,] what the content was of the fraudulent claims and cost reports[,] what monies were fraudulently obtained as a result of the alleged illegal arrangement[,] or how plaintiff learned of the alleged fraudulent claims and their submission for payment").

As with Count I, Counts II and IV fail because the SAC does not identify in any way—much less with the required specificity—any alleged false record or material statement made by

any of the West Defendants that was material to a false or fraudulent claim.  (*See* SAC ¶¶ 111-13).  As such, Relators' claims under § 3729(a)(1)(B) must be dismissed.

### e. Relators Fail to Sufficiently State a Claim for Reverse False Claims Under § 3729(a)(1)(G), and Counts V and VI Must Be Dismissed

While subsections (a)(1)(A) and (a)(1)(B) of the FCA protect payments made *by* the Government, the so called "reverse false claims provision" in subsection (a)(1)(G) imposes liability on a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an *obligation to pay or transmit money or property to the Government*, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property *to* the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).  In the SAC, Relators make conclusory allegations that all "Defendants have knowingly caused[15] and retained overpayments from federal and state health care programs (SAC ¶ 556, Count V) and that "Defendants knowingly made and used, or caused to be made or used, false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and State of Tennessee."  (*Id.* ¶ 560, Count VI).  Relators do not specifically identify a single "obligation to pay or transmit money or property *to the Government*," however.  *See* 31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Relators also fail to offer any specific allegations about the West Defendants' retention of overpayments.   Instead they merely repeat the statutory

---

[15] A claim for knowingly "*causing*" an overpayment from the Government must be brought under subsections (a)(1)(A) or (a)(1)(B), not the reverse false claim provision in (a)(1)(G).  To the extent that Counts V and VI are based on the Defendants' failure to return alleged overpayments to the Government resulting from the underlying alleged AKS and/or Stark Law violations, these claims are redundant and duplicative of Counts I, II, and IV under subsections (a)(1)(A) and (a)(1)(B), and they fail for the same reason.  *See Chesbrough*, 655 F.3d at 473 ("[Relators] have not identified in their complaint any concrete obligation owed to the government by [the defendant] at the time an allegedly false statement was made.  Rather, they merely allege that [the defendant] is obligated to repay all payments it received from the government.  Their allegations involving [§ 3729(a)(1)(G)] accordingly fail."); *United States ex rel. Ligai v. ETS-Lindgren Inc.*, No. CIV. A. H-112973, 2014 WL 4649885, at *13 (S.D. Tex. Sept. 16, 2014) ("[Relator's] reverse-false claim alleges a failure to refund the false claims the government paid. In such a case, courts have held that the plaintiff 'is merely recasting his false statement claim under [the FCA conspiracy cause of action].  This type of redundant false claim is not actionable under subsection [(a)(1)(G) ].'").

24

language of § 3729(a)(1)(G), and then make conclusory allegations that *all Defendants* caused and retained overpayments and made or used false records to conceal obligations to pay. (SAC ¶ 556). These general allegations as to all Defendants are insufficient.

Under Rule 9(b), in order to state a claim for a violation of the reverse false claim provision in § 3729(a)(1)(G), a relator must plead the "who, what, when, where, and how" of defendants' making or use of a false record or statement material to a payment obligation and how defendants concealed their obligation to return any overpayment. *See Chesbrough*, 655 F.3d at 473 (affirming dismissal of reverse false claims allegations where relators failed to identify "any concrete obligation owed to the government . . . at the time an allegedly false statement was made"). The general recitation of statutory and regulatory language does not offer the required "factual basis for this claim, which requires at least an allegation that the defendant owed the government a debt at the time of the alleged false statement." *United States ex rel. Winkler v. BAE Sys., Inc.*, 957 F. Supp. 2d 856, 876-77 (E.D. Mich. 2013); *see also United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, 255 F. Supp. 3d 13, 31-32 (D.D.C. 2017) (dismissing reverse false claims count because the complaint failed to "plead any monetary obligation owed by [the defendant] to the government independent of its 'concealment of [its] allegedly fraudulent activity'"). Even if Relators could identify an allegedly false claim with the required specificity, they must also provide specific allegations about a known obligation to the Government in order to make out a claim pursuant to subsection (a)(1)(G). *See United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514-15 (E.D. Pa. 2010) (holding that "merely recasting [a] false statement claim" as a reverse false claim, results in a "redundant false statement claim" and warrants dismissal). Relators cannot recast their insufficient false statement claim as a reverse false claim. For these reasons, Count V and VI must be dismissed.

