# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and the STATE OF TENNESSEE ex rel. JEFFREY H. LIEBMAN and DAVID M. STERN, M.D.** | ) ) ) | |
| | ) | |
| **Relators,** | ) | **Case No. 3:17-CV-00902** |
| | ) | |
| **v.** | ) ) | **District Judge William L. Campbell, Jr.** |
| | ) | |
| **METHODIST LE BONHEUR HEALTHCARE, METHODIST HEALTHCARE-MEMPHIS HOSPITALS, CHRIS MCLEAN, AND GARY SHORB,** | ) ) ) ) ) | **Magistrate Judge Barbara D. Holmes** |
| | ) | |
| **Defendants.** | ) ) | |

## THIRD AMENDED COMPLAINT UNDER THE FEDERAL AND TENNESSEE MEDICAID FALSE CLAIMS ACTS

PARTIES...........................................................................................................................9

JURISDICTION AND VENUE..........................................................................................14

APPLICABLE LAWS..........................................................................................................16

    INTRODUCTION TO FEDERAL ANTI-KICKBACK STATUTE.............................................................16
    INTRODUCTION TO FEDERAL STARK LAWS................................................................................22
    COMPLIANCE WITH AKS AND STARK IS CONDITION OF EACH FEDERAL AND STATE PAYMENT ......26
    COMPLIANCE WITH AKS AND STARK LAWS IS CONDITION OF EACH MEDICARE PAYMENT .............27
    COMPLIANCE WITH AKS AND STARK IS CONDITION OF EACH MEDICAID PAYMENT.......................30
    COMPLIANCE WITH AKS AND STARK IS CONDITION OF EACH TRICARE PAYMENT ........................33

METHODIST'S KICKBACKS TO WEST PHYSICIANS ..............................................35

    FROM THE BEGINNING METHODIST INTENDED TO BUY WEST'S REFERRALS..................................35
    WEST DRAMATICALLY INCREASED METHODIST'S DRUG PROFITS FROM THE 340B PROGRAM AND
    METHODIST CHANNELED A PORTION OF THOSE PROFITS TO WEST THROUGH DISGUISED PAYMENTS UNDER
    THE PROFESSIONAL SERVICES AGREEMENT ...............................................................................43
    METHODIST'S DISGUISED FINANCIAL PAYMENTS UNDER THE PSA WHICH REWARDED WEST PHYSICIANS
    FOR THEIR REFERRALS ..............................................................................................................59
    METHODIST PAID $13-16 MILLION TO WEST PHYSICIANS FOR INPATIENT MANAGEMENT SERVICES NOT
    PERFORMED .............................................................................................................................67
    METHODIST OVERPAID FOR WEST'S RESEARCH ENTITY AS A COST OF INDUCING THEIR REFERRALS...........85
    WEST CLINIC PHYSICIANS RECEIVED INCOMES FAR IN EXCESS OF THE NATIONAL 90TH PERCENTILES FOR
    THEIR SPECIALTIES ...................................................................................................................90
    METHODIST COVERED ALL OVERHEAD AND PRACTICE EXPENSES FOR WEST CLINIC PHYSICIANS...............93
    DEFENDANT'S CONTINUOUSLY MONITORED THE VALUE AND VOLUME OF REFERRALS FROM WEST CLINIC
    PHYSICIANS .............................................................................................................................96
    METHODIST'S SCHEME TARGETED AND DAMAGED FEDERAL AND STATE HEALTHCARE PROGRAMS ..........101
    THE ARRANGEMENT WAS DETRIMENTAL TO PATIENT CARE.....................................................107

FINANCIAL DAMAGES TO THE MEDICARE AND MEDICAID PROGRAMS .......109

    STARK LAWS REQUIRE FULL REFUND OF MEDICARE AND MEDICAID PAYMENTS ARISING FROM REFERRALS
    BY WEST CLINIC PHYSICIANS FOR DESIGNATED HEALTH SERVICES ..............................................109
    THE AKS REQUIRES REFUND OF CLAIMS ARISING FROM REFERRALS AFTER KICKBACKS PAID .................110
    WEST CLINIC'S REFERRALS OF MEDICARE AND MEDICAID INPATIENTS TO METHODIST HOSPITALS...........111
    WEST CLINIC'S REFERRALS OF OUTPATIENTS COVERED BY MEDICARE OR MEDICAID PROGRAMS .............112
    SUMMARY OF DAMAGES TO THE MEDICARE AND MEDICAID PROGRAMS ......................................121

LEGAL REMEDIES FOR DEFENDANTS' FALSE CLAIMS.......................................121

    THE FEDERAL FALSE CLAIMS ACT .........................................................................................121
    THE TENNESSEE MEDICAID FALSE CLAIMS ACT .....................................................................123

COUNT I---PRESENTING FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(A) (1)(A) AND TENN.
CODE § 71-5-82(A)(1)(A) AGAINST ALL DEFENDANTS ..................................................124

COUNT II--- USE OF FALSE STATEMENTS IN VIOLATION OF 31 U.S.C. 3729(A)(1)(B) AND TENN.
CODE ANN. § 71-5-182(A)(1)(B) AGAINST ALL DEFENDANTS.....................................125

COUNT III--- CONSPIRING TO SUBMIT FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(A)(1)(C)
AND TENN. CODE ANN. § 71-5-182(A)(1)(C) AGAINST ALL DEFENDANTS .........................126

COUNT IV---SUBMISSION OF EXPRESS AND IMPLIED FALSE CERTIFICATIONS IN VIOLATION
OF 31 U.S.C. § 3729(A)(1)(B) AND TENN. CODE ANN. § 71-5-182(A)(1)(B) AGAINST ALL
DEFENDANTS............................................................................................................................128

COUNT V---KNOWINGLY CAUSING AND RETAINING OVERPAYMENTS IN VIOLATION OF 31
U.S.C. § 3729(A)(1)(G) AND TENN. CODE ANN. § 71-5-182(A)(1)(D) AGAINST ALL DEFENDANTS.....129

1

**COUNT VI--- FALSE RECORD TO AVOID AN OBLIGATION TO REFUND AGAINST ALL DEFENDANTS** .................................................................................................................................**130**

**PRAYERS FOR RELIEF** .................................................................................................................................**130**

1.      Under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, ("FCA"), and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182 *et seq.*, Relators Jeffrey H. Liebman ("Liebman") and David M. Stern, M.D.("Stern") state the Third Amended Complaint against Defendants Methodist Le Bonheur Healthcare, Methodist Healthcare-Memphis Hospitals, Chris McLean, and Gary Shorb (collectively "Methodist") as follows.

2.      This *qui tam* case is brought against Methodist for knowingly defrauding federal and state healthcare programs. As discussed in detail below, from 2012 through 2018, Methodist paid financial inducements, excessive compensation, and kickbacks to independent physicians (the West Clinic ("West") ) for generating referrals and lucrative profits to the hospital system.

3.      In January of 2021, Co-Relators Liebman and Stern executed a settlement agreement with former Defendants The West Clinic, PLLC (a/k/a The West Clinic, LLC), West Partners, LLC, Lee Schwartzberg, M.D., and Erich Mounce (the "West entities").  As part of the settlement terms, the West entities committed to cooperate with Co-Relators in disclosing complete and accurate information, documents, and facts. The West entities also agreed to interviews by Relators' counsel regarding such facts, documents, and information.

4.      As previously pled in the Second Amended Complaint, Methodist structured a financial deal with West physicians based on the value of their referrals to the Methodist system, including referrals for chemotherapy and oral cancer drugs and the resulting lucrative profit margins under the 340B Drug Discount Program. This Third Amended Complaint explains and elaborates on the disguised mechanisms and economics of Methodist making such payments to West physicians. In interviews as part of the Settlement Agreement's terms of cooperation in disclosing information,

facts, and documents, West's senior leadership has explained and confirmed significant facts related to such mechanisms and economics addressed below. As discussed further below, over the 7-year "partnership," Methodist used a Professional Services Agreement to channel over $125 million dollars to West physicians in excess of their professional collections.[1] As addressed below, these payments exceeded fair market value, were not commercially reasonable, violated the conditions of Methodist's own valuation opinion obtained prior to the "partnership," and took into account the value of West's referrals to the Methodist system, including chemotherapy drug referrals with lucrative profit margins under the 340B Drug Discount Program.

5.     As previously pled in the Second Amended Complaint, Methodist's aggregate payments to West physicians took into account the value of their referrals.  Both the Anti-Kickback Statute ("AKS") and Stark laws focus on aggregate payments to referring physicians under personal services arrangements. Both the AKS and Stark laws require that aggregate payments to physicians must not take into account the value of their referrals. The Third Amended Complaint explains and elaborates on the disguised mechanisms and economics of Methodist making excessive aggregate payments to West physicians which took into account the value of their referrals.

6.     As previously pled in the Second Amended Complaint, between 2012-2018, Methodist paid excessive management fees to West for outpatient and inpatient management services within Methodist's entire oncology service line.  Methodist's management fees paid to West totaled approximately $27 million over the 7-year "partnership."  Approximately $13-16 million of such management fees paid by Methodist to West were based on extensive contractual terms requiring

_____
[1] The term "professional collections" is a physician productivity metric that is commonly used in the healthcare industry. It measures the collections received for the professional component of services personally provided by a physician.

West physicians to perform specific inpatient management services at Methodist hospitals, including Methodist's four acute care hospitals. As previously pled in the Second Amended Complaint, based on Co-Relator Jeff Liebman's knowledge and responsibilities serving as CEO of Methodist's largest hospital, West physicians did not perform inpatient management services at Methodist hospitals. In interviews as part of the Settlement Agreement's terms of cooperation in disclosing information, facts, and documents, West's senior physician leadership has confirmed that West did not perform inpatient management services at Methodist hospitals over the 7-year term of the partnership. Nevertheless, between 2012-2018, Methodist paid West approximately $13-16 million dollars in base management fees to West for inpatient management services at Methodist hospitals.

7.     As discussed further below, Methodist's payments and financial strategies to generate revenues deliberately violated the federal AKS and Stark laws as discussed below. Methodist's violations of federal laws are not minor, technical or insubstantial. Methodist's financial arrangements at issue violated the AKS's and Stark's core prohibitions. Compliance with the AKS and Stark laws is a material condition of every payment received by Methodist from federal healthcare programs. As a matter of law, claims submitted to federal healthcare programs that include items or services resulting from violations of the AKS "constitute…false or fraudulent claim[s] for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

8.     The AKS prohibits a healthcare provider from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

9. The Stark laws prohibit the United States from paying for designated health services ("DHS") prescribed by physicians who have improper financial relationships with the DHS provider. In addition to prohibiting the hospital from submitting claims under these circumstances, the Stark laws also prohibit payments by federal health care programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[2]

10. In the years prior to the "partnership" beginning in 2012, oncology practices in the United States faced declining reimbursement levels, including declining drug profit margins. In 2011, West physicians were aware that many oncology practices in the United States had faced reductions in income of approximately 30 percent during this time frame.

11. In contrast to tighter drug profit margins for independent physician practices, hospitals with eligibility under the 340B Drug Discount Program[3] could acquire drugs at deep discounts,

---

[2] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

[3] The 340B Program requires drug manufacturers that participate in the Medicaid drug rebate program to extend discounts on drugs administered in the outpatient setting, including physician-administered infusion drugs such as those used to treat cancer. The typical discount ranges from 30% to 50% off the drug's list price. As of January 1, 2015, there were 644 drug manufacturers participating in the 340B Program.

For hospitals to qualify for the 340B program, they must meet three requirements. *See* 42 U.S.C. § 256b(a)(4)(L)(i). The first requirement, known as the government ownership or government control requirement, mandates that the qualifying hospital —

"[be] owned or operated by a unit of state or local government, [be] a public or private non-profit corporation which has been formally granted governmental powers by a unit of state or local government, or [be] a private non-profit hospital with a contract with a state or local government to provide health care services to low-income individuals who are not entitled to benefits under [Medicare or Medicaid]."
42 U.S.C. § 256b(4)(L)(i).

The second criterion requires that the hospital have a sufficient Medicare disproportionate share hospital (DSH) adjustment percentage. The magnitude of a hospital's DSH adjustment depends on the number of inpatient days of its Medicaid and Supplemental Security Income (SSI) patients. This criterion also includes hospitals qualifying for Medicare disproportionate share payments by virtue of their large uninsured patient populations.

Third, DSH hospitals, children's hospitals and free-standing cancer hospitals that meet the first two criteria are eligible to participate in the 340B program if they sign a written certification stating that they will not obtain covered outpatient

resulting in large profit margins. The profit margins from drugs are achieved with minimal labor and overhead expenses.

12.     Before the "partnership,"[4] West owned and operated five outpatient oncology clinics, whereas Methodist had none. Before the partnership, Methodist had minimal inpatient or outpatient services for cancer patients.

13.     Prior to the partnership, at the five West Clinic sites, West physicians received multiple income streams, including patient fees, chemotherapy drug revenues, oral drug revenues, radiology revenues, surgery revenues, and ambulatory surgical center fees.

14.     Methodist negotiated to own these five West cancer clinics and acquire all of these revenue streams from West's referrals. For example, before the partnership, West physicians referred chemotherapy patients to the West Clinic facilities that they owned and operated. After the partnership, West physicians referred chemotherapy patients to a hospital outpatient department operated by Methodist at the same location as the former West Clinic sites.

15.     One of Methodist's financial strategies was to bill the ancillary or technical services from West physicians' referrals as hospital outpatient services with higher reimbursement rates from Medicare. Methodist accomplished this scheme largely at the expense of the federal government. The outpatient oncology services at the five clinic sites remained the same. Only after the

---

drugs through a group purchasing organization or other group purchasing arrangement in compliance with the third criterion. Rural hospitals are not subject to this GPO prohibition.

"Off-site outpatient facilities and clinics (child sites) not located at the same physical address as the parent hospital covered entity will be listed on the public 340B database, and are able to purchase and use 340B drugs for eligible patients, if the hospital covered entity provides its most recently filed Medicare cost report demonstrating that: (1) each of the facilities or clinics is listed on a line of the cost report that is reimbursable under Medicare; and (2) the services provided at each of the facilities or clinics have associated outpatient Medicare costs and charges." Federal Register, Vol. 80, No. 167, p. 52302 (August 28, 2015).

[4] In numerous communications and in interviews with Co-Relators' counsel, West's senior leadership referred to the arrangement with Methodist as a "partnership." There was no formal partnership agreement between the parties.

partnership, Methodist billed the federal government at a higher rate under the hospital provider-based billing mechanism.

16.     Under Medicare, payments for services performed in provider-based facilities are often more than 50 percent higher than payments for the same services performed in a freestanding facility. This increased cost is borne by both Medicare and its beneficiaries. "Provider based" is a Medicare payment designation that allows facilities owned by and integrated within a hospital to bill Medicare as a hospital outpatient department, resulting in these facilities receiving higher payments than freestanding facilities.[5]

17.     It would be brazenly illegal under the AKS and Stark laws for Methodist to write a check each month for drug profits to the West physicians from their referrals. Consequently, Methodist devised a scheme to pay the West physicians through disguised inflated payments under the Professional Services Agreement that violated Methodist's own valuation opinion and exceeded collections for West's professional services by over $125 million during the years 2012-2018. Methodist's disguised scheme accomplished the same objective of rewarding the physicians for the value of their referrals, including lucrative chemotherapy referrals, to the Methodist-acquired cancer clinics and Methodist hospitals.

18.     In interviews conducted through the terms of the Settlement Agreement with the West Defendants, West's senior leadership has confirmed that the West physicians made a business deal to guarantee their incomes and the vehicle for funding that deal was 340B drug profits from West's referrals of drug prescriptions to the Methodist system, including chemotherapy.

19.     In addition to the payments over $125 million in excess of West's professional collections,

---

[5]     The governing regulation establishing requirements for provider-based facilities is 42 C.F.R. §413.65.

Methodist also paid West approximately $27 million in management fees to manage the entire outpatient **and** inpatient oncology service line at the Methodist system. Methodist paid approximately $13-16 million of the $27 million in management fees to West as base management fees for inpatient management services at Methodist's four acute care hospital facilities.

20.     In recent interviews under the terms of the Settlement Agreement, West's senior leadership has confirmed that West did not perform inpatient management services at Methodist hospitals between 2012-2018. Despite West not performing inpatient management services as required under the Management Services Agreement, Methodist continued paying the base management fees to West year after year. Methodist did not stop or reduce the payments. Nor did Methodist negotiate to amend the Management Services Agreement.

21.     In addition, Methodist paid approximately $7 million to West physicians, including $3.5-4.0 million for debt and to repay the physicians' personal loans, as an "investment" in their for-profit research company. Methodist's payment was inflated and a disguised kickback to reward the West physicians' referrals to the Methodist system.

22.     The aggregate payments to West physicians exceeded fair market value, were not commercially reasonable, and took into account the value of West's referrals to the Methodist system. West's senior leadership has confirmed that Methodist did not obtain a fair market valuation of the aggregate payments to West physicians under the terms of the 7-year partnership.

23.     Methodist's scheme resulted in massive financial enrichment at the expense of the Medicare and Medicaid Programs. Senior Methodist executives profited from bonuses based on the financial performance of the healthcare system. The Methodist system profited with over $1.5 billion in increased revenues from business generated by West physicians. The Methodist system

has become one of the wealthiest "non-profit" and tax-exempt hospital systems in the United States with cash reserves and investments in excess of $1 billion.

24.     The Medicare and Medicaid Programs have largely funded the illegal financial windfall to Methodist. As addressed in detail below, Methodist's scheme caused estimated single damages to the Medicare and Medicaid Programs exceeding $800 million.

25.     As in the Second Amended Complaint, the Third Amended Complaint first introduces the parties to this action and the jurisdiction of this Court. The Third Amended Complaint then addresses the applicable laws and Methodist's illegal business strategies to generate revenues and profits in violation of the federal AKS and Stark laws.

## PARTIES

26.     Co-Relator Dr. Stern did his undergraduate training at Yale University (B.S., 1973), followed by medical training at Harvard Medical School (M.D., 1978). He then went to the College of Physicians & Surgeons of Columbia University for training in internal medicine (1978-81) and hematology fellowship (1981-83). He joined Columbia's faculty in 1983 and was appointed Assistant Professor in the Department of Medicine at the College of Physicians & Surgeons of Columbia University in the Division of Hematology (1983).  His attention was focused on the properties of endothelial cells, the cells that form the inner lining of blood vessels.  His research purview expanded steadily over the years as his work entered the area of blood vessel (vascular) complications of diabetes, Alzheimer's disease, inflammation and cancer.  Dr. Stern was the principal investigator of numerous grants from the National Institutes of Health and private foundations, as well as philanthropic contributions to his laboratory.  His laboratory grew into the Center for Vascular and Lung Pathobiology at the College of Physicians and Surgeons.  Dr. Stern was the founding Director and was appointed the Carrus-endowed Professor and then full

Professor with tenure at Columbia. This Center was a large enterprise as it occupied 25,000 square feet of laboratory space and involved multiple faculty members and research trainees. As a result of his research, Dr. Stern authored several hundred peer-reviewed papers, and was a frequent speaker at national and international meetings. He was recognized as a leader in the biology of blood vessels (vascular biology).

27. Following his time at Columbia, Dr. Stern entered healthcare administration and served as the Dean and Chief Clinical Officer at Medical College of Georgia (2002-2005) and Dean (2005-2010) and Vice-President for Health Affairs (2008-2010) at the University Cincinnati College of Medicine. As leader of the faculty practice plan (University of Cincinnati Physicians), he consolidated 15 departmental practice corporations into a unified entity. He led the development of the new health system which became the foundation of the University of Cincinnati's participation in regional healthcare.

28. He then became the Executive Dean and Vice-Chancellor of Clinical Affairs at the University of Tennessee Health Sciences Center ("UTHSC"). As Executive Dean, Dr. Stern was responsible for clinical, research, educational and administrative activities of the College of Medicine at UTHSC on four campuses, Memphis (main campus) and three satellites (Chattanooga, Knoxville, and Nashville). His responsibilities included formulating the strategic plan, budget, recruitment plans, developing programs and other activities (faculty promotions, overseeing student activities, etc.). As Vice-Chancellor for Health Affairs, Dr. Stern was charged with overseeing the clinical programs of the Colleges of Pharmacy, Nursing and Health Professions in addition to the College of Medicine.

29. He was also Chairman of the Board of the University of Tennessee Medical Group (the faculty practice plan that was later renamed University Clinical Health), Co-Chair of the

University-LeBonheur Pediatrics Specialists (the pediatrics faculty practice plan), and Co-Chair of University of Tennessee Methodist Physicians (an adult faculty practice plan associated with Methodist).

30. Dr. Stern served on the Board of Directors of Defendant Methodist LeBonheur Healthcare from 2011 to 2017 and the Methodist Board Finance Committee. He also served as Methodist's Executive Vice President of Medical Affairs from 2011 to 2016.

31. Dr. Stern served as Executive Dean and Vice Chancellor at UTHSC from 2011 to 2017---during the years that West Clinic, Methodist, and UTHSC negotiated and implemented a three-way oncology "affiliation" arrangement.

32. From 2011 through 2017, Dr. Stern attended over 200 meetings in person or by phone with Methodist and West executives. Dr. Stern was one of 12 members of the Executive Cancer Operations Council, composed of primarily West physicians, Methodist senior executives, and West Clinic senior executives. Dr. Stern also had regularly scheduled calls with West senior partner, Dr. Lee Schwartzberg, West CEO Erich Mounce, and Dr. Guy Reed, Chair of the UTHSC Department of Medicine. Dr. Stern also attended many meetings with Methodist's senior executives called "Kitchen Cabinet Meetings" usually held at the office of Methodist CEO Gary Shorb. These meetings were commonly scheduled on a weekly basis. These meetings were usually attended by Methodist's CEO Gary Shorb, CFO Chris McLean, COO Michael Ugwueke, Executive Vice-President Donna Abney, Chief of HR Carol Ross-Spang, Healthchoice CEO Mitch Graves, and Senior Vice President of Public Policy and Regulatory Affairs Cato Johnson.

33. Dr. Stern was also a member of the West Cancer Center---Strategy and Partnership Model Steering Committee and attended meetings of that Committee along with Co-Relator Jeff Liebman.

34.    Co-Relator Jeff Liebman is the former President of Methodist University Hospital, the largest hospital in the Methodist Healthcare system. He held the position of Chief Executive Officer of Methodist University Hospital from February of 2014 through early May of 2017 when his title became President. Liebman resigned from Methodist in late August 2017.

35.    As CEO of the largest Methodist hospital, Liebman's responsibilities included overseeing the operations of all inpatient and outpatient clinical activities at University Hospital.  His office was responsible for the clinical as well as financial performance of all programs at the hospital. His monthly reviews included profit and loss results for all aspects of the 617-bed hospital. This hospital had the sickest patients in the entire Methodist network and the busiest emergency room. On a routine basis, Liebman reported to the Quality Committee of the Methodist Board and provided leadership for the development of all new clinical services including patient care, facilities, and physician recruitment for the hospital. A significant part of his duties included the development of new clinical services and strategic plans for the future growth of the institution as well as considering improvements in quality of care.

36.    Liebman also attended monthly meetings with Chief Executive Officers of all Methodist hospitals and other senior Methodist executives. At those meetings there were typically quarterly updates by West CEO Erich Mounce regarding new initiatives and activities by the West physicians.  Liebman also attended weekly senior management meetings for all Methodist hospital Chief Executive Officers and Vice Presidents. At these meetings, there were commonly extensive discussions about hospital management issues and initiatives.

37.    Liebman was also a member of the West Cancer Center---Strategy and Partnership Model Steering Committee.

38.     Through their work and experience, Liebman and Stern have direct, detailed, and personal knowledge that Methodist deliberately violated the AKS and Stark laws as a calculated cost of increasing lucrative patient referrals, revenues and profits.

39.     **Defendant** Methodist Le Bonheur Healthcare is an integrated healthcare system based in Memphis, Tennessee, with locations and partners across the Mid-South. The healthcare system includes:

- 4 adult hospitals;
- 1 children's hospital;
- 2 wound healing centers;
- 2 sleep centers;
- 52 physician and specialty practices;
- 7 minor medical and urgent care clinics;
- 5 surgery centers;
- 7 diagnostic centers;
- 7 cancer treatment sites;
- 1 hospice and palliative care facility;
- Transplant Institute;
- Sickle Cell Center;
- 7 work-site Clinics;
- Home Health; and
- Home Medical Equipment.

40.     Defendant Methodist Healthcare-Memphis Hospitals, ("MHMH") is a wholly owned subsidiary of Methodist Le Bonheur Healthcare. MHMH is organized as a Section 501(c)(3) entity consisting of five hospitals within an integrated healthcare delivery system. MHMH includes five Memphis hospitals---Methodist Germantown Hospital, Le Bonheur Children's Hospital, Methodist North Hospital, Methodist South Hospital, and Methodist University Hospital. The Board of Methodist Healthcare---Memphis Hospitals is comprised of the same persons as Methodist Le Bonheur Healthcare, the sole member and controlling parent organization.

41.     Defendants also include Methodist executives who were the leaders in formulating and implementing Methodist's illegal schemes at issue to generate revenues and profits in violation of the AKS and Stark laws. [6]

42.     Defendant Gary Shorb was the Chief Executive Officer of Methodist from the beginning of negotiating the illegal arrangements at issue in 2011 through his resignation at the end of 2016.

43.      Defendant Chris McLean was the Chief Financial Officer of Methodist from the beginning of negotiating the illegal arrangements at issue in 2011 through his resignation at the end of 2018.

## JURISDICTION AND VENUE

44.     This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

45.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

---

[6] On September 9, 2015, the Department of Justice issued a memorandum to all United States Attorneys and top federal law-enforcement officials regarding "individual accountability for corporate wrongdoing." The Memorandum was issued by Sally Yates, Deputy Attorney General, and became known as the "Yates Memo." The Memo states in part, "Fighting corporate fraud and other misconduct is a top priority of the Department of Justice…One of the most effective ways to combat corporate misconduct is by seeking accountability from individuals who perpetrated the wrongdoing. Such accountability is important for several reasons: it deters future illegal activity, it incentivizes changes in corporate behavior, it ensures that the proper parties are held responsible for their actions, and it promotes the public's confidence in our system."

The "Yates Memo" addressed "six key steps to strengthen our pursuit of individual corporate wrongdoing," including "criminal and civil corporate investigations should focus on individuals from the inception of the investigation" and "civil attorneys should consistently focus on individuals as well as the company and evaluate whether to bring suit against an individual based on considerations beyond that individual's ability to pay."

46.     Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) and Tenn. Code Ann. § 71-5-185, as Defendants transacted business or otherwise engaged in illegal conduct at issue within the District.

47.     Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." The Tennessee Medicaid False Claims Act provides similar venue rules. *See* Tenn. Code § 71-5-185.

48.     Methodist is the largest Medicaid provider in the State of Tennessee with over 13,000 inpatient admissions each year covered by Tennessee Department of Finance and Administration's Division of Health Care Finance and Administration Bureau of TennCare ("TennCare"), the state of Tennessee's Medicaid Program. TennCare is headquartered in Nashville, Tennessee within this judicial district. As discussed below, Methodist has submitted thousands of false claims to TennCare in Nashville and such claims have been processed and paid with federal and state funds administered by TennCare in Nashville. TennCare's services are offered through managed care organizations. In its contracts with managed care organizations for the administration of Medicaid claims, there is an agreed venue provision for Davidson County, Tennessee. The contracts state, "[T]he place of proper venue shall be Davidson County, Tennessee." During the years 2012-2018, all claims to TennCare submitted by the Defendants were administered through contracts with this agreed venue provision and all claims were ultimately processed by TennCare with its headquarters in Nashville, Tennessee.

49.     Venue is proper in this District where Methodist has submitted false claims in violation of the AKS and Stark laws. This action seeks recovery under the False Claims Act and Tennessee

Medicaid False Claims Act for violations of the AKS and Stark laws with respect to Defendants' claims for payments by federal and state healthcare programs for fiscal years 2012 through 2018.

50.     Prior to filing the original Complaint, Liebman, through counsel, delivered a draft copy of the Complaint and his written Disclosures of substantially all material evidence and information in his possession to the United States Attorney's Office for the Middle District of Tennessee, the United States Attorney General's Office, and the Tennessee Attorney General's Office.  Prior to filing the Second Amended Complaint, Liebman and Stern, through counsel, delivered a draft copy of the Second Amended Complaint and Dr. Stern's written Disclosure of substantially all material evidence and information in his possession to the United States Attorney's Office for the Middle District of Tennessee, the United States Department of Justice in Washington, D.C., and the Tennessee Attorney General's Office.

## APPLICABLE LAWS

### Introduction to Federal Anti-Kickback Statute

51.     Physicians primarily control patient referrals because they prescribe medical services. In an effort to contain soaring healthcare costs and reduce conflicts of interest, the AKS provides important protections against the corruption of medical providers offering or paying inducements to influence referrals.

52.     The AKS applies to all providers and covers referrals of all services to patients insured by federal healthcare programs.[7]

---

[7] The Stark law applies to compensation arrangements with physicians and covers the referrals of "designated health services" for patients insured by federal healthcare programs as discussed above.

53.    The AKS prohibits "knowingly and willfully" offering or paying remuneration to induce a referral "for an item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

54.    The AKS specifies that "remuneration" includes "any kickback, bribe or rebate" and broadly applies to benefits provided "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1320a-7b(b)(1) & (2). "Remuneration" is defined elsewhere to include "transfers of items or services for free or for other than fair market value." 42 U.S.C. §1320a-7a(i)(6).

55.    The AKS arose out of Congressional concern that financial inducements to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, of poor quality or potentially harmful to a vulnerable patient population.

56.    The AKS was based in part on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there was a financial incentive to generate business.

57.    To protect the integrity of federal healthcare programs, Congress enacted a *per se* prohibition against financial inducements in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

58.    First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that financial inducements masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

59. The AKS prohibits a hospital from offering "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b).

60. The AKS has two separate liability provisions, the violation of *either* of which subjects a person to liability. *See* 42 U.S.C. § 1320a-7b(b)(1)(A) (prohibiting the solicitation and receipt of remuneration in exchange for referrals; 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration to induce referrals). The AKS is violated if a hospital knowingly and willfully offered remuneration to induce referrals even if the doctors were not actually induced. *See* 42 U.S.C. §1320a-7b(b)(2)(A) (prohibiting the offer or payment of remuneration for the purpose of inducing referrals). Under the AKS, any amount of inducement is illegal.

61. The AKS prohibitions do not apply to "any payment practice specified by the Secretary in regulations promulgated pursuant to 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987." 42 U.S.C. §1320a-7b(b)(3)(E). The Secretary has issued approximately 24 "exceptions" or safe harbors to the criminal prohibitions of 42 U.S.C. §1320a-7b(b).

62. Payment practices falling within either the statutory exceptions or the regulatory safe harbors to the AKS are protected from criminal prosecution. 42 U.S.C. §1320a-7b(b)(3); 42 C.F.R. § 1001.952. For such protection, the OIG has required strict compliance with each provision of an applicable safe harbor.

63. The arrangement between Methodist and West physicians included a professional services contract and management services contract. The AKS regulations provide a "safe harbor" for personal services and management contracts if all seven of the following requirements are met:

Personal services and management contracts. As used in section 1128B of the Act, "remuneration" does not include any payment made by a principal to an agent as compensation for the services of the agent, as long as all of the following seven standards are met --

> (**1**) The agency agreement is set out in writing and signed by the parties.
> (**2**) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.
> (**3**) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.
> (**4**) The term of the agreement is for not less than one year.
> (**5**) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.
> (**6**) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.
> (**7**) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

   42. C.F.R. §1001.952(d).

64.    As discussed in detail below, Methodist did not comply with these seven requirements. The aggregate compensation paid by Methodist to West physicians was not "consistent with fair market value in arms-length transactions" and was "determined in a manner that [took] into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs."

65.    A violation of the safe harbor's requirements does not make the arrangement per se illegal. Rather, the arrangement must be examined under the terms of the AKS. If any one purpose of remuneration is to induce or reward referrals, the AKS is violated. Federal courts have confirmed

that the AKS is violated when one purpose of the payment in question was to induce referrals, irrespective of other legitimate purposes.

66.     As addressed in detail below, Methodist' payments were deliberate violations of the AKS---the calculated costs of a lucrative business strategy to escalate revenues for the hospital system. Methodist intentionally violated the AKS by rewarding West physicians with an aggregate compensation package that stacked multiple components of compensation far in excess of fair market value and based in part on the value of West physicians' referrals to the Methodist system, including (1) disguised inflated payments under the Professional Services Agreement that violated Methodist's own valuation opinion and exceeded collections for West's professional services by over $125 million, (2) "management" fees in the amount of $13-16 million for inpatient oncology service line management services that West's senior leadership has confirmed they did not perform, (3)  $7 million payment to West's research company, including approximately $4.0 million used in part for paying off debts and West physicians' personal loans to the company, as a disguised inducement to West physicians for their referrals, and (4) "miscellaneous" income  that fluctuated from approximately $1.51 million in 2013 to 1.38 million in 2014, $952,466 in 2015, $924,571 in 2016, $1.5 million in 2017, and $1.86 million in 2018. West's senior leadership has confirmed that Methodist never obtained a fair market valuation of the aggregate compensation paid to West physicians under the partnership.

67.     Violation of the AKS may subject the perpetrator to exclusion from participation in federal health care programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. *See* 42 U.S.C. § 1320-7(b) (7) and 42 U.S.C. § 1320a-7a (a) (7).

68.     Any party convicted under the AKS must be excluded from federal healthcare programs for a term of at least five years. *See* 42 U.S.C § 1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from federal healthcare programs for a discretionary period and may consider imposing administrative sanctions of $50,000 per kickback violation. *See* 42 U.S.C. § 1320a-7(b).

69.     Compliance with the AKS is a prerequisite to a provider's right to receive and retain payments from Medicare, Medicaid and other federal healthcare programs. Similarly, compliance with the AKS and comparable state anti-kickback statutes is a prerequisite to a provider's right to receive and retain payments from state-funded healthcare programs.

70.     Claims for payment for services tainted by financial inducements for referrals prohibited by the AKS are false or fraudulent under the False Claims Act because providers of such services are ineligible to participate in government healthcare programs, and the government would not have paid such claims had it known of the inducements for referrals. *See* 31 U.S.C. §§ 3729(a) & (b); 42 U.S.C. §§ 1320a-7b(b), (f) & (g).

71.     Effective March 23, 2010, the Patient Protection and Affordable Care Act confirmed that claims submitted in violation of the AKS automatically constitute false claims for purposes of the False Claims Act. The statute states, "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

72.     Congress also eliminated the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. *See* 42 U.S.C. § 1320a-7b(h).

## Introduction to Federal Stark Laws

73.     Enacted in 1989 to contain health care costs and reduce conflicts of interests, the Stark laws generally prohibit physicians from referring[8] their Medicare patients to business entities, such as hospitals or laboratories, with which the physicians or their immediate family members have a "financial relationship." 42 U.S.C. §1395nn(a)(1); *see* generally 42 C.F.R. §§ 411.350-.389 ("Subpart J---Financial Relationships Between Physicians and Entities Furnishing Designated Services"). Subsequent amendments extended Stark laws to Medicaid patients. *See* 42 U.S.C. §1396b(s).

74.     Congress enacted Stark laws to address overutilization of services by physicians who stood to profit from referring patients to facilities or entities in which they had a financial arrangement. The Third Circuit recently summarized the important public interests underlying Stark laws:

> "Healthcare spending is a huge chunk of the federal budget. Medicare and Medicaid cost roughly a trillion dollars per year. And with trillions of dollars comes the temptation for fraud. Fraud is a particular danger because doctors and hospitals can make lots of money from one another. When doctors refer patients to hospitals for services, the hospitals make money. There is nothing inherently wrong with that. But when hospitals pay their doctors based on the number or value of their referrals, the doctors have incentives to refer more. The potential for abuse is obvious and requires scrutiny. The Stark Act and the False Claims Act work together to ensure this scrutiny and safeguard taxpayer funds against abuse. The Stark Act forbids hospitals to bill Medicare for certain services when the hospital has a financial relationship with the doctor who asked for those services, unless an exception applies."

*United States ex rel. Bookwalter v. UPMC*, 2019 U.S. App. LEXIS 27937, at 2-3, 938 F.3d 397 (3d Cir. 2019)

---

[8] The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A). The accompanying regulations also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

75.    Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

76.    In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services. Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

77.    As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

78.    In contrast to the AKS which applies to all providers and covers referrals of all services to patients insured by federal healthcare programs, the Stark law applies to compensation arrangements with physicians and covers the referrals of "designated health services" for patients insured by federal healthcare programs.

79.    The Stark statute and regulations prohibit any entity from submitting a Medicare claim for services rendered pursuant to a prohibited referral, 42 U.S.C. §1395nn(a)(1)(B); 42 C.F.R. §411.353(b), prohibit Medicare from paying any such claims, 42 U.S.C. §1395nn(g)(1); 42 C.F.R. §411.353(c), and require an entity that receives payment for such a claim to reimburse the funds to the United States, 42 C.F.R. §411.353(d).

80.     The Stark laws define a "financial relationship" to include a "compensation arrangement," 42 U.S.C. §1395nn(a)(2), which means "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity." 42 U.S.C. §1396nn(H)(1)(A); 42 C.F.R. § 411.354.

81.     In turn, "remuneration" is broadly defined to include "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §1395nn(h)(1)(B); *see also* 42 C.F.R. §411.351 ("Remuneration means any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind").

82.     "An 'under arrangements' contract between a hospital and an entity providing DHS 'under arrangements' to the hospital creates a compensation arrangement for purposes of these regulations." 42 C.F.R. § 411.354(c).

83.     "Compensation arrangements can be either direct or indirect." 42 C.F.R. § 411.354(c).[9] "A physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if--(A) [t]he only intervening entity between the physician and the entity furnishing DHS is his or her physician organization; and (B) [t]he physician has an ownership or investment interest in the physician organization." *Id.* § 411.354(c)(1)(ii).

84.     Once the relator or the government has established proof of each element of a *Stark* violation, the burden shifts to the defendant to establish that the conduct was protected by an

---

[9] An "indirect compensation arrangement" requires three elements. First, there must be "an unbroken chain . . . of persons or entities that have financial relationships" connecting the referring doctor with the provider of the referred services. *Id.* § 411.354(c)(2)(i). Second, the referring doctor must get "aggregate compensation . . . that varies with, or takes into account, the volume or value of referrals." *Id.* § 411.354(c)(2)(ii). And third, the service provider must know, recklessly disregard, or deliberately ignore that the doctor's compensation "varies with, or takes into account, the volume or value of referrals." *Id.* § 411.354(c)(2)(iii).

exception.[10] If no exception or safe harbor applies to a Stark violation or if a defendant fails to comply with the requirements of an applicable safe harbor, then all referrals from the referring physician to the DHS entity are subject to prohibition.

85.     Subsections (b), (c), (d) and (e) of 42 U.S.C. §1395nn set forth 18 exceptions or "safe harbors" to the subsection (a) referral prohibitions. One of the "safe harbors" is the personal services safe harbor which applies to the arrangement between Methodist and West physicians.

86.     Methodist entered into a professional services contract and management services contract with the West physicians. Both contracts required West physicians' personal services.

87.     Similar to the AKS discussed above, Stark laws establish seven requirements for an entity providing remuneration or any benefit to a physician through a "personal service" or management services agreement. Among those seven requirements, the compensation paid over the term of the arrangement must be "set in advance," must not "exceed fair market value," and must  "not [be] determined in a manner that takes into account the volume and value of any referrals or other business generated between the parties." 42 U.S.C.S. §1395nn(e)(3)(A)(v); 42 C.F.R. §411.357 (d)(1)(v).  These requirements apply to any "[r]emuneration from an entity under an arrangement or multiple arrangements to a physician….or to a group practice." 42 C.F.R. §411.357 (d).

88.     The Stark statute defines "fair market value" as  "the value in arms-length transactions, consistent with the general market value, and, with respect to rentals or leases, the value of rental property for general commercial purposes (not taking into account its intended use) and, in the

---

[10] Among the multiple requirements of the "academic medical center" safe harbor provided in *Stark* regulations, the referring physician must be a bona fide full-time or "substantial" part-time employee of the center. *See* 42 C.F.R. §411.355(e)(1)(i)(A). During the years of the partnership with Methodist, West physicians were a private practice group. They were not employees of any academic medical center. For employees of an academic medical center, the total compensation at the center cannot "exceed the fair market value of all of the services provided" and cannot be "determined in a manner that takes account the volume or value of any referrals." *See* 42 C.F.R.  §411.355(e)(1)(ii). Even if Methodist could qualify as an academic medical center, Methodist violated these regulatory requirements under the *Stark* laws.

case of a lease of space, not adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor where the lessor is a potential source of patient referrals to the lessee." 42 U.S.C. §1395nn(h)(3).

89.     In pertinent part, the Stark regulation defines "fair market value" as "the value in arm's-length transactions, consistent with the general market value…or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party." 42 C.F.R. §411.351.

90.     Under the definition of "fair market value," any remuneration or benefit given by a hospital system to a physician must be based solely on the physician's personal labor and not based on his or her ability to generate referrals or business for the system.

91.     As addressed in detail below, Methodist did not comply with the requirements of the "personal services" safe harbor under Stark laws.

### Compliance with AKS and Stark Is Condition of Each Federal and State Payment

92.     Compliance with the AKS and Stark laws is a mandatory condition of healthcare providers' enrollment in federal health care programs, a mandatory condition of every claim submitted by providers to federal health care programs, and a mandatory condition of every payment made to providers by federal health care programs.

93.     Federal health care programs include patients covered under Medicare, Medicaid, or TRICARE in addition to federal employees and retired federal employees.

**Compliance with AKS and Stark Laws is Condition of Each Medicare Payment**

94.     Medicare covers the costs of certain medical services for persons aged 65 years or older and those with disabilities.

95.     Medicare is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

96.     HHS is responsible for the administration and supervision of Medicare. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of Medicare.

97.     CMS makes Medicare payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in Medicare. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

98.     Defendants Methodist Le Bonheur Healthcare and/or Methodist Healthcare-Memphis Hospitals  have executed at least one provider agreement with CMS in which they agreed to abide by the Medicare laws, regulations and program instructions…" CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B.  In the provider agreement, Defendants Methodist Le Bonheur Healthcare and/or Methodist Healthcare-Memphis Hospitals certified their understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)…" *Id.*

99. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. *See* 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments electronically on a CMS UB-04 Form.

100. The UB-04 Form contains the following notice in bold capital letters: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

101. The UB-04 Form requires the provider to certify the following:

"Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."
"For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws."
"For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient."

102. As a condition of payments by Medicare, CMS also requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

103. After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959(g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine

whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

104.    Each cost report contains mandatory certifications of compliance with the AKS and Stark laws. Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

105.    For each of the fiscal years between 2012 and 2018, each cost report certification page submitted by Methodist included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result**." (Emphasis added).

106.    On each cost report for each fiscal year from 2012 through 2018, the responsible officer(s) on behalf of the Methodist hospitals certified as follows:  "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report….and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (Emphasis added).

107.    Methodist was required to certify that its filed cost reports were  (1) truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, (4) **that the services provided in the cost report were not linked to kickbacks**, **and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the Stark laws and AKS.**

108.    In the months following the end of each fiscal year, Methodist submitted annual cost reports to CMS and attested to the certifications stated above. Methodist submitted cost reports with the certifications stated above for Fiscal Years 2012, 2013, 2014, 2015, 2016, 2017, and 2018.

109.    Methodist filed its Cost Reports electronically each year with CMS. There is no paper submission, but there is an electronic record created by the Medicare Administrative Contractor ("MAC") each time a change was made to the cost reports filed by the hospital and/or by the MAC.

110.    Attached to this Third Amended Complaint as Exhibit A is a summary of the electronic record numbers submitted by Methodist in which it falsely certified compliance with the AKS and Stark laws. This summary includes the dates that the MAC received the cost reports (the MAC create date) and the dates the MAC processed the report (i.e., the "official" date of the report).

111.    For Fiscal Years 2012-2018, Methodist repeatedly falsely represented and certified to the federal government that it had complied with the AKS and Stark laws.

### Compliance with AKS and Stark is Condition of Each Medicaid Payment

112.    Medicaid is a joint federal-state program that provides healthcare benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with federal requirements specified in the Medicaid

statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

113.    The federal Medicaid statute sets forth minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq*.  As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. *See* 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

114.    During the years 2012-2018, the federal matching rate for TennCare (the Tennessee Medicaid Program) was approximately 65 percent.

115.    TennCare's Master Contract requires compliance with Stark laws and the AKS as a condition of each payment to Medicaid providers.  Each claim submitted by providers to TennCare "constitutes a certification that the provider, subcontractor or any other entity has complied with all applicable Medicaid laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), in connection with such claims and the services provided therein." TennCare Master Contract, Paragraph 2.12.9.40.

116.    In Tennessee, provider hospitals participating in the Medicaid Program must file annual cost reports with the State's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.  Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

117.    Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the AKS and Stark laws.

118.    The Tennessee Medicaid Program uses the Medicaid patient data in the cost reports to determine the payments due each facility.

119.    Methodist submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with the AKS and Stark laws. The Tennessee Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims.

120.    Although Stark originally applied only to Medicare claims, it was later expanded to apply to Medicaid claims. The Medicaid statute imposes limits on referrals and reimbursements similar to Stark laws. Specifically, 42 U.S.C. 1396b(s) titled "Limitations on certain physician referrals," provides,

> No payment shall be made to a State under this section for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in subsection (h)(6) of section 1395nn of this title) furnished to an individual on the basis of a referral that would result in the denial of payment for the service under subchapter XVIII of this chapter if such subchapter provided for coverage of such service to the same extent and under the same terms and conditions as under the State plan.

121.    Subchapter XVIII governs the Medicare program, including Stark laws. The substantive prohibitions contained in the Stark laws are therefore applicable to claims submitted to Medicaid.

122.    CMS cannot pay federal financial participation funds for services provided under Medicaid if the payment would be prohibited under Medicare due to an illegal referral in violation of Stark laws or the AKS. The only difference between holding a defendant liable for Stark-predicated FCA violations based on Medicare claims and those based on Medicaid claims is that the former are submitted to the federal government directly, while the latter are submitted to the states, which in turn receive federal funding to help pay the claims. It does not matter for purposes of the False Claims Act whether a claim is submitted to an intermediary or directly to the United States. *See* 31 U.S.C. 3729(b)(2) (defining an FCA "claim" to include requests for payments submitted "to a contractor, grantee, or other recipient, if the money . . . is to be spent or used . . . to advance a

Government program or interest").

123. Moreover, even if its own Medicaid claims to Tennessee did not create FCA liability, Methodist would still be liable for causing Tennessee to submit a claim in violation of Stark laws and the AKS to the federal government. Causing a third party to present a false claim or use a false record creates FCA liability just as if the defendant had presented or used the claim or record itself. *See* 31 U.S.C. 3729(a)(1)(A-B).

124. A false claim submitted to the Medicaid program is a false claim presented to the United States. Given the structure of the Medicaid, Medicare, and TRICARE systems, the natural and foreseeable consequence of submitting a false claim to any of them is that the United States will provide funds to pay the false claim. Given the comprehensive funding and reimbursement structure between the states and federal government under the Medicaid scheme, claims that are submitted to Medicaid are claims to the federal government.

## Compliance with AKS and Stark is Condition of Each TRICARE Payment

125. Methodist also enrolled in and sought payments from the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

126. TRICARE is a federally funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active-duty service members as well. *See* 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a). Methodist has received revenue from the TRICARE Program.

127. In addition to individual patient costs, TRICARE pays hospitals for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs. *See* 32 C.F.R. § 199.6.

128. A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement"), in which the provider sets forth the number of patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

129. The Request for Reimbursement requires that the provider certify that the information contained therein "is accurate and based upon the hospital's Medicare cost report."

130. Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

131. Methodist submitted Requests for Reimbursement to TRICARE that were based on its Medicare cost reports. Whenever the Medicare cost reports of Methodist contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

132. On each occasion when Methodist's Requests for Reimbursement were false due to falsity in its Medicare cost reports, Methodist falsely certified that the information contained in its Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

133. Methodist knew that false claims contained in its Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.

## METHODIST'S KICKBACKS TO WEST PHYSICIANS

### From the Beginning Methodist Intended to Buy West's Referrals

134.     On or about April 28, 2011 Methodist CEO Gary Shorb and Methodist CFO Chris McLean met with UTHSC Chancellor Dr. Steve Schwab to discuss the overall terms of an arrangement between Methodist, West physicians, and the University of Tennessee. The meeting was at Chancellor Schwab's office. Also in attendance at this meeting was Co-Relator Dr. Stern. This was the first month of Dr. Stern's appointment as Executive Dean and Vice-Chancellor of Clinical Affairs at UTHSC.

135.     At this meeting McLean and Shorb stated that West doctors would end their relationship with Baptist Healthcare, a competitor of Methodist, and bring their patients and referrals to Methodist. McLean and Shorb were enthusiastic about this strategy because of the significant increased revenues that West physicians' referrals would generate for the Methodist system.

136.     At this meeting, McLean and Shorb described a financial "windfall" from West physicians' referrals of cancer patients for chemotherapy/infusion therapy using expensive drugs. Shorb and McLean stated that Methodist would make significant drug profits under the 340B Program from West Clinic's referrals, the West doctors would share in the drug profits, and UTHSC would also receive part of the drug profits. McLean and Shorb described the deal as a "windfall" and "win-win" for everybody.

137.     At this meeting, Shorb and McLean described a professional services agreement under which Methodist would pay $120 per wRVU[11] for all physicians of West regardless of experience,

_____

[11] The most common measure of physician productivity is Work Relative Value Units (wRVUs). These units reflect the level of time, skill, training, and intensity required of a physician to provide a given service. These units are the leading method for calculating the volume of work or effort expended by a physician in treating patients. Under this relative scale, a physician seeing two or three complex or high acuity patients per day would accumulate more RVUs than a physician seeing lower acuity patients each day.

credentials or collections. McLean stated that there were 27 physicians at West Clinic at the time and their collective annual wRVUs were approximately 259,000.

138.    Methodist CEO Shorb and CFO McLean stated that Methodist was also considering a professional services agreement with another group of oncologists---UTCI or University of Tennessee Cancer Institute. McLean told Dr. Stern and Dr. Schwab that UTCI had 13 physicians and produced 100,000 wRVUs per year. McLean told Dr. Stern and Dr. Schwab that UTCI would generate revenues from referrals in the amount of $50 million per year and wanted payments for professional services at the rate of $70 per wRVU.

139.    In contrast, McLean stated that West physicians wanted payments per wRVU at the higher rate of $120, but West would generate revenues from referrals in the amount of $120 million per year.[12]

140.    Methodist CEO Shorb and CFO McLean knew that West's higher rate per wRVU was above the Memphis market rates for oncologists, but Shorb and McLean were focused on the higher revenues ($120 million) that West's referrals would generate for the Methodist system.

141.    At this meeting, McLean stated that West physicians' referrals would increase Methodist's drug profits under the 340B Program by an estimated $15 million per year. Of this $15 million, Methodist CEO Shorb and Methodist CFO McLean described an arrangement of giving each entity one-third or $5 million. The University of Tennessee would receive one-third or $5 million, Methodist would receive one-third or $5 million, and West physicians would receive one-third or $5 million of the projected $15 million per year.

---

[12] In the subsequent months, Methodist also attempted to enter a professional services agreement with UTCI; however, West Clinic senior partner Dr. Schwartzberg objected and told Methodist CEO Shorb that UTCI physicians must be employed by or subordinate to West Clinic. Shorb yielded to Dr. Schwartzberg's objection and Methodist did not enter into a professional services agreement with UTCI.

142. The one-third of 340B drug profits to be paid to West physicians was in addition to Methodist's payments per wRVU to the physicians. Shorb and McLean stated that the drug profits generated by the West physicians' referrals would directly bolster the physicians' incomes in addition to payments per wRVU.

143. Dr. Stern responded to both Methodist CEO Shorb and UTHSC Chancellor Schwab that based on his experience with a cancer center at Columbia and what he knew of Dana Farber Cancer Institute in Boston, it was very unusual for 340B drug profits to be used to increase physicians' incomes. Dr. Stern believed that the 340B drug profits should be used to bolster programs at the nascent cancer center----recruitment, equipment, clinical trials, and infrastructure. He disagreed with using the drug profits to enrich the incomes of referring physicians.

144. Shorb wanted to increase the Methodist system's market share of cancer patients. Shorb stated that West was a leading community-based oncology practice with the ability to direct or refer significant market share of cancer patients to Methodist.[13]

145. Three weeks later on May 17, 2011, UTHSC Chancellor Schwab sent an email to Methodist CEO Shorb and stated with respect to the proposed Professional Services Agreement ("PSA") with West Clinic physicians: "Gary, My understanding of the Cancer Center based on our discussions…The financial lift created by this PSA will be distributed as follows…a. 33% Cancer PSA, b. 33% Methodist c. 33% UT COM."

146. The "financial lift" referred to 340B drug profits "created by this PSA" with West Clinic physicians.

---

[13] West's senior leadership has confirmed that prior to the partnership with Methodist, West controlled approximately 75% of the cancer patient market in the Memphis region. West physicians controlled the referrals of thousands of cancer patients and such referrals would generate lucrative revenues for Methodist's oncology service line, including chemotherapy infusion drugs and oral cancer drugs with high profit margins. Those referrals were the focus of Shorb and McLean in their financial analysis of the "alliance" with West.

147.    "Cancer PSA" referred to the "cancer" physicians at West Clinic under the Professional Services Agreement.

148.    "UT COM" referred to the University of Tennessee College of Medicine.

149.    The email sent by UTHSC Chancellor Schwab to Methodist CEO Shorb on May 17, 2011 confirmed that the business strategy at Methodist was to "distribute" 33 percent of the 340B drug profits to the referring physicians at West Clinic.

150.    On July 11, 2011 at the request of Chancellor Schwab, Dr. Stern drafted a letter which memorialized the discussions between Methodist CEO Shorb and UTHSC Chancellor Schwab. The letter confirmed the commitments between Methodist and the University of Tennessee regarding a "collaborative comprehensive cancer center." That draft letter stated in pertinent part: "The initial 'lift' for the Methodist system provided by this cancer center has been determined to be approximately $18 million. We (Methodist system) will provide one third of this 'lift' to UT to spend on cancer-related projects per year. It is our mutual intention (UT and Methodist) that these funds will be expended to develop the cancer center with the advice of the above governing board. As the 'lift' of the cancer center changes over time, this amount will be duly altered not to fall below $5 million per year."

151.    Instead of a letter agreement, Methodist and UT entered into a more formal Memorandum of Understanding ("MOU") on July 19, 2011. Methodist CEO Shorb signed this MOU on behalf of Methodist and Chancellor Schwab signed this MOU on behalf of the University of Tennessee.

152.    The MOU stated: "One third of the annual contribution of the defined cancer service line will be provided to UT through the affiliation agreement to reinvest in cancer-related programs and in particular the expansion of oncologic research. The parties will work in good faith to define this contribution margin, the term of such an arrangement and related matters."

153.    A few months later Methodist and UT entered into the Fourth Amendment to Addendum A to the Amended and Restated Master Affiliation Agreement.

154.    The Fourth Amendment referenced the MOU which "set forth the guiding principles for the development of the premier academic-affiliated cancer program in the region…"

155.    The Fourth Amendment stated that Methodist "shall make an annual payment of 'Base Mission Support' to UT" in the amount of "five million dollars ($5,000,000) or one third (1/3) of the cancer service line contribution margin (whichever is greater) per year."

156.    The physician leaders of West were looking for a hospital "partner" to create an outpatient cancer center called West Cancer Center. West leaders presented six primary financial requirements to Methodist's senior executives. First, West physicians wanted the "ability to capitalize on" the 340B Program by using Methodist's status as a "covered entity" to acquire cancer drugs at deep discounts. Second, West physicians demanded premium rates per wRVU for all West physicians regardless of credentials, experience or collections. Third, West physicians wanted payments for "co-management" fees to manage the oncology service line at Methodist. Fourth, West required that key personnel of West would be appointed to leadership positions within Methodist. Fifth, West physicians wanted Methodist to fund all expenses, operations, offices, and staffing at the West sites to be included in the "partnership." Sixth, West physicians wanted a major investment in their for-profit research entity call ACORN (subsequently renamed Vector), a portion of which would be used to pay back the West physicians for their personal loans to the company .

157.    West leaders advised Methodist's executives that they were also considering "partnerships" with Methodist's competitors, Baptist and Tenet.

158.     Methodist's senior executives led by CEO Shorb and CFO McLean agreed to all of West's demands.

159.     In 2011, Methodist's executives finalized the following agreements with West physicians effective December 31, 2011: Professional Services Agreement ("PSA"), Co-Management Agreement, Leased Employee and Administrative Services Agreement, and Unwind Agreement.[14] The Agreements had an initial term of seven years ending on December 31, 2018.

160.     In 2011, Dr. Stern attended multiple meetings with senior Methodist executives and West executives when they discussed the negotiation and terms of these agreements.

161.     On September 30, 2011, Dr. Stern attended the weekly scheduled "Strategy Meeting" with senior Methodist executives at Methodist CEO Shorb's office. In attendance at this meeting was Bill Breen, Methodist's Senior Vice-President of Physician Alignment. Breen reported that the valuation of West's planned management services under the Co-Management Agreement was "about $500,000 lower than expected." Breen, Methodist CEO Shorb, and Methodist CFO McClean discussed ways to paper over the difference by stating that Methodist would also pay West for unspecified "billing services."

162.     Instead of accepting the fair market valuation, Methodist's senior executives schemed of ways to exceed the valuation number and add $500,000 more cash disguised as "billing" services.

163.     In negotiating and finalizing these agreements, West physicians did not become employees of the Methodist system. They negotiated to retain their autonomy and repeatedly asserted their autonomy as a private practice during the course of the 7-year alliance with Methodist.

---

[14] Methodist also subsequently entered into a 340B Contract Pharmacy Services Agreement with AnovoRX Group, LLC for the purpose of providing pharmacy services dedicated to filling prescriptions and managing collections for oral drugs ordered by West Clinic physicians.

164.    After the agreements were finalized, Dr. Stern attended a Methodist Board meeting in December of 2011. At that Board meeting, Methodist CFO McLean projected that West's referrals would increase the hospital system's net revenues by approximately $200 million each year.

165.    On January 27, 2012, West CEO Mounce made a PowerPoint presentation at the Methodist "Strategy" meeting usually scheduled for Friday mornings. Dr. Stern attended this "strategy" meeting. The meeting was usually held at 1211 Union, in Methodist's Administrative Suite, 7th floor conference room.

166.    The PowerPoint was called "The West Clinic Methodist Le Bonheur Healthcare and The University of Tennessee Health Science Center--- An Innovative Partnership in Cancer Care."

167.    Slide Number 5 described seven major terms of the "Provider Service Agreement" between Methodist and West: (1) "West Physicians not acquired and maintain PC infrastructure," (2) "MLH Owns and Leases Infusion Areas and Imaging/Surgery Center Areas," (3) "West's clinical employees become MLH employees (Approx. 100 clinical)," (4) "MLH orders all supplies using current relationships and in some sites a 340 B drug pricing mechanism," (5) "West Bills and Collects under provider based billing (Hybrid model),"[15] (6)"All collections are swept to MLH," and (7) "MLH responsible for West's operational expenses."

168.    Slide Number 6 described the Management Services Agreement and stated, "West contracted to manage the Cancer Service Line for all Cancer Services at MLH." "This includes but is not limited to…All Services at West Clinic Outpatient Sites, All Inpatient and Outpatient

---

[15] One of Methodist's strategies was to bill the West Cancer Center as hospital outpatient services and/or exploit the provider-based billing status under Medicare reimbursement rules. "Provider based" is a Medicare payment designation that allows facilities owned by and integrated within a hospital to bill Medicare as a hospital outpatient department, resulting in these facilities generally receiving higher payments than freestanding facilities. Medicare payments for services performed at provider-based facilities are often more than 50 percent higher than payments for the same services performed at a freestanding facility.

Services at MLH Hospitals, Radiation Oncology, Participation and operational oversight for many management and quality categories."

169.    At the same time as the Professional Services Agreement and Management Services Agreement,  effective January 1, 2012, the University of Tennessee and West Clinic, P.C. entered into the Affiliation Agreement. In July of 2012, the Affiliation Agreement was signed by Chancellor Schwab on behalf of UTHSC and by Dr. Lee Schwartzberg, senior partner and Medical Director of West.

170.    The Affiliation Agreement recites that West, Methodist Healthcare---Memphis Hospitals ("MHMH"), and the University of Tennessee "through its Health Science Center…intend to memorialize the advancement of patient care delivery, quality clinical research and clinical education, and community service programs in the fields of oncology and hematology, gynecologic oncology and such other medical disciplines and specialties as may be hereby affected."

171.    The Affiliation Agreement states that "the Parties agree to collaborate in the management of MHMH's hospital inpatient and outpatient cancer service lines."

172.    The Agreement further states that the University of Tennessee and West Clinic "desire for [West Clinic] to serve as UT's primary faculty group practice for the delivery of academically-related cancer patient care services…" The Agreement provides for "part-time faculty compensation" for West Clinic physicians.

173.    The parties further agreed to "form in cooperation with MHMH the Tennessee Cancer Council…to serve as an advisory board to enhance the patient care delivery and quality of inpatient and outpatient Cancer Patient Care Activities, including MHMH's system-wide cancer service line…"

174. The Agreement also states that the "Parties will endeavor to cause the UT hematology/oncology program to receive designation as a National Cancer Institute ('NCI') Cancer Center."

175. The term of the Affiliation Agreement is also 7 years through December of 2018.

176. The Affiliation Agreement was amended in January of 2014 to increase the faculty compensation to West physicians and increase their reimbursements for "costs associated with the advancement of academically-related cancer patient care services."

### West Dramatically Increased Methodist's Drug Profits from the 340B Program and Methodist Channeled a Portion of Those Profits to West Through Disguised Payments Under the Professional Services Agreement

177. From 2011 through 2017, Dr. Stern regularly attended weekly or monthly meetings with senior Methodist executives regarding the "alliance" with West Clinic. These meetings usually included Methodist CEO Gary Shorb, Methodist CFO Chris McLean, and Methodist COO Michael Ugwueke.

178. Dr. Stern was a member of the Methodist Board of Directors during the time period of 2011-2017. He was also a member of the Methodist Finance Committee.

179. Dr. Stern was one of 12 members of the Executive Cancer Operations Council, composed of primarily West physicians, Methodist senior executives, and West senior executives. Dr. Stern also had weekly or monthly scheduled calls with West senior physician leader, Dr. Lee Schwartzberg, West CEO Erich Mounce, and Dr. Guy Reed, Chair of the UTHSC Department of Medicine. Dr. Stern was also a member of the West Cancer Center---Strategy and Partnership Model Steering Committee.

180. During the time period 2011-2017, Dr. Stern also attended many meetings with Methodist's senior executives called "Kitchen Cabinet Meetings" usually held at the office of

Methodist CEO Gary Shorb. These meetings were commonly scheduled on a weekly basis. These meetings were usually attended by Methodist CEO Gary Shorb, CFO Chris McLean, COO Michael Ugwueke, Executive Vice-President Donna Abney, Chief of HR Carol Ross-Spang, Healthchoice CEO Mitch Graves, and Senior Vice President of Public Policy and Regulatory Affairs Cato Johnson.

181.    In approximately 2011, Methodist CFO McLean and Methodist CEO Shorb told Dr. Stern that West physicians demanded that they be paid above the national 90th percentile income for oncologists each year and the drug profits from their referrals would assure their demand was met.

182.    Initially, Methodist CFO McLean projected that in the first year of the alliance, West physicians would generate $15 million in 340B profits as a direct result of these physicians' referrals for chemotherapy infusion and oral cancer drugs. At the beginning of the deal, Methodist CEO Shorb and UTHSC Chancellor Schwab agreed that the University of Tennessee would receive $5 million each year or one-third share of the projected $15 million in annual 340B profits.

183.    The actual 340B profits from West physicians' referrals were much higher than originally projected and increased to $63.73 million by 2016.

184.    During the years 2011 through 2016, at meetings with Methodist and West executives (including Methodist CEO Shorb, Methodist CFO McLean, West CEO Mounce, and West senior partner Dr. Schwartzberg),  Dr. Stern repeatedly objected to the use of 340B drug profits to fund payments to West physicians as inappropriate and excessive. Dr. Stern argued that the 340B drug profits should be used for indigent care, cancer research, and for the development of  an NCI-designated cancer center in Memphis. Dr. Stern was repeatedly rebuffed by Shorb and McLean.

185.    During Liebman's tenure as CEO of Methodist University Hospital there were weekly Friday morning senior management meetings held at the Methodist corporate office as well as

many planning meetings for the Methodist oncology service line. In those meetings there were many discussions about the importance of 340B profits to the finances of the entire Methodist system as well as the relationship between West physicians and the Methodist system.

186.     During these meetings in Liebman's presence, Methodist CFO McLean stated that the reason Methodist decided to partner with West versus other physicians was their ability to direct cancer patients away from the Baptist Healthcare system -- where the West physicians had referred patients for almost twenty years -- to the Methodist system whose facilities were further away and less convenient.  In addition, McLean stated this private practice group was valuable to Methodist because they could drive up radiation therapy volumes by again redirecting patients away from Baptist to Methodist.

187.     Additionally, McLean stated that he had calculated drug profits under the 340B Program from the West physicians' referrals and how to use those new profits to move the main focus of the cancer service line to the wealthier suburbs despite the intent of the 340B program to assist vulnerable or uninsured patients' access to prescription medicines and health services.

188.     McLean boasted that this strategy was the way to incentivize the doctors to join with Methodist, make more money, and move away from the urban campus to the wealthiest suburb with higher reimbursement rates from more cancer patients with commercial insurance, Medicare, and Medigap coverage. McLean and Shorb redirected significant investments in the cancer program to the Germantown market, including new equipment, new buildings, and the relocation of physicians away from the inner city to the wealthier suburbs.

189.     Methodist CFO McLean and Methodist University Hospital CFO Chuck Lane told Liebman that Methodist "bought the 340B business and the radiation therapy business" by over-paying the West doctors to leave their former relationship of referrals with Baptist Healthcare.

190. Liebman met with McLean on a quarterly basis. In the third quarter of 2014, McLean told Liebman that the complexities of the 340B program itself and the "lack of sophistication" of the federal government to detect this arrangement of channeling 340B drug profits to West made this strategy a "safe" way to move forward. At Friday morning Methodist strategy meetings, McLean, who was not an attorney, often made joking reference to the fact that he was the law firm of "McLean and associates" that was in control of Methodist's strategies. His attitude was defiance of federal laws that apply to hospitals and physicians. These meetings were held at 1211 Union Avenue, Methodist's Administrative Conference suite.

191. McLean intimidated others from raising any questions about what he was reporting or doing with the West finances and payments from Methodist. McLean made intimidating remarks to third persons in the presence of both Methodist CEO Shorb and Methodist COO Ugwueke who would agree verbally, smile and laugh in agreement, or remain silent and nod.

192. During monthly review or annual budget meetings for Fiscal Years 2015 and 2016 in the late summers of those years, McLean did not distribute financial reports for West Cancer Center (as he did with other service lines) to the rest of the management team including Liebman. During the budget planning process in the late summer of 2015 at the Methodist Administrative Conference Room at 1211 Union, Liebman asked him why and McLean told Liebman "don't worry" and the "in-house law firm of McLean and Associates" was handling all things related to the cancer program.

193. McLean also told Liebman that he was an expert in creating financial statements to make numbers "look any way" he wanted them to look, including line items on the Medicare cost reports.

194. On one occasion, McLean informed Stern that Methodist was not interested in Stern's ideas or any proposals that originated from Stern and UTHSC. He indicated that whatever plan Stern would bring forward, McLean would manipulate the numbers so that it would fail and the plan would never be considered by Methodist's leadership. Methodist CEO Shorb insisted that any time Dr. Stern wanted to make a business plan, he had to do it with McLean and his staff. Invariably, no staff was assigned or the plan was never made.

195. McLean made it clear to Dr. Stern that his objective was to make the "partnership" with West as profitable as possible and that any programmatic interests that Dr. Stern might have in expanding healthcare to the poor and uninsured or enhancing teaching and research would be viewed as an unwelcome distraction.

196. Whenever the discussion came up about increased funding for UT consistent with the terms of the original agreement to share one-third of the 340B drug profits with UT, Mclean told Dr. Stern that no additional funds were available beyond the $5 million per year.

197. During the budget planning process in the late summer of 2015, Liebman also asked McLean why the West Cancer Center doctors were receiving a much lower allocation of corporate overhead than the employed physician practices or any other entity in the system. McLean dodged that question and simply said, "That's a different deal."

198. During the meetings McLean repeatedly exhibited an attitude of not caring about issues related to compliance with federal laws. His focus was monitoring and increasing referrals and revenues.

199. When Methodist and West senior leaders were negotiating an extension of the "alliance" in 2016, both McLean and Methodist CEO Gary Shorb stated that Methodist would not have any business relationship with any medical oncologists in the community unless West CEO Mounce

and West Clinic's senior partner Dr. Schwartzberg approved the relationship. McLean and Shorb also stated that employed oncologists at UTHSC would be transitioned under West's control as soon as possible. Dr. Stern objected to this plan.

200.    West wanted to control all physicians and revenues in the area of oncology. Dr. Stern told Methodist CEO Shorb that West's attempt to form a monopoly was against the interests of Methodist and UTHSC and was not consistent with the goals of outstanding cancer care or building an NCI-designated cancer center.

201.    Methodist CFO Chris McLean closely guarded the secrecy of payments Methodist made to West physicians and the incomes of West physicians.

202.    Within months of finalizing the "partnership" with West, one of Methodist's maneuvers was to contract with a separate outside pharmacy service to dispense oral drugs prescribed by West physicians. That pharmacy was AnovoRX Group.

203.    This maneuver was illogical because Methodist already had a major pharmacy service within its hospital system and that pharmacy service was capable of filling any prescriptions for oral cancer drugs ordered by West physicians at minimal additional cost since Methodist already had the pharmacy department services and infrastructure in place. Methodist also had a pharmacy residency program operated out of Methodist University Hospital and Methodist Germantown Hospital.

204.    Yet Methodist's financial strategists bypassed their own pharmacy services and contracted with AnovoRX, paying "a fee equal to $196.00 per prescription for services provided pursuant to this Agreement." Under the Pharmacy Services Agreement, AnovoRX performed "billing and collections function to the associated third-party payors and perform[ed] accurate financial reporting" to Methodist on a "monthly basis."

205.     Methodist was able to contract with the outside pharmacy to dispense oral cancer medications for prescriptions written by West physicians. The infusion therapy drugs, however, were different because infusion drugs were administered intravenously through a needle or catheter at the hospital or outpatient clinic and had to be mixed and supplied from Methodist's internal pharmacy as part of its hospital services for cancer patients.  Therefore, Methodist was not able to create a separate accounting system with an outside pharmacy to fill infusion therapy drug prescriptions.

206.     At the start of the deal Methodist's executives estimated that increased drug profits from West's referrals would be approximately $15-20 million per year. That estimate turned out to be low. The actual drug profits in subsequent years were much higher.

207.     For example, in 2015 the profits from oral cancer drug prescriptions ordered by West physicians and filled by AnnovoRX[16] totaled $10.06 million. In 2015, profits from chemotherapy infusion drugs ordered by West physicians totaled $30.60 million. In 2015, total drug profits from West's referrals were $40.66 million. In that year, Methodist's drug profits under the 340B Drug Discount Program totaled $74.29 million. West's referrals represented approximately 54 percent of these 340B drug profits.

208.     In 2016 the profits from oral cancer drug prescriptions ordered by West physicians and filled by AnnovoRX totaled $10.55 million. Profits from chemotherapy infusion drugs ordered by West physicians totaled $53.19 million. In 2016, total drug profits from West's referrals were $63.74 million. In that year, Methodist's drug profits under the 340B Drug Discount Program totaled $112.10 million. West's referrals represented approximately 56 percent of these profits.

---

[16] AnovoRX filled prescriptions and managed collections for oral drugs ordered by West Clinic physicians.

209.    Dr. Stern attended Methodist Board and Finance Committee meetings in which Methodist CFO McLean stated that Methodist's 340B drug profits were in the range of $70-100 million each year. When Dr. Stern heard this, he proposed to the Methodist leaders (CEO Gary Shorb, CFO Chris McLean, and COO Michael Ugwueke) to "put all the 340B profits in a pot" and distribute more to UTHSC for research, indigent care, and the development to an NCI-designated cancer center[17] in Memphis. They refused to do this and directed Dr. Stern to silence his views.

210.    Dr. Stern repeatedly argued that the 340B drug profits should serve the purposes of indigent care and the development of an NCI-designated cancer center. Methodist's senior executive team---Shorb, McLean, and Ugwueke--- opposed that objective and focused on using the drug profits to enrich Methodist's revenues and West physicians' incomes.

211.    In early 2015, Methodist's senior executives who engineered the partnership became more anxious about the risks of losing Methodist's $50+ million investment into the new West Cancer Center office spaces and the risks of losing revenues from referrals by West physicians if West chose to opt out of the alliance as allowed by their existing agreements with 6-month notice. Methodist's senior executives sought to reach a longer term "deal" with West and they formed a "Steering Committee" composed of executives at Methodist, West, and UTHSC.

212.    On January 8, 2015, at Michael Ugwueke's (Methodist COO) request, Liebman arranged a conference call with Chartis Group` ("Chartis"), a health care consulting firm. The purpose of the conference call was to discuss that firm assisting in developing a mutually agreeable business plan for Methodist and West to continue their "alliance" into the future. The conference call was at 10:00 am Central Time on January 8, 2015.

---

[17] The National Cancer Institute (NCI) Cancer Centers Program was created as part of the National Cancer Act of 1971. Through this Program, NCI recognizes centers around the country that meet rigorous standards for research focused on developing new and better approaches to preventing, diagnosing, and treating cancer.

213.     On February 3, 2015, Liebman and Stern attended a meeting with Ugwueke (Methodist COO), attorney Chris Jedrey (who was making a pitch to represent UT), Chris Regan and Pamela Damsky from Chartis, and Erich Mounce (West Clinic CEO) to discuss forming a steering committee to extend the "alliance" between Methodist and West physicians.

214.     At that meeting, West CEO Mounce stated that the West physicians had some "non-negotiable" requirements, including (1) keeping their income levels above the 90th percentile, and (2) protecting their income levels in the event of any change in the 340B Program that Methodist was using to channel profits from cancer drug sales to West physicians.

215.     Mounce confirmed that the West physicians were worried about their incomes declining if there were changes in the 340B Program. Mounce adamantly argued that the West physicians' incomes must continue at the same level calculated to include drug profits even if there were future regulatory changes in the 340B Program.

216.     After this meeting, Ugwueke told Dr. Stern that there could be no legal counsel on behalf of UTHSC[18] at the Steering Committee meetings.  Ugwueke insisted that only West's legal counsel would be allowed to participate.

217.     Stern ran into resistance in securing outside legal counsel during these discussions even though the University of Tennessee routinely retained outside counsel on various matters. Chancellor Schwab told Dr. Stern that it was a "complicated process" for the University to have outside legal counsel present at these meetings.

218.     Methodist hired PricewaterhouseCoopers (PwC) to conduct interviews and develop a business plan mutually agreeable for the parties to extend the duration of the "alliance."

---

[18] Throughout the history of their relationship, UTHSC did not control or participate in Methodist's senior management decisions to make any of the payments to West Clinic physicians. UTHSC has not managed, operated or controlled Methodist, West Cancer Center or West Clinic physicians.

219.    The West Cancer Center---Strategy and Partnership Model Steering Committee ("Steering Committee) met multiple times in the summer of 2015. Liebman and Stern attended these meetings.

220.    As part of the Steering Committee's work, PwC consultants interviewed numerous Methodist executives, West physicians and West executives including: Gary Shorb, CEO of Methodist; Michael Ugweuke, COO of Methodist; Chris McLean, CFO of Methodist; Jeff Liebman, CEO of Methodist University Hospital; William Kenley, CEO of Germantown Hospital; Erich Mounce, West's CEO; Dr. Kurt Tauer, West's Chief of Staff; Dr. Lee Schwartzberg, West's Chief Medical Officer; Dr. Matt Ballo, West's Medical Director; and Ari Vanderwalde, West's Director of Clinical Research.

221.    On June 3, 2015, the Steering Committee held its first meeting. In attendance were executives from Methodist, UTHSC, and West. Liebman and Stern attended this meeting. Methodist did not have legal counsel in attendance at this meeting.

222.    The other individuals in attendance included: PwC consultants, Gary Shorb (CEO of Methodist), Michael Ugweuke (COO of Methodist), Chris McLean (CFO of Methodist), Erich Mounce (West's CEO), Dr. Kurt Tauer (West's Chief of Staff), and Dr. Lee Schwartzberg ( West's Chief Medical Officer).

223.    At this meeting, the PwC consultants presented their findings after "conduct[ing] 22 interviews" of Methodist executives and West executives and physicians. PwC consultants also performed an "[a]ssessment of partnership financials and funds flow."

224.    During the meeting, PwC consultants reported that the interviews confirmed that Methodist was using 340B drug profits and other compensation to incentivize the doctors to help Methodist capture more market share of oncology patients in the region. The consultants repeatedly said that

West physicians had the ability to shift even more cancer market share to Methodist in exchange for "financial support."

225.    The consultants from PwC presented a series of slides that included the following statements based on PwC's interviews of Methodist and West Clinic executives.

226.    Slide Number 9 stated that "West Clinic Goals" in originally forming the "alliance" included "[g]ain ability to capitalize on 340b opportunity" and "[a]lign with strong hospital partner for capital and growth."

227.    Methodist's "Goals" also included "[c]apitalize on 340b opportunity." Methodist further wanted to "[e]nhance market share and brand."

228.    Slide Number 10 listed the "strengths/capabilities" that each "partner" has brought to the "partnership." West's "strengths" included "ability to shift significant market share to Methodist." Methodist's "strengths" included "ability to capitalize on 340b."

229.    Slide Number 11 addressed "Success to Date" and stated in part, "Tangible financial benefits to all parties" and "market share growth."

230.    Slide Number 12 listed financial numbers of the original "structure" and operating model and compared these original numbers to "current" numbers.

231.    On Slide Number 12, there was a section titled, "Funds Flow & Comp Structure." That section compared "Original Terms/Structure" with "Current State." For "Original Terms/Structure," the first item listed was "340b Benefit estimate" of approximately $15 million. Under "Current State," the "340b Benefit Actual" was listed as "~$25-$30" million. The presentation listed these 340B drug profits in the section titled "Funds Flow & Comp Structure."

232.    The actual 340B profits given to West Clinic physicians were not itemized on the slideshow, but Slide Number 13 confirmed, "The funds flow between entities runs primarily through Methodist and is heavily reliant on 340b savings." The term "savings" meant profits.

233.    Slide Number 15 further confirmed that Methodist "distributed" 340B drug profits: "340b savings are made possible by Methodist (payer mix and provider number), however due to the nature of the program, the benefit runs through the Methodist P & L before being distributed or reinvested."

234.    At this meeting, Methodist senior executives---including CEO Gary Shorb and CFO Chris McLean---confirmed that they wanted to use 340B drug profits and other methods to incentivize the West physicians to help Methodist capture more market share of cancer patients in the region. Shorb and McLean confirmed that they wanted to maximize referrals of cancer patients to the Methodist system because of high profits associated with oncology services and they would continue to pay West for that objective in multiple ways.

235.    West CEO Mounce and West senior physician partner, Dr. Lee Schwartzberg, stated that they had the ability to shift even more cancer "market share" or cancer patients to Methodist in exchange for "financial support."  During the meeting, Liebman asked several times if there were any regulatory risks with this business arrangement.

236.    As discussed at the Steering Committee meeting, West physicians' goals in originally forming the "alliance" with Methodist included "capitalize on 340B opportunity" and align with a hospital system for financial "capital." Methodist's goals included included "[c]apitalize on 340b opportunity" and  "[e]nhance market share and brand."

237.    At these meetings, Dr. Stern objected to the focus of the meetings being on West's dominance in the Cancer Center from the standpoint of control and financial considerations. Stern

was focused on following an NCI-designated cancer center model and recruiting cancer center leadership and faculty physicians/researchers who could improve cancer care for Memphis and the mid-South.

238. At the Steering Committee meeting on June 3, 2015, PwC consultants and Methodist executives discussed the financial terms and profits to date from the "alliance" with West physicians. The original projections by Methodist CFO McLean at the beginning of the "alliance" with West contemplated increased annual 340B drug profits of approximately $15 million. Actual 340B drug profits had been higher at approximately $25-30 million dollars per year from referrals by West physicians.

239. The original terms contemplated "management fees" of approximately $3 million per year paid by Methodist to West physicians. The actual management fees paid to West physicians in FY 2014 were approximately $4.4 million.

240. The original terms also provided for Methodist to pay $7 million to Vector (formerly known as ACORN), the research company controlled by West physicians.

241. Methodist executives also discussed increased profits to the hospital system from West physicians' referrals of cancer patients for hospital admissions.

242. On July 15, 2015, the Steering Committee met again and the PwC consultants led the discussion based on their interviews of West and Methodist executives. Liebman and Stern attended this meeting along executives from West and Methodist. The consultants circulated another slide presentation and reported hospital financial data.

243. At this meeting, Methodist executives discussed the healthcare system's financial data demonstrating that referrals from West physicians had increased Methodist's market share since the financial payments to West began. Between 2012 and the 2014, inpatient oncology volume at

Methodist more than doubled as hospital discharges for cancer patients moved from 7,320 discharges in 2012 to 15,834 discharges in 2014.

244. Between 2012 and 2014, the oncology payor mix at Methodist remained consistent with 43 percent of oncology inpatient cases covered by Medicare and 23-25 percent covered by Medicaid. With respect to outpatients, Medicare covered approximately 43 percent of oncology patients at Methodist and Medicaid covered approximately 8 percent.

245. At this meeting in July 2015, West physicians at that meeting insisted that if the funding from 340B profits were reduced, they wanted the option to leave the "partnership."

246. Liebman told other Methodist executives that Methodist needed a deeper commitment to compliance and the mission of developing an NCI-designated cancer center could not be about enriching private physicians for referrals.

247. There is extensive documentation of West physicians' anxiety about potential changes to the 340B drug program. In the slide presentation at the West Cancer Center---Strategy and Partnership Model Steering Committee Meeting on July 15, 2015, multiple slides addressed potential changes in the 340B Program. Slide Number 7 listed "executive summary of insights to be shared today" and one of the "insights" stated, "A deterioration in 340b funding is possible over the mid-to-long term (3-5 years) as the definition of an 'eligible patient' and other tenants of the legislation are debated." (Slide Number 7). Slide Number 35 stated, "The 340b program provides notable benefits to the partnership, but changes are expected with intense Pharma opposition (next 3-5 years?)." (Slide Number 35). Slide Number 36 stated, "The rapid growth of 340b over the past decade has created intense scrutiny on the program and pharma opposition." (Slide Number 36). Slide Number 38 stated, "The initial Steering Committee meeting highlighted four critical areas to address…" (Slide Number 38). One of these four "critical areas" was listed

as "340b risk mitigation (revenue growth opportunities): How will the partnership reduce reliance on 340b for financial stability…?" *Id.*

248.    At the Steering Committee meeting on August 20, 2015, West CEO Mounce insisted that any extension of the "partnership" must guarantee physician compensation above the 90th percentile no matter regulatory changes in the 340B Drug Program or Methodist's eligibility to participate.

249.    Liebman again openly questioned the legality of such an arrangement and openly expressed his concerns in that meeting.

250.    In October of 2015, Methodist and West executives exchanged a document called "West Cancer Center Deal Terms and Methodist Response." This "document contains a summary of feedback from UT and the West Clinic on the initial deal framework and Methodist's response."

251.    In discussing the continuation of their "partnership," one of the "new model imperatives" was "[s]tructure must not jeopardize 340b benefit."

252.    Another slide provided "notable feedback" from West physicians regarding a new business model for the alliance with Methodist. The "West Clinic Feedback" included a requirement for Methodist's "funding and capital investments [to] continue at existing rates even if 340b benefit is lost."

253.    One of West's requirements was "[n]o disclosure of individual physician incomes." One of the "new model imperatives" was "[n]o disclosure of individual physician compensation for West Clinic shareholders in short term" and "[l]imit disclosure of other individual physician compensation through transition period."

254. West also insisted that UTHSC physicians who were part of the Cancer Center join the "captive PC" that was being formed and would be governed by West Clinic physicians. Stern objected to this.

255. In the summer of 2016, West CEO Mounce circulated a memo called "Deal Points" to Methodist executives and Dr. Stern.

256. On July 28, 2016, Methodist COO Michael Ugwueke sent updated "Deal Points" to Dr. Stern, Dr. Steve Schwab (the Chancellor and CEO of UTHSC), and Dr. David Shibata (Chair of the Department of Surgery at UTHSC). In his cover email, Ugwueke stated, "Please find an updated West Cancer deal points that Gary [Methodist CEO Gary Shorb] and I would like to discuss with you."

257. The "Deal Points" guaranteed payments to West physicians "at or above the 90th percent" compensation per wRVU. "The specialty-specific wRVU rate, and the CMA [Co-Management Agreement] fees will be periodically re-appraised in accordance with the revaluation schedule in the Current Agreements." The Deal Points further stated, "If the revaluation identifies a fair market value range for the specialty-specific wRVU rate, MLH and the PC agree to select the value that is at or above the 90th percent of that fair market value range." This "deal point" was a continuation of the same commitment that Methodist executives made at the beginning of the "alliance" in which they guaranteed that West physicians would be paid above the national 90th percentile.

258. West physicians also required the option to "unwind" and walk out of the deal with Methodist if their income decreased "10% or more in any given year over life of Master Transaction Agreement."

259. Methodist and West negotiated over a longer "alliance" and the negotiations were ongoing when Liebman left Methodist in August of 2017.

260. The "partnership" ended in 2018, the same year that changes to the 340B Program went into effect reducing the Medicare payment rates for drugs purchased by hospitals through the Program. Under the final rule implemented in January 2018, Medicare payments for outpatient drugs to hospitals in the 340B Program were reduced by approximately 28.5%.

## Methodist's Disguised Financial Payments Under the PSA Which Rewarded West Physicians for Their Referrals

261. It would be brazenly illegal for Methodist to write a check each month for drug profits to the West physicians from their referrals. Consequently, Methodist devised a disguised scheme that accomplished the same objective of rewarding the physicians for the value of their referrals, including lucrative chemotherapy referrals, to the Methodist-acquired cancer clinics and Methodist hospitals.

262. In interviews conducted through the terms of the Settlement Agreement with the West entities, West's senior leadership has confirmed that the West physicians made a business deal to guarantee their incomes and the vehicle for funding that deal was 340B drug profits from West's referrals of drug prescriptions to the Methodist system, including chemotherapy.

263. The revenue stream with the highest profit margin for Methodist was chemotherapy infusion drugs and oral cancer drugs because of Methodist's eligibility under the 340B Program to acquire drugs at deep discounts with savings of 20-50 percent. Drug profits under the 340B Program were the primary economic reason that Methodist offered and paid the West physicians a compensation pool far higher than West's historical earnings and far higher than their professional collections.

264. As demonstrated below, Methodist did not simply guarantee West's income at historic levels. Rather Methodist dramatically increased West's income under the "partnership."

265.    Prior to the partnership, in 2010 West reported a physician compensation pool of $31.62 million from the sites that would become owned and operated by Methodist starting in 2012. In 2011 West had a physician compensation pool of $32.21 million, however, West's short-term debt increased from approximately $4.07 million to $12.07 million in that single year.

266.    In the first year of the partnership (2012), the physician compensation pool was $50.58 million after servicing debt of $3.25 million according to West's senior leadership. In the second year of the partnership (2013), the physician compensation pool was $37.52 million after servicing debt of $2.32 million according to West's senior leadership. The physician compensation pool continued at levels far higher than the compensation pool prior to the partnership, increasing to $37.74 million after servicing debt of $1.56 million in 2014, $41.20 million after servicing debt of $1.052 million in 2015, $42.28 million in 2016, approximately $48.47 million in 2017, and budgeted at $50.59 million in 2018 according to West's senior leadership.

267.    While the physicians' invoiced wRVUs increased over this time frame, Methodist's financial arrangement allowed the West shareholders to hire more oncologists as employees at lower salaries and leverage the profit margins by billing these physicians at premium rates per wRVU.

268.    It is a fundamental requirement of Stark laws and the AKS that physicians must be paid based on the value of their personally performed services and not based on the value of business or referrals generated for the hospital system. As the hospital system paying the amounts at issue to referring physicians, Methodist was responsible for ensuring compliance with federal laws.

269.    An important benchmark in the determination of fair market value compensation is physician compensation to collections ratios. West's senior leadership has confirmed that on the eve of the partnership in the fall of 2011, Methodist hired ECG Management Consultants ("ECG")

to issue a valuation opinion regarding the payments per wRVU to West physicians. West's senior leadership has confirmed that in October of 2011, ECG issued a valuation opinion to Methodist premised on the condition that the compensation to collections ratios for West physicians must not exceed 5 percentage points of the MGMA[19] national median. Therefore, if the national median compensation to collections ratio was 1.12 for medical oncologists, the compensation to collections ratio for West oncologists could not exceed 1.17. West's senior leadership understood that the ECG valuation report focused on the physicians' professional collections for personally performed services and excluded drug revenues and technical charges.

270.    From the beginning of the partnership, Methodist had no intention of complying with this important condition of its own valuation opinion. West's senior leadership has confirmed that Methodist executives, including CFO McLean, understand and knew this condition was an important requirement of ECG's valuation opinion. West's senior leadership has confirmed that they deferred to Methodist in evaluating the West physicians' compensation to collections ratios each year.

271.    West's senior leadership has also confirmed the accuracy of the following financial data demonstrating that Methodist never complied with this important condition of ECG's valuation opinion.

272.    In 2012, Methodist paid the overall West physicians $35.63 million in "wRVU" payments. Yet West's senior leadership has confirmed that their total professional collections at the partnership sites in 2012 were $14.45 million. In a single year, Methodist paid West physicians

_____

[19] Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are leading benchmarking resources for physician compensation in the United States. The annual MGMA Surveys are based on physician compensation and productivity data in the prior year. For example, the 2017 MGMA Survey reports physician compensation data from 2016.

$21.18 million more in "wRVU" payments than their professional collections. In "wRVU" payments alone, the compensation to collections ratio for West physicians overall was 2.46.

273. Methodist paid the West physicians at extreme levels with respect to compensation to collections ratios. This fact is true whether examining the overall compensation to collections ratios for all West physicians or examining the compensation to collections ratios for the West oncologists.

274. For example, in the single year 2012, Methodist paid the West oncologists approximately $24.31 million in "wRVU" payments. Yet the West oncologists' professional collections were less than total professional collections for all West physicians in the amount of $14.45 million. In 2012, Methodist paid the West oncologists at least $10 million more in "wRVU payments" than their professional collections. The actual compensation to collections for the West oncologists exceeded 2.0 in 2012.

275. Instead of paying West oncologists within 5 percentage points of the national median compensation to collections ratios as required by their own valuation, in the first year of the partnership, Methodist paid West oncologists at the national 90th percentile level in compensation to collections ratios.

276. The compensation package was extraordinary for West oncologists prescribing the chemotherapy drug referrals and generating other referrals to the Methodist system. First, the payment rate of $145 per wRVU for West's medical oncologists[20] approached or exceeded the national 90th percentile in multiple years.[21] Second, Methodist's payments to the West oncologists

---

[20]Throughout the years of the partnership, most of the West physicians were hematologists/oncologists or medical oncologists. Throughout the years of the partnership the senior physician leaders of West were oncologists. These senior oncologists controlled the distributions of the physician compensation pool generated by payments from Methodist.

[21] For oncology only, the national 90th percentile payment per wRVU was $114.68 in 2011, $109.79 in 2012, $118.53 in 2013, $137.86 in 2014, $137.34 in 2015, $223.64 in 2016, $169.34 in 2017, and $163.10 in 2018. For

at levels over double their professional collections towered above national MGMA benchmarks.[22] Methodist paid West oncologists at levels approaching or exceeding the national 90th percentile in numerous years.[23]

277.     In 2013, Methodist paid the overall West physicians $36.66 million in "wRVU" payments. Yet West's senior leadership has confirmed their total professional collections at the partnership sites in 2013 were $16.84 million. In that single year, Methodist paid the overall West physicians $19.82 million more in "wRVU" payments than their professional collections. In "wRVU" payments alone, the overall compensation to collections ratio for West physicians was approximately 2.17.

278.     With respect to the West oncologists in 2013, Methodist paid them approximately $23.86 million in "wRVU" payments. Yet the West oncologists' professional collections were less than the total professional collections for all West physicians in the amount of $16.84 million. In 2013, Methodist paid the West oncologists at least $7 million more in "wRVU payments" than their professional collections. In "wRVU" payments alone, the actual compensation to collections ratio for the oncologists exceeded 1.6.

279.     In 2014, Methodist paid the overall West physicians $38.69 million in "wRVU" payments. Yet West's senior leadership has confirmed their total professional collections at the partnership sites in 2014 were $18.38 million. In that single year, Methodist paid West physicians approximately $20.31 million more in "wRVU" payments than their professional collections. In

---

hematology/oncology, the national 90th percentile payment per wRVU was $145.78 in 2011, $149.00 in 2012, $168.18 in 2013, $142.61 in 2014, $196.57 in 2015, $160.51 in 2016, $156.91 in 2017, and $147.12 in 2018.

[22] For example, the national median compensation to collections ratio for hematologists/oncologists was 1.10 in 2011, 1.10 in 2012, 1.13 in 2013, 1.10 in 2014, 1.24 in 2015, 1.43 in 2016, 1.22 in 2017, and 1.34 in 2018.

[23] For example, the national 90th percentile compensation to collections ratio for hematologists/oncologists was 1.99 in 2011, 2.19 in 2012, 2.20 in 2013, 2.12 in 2014, 2.61 in 2015, 2.82 in 2016, 2.09 in 2017, and 2.34 in 2018.

"wRVU" payments alone, the overall compensation to collections ratio for West physicians was 2.10.

280.  With respect to the West oncologists in 2014, Methodist paid them approximately $22.72 million in "wRVU" payments.  Yet the West oncologists' professional collections were less than the total professional collections of all West physicians in the amount of $18.38 million.  In 2014, Methodist paid the West oncologists at least $5 million more in "wRVU payments" than their professional collections. In "wRVU" payments alone, the actual compensation to collections ratio for the medical oncologists exceeded 1.6.

281.  In 2015, Methodist paid the overall West physicians $38.29 million in "wRVU" payments. Yet West's senior leadership has confirmed their total professional collections at the partnership sites in 2015 were $19.09 million. In that single year, Methodist paid West physicians $19.2 million more in "wRVU" payments than their professional collections. In "wRVU" payments alone, the overall compensation to collections ratio for West physicians was 1.92.

282.  With respect to the medical oncologists in 2015, Methodist paid them  $23.03 million in "wRVU" payments.  Yet the West oncologists' professional collections were less than the total professional collections of all West physicians in the amount of $19.09 million.  In that year, Methodist paid the West oncologists at least $4 million more in "wRVU payments" than their professional collections. In "wRVU" payments alone, the actual compensation to collections ratio for the medical oncologists exceeded 1.4.

283.  Over the time period of 2012-2015, Methodist paid the overall West physicians approximately $80.51 million more in "wRVU" payments than their professional collections. In "wRVU" payments alone, the overall average compensation to collections ratio during these years was approximately 2.16.  Over the time period of 2012-2015, Methodist paid the West oncologists

in excess of $26 million more in "wRVU" payments than their professional collections. These calculations do not include additional excessive payments for inpatient management services not performed as discussed further below.

284.    Methodist's executives deliberately decided to make such overpayments because of the value of the oncologists' referrals, including chemotherapy and oral drug prescriptions with high profit margins under the 340B Program. Payments at this level are not legitimate and legal payments for wRVUs. Rather, payments at this level have no relationship to the physicians' personally performed services or professional collections and represent payments for something different than wRVUs---the payments channeled a share of the physicians' referrals to the Methodist-acquired clinics and Methodist hospitals, including 340B drug profits Methodist obtained from West's referrals of chemotherapy and oral cancer drugs.

285.    The excessive payments continued in 2016 and 2017.

286.    In 2016, Methodist paid the  overall West physicians $41.43 million in "wRVU" payments. Yet their total professional collections at the partnership sites were $28.32 million according to West's senior leadership. In that single year, Methodist paid West physicians $13.11 million more in "wRVU" payments than their professional collections. In "wRVU" payments alone, the overall compensation to collections ratio for West physicians was 1.46.

287.    In 2017, Methodist paid the West physicians $45.40 million in "wRVU" payments. Yet their total professional collections at the partnership sites were approximately $25.34 million according to West's senior leadership. In a single year, Methodist paid West physicians approximately $20.06 million more in "wRVU" payments than their professional collections. In "wRVU" payments alone, the overall compensation to collections ratio for West physicians was 1.8.

288.    With respect to the medical oncologists in 2017, Methodist paid them approximately

$29.84 million in "wRVU" payments. Yet the West oncologists' professional collections were less

than the total professional collections of all West physicians in the amount of $25.34 million.  In

2017, Methodist paid the West oncologists over $5 million more in "wRVU payments" than their

professional collections.

289.    Over the time period of 2012-2018, Methodist paid the overall West physicians over $125

million more in "wRVU" payments than their professional collections. In "wRVU" payments

alone, the overall average compensation to collections ratio for West physicians during these years

was approximately 1.93. In "wRVU" payments alone, Methodist paid the West physicians

approximately double the amounts of their professional collections.

290.    These calculations do not include Methodist's additional payments of base management

fees in the amounts of $13-16 million for inpatient management services not performed as

discussed below. In stacking multiple components of excessive payments, Methodist paid the West

physicians over double the amounts of their professional collections. Methodist also paid for all of

the West physicians' practice expenses. The excessive extraordinary payments by Methodist were

pure profits to West physicians.

291.    While most of the West physicians were oncologists, Methodist also paid different wRVU

rates for West specialists in endocrinology, gynecological oncology, pain management, hospitalist

internal medicine, radiation oncology, radiology, and breast surgery. None of these specialties had

median compensation to collections ratios justifying Methodist's payments at over $125 million

above professional collections. For example, the MGMA national median compensation ratio for

endocrinology stayed between .59 and .66 during the years 2012-2018. The MGMA national

median compensation ratio for gynecological oncology stayed between .62 and 1.26 during the

years 2012-2018. The MGMA national median compensation ratio for pain management stayed between .55 and .89 during the years 2012-2018. The MGMA national median compensation ratio for radiation oncology stayed between .80 and 1.05 during the years 2012-2018. The MGMA national median compensation ratio for radiology stayed between .76 and .94 during the years 2012-2018. The MGMA national median compensation ratio for breast surgery stayed between .67 and .86 during the years 2012-2018. The MGMA national median compensation ratio for hospitalist internal medicine stayed between 1.21 and 1.42 during the years 2012-2018.

## Methodist Paid $13-16 Million to West Physicians for Inpatient Management Services Not Performed

292.    The "wRVU" payments were not the only payments received from Methodist. Methodist stacked "management" fees on top of the "wRVU" payments each year. By paying the "wRVU" payments and the management fees in lump payments to West, Methodist stacked payments to the physicians and allowed West to distribute these payments to individual physicians, including West oncologists regardless of whether the physicians provided any management services.

293.    The management fees paid by Methodist each year were in two parts: base management fees and incentive fees. The Management Services Agreement provides for an annual base management fee of $1,562,400 "for inpatient management services at the Methodist Hospitals." The base management fee increased as the oncology service line revenues grew. Between 2012 and 2018, Methodist paid approximately $13-16 million dollars in base management fees to West physicians for inpatient management services at Methodist hospitals.

294.    West's senior leadership has confirmed that West did not provide inpatient management services at Methodist hospitals during the years of the "partnership" with Methodist.

295.    West's senior physician leadership has confirmed that West physicians did not provide inpatient management services at Methodist hospitals in 2012, 2013, 2014,  2015, 2016, 2017 or 2018 and only began "planning" to provide inpatient management services for the new hospital wing in 2015.

296.     West's senior leadership has confirmed that West physicians' focus was on outpatient management services at the Cancer Center Sites, not inpatient management services at Methodist's hospital facilities. West's senior leadership has stated that West's expertise was  managing outpatient services, not inpatient services. West's decision not to provide inpatient management services was by design based on their lack of experience and training with such services and their focus on outpatient management services at the cancer center sites.

297.    West's senior leadership has also confirmed that Methodist did not require West physicians to keep records describing their management services and the times expended in such services and West physicians did not keep such records.

298.    West's senior leadership has confirmed that West did not perform the extensive duties required by the Management Services Agreement for inpatient management services at Methodist hospitals.

299.    Despite West not providing inpatient management services, Methodist paid West a base management fee each year for inpatient management services and the amounts of the base fee increased as the service line revenues increased.

300.    As the oncology service line revenues grew from West's referrals, Methodist repeatedly obtained new valuations to pay higher "management fees" to West.  Methodist orchestrated increased management fees to West based on the scope of the "managed services" defined by Methodist's oncology service line revenues, including inpatient revenues.

301.    As a part of the management fee valuations, West's senior leadership has confirmed that West compiled and provided the following financial numbers to the valuation consultants regarding oncology service line revenues at Methodist hospitals and the scope of West's "managed services." West's senior leadership has confirmed that these revenues included inpatient oncology admissions and services at Methodist hospitals.

302.    For example, the inpatient and outpatient oncology revenues at University Hospital were $34.11 million in 2012, $40.72 million in 2013,  $52.26 million in 2014,  $60.48 million in 2015, $61.40 million in 2016,  and approximately $72.20 million in 2017. The inpatient and outpatient oncology revenues at Germantown Hospital were $10.03 in 2012, $13.76 in 2013, $13.36 million in 2014, $21.66 million in 2015, $23.75 million in 2016, and approximately $25.94 million in 2017.

303.    West's senior leadership confirmed that these revenue numbers were provided to valuation consultants offering opinions as to the fair market value of the management fees paid to West. These hospital revenues were included in the oncology service line revenues used to define the scope of West's managed services despite the fact that West did not provide inpatient management services at Methodist hospitals.

304.    As previously described in the Second Amended Complaint, the Management Services Agreement contains extensive requirements for West physicians to manage the inpatient oncology services at Methodist's hospitals for the time period January 1, 2012 through December 31, 2018.

305.    The contract terms began by recognizing that Methodist Healthcare-Memphis Hospitals "owns and operates four acute care hospitals in the Memphis area, including Methodist University, Methodist South Hospital, Methodist North Hospital, [and] Methodist Le Bonheur Germantown." The contract further confirmed that these four hospitals "provide a wide range of inpatient,

outpatient and clinic oncology services (including, but not limited to, radiation, medical hematology, surgical and specialty oncology services, and related ancillary services, used in the treatment of oncology patients and those services described in Section 1.2 and Exhibit A) to adult oncology patients at MHMH, including the Cancer Center Sites, and the other Methodist Hospitals (the 'Service Line')."

306.    The contract terms required West to "provide management and performance improvement services for and on behalf of MLH and MHMH with respect to the Methodist Hospitals, the Cancer Center sites, and such other off-campus oncology care sites as may in the future be operated under the license of or managed by any of the Methodist Hospitals… (Paragraph 1.1). The scope of engagement included the "following clinical oncology service lines: inpatient, outpatient, and clinic services at the Managed Sites, including hospitalist services for oncology inpatients." (Paragraph 1.2).

307.    The contract required West physicians to "assist the applicable Methodist Hospital in overseeing and managing all Hospital Service Line clinical staff including clinical personnel, nurse practitioners, and physician assistants other than physicians employed by Manager who provide services in connection with the Service Line as either Methodist Hospital employees or leased employees…and assist the applicable Methodist Hospital in its recruitment, hiring, evaluation, termination, discipline, reprimand, and establishment of terms of employment for the Service Line Employees." (Par. 1.5). "As of the Effective Date, the parties agree that the initial Service Line Employees shall consist of the following positions: Oncology personnel involved with the Service Line; Nursing staff involved with the Service Line; Hospitalists involved with the Service Line; and Other clinical staff involved with Service Lines." *Id.*

308.     The contract further required West physicians to perform extensive inpatient management services at the Methodist hospitals, including the following:

- "Manager shall evaluate and make recommendations to MHMH and the Methodist Hospitals with respect to the subject matter of material contracts, leases, and purchases pertaining to the Service Line" (Par. 1.7)
- "Manager shall assist the Methodist Hospitals in the negotiation of reimbursement and fee payment arrangements for the Service Line with third party payors and/or state or federal agencies."(Par. 1.8)
- "Manager shall assist the Methodist Hospitals in complying with the standards and requirements of accrediting agencies, including, but not limited to, The Joint Commission and other applicable accreditations specific to the oncology-related services as requested by MHMH or MLH on behalf of the Methodist Hospitals, including, but not limited to, MLH's goal of the Service Line receiving NCI/NCCN designation. (Par. 1.9).
- "Manager shall assist the Methodist Hospitals in formulating, implementing, monitoring and managing hospital quality assurance, utilization review, educational and risk management programs for the Service Line." (Par. 1.10).
- "Manager shall assist the Methodist Hospitals in the development of educational training materials and the training and educating of employees assigned to the Service Line." (Par. 1.11).
- "Manager shall assist the Methodist Hospitals in the credentialing process regarding appointments and re-appointments to the Medical Staffs of practitioners who provide professional services in connection with the Service Line through the evaluation of relevant data." (Par. 1.12).
- "Working with MHMH and Methodist Hospitals, Manager shall design and seek to implement stipulated documentation, including, but not limited to, charts, forms, clinical notes and other documents for the Service Line, and shall seek to ensure compliance with the Methodist Hospitals' documentation standards and process." (Par. 1.13).
- "Manager shall assist MHMH and the Methodist Hospitals in evaluating the physical facilities at the Managed Sites (e.g., site layout, space planning) to improve patient care, increase efficiency and improve patient and practitioner experience." (Par. 1.17).
- "Manager will engage in pre-bill review of Service Line designated cases pursuant to the Methodist Hospitals' internal control processes for the Service Line. Manager shall also assist in the formation of such processes, which shall include medical records reviews to ensure appropriate documentation is in place to support the services billed for." (Par. 1.18).
- "Manager shall assist MHMH and the Methodist Hospitals in the selection and criteria for clinical usage of chemotherapy drugs and supportive pharmaceutical agents and make recommendations with respect thereto." (Par. 1.19).
- "Manager shall monitor and evaluate the use of intensive care services by

Service Line patients of the Methodist Hospitals." (Par. 1.23).

- "Manager shall assist the Methodist Hospitals in monitoring and evaluating patient, physician and staff satisfaction within the Service Line, and, as needed, develop, implement and manage programs and plans for improvement." (Par. 1.24).

- "Manager shall be responsible for overseeing the delivery of outpatient pre-procedure/visit communications with Service Line patients to ensure that (i) all required paperwork and consents are completed; and (ii) Service Line patients' questions have been answered and that patients are reasonably informed and prepared for his/her procedure or visit. Manager will oversee the development of pre-procedure visit communications protocols for inpatients in the Service Line." (Par. 1.25).

- "Manager will assist in the Methodist Hospitals' case management activities necessary for the proper operation of the Service Line. The case management activities may include, but are not limited to, discharge planning, appointment scheduling, development of patient educational materials and discharge instructions, facilitating the ordering of appropriate services and supplies upon discharge, and the establishment, and implementation and monitoring of a patient call-back process that meets applicable regulatory standards for Service Line patients." (Par. 1.27).

309.    Exhibit A to the Management Services/Performance Improvement Agreement also listed 24 separate management responsibilities of the West physicians and these specific responsibilities included inpatient management services. Exhibit A stated that West physicians "shall assist MLH, MHMH and the Methodist Hospitals in operating the Service Line by providing the following general management services" at the Methodist hospitals:

- "direct and coordinate the Service Line in accordance with recognized standards to promote quality and efficient care to be given to patients,"
- "develop and update" best practice standards for the Service Line,
- "develop, implement and  regularly update" patient care "protocols, pathways and guidelines for the delivery of Service Line services and assure consistency with national best practice standards,
- "assist as a liaison among administrative departments and committees as well as the Medical Staffs," "assist in strategic, financial and operational planning for future oncology-related services provided by the Methodist Hospitals,"
- "develop and present, on at least a semi-annual basis, educational programs to physicians providing services within the Service Line,"
- "develop and present, on at least a semi-annual basis, educational and informational programs to community-based physicians,"

72

- "assist MHMH and the Methodist Hospitals in the development, implementation and monitoring of programs and plans to reduce adverse events, including medication errors,"
- "assist MHMH and the Methodist Hospitals in negotiating, retaining and managing of services that may be furnished through contractual arrangements (e.g. anesthesia services, radiology services, pathology services and other services as appropriate),"
- "in conjunction with MHMH and the Methodist Hospitals, develop, implement and, as appropriate, update and recommend additions and/or revisions in the administrative operating policies and procedures pertaining to the Service Line,"
- "assist MHMH and the Methodist Hospitals in the development of community awareness and educational programs providing information regarding Service Line services,"
- "assist MHMH and Methodist Hospitals by managing the Service Line quality and productivity in furtherance of and consistent with the objectives of the Agreement by…monitoring, evaluating and, as needed, restructuring delivery of care processes, evaluating job descriptions and realigning responsibilities as appropriate, establishing, monitoring and maintaining productivity standards,"
- and "assist MHMH and the Methodist Hospitals in the development and implementation of patient care protocols for the delivery of the Service Line."

310. In continuing to provide management services at the outpatient cancer center sites that West had owned for years, West continued its business operations. The legal compliance violation though is that year after year, Methodist knew that it was paying base management fees determined based on the value of West providing inpatient management services at all Methodist hospitals, including Methodist's acute care hospitals. Methodist executives knew that Methodist was paying approximately $13-16 million to West physicians for inpatient management services not performed as required by the contract.

311. As mentioned, the Management Services Agreement provides for an annual base management fee of $1,562,400 "for inpatient management services at the Methodist Hospitals." The base management fee increased as the oncology service line revenues grew. Between 2012

and 2018, Methodist paid $13-16 million dollars in base management fees to West physicians for inpatient management services at Methodist hospitals that West did not perform.

312. These facts confirmed by West's senior leadership correspond with the direct personal experience and knowledge of Co-Relator Jeff Liebman who served as CEO of Methodist's largest hospital and knew that West physicians did not manage the inpatient oncology services at Methodist hospitals as required by the Management Services Agreement.

313. Liebman's responsibilities included overseeing the operations of all inpatient and outpatient clinical activities at University Hospital. His office was responsible for the clinical as well as financial performance of all programs at the hospital. His monthly reviews included profit and loss results for all aspects of the 617-bed hospital. This hospital had the sickest patients in the entire Methodist network and the busiest emergency room. On a routine basis, Liebman reported to the Quality Committee of the Methodist Board and provided leadership for the development of all new clinical services including patient care, facilities and physician recruitment for the hospital. A significant part of his duties included the development of new clinical services and strategic plans for the future growth of the institution as well as considering improvements in quality of care.

314. Liebman also attended monthly meetings with Chief Executive Officers of all Methodist hospitals and other senior Methodist executives. At those meetings there were typically quarterly updates by West Clinic CEO Erich Mounce regarding new initiatives and activities by the West Clinic physicians. Liebman also attended weekly senior management meetings for all Methodist hospital Chief Executive Officers and Vice Presidents. At these meetings, there were commonly extensive discussions about hospital management issues and initiatives.

315.    The chronology of meetings Liebman attended regarding oncology services include the following.

316.    On or about May 23, 2014, Liebman met with West Clinic CEO Mounce. At this meeting, Mounce informed Liebman that eventually more cancer related services would be moved under Mounce's direction in order to "justify" the management fees that West Clinic physicians were receiving from Methodist.

317.    Liebman was surprised by Mounce's comment. At that time, Liebman did not know the exact dollar amounts Methodist paid to West Clinic physicians for supposed "management" services, but he knew that the physicians were not actually providing any management services at University Hospital or the other three Methodist hospitals. Mounce's statements to Liebman were admissions of this fact.

318.    On or about July  3, 2014, Liebman met with Dr. Ballo, Chair of the UTHSC Department of Radiation Oncology, at University Hospital to discuss radiation oncology services.  At that meeting Dr. Ballo indicated that he was confused about the relationship between him as Chair of the Department and the West Clinic.  Dr. Ballo stated that the West Clinic physicians had little interest in performing services at the downtown University Hospital location because patients in the wealthier suburbs had commercial insurance or Medicare coverage with higher payment rates.

319.    On July 30, 2014, Liebman met with Methodist COO Michael Ugwueke to review Methodist's relationship with West physicians and other items. In this meeting, Liebman questioned how West physicians fit into the clinical coverage and future needs of the hospital as well as the system.  Ugwueke indicated to Liebman that the West Clinic deal came about because the group was having "financial problems" and needed funding.  Ugwueke expressed concerns about the ability of West Clinic to leave the "partnership" at any time without cause on 6 month-

notice. He said that he would include Liebman in future discussions. Ugwueke was concerned because Methodist was "investing" high levels of funds in the West relationship and they could leave at any time. Ugwueke explained to Liebman that this was a "unique partnership" with the West. He also stated that West CEO Mounce was not a Methodist employee but worked for West. At this meeting, Ugwueke had no response to Dr. Ballo's concerns about the lack of West's involvement in the oncology service line at University Hospital.

320.    Shortly thereafter Dr. Ballo relocated to Germantown as his primary location. At a later meeting, Dr. Ballo told Liebman meeting that there was no real business strategy for University Hospital's oncology services because West physicians were not interested in being involved in hospital management issues. Dr. Ballo also stated that he and Liebman had to be "very considerate" of the wishes of the referring physicians at West.

321.    On or about August 1, 2014, Liebman met with the UTHSC Chief of Thoracic Surgery, Dr. Benny Weksler. At this meeting and in subsequent meetings, Dr. Weksler indicated that he was being pressured to join West and move his practice to the suburbs and away from downtown.

322.    On or about September 9, 2014, Liebman met again with Dr. Ballo. Dr. Ballo told Liebman that he believed that the downtown location for radiation therapy should be the main location for his department but West physicians disagreed and wanted to move that department to the wealthier suburb of Germantown.

323.    On or about September 26, 2014, Liebman met with Methodist COO Ugwueke again. This meeting was a follow up to Liebman's meeting with Dr. Weksler. Liebman reviewed with Ugwueke that Dr. Weksler was feeling pressured by West CEO Mounce and other Methodist executives (including William Kinley) to move his surgical practice to the wealthy suburb of Germantown. Liebman expressed his concerns about the impact this move might have on the

teaching programs located at University Hospital and the expectations of the ACGME for surgical training programs. The ACGME is the accrediting body for residents and fellows.

324. Ugwueke would not agree that the majority of Dr. Weksler's work should be done in downtown Memphis rather than Germantown and explained that it was of "extreme importance" that they keep the referring West physicians happy. Ugwueke directed Liebman to stay in touch with West CEO Mounce about this issue. Subsequently, some of Dr. Weksler's practice was moved to Germantown.

325. In follow up conversations, Mounce told Liebman that West wanted high level oncology services in the Germantown area as a high priority and had no interest in managing services in downtown Memphis at University Hospital.

326. Liebman followed up with Dr. Ballo at UTHSC and he told Liebman that it was not his intent to move the UTHSC radiation oncology department under the control of West. This statement by Dr. Ballo was consistent with the offer letter/contract that was signed by Stern and Schwartzberg pursuant to which Dr. Ballo would transition over approximately a 3-year period to be an employee of a UTHSC Practice Plan. In addition, Dr. Ballo would transition radiation oncologists who were part of his group to become faculty at UTHSC and members of a UTHSC Practice Plan if they were appropriate to join an academic track. Dr. Ballo confirmed on multiple occasions with Dr. Stern that he would stay with UTHSC. However, he ultimately left and joined the West Clinic.

327. On or about October 28, 2014, Liebman had a conference call with Dr. Lee Schwartzberg, senior partner and West Medical Director. Liebman asked Dr. Schwartzberg for an organizational chart of the West Clinic and asked him who would be the clinical leader to oversee oncology services at University Hospital. Liebman told Dr. Schwartzberg that he wanted to have regular

weekly or monthly meetings regarding oncology services and management of those services at University Hospital. Schwartzberg did not comply with Liebman's requests and there were no weekly or monthly meetings.

328. On or about January 6, 2015, Liebman met with Methodist's administrative director for radiation therapy, Genia Nipp. She informed Liebman that Methodist's senior executives had decided that future investments in radiation oncology would be for the Germantown location solely because that location was where the West doctors wanted it to be. She indicated that the Methodist corporate leadership had already agreed to this and West CEO Mounce would decide which radiation therapy equipment to buy and Methodist would pay for all equipment.

329. On or about February 26, 2015, Liebman had a conference call with Dr. Ballo who confirmed that he was moving to Germantown where future radiation therapy investments would be for the next several years. He also indicated that he would spend limited time in downtown Memphis.

330. On or about April 15, 2015, Liebman met with Dr. Martin Fleming to discuss surgical oncology. Dr. Fleming indicated he was concerned about taking very sick patients out of the University Hospital environment to do complex surgical care in the Germantown facility where there was limited night coverage, no teaching service, and fewer ICU beds. Dr. Fleming said pressure was coming from the West physicians because they had no interest in developing a comprehensive inpatient program in downtown Memphis at University Hospital. Liebman also shared a comprehensive clinical study showing that difficult surgeries should be concentrated in one campus for better clinical outcomes. Liebman sent that study to Methodist CEO Shorb and COO Ugwueke.

331. On or about April 23, 2015, Liebman had a conference call with Methodist COO Ugwueke to discuss various items. Liebman expressed his concerns about the lack of participation by the West physicians in any oncology services or inpatient programs at University Hospital.

332. During the week of June 3, 2015, Liebman attended the first West Cancer Center---Strategy and Partnership Model Steering Committee meeting.

333. During the week of July 15, 2015, Liebman attended the second West Cancer Center---Strategy and Partnership Model Steering Committee meeting. The individuals in attendance included (but were not limited to) PricewaterhouseCoopers ("PwC") representatives (Dr. Chin and Cindy Vanderline), Drs. Schwartzberg, Ballo, Weksler, and Tauer, Methodist CEO Shorb, Methodist CFO Chris McLean, West Clinic CEO Mounce, Dr. Stern and Liebman.

334. During the week of August 20, 2015, Liebman attended the third West Cancer Center---Strategy and Partnership Model Steering Committee meeting.

335. During the week of September 2, 2015, Liebman attended the fourth West Cancer Center---Strategy and Partnership Model Steering Committee meeting.

336. On or about October 12, 2015, there was a cancer leadership dinner. UTHSC physicians-- including Dr. Fleming, Dr. Stern, and Dr. Wecksler---expressed concerns about the governance model and the fact that West Clinic insisted that medical oncologists have a different and higher compensation model than the surgeons because they generated 340B drug profits.

337. Stern was also present at this meeting and objected to the governance model in which West Clinic physicians (i.e. Dr. Schwartzberg) ran the Cancer Center and UTHSC physicians worked for them. Stern also objected to the "captive PC" which was explained as a way to not reveal income or financial data about West physician compensation. The response from West senior

partner Dr. Schwartzberg and CEO Mounce was that the West Clinic physicians' referrals drove the Cancer Center and they would do as they saw fit.

338.     On or about October 30, 2015, Liebman had a meeting with West CEO Mounce at 8:00 a.m. in Liebman's office.  Mounce informed Liebman that the "deal" was always for the West oncologists to get paid more because they generated 340B drug profits through referrals for chemotherapy infusion and oral cancer drugs.

339.     During the week of November 16, 2015, Liebman attended the fifth West Cancer Center---Strategy and Partnership Model Steering Committee meeting.

340.     On or about January 20, 2016, Liebman met with Methodist COO Ugwueke and again expressed his concerns about there being no plan for West Clinic physicians managing oncology clinical services at University Hospital, Methodist North, or Methodist South hospitals.  Ugwueke suggested that Liebman meet with Dr. Shibata from "time to time." Dr. Shibata was the Chair of the UTHSC Department of Surgery.

341.     On or about April 11, 2016, the Steering Committee met again at the West Cancer Center in Germantown and Liebman attended. At that meeting, a model was shared and discussed regarding governance and administrative responsibilities going forward for the cancer program.

342.     On or about April 18, 2016, Liebman attended a meeting at 7:00 a.m. in Methodist CEO Gary Shorb's office. In attendance were Drs. Shibata, Stern, Fleming, Methodist COO Michael Ugwueke, Methodist CEO Shorb, and Liebman. Dr. Fleming was the Division Chief of the UTHSC Department of Surgical Oncology.  The UTHSC physicians (Drs. Shibata, Stern, and Fleming) expressed their concerns about the future direction of the cancer program and the lack of interest by West physicians in anything other than 340B money and suburban patients with higher payment rates.  The UTHSC physicians presented thoughts on a different model going forward.

343.    In the spring of 2017, Liebman reviewed the contract terms for the "management" arrangement with West physicians.

344.    As CEO of University Hospital with management responsibility over all hospital operations, Liebman knew that West physicians were not performing these management services at University Hospital or the other three Methodist hospitals.

345.    Despite the extensive contract requirements for West physicians to provide inpatient management services at Methodist's hospitals, the truth is that West Clinic actually did not perform inpatient management services at Methodist's four hospitals during the years 2012-2018 as required by the Management Services Agreement.

346.    West physicians were absent despite extensive oncology services provided at Methodist hospitals. During the years of 2012-2017, Methodist University Hospital had the highest acuity of oncology patients in the greater Memphis area. For outpatient oncology services, University Hospital had a busy radiation therapy center, infusion center and sickle cell therapy center that provided high level infusion services as well.  There was also significant outpatient surgery and ancillary testing done there for cancer patients. These services included follow-up care as well as routine ancillary testing.  Many cancer patients came to the University Hospital ER for emergency care. For inpatient oncology services, University Hospital had a dedicated inpatient cancer unit. Highly complex surgical oncology was also provided in University Hospital operating rooms with a significant presence of surgeons dedicated to treating surgical oncology patients.

347.    West physicians did not manage any inpatient oncology services at University Hospital during Liebman's tenure as CEO of University Hospital from 2014 through 2017.

348.    West Clinic physicians did not meet with Liebman to discuss improvements in inpatient oncology services or to review the existing programs that were in place.

349.    West physicians generally did not attend medical staff meetings at University Hospital and they did not serve on standing committees such as the Medical Executive Committee or peer review.

350.    Liebman did not see or authorize any time sheets or attendance records for West physicians performing any "management" or clinical services during his entire time at University Hospital.  As CEO of University Hospital, if such time sheets or records existed, their approval and payment would be subject to Liebman's oversight.

351.    During Liebman's tenure as CEO of University Hospital, there was minimal interaction between West physicians and the hospital's administrative leadership.  West CEO Erich Mounce only occasionally attended construction meetings at University Hospital regarding a new addition for the hospital.

352.    Prior to the "partnership" with Methodist, West operated and managed 8 clinical sites. 5 of the 8 clinical sites became part of the "partnership" with Methodist.

353.    Starting in 2012, West Clinic continued managing these 5 clinical sites just as it had done in prior years. But starting in 2012, Methodist paid West physicians $3-4.5 million per year to "manage" the 5 clinic sites that they had already been managing.

354.    At the June 3, 2015 the Steering Committee meeting discussed above, the PwC consultants presented their findings after "conduct[ing] 22 interviews" of Methodist and West executives. On Slide Number 12 of the presentation at that meeting compared the "original terms" with the "current state" of the "partnership model and operating structure" between Methodist and West. The "original terms" provided "co-management for oncology service line with quality and performance metrics jointly determined" and "West Clinic leadership holds SVP [senior vice-

president] of service line position." The "current state" was "West Clinic leadership maintains SVP position, **but primary focus to date on outpatient activities**." (emphasis added).

355. This statement was a confirmation that West physicians did not actually manage the Methodist Hospitals' inpatient oncology service line. The statement "primary focus to date on outpatient activities" referred to West's focus on outpatient services at its 5 clinic sites subject to the "partnership" with Methodist.

356. Methodist disguised a component of its overpayments to West physicians as "management fees" for supposedly managing inpatient services at Methodist hospitals. In 2012, Methodist paid approximately $3.0 million to West Clinic physicians for "management fees." In 2013, Methodist increased the payments for "management services" to $3.2 million.

357. From 2012 to 2013, there was no legitimate basis to increase the management fees to West physicians because they were not performing the inpatient management services at Methodist hospitals as required under the Management Services Agreement.

358. From 2012 to 2013, the oncology service line revenues increased from $139.9 million in 2012 to $151.7 million in 2013. These oncology service line revenues were generated by West physicians' referrals to the Methodist system.

359. Methodist's payments for "management" services increased in sync with the rising oncology service line revenues largely generated by the West physicians' referrals.

360. Under this arrangement, West's management fees increased with their increased referrals to the Methodist oncology service line. West's senior leadership has confirmed that West's management fees moved from $3.00 million in 2012 to $3.23 million in 2013, $4.40 million in 2014, $4.26 million in 2015, $4.35 million in 2016, and $4.51 million in 2017.

361.     West's senior leadership has confirmed that the Methodist oncology service line revenues increased from $180.84 million in 2012 to $207.26 million in 2013, $217.69 million in 2014, $242.87 million in 2015, $281.59 million in 2016, and approximately $338.19 million in 2017.

362.     There was no legitimate legal basis to repeatedly increase the management fees because West physicians were not performing the inpatient management services at Methodist hospitals as required under the Management Services Agreement.

363.     The rising co-management fees paid by Methodist corresponded with the rising revenues from West Clinic's referrals to the Methodist oncology service line. The rising co-management fees were not based on actual inpatient management services performed by West Clinic physicians at Methodist hospitals as required by the contract.

364.     West was not simply one of many sources of referrals to the Methodist oncology service line. West was the source. West senior leadership has confirmed that prior to the partnership, West controlled 75 percent of the cancer market in the region. Methodist controlled virtually none.

365.     West senior leadership has confirmed that Methodist structured the deal so that West could request new valuations of the management fees based on the revenues of the Methodist oncology service line.

366.     West physicians were incentivized to generate referrals because their management fees were determined in part based on the scope of managed services as defined by oncology service line revenues.

367.     West senior leadership has confirmed that West physicians paid their CEO a bonus each year based in part on achieving the Methodist oncology service line budget.

368.     From 2012-2018, Methodist paid West Clinic physicians $13-16 million dollars in "co-management" fees for inpatient management services at Methodist hospitals that West's senior

leadership has confirmed were not performed. The management fees were not based on time records or actual time performing inpatient management services. The "management" fees increased in sync with the rising oncology service line revenues generated by the West's referrals. In reality, the rising "management" fees were financial rewards for the rising revenues generated by the West's referrals to the Methodist oncology service line.

### Methodist Overpaid for West's Research Entity as a Cost of Inducing Their Referrals

369.     Under the "partnership" with West, in 2011, Methodist also agreed to pay or "invest" $7 million in Vector Oncology (formerly known as ACORN), a for-profit research entity controlled by West Clinic physicians. West Clinic's managing physicians required this $7 million payment as a condition of entering into the "partnership" with Methodist. Approximately 50 percent of the $7 million payment by Methodist was to pay off Vector's debts, including personal loans from West physicians to Vector.[24]

370.     On November 29, 2011 at a meeting with Dr. Tauer, Dr. Schwartzberg, Methodist CEO Shorb, and Dr. Stern, Shorb asked Dr. Stern to join the Vector Board. Shorb told Dr. Stern that because he had extensive experience in research, he would be a valuable Board member and adviser to Vector.[25]

---

[24] At the June 3, 2015 meeting of the West Cancer Center Steering Committee, one of the slides presented confirmed that the original terms provided for "Methodist investment in Vector; $7m (50-50 debt, equity)." The slide also listed the current state as "Equity investment in Vector diminished, with $3.5m balloon payment for debt in 2017."

[25] Dr. Stern started his career as a faculty member after completing a fellowship in hematology at the College of Physicians & Surgeons of Columbia University (1981-1983). He was appointed Assistant Professor in the Department of Medicine at the College of Physicians & Surgeons of Columbia University in the Division of Hematology (1983). His attention was focused on the properties of endothelial cells, the cells that form the inner lining of blood vessels. His research purview expanded steadily over the years as his work entered the area of blood vessel (vascular) complications of diabetes, Alzheimer's disease, inflammation and cancer. Dr. Stern was the principal investigator of numerous grants from the National Institutes of Health and private foundations, as well as philanthropic contributions to his laboratory. His laboratory grew into the Center for Vascular and Lung Pathobiology at the College of Physicians and Surgeons. Dr. Stern was the founding Director and was appointed the Carrus-endowed Professor and then full Professor with tenure at Columbia. This Center was a large enterprise as it occupied 25,000 square feet of laboratory space and involved multiple faculty members and research trainees. As a result of his research, Dr. Stern authored

371.    In subsequent years Vector Board meetings were generally scheduled quarterly and Dr. Stern attended these meetings.

372.    When he joined the Board, Dr. Stern learned that West Clinic's Medical Director, Dr. Schwartzberg, and his partners at West had been loaning funds to Vector for a number of years. West physicians wanted their loans to be repaid. They wanted Methodist's "investment" to repay the loans and provide operating capital. Dr. Schwartzberg had personally underwritten some of Vector's debts.

373.    West's senior leadership has confirmed that Dr. Schwartzberg had personally loaned Vector approximately $2 million and Methodist's $7 million "investment" in Vector was used to pay back this loan to Dr. Schwartzberg.

374.    Vector's primary business model revolved around three ideas. First, Vector would serve as a contract research organization or CRO. This is a function whereby Vector proposed to secure clinical trials funded by drug companies to test new drugs or drug combinations.  The clinical trials would then be given to Vector sites under a financial arrangement. The CRO function was intended as the financial driver in the short-term, as potential contracts with pharmaceutical companies would generate revenues for Vector.

---

several hundred peer reviewed papers, and was a frequent speaker at national and international meetings.  He was recognized as a leader in the biology of blood vessels (vascular biology).

In 2002, Dr. Stern became the Dean (of the College of Medicine) and Chief Clinical Officer at the Medical College of Georgia, and then moved on to become the Dean and Vice-President of Health Affairs at the University of Cincinnati.  At each place where Dr. Stern served in a leadership position, he was extensively involved in promoting research at the institution.

On moving to the University of Tennessee Health Sciences Center as Executive Dean and Vice-Chancellor for Health Affairs, Dr. Stern also championed the research mission of the College of Medicine.  When the University was without a Vice-Chancellor for Research, he served in that role as an interim Vice-Chancellor for Research from 2011-2012.  At Methodist, Dr. Stern's research background was recognized as unique among the medical and hospital leadership.

375.    This idea of being a CRO was not unique or proprietary. Many organizations serve as CROs and Vector did not offer any unique or original position or strategy to serve as a CRO. The role of CRO required labor-intensive execution in a crowded marketplace already providing these services.

376.    West predominately did pharmaceutical-sponsored research in which the innovation takes place at the level of drug discovery. West was generally one of many sites that was paid to recruit patients into a previously designed trial and determine the results of exposure to the drug in a manner that would be reported in the trial. West functioned in the role of a subcontractor. For this reason, West was paid by the industry sponsor based on the number of patients they recruited to the trial.

377.    Vector was not able to easily secure contracts for clinical trials with pharmaceutical companies and had only limited contracts producing limited revenues. Vector did not have any revenue-producing assets. Rather, Vector's revenues were dependent on labor-intensive pharmaceutical contracts with pharmaceutical companies.

378.    Dr. Stern found that the bigger problem was that Vector's clinical research sites were not effective in recruiting patients. Recruiting patients to a research study slows down an oncology clinical practice that is focused on treating as many patients as possible. Physicians must spend time convincing patients that the clinical trial is "right for them" and potentially beneficial. Because of this limitation, Vector realized quickly that sites aside from the home base (West Clinic) were not effective in recruitment.

379.    Thus, Vector decided to pull back and focus on West Clinic sites. This approach also did not work because West physicians were not focused primarily on clinical research. Most West

physicians had no significant background in clinical research. West's business strategy was focused primarily on patient volumes and revenues, not research.

380.   Under the CRO idea, Vector also discussed expanding their relationships to clinical sites with international locations. This idea was originally proposed by Dr. Schwartzberg. The idea did not make financial sense because the CRO mechanism was to be the underpinning of the strategy and Vector was already struggling to execute the strategy of being a CRO. Mike Choukas presented this "global" expansion idea at a Vector Board meeting and Choukas ultimately became Vector's CEO. The idea of "global" expansion was not implemented while Dr. Stern served on the Vector Board.

381.   Vector's second business idea was centralized management of community sites but Vector brought nothing original or unique to this concept and there were larger established organizations already performing this service effectively.

382.   Vector's third business idea was HOPE or "health outcomes pharmaco-economics." The idea revolved around using "clinical and financial databases with patient outcomes and comparative effectiveness questions." This idea required collecting "PRO" or patient reported outcomes. The key to this idea was Dr. Amy Abernathy of Duke (at the time). She was a collaborator of Dr. Schwartzberg. But this idea was not implemented while Dr. Stern served on the Board.

383.   Another idea discussed at Vector Board meetings was for Vector to provide research infrastructure for clinical trials to the University of Tennessee and Methodist. This would be done on a fee for service basis. This idea never advanced to execution except on a small scale and limited amount of time with a few investigators from the University of Tennessee during the time Dr. Stern was on the Vector Board.

384.    From the start in 2011, there was no legitimate business reason for Methodist to "invest" in Vector. Methodist's mission was not research. Methodist's mission was clinical care. Methodist employed physicians for clinical medical treatment. Methodist did not employ researchers except in an unusual situation for a short amount of time related to a particular project and usually as a consultant. Methodist had no operations or infrastructure for conducting or staffing research. Methodist had no executives with significant experience in managing clinical research.

385.    From the start, there was no legitimate business reason for Methodist to pay approximately $3.5-4.0 million for the debts of Vector. Paying off Vector's debts was of no benefit to Methodist. Instead, this was a disguised financial benefit given to West partners as a further inducement and reward for referrals.

386.    The arrangement also did not make sense with Vector as a distinct "for profit" entity controlled by private physicians separate from Methodist and the University of Tennessee. There was no legitimate business reason why Methodist would subsidize a for-profit research entity controlled by private physicians that did not offer any unique strategy or intellectual property for cancer research. There was no legitimate business reason why a public university such as the University of Tennessee would work with a for-profit research entity controlled by private physicians that did not offer any unique business strategy or services for cancer research.

387.    Vector did not offer anything of significant legitimate value to Methodist or the University of Tennessee.  Methodist's $7 million payment to Vector benefited no one other than the individual physician partners of West. These individuals were instrumental in West negotiating the referral "alliance" with Methodist.

388.    From his experience and knowledge serving on the Vector Board, Dr. Stern found that the company was a failing enterprise with no intellectual property of significant value and no viable

business strategy. In the end, Vector had no viable business strategy that generated revenues to sustain its operation. Vector had no intellectual property, no patents, and no original business strategy. The company was encumbered with a history of significant debts. These are the facts Dr. Stern found in 2012 after Methodist had agreed to pay $7 million as an "investment" in Vector.

389. Dr. Stern told Methodist CFO McLean and Methodist CEO Shorb that Methodist should cut its losses and get out of the Vector deal.

390. In response, McLean told Dr. Stern that Methodist's investment in Vector was the "cost of doing business" with West Clinic physicians.

391. West's senior leadership has confirmed that West's Vice-President and Medical Director, Dr. Schwartzberg, had personally loaned Vector approximately $2 million and Methodist's $7 million "investment" in Vector was used to pay back this loan from Dr. Schwartzberg.

### West Clinic Physicians Received Incomes Far in Excess of the National 90th Percentiles for Their Specialties

392. Over the course of the "alliance" between 2012-2018, West Clinic had specialists in four primary areas: medical oncology, gynecological oncology, radiation oncology, and diagnostic radiology.

393. Most of the physicians at West Clinic were medical oncologists. The income received by West Clinic physicians from the Methodist "alliance" greatly exceeded the MGMA national 90th percentile compensation for this specialty.

394. As a result of the extraordinary payments from Methodist, the shareholder oncologists at West received annual incomes exceeding $1 million and the senior oncologists at West were paid in excess of $3 million. In approximately 2014 or 2015, Methodist CEO Shorb and CFO McLean told Dr. Stern these income numbers for West physicians. This conversation occurred in the

context of Shorb and McLean expressing difficulty finding a "fair market" valuation that would support West physicians' incomes.

395.    Many oncologists of West received salaries at levels that were double, triple, or four times the national 90th percentile for medical oncologists in the United States.[26] The national 90th percentile compensation for medical oncologists was $777,940 in 2013, $922,244 in 2014, $762,970 in 2015, $693,452.28 in 2016, and $646,226.73 in 2017 according to MGMA Physician Compensation and Production Survey Data.

396.    One of the issues that Liebman and Stern openly opposed at executive meetings was Methodist CEO Shorb and CFO McLean guaranteeing to pay West physicians above the 90th percentile compensation levels regardless of the physicians' personal productivity. Liebman and Stern openly questioned this arrangement because the industry norm is to pay physicians based on personal productivity.

397.    Shorb and McLean said that defining physician compensation at any percentile was something that was just a matter of finding the "right" compensation consultants who would get the answer that Short and McLean wanted. When they found a company that agreed that paying the West physicians at exorbitant rates was "fair market value," they admitted they would probably never be able to get such an opinion again. Shorb and McLean knew that the compensation package to West physicians was far out of the bounds of reasonable compensation.

---

[26] Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are leading benchmarking resources for physician compensation in the United States. The annual MGMA Surveys are based on physician compensation and productivity data in the prior year. For example, the 2017 MGMA Survey reports physician compensation data from 2016.

398.     At the beginning of the "affiliation" agreement in 2011, McLean stated that he could "alter the numbers in any way necessary" to get a deal done with the West. This statement was made by McLean in Dr. Stern's presence and in Shorb's presence.  Shorb agreed with McLean's statement.

399.     Methodist was able to guarantee West oncologists with incomes above the national 90th percentile by artificially constructing multiple components to their compensation.

400.     First, from the beginning of the alliance, the oncologists were paid a premium rate of compensation per wRVU. In April of 2011, Methodist CFO McLean told Dr. Stern that the rate would be $120 per wRVU. The actual was even higher at $145 per wRVU.

401.     Although the agreed deal starting in 2012 had multiple components of cash income to West Clinic physicians, the rate of $145 per wRVU alone approached or exceeded the MGMA national 90th percentile compensation per wRVU in multiple years.

402.     Secondly, Methodist also guaranteed payments to West physicians for supposedly "co-managing" the entire Methodist oncology service line. These payments increased from 3.0 million in 2012 to $3.2 million in 2013 and $4.4 million in 2014. These payments for "management" services continued in 2015, 2016, 2017, and 2018 under the 7-year term of the "alliance." As discussed above, Methodist paid West approximately $13-16 million for inpatient management services at Methodist hospitals even though West did not perform these services.

403.     From the beginning, Methodist CFO McLean and other senior executives knew that paying West physicians at these levels would lead to major financial losses for Methodist if revenues from their referrals were not considered. Methodist knew that nearly 50 percent of West Clinic's patient population was insured by the Medicare Program and Methodist executives knew that the Medicare reimbursement rate per wRVU was far lower than $145 per wRVU.  The Medicare

reimbursement rate per wRVU was $34.03 in 2012 and stayed between $34-35 per wRVU[27] throughout the 7-year term of the alliance.

404.    Yet Methodist guaranteed payments of $145 per wRVU to the oncologists regardless of collections. That rate was approximately 426 percent above the Medicare reimbursement rate.

## Methodist Covered All Overhead and Practice Expenses for West Clinic Physicians

405.    Another component of the funding provided to West physicians was that Methodist paid all expenses and overhead costs, including staff and office space, for the West Cancer Center locations.

406.    Prior to the "alliance" with Methodist, West operated and managed 8 clinical sites and paid all expenses related to operations at these sites, including commercial property expenses and lease payments. As mentioned above, 5 of the 8 clinical sites became part of the "partnership" with Methodist and were renamed "West Cancer Center."

407.    Starting in January of 2012, West continued managing these 5 clinical sites just as it had done in prior years---only the name of these sites changed to West Cancer Center and Methodist paid for all overhead expenses at these sites.

408.    West's original terms proposed in 2011 provided that Methodist would employ the nurses, lab technicians, and mid-level practitioners at West and lease West's clerical, administrative, and other support staff. Methodist agreed to West's demands.

409.    One of the West Clinic sites was located at 100 North Humphreys Boulevard close to Baptist Healthcare in downtown Memphis. As part of Methodist's strategy for West physicians to

---

[27] The Medicare reimbursement rate per wRVU was $34.0376 in 2012, $35.0230 in 2013, $35.8228 in 2014, $35.7547 from January 1, 2015 through June 30, 2015, $35.9335 from July 1, 2015 through December 31, 2015, $35.8043 in 2016, $35.8887 in 2017, and $35.9996 in 2018.

refer patients to Methodist instead of Baptist, Methodist closed the North Humphreys location and spent approximately $52 million on a new facility located on Wolf River Boulevard in Germantown, the wealthiest suburb of Memphis. This location was more convenient for West Clinic physicians and offered a patient population with higher payments through commercial insurance coverage, Medicare coverage, and Medigap supplemental coverage than the payments for poorer patients in downtown Memphis.

410.    In December of 2013, Methodist purchased the Germantown Multi-Specialty Center at 7945 Wolf River Boulevard in Memphis for approximately $22.5 million from UT Medical Group, Inc. The building when purchased was approximately 116,865 square feet of space located on 9.6 acres of land. In the following year, Methodist spent approximately $30 million dollars to renovate the building.

411.    On June 25, 2014, Liebman met with Dr. Ballo, Director of Radiation Oncology at West Cancer Center. Dr. Ballo stated that Methodist executives promised to move patients "out of downtown" to a new location for the convenience of West Clinic physicians.  Dr. Ballo also stated that Methodist was funding construction of a new building for West physicians and that profits from the 340B Program were the economic "engine" for the relationship between West and Methodist.

412.    On August 7, 2014, Liebman again met with West CEO Mounce to discuss space options on the Methodist campus for a new oncology building.  Mounce stated that the costs of this project would not be assigned to the cancer program but to Methodist University Hospital to "make sure" that the financials of West Cancer Center would "look as strong as possible."  He also indicated that West Clinic physicians would determine who could practice in the building even though the

hospital had an open medical staff. Liebman told him that the medical staff bylaws would not allow that.

413.    In 2015, West Clinic physicians moved their main office operations to the Germantown Multispecialty Center at 7945 Wolf River Boulevard that had been purchased and renovated by Methodist at a cost of approximately $52 million. After that time until the end of the "alliance," West Clinic physicians enjoyed free office space compliments of Methodist.

414.    Liebman confirmed with Marigay Miller, Methodist's Vice President of Primary Care and Practice Support, that West Clinic physicians did not pay any rent for the use of this $50 million office complex.

415.    On June 15, 2017, Miller sent a text message to Liebman in which she stated, "Short answer---no we do not charge West rent. MH [Methodist Healthcare] bought building and paid for build out. Depreciation charges against the cost center. We do not charge rent, we provide space for West Docs to provide care to our patients."

416.    This statement reflected Methodist's overall scheme for West's patients to become Methodist's patients (but still being treated by physicians employed by West) with Methodist covering all costs of the West sites and developing a new facility for West Clinic physicians to practice with no overhead expenses.[28]

417.    Methodist structured a deal of excessive guaranteed payments to West physicians with no financial risks to the physicians under Methodist's terms.

_____

[28] Federal regulations under the Stark laws require that "the space rented or leased does not exceed that which is reasonable and necessary for the legitimate business purpose of the lease arrangement" and the "rental charges" must be "consistent with fair market value." *See* 42 C.F.R. §411.357(a)(3) and (4). The "lease arrangement [must] be commercially reasonable even if no referrals were made between the lessee and the lessor." 42 C.F.R. §411.357(a)(6).

## Defendant's Continuously Monitored the Value and Volume of Referrals from West Clinic Physicians

418.    Throughout the "partnership," Methodist senior executives led by Methodist CFO McLean monitored the value and volume of referrals from West physicians. West physicians also continuously monitored the value of their referrals to the Methodist system.

419.    For many years Methodist has maintained an accounting system to track and monitor the volume and value of patient referrals from all physicians to all hospitals and all service lines or departments of the hospital system.

420.    For example, in 2011, Methodist maintained "balanced scorecard" records that tracked monthly referrals for radiation therapy to University Hospital. In 2011, the year before the "innovative partnership," West physicians referred 345 patients to University Hospital for radiation therapy.

421.    In 2012, West physicians referred 441 patients to University Hospital for radiation therapy. In 2014, West physicians referred 535 patients to University Hospital for radiation therapy. And in 2015, referrals from West physicians to University Hospital for radiation therapy increased to 646.

422.    As CEO of the University Hospital from 2014-2017, Liebman's responsibilities included overseeing the operations of all inpatient and outpatient clinical activities at the hospital, including radiation therapy. Liebman received historical and current data to track trends for each service line, including oncology and radiation therapy. Between 2012 and 2015, over 50 percent of these increased referrals by West physicians for radiation therapy were Medicare or Medicaid patients.

423.    In addition to radiation therapy, West's referrals to Methodist have included thousands of patients for chemotherapy infusion therapy billed and collected by Methodist. Methodist has

received enormous profits from such referrals because Methodist acquired infusion therapy drugs at deep discounts under the 340B Program and then sold the drugs at retail rates.

424. For example, in 2015, referrals for chemotherapy services from West physicians to Methodist generated drug profits to the hospital system of approximately $30.60 million.

425. In 2016, referrals for chemotherapy services from West physicians to Methodist generated drug profits to the hospital system of approximately $53.18 million.

426. In forming the alliance with West and paying massive kickbacks to West physicians for their referrals, Methodist targeted increased revenues from oncology services and large profits from prescription oncology drugs. For example, after the alliance began, all payments for chemotherapy infusion services generated by West physicians belonged to Methodist. For example, Methodist's net revenues from chemotherapy infusion therapy increased from $6.1 million in the first quarter of 2015 to $10.3 million in the second quarter, $10.7 million in the third quarter, and $11.1 million in the fourth quarter.

427. In 2016, Methodist's net revenues from chemotherapy infusion therapy continued rising, moving from $14 million in the first quarter of 2016 to $16 million in the second quarter, $17 million in the third quarter, and $17.6 million in the fourth quarter.

428. Throughout the 7-year alliance, West and Methodist executives regularly tracked and monitored the value of patient referrals from West physicians to Methodist. For example at a Methodist Strategy Committee meeting on August 1, 2014, Methodist and West senior executives met to discuss the "strategic priority" of a comprehensive cancer center. At this meeting, West Clinic CEO Mounce gave a presentation in which he stated that West physicians were "working on increasing admissions in all parties (MUH=4,582/ GTN=2,166/ North=937/ South=114/ OB=23)." Mounce listed the numbers of referrals by West physicians for inpatient admissions at

each Methodist hospital. "MUH" stands for Methodist University Hospital, "GTN" stands for Methodist Germantown Hospital, "North" stands for Methodist North Hospital, "South" stands for Methodist South Hospital, and "OB" stands for Methodist Olive Branch Hospital. Mounce stated that West physicians were "working on increasing admissions" to Methodist hospitals. He stated that each 1% increase in inpatient surgeries "will bring about $1.5 million" in profits to Methodist.

429.     Mounce also provided the numbers of referrals by West physicians to Methodist for radiation therapy. In 2013, West physicians referred 1,544 patients to Methodist for radiation therapy. In 2014 as of August, West physicians referred 785 patients to Methodist for radiation therapy. Mounce stated that the West "represents 59% of referrals" to Methodist for radiation therapy.

430.     During the Strategy Committee Meeting on August 1, 2014, Methodist executives discussed the fact that each referral for radiation therapy represented an "average contribution margin of $5,255 per patient per course (22-25 daily sessions)."

431.     Methodist executives had an ongoing joint focus on the value of referrals from West physicians to the Methodist oncology service line. For example, at the meeting of the West Cancer Center Executive Operations Council on July 13, 2016, West CEO Mounce and Methodist CFO McLean "reviewed the first quarter financial results for the oncology service line with the committee members." "Specific discussion around 340B funds and the future effect of any 340B guideline changes were also discussed." Mounce also "discussed the great revenue results for medical oncology, gyn oncology, radiation oncology, and surgical oncology."

432.     Methodist implemented an accounting system of tracking the value and volume of patient referrals from West physicians and all physicians affiliated with the Methodist system. Methodist's executives generated regular reports that tracked the volume and value of referrals each month

from every employed physician or physician group. These reports are called "balanced scorecards" in Methodist's accounting system.

433.     At each hospital and at each department within the Methodist system, accounting reports regularly tracked the volume of patient referrals each month from all physicians. For example, in 2015, Methodist tracked referrals for radiation therapy to Methodist University Hospital where Liebman served as CEO. West physicians led all sources of patient referrals for radiation therapy in 2015 with 656 referrals to University Hospital. In 2016, West physicians again led all sources of referrals to University Hospital for radiation therapy with 546 patient referrals to University Hospital.

434.     The volume and value of referrals from physicians was the focus of the Methodist "CEO Retreat" on July 11, 2014. This retreat for Methodist's top executives included a slide presentation titled, "CEO Retreat Service Line Assessment." The presentation focused on the values of referrals from different physician specialties to Methodist hospitals. The analysis used 2013 data and included West physicians' referrals to Methodist hospitals but did not include outpatient referrals to West Cancer Center.

435.     Five specialties represented 57 percent of the value of physician referrals to the Methodist system: women's health, cardiology, orthopedic/neurosurgery, oncology, and psychiatry. "CV [cardiovascular services] and oncology contribute the most (42% of total CM)." The acronym "CM" stands for contribution margin or hospital profits.

436.     The slide presentation stated, "Sutherland and West Clinic critical to sustaining our margin, give their commercial base (32% Sutherland, 41% percent West)." Sutherland Cardiology was the employed cardiology group at Methodist. Commercial base refers to the percentage of patients with commercial insurance at Sutherland Cardiology and West Clinic.

437.   In 2013 the total profits from physician referrals to Methodist was $204.1 million. Oncology was second in the rankings of physician referrals by specialty with profits of $28.8 million in 2013, representing 65,557 patients.

438.   The presentation evidenced Methodist's extensive tracking and monitoring system to evaluate the volumes and values of physician referrals. That focus was the reason Methodist overpaid West physicians in relation to their personal productivity.

439.   Liebman and Stern attended many Physician Recruitment Committee meetings at Methodist. These meetings were generally held on Friday mornings at least once a month. Liebman attended these meetings because the financial losses from physician compensation packages were commonly charged as expenses to Methodist University Hospital where Liebman served as CEO. At these meetings, Methodist executives regularly evaluated physician recruits based on the value of their potential referrals to the Methodist system and regularly prepared proformas with actual or projected revenues from referrals by physicians being recruited. Methodist CFO McLean used these proformas with historical or projected referral revenues to determine salary packages for physicians.

440.   There was also pressure on Dr. Stern to require that all referrals from UTHSC physicians go to the West Clinic for chemotherapy and radiation oncology. As an example, Dr. Sandeep Samant was an accomplished head and neck surgeon. His referrals for radiation oncology were split between Baptist Memorial Healthcare and Methodist. West Clinic CEO Mounce directed Dr. Stern to require Dr. Sandeep to send all of his referrals for chemotherapy and radiation oncology to the West Clinic. Dr. Stern objected to Mounce's instruction and told him that referrals should go to the place that could help the patients the most. Dr. Samant told Dr. Stern that he was aware of this pressure and had heard about it from many sources. Dr. Samant also disagreed with the

aggressive pressure from Mounce telling Dr. Samant where to send his patients. Dr. Samant left UTHSC shortly thereafter. He was a leading physician at the University. His loss resulted in the necessity to find a new chair of otolaryngology/head and neck surgery, and to build anew the head and neck cancer surgery program.

**Methodist's Scheme Targeted and Damaged Federal and State Healthcare Programs**

441. Methodist's scheme targeted federal and state health care programs, including patients covered under Medicare and Medicaid.

442. As discussed above, at the meeting of the West Cancer Center---Strategy and Partnership Model Steering Committee on June 3, 2015, one of the slides in the presentation addressed the original goals of Methodist and West Clinic in forming the "partnership."

443. Methodist's goals included "enhance market share" and "strong market share among government entities."

444. The reference to Methodist's "strong market share among government entities" was Methodist's goal to increase its revenues from the Medicare and Medicaid Programs. Cancer incidence increases with age and the Medicare Program is the largest insurer of patients for cancer care in the Memphis region and the United States. Methodist is also the largest provider of Medicaid services in the State of Tennessee.

445. Methodist achieved its goal of "strong market share among government entities" as its payments from the Medicare and Medicaid Programs escalated in the years after the "alliance" with West began.

446. During the years of the "alliance" with West physicians, Medicare payments to Methodist for outpatient services increased by approximately 300 percent.

447.   Before the "partnership" in the years 2008-2011, Medicare payments to Methodist for outpatient services averaged $40.0 million per year. After the "partnership" in the years 2012-2017, Medicare payments to Methodist for outpatient services averaged $87.72 million per year.

448.   Medicare payments to Methodist for outpatient services increased from $40.14 million in 2011 to $68.73 million in 2012, $74.03 million in 2013, $84.65 million in 2014, $91.39 million in 2015, $83.88 million in 2016, and $123.65 million in 2017.

449.   Methodist's overall net patient revenues[29] moved from $1.17 billion in 2011 to $1.39 billion in 2012, $1.44 billion in 2013, $1.51 billion in 2014, $1.62 billion in 2015, $1.70 billion in 2016, and $1.77 billion in 2017. A substantial portion of this escalation in revenues represented payments from the Medicare and Medicaid Programs for cancer services generated by referrals from West Clinic physicians to the Methodist system.

450.   Methodist's senior executives personally benefitted from this escalation in revenues generated by West's referrals because the executives received significant annual bonuses based in large part on the net revenues of the system.

451.   With respect to the oncology service line at Methodist during 2012-2018, the Medicare and Medicaid Programs covered the majority of patients at Methodist and West Cancer Center.

452.   Between 2012 and the 2014, inpatient oncology volume at Methodist more than doubled as hospital discharges for oncology admissions moved from 7,320 discharges in 2012 to 15,834 discharges in 2014 or an annual increase of 8,514 admissions.  At University Hospital, inpatient oncology admissions increased from 3,486 admissions in 2012 to 7,149 admissions in 2014.

---

[29] Medicare defines "net revenue" as total or gross revenue decreased by "bad debts, contractual adjustments, charity discounts, teaching allowances, policy discounts, administrative adjustments, and other deductions from revenue." Net revenues are the actual payments a hospital collects from all sources for patient services.

453.    These numbers are consistent with West CEO Mounce's presentation in August of 2014 at a Methodist Strategy Committee meeting. At this meeting, Mounce gave a presentation in which he stated that West Clinic physicians were "working on increasing admissions in all parties (MUH=4,582/ GTN=2,166/ North=937/ South=114/ OB=23)." Mounce listed the numbers of referrals by West physicians for inpatient admissions at each Methodist hospital. The total annual number of patients referred for inpatient admissions touted by Mounce was 7,822. This tally indicates that of the annual increase of 8,514 oncology admissions at Methodist hospitals between 2012 and 2014, West's referrals represented 91 percent of these increased admissions.

454.    As CEO of University Hospital starting in 2014, Liebman's responsibilities included overseeing the operations of all inpatient and outpatient clinical activities at University Hospital. As CEO, Liebman received extensive historical and current financial data regarding inpatient admissions for every service line, including oncology. He also received regular financial reports regarding the payor mix for each service line, including oncology. Liebman knew that West's referrals had generated a major increase in inpatient admissions for oncology services at University Hospital between 2012 and 2014

455.    As CEO, Liebman had direct oversight of the University Hospital's finances, and he routinely was involved in oversight of revenue cycle management including claims processing, claims payment and revenue generation at the hospital. Specifically, Liebman stayed abreast on at least a monthly basis of any changes in the hospital's payor mix (i.e. Medicare, Medicaid and private insurance) as even a small change in the distribution of payors could have a tremendous impact on the hospital's finances.

456.    The Chief Financial Officer of University Hospital, Chuck Lane, reported directly to Liebman.  Lane had direct oversight of the hospital's Billing Department and he kept Liebman

constantly abreast of the hospital's revenue cycle management.  Liebman led a monthly Financial Review Meeting that was attended by Lane and all of the department heads at University Hospital. One of the first agenda items of each monthly Financial Review Meeting was an analysis of the previous month's payor mix.

457.    At this monthly meeting, each department head would  discuss the revenue generated by their respective departments, describe any change in payor mix, discuss any material matters related to revenue collection, and report on any significant developments pertaining to referral sources.  Of particular interest, the department heads of Imaging Services, Surgical Cases, Bone Marrow Therapy, and Radiation Therapy frequently reported on the impact of the "alliance" with West Clinic and how referrals from West physicians impacted each of those department's bottom line on a monthly basis.

458.    Based on the monthly payor mix data and the monthly financial review, it was clear to Liebman that during his tenure as CEO both the Medicare and Medicaid Programs were receiving and paying more and more claims that were directly attributable to West physicians' referrals. Any drop or increase in any referrals would be noted by the department heads and West's referrals were a frequent topic of conversation due to the significant increase in revenue, including Medicare and Medicaid revenue, directly attributable to those physicians.

459.    For example, the head of the Radiation Therapy department maintained a report of each referring doctor, the numbers of referrals made by doctor, and the type of  radiation treatment that was administered at University Hospital.  The number of referrals from West oncologists was routinely noted and tracked.  Based on these reports, it was clear that during Liebman's tenure as CEO that West continually increased its referrals of cancer payment for radiation treatment to University Hospital. Based  on  the  revenue  reports  reviewed  by  Liebman  and  the  monthly

assessments of payor mix, it was also clear to Liebman that University Hospital was submitting an increased volume of Medicare and Medicaid claims for radiation therapy due to West's referrals.

460. From review of the historical payor mix and trends of payor mix at Methodist hospitals, Liebman knew that between 2012 and 2015, the Medicare Program insured approximately 43 percent of the oncology inpatient admissions at Methodist hospitals and the Medicaid Program insured 23-25 approximately percent. The escalation in inpatient oncology admissions at Methodist hospitals generated by West physicians were largely funded by the Medicare and Medicaid Programs.

461. In addition to inpatient referrals, based on the revenue reports reviewed by Liebman and the monthly assessments of payor mix, it was also clear to Liebman that the Methodist system and University Hospital were submitting an increased volume of Medicare and Medicaid claims for outpatient services due to West's referrals.

462. The Medicare claims data confirms a dramatic increase in referrals to the Methodist system for outpatient oncology services after the "alliance" with West began in January of 2012.

463. The Medicare claims data analyses reviewed approximately 550 oncology diagnosis codes submitted by Methodist in their claims for payment to the Medicare program. An Excel spreadsheet listing these diagnoses codes and the detailed Medicare claims data is attached to this Third Amended Complaint as Exhibit B.

464. In 2011, the year before the "alliance" began, Methodist submitted 31,981 claims to the Medicare Program for outpatient oncology services based on these 550 oncology diagnosis codes. Medicare paid Methodist $7.686 million for these claims.

465. In the first year of the "alliance," Methodist's outpatient oncology claims jumped from 31,981 cases in 2011 to 84,952 cases in 2012. The single year increase was 265 percent.

466.    In 2013, there were 90,763 cases of Medicare outpatient oncology claims, 94,748 cases in 2014, and 74,032 cases through September of 2015.[30]

467.    There was a corresponding increase in Medicare payments for outpatient oncology services at Methodist. Medicare payments for outpatient oncology services at Methodist moved from at least $7.686 million in 2011 to at least $29.148 million in 2012, $33.191 million in 2013, $34.518 million in 2014, and $29.475 million through September of 2015.

468.    In 2012 (the first year of the alliance), Medicare payments to Methodist for outpatient oncology services increased by at least 379 percent over the prior year. This increase in Medicare payments was caused by the referrals of West physicians. In subsequent years Medicare payments for oncology outpatient services at Methodist continued to rise as a result of increasing referrals by West physicians.

469.    One of Methodist's strategies was to bill the West Cancer Center as hospital outpatient services and/or exploit the provider-based billing status under Medicare reimbursement rules. "Provider based" is a Medicare payment designation that allows facilities owned by and integrated within a hospital to bill Medicare as a hospital outpatient department, resulting in these facilities generally receiving higher payments than freestanding facilities. Medicare payments for services performed at provider-based facilities are often more than 50 percent higher than payments for the same services performed at a freestanding facility.

470.    The referrals from West physicians to Methodist also generated facility fees paid by Medicare to Methodist. When a physician provides a service to a patient in a location that

---

[30] The Medicare outpatient data is on a calendar year and 2015 contains only three quarters of data through September of 2015 for these diagnoses codes because of the transition from ICD-9 to ICD-10 diagnosis coding system in the fourth quarter of 2015. The evaluation of the Medicare outpatient claims data included only claims from 2011 through September of 2015 to ensure comparison of the same diagnoses codes under the ICD-9 coding system.

legitimately qualifies as part of a hospital, Medicare's payment rules permit the hospital to submit a claim for provider-based facility charges. Facility fees are commonly higher than the cost of the physician's actual services and commonly exceed the cost of providing the same service in a private practice setting.

471. The dramatic increase in Medicare and Medicaid revenues to the Methodist oncology service line was the result of referrals by West physicians. From the beginning of negotiations, Methodist executives targeted these government payments.

472. During the 7-year term of the "alliance," Methodist's oncology service line revenues largely derived from inpatient and outpatient referrals by West physicians. For fiscal years 2012 through 2018, the Defendants submitted thousands of false claims both for specific services provided to beneficiaries of federal healthcare programs and claims for general and administrative costs incurred in treating such beneficiaries.

## The Arrangement Was Detrimental to Patient Care

473. When physicians are financially incentivized to generate referrals, healthcare costs escalate as demonstrated in the financial data for the Methodist system.

474. A review of Methodist's revenues reported in its cost reports submitted to CMS reveals why Methodist would pay such extraordinary amounts of cash to a private group of oncologists. The "partnership" with West was enormously profitable for Methodist as it received the referral stream of patients from West's physicians and the associated lucrative revenues discussed above.

475. Analyses of Methodist's cost reports reveal the escalation in revenues to the Methodist system after the "partnership" with West physicians began in 2012.

476. Methodist's overall net patient revenues[31] moved from $1.17 billion in 2011 to $1.39 billion in 2012, $1.44 billion in 2013, $1.51 billion in 2014, $1.62 billion in 2015, $1.70 billion in 2016, and $1.77 billion in 2017.

477. These numbers from Methodist's cost reports submitted to CMS are consistent with Methodist's internal projections. At a December 2011 Board meeting of Methodist Healthcare, Methodist executives projected that the partnership with West physicians would increase the hospital system's annual net revenues by approximately $200 million, moving from "1.25 B [billion] before West Clinic acquisition" to "$1.45B [billion] revenues w [with] West Clinic acquisition."

478. Before the "alliance" during the years 2008-2011, Methodist's average net patient revenues were $1.07 billion per year. After the West "alliance" from 2012-2017, Methodist's average net patient revenues were $1.56 billion per year.

479. Comparing the years before and after the West alliance, the average difference in Methodist's net patient revenues was approximately $484 million per year. Multiplying that annual number over 7 years would equal $3.388 billion.

480. On the annual cost reports submitted by Methodist to CMS, there is a line item for "other net income." The number listed on that line item increased dramatically after the "partnership" with West physicians began in 2012. That line item includes profits from the 340B Program.

481. The "other net income" total listed by Methodist moved from $16.91 million in 2011 to $62.23 million in 2012, $86.61 million in 2013, $100.08 million in 2014, $154.40 million in 2015,

---

[31] Medicare defines "net revenue" as total or gross revenue decreased by "bad debts, contractual adjustments, charity discounts, teaching allowances, policy discounts, administrative adjustments, and other deductions from revenue." Net revenues are the actual payments a hospital collects from all sources for patient services.

$174.40 million in 2016, and $187.26 million in 2017. The increase in "other net income" exceeded $700 million over the time period 2012-2018.

482.    Methodist's gross charges from outpatient services escalated after the "partnership" with West. In the first year of the West "partnership," Methodist's gross charges from outpatient services increased from $1.67 billion in 2011 to $2.34 billion in 2012. By 2017, Methodist's gross charges from outpatient services had increased to $3.91 billion.

483.    Before the West "alliance" from 2008-2011, Methodist's average gross charges for outpatient services were $1.38 billion per year. After the West "alliance" from 2012-2017, Methodist's average gross charges for outpatient services were $3.07 billion per year. The gross charges are not net reimbursement, but the rising charges indicate rising net revenues. During this time period, Methodist's overall collection rate was 24-27% of gross charges.

484.    Another indication of the enormous profits to Methodist from the "alliance" with West physicians is the escalation in outpatient drug charges reported by Methodist on its cost reports under the category "drugs charged to patients." In 2011, Methodist reported $130.10 million in outpatient "drugs charged to patients department charges." In 2012, the first year of the "alliance" with West Clinic physicians, the outpatient drug charges skyrocketed to $446.83 million---an increase of $316.73 million over the prior year. The increases continued in subsequent years with drug charges of $456.88 million in 2013, $475.58 million in 2014, $512.27 million in 2015, $605.70 million in 2016, and $713.14 million in 2017. These numbers are gross charges but the rising gross charges evidence rising net revenues.

## FINANCIAL DAMAGES TO THE MEDICARE AND MEDICAID PROGRAMS

### Stark Laws Require Full Refund of Medicare and Medicaid Payments Arising from Referrals by West Clinic Physicians for Designated Health Services

485.    The Stark statute and the AKS establish the measure of damages. The Stark statute provides, "If a person collects any amounts that were billed in violation of subsection (a)(1), the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amounts so collected." 42 U.S.C. §1395nn(g)(2). "An entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis, as defined at § 1003.101 of this title." 42 C.F.R. §411.353(d). The statutory language requires refund of "any amounts so collected" from federal healthcare programs. The regulatory language requires refund of "all collected amounts."

### The AKS Requires Refund of Claims Arising from Referrals After Kickbacks Paid

486.    As discussed above, compliance with the AKS is a mandatory condition of healthcare providers' enrollment in federal healthcare programs, a mandatory condition of every claim submitted by providers to federal healthcare programs, and a mandatory condition of every payment made to providers by federal healthcare programs.

487.    Most courts have ruled that the Anti-Kickback Statute makes all claims made after a kickback a false claim because the claimant falsely certifies that it has complied with the AKS as a material condition of submitting claims for payment to the Medicare and Medicaid Programs.

488.    Effective March 23, 2010, the Patient Protection and Affordable Care Act confirmed that claims submitted in violation of the AKS automatically constitute false claims for purposes of the False Claims Act. The statute states, "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31 [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

489.    Under the statutory language, all claims arising from referrals by West Clinic physicians to Methodist after Methodist began making the overpayments to West Clinic physicians were false claims and are subject to recovery or refund plus penalties under the False Claims Act.

490.    Congress eliminated the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. *See* 42 U.S.C. § 1320a-7b(h).

491.    Whether the payment of excessive remuneration or kickbacks affected patient care is irrelevant and not a defense to violations of the AKS.

### West Clinic's Referrals of Medicare and Medicaid Inpatients to Methodist Hospitals

492.    The financial data available in Methodist's cost reports submitted to CMS and its Medicare claims data do not reveal the fraud at issue in this case. But the financial data can be used in a model for estimating the scope of damages to the Medicare and Medicaid Programs caused by the Methodist's illegal schemes.

493.    Medicare payments for hospital admissions to treat cancer vary by diagnoses but over the time period 2012-2018, the average Medicare payment for oncology admissions at Methodist hospitals was approximately $13,500 per admission. This payment estimate was determined from reviewing oncology diagnoses codes and payment rates for inpatient admissions in Methodist's claims data available in the MEDPAR file.

494.    As discussed above between 2012 and the 2014, inpatient oncology volume at Methodist hospitals more than doubled. Methodist hospital discharges for oncology admissions increased from 7,320 discharges in 2012 to 15,834 discharges in 2014. The increase was 8,514 oncology admissions per year.

495.    This number is also consistent with West CEO Mounce's presentation in August of 2014 touting the total annual number of patients referred by West for inpatient admissions as 7,822. This

tally indicates that the annual increase of 8,514 oncology admissions at Methodist hospitals between 2012 and 2014 was largely due to West's referrals.

496.     Between 2012 and 2014, the oncology payor mix at Methodist remained similar with 43 percent of oncology inpatient cases covered by Medicare and 23-25 percent covered by Medicaid. Among outpatients, Medicare covered approximately 43 percent of oncology outpatients at Methodist and Medicaid covered approximately 8 percent during this time period.

497.     Using the number of 7,822 referrals per year for inpatient admissions, over the 7-year period of 2012-2018, the total number of patients referred by West physicians to Methodist hospitals for inpatient admissions would be approximately 54,754. Assuming Medicare insured 43 percent of these patients and Medicaid insured 23 percent, then 66 percent of the 54,754 admissions would be covered by the Medicare or Medicaid Programs. That 66 percent translates to 36,137 admissions. Applying the average Medicare payment rate of $13,500 for each oncology admission at Methodist hospitals over the time period 2012-2018, single damages to Medicare and Medicaid from **inpatient** referrals would total approximately $487.85 million.

### West Clinic's Referrals of Outpatients Covered by Medicare or Medicaid Programs

498.     The "partnership" with West physicians also generated significant numbers of **outpatient** referrals to Methodist facilities, including Methodist hospitals and the West Cancer Center sites billed as outpatient departments of the hospital system.

499.     Medicare payments to Methodist for outpatient services increased from $40.14 million in 2011 to $68.73 million in 2012, $74.03 million in 2013, $84.65 million in 2014, $91.39 million in 2015, $83.88 million in 2016, and $123.65 million in 2017. During the years of the "alliance" with West Clinic physicians, Medicare payments to Methodist for outpatient services increased by approximately 300 percent.

500.    During this time period, the average annual increase in Medicare payments to Methodist for outpatient services was approximately $48 million. Multiplying the average increase of $48 million over 7 years, the total is approximately $336 million dollars in increased Medicare payments for outpatient services. This number does not include increased Medicaid payments for outpatient services. Damages to Medicaid from tainted referrals for outpatient services by West Clinic physicians would be an additional component of damages.

501.    Through this unlawful kickback scheme Methodist has submitted or caused the submission of false claims for payment to Medicare and TennCare.

502.    The following paragraphs set forth several representative examples of false claims submitted through Methodist's illegal scheme to Medicare and Tenncare.

### Patient A[32]

503.    On February 6, 2017, a diagnostic radiology (diagnostic imaging) procedure of the chest was performed for Medicare beneficiary **Patient A** (CPT code 71260).  **Patient A** had been referred for this procedure by West physician Dr. David Portnoy.  The procedure was performed by/under the immediate personal supervision of West radiologist Dr. William Lankford.

504.    The West Clinic, P.C. submitted a claim for payment to Cahaba—Medicare's claims administrator for the region—for **Patient A's** procedure, listing a billed amount of $180.  This claim was submitted by West sometime on or after February 9, 2017 and was assigned the internal control number (ICN) 0917040089730. The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, at 7945 Wolf River Blvd., Germantown, Tennessee. This site was owned and operated by Methodist. Cahaba determined that the allowed amount for

---

[32] For the sake of patient confidentiality, specific patients are identified only by letter (e.g. "Patient A") in this Complaint.  After this complaint is docketed, Relators can provide additional identifying information to Defendants, subject to the terms of the Protective Order in this case.

this claim was $61.00.  Cahaba sent a remittance notice to The West Clinic, P.C. on February 23, 2017, and remitted payment in the amount of $46.86—the allowed amount minus several stated adjustments—to The West Clinic, P.C. for this claim.

**Patient B**

505.    On February 7, 2017 a radiologic examination of the shoulder (CPT code 73030) was performed for Medicare beneficiary **Patient B**.  Patient B had been referred for this procedure by West physician Dr. Brad Somer.  The procedure was performed by/under the immediate personal supervision of West radiologist William Lankford.

506.    The West Clinic, P.C. submitted a claim for payment to Cahaba—Medicare's claims administrator for the region—for **Patient B's** procedure, listing a billed amount of $21.  This claim was submitted by West sometime on or after February 9, 2017 and was assigned the internal control number (ICN) 0917041160820.  The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, at 7945 Wolf River Blvd., Germantown, Tennessee. This site was owned and operated by Methodist.  Cahaba determined that the allowed amount for this claim was $9.23.  Cahaba sent a remittance notice to The West Clinic, P.C. on February 24, 2017, and remitted payment in the amount of $7.09—the allowed amount minus several stated adjustments—to The West Clinic, P.C. for this claim.

**Patient C**

507.    On January 31, 2018, an abdominal ultrasound was performed on Railroad Medicare beneficiary **Patient C** (CPT code 76700).  **Patient C** had been referred for this procedure by Dr. Michael S. Dragutsky.   The procedure was performed by/under the immediate personal supervision of West radiologist Daniel K Powell.

508.   The West Clinic, P.C. submitted a claim for payment to Palmetto GBA Railroad Medicare—Railroad Medicare's claims administrator—for **Patient C's** procedure, listing a billed amount of $134.  This claim was submitted by West sometime on or after June 26, 2018 and was assigned the internal control number (ICN) 0218178156070.  The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, at 7945 Wolf River Blvd., Germantown, Tennessee. This site was owned and operated by Methodist. Palmetto GBA Railroad Medicare determined that the allowed amount for this claim was $39.65. Palmetto GBA Railroad Medicare sent a remittance notice to The West Clinic, P.C. on July 11, 2018, and remitted payment in the amount of $31.09—the allowed amount minus several stated adjustments—to The West Clinic, P.C. for this claim.

### Patient D

509.   On February 1, 2018, Medicare beneficiary **Patient D** received a CT scan of the soft tissue of the neck with contrast materials (CPT code 70491) and a CT scan of the chest with contrast materials (CPT code 71260).  **Patient D** had been referred for these services by oncologist Dr. Arnel Pallera.  The procedures were performed by/under the immediate personal supervision of West radiologist William Lankford.

510.   The West Clinic, P.C. submitted a claim for payment to Cahaba—Medicare's claims administrator for the region—with a billed amount of $210 for **Patient D's** CT scan of the neck and a billed amount of $189 for **Patient D**'s CT scan of the chest.  This claim was submitted by West sometime on or after February 5, 2018 and was assigned the internal control number (ICN) 0218037056130. The claims data listed the service facility location for these two procedures as Methodist Memphis Wolf River, at 7945 Wolf River Blvd., Germantown, Tennessee. This site was owned and operated by Methodist.  Cahaba determined that the allowed amounts for these

two procedures were $66.54 (for CPT code 70491) and $56.82 (for CPT code 71260). Cahaba sent a remittance notice to The West Clinic, P.C. on February 20, 2018, and remitted payment in the amounts of $52.17 and $44.55, respectively—the allowed amounts minus several stated adjustments for each procedure—to The West Clinic, P.C. for this claim.

**Patient E**

511.  On December 30, 2015 a thoracentesis procedure (CPT code 32555) was performed for TennCare beneficiary **Patient E**.  **Patient E** had been referred for this procedure by West physician Dr. Kurt Tauer.  The procedure was performed by/under the immediate personal supervision of West radiologist Daniel K. Powell.

512.  The West Clinic, P.C. submitted a claim for payment to Blue Cross Blue Shield of Tennessee (BlueCare)—the TennCare managed care organization for **Patient E**—for **Patient E's** procedure, listing a billed amount of $372.  This claim was submitted by West sometime on or after January 4, 2016 and was assigned the internal control number (ICN) BTCPG4CT3G00.  The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, 7945 Wolf River Blvd, Germantown, TN 38138. This site was owned and operated by Methodist. Blue Cross Blue Shield of Tennessee determined that the allowed amount for this claim was $372. Blue Cross Blue Shield of Tennessee sent a remittance notice to The West Clinic, P.C. on January 15, 2016, and remitted payment in the amount of $372 to The West Clinic, P.C. for this claim.

**Patient F**

513.  On December 22, 2015 a duplex scan of extremity veins (CPT code 93971) was performed for TennCare beneficiary **Patient F**.  **Patient F** had been referred for this procedure by Dr. Elizabeth Ott.  The procedure was performed by/under the immediate personal supervision of West radiologist Dr. Scott Baum.

514.     The West Clinic, P.C. submitted a claim for payment to Blue Cross Blue Shield of Tennessee (BlueCare)—the TennCare managed care organization for **Patient F**—for **Patient F's** procedure, listing a billed amount of $258.  This claim was submitted by West sometime on or after December 28, 2015 and was assigned the internal control number (ICN) BTCPF7LN1L00. The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, 7945 Wolf River Boulevard, Germantown, TN 38138. This site was owned and operated by Methodist.  Blue Cross Blue Shield of Tennessee determined that the allowed amount for this claim was $22.46.  Blue Cross Blue Shield of Tennessee sent a remittance notice to The West Clinic, P.C. on January 8, 2016, and remitted payment in the amount of $22.46 to The West Clinic, P.C. for this claim.

### Patient G

515.     On May 24, 2016 a lung/mediastinum biopsy procedure with a percutaneous needle (CPT code 32405) with CT guided needle placement (CPT code 77012) were performed for TennCare beneficiary **Patient G**.  **Patient G** had been referred for these procedures by Dr. Benny Weksler. The procedures were performed by/under the immediate personal supervision of West radiologist Dr. Scott Baum.

516.     The West Clinic, P.C. submitted a claim for payment to Blue Cross Blue Shield of Tennessee (BlueCare)—the TennCare managed care organization for **Patient G**—listing a billed amount of $270 for **Patient G's** biopsy procedure and a billed amount of $137 claim for the CT guided needle placement.  These claims were submitted by West sometime on or after June 13, 2016 and were assigned the internal control number (ICN) BTCQB9ZJ4Q00. The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, 7945 Wolf River Boulevard, Germantown, TN 38138. This site was owned and operated by Methodist.  Blue

Cross Blue Shield of Tennessee determined that the allowed amount for the CPT code 32405 claim was $141.79, and the allowed amount for the CPT code 77012 claim was $45.51. Blue Cross Blue Shield of Tennessee sent a remittance notice to The West Clinic, P.C. on June 24, 2016, and remitted payment in the amounts of $141.79 and $45.51, respectively, to The West Clinic, P.C. for this claim.

### Patient H

517.    On January 3, 2017 a diagnostic radiology procedure (CPT code 76380) was performed for TennCare beneficiary **Patient H**. **Patient H** had been referred for this procedure by Dr. Michael Martin. The procedure was performed by/under the immediate personal supervision of West radiologist Dr. Scott Baum.

518.    The West Clinic, P.C. submitted a claim for payment to Blue Cross Blue Shield of Tennessee (BlueCare)—the TennCare managed care organization for **Patient H**—for **Patient H's** diagnostic radiology procedure, listing a billed amount of $141. This claim was submitted by West sometime on or after January 17, 2017 and was assigned the internal control number (ICN) BTCRD9GL7Y00. The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, 7945 Wolf River Boulevard, Germantown, TN 38138. This site was owned and operated by Methodist. Blue Cross Blue Shield of Tennessee determined that the allowed amount for this claim was $43.66. Blue Cross Blue Shield of Tennessee sent a remittance notice to West Clinic, P.C. on January 27, 2017, and remitted payment in the amount of $43.66 to the West Clinic, P.C. for this claim.

### Patient I

519.    On January 17, 2017 a CT scan of soft neck tissue (CPT code 70491) was performed for TennCare beneficiary **Patient I**. **Patient I** had been referred for this procedure by Dr. Moon

Fenton. The procedure was performed by/under the immediate personal supervision of West radiologist Dr. William Lankford.

520. The West Clinic, P.C. submitted a claim for payment to Blue Cross Blue Shield of Tennessee (BlueCare)—the TennCare managed care organization for **Patient I**—for **Patient I's** procedure, listing a billed amount of $200. This claim was submitted by West sometime on or after January 19, 2017 and was assigned the internal control number (ICN) BTCRF1KZ9N00. The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, 7945 Wolf River Boulevard, Germantown, TN 38138. This site was owned and operated by Methodist. Blue Cross Blue Shield Tennessee determined that the allowed amount for this claim was $61.40. Blue Cross Blue Shield of Tennessee sent a remittance notice to West Clinic, P.C. on January 27, 2017, and remitted payment in the amount of $61.40 to The West Clinic, P.C. for this claim.

### Patient J

521. On February 7, 2018 magnetic resonance imaging of the brain (CPT code 70553) was performed for TennCare beneficiary **Patient J**. **Patient J** had been referred for this procedure by Dr. Albert Weeks. The procedure was performed by/under the immediate personal supervision of West radiologist Daniel K. Powell.

522. The West Clinic, P.C. submitted a claim for payment to Blue Cross Blue Shield of Tennessee (BlueCare)—the TennCare managed care organization for **Patient J**—for **Patient J's** procedure, listing a billed amount of $382. This claim was submitted by West sometime on or after February 9, 2018 and was assigned the internal control number (ICN) BTCTD2ZT3B00. The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, 7945 Wolf River Boulevard, Germantown, TN 38138. This site was owned and operated by

Methodist. Blue Cross Blue Shield of Tennessee determined that the allowed amount for this claim was $106.44. Blue Cross Blue Shield of Tennessee sent a remittance notice to The West Clinic, P.C. on February 23, 2018, and remitted payment in the amount of $106.44 to The West Clinic, P.C. for this claim.

**Patient K**

523.    On March 28, 2018 magnetic resonance imaging of the brain (CPT code 70553) was performed for TennCare beneficiary **Patient K**. **Patient K** had been referred for this procedure by West physician Dr. Lee Schwartzberg. The procedure was performed by/under the immediate personal supervision of West radiologist Dr. Daniel Powell.

524.    The West Clinic, P.C. submitted a claim for payment to Blue Cross Blue Shield of Tennessee (BlueCare)—the TennCare managed care organization for **Patient K**—for **Patient K's** procedure, listing a billed amount of $382. This claim was submitted by West sometime on or after March 30, 2018 and was assigned the internal control number (ICN) BTCTL1VP2V00. The claims data listed the service facility location for the procedure as Methodist Memphis Wolf River, 7945 Wolf River Blvd. Germantown, TN 38138. This site was owned and operated by Methodist. Blue Cross Blue Shield of Tennessee determined that the allowed amount for this claim was $106.44. Blue Cross Blue Shield of Tennessee sent a remittance notice to The West Clinic, P.C. on April 13, 2018, and remitted payment in the amount of $106.44 to The West Clinic, P.C. for this claim.

525.    Pursuant to the Professional Services Agreement between West and the Methodist Defendants, any funds that West received for providing these services to **Patients A-K** were all remitted back to Methodist.

## Summary of Damages to the Medicare and Medicaid Programs

526.    Over the time period 2012-2018, single estimated damages to Medicare and Medicaid from tainted **inpatient** referrals total approximately $487.85 million. Over the time period 2012-2018, single estimated damages to Medicare from tainted **outpatient** referrals by West physicians to Methodist total approximately $336 million. This number does not include damages to the Medicaid Program from tainted outpatient referrals by West physicians to Methodist.

527.    The "partnership" was richly rewarding to Methodist at the expense of the Medicare and Medicaid Programs. Methodist' net revenues escalated from West's referrals, including enormous 340B drug profits from expensive cancer drugs. Methodist's senior executives personally profited through annual bonuses based on system revenues. It was a shrewd "investment" by Methodist and deliberate calculated strategy to capture massive profits gained from secretive violations of federal laws.

528.    Methodist's scheme caused estimated single damages to the Medicare and Medicaid Programs exceeding $800 million.

## LEGAL REMEDIES FOR DEFENDANTS' FALSE CLAIMS

### The Federal False Claims Act

529.    The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material[33] to a false or fraudulent

---

[33] "The term 'material' means having a natural tendency to influence. Or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

claim," 31 U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation[34] to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

530.    The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

531.    Statutory liability under the False Claims Act includes a civil penalty "not less than $5,500 and not more than $11,000" per false claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

532.    Under the federal False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and requires no proof of specific intent to defraud." 31 U.S.C. 3729 (b)(1).

533.    In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required.  *Id.* A defendant is liable for acting

---

[34] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information." *Id.*

<strong>The Tennessee Medicaid False Claims Act</strong>

534.    The Tennessee Medicaid False Claims Act contains similar provisions as the federal False Claims Act.

535.    The Tennessee Medicaid False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the [M]edicaid program," Tenn. Code Ann. § 71-5-182(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the [M]edicaid program," Tenn. Code Ann. § 71-5-182(a)(1)(B), "conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D)," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids or decreases an obligation to pay or transmit money or property to the state, relative to the [M]edicaid program." Tenn. Code Ann. § 71-5-182(a)(1)(D).

536.    Under the Tennessee Medicaid False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." Tenn. Code Ann. § 71-5-182(b).

537.    Statutory liability under the Tennessee Medicaid False Claims Act includes a civil penalty "not less than $5,000 and not more than $25,000…plus 3 times the amount of damages which the state sustains because of the act of that person." Tenn. Code Ann. § 71-5-182(a)(1)(D).

## COUNT I---PRESENTING FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(A) (1)(A) AND TENN. CODE § 71-5-82(A)(1)(A) AGAINST ALL DEFENDANTS

538.    Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

539.    In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A); Tenn. Code Ann. § 71-5-182(a)(1)(A).

540.    Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States and State of Tennessee in violation of 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code Ann. § 71-5-182(a)(1)(A).

541.    This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A).

542.    Through the acts described above, Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government and State of Tennessee, within the meaning of 31 U.S.C. § 3729(a)(1)(A) and Tenn. Code Ann. § 71-5-182(a)(1)(A).

543.    The United States and the State of Tennessee were unaware of the falsity of the records, statements and claims made or caused to be made by Defendants. In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States and the State of Tennessee paid claims that would not be paid if Defendants' illegal conduct was known.

544.    As a result of Defendants' acts, the United States and the State of Tennessee have sustained damages in a substantial amount to be determined at trial.

545.    Additionally, the United States and State of Tennessee are entitled to civil penalties for each false claim made or caused to be made by Defendants arising from their illegal conduct as described above.

## COUNT II--- USE OF FALSE STATEMENTS IN VIOLATION OF 31 U.S.C. 3729(A)(1)(B) AND TENN. CODE ANN. § 71-5-182(A)(1)(B) AGAINST ALL DEFENDANTS

546.    Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

547.    In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B); Tenn. Code Ann. § 71-5-182(a)(1)(B).

548.    This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729, *et seq*., and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B).

549.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements. Through the acts described above, Defendants knowingly

made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B). The records were false in that they purported to show compliance with the AKS and Stark laws.

550. Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States and State of Tennessee.

551. The United States and State of Tennessee were unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by Defendants. The United States and State of Tennessee paid claims that would not be paid if Defendants' illegal conduct was known.

552. By virtue of the false records or false claims made by Defendants, the United States and State of Tennessee sustained damages and therefore are entitled to treble damages under the federal False Claims Act and Tennessee Medicaid False Claims Act respectively to be determined at trial.

553. Additionally, the United States and State of Tennessee are entitled to civil penalties for each false claim made and caused to be made by Defendants arising from their illegal conduct as described above.

### COUNT III--- CONSPIRING TO SUBMIT FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(A)(1)(C) AND TENN. CODE ANN. § 71-5-182(A)(1)(C) AGAINST ALL DEFENDANTS

554. Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

555. In pertinent part, the federal False Claims Act establishes liability for "any person who….conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C.

§ 3729(a)(1)(C). The Tennessee Medicaid False Claim Act contains a similar provision. *See* Tenn. Code Ann. § 71-5-182(a)(1)(C).

556. This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(C).

557. Through the acts described above, Defendants acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and State of Tennessee and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

558. Defendants conspired to withhold information regarding excessive and illegal payments to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees to the Methodist system.

559. As a result, the United States and State of Tennessee were unaware of the false claims submitted and caused by Defendants and the United States and State of Tennessee paid claims that would not be paid if the Defendants' illegal conduct was known to the United States and State of Tennessee.

560. By reason of Defendants' acts, the United States and State of Tennessee have been damaged in a substantial amount to be determined at trial.

561. By virtue of Defendants' conspiracy to defraud the United States and State of Tennessee, the United States and State of Tennessee sustained damages and are entitled to treble damages under the Federal False Claims Act and Tennessee Medicaid False Claims Act, to be determined at trial, plus civil penalties for each violation.

## COUNT IV---SUBMISSION OF EXPRESS AND IMPLIED FALSE CERTIFICATIONS IN VIOLATION OF 31 U.S.C. § 3729(A)(1)(B) AND TENN. CODE ANN. § 71-5-182(A)(1)(B) AGAINST ALL DEFENDANTS

562. Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

563. In pertinent part, the federal False Claims Act and Tennessee Medicaid False Claims Act establish liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *See* 31 U.S.C. § 3729(a)(1)(B) and Tenn. Code Ann. § 71-5-182(a)(1)(B).

564. Compliance with the AKS and Stark laws was an explicit condition of each payment under federal healthcare programs. For each of the years between 2012 and the present, Defendants explicitly and implicitly certified compliance with the AKS and Stark laws.

565. Defendants' certifications of compliance with the AKS and Stark laws were knowingly false.

566. In reliance on the Defendants' express and implied certifications, the United States and State of Tennessee made payments to Defendants under federal and state health care programs. If the United States and State of Tennessee had known that Defendants' certifications were false, their payments would not have been made to Defendants for each of the years in question.

567. By virtue of the false records, false statements, and false certifications made by Defendants, the United States and State of Tennessee sustained damages and are entitled to treble damages under the federal False Claims Act and the Tennessee Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT V---KNOWINGLY CAUSING AND RETAINING OVERPAYMENTS IN VIOLATION OF 31 U.S.C. § 3729(A)(1)(G) AND TENN. CODE ANN. § 71-5-182(A)(1)(D) AGAINST ALL DEFENDANTS

568.    Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

569.    The federal False Claims Act and Tennessee Medicaid False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C. § 3729(a)(1)(G); Tenn. Code Ann. § 71-5-182(a)(1)(D).  The False Claims Act and Tennessee Medicaid False Claims Act define "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *See* 31 U.S.C. § 3729(b)(3); Tenn. Code Ann. § 71-5-182(d).

570.    "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

571.    "The OIG may impose a penalty, and where authorized, an assessment against any person…whom it determines…[h]as not refunded on a timely basis….amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

572.    Defendants have knowingly caused and retained overpayments from federal and state health care programs arising from Defendants' violations of the Stark laws and AKS.

573.    By virtue of Defendants causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other federal health care programs, the United States and State of Tennessee sustained damages and are entitled to treble damages under the False Claims Act and Tennessee Medicaid False Claims Act respectively, to be determined at trial, plus a civil penalty for each violation.

## COUNT VI--- FALSE RECORD TO AVOID AN OBLIGATION TO REFUND AGAINST ALL DEFENDANTS

574.    Relators repeat and reallege the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

575.    The False Claims Act and Tennessee Medicaid False Claims Act also establish liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); Tenn. Code Ann. § 71-5-182(a)(1)(D).

576.    Defendants knowingly made and used, or caused to be made or used, false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and State of Tennessee.

577.    By virtue of the false records or false statements made by the Defendants, the United States and State of Tennessee sustained damages and therefore are entitled to treble damages, to be determined at trial, plus civil penalties for each violation.

## PRAYERS FOR RELIEF

578.    On behalf of the United States and State of Tennessee, Relators request and pray that judgment be entered against Defendants in the amount of the United States' and State of Tennessee's respective damages, trebled as required by law, such civil penalties as are required by

law, for a *qui tam* relator's share as specified by 31 U.S.C. §3730(d) and Tenn. Code Ann. § 71-5-183(d), for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d) and Tenn. Code Ann. § 71-5-183(d), and for all such further legal and equitable relief as may be just and proper.

**Jury trial is hereby demanded.**


Dated: March 19, 2021            Respectfully submitted,

/s/ Jerry E. Martin
Jerry E. Martin (TNBPR No. 20193)
Seth Hyatt (TNBPR No. 31171)
BARRETT, JOHNSTON MARTIN & GARRISON, LLC
414 Union Street; Suite 900
Nashville, TN 37219
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

Bryan A. Vroon, Esq.
(Admitted *Pro Hac*)
Georgia Bar No. 729086
LAW OFFICES OF BRYAN A. VROON, LLC
1380 West Paces Ferry Road
Suite 2270
Atlanta Georgia 30327
Telephone: (404) 441-9806
bryanvroon@gmail.com

Edward D. Robertson, Jr.
(Admitted *Pro Hac*)
BARTIMUS FRICKLETON ROBERTSON & RADER, P.C.
109b East High Street
Jefferson City, MO. 65101
Telephone: (573) 659-4454
chip.robertson@me.com

*Counsel for Relators Jeff Liebman and David M. Stern, M.D.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of this *Third Amended Complaint Under the Federal and Tennessee Medicaid False Claims Acts* has been served on the following counsel today, March 19, 2021, via the Court's CM/ECF email notification system:

Kara F. Sweet
U.S. Attorney's Office (Nashville Office)
Middle District of Tennessee
110 Ninth Avenue, S
Suite A961
Nashville, TN 37203-3870
Telephone: (615) 401-6598
Facsimile: (615) 401-6626
kara.sweet@usdoj.gov

Brian D. Roark
J. Taylor Chenery
Taylor M. Sample
Hannah E. Webber
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone: (615) 742-6200
Facsimile: (615) 742-6293
broark@bassberry.com
tchenery@bassberry.com
taylor.sample@bassberry.com
hannah.webber@bassberry.com

Tony Hullender
Scott M. Corley
Office of the Attorney General of Tennessee
Civil Rights and Claims Division
P.O. Box 20207
Nashville, TN 37202-0207
Telephone: (615) 253-1103
Facsimile: (615) 741-1026
Tony.hullender@ag.tn.gov
Scott.corley@ag.tn.gov

Walter E. Schuler
University of Tennessee Office of General Counsel
66 N. Pauline Street, Suite 428
Memphis, TN 38163
Telephone: (901) 448-5615
Facsimile: (901) 448-8031
wschuler@tennessee.edu

/s/ Jerry E. Martin
Jerry E. Martin