# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and the STATE OF TENNESSEE ex rel. JEFFREY H. LIEBMAN and DAVID M. STERN, M.D.** | ) ) ) ) | |
| **Relators,** | ) ) | **Case No. 3:17-CV-00902** |
| **v.** | ) ) ) | **District Judge William L. Campbell, Jr.** |
| **METHODIST LE BONHEUR HEALTHCARE, METHODIST HEALTHCARE-MEMPHIS HOSPITALS, CHRIS MCLEAN, GARY SHORB, AND JOHN DOES 1–100,** | ) ) ) ) ) ) | **Magistrate Judge Barbara D. Holmes** |
| **Defendants.** | ) ) ) | |

## METHODIST'S RESPONSE IN OPPOSITION TO
## UNITED STATES' MOTION TO INTERVENE FOR GOOD CAUSE

Defendants Methodist Le Bonheur Healthcare, Methodist Healthcare-Memphis Hospitals, Chris McLean, and Gary Shorb (collectively, "Methodist") respectfully submit this opposition in response to the United States' Motion to Intervene for Good Cause, (Dkt. No. 193).

## PRELIMINARY STATEMENT

The False Claims Act ("FCA") permits late intervention by the United States only upon a showing of good cause. Where, as here, there is no good cause, the United States' request to intervene 54 months after the case was filed and 25 months after its declination is abusive, and late intervention would be prejudicial to Defendants. Under such circumstances, the Court should deny the United States' motion.

The Government's investigation in this case followed on an all-too-familiar pattern. The United States sought and received multiple extensions of the seal period following the initial 60-day period allowed under the FCA for the United States to investigate the allegations made by the

Relator in his initial *qui tam* complaint.  Following that investigation and the Court's determination that good cause no longer existed to extend the seal period, the United States declined to intervene. After sitting on the sideline for years, the United States now has reversed course and wants to intervene after all.  The only problem with that decision is that the United States must demonstrate "good cause" for late intervention—a standard the United States makes no effort to meet.  Rather, as occurred in another recent case in this district, *U.S. ex rel. Odom v. SouthEast Eye Specialists, PLLC*, No. No. 3:17-cv-689 (M.D. Tenn.) (hereinafter "*SEES*"), the United States asserts that the FCA's good-cause standard has been met because the United States says so.  But, that say-so did not satisfy the Court in *SEES*, and it does not justify late intervention here.[1]

To be sure, the United States claims that it has found "new and additional" evidence that would justify late intervention.  And, the United States seemingly dares the Court to deny its motion to intervene, citing a string of judicial decisions which it says permit intervention so long as relators consent, hoping to create the impression that the Court would have to disregard these cases to deny its motion.  But, perhaps not surprisingly, the United States fails to cite the Court's decision in *SEES*, where the Court held that even where a relator consents to late intervention, the Government still must provide a sufficiently specific evidentiary basis—through affidavits or declarations—detailing the Government's investigatory steps and tools utilized from the time the case was filed and demonstrating what new evidence that was not readily available to the Government during its sealed investigation had been discovered since its declination.  Finding that

---

[1] In *SEES*, the Court held multiple hearings on the Government's motion to intervene.  *See SEES*, No. 3:17-cv-689, Dkt. Nos. 93, 105 (M.D. Tenn.)  Following this procedure, and given the complexity of the procedural history in this case, Methodist respectfully requests oral argument on the United States' Motion to Intervene, (Dkt. No. 193).

the Government failed to meet this burden, the Court denied the Government's motion for late intervention.

As if the Court's decision in *SEES* never existed, the United Sates has done again what the Court there said it cannot do: make conclusory claims of good cause without any evidentiary support whatsoever. Because it is the United States' burden to establish good cause, its failure to even address the Court's rulings on the very issue now before it should result in denial of the United States' motion.

Even if the Court were to consider the supposed "new and additional" evidence the United States purports to identify without any support, all of that so-called evidence was either known or readily available to the United States when it declined to intervene in 2019. None of the evidence described in the Motion to Intervene would expand the scope of the alleged fraud since the original 2017 complaint alleged that the entire affiliation between West Clinic and Methodist violated the Anti-Kickback Statute ("AKS"). To the contrary, the "predicate legal question" the United States seeks to resolve through intervention was raised by the original complaint and known to the United States long before its 2019 declination. At most, the United States has described a change of heart, not a change of facts.

The United States' assertion that late intervention will not prejudice Methodist is also wrong. The United States claims that it "intends to streamline the case by seeking partial summary judgment to resolve a contested legal issue at the outset, which would result in more narrowed discovery." But the "outset" of this case has long since passed. The United States' motion for late intervention comes only two months before fact discovery is set to close. At that point, Methodist will likely file its own motion for summary judgment due to the lack of evidence to support any of the claims in this lawsuit. Given the age of the lawsuit, the United States does not indicate how

3

its speculative motion for partial summary judgment would streamline the case or why the United States is asking for late intervention at the eleventh hour.

At bottom, the United States asks the Court to disregard the very standards it recently articulated to evaluate requests for late intervention under the FCA, to overlook the absence of evidentiary support for the United States' claims, and to turn a blind eye to the significant prejudice Methodist would suffer from such a late intervention. This is not good cause, and the motion should be denied.

## BACKGROUND

### I.    Sealed Investigation

Jeff Liebman filed this *qui tam* case under seal in May 2017 alleging that Methodist's affiliation with West Clinic establishing the West Cancer Center violated the AKS and Stark Law and resulted in the submission of false claims to federal healthcare programs. (Dkt. No. 1 ¶¶ 33–116.) Liebman's 2017 Complaint alleged that West Clinic co-managed the West Cancer Center in exchange for "excessive" management fees paid by Methodist and provided clinical services to Cancer Center patients in exchange for "premium" compensation paid by Methodist. (*Id.* ¶¶ 33, 40, 59.) Liebman further alleged that West Clinic was paid a portion of the "profits" it generated for the Cancer Center, and in return for all of these payments, West Clinic agreed to refer its patients "to the West Cancer Center and Methodist as often as possible." (*Id.* ¶ 42.) Liebman's 2017 Complaint alleged that Methodist and West Clinic memorialized their affiliation through a series of agreements, including a Professional Services Agreement ("PSA"), a Management Services Agreement ("MSA"), a Leased Employee and Administrative Services Agreement, and an Unwind Agreement (collectively referred to as the "Affiliation Agreements"). (*Id.* ¶ 49.) Liebman alleged that the "scheme" implemented through the Affiliation Agreements was intended

4

to increase referrals from West Clinic physicians to Methodist in deliberate violation of the AKS and Stark Law.  (*Id.* ¶¶ 72, 108.)

Pursuant to the FCA's statutory framework, the original complaint was filed under seal, where it remained for a period of 60 days, during which the Government was to investigate its allegations and decide whether to take over the case.  *See* 31 U.S.C. § 3730(b)(2), (3).  On July 28, 2017, the Government sought its first of four extensions of its deadline to reach an intervention decision.  (Dkt. No. 10.)  The Government later requested additional extensions on January 19, 2018 (Dkt. No. 15), July 26, 2018 (Dkt. No. 21), and March 4, 2019 (Dkt. No. 35).  On March 15, 2019, the Court held a conference with the Government at which it granted a fourth extension of the deadline to reach an intervention decision until September 3, 2019, and ruled that this would be the final extension.[2]  (Dkt. No. 39.)

During its two-year sealed investigation, the United States issued more than seventy document requests and interrogatories to Methodist through a Civil Investigative Demand served on June 13, 2018.  (Declaration of Brian Roark "Roark Decl." ¶ 2.)  In response to the requests, Methodist produced to the United States more than 100,000 pages of documents and communications, including draft and final copies of the Affiliation Agreements between Methodist and West Clinic, fair market value opinions on which the parties relied in determining the compensation, documentation related to payments made as a part of the affiliation, and email

---

[2] Because the memoranda supporting the Government's requests to extend the seal period still remain under seal at the Government's request, (*see* Dkt. No. 60), Methodist is unable to review what evidence regarding its investigation the Government offered to show good cause to extend the seal, as compared to the evidence it purports to offer now to show good cause to intervene. Should the Court consider in its good cause analysis the representations the Government made to the Court during its sealed investigation, Methodist respectfully requests that the Court unseal the remaining sealed docket entries. *See U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, 912 F. Supp. 2d 618, 626 (E.D. Tenn. 2012) ("[N]othing in the text of the FCA authorizes … an indefinite seal on record materials beyond the Complaint.")

communications relating to West Cancer Center and the services provided under the agreements. (*Id.* ¶ 3.) Methodist also answered the United States' interrogatories identifying, among other things, the amounts paid from Methodist to West Clinic during the affiliation, the individuals involved in negotiating and structuring the affiliation, and the rationale and reasons for forming the West Cancer Center and met with counsel for the Government to discuss the West Cancer Center affiliation. (*Id.* ¶ 4–5.) On September 3, 2019, after investigating for more than two years, the United States and State of Tennessee[3] filed notices with the Court that neither would be intervening in the litigation by the court-mandated deadline. (Dkt. Nos. 44, 45.)

## II.     Litigation against Relators

Although FCA cases are normally unsealed after the Government declines to intervene, at Liebman's request, the Court kept the case against Methodist and West Clinic under seal for three additional months—with no notice to Defendants—while Liebman drafted a Second Amended Complaint ("SAC") and recruited a second Relator, Dr. David Stern, to join him in bringing the case. (*See* Dkt. Nos. 48, 52.) On December 13, 2019, Liebman and Stern filed their SAC, which was unsealed and first became available to Methodist and West Clinic on December 19, 2019. (Dkt. Nos. 59, 61.)

On March 9, 2020, Methodist and West Clinic moved to dismiss the SAC because the FCA's "first-to-file" rule bars Stern's attempted intervention and because the SAC's lack of essential details on the alleged scheme and any representative false claims failed to satisfy Rule 9(b)'s heightened pleading requirements. (Dkt. Nos. 79–82.) Methodist also moved to stay discovery pending a ruling on its motion to dismiss because it would contravene Rule 9(b) for Relators to get access to discovery after filing a facially-deficient complaint. (Dkt. Nos. 86–87.)

---

[3] The instant motion to intervene has been filed only by the United States. The State of Tennessee has not joined in the motion.

Magistrate Judge Holmes denied that motion and ordered the parties to engage in discovery despite Defendants' pending motions to dismiss. (Dkt. No. 99.)

The parties have thereafter engaged in discovery, which is currently set to close on December 15, 2021. On January 28, 2021, with approval from the Government, Relators and West Clinic settled Relators' claims against West Clinic for $1.3 million, plus an additional $1.3 million in Relators' attorneys' fees. (Dkt. No. 145-2.)

Then, on March 19, 2021—following several extensions of their amendment deadline over Methodist's objections—Relators moved to file a Third Amended Complaint ("TAC") that included information Relators had obtained through post-pleading discovery to try to address pleading deficiencies noted in Methodist's pending motion to dismiss, such as the failure to identify any actual false claims. (Dkt. Nos. 154–155.) Methodist opposed this motion because Relators' SAC had not satisfied Rule 9(b)'s heightened pleading standard for FCA cases, and it is well-settled that pleading deficiencies cannot be remedied through post-pleading discovery. (Dkt. No. 162.) Magistrate Judge Holmes granted Relators' motion for leave to amend without considering Methodist's objections to the use of post-pleading discovery, holding that consideration of that argument was a dispositive issue within the purview of the District Judge. (Dkt. No. 168 at 5–6.) Thus, on June 2, 2021, Methodist moved to strike from the TAC the information inappropriately included from post-pleading discovery and moved to dismiss the remainder of the TAC because—like the SAC—it could not otherwise satisfy Rule 9(b) and was barred by the FCA's first-to-file bar. (Dkt. Nos. 174–176.) Methodist's motion remains pending

7

before this Court and would be mooted by the Government's Complaint in Intervention, if late intervention is allowed.[4]

## III. Recent Government Requests

The TAC alleges that unnamed members of West Clinic admitted that they performed no inpatient management services during its affiliation with Methodist. Relators have never identified who from West Clinic made these admissions or what they actually said. Nonetheless, the United States contacted Methodist in May 2021 and requested information relating to West Clinic's provision of management services. (*See* Roark Decl. ¶ 6.) Methodist identified documents that it previously had produced and addressed key aspects of the arrangements that it had previously discussed with prior Government counsel during the earlier investigation. Additionally, over the next several months, Methodist voluntarily provided additional information to the United States and made the two Methodist executives named as defendants available for interviews, all while continuing to actively litigate against Relators. (*Id.* ¶ 7.)[5]

To be clear, there was nothing new about the subject matter of the United States' post-declination requests or the information provided. These requests concerned the very same subject matter at issue in the investigation the United States conducted during the seal period. Perhaps the

---

[4] Indicative of the house-of-cards nature of this lawsuit, Relators filed a facially deficient complaint that failed to meet the pleading requirements for an FCA case. Relators then conducted discovery to obtain information that they used in the TAC to address those deficiencies. Should the United States' motion to intervene be granted, then Relators will have successfully avoided the district court ever passing on their skirting of these pleading rules.

[5] At no point did Methodist "expressly recognize" the United States' authority to investigate and intervene. To the contrary, Methodist made clear it was providing information in response to the United States' requests on a voluntary basis because there had been no change in the underlying facts of the case since the previous declination. In fact, the United States recognized that at any time Methodist could have refused to respond to a request given that the United States no longer had CID authority under the FCA.

re-do was driven by the replacement of the United States' counsel in the matter in December 2019, (Dkt. No. 55), but there was decidedly nothing new about the post-declination inquiry.

## ARGUMENT

When a private relator brings an action under the FCA on behalf of the Government, he must serve the Government with a copy of the complaint and a written disclosure of substantially all material evidence he possesses. 31 U.S.C. § 3730(b)(2). The Government must investigate those allegations. *Id.* § 3730(a) ("Attorney General diligently shall investigate" alleged violations). The Government must then decide whether to intervene and take over the case within 60 days (or within any extension of that time period). *Id.* §§ 3730(b)(2), (3). If the Government declines to intervene by its statutory deadline, it cannot intervene at a later time unless it makes a "showing of good cause" for the untimely intervention. *Id.* § 3730(c)(3).

The statute does not define "good cause," but courts recognize that at a minimum, the Government must provide "some justification for its untimely intervention," which must ultimately be weighed against any possible prejudice to the litigating parties caused by the late intervention. *Griffith v. Conn.*, 2016 WL 3156497, at *3 (E.D. Ky. Apr. 22, 2016). The Government bears the burden of proof and must support its justification for late intervention through the submission of sufficiently specific evidence. *See SEES*, Dkt. No. 93 at 22:15–18 ("Regardless of how you define good cause, the Court needs some evidentiary basis to exercise its discretion. There is no evidentiary basis currently before the Court. The burden of proof is on the Government to establish that.") (Attached as Exhibit A.)

Courts considering a request for late intervention often look to: (1) "whether new, probative evidence has been discovered, particularly as to the magnitude of the fraud," (2) "whether intervention would unfairly prejudice the relator or the defendant," and (3) "whether intervention

would be in the public interest." *U.S. ex rel. Ross v. Indep. Health Corp.*, 2021 WL 3492917, at *2 (W.D.N.Y. Aug. 9, 2021) (collecting cases).

**I.    The United States Has Failed to Show that Any New, Probative Evidence has been Discovered.**

To establish good cause for late intervention, the United States must show that it has discovered some new, probative evidence—particularly evidence relating to the magnitude of the alleged fraud—after it declined to intervene. *Ross,* 2021 WL 342917, at *2. The United States has made no attempt to meet its evidentiary obligation here.

**A.    The United States Offers No Evidence of the Magnitude of the Alleged Fraud.**

In May 2017, Jeff Liebman alleged that the West Cancer Center affiliation violated the AKS because Methodist was overpaying West Clinic for management and professional services and was sharing with West the profits generated by its referrals. (*See* Dkt. No. 1 ¶¶ 33–116.) He also alleged that as a result of this AKS violation, every claim Methodist submitted to the federal healthcare programs during the seven-year affiliation violated the FCA. (*Id.*)

The United States now says it intends to intervene in the case to pursue a "predicate legal question" as to whether the affiliation violated the AKS. The "facts" the United States alleges on this issue are: (1) that Methodist paid millions of dollars to West Clinic over the seven-year affiliation, and (2) that Methodist and West established the amount of payments based on revenue generated by West's referrals. (*See* Dkt. No. 194 ("Mem.") at 10.) Liebman alleged these same "facts" in 2017, and the United States investigated them, as the FCA requires. The United States has offered no evidence at all signaling that the magnitude of the alleged fraud has been expanded in any way. *Contra U.S. ex rel. Hall v. Schwartzman*, 887 F. Supp. 60, 62 (E.D.N.Y. 1995) (government initially declined to intervene due to small scale of alleged fraud, but evidence relator discovered "vastly expand[ed] the universe of possible fraudulent activity."). Nor has the United

States offered any precedent to support finding good cause for late intervention based on the desire to raise a "predicate legal question" that could have been divined years earlier.

**B.     The United States Offers No Newly-Discovered Probative Evidence.**

The United States must show that it has discovered some new, probative evidence since it declined to intervene.  But, rather than attempting to make such a showing, the United States instead baldly claims it has obtained "new and additional" evidence and expects this Court to blindly accept its inaccurate assertions as fact.

In a parallel FCA case now pending before the Court, the United States and the State of Tennessee recently attempted to intervene after the statutory deadline based on similar conclusory assertions.  The Court explained, however, that in order satisfy its burden, the Government must do more than "simply expect the Court to trust them because they say there is, quote, new and sufficient evidence." *SEES,* Dkt. No. 105 at 39:22–25 (Attached as Exhibit B).  In *SEES*, the Court offered the Government a second chance to satisfy its burden of proof and a roadmap to do so, ordering the Government to submit evidence detailing the history of its investigation from the time it started through the present that identified the goals of the investigation, the investigative tools the Government utilized, the significant events or milestones the Government deemed important in determining whether to intervene, and the investigative evidentiary findings establishing what new information came into the Government's knowledge after its declination.  (Ex. A at 22:13–26:10.)  When the Government submitted its proof to support its claims of "new and sufficient evidence," the Court denied the motion to intervene, finding "the United States [] tepid submission does not come close to establishing the good cause necessary . . . nearly three years after the

original complaint was filed, and more than six months after the Court set a final deadline for intervention that was extended six times."  (Ex. B at 47:14–19.)[6]

Now, only months after the Court issued its ruling in *SEES*, the United States is attempting to intervene under even more egregious circumstances and again without offering any proof whatsoever to establish good cause, and should not, this time, be given a second chance to do so. Liebman filed his initial complaint *more than four years ago*, and the Court set a final deadline for intervention *more than two years ago*.  As it did in *SEES*, the United States claims "new and additional" evidence has been uncovered and asks the Court to "trust them because they say there is. . . ."  The United States does not mention, much less follow, the Court's clear guidelines for establishing good cause.

Instead, it claims that courts "almost uniformly" allow post-declination intervention, so long as Relators consent.  (Mem. at 6 (citing district court cases from other circuits and districts).) Not so.  Despite the United States' claim, the requirement of an evidentiary record is not unique to this Court.  In other districts where the United States seeks late intervention, it supports its motions with declarations and other evidentiary documents.  *See, e.g., U.S. ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*, 2017 WL 1217118, at *6 (D. Mass. Mar. 31, 2017) (evidentiary documentation); *U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, 2011 WL 4480846 (M.D. Fla. Sep. 27, 2011) (No. 09-cv-1002, Dkt No. 58–2) (government attorney declaration); *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 950 F. Supp. 1046, 1049 (D. Colo. 1996) (government attorney declarations).

---

[6] The Court should not permit the United States to seek to satisfy its obligations post hoc through a reply brief or late-filed declaration.  Given the clear language and directive set forth in *SEES*, the time for the United States to satisfy its burden to demonstrate good cause has passed.

Without any evidentiary record before it, this Court is left unable to engage in the appropriate analysis to determine whether to exercise its discretion in allowing the Government to intervene. (*See* Ex. B at 40:12–13 ("The Court can only rely upon what's properly before it.").) Because it is the United States' burden to establish good cause, its motion for late intervention should be denied because it has not, and cannot, satisfy its burden.

## C.    The Facts Cited By the United States Do Not Support Untimely Intervention.

In place of evidence, the United States offers general descriptions—without any support—of "new and additional" facts it claims to have recently learned. But, even accepting the United States' unsupported claims as fact would not establish good cause for late intervention because this information is neither "new" nor "additional."

### 1.    West Interviews

The United States says that it conducted interviews of "West personnel" after Relators filed their TAC in which it obtained admissions "from West" that West Clinic received payments for services that it never performed. (Mem. at 7–8.) Surely, this Court's good-cause standard requires more than unsupported characterizations of informal interviews of unnamed witnesses. Even so, the fact that the United States conducted additional interviews of witnesses well-known and available during its sealed investigation on topics Liebman clearly alleged four years ago cannot satisfy the good-cause standard. In *SEES*, the Court denied the United States' and State of Tennessee's motions to intervene, noting that many of the investigative steps taken post-declination, including interviews, document requests, and analysis were "readily available" to the Government "long before" its deadline to intervene. (Ex. B at 38:23–25); (*see also id.* at 38:1–2 ("Given that this unnamed witness mainly added to what was already known, it could hardly be new evidence.")); *contra U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, 2005 WL 2667207, at *3 (N.D. Ill. Oct. 17, 2005) (allowing the government to intervene after filing a notice of declination, given

"new and significant evidence obtained by the relator during discovery"). The West principals the United States interviewed following their settlement—all of whom Liebman's 2018 First Amended Complaint identified by name—were well-known to the United States during its two-year investigation and could easily have been interviewed (or deposed) at that time.

### 2. Time Records

The United States claims to have recently "confirmed" that West lacked any "time records" to justify its management fees. (Mem. at 3–4.) Again, the United States offers no support for this bald claim. Nor does it provide any context to explain why an absence of "time records" would be a new, probative fact. Liebman's 2017 Complaint and his 2018 First Amended Complaint both alleged that West Clinic was overpaid management fees because it was not performing all of the management services in the management agreement. (*See* Dkt. No. 1 ¶¶ 58–60, Dkt. No. 20 ¶¶ 54–56.) During its two-year sealed investigation, the United States requested and was provided a copy of the MSA, as well as significant documentation showing the time and effort West physicians devoted to management of the West Cancer Center. (*See* Roark Decl. ¶ 3.) Simply confirming the absence of what it would consider to be timesheets is neither new nor probative.[7]

### 3. Increased Management Fees

The United States says that it only recently learned that West sought increased management fees based on increased revenues at the Cancer Center. Once again, the United States fails to explain what *new evidence* it has unearthed to support this claim. When the Government in *SEES* proffered that it had continued investigating and gathering evidence of kickbacks, the Court

---

[7] Neither the AKS nor the FCA require a party to maintain "time records" or define what would even constitute a time record in the first instance. In any event, voluminous records exist documenting the management services the West Clinic provided, which the United States has not even claimed—much less established—were unavailable to it before the statutory intervention deadline.

explained that simply gathering "more" evidence of the same alleged misconduct is not the type of "new" evidence required for establishing good cause. (Ex. B at 40:15–18.) While Methodist disagrees with the United States' characterizations, the fact that management fees would increase as program revenue increased because the managers would necessarily have more activity to manage is not a new fact and was overtly disclosed in the independent third-party evaluations determining the fair-market value for the management fees. This was well-known to the United States when it declined intervention in 2019.[8]

### 4. Professional Fees

The United States also claims that Methodist's recent interrogatory responses to Relators confirm that the payments for professional services under the PSA were excessive compared to their value. Methodist would, again, disagree with the United States' characterizations of the numbers, but this is not new information. Methodist provided the United States with a copy of the PSA, information related to compensation for professional services, and the independent third-party valuations of those payments setting forth methodologies to determine that payments are set at fair market value during the Government's two-year sealed investigation. (*See* Roark Decl.

---

[8] The court in *U.S. ex rel. Martin v. Life Care Ctrs.*, 912 F. Supp. 2d 618, 623–26 (E.D. Tenn. 2012), admonished the Government for prolonging the investigative period and thereby needlessly imposing additional costs on defendants and the public. *Id.* (noting Congress intended "vast majority" of all pre-intervention investigations should be concluded within 60-days and "pre-intervention strategies approach the abusive" when Government uses the period to conduct "one-sided discovery"). The *Life Care* court thus directed the Government to avoid these abusive practices and adhere to statutorily imposed time-periods. *Id.* The United States has engaged in the same abusive practices here by conducting its two-year investigation far exceeding the 60-days contemplated in the FCA, and then, as if that were not enough, engaged in the same doubly abusive practices after the time-period set by the statute had expired. To avoid this type of abuse and prejudice, the Court in *SEES* mandated that the Government, to show good cause, must provide a sufficiently specific evidentiary basis demonstrating that new evidence was discovered that was not readily available to it during the multi-year investigation while the case remained sealed. (Ex. B at 36:7–40:18.) Here, the United States, which does not even cite to the Court's directive in *SEES,* does not and cannot satisfy this standard and hence its motion should be denied.

15

¶¶ 3–4.)  Relators' recent interrogatories requested the amount in collections Methodist received for professional services West Clinic physicians performed.  To the extent these collections are relevant at all to the value of the West physicians' services, they would have been readily apparent and available to the Government before the Government's declination in 2019.  (*Cf.* Ex. B at 38:19–25 (finding that the Government's post-declination requests for, and analysis of, data that was "readily available" during its sealed investigation could not establish good cause for late intervention).)

### 5.    Public Statements of Counsel

Finally, the United States says that it only recently learned that one of the attorneys who represented West Clinic in negotiating and structuring the West Cancer Center affiliation made public statements that the "overall transaction structure presented irreducible AKS risk."  (Mem. at 8.)   While Methodist disagrees with the United States' characterizations of these public statements and of their probative value, the United States does not identify the statements, or state when they were made, or explain why it only recently learned of them.  The identity of the numerous attorneys, consultants, valuators, and other third-party experts who assisted Methodist and West Clinic in structuring and forming the West Cancer Center was well-known to the United States long before it declined to intervene in this case.  If the United States believed then that "overall transaction structure" presented a "predicate legal question" regarding its compliance with the AKS, it could have easily accessed the publicly-available statements of those third-party experts and advisors during its multi-year investigation while the matter remained sealed.

The sum of the United States' generally-described evidence reveals that the only true change in this case is the United States' view of facts known or readily available to it when it declined to intervene in 2019.  A change of mind without any change in the evidence is not good cause for untimely intervention.

16

II.     **Allowing Untimely Intervention Would Significantly Prejudice Methodist.**

The FCA's good-cause standard for late intervention is intended to protect "defendants from unfair prejudice due to an untimely intervention from the government."  *Griffith*, 2016 WL 3156497, at *3.[9]  The United States' untimely intervention in this case—more than four years after it was first filed—would prejudice Methodist.[10]

A.     **The Age of this Case Weighs against Late Intervention.**

An important factor in assessing potential prejudice to defendants is the stage of the proceedings at which the Government seeks intervention.  *Compare Griffith*, 2016 WL 3156497, at *3 (hypothesizing that a "strong justification" for intervention would be necessary if "three years into the litigation, the government decides to intervene, causing some discovery to be repeated, requiring new discovery, and potentially requiring relitigation of some issues") *with Ross*, 2021 WL 3492917 at *3 (granting United States' intervention motion when case was "procedurally in its infant stages, with discovery not having yet commenced").

This case is not in its "infant stages."  It was filed against Methodist in 2017.  After the Government sought two years' worth of extensions to investigate, it declined to intervene in 2019.  Since then, Methodist has been actively litigating against Relators, including filing two motions to

---

[9] The United States centers its focus on the fact that Relators have consented to its intervention, going as far as to claim that their consent is "almost dispositive." (Mem. at 7.)  The case law does not support such a heavy-handed claim.  If Relators' consent were all that was required, it "would virtually eliminate the 'good cause' requirement…since a relator may consent for any reason or no reason at all."  *See Fresenius Med. Care*, 2017 WL 1217118, at *5 n.2.  In fact, in *SEES*, the Government also relied heavily on the fact that the relators had "strongly consent[ed]" to its intervention, but the Court nonetheless denied the Government's motion to intervene.  (*See* Ex. B at 14:22–24.)

[10] The United States would not be prejudiced by a denial of its untimely intervention.  Relators, who have been litigating this case for years since the Governments' declinations, are prosecuting the case *on behalf* of the United States and the State of Tennessee.  Like all declined *qui tam* cases, any recovery achieved by Relators will be on behalf of and paid to the Government.

dismiss. The United States' Motion to Intervene was filed two months prior to the close of fact discovery. If late intervention is allowed, much of this significant time and expense will be for naught. (*See* Roark Decl. ¶ 8.) This waste of time and resources could easily have been avoided had the United States completed its investigation or made the decision to pursue its "predicate legal question" within the time-period Congress set in the FCA and that the Court extended four times, instead of ignoring the FCA's seal requirements and essentially forcing Methodist to defendant against two different cases.

If the United States were allowed to intervene now, the remaining deadlines in the case, including the cut-off for fact discovery and the trial date, likely would have to be extended, and Methodist would have to respond to what would be the *fifth* iteration of the complaint. The United States attempts to downplay this potential prejudice by claiming that "it intends to streamline the case by seeking partial summary judgment to resolve a contested legal issue at the outset, which would result in more narrowed discovery at a minimum." (Mem. at 2.) This is a red herring. The parties are a mere two months from the close of fact discovery, which begs the question of what remaining discovery the United States would intend to "narrow" at this stage of the litigation.

Additionally, to reach the United States' conclusion, the Court must presume: (1) that Relators will not seek to pursue their own, more fact-intensive theory or claims against individual defendants and under the Stark Law in which the United States has not moved to intervene; (2) that the West Defendants will not require additional time to conduct discovery once added back into the case; (3) that the United States will not seek fact-intensive discovery on other theories while its motion for partial summary judgment is pending; and (4) that the United States will prevail on its yet-to-be-filed motion for partial summary judgment. In reality, there is but one clear result of a late intervention: further delay and prejudice to Methodist. The parties should proceed with the

current litigation, with this Court ruling on the pending motion to dismiss and motion to strike, completing fact discovery, and, if necessary, ruling on Methodist's own motion for summary judgment.

**B.    The United States Conflates Surprise with Prejudice.**

The United States also claims that because Methodist was aware of the United States' continued investigation after the case was unsealed, there is "limited, if any, prejudice to Methodist" from such a late intervention.  (Mem. at 8.)  The United States' claim that Methodist was aware of its ongoing investigation is, again, without evidentiary support.  As the United States has represented to the Court, it only "more recently" began considering a late intervention.  (*See* Dkt. No. 190 at 12:10–13:19.)  Indeed, discovery had been ongoing in the litigation for more than a year, Relators had already settled with West, and Relators had submitted their *fourth* version of a complaint against Methodist before the United States began making additional requests for information.  And, as explained below, surprise is just one aspect of the prejudice faced by Methodist due to the United States' conduct in this case.

**III.   The United States' Abuse of the FCA Offends Public Policy.**

The United States' conduct in prosecuting this case contravenes the purposes of the FCA. The FCA provides a sealed investigatory period of 60 days for the United States to review a relator's complaint, investigate the allegations, and make a decision on how to proceed.  31 U.S.C. § 3730(b)(2).  In drafting the FCA, Congress contemplated that this 60-day period should be sufficient in the "vast majority" of cases.   *Life Care Ctrs.*, 912 F. Supp. 2d 618, 623–26 (E.D. Tenn. 2012) (citing S. Rep. No. 99-345, 99th Cong., 2d Sess. 24, 1986 U.S.C.C.A.N. 5266, 5289-90).  Thus, any requested extension of the sealed investigatory period must only be for "good cause," and such a request should "be met with significant scrutiny."  *Id.*

After granting four such extensions, the Court determined in 2019 that the United States had no good cause to continue investigating under seal. Despite having no statutory authority to do so, the United States instead filed a notice with the Court stating that it had not reached a decision and would continue its investigation after the court-imposed deadline. (Dkt. No. 45.) And now, the United States claims not only that it never stopped investigating, but also that its notice of continued investigation is evidence of good cause for late intervention. However, as the Court set forth in *SEES,* the United States cannot circumvent its statutory and court-imposed deadlines in this way. Indeed, allowing the Government to simply continue its investigation and intervene at-will would read the seal-period requirements of the FCA out of the statute completely and would contravene the Court's prior rulings.

In addition, years after filing this notice of "no decision," the United States began making informal email requests for information from Methodist under the threat that it might seek to intervene in the case. These requests—made in the middle of ongoing litigation with Relators—functioned as extra-judicial discovery to which neither Relators nor the United States were entitled under the Federal Rules and over which the Court had no control. Given that the United States had changed counsel following its original declination, Methodist voluntarily responded to the requests by identifying and addressing questions regarding documents and information that Defendants previously had discussed with prior Government counsel during the sealed investigation. (*See* Roark Decl. ¶ 7.) But now, in a bait-and-switch maneuver, the United States seeks to hold Methodist's voluntary responses to those requests against it by arguing that Methodist has "expressly recognized" the United States' authority to conduct a post-declination investigation through informal requests and to intervene without good cause. The FCA does not provide for ever-lasting Government investigations, and the United States' claim of ongoing

"investigation" cannot be a guise for unfettered and unsanctioned discovery during active litigation with Relators. Nor can it be considered evidence mitigating prejudice to a defendant who, while actively litigating against Relators, is threatened with additional litigation against the United States if it does not contemporaneously cooperate with the United States' extra-judicial requests.

Courts have long recognized that the steep financial penalties and lucrative bounties created by FCA litigation present a unique danger that relators might bring baseless allegations of fraud that damage a defendant's goodwill and reputation in order to extract sizeable settlements. *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 801 n.23 (11th Cir. 2014). The FCA and the Federal Rules of Civil Procedure are thus designed to prevent Relators "from bringing suit under the FCA and using the complaint as 'a fishing expedition' to uncover wrongdoing." *United States v. UT Med. Grp., Inc.*, 2013 WL 12149636, at *3 (W.D. Tenn. Aug. 15, 2013) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007)). They are also intended to "protect defendants' reputations from allegations of fraud and to narrow potentially wide-ranging discovery to relevant matters." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (cleaned up). Yet, as a result of the United States' and Relators' conduct, Methodist has endured more than four years of burdensome discovery and has faced four versions of Relators' ever-shifting accusations without ever having a meaningful opportunity to challenge the allegations against it. This was not the intent of the FCA. Methodist is entitled to an opportunity to defend itself, and the United States' requested intervention will only further delay and prejudice Methodist. Because the United States has not demonstrated good cause to intervene, its motion should be denied.

21

## CONCLUSION

For all the reasons above, the United States' Motion to Intervene for Good Cause, (Dkt. No. 193), should be denied.

Respectfully Submitted,

*/s/ Brian D. Roark*
Brian D. Roark
J. Taylor Chenery
Taylor M. Sample
Hannah E. Webber
Bass, Berry & Sims PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
broark@bassberry.com
tchenery@bassberry.com
taylor.sample@bassberry.com
hannah.webber@bassberry.com

Robert Salcido
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, D.C. 20006
(202) 887-4095
rsalcido@akingump.com

*Attorneys for Defendants Methodist Le Bonheur Healthcare, Methodist Healthcare-Memphis Hospitals, Chris McLean, and Gary Shorb*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served upon counsel, via the Court's CM/ECF e-mail notification system, on this the 22nd day of October, 2021:

Bryan A. Vroon
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta, GA 30327
(404) 441-9806
bryanvroon@gmail.com

David Rivera
Jerry E. Martin
Seth Marcus Hyatt
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
drivera@barrettjohnston.com
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

Edward D. Robertson , Jr.
Bartimus Frickleton Robertson Rader, PC
109 B East High Street
Jefferson City, MO 65101
(573) 659-4454
crobertson@bflawfirm.com

Kara F. Sweet
U.S. Attorney's Office (Nashville Office)
Middle District of Tennessee
110 Ninth Avenue, S
Suite A961
Nashville, TN 37203-3870
(615) 401-6598
kara.sweet@usdoj.gov

Tony Hullender
Scott M. Corley
Office of the Attorney General of Tennessee
Civil Rights and Claims Division
P.O. Box 20207
Nashville, TN 37202-0207
(615) 253-1103
Tony.hullender@ag.tn.gov
Scott.corley@ag.tn.gov

*/s/ Brian D. Roark*

23