# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION

 3     UNITED STATES OF AMERICA    )
       and the STATE OF TENNESSEE, )
 4     ex rel, GARY ODOM and ROSS  )
       LUMPKIN,                    ) Case No.
 5                                 ) 3:17-cv-00689
                    Plaintiffs,    )
 6                                 ) CHIEF JUDGE CRENSHAW
           v.                      )
 7                                 )
       SOUTHEAST EYE SPECIALISTS,  )
 8     PLLC, SOUTHEAST EYE SURGERY )
       CENTER, LLC, and EYE        )
 9     SURGERY CENTER OF           )
       CHATTANOOGA, LLC.,          )
10                                 )
                    Defendants.    )
11

12
       - - - - - - - - - - - - - - - - - - - - - - - - - - -
13
                      BEFORE THE HONORABLE
14
           CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.
15
                    TRANSCRIPT OF PROCEEDINGS
16
                      September 30, 2020
17     - - - - - - - - - - - - - - - - - - - - - - - - - - -

18

19

20

21

22

23    PREPARED BY:
                   LISE S. MATTHEWS, RMR, CRR, CRC
24                     Official Court Reporter
                       801 Broadway, Room A839
25                      Nashville, TN 37203
                  lise_matthews@tnmd.uscourts.gov
```

```
1   APPEARANCES:

2   For the Plaintiff:          Ellen Bowden McIntyre
    (United States)             Office of the United States Attorney
3                               110 Ninth Avenue, S
                                Suite A961
4                               Nashville, TN 37203-3870
    For the Plaintiff:
5   (State of Tennessee)        Philip H. Bangle
                                Tennessee Attorney General's Office
6                               P O Box 20207
                                Nashville, TN 37202-0207
7
    For the Plaintiff:          Jeffrey W. Dickstein
8   (Relators)                  Phillips & Cohen LLP
                                One Biscayne Tower
9                               2 S Biscayne Boulevard
                                Suite 1600
10                              Miami, FL 33131

11  For the Plaintiff:
    (State of Tennessee)        Philip H. Bangle
12                              Tennessee Attorney General's Office
                                P O Box 20207
13                              Nashville, TN 37202-0207

14
    For the Defendants:         Matthew M. Curley
15                              Bass, Berry & Sims
                                150 Third Avenue South
16                              Suite 2800
                                Nashville, TN 37201
17
                                Scott D. Gallisdorfer
18                              Bass, Berry & Sims
                                150 Third Avenue South
19                              Suite 2800
                                Nashville, TN 37201
20
    (Via Phone -
21  Listening Only)             Alan E. Schabes
                                Benesch Friedlander
22                              200 Public Square
                                Suite 2300
23                              Cleveland, OH 44114-2378

24

25
```

1          The above-styled cause came on to be heard on
2  September 30, 2020, before the Honorable Waverly D.
3  Crenshaw, Jr., Chief District Judge, when the following
4  proceedings were had, to-wit:
5          THE COURT:  All right.  Be seated.  Good
6  afternoon.
7          We're here on Case 17-689, United States of
8  America, et al., versus SouthEast Eye Specialists, PLLC, et
9  al.
10          If counsel want to introduce yourselves.
11          MS. MCINTYRE:  Sorry, Your Honor.  I guess I'm not
12  quick with the mask -- unmasking so far.
13          Ellen Bowden McIntyre, on behalf of the United
14  States.
15          THE COURT:  Okay.
16          MR. BANGLE:  Philip Bangle on behalf the State of
17  Tennessee.
18          MR. DICKSTEIN:  Jeffrey Dickstein, law firm of
19  Phillips & Cohen, on behalf of the relators, Gary Odom, Ross
20  Lumpkin.
21          THE COURT:  And then for the defendant?
22          MR. CURLEY:  Your Honor, Matthew Curley of Bass,
23  Berry, Sims, on behalf of the defendants.  I'm joined by
24  Scott Gallisdorfer, also of Bass, Berry & Sims.  And
25  Mr. Schabes of the Benesch firm is on the phone, I believe

```
 1   muted.  We appreciate the Court's accommodation of
 2   Mr. Schabes to attend telephonically.
 3              THE COURT:  Sure.
 4              Okay.  So we're here on the objections to the
 5   magistrate's report and recommendation.  I've read the
 6   briefs.  And I really want to start with the United States
 7   being allowed to respond to the Reply.  So why don't we pick
 8   up your argument -- who's going to argue?  Ms. Bowden --
 9   Ms. McIntyre?
10              MS. MCINTYRE:  Yes, that's correct, Your Honor.
11              THE COURT:  So we've got the Defendants' Reply.
12              MS. MCINTYRE:  Okay.
13              THE COURT:  And now let's just pick up with what
14   does the United States say to that?
15              MS. MCINTYRE:  Okay.  First off -- can I just have
16   one moment, Your Honor --
17              THE COURT:  Sure.
18              MS. MCINTYRE:  -- to gather in the order of the
19   Reply?
20              THE COURT:  Sure.
21              I mean, you're free to emphasize -- but I've
22   already read everything else, but if you want to emphasize
23   stuff we've already covered. . .
24              MS. MCINTYRE:  Thank you, Your Honor.  I'll be
25   just 30 seconds.
```

1        THE COURT:  Okay.

2        And the meat of the Reply starts on page 2.

3        MS. MCINTYRE:  Good afternoon, Your Honor.

4        I will proceed if I may.

5        THE COURT:  Okay.

6        MS. MCINTYRE:  In brief -- I would like to give a

7 brief introduction, if I may, which is that the U.S.

8 respectfully asks this Court to adopt the magistrate's

9 well-reasoned and well-supported report and recommendation in

10 full.

11        The U.S. and Tennessee are the real parties in

12 interest here.  And the U.S. and Tennessee will get at least

13 70 percent of any eventual recovery.  So we should represent

14 the Medicare and TennCare programs' interest in fighting

15 fraud against these programs, not the relator.

16        And in terms of the specific arguments raised in

17 the Reply, the -- one of the first ones was that they

18 asserted that we were using litigation tactics and pursuing

19 one-sided discovery.  Respectfully, this is not the case.

20        The False Claims Act obligates the United States

21 to investigate allegations of fraud before making an

22 intervention decision.  And this is specifically required by

23 31, U.S. Code, 3730(a), which says the Attorney General

24 "shall investigate."

25        The United States was not taking one-sided

1  discovery or using unfair litigation tactics.  Instead, we
2  were "investigating" the relator's allegations for the
3  purpose of making an intervention decision.  Congress
4  expressly allows this in the statutory language.
5          The U.S. was even using the False Claims Act
6  statutory investigative tools, namely, a Civil Investigative
7  Demand, which is a CID.  A CID is not available under regular
8  litigation, and it is not available under the Federal Rules
9  of Civil Procedure.  It is handed to the United States to
10 carry out its statutory job to investigate fraud.
11         And the United States, when it's using the CID --
12 which is what we used here on several occasions -- is --
13 allows the Attorney General, or his or her designee, to issue
14 a Civil Investigative Demand requiring production of
15 documents, answers to interrogatories, or oral testimony.
16         In this case, the United States throughout the
17 preintervention decision period used all of those tools -- of
18 course, we stopped once the U.S. filed our notice of
19 nonintervention at this time.  And this is specifically
20 called an investigative tool, not a discovery or litigation
21 tool, by the Sixth Circuit itself, in *United States v.*
22 *Markwood*, which, though I didn't cite it in my brief, I'm
23 happy to give the Court the cite.  It's 48 F.3d 969 at 976.
24 This is a Sixth Circuit decision from 1995.  And I quote it
25 as saying (As read):

1          Congress has given the Department of Justice a

2  particular type of investigative tool, the False Claims Civil

3  Investigative Demand, to enable it to investigate whether

4  there is a basis for remedying a false claim made against the

5  United States.

6          The decision further stated on the same page (as

7  read):

8          A False Claims Act CID may be issued to any person

9  having information relevant to a false claims investigate.

10          The United States used those tools, and we used

11  tools on our own side, such as looking at Medicare and

12  TennCare claims data.  We continued our investigation, but we

13  did it using these investigative tools, which are not

14  litigation tools.  They are not unfair.  They are for the

15  purpose of making an intervention decision.  And they are

16  allowed by statute.

17          Another point made in the Reply brief was that

18  SEES argues that in the -- that this Court should not apply

19  the typical good cause interpretation, which is in about 20

20  or so cases from around this country, including in other

21  cases in -- within our circuit, such as the *Griffin v. Chon*

22  decision out of the Eastern District of Kentucky.  And they

23  instead ask the Court to use the good cause definition, if it

24  is a definition, from *Nix v Sword*.  But the *Nix v Sword* case

25  is completely inapposite.  That was a case involving civil

1  RICO violations and wiretapping alleged violations.  And it

2  was alleged -- and there was discovery sought from a U.S.

3  Congressman.  And that Congressman had moved for a protective

4  order.  And later on, under -- the Sixth Circuit ruled that

5  there -- the standard for good cause under protective -- for

6  a protective order under Rule 26 involves showing serious

7  injury, which of course, doesn't apply here, and that you had

8  to clearly show serious injury.  These are apples and

9  oranges.

10         Rule 26 is not the same thing as the False Claims

11  Act.  The meaning of good cause from Congress's definition is

12  -- is plain.  And the Sixth Circuit at various times,

13  including in a False Claims Act case, U.S. v Health

14  Possibilities, which I can also give the Court the cite of,

15  at 207 F.3d 335 -- in that decision, the Court did discuss

16  good cause in general.  Although, it wasn't ruling on a

17  motion to intervene like we have here.  Instead, there the

18  Sixth Circuit was ruling that the Attorney General was

19  required to consent to a relator's dismissal -- or motion to

20  dismiss their own case.  But in so doing, the Sixth Circuit

21  indicated repeatedly that the False Claims Act is there for

22  the U.S. to be in control of the litigation.  And one of the

23  quotes from that case says, Congress had a manifest desire to

24  ensure that the government retained significant authority to

25  influence the outcome of qui tam actions, even when the U.S.

1   decides not to intervene. That case -- and also in the

2   *Cochise Consultancy* Supreme Court case, that was from just

3   2019, Your Honor, further said that the U.S. can intervene at

4   any time.

5         Here, the United States did not intervene at any

6   time, and we are not pushing the envelope asking, you know,

7   four years into this litigation to be allowed to become a

8   party. That is not -- that was never our desire or our plan.

9   And that was not how we behaved. We have acted

10   expeditiously, in accordance with the good cause statutory

11   standard in the False Claims Act and the Tennessee Medicaid

12   False Claims Act to investigate this case.

13         And we -- when we were unable to reach a decision

14   by the Court's original deadline, we then did as much as we

15   could to make a decision as quickly thereafter as we could.

16   And that -- that -- the investigation that we did in that

17   six-month period is what allowed us to have good cause for

18   our investigation -- for our motions to intervene now.

19         In addition, the Reply brief argues that the U.S.

20   has somehow failed to submit documentation in support of our

21   good cause motion. But nothing in the False Claims Act or

22   the Tennessee Medicaid False Claims Act requires the

23   Government to submit documentation in support of such a

24   motion.

25         THE COURT: Well, I do.

1    MS. MCINTYRE:  Your Honor, I -- what -- if

2 you require it, then the United States would respectfully ask

3 that we submit something to you in camera, if the Court would

4 entertain that.  And we could submit it, you know -- we could

5 submit it soon.  To be honest, my mom --

6    THE COURT:  Hold on.

7    MS. MCINTYRE:  -- was just --

8    THE COURT:  Hold on.

9    MS. MCINTYRE:  -- hospitalized.  So I can't tell

10 you that I would submit it tomorrow, because I have to figure

11 out my mom's health situation, but I would certainly submit

12 something in camera to you as you wish.

13    THE COURT:  Well, I certainly don't want you to

14 not take care of your mother.  And there are plenty of other

15 attorneys listed here of record.

16    So Mr. Curley, respond to the last thing she said.

17    MR. CURLEY:  Respond to the last point, Your

18 Honor?

19    THE COURT:  The last point, which sort of gets to

20 the guts of the hearing here today.  She offers to provide it

21 under -- provide an affidavit to the Court.

22    MR. CURLEY:  Sure, Your Honor.

23    May it please the Court, I think when we look at

24 whether a submission to the Court satisfies the good cause

25 standard under the False Claims Act, I think it's necessary

1  to take a step back and see what, in fact, that standard

2  requires.  And, of course, the statute says the False Claims

3  Act, upon a motion to late intervene by the Government, the

4  Court may permit that.  So it does not require the Court to

5  allow for late intervention.  And certainly the good cause

6  standard requires something more than what we've heard from

7  in the Government's submissions so far.

8           THE COURT:  So she's offering to give me something

9  in camera.  Let's expand on that idea.

10          MR. CURLEY:  Sure, Your Honor.  I think, to put it

11 at the bottom, it's more of the same.  We've had a

12 significant amount of under seal litigation in this case.

13 We've had one-sided discovery.  Both of those points are

14 raised -- are made by the Government in its opposition to the

15 objection.

16          So to the extent the government wants to submit

17 anything, and there's a need for it to be under seal, if it's

18 patient information or something that should be shielded from

19 public view because of that, I don't have an objection to

20 that.  But if it's simply to protect the Government's

21 investigation, now that we're in litigation, I wouldn't see

22 any basis for a submission under seal.

23          THE COURT:  Ms. McIntyre, what do you say to that?

24          MS. MCINTYRE:  At least one of the cases that SEES

25 cited in their brief included an affidavit from -- I believe

1  an Assistant U.S. Attorney.  I don't want to misspeak.  I
2  think that may be the case, though.
3          THE COURT:  Well, his point is --
4          MS. MCINTYRE:  I'm not sure if that's what
5  you're --
6          THE COURT:  Well, his point --
7          MS. MCINTYRE:  -- asking.
8          THE COURT:  -- is that you can provide it under --
9  to the Court, but let it be shared with the attorneys for the
10 defendants.
11          What's your position on that?
12          MS. MCINTYRE:  I would like to consider exactly
13 what we would submit.  But we have certainly a lot of claims
14 data that we can submit because that's part of --
15          THE COURT:  No.  No.  Just deal with the narrow
16 issue.  If you submit something you propose to the Court, do
17 you have any problem with the attorneys for SouthEast
18 receiving a copy of that?
19          MS. MCINTYRE:  I guess it depends on what the
20 Court wishes me to submit.
21          THE COURT:  No.
22          MS. MCINTYRE:  And can I address the two
23 possibilities?
24          THE COURT:  No.  You can tell me, yes, no, or you
25 don't know.

1      MS. MCINTYRE:  I would not want to get into my

2  work product and supply it to them.  And certainly work

3  product, which I've been briefing in some other cases not

4  before this Court, but before other judges in this

5  district -- obviously, some of my work product might be

6  encompassed.  But I perhaps could avoid that if I provided

7  you with a lot of data.  But you probably don't want to read

8  a lot of data.

9      THE COURT:  Who was the lead investigator for the

10  investigation by the government?  What was that person's

11  name?

12      MS. MCINTYRE:  The -- I guess the lead agent is --

13  I don't know if we designated someone a lead, but in my view

14  the lead agent possibly is Phillip Cicero --

15      THE COURT:  Spell it.

16      MS. MCINTYRE:  -- but he has not requested --

17      THE COURT:  Slow down.

18      MS. MCINTYRE:  -- the data.

19      THE COURT:  Spell the last name.  Phillip?

20      MS. MCINTYRE:  Cicero.  And it's like the Roman

21  person, C-i-c-e-r-o, Phillip.

22      THE COURT:  C-i-c-r-o?

23      MS. MCINTYRE:  e-r-o, Your Honor.

24      THE COURT:  Okay.

25      MS. MCINTYRE:  But for what it's worth, that agent

1  has done many interviews, but he's -- not only is he not the

2  original agent -- because the original agent was promoted.

3  And so he replaced her.  But also a lot of the analysis has

4  been done within the U.S. Attorney's office.  And, in fact, I

5  would say the majority of the analysis has been done within

6  the U.S. Attorney's office.

7          THE COURT:  But it would be true that Cicero would

8  have an overarching understanding of the progression of the

9  investigation from day one to the present?

10         MS. MCINTYRE:  No.  Unfortunately, he would not,

11 because the original agent was agent Angel Beverly, and she

12 was promoted and --

13         THE COURT:  Okay.

14         MS. MCINTYRE:  So he was -- he probably joined

15 maybe eight months ago.

16         THE COURT:  But Mr. Cicero as the lead

17 investigator would have access to whatever Agent Beverly had?

18         MS. MCINTYRE:  He would have access to the part

19 about the interviews that they did.  But we have done a lot

20 of investigation in addition to interviews, and that would be

21 work product.  Although some of it, we -- if we were aloud to

22 intervene, Your Honor, we would provide in initial dis- --

23 like, the data we would provide in initial disclosures.  Of

24 course, we're not a party yet.  So we wouldn't normally -- so

25 I don't -- I wouldn't object to -- you know, I would consider

1    what would be the best, most efficient way to provide the

2    Court with something in camera.  If I could, I would prefer

3    to provide it in camera.  And if I am required to share it

4    with them, I might be more limited in the way --

5                THE COURT:  Where --

6                MS. MCINTYRE:  -- I describe what --

7                THE COURT:  Where is Mr. Phillip Cicero?

8                MS. MCINTYRE:  I don't know his location.  He

9    probably got on the case --

10               THE COURT:  No.  No.

11               MS. MCINTYRE:  I don't want to say.  But I just --

12   assume he's in Nashville.  I don't know for sure.

13               THE COURT:  You've never talked to him?

14               MS. MCINTYRE:  I've talked to him on the phone.  I

15   haven't met him in person.

16               THE COURT:  And when you talked to him on the

17   phone, was it a Nashville number or a 202 number in

18   Washington?

19               MS. MCINTYRE:  Oh, no.  He's a Tennessee Bureau of

20   Investigation agent, Your Honor.  I'm sorry I didn't clarify

21   that.  I should have.

22               THE COURT:  Do you know of anyone who would -- who

23   has -- have more authority in the investigation and the

24   direction and the progression of the investigation other than

25   Mr. Cicero?

1          MS. MCINTYRE:  I guess I could say Ms. Beverly,

2    because Ms. Beverly was the original agent, and she's still

3    employed by TBI.  She's the supervisor, I think.

4          THE COURT:  Oh.  And what was Ms. Beverly's name,

5    first name?

6          MS. MCINTYRE:  Angela.  I'm sorry.  We call her

7    Angel.  But Angela Beverly.  And she's probably called the

8    Assistant Supervising Agent in Charge of the TBI Medicaid

9    Fraud Control Unit, which is very long, and I can say it

10   again if you wish.

11         THE COURT:  So would it be true that Ms. Beverly

12   and Mr. Cicero as TBI investigators together would have the

13   most comprehensive knowledge about the investigation from

14   beginning to today?

15         MS. MCINTYRE:  Your Honor, the truth is, I would

16   have the most comprehensive knowledge.

17         THE COURT:  I'm -- and I -- I don't think you want

18   to be deposed.

19         MS. MCINTYRE:  Right.

20         THE COURT:  The people -- non attorney.  They

21   would -- non attorney.

22         MS. MCINTYRE:  I guess I would say -- so for what

23   it's worth, there's actually several agents from the --

24         THE COURT:  Hold on.

25         MS. MCINTYRE:  There's probably four agents on the

case.  But, yes, she probably -- she probably would be in a
position to give you the longest history because of her being
on in the beginning and now being the supervisor of
Mr. Cicero.

THE COURT:  So again, Ms. Beverly and Mr. Cicero
together would have the most comprehensive knowledge about
the progression of the investigation from day 1 to the
present?  True or false?

MS. MCINTYRE:  True, with the exception of the
U.S. Attorney's office and to some extent DOJ.

THE COURT:  Okay.

All right.  Mr. Curley.

MR. CURLEY:  Is there a specific issue Your Honor
would like me to address, or may I speak to other things?

THE COURT:  I want to give you a chance -- and
I've read everything.  So it's not productive to reread to me
what's been filed.  And -- but I want to give you a chance to
say anything you want to say in response to Ms. McIntyre.

MR. CURLEY:  Thank you, Your Honor.

I just want to touch briefly on the issue of
prejudice.  In our estimation, respectfully, the magistrate
judge looked at the issue of prejudice far too narrowly.

So the magistrate judge focused on the period of
time between declination by the Government in August of 2019,
three-years-plus after the seal -- expiration of the seal

1   period -- or the case being filed -- and the date of the

2   filing of the Government's motion to intervene.  And in our

3   view, Your Honor, we respectfully submit that that's an error

4   to look at that narrow period.

5          The prejudice here is much broader than that.  We

6   see in the opposition filed by the Government its reference

7   to conducting common litigation practices, engaging in

8   preintervention discovery.  Both of those are a misuse of the

9   seal investigatory period in our view.  And I don't say that

10  lightly.  I do agree with Ms. McIntyre, the Government's

11  typically afforded wide latitude in conducting these

12  investigations.  But as we indicated in our motion to

13  dismiss, much of the information here was publicly disclosed

14  as of the date of the filing of this case to begin with:  The

15  Defendants' business practices, the events that the relators

16  allege constituted impermissible remuneration under the

17  Kickback Statute.  So this was a straightforward case to

18  investigate.  It took the government 28 months.  And now we

19  know why.  The government was engaging in one-sided

20  discovery, engaging in litigation under the cloak of the

21  seal.

22         In our view, this was illustrated perhaps most

23  clearly by the depositions that were taken immediately prior

24  to the expiration of the seal period, the presentation made

25  by the Government where in its opposition to our objection

1   says that it revealed the results of its investigation.  All

2   of that goes into the analysis of the fact that the

3   defendants were prejudiced here.

4           The question in my mind is why did the Government

5   continue to seek extensions of the seal period.  If the

6   government had intervened in a timely manner, we would have

7   had access to the allegations asserted against the

8   Defendants.  We would have been able to move to dismiss those

9   claims.  The Defendants themselves could have sought

10  discovery from third parties or the Government.  We would

11  have had recourse to the Court, in the event that we had wide

12  ranging discovery that went beyond the allegations in the

13  Complaint itself.  If the Government had intervened after six

14  months or 12 months, or even 18 months, the Defendants would

15  have saved countless resources that they expended in engaging

16  in this under-seal litigation.  More importantly, Your Honor,

17  the defendants would have been afforded the due process

18  afforded to a party in an adversarial action.  None of which

19  we had in responding to the Government's under-seal

20  litigation and one-sided discovery in the context of the seal

21  period.

22          So we submit that the magistrate judge erred in

23  looking at prejudice fair too narrowly, looking at this time

24  period between August of 2019 and February of 2020.  When the

25  Government filed its motion to intervene, that's just the

last pebble on the scale in evaluating the prejudice with
respect to the Defendants resulting from the Government's
conduct.

As we indicated in our papers, Your Honor, the
Government's not without recourse if the Court were to deny
its motion.  The government could file its own Complaint.
They've indicated that they intend to do that, initiate a new
action, if the Court were to deny the motion.

What the Government can't do is intervene in a
case without satisfying the good cause standard.  And what we
have here, submitted as good cause, simply doesn't rise to
that level.

If the government says so, if that's sufficient to
constitute good cause, then the Court's orders are without
meaning when it sets a deadline, because in any case the
government could decline and then come in after the fact and
say we now have good cause.

So Your Honor, we believe that the magistrate
judge erred in evaluating the prejudice.  We believe that the
magistrate judge also erred in crediting the assertions of
the Government in its -- in its filings, as constituting good
cause.

And finally, I would note, Your Honor, in each of
the cases that the government cites favorably in its papers,
the *Hallofax* [phonetic] case, in Florida, there the

government submitted a declaration.  In the *Stone* case, in
Colorado, the government submits a declaration.  In this
*Griffith* case, in the Eastern District of Kentucky, the
government submits the testimony in front of the Senate
Committee that occurred after declination in support of its
motion to intervene.  In all of these cases, the government
comes forward with far more to meet the good cause standard.

And I would end, Your Honor, with the *Life Care*
case, in the Eastern District of Tennessee.  The Court
looking at the good cause standard -- albeit in the context
of the extension of the sealed period -- the District Court
in the *Life Care* case references the need to conduct a
searching inquiry and a significant scrutiny of the
Government's reasons for late intervention.

Here again, Your Honor, the statute does not
require the Court to allow the Government to intervene.  I
would -- I would submit to the Court, the Seventh Circuit
case, in August, the *United States versus UCB*, the Court
there says clearly once the Government declines, the case
belongs to the relator.  And that's what we have here.

So we respectfully ask that the Court decline the
motion to intervene and proceed to rule on Defendants'
motions to dismiss.

THE COURT:  All right.  Thank you.

Anything else, Ms. McIntyre?

 1              MS. MCINTYRE:  Yes.  May I respond, Your Honor?

 2              THE COURT:  Well, I started off a little unusual.

 3      It really is the Defendants' motion.  But I didn't let it go

 4      first.  It gets the last word.

 5              I mean, if you want to make a targeted response to

 6      something he said, go ahead.

 7              MS. MCINTYRE:  If the Court feels that you have

 8      enough information --

 9              THE COURT:  For right now I do.

10              MS. MCINTYRE:  -- we certainly respect that, Your

11      Honor.

12              Thank you so much.

13              THE COURT:  So this is what I want the Government

14      to do.

15              Regardless of how you define good cause, the Court

16      needs some evidentiary basis to exercise its discretion.

17      There is no evidentiary basis currently before the Court.

18      The burden of proof is on the Government to establish that.

19      And I'm going to order the Government to file, under seal,

20      with a copy to the Defendants' attorney, for Defendants'

21      attorneys's eyes only, a declaration or affidavit under oath

22      from Angela Beverly and Phillip Cicero, who have been

23      identified here in this hearing as the two people who

24      collectively would have the most historical knowledge about

25      the entire investigation in this case.  It's been represented

1 to the Court that they're at the TBI here in Nashville,

2 Tennessee.  So they should be accessible.

3         I'm going to ask the Government to get with

4 Ms. Beverly and Cicero and file under seal, much as the

5 Government does when you file with the Court a Title III

6 affidavit for a wiretap -- based on their personal knowledge,

7 as well as knowledge that's accessible to them in their role

8 as lead investigators at different time periods the

9 following:

10        1.  They shall give me a history of this

11 investigation from the -- day 1 to the present.

12        They shall establish and identify what the goal(s)

13 of the investigation was, and identify with particularity

14 each and every investigative tool utilized by the Government

15 in the progression of this investigation.

16        2.  They shall describe the progression of the

17 investigation, highlighting the significant events and

18 milestones that the Government deemed important in assessing

19 whether to intervene in the case at different points in time.

20        3.  The declaration from Ms. Beverly and Cicero

21 will provide particular and specific focus on the progression

22 and history of the investigation from August 9, 2019 to

23 February 10, 2020.  That explanation -- that -- that shall

24 include a time period chronology -- I'm not going to specify

25 that the chronology needs to be day by day, but if you choose

1  to do that, the Government is welcome to.  It can be day by

2  day.  It can be week by week.  It can be biweek by biweek.

3  It's whatever Ms. Cicero -- Mr. Cicero and Ms. Beverly deem

4  important as they oversaw in their lay roles as the lead

5  investigators in this case.

6         In other words, the Court wants one portion of

7  this declaration to track from August 9, 2019 to February 10,

8  2020, spec- -- with -- how the investigation progressed in a

9  chronological fashion.  And in doing so, provide me the

10  investigative findings, on a chronological basis, and the

11  investigation conclusions, both preliminary conclusions and

12  revised conclusions, as is typical when an investigation

13  proceeds over a period of time.

14         4.  The declaration shall identify each and every

15  investigative tool, including, but not limited to -- because

16  I don't know all the tools that they use -- document review,

17  one; two, data analysis; three, witness interviews; and,

18  four, CID testimonial and documentary productions.

19         Each of these investigative tools shall be placed

20  in a chronological fashion so that when the Court reads it, I

21  can discern how -- at what point each investigative tool came

22  into play and what information it gained.

23         5:  The declaration shall also provide the Court

24  investigative evidentiary findings as of August 9 and through

25  February -- I'm sorry -- as of August 9, 2019 through

1  February 10, 2020.

2          And by investigative evidentiary findings, the

3  Court's going to be looking for how -- what information the

4  investigation uncovered during this period of time.

5          This declaration shall provide the Court with no

6  information whatsoever about the Government's attempts to

7  settle the matter.  That is not something the Court wants

8  included in the investigation in any fashion.

9          Again, Ms. Beverly and Mr. Cicero shall speak from

10  their personal knowledge, but also any and all knowledge

11  that's available to them as the lead investigators.  In other

12  words, and by -- and by example, if there were other

13  investigators working with or in conjunction or under

14  Ms. Beverly and Cicero at any point during the life of this

15  investigation, then the Court considers that information

16  available to the investigators.

17          As the Government well knows, in a Title III

18  application, the Government represents to the Court, that is

19  part and parcel of the investigation the affiant is

20  describing to the Court, all of what has occurred to justify

21  the wiretap, even though that lead investigator may not have

22  been directly and personally involved.  Nevertheless, the

23  lead investigator has knowledge of the overall focus and

24  direction of the investigation and presents that to the Court

25  to justify the Title III request.

1          Nothing in the Court's request would require
2     production of any kind of work product information, as this
3     is information that comes based on the roles of Ms. Beverly
4     and Mr. Cicero in their investigative position.
5          In sum, the declaration needs to be under oath, or
6     affidavit.  It should provide the Court a picture of where
7     the Government was in its investigation as of August 9, 2019,
8     and the Court can then discern what change, what new
9     information, came into the Government's knowledge to lead to
10    the decision on February 10, 2020 to intervene.
11         All right.  I recognize I've -- I've gone through
12    a lot, but I also know you can get the transcript.
13         Any questions from the Government?
14         MS. MCINTYRE:  I have one question.  And, of
15    course, thank you for your direction, Your Honor.  We will,
16    obviously, comply.
17         So my main question has to do with the work
18    product.  I would politely ask the Court -- because I do
19    think that -- to the extent that there's things that they
20    don't personally know, they'll have to get it from the
21    attorneys, and it's things that the attorneys requested at
22    our direction.  I understand that the Court wants this.  And
23    I will -- we will, obviously, comply.  But I would wonder --
24    I would request that there be an instruction that nothing in
25    the affidavit be construed as a waiver of work product, and

1  that it cannot be used by the defense, you know, other than

2  the purpose for which it's intended, which is for the Court

3  to rule on this motion.  I may not have worded that

4  correctly, but I was trying to, you know, articulate it.

5           THE COURT:  I think -- I'll stop with -- you can

6  certainly put it's not intended to be a waiver of work

7  product.  But I do believe the information I'm requesting is

8  information that would -- the Government would probably, and

9  more likely than not, have to provide as initial disclosures

10 if I allow you into the case.  And I crafted it in such a way

11 that I think this would be information required to be

12 produced in the initial disclosures.

13          MS. MCINTYRE:  Thank you, Your Honor.

14          THE COURT:  Well, I thought you would have one

15 more question.

16          MS. MCINTYRE:  Oh, that's right.  About the date,

17 Your Honor.

18          THE COURT:  Yeah.

19          MS. MCINTYRE:  This --

20          THE COURT:  I thought that would be your question.

21          MS. MCINTYRE:  What is -- I think this will take

22 us some time because --

23          THE COURT:  Well --

24          MS. MCINTYRE:  And I don't mean too much time, but

25 I just mean -- even just to sort of go through the entire

1  timeline -- and I was added to this case a year late because
2  the original AUSA left.  We would need to make sure we get
3  the dates right as Your Honor has requested.  And so I would
4  just want to put enough effort in that we can be certain that
5  we get our dates right.
6           THE COURT:  So today is September 30th.  I have a
7  time period in mind, but I'm going to let you offer what you
8  think is a reasonable time before I ask Mr. Curley.
9           MS. MCINTYRE:  Well, Your Honor, since I don't
10 know the availability of the -- Mr. Cicero or Agent Beverly,
11 I would suggest two weeks.  If the U.S. can get it done
12 sooner, we will provide it sooner.
13          THE COURT:  So you're saying on or before October
14 14th?
15          MS. MCINTYRE:  That sounds right, Your Honor.
16          THE COURT:  That's two weeks from today.
17          MS. MCINTYRE:  Yes, Your Honor.
18          THE COURT:  Mr. Curley?
19          MR. CURLEY:  No objection, Your Honor, to that.
20          THE COURT:  Wow.  I did not think we would reach
21 an agreement on the date.
22          October 14th it will be.
23          All right.  Mr. Curley, any questions about what
24 the Court has asked?  I do strongly urge you all to get the
25 transcript.

```
 1              MR. CURLEY:  We will, Your Honor.
 2              No questions.  Thank you.
 3              THE COURT:  All right.
 4              So I'll wait until I get the declaration or
 5      affidavit under oath.  Obviously that's going to be key to
 6      the first finding of whether or not there is an evidentiary
 7      basis for good cause.  I hope -- I trust that the
 8      affidavit -- and the Government will give me an affidavit
 9      with sufficient specificity that we don't need to get back
10      together on this, but if we do, then I will let you know.
11      And then we'll move on to the other factors.  But let's --
12      let's find out first is there a basis here.  Is there --
13      evidentiary basis to the Court to exercise its discretion and
14      make a finding that there's a good cause for the Government
15      to intervene.
16              All right.  Thank you.
17              MR. CURLEY:  Thank you, Your Honor.
18              MS. MCINTYRE:  Thank you, Your Honor.
19
20
21
22
23
24
25
```

1   REPORTER'S CERTIFICATE

2

3           I, Lise S. Matthews, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Tennessee, with offices at Nashville, do hereby certify:

6           That I reported on the Stenograph machine the

7   proceedings held in open court on September 30, 2020, in the

8   matter of UNITED STATES OF AMERICA and the STATE OF

9   TENNESSEE, ex rel, GARY ODOM and ROSS LUMPKIN v. SOUTHEAST

10  EYE SPECIALISTS, PLLC, SOUTHEAST EYE SURGERY CENTER, LLC, and

11  EYE SURGERY CENTER OF CHATTANOOGA, LLC., Case No.

12  3:17-cv-00689; that said proceedings in connection with the

13  hearing were reduced to typewritten form by me; and that the

14  foregoing transcript (pages 1 through 29) is a true and

15  accurate record of said proceedings.

16          This the 2nd day of October, 2020.

17

18                          /s/ Lise S. Matthews
                            LISE S. MATTHEWS, RMR, CRR, CRC
19                          Official Court Reporter

20

21

22

23

24

25