### f. Relators Fail to State a Conspiracy Claim Under § 3729(a)(1)(C), and Count III Must Be Dismissed

To state an FCA conspiracy claim, a relator must plead facts *with particularity* "showing that there was a plan or agreement '*to commit a violation of*' one or more of the FCA subsections." *Ibanez*, 874 F.3d at 917 (emphasis added) (quoting 31 U.S.C. § 3729(a)(1)(C)) (affirming dismissal of FCA conspiracy claim and noting that "it is not enough for relators to show there was an agreement that made it *likely* there would be a violation of the FCA; they must show an agreement was made *in order* to violate the FCA"). Because "a corporation cannot conspire with its own agents or employees," as to The West Clinic PLLC and West Partners LLC, Relators must also allege with particularity that "(1) [they] knowingly conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, and (2) that one or more of the conspirators performed any act to effect the object of the conspiracy." *UT Med. Grp.,* 2010 WL 11493930, at *13 (barring Government's FCA conspiracy claim under the intra-corporate conspiracy doctrine). To meet their burden under Rules 8 and 9(b), relators must specifically allege, with particularity, *who* within the defendants entered into the conspiracy, *when* he or she did so, and *what* they sought to gain. *See United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 282 (4th Cir. 2014) (holding that relator failed to establish an FCA conspiracy claim under Rule 8 and Rule 9(b) where the complaint did not identify *who* within the corporate defendant entered into the conspiracy, *when* they did so, or *what* they sought to gain from the conspiracy).

Without "supporting facts to show when, where or how the alleged conspiracy occurred" allegations of a conspiracy "amount to only a legal conclusion and are insufficient to state a cause of action." *See Dennis*, 2013 WL 146048, at *17-18. The SAC must "identify specific parties, contracts, or fraudulent acts," and cannot generally "rely upon blanket references to acts or omissions by *all* of the 'defendants.'" *Bledsoe I*, 342 F.3d at 643. Despite 131 pages of allegations,

Relators do not identify who from The West Clinic, P.C. allegedly conspired or how they conspired. (*See, e.g.*, SAC ¶ 163 ("In return, *West Clinic physicians* agreed to an arrangement of exclusively referring their patients to West Cancer Center and the Methodist hospital system instead of Baptist Healthcare where West Clinic physicians had historically sent referrals.") (emphasis added)). These blanket references to "Defendants" and "West Clinic physicians" which appear throughout the SAC, do not meet the requirements of Rules 8 or 9(b), and should result in dismissal. *See Bledsoe I*, 342 F.3d at 643 (holding that where a complaint "did not specify" the defendants involved but made allegations against "all of the 'defendants'" "the allegations in Relator's amended complaint have failed to comply with Rule 9(b)" because "each defendant named in the complaint is entitled to be appraised of the circumstances surrounding the fraudulent conduct with which he individually stands charged"). To survive a Rule 9(b) motion to dismiss, a relator must sufficiently allege who was involved in the allege conspiracy and who "performed any act to effect the object of the conspiracy." *UT Med. Grp.*, 2010 WL 11493930, at *13.

In addition, because the SAC fails to sufficiently allege claims under subsections (a)(1)(A), (a)(1)(B), and (a)(1)(G) with the required specificity, the conspiracy claim under subsection (a)(1)(C) must also be dismissed. *See Winkler*, 957 F. Supp. 2d at 876 (dismissing FCA conspiracy claim where the relator "fail[ed] to sufficiently plead a violation of § 3729(a)(1)(A) or (B)[, which] necessitates a finding of a failure to plead a conspiracy to violate those sections under § 3729(a)(1)(C)"); *United States ex rel. Holbrook v. Brink's Co.*, 336 F. Supp. 3d 860, 873-74 (S.D. Ohio 2018) (quoting *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014) ("[T]here can be no liability for conspiracy where there is no underlying violation of the FCA.")). As set forth above, Relators fail to specifically identify an allegedly false claim submitted or caused to be submitted by the West Defendants (§ 3729(a)(1)(A)), any false statements or records created

or used by the West Defendants (§ 3729(a)(1)(B)), or any specific obligations that the West Defendants owed the Government (§ 3729(a)(1)(G)).  Therefore, as a matter of law, Relators' conspiracy claim must also fail, and Count III must be dismissed.

### g.  Relators Fail to Allege that the West Defendants Made any Certifications, Express or Implied, and Count IV Must Be Dismissed

Relators' false certification claims under § 3729(a)(1)(B) are similarly deficient.  In order to satisfy Rule 9(b), Relators must identify the specific certifications where the West Defendants falsely certified compliance with the AKS and Stark Law, and that payments from the Government were conditioned on those certifications.  *See United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 Fed. App'x 890, 894 (5th Cir. 2013) (affirming dismissal of FCA complaint based on an alleged AKS violation where the relator failed to allege with particularity an actual certification to the Government made by the defendant); *United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*, No. 2:14-cv-02426, 2015 WL 13174966, at *2 (W.D. Tenn. June 2, 2015) (holding that plaintiff did not satisfy Rule 9(b) where "Plaintiff's Amended Complaint [was] completely void of any specific false claim or false certification of compliance presented to the government").

Here, Relators fail to identify *any* specific false certifications made by any of the West Defendants.  (*See* SAC ¶ 97 ("Each Defendant has executed at least one provider agreement with CMS . . ."); ¶ 113 ("For claims arising from Fiscal Years 2012 through 2018, the Defendants orchestrated the submission of thousands of CMS-1500 forms [where the] West Clinic physicians certified that they were eligible for participation in Medicare and that they complied with all applicable regulations and laws governing Medicare, including Stark laws and the AKS.")).  These

generalized allegations as to "Defendants" and "West Clinic physicians"[16] are insufficient. *Smoky Mt. Freightliner, LLC v. DaimlerChrysler Vans, LLC*, No. 2:05-CV-173, 2006 WL 8442968, at *4 (E.D. Tenn. Mar. 7, 2006) (holding that complaint failed to meet the Rule 9(b) standard where "Plaintiffs merely refer collectively to the 'defendants'"); *United States ex rel. Kreipke v. Wayne State Univ.*, No. 12-14836, 2014 WL 6085704, at *4 (E.D. Mich. Nov. 13, 2014) (holding that amended complaint failed to meet the Rule 9(b) standard because "[t]hroughout the Amended Complaint, Plaintiff alleges very generally that the 'Defendants' engaged in fraudulent activity").

The SAC does not specifically identify any single defendant (or even a physician employed by The West Clinic, P.C.) who allegedly made these certifications, when the certifications were allegedly made, or in the case of the CMS-1500 forms, what the certification allegedly was. Generalized allegations do not meet the heightened standard of Rule 9(b) and Relators' FCA claim in Count IV must be dismissed as to the West Defendants.

## III.  BOTH THE WEST CLINIC, PLLC AND WEST PARTNERS, LLC MUST BE DISMISSED PURSUANT TO BOTH RULE 12(b)(6) AND 9(b)

In addition to the other arguments set forth above, defendants The West Clinic, PLLC and West Partners, LLC must be dismissed pursuant to both Fed. R. Civ. P. 12(b)(6)[17] and 9(b) because

---

[16] There are only three physicians employed by The West Clinic, P.C. that are identified by name in the SAC.  In FY 2017 there were 94 physicians and 37 advanced practice providers who provided services at the West Cancer Center.  There is simply no way for the West Defendants to know who Relators allege these unidentified "physicians" are, and leaves the West Defendants unable to know "the particulars of their alleged misconduct." *Chesbrough*, 655 F.3d at 472.  Relators also cannot point to their pleading of multiple "John Doe" defendants to plug this, or any other hole, that may exist in the SAC. *See Silverstein v. Percudani*, 422 F. Supp. 2d 468, 473 n.3 (M.D. Pa. 2006) ("Plaintiffs have advanced no allegations against the John Doe defendants.  They have not identified what actions the John Doe defendants took, or even their role in the scheme.  Such a use of fictitious party pleading runs afoul of Rule 9(b), and we will dismiss these entities.").

[17] As this Court is well aware, Rule 12(b)(6) requires a plaintiff ore relator to allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Though the Court must accept all well-pleaded factual allegations in the complaint as true, it need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation omitted).  Facially plausible complaints "require more than labels and conclusions . . . .  Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

29

Relators have failed to make *any* factual allegations regarding either entity.  Where a plaintiff (or

relator) fails to name a defendant "in the fact section of his complaint" and "fails to establish a

causal connection between his injuries and any actions taken by the named defendants, or to allege

'factual content that allows the court to draw the reasonable inference that the defendant[s] [are]

liable for the misconduct alleged,' then any claims against that named defendant should be

dismissed."  *Pruitt v. McConnell*, No. 3:13-cv-1003, 2013 WL 5493490, at *4 (M.D. Tenn. Oct.

2, 2013) (quoting both *Iqbal*, 556 U.S. at 678 and *Twombly*, 550 U.S. at 556); s*ee also Olivier v.*

*Williams*, No 3:17-cv-32, 2017 WL 5653888, at *2 (M.D. Tenn. Jan. 26, 2017) ("Where a

defendant is named but the plaintiff fails to allege that the defendant engaged in any specific

conduct, the complaint is subject to dismissal.").

For a FCA complaint to survive a motion to dismiss, the relator must "connect the alleged

wrongful conduct to the named defendants."  *United States ex rel. Mooney v. Americare, Inc.*, No.

06-cv-1806, 2013 WL 1346022, at *4 (E.D.N.Y. Apr. 3, 2013).  Beyond listing them as named

defendants in the "Parties" section, the SAC has no allegations that connect either The West Clinic,

PLLC or West Partners, LLC to any alleged misconduct and both should be dismissed.

### a.   The SAC Fails to Connect The West Clinic, PLLC to any of the Underlying Actions Complained of in the SAC

The SAC specifically references the "The West Clinic, PLLC" in three places: (1) the

caption, (2) the first paragraph naming the parties, and (3) paragraph 29 specifically identifying

"The West Clinic, PLLC d/b/a West Cancer Center" as an "independent for-profit private practice

group of medical oncologists, gynecological oncologists, radiologists, and other physician

specialists based in Memphis, Tennessee."  (SAC ¶¶ 1, 29).  Paragraph 29 does not set forth a

defined term or shorthand for "The West Clinic, PLLC" other than the "d/b/a West Cancer Center."

(*Id.* at ¶ 29).  The second sentence of paragraph 29 then states that "During the 7-year term of the

'partnership' with Methodist, most *West Clinic* physicians were medical oncologists" but alleges no connection between "The West Clinic, PLLC" and "West Clinic," or otherwise attempts to define the "West Clinic." (*Id*.) (emphasis added). Paragraphs 30-32 then describe how Methodist and the undefined "West Clinic": renamed certain locations "West Cancer Center" (*Id*. ¶ 30); "described [the] relationship" as "West Cancer Center" (*Id*. ¶ 31); and operated "under the assumed names of (1) *West Cancer Center and Research Institute*, (2) West Surgery Center, and (3) West Cancer Center Co.," all of which are undefined or described. (*Id*. ¶ 32) (emphasis added). Adding to the confusion, the SAC earlier defines the term "West Clinic Defendants" as "independent physicians" who received "financial inducements, excessive compensation, and kickbacks" from the Methodist Defendants, but fails to name any of these "independent physicians," or connect them with The West Clinic, PLLC.[18] (SAC ¶ 2).

The SAC goes on to lodge the majority of its allegations against the undefined "West Clinic." (*See, e.g., id.* ¶ 171) ("Instead of accepting the fair market valuation, Methodist's senior executives schemed of ways to exceed the valuation number and add $500,000 more cash 'expected' by *West Clinic physicians* and disguised as 'billing' services.") (emphasis added).[19] Relators also allege that the two operative agreements at issue in the SAC were between Methodist and the "West Clinic." (*See, e.g.*, *id.* ¶ 172) ("In negotiating and finalizing these *agreements*, *West Clinic physicians* did not become employees of the Methodist system.") (emphasis added). The SAC further muddies the water by also alleging that as part of the transaction, the "West Clinic, *P.C.*" entered into an "Affiliation Agreement" with UT and Methodist, which was alleged to have

---

[18] This definition of "West Clinic Defendants" would also exclude any non-physicians such as Defendant Mounce, as well as any corporate entities that are also not "independent physicians" such as The West Clinic, PLLC and West Partners, LLC.

[19] The term "West Clinic" is mentioned over 585 times in the SAC and approximately 288 of those references are to the undefined and unidentified "West Clinic physicians." Conversely, "West Cancer Center" is mentioned 57 times, "The West Clinic PLLC" is mentioned three times, and the "West Clinic Defendants" is used once, when it is defined, and then never again.

been signed by "Dr. Lee Schwartzberg, senior partner and Medical Director of West Clinic." (*Id.* ¶ 178). This allegation relating to West Clinic P.C. demonstrates the deficiency of the SAC's allegations.

First, despite alleging that this agreement between The West Clinic, P.C. and UT was signed by the "senior partner and Medical Director of West Clinic," the SAC does not explain whether the West Clinic, P.C. is the same as "The West Clinic, PLLC" or the "West Clinic." Second, Relators are (or should be) well aware that all of the agreements at issue, including the "Affiliation Agreement" specifically identified in paragraph 178 were between Methodist, The West Clinic P.C., and UT; ***not*** The West Clinic, PLLC. Indeed, the SAC does not specifically allege that "The West Clinic, PLLC" executed any agreement with any of the other defendants. It should be a simple task for Relators to connect The West Clinic, PLLC with the allegations in the SAC, and this deficiency highlights the slipshod nature of the SAC's allegations. The lack of a specific causal link between the undefined term "West Clinic," the defined term "West Clinic Defendants," and legal entity names "The West Clinic, PLLC" or "The West Clinic, P.C." is particularly surprising given that the complaint in this action has been amended twice and Relators have had over two years to investigate their claims. Whatever the provenance, it does not comply with either Rule 8 or Rule 9(b), and The West Clinic, PLLC should be dismissed.

### b. The SAC Contains No Allegations as to West Partners, LLC

Despite being named as a defendant, West Partners, LLC is referenced only three places in the SAC: (1) the case caption; (2) paragraph 1 setting forth all named defendants; and (3) paragraph 34 in the "Parties" section, where Relators allege that West Partners LLC "is an affiliated and related entity to the *West Clinic* formed and controlled by the *West Clinic physicians* for the purposes of operating and conducting West Clinic business." (*Id.* at ¶ 34) (emphasis added). As

identified, West Partners, LLC is a legally distinct corporate entity from The West Clinic, PLLC, The West Clinic, P.C., and the undefined term the "West Clinic." (*Id*.). Paragraph 34 does not provide a defined or shorthand term for "West Partners, LLC." (*Id*.). Paragraph 34 is the first, and last, time the SAC offers any allegations concerning West Partners, LLC, and every following allegation is devoid of any further reference to this entity. There are no allegations about how West Partners, LLC participated or was involved in the alleged scheme, who controlled it, what agreements it made, what claims it submitted or caused to be submitted, what certifications it may have made, or what records or statements, if any, it allegedly created. Relators do not (and cannot) provide any factual allegations to support a claim that West Partners, LLC was involved in the allegations set forth in the SAC, or that it was involved in any way in the presentment of any allegedly false claims to the government. In the absence of specific allegations required by Rule 9(b), much less any allegations at all as to West Partners LLC, it must be dismissed. *See Jenkins v. Metro Bd. of Educ.*, No. 3:12-cv-62, 2012 WL 874718, at *3 (M.D. Tenn. Mar. 14, 2012) (quoting *Iqbal*, 556 U.S. 662, 677-78 (2009)) (granting defendant's motion to dismiss where, under the Rule 8 standard, the plaintiff failed "to allege any specific facts regarding the named individuals," and where the "pleadings lack 'factual content that allows the court to draw the reasonable inference that the [individual defendants are] liable for the misconduct alleged"); *Wood ex rel. United States v. Applied Research Assocs., Inc.*, 328 Fed. App'x 744, 749 (2d Cir. 2009) (affirming dismissal of relator's claims with prejudice under Rule 9(b) due to relator's failure to allege "specific allegations as to a given defendant's involvement" in the underlying alleged fraud).

<u>**CONCLUSION**</u>

As set forth above, the SAC improperly attempts to add a barred relator, fails to satisfy Rule 9(b)'s heightened pleading standard, including failing to identify a single false claim that the West Defendants allegedly submitted, and fails to connect any of the conduct alleged to either The West Clinic, PLLC or West Partners, LLC. For these reasons the SAC should be dismissed. Given the multiple amendments in this case and time and documentation that Relators have had to investigate their claims, further amendment would be futile, and any dismissal should be with prejudice.

Respectfully submitted,

<u>/s/ John-David Thomas</u>
John-David Thomas, TN BPR # 027582
Andrew F. Solinger, TN BPR # 036943
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
jd.thomas@wallerlaw.com
andrew.solinger@wallerlaw.com

*Attorneys for Defendants The West Clinic, PLLC, West Partners, LLC, Lee Schwartzberg, M.D., and Erich Mounce*

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2020, I electronically filed with the Clerk of the Court using the CM/ECF system and served the above via the CM/ECF system, or by U.S. mail, where applicable, upon:

Jerry E. Martin
David Rivera
Seth Hyatt
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219

Bryan A. Vroon
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road
Suite 2270
Atlanta, GA 30327

Edward D. Robertson, Jr.
Bartimus Frickleton Robertson & Rader, P.C.
109b East High Street
Jefferson City, MO 65101

*Attorneys for Relators*

Kara F. Sweet
U.S. Attorney's Office for the Middle District of Tennessee
110 Ninth Avenue South
Suite A961
Nashville, TN 37203

*Attorney for the United States*

Scott M. Corley
Office of the Attorney General of Tennessee
PO Box 20207
Nashville, TN 37202

*Attorney for the State of Tennessee*

35

Brian D. Roark
J. Taylor Chenery
Bass, Berry & Sims
150 Third Avenue South
Suite 2800
Nashville, TN 37201

*Attorneys for Defendants Methodist Le Bonheur Healthcare, Methodist Healthcare-Memphis Hospitals, Chris McLean, and Gary Shorb*

/s/ John-David Thomas