EXHIBIT B

```
 1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF TENNESSEE
 2                       NASHVILLE DIVISION

 3   UNITED STATES OF AMERICA    )
     and the STATE OF TENNESSEE, )
 4   ex rel, GARY ODOM and ROSS  )
     LUMPKIN,                    )
 5                               )  Case No. 3:17-cv-00689
              Plaintiffs,        )  CHIEF JUDGE CRENSHAW
 6                               )
     V.                          )
 7                               )
     SOUTHEAST EYE SPECIALISTS,  )
 8   PLLC, SOUTHEAST EYE SURGERY )
     CENTER, LLC, and EYE        )
 9   SURGERY CENTER OF           )
     CHATTANOOGA, LLC.,          )
10                               )
              Defendants.        )
11

12   - - - - - - - - - - - - - - - - - - - - - - - - - - -

13                     BEFORE THE HONORABLE

14      CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

15                  TRANSCRIPT OF PROCEEDINGS

16                      February 24, 2021

     - - - - - - - - - - - - - - - - - - - - - - - - - - -
17

18

19

20

21

22

23   PREPARED BY:
     LISE S. MATTHEWS, RMR, CRR, CRC
24   Official Court Reporter
     801 Broadway, Room A839
25   Nashville, TN 37203
     lise_matthews@tnmd.uscourts.gov
```

```
1   APPEARANCES:

2
    For the Plaintiff:      Ellen Bowden McIntyre
3   (United States)         Office of the United States Attorney
    (Via Video Conference)  110 Ninth Avenue, S
4                           Suite A961
                            Nashville, TN 37203-3870
5
    For the Plaintiff:
6   (State of Tennessee)    Philip H. Bangle
                            Tennessee Attorney General's Office
7                           P O Box 20207
                            Nashville, TN 37202-0207
8
    For the Plaintiff:      Jeffrey W. Dickstein
9   (Relators)              Phillips & Cohen LLP
                            One Biscayne Tower
10                          2 S Biscayne Boulevard
                            Suite 1600
11                          Miami, FL 33131

12  For the Defendants:     Matthew M. Curley
                            Scott D. Gallisdorfer
13                          Bass, Berry & Sims
                            150 Third Avenue South
14                          Suite 2800
                            Nashville, TN 37201
15

16

17

18

19

20

21

22

23

24

25
```

1　　　　　　The above-styled cause came on to be heard on

2　February 24, 2021, before the Honorable Waverly D.

3　Crenshaw, Jr., Chief District Judge, when the following

4　proceedings were had, to-wit:

5

6　　　　　　THE COURT:  All right.  Be seated.  Good morning.

7　　　　　　Let's see.  We're here on Case 17-689, United

8　States of America versus State of Tennessee, Gary Odom and

9　Ross Lumpkin versus Southeast Eye Specialists and other

10　defendants.

11　　　　　　If the plaintiff wants to make an appearance on

12　the record.

13　　　　　　MR. CURLEY:  Your Honor, good morning.

14　　　　　　THE COURT:  Okay.

15　　　　　　MR. CURLEY:  I thought you said defendants.

16　　　　　　THE COURT:  Either one.

17　　　　　　MR. CURLEY:  Matthew Curley and Scott Gallisdorfer

18　from Bass, Berry & Sims, on behalf of the defendants.

19　　　　　　MR. DICKSTEIN:  Good morning, Your Honor.  Jeffrey

20　Dickstein on behalf of the relators.

21　　　　　　THE COURT:  Okay.  Go ahead.

22　　　　　　MS. MCINTYRE:  Ellen Bowden McIntyre on behalf of

23　the United States.

24　　　　　　THE COURT:  All right.

25　　　　　　MR. BANGLE:  And Scott Bangle on the behalf of the

1  State of Tennessee.  Good morning, Your Honor.

2          THE COURT:  Okay.  Good.

3          So we're here today on the defendants' -- I'm

4  sorry -- the State of Tennessee's motion to intervene.

5          Previously I've held a hearing, reviewed the

6  report and recommendation from the magistrate judge.  And

7  since the last hearing the State and the United States have

8  filed two affidavits, which I assume -- I assume the

9  defendants have received.

10          MR. CURLEY:  Yes, Your Honor.

11          THE COURT:  I've reviewed the affidavits, as well.

12  So what I would do is -- we're here on the -- on the State of

13  Tennessee and Government's motions to intervene.  So I'll

14  hear from them and then hear from the defendants and then the

15  state, government -- and federal government can have the last

16  word.

17          Now, to help us make this productive today, it

18  would be helpful to the Court if you all focus your arguments

19  on the two affidavits filed, Documents Number 99 and 100, I

20  believe.  Obviously you're free to argue whatever you like.

21  I'm not restricting you.  But that's what's going to be most

22  helpful to the Court.

23          So -- okay.  Ms. McIntyre, are you going to make

24  the argument for the United States and the State of

25  Tennessee?

```
 1              MS. MCINTYRE:  Yes.  Thank you, Your Honor.  Of
 2   course, Tennessee can add something if they wish to, but I
 3   will be arguing first.
 4              Good morning, Your Honor.  Before we begin, I
 5   wanted to briefly ask the Court to seal any portion of the
 6   transcript in this case that contains references to the
 7   sealed versions of the two agent affidavits since they are
 8   currently under seal.
 9              (Overlapping speech.)
10              THE COURT:  Yeah, I can't do that, because there's
11   a procedure for sealing -- this is a public courtroom, to
12   which the public is invited, and there's a process for doing
13   that, which you have not followed.  So that will be denied.
14              MS. MCINTYRE:  Thank you, Your Honor.
15              This suit alleges that Southeast Eye Specialists,
16   which I'll call SEES, which is a company that provided --
17   that provides ophthalmology services like cataract --
18              (Lost teleconference connection.)
19              THE COURT:  Well, looks like counsel in the
20   courtroom is up.
21              Can you hear me, Ms. McIntyre?
22              COURT DEPUTY:  She's off.
23              THE COURT:  Did it just disconnect?
24              (Respite.)
25              MS. MCINTYRE:  Can the Court see me again, Your
```

1  Honor?

2          THE COURT:  I can.  You might want to start over

3  because we lost you pretty quick.

4          MS. MCINTYRE:  Yes.  I noticed.  Is

5  there (indiscernible).

6          (Court reporter interruption for clarification.)

7          THE COURT:  We couldn't understand you.

8          MS. MCINTYRE:  I think there's an echo now.  And I

9  want to maybe (indiscernible.)

10          THE COURT:  You should probably work from -- you

11  should not use a speaker phone.  That causes an echo.

12          MS. MCINTYRE:  I am not doing that, Your Honor.

13  It was fine until I just rejoined.  Would it trouble the

14  Court if I exited (indiscernible).  It's hard for me to hear

15  with the echo.

16          THE COURT:  We're having a hard time hearing you

17  as well.

18          Go ahead.  Let's try to go forward.

19          MS. MCINTYRE:  That's what I'm trying to do, Your

20  Honor.  I think my echo is gone, and my picture has been

21  lost.  So -- my apologies.

22          All right.  Your Honor, I still have -- Your

23  Honor, can you -- can the Court hear me?

24          THE COURT:  Right now I can.

25          MS. MCINTYRE:  Okay.  I'm just going to -- if the

1    Court can see me, I'm going to proceed even though I can't

2    see, because otherwise I sort of hear an echo.

3          This suit alleges that SEES, a company that

4    provides ophthalmology services, like cataract surgeries,

5    caused the submission of false claims to Medicare and

6    TennCare that were tainted by kickbacks to optometrists to

7    induce them to refer their patients to SEES for surgeries.

8          Many courts have found this type of arrangement to

9    be illegal and that complaints with similar allegations

10   (indiscernible) motion to dismiss, such as in the *Teva*,

11   *Purcell* and *Medtronic* cases cited in the U.S.'s opposition

12   brief.

13         At the last hearing in this case this Court

14   ordered the U.S. to submit agent affidavits covering many

15   specific topics to provide an evidentiary basis for the Court

16   to find good cause for the U.S.'s and Tennessee's motions to

17   intervene.  We submitted those two affidavits and Angel

18   Beverly's affidavit, in particular, which was 16 pages long,

19   provides ample detail and facts to support a finding of good

20   cause in this case, such as the good cause that was

21   recommended to the Court by Magistrate Judge Newbern in her

22   report and recommendation.

23         Agent Beverly's affidavit showed a number of

24   important things.  First, it showed that in the initial

25   period of investigation, while this case was sealed, the

1   United States and Tennessee diligently investigated this
2   case.  When looking at her affidavit, it reflects that the
3   government was taking affirmative steps essentially every
4   single month while this case was under seal -- under seal,
5   and that they were continuing and ongoing efforts to
6   investigate and ferret out the potential fraud, as alleged in
7   the Relators' complaint.
8           Secondly, her affidavit reflects that the U.S.
9   obtained new and significant evidence in the second period of
10  our investigation, which was after August 10th, 2019, and
11  after the U.S. had filed its notice of nonintervention at
12  that time.
13          During the second six-month period, Agent
14  Beverly's affidavit relayed that we acquired the following
15  additional evidence and analysis:
16          First, she said that we -- that the government
17  conducted several witness interviews of former SEES patients
18  and of its former SEES marketing employee, who the affidavit
19  describes as a product development manager, I believe, in
20  that period.  And her affidavit in the redacted portions
21  explains why those interviews were significant.
22          Her affidavit also explains that the United States
23  and Tennessee obtained additional data that we did not have
24  in the earlier period.  That data used a field that is
25  available that shows whether an optometrist has referred --

who was the referring optometrist for all surgeries SEES had
performed.  Using this particular data field, we pulled all
of the referral data for all optometrists who had referred
patients for surgeries to SEES, and we looked at all of their
referrals, not just their referrals to SEES, but their
referrals to SEES as well as to any other ophthalmologists
for surgeries.  This allowed us to compare their referrals to
SEES versus their referrals to non SEES ophthalmologists.
And that allowed us to see that some optometrists were
sending as much as 100 percent of their patients to SEES and
no patients to non SEES ophthalmologists.

   With that information in hand, the United States,
according to Agent Beverly's affidavit, painstakingly matched
the evidence of kickbacks from those high-referring
optometrists to SEES to their receipt of kickbacks from SEES
in the form of continuing medical education credits, fancy
dinners at lavish restaurants, balls, parties, tickets to
professional sporting game events, that included people who
weren't on the staff -- who weren't just the physicians, but
their families and relatives, comanagement fees and
traditional gifts.

   Her affidavit also describes how the United States
made a preliminary damages estimate in this second
investigative period after we filed our notice of
nonintervention at the time.

1    And although it is not mentioned in the affidavit,
2  because the Court didn't want us to discuss settlement
3  discussions, the U.S. did have an opportunity to meet with
4  the defendants and hear their perspective and consider that
5  perspective in this second phase after August 10th of 2019.
6    All this, collectively, provided the U.S. with
7  good cause to intervene by -- when the U.S. filed its motion
8  on February 14th, 2020, and I think about ten days or 12 days
9  later, when Tennessee filed its motion in 2020.
10    Agent Beverly's affidavit, in particular -- and,
11  of course, I emphasize hers because she was the lead agent
12  and the other agent wasn't assigned to the case until
13  after -- after we had made our intervention decision.  Her
14  affidavit makes it very clear that we have met the good cause
15  standard, as Magistrate Judge Newbern found in her report and
16  recommendation.
17    And in terms of specifically applying the
18  affidavit to the standard, I wanted to say that, first, the
19  U.S. has shown good cause to intervene.  Although, as
20  discussed in the *Griffith v. Chon* case in the Eastern
21  District of Kentucky in 2016, the U.S. is not actually
22  required to necessarily show new and significant evidence to
23  prove good cause, the U.S. has still satisfied that standard,
24  just as Judge Newbern recommended.
25    The new evidence consists of this new data

1   analysis, the new interviews, the matching of the data, which

2   required a painstaking amount of work by the U.S. Attorney's

3   office, with the kickbacks evidence to show what exactly each

4   doctor recommended who was -- I'm sorry -- what they received

5   in the form of a kickback, and the damages evidence -- or the

6   damages estimate.

7          The redacted portions of the Agent Beverly's

8   affidavit also explained why the evidence was particularly

9   significant and influenced the U.S. to be able to make that

10  decision.

11         The second part of the analysis is the undue

12  prejudice for delay component.  The magistrate judge rightly

13  found that this standard primarily focuses on the Relator and

14  whether there's prejudice to the relator, but, of course,

15  here (indiscernible) the intervention.

16         The magistrate judge's opinion also correctly

17  found that there is not even one single case, even not cited

18  by the defendant, that -- that held that intervention should

19  not be allowed at such an early stage of the case before

20  discovery has begun.

21         In short, there are simply no case anywhere in the

22  U.S. saying that there would be undue prejudice in a case

23  like here where discovery hasn't started.  In fact, there are

24  (indiscernible) cases in which courts have allowed

25  intervention at much later stages, like in the *Guidant* case

1   that was in this Middle District of Tennessee, in which Judge
2   Trauger allowed intervention for good cause two years after
3   the U.S. had declined.  This is also significant because in
4   the *Griffith v. Chon* decision, the Court allowed the U.S. to
5   intervene three years after having declined.

6           Although the magistrate judge found that some --
7   that the filing of the motion to dismiss by SEES constituted
8   some minimal prejudice, she found that it was not weighty
9   enough to deny the motion for leave to intervene.  This is
10  consistent with other court decisions.  And, of course, in
11  the *Guidant* case there had been two motions to dismiss that
12  the Relators had withstood before the U.S. intervened.  And
13  in the *Griffith v. Chon* case there had been three motions to
14  dismiss that had been filed by defendants.

15          So although defendants wish to point to the
16  motions to -- the filing of the motion to dismiss as undue
17  prejudice, it's simply -- that is not something that has been
18  found to be unduly prejudicial by any court anywhere in the
19  country.

20          SEES's counter argument that the U.S. would not be
21  harmed by a denial of our motion to intervene is incorrect.
22  The reality is that if the U.S. were denied this motion to
23  intervene, and if Tennessee's motion were denied, then the
24  government would have to confront a situation in which we had
25  to potentially file a new complaint, potentially have two

1    complaints pending on the same issues, the same transactions

2    and occurrences before this Court at the exact same time, and

3    potentially be consolidated.  This is not what is intended

4    when Congress allowed the U.S. to intervene later for good

5    cause.

6              And, in short, this case is in the early stages,

7    and it would not be uncommon for a plaintiff to even seek to

8    still amend their complaint in this early phase, which is

9    akin to what the U.S. and Tennessee will do when and if the

10   Court grants the motion that would allow us to file -- to

11   intervene in this case and file our own complaint in

12   intervention.

13             In short, we believe that with the addition of the

14   two affidavits that the Court ordered us to submit, the U.S.

15   has provided an evidentiary basis for the Court to grant our

16   motion to intervene.  I will also let Tennessee speak, but I

17   briefly wanted to point out that in terms of the Defendants'

18   objections to Tennessee's motion to intervene, I think the

19   affidavit of the two -- the two affidavits amply

20   (indiscernible) that Tennessee has been involved in actively

21   investigating this investigation as the lead agents, and

22   Tennessee's motion should be granted for the same reasons,

23   and their statute tracks -- the Tennessee Medicaid False

24   Claims Act statute has almost the identical language to the

25   False Claims Act, and thus they should also have their motion

1   granted, Your Honor.

2            We do ask the Court respectfully --

3            (Lost teleconference connection.)

4            THE COURT:  Ms. McIntyre, are you still there?

5            Okay.  I think we've lost her.  But I also think

6   she was probably near the end.  So I'm going to turn it over

7   to you.

8            MR. BANGLE:  Almost made it, Your Honor.

9            THE COURT:  Go ahead.

10           MR. BANGLE:  Thank you.  Good morning.  Philip

11  Bangle on behalf of the State of Tennessee.  Ms. McIntyre

12  made her arguments on behalf of the government, including the

13  State of Tennessee and the United States.  And just to make

14  clear for the record, the State of Tennessee endorses and

15  adopts those arguments.

16           THE COURT:  All right.  Thank you.

17           Well, let's go to the defendant.  Mr. Dickstein?

18           MR. DICKSTEIN:  For relators.  On behalf of

19  relators.

20           THE COURT:  Do you want to add anything on the

21  motion?

22           MR. DICKSTEIN:  Judge, I would -- I would

23  emphasize to the Court the relators strongly consent to

24  government intervention in this case.  The government --

25  relators don't always do that.  In many instances there

1  are -- where the cases are developed, where depositions have

2  been taken, where documents have been reviewed, where cases

3  are far along, in that case when the government wants to

4  swoop in and take over the litigation, we would object

5  because we've handled this case.  That's not the case here,

6  because really we haven't started.  It's really in the

7  embryonic stages.  And in terms of prejudice, where there

8  haven't been depositions and there haven't been document

9  requests or reviews done, it's very early, we don't see the

10 prejudice that Mr. Curley complains of.

11          And, frankly, Your Honor, this case involves

12 government money.  We're always involved, bringing this to

13 the government's attention.  But where State of Tennessee

14 money, and federal government money through Medicare, we

15 think this case is best prosecuted by representatives of

16 those government entities.  That's our position, Your Honor.

17          THE COURT:  All right.  Thank you.  So that takes

18 us to the defendants.  Mr. Curley?

19          MR. CURLEY:  Good morning, Your Honor.  May it

20 please the Court.  When we were last before the Court, the

21 Court noted that there was no evidentiary basis to conclude

22 that good cause existed to justify the government's motion

23 for late intervention, and certainly that -- that conclusion

24 was warranted.

25          In the filings prior to that hearing, the

government offered very little of substance and was exceedingly bare on this point.  In one of its pleadings it submitted to the Court, it suggested that the government should not have to, quote, put forth any particular justification for seeking to intervene late after the Court's deadline.  And in another filing the government seemed to dare the Court to decline intervention because no other case had done so.  And they've seemed to have doubled down on that argument here today.

But no other district court's been faced with the record that this Court has.  Rather than point to new and significant evidence, the Government has repeatedly pointed to additional investigative steps that it has taken, whether that's reviewing of documents that they had in their possession long before August of 2019, looking at its own Government claims data or interviewing additional witnesses. And there's no explanation, none offered before our last hearing, none offered today, as to why any of those investigative steps could not have been taken prior to the 28 months of investigation leading up to its declination decision, or the significance of those steps relative to its late motion for leave to intervene.

Now with the benefit of the government's submission following our last hearing, Your Honor, three points come into much sharper focus.  First, the claim by the

government in its notice of declination that it had not completed its investigation during the 28 months that it had since the filing of the case was clearly the result of large periods of inexplicable government inactivity during the course of that time period. In at least six separate months prior to the intervention deadline, the Government engaged in no investigation at all, according to the declaration of Ms. Beverly. Those are the months of September and November of 2017, June and September of 2018, and January and February of 2019. In at least four other months the only investigative activity noted in the government's declaration was the receipt of documents from Southeast Eye, not the review of documents, the receipt of documents. That was the case in January, March, April, and May of 2018. So in ten of the 28 months where the -- we have -- during the investigative period, the government essentially did nothing.

While the government also notes requesting claims data from its own contractors, it notes no analysis of any of that data until after declination. And despite receiving 63,000 pages of documents by December of 2018 from Southeast Eye more than seven months prior to declination, the government only began a, quote, targeted document review in July of 2019. And that, of course, was less than one month prior to declination. It also acknowledged that its review strategy left thousands -- tens of thousands of pages to

1    review at the time of declination.  For its part, Southeast

2    Eye cooperated, was transparent with the government during

3    the course of the investigation, expended considerable

4    resources in reviewing and producing documents to the

5    government, voluntarily met with the government, as indicated

6    in the declaration, and voluntarily provided its own data

7    analysis to the government, as well, in March of 2019.

8            In the 28 months while the case was under seal,

9    that time period was punctuated by significant periods of

10   inactivity by the government.  It's also difficult to imagine

11   how the government articulated that there was good cause

12   before the Court to extend the seal period repeatedly during

13   that 28-month time period based on what we now know.  And

14   it's simply inexplicable that the government would represent

15   to the Court that it had not completed its investigation as

16   of August of 2019.

17           The second point, Your Honor, that comes into

18   clearer focus is that the government used the prolonged

19   sealed period to engage in one-sided discovery and litigation

20   under the cloak of the seal.  The government acknowledged

21   that in page 3 of its response, Docket Number 88, that it

22   engaged in, quote, common litigation practice during the

23   sealed period with respect to the three depositions that it

24   took on the eve declination.  And the government eliminated

25   any doubt as to its motives during the sealed period on page

1  17 of that same response where the government referred to its

2  investigation as, quote, a period of preintervention

3  discovery.

4          The eleventh hour depositions sought by the

5  government in July of 2019 now take on the air of attempting

6  to lock in testimony as if this were kind some kind of grand

7  jury proceeding, rather than an investigation of allegations

8  in a civil *qui tam* lawsuit.

9          All of this leads to the inevitable conclusion in

10  our estimation that the government abused the sealed period.

11  As a result, Southeast Eye was subjected to one-sided

12  discovery without access to a complaint, with no check on the

13  government's inquiry, without the ability to seek its own

14  discovery from the Government and third parties.  In short,

15  without any due process that would be afforded to any civil

16  litigant that would appear before the Court.  And there would

17  be no question, Your Honor, from our perspective that

18  prejudiced the defendants.

19          The third point that comes into sharper focus,

20  Your Honor, is the so-called conclusions reached by the

21  Government after declination are not tied in any significant

22  way to investigative activity.  As of the date of the

23  declination decision in August 2019, the Government states

24  that it had, quote, serious concerns about SEES' potential

25  liability and that it had compiled voluminous evidence,

1    although it seemingly did not review that evidence.

2            The Government made those concerns known to

3    Southeast Eye prior to declination, as we've indicated

4    previously, but the Government then notes it had work left to

5    do, presumably all of the work that should have been done

6    during the investigative period.  That work included the

7    review of documents that had long since been produced by

8    Southeast Eye, analyzing its own Government data that it

9    should have had in its possession all along, as well as a

10   handful of witness interviews.

11           The Government made -- has never made any showing

12   as to why any of that work could not and should not have been

13   done during the 28-month period that it calls the

14   preintervention discovery period.  Rather, the Government

15   claims that new and sufficient evidence following the

16   declination caused its concerns to blossom into a full-blown

17   conclusion that Southeast Eye engaged in a violation of the

18   criminal kickback statute.

19           According to the Government, its conclusion is

20   supported by, quote, new evidence.  But those are -- that

21   evidence is nothing more than the same allegations that

22   existed in the relators' complaint on day 1 of this case:

23   That Southeast Eye promoted the practice of comanaging

24   patients' postoperative care, that Southeast Eye failed to

25   give patients a choice about what ophthalmologists to seek

1   out for surgery, that they held reduced-price continuation

2   education seminars, and provided meals and entertainment and

3   gifts to optometrists.  Those are the very same allegations

4   that were in the Complaint.  And as we noted in our motion to

5   dismiss, and the record that's before the Court, they're the

6   very same information that was publicly available well before

7   this case was even filed.  And we've -- there's a press

8   release that's attached to our motion to dismiss from

9   February 2017, which identifies the business model of

10  Southeast Eye as a comanagement business model, that reflects

11  its cultivation of relationships with optometrists as

12  referral sources.  They're a specialty practice.  All they do

13  is eye surgery.  They don't have primary eye care there.  So

14  this was no secret.  There's also in the record before the

15  Court a calendar submission from Southeast Eye identifying

16  the events and activities that Southeast Eye held throughout

17  the time period at issue in this case.

18          So all of this information that the Government

19  claims is now new and significant evidence was publicly

20  available information long before this case was even brought.

21  And we vigorously dispute that any of this so-called evidence

22  amounts to a violation of the criminal kickback statute, but

23  the notion that new and significant evidence emerged

24  following declination that substantially changed the

25  government's views on this case is difficult to believe.

1      The entirety of the record before the Court, Your

2   Honor, from our perspective is clear.  There was no excuse,

3   and certainly no good faith basis for the Government to seek

4   numerous extensions of the seal over a 28-month period.  The

5   Government misused the seal period, using it not for

6   investigation, as the False Claims Act requires, but to

7   engage in improper, one-sided discovery as it acknowledged in

8   its response.  These things substantially prejudiced the

9   defendants.  The defendants incurred extraordinary and

10  unnecessary costs, deprived the defendants of due process,

11  and this significant delay may very well compromise the

12  defendants' ability to defend themselves regarding the

13  conduct alleged to have occurred many years ago, not to

14  mention the tremendous uncertainty of having a never-ending

15  federal investigation hanging over the head of a business

16  with no ability for the business to defend itself or have its

17  day in court during that preintervention discovery period

18  described by the government.

19      Your Honor, if good cause is to mean anything

20  under the False Claims Act, the record cannot amount to good

21  cause here to justify late intervention.

22      There are certainly not many cases concerning the

23  question of late intervention, but none of those cases has

24  the documented record that's before this Court of the

25  government's misuse of the seal period and the demonstrable

1  prejudice to the defendants resulting from that.  As we've
2  noted, the government's not without recourse.  The government
3  may file its own lawsuit against the defendants and proceed
4  in that fashion if it wishes.  Ms. McIntyre articulated why
5  that may not be a preference to the Government, but that's of
6  no moment with respect to the issue that's before the Court
7  here today.  We've heard no explanation, Your Honor, as to
8  why that really would not be a sufficient course for the
9  Government.  What should not occur is for the Government
10 to -- is for the Court to reward the Government with respect
11 to its unjustifiable delay, its misuse of the seal period,
12 and the prejudice that it has caused the defendants.
13        And so, Your Honor, we would respectfully submit
14 that the Court overrule the recommendation of the magistrate
15 judge and proceed with ruling on the defendants' motion to
16 dismiss and deny the government's motion for late
17 intervention.
18        THE COURT:  All right.  Thank you.
19        So I'm going to let Ms. McIntyre and Mr. Bangle
20 have the last word.  Ms. McIntyre, do you want to go first?
21        You need to turn your microphone on.
22        MS. MCINTYRE:  Thank you, Your Honor.  The U.S.
23 obviously takes a different position than what Mr. Curley
24 described, but I would like to answer all of the questions
25 and points that he raised.

1    First, in terms of why his argument that the U.S.
2 should have discovered this evidence sooner and that it
3 doesn't constitute new evidence, we disagree.  The U.S. does
4 not and should not have to take every possible investigative
5 step in an investigation on day 1 when a *qui tam* is filed.
6 An investigation builds on itself.  You start at the
7 beginning with the relators' allegations and then you build
8 the investigation brick by brick, adding to the evidence as
9 the evidence comes in as a result of each step that you take.
10 And that includes following where the evidence leads and
11 taking additional follow-up steps as you find out where
12 everything is turning -- is going.
13    The U.S. and Tennessee simply were not ready to
14 intervene by the Court's deadline, and as we have said, we
15 did not have permission to intervene by our client agency at
16 that date.  But we continued investigating, we filed briefs.
17 We were an active participant in this case.  And in any case,
18 there is no requirement by -- I'm sorry.  Your Honor is
19 looking questionable.  I mean that we filed briefs.  We asked
20 to be served with copies of pleadings.  We continued to
21 engage with the defense, which was a consideration by the
22 Court in the *Griffith v. Chon* case in Kentucky.
23    In any case, there is no requirement that the U.S.
24 prove some standard like due diligence or that we couldn't
25 have discovered something sooner.  There is nothing that

1 shows that evidence has to fall like manna from heaven from
2 the sky.

3        And Mr. Curley does not point to any case saying
4 that there's a standard like due diligence. The standard,
5 rather, is good cause, which the U.S. has shown through our
6 affidavits.

7        The defendants have argued that -- the defendants
8 in other cases who have made a similar argument that the
9 government must show that we couldn't have uncovered evidence
10 sooner have lost that argument; for example, in the *Guthrie*
11 decision, which we cited in our pleadings.

12        Mr. Curley also argued just now that the U.S.
13 didn't take any investigative steps in six particular months.
14 I haven't been able to go back during this argument and look
15 at those months, but I will tell the Court from my memory
16 what I believe is the case.

17        First, when he mentioned two months in November --
18 in 2017, I believe that that is the period when the prior
19 AUSA assigned to this case, Jason Ehrlinspiel, was preparing
20 to leave the office. I'm not sure. But I wasn't the
21 Assistant U.S. Attorney on the case at that time. And I
22 recall that since Mr. Erlinspealil is gone, there simply is
23 less that we can say about that portion of the case, because
24 he's not available to speak to it. Agent Beverly -- I think
25 that things were ongoing, but I think there's a sentence in

1   her affidavit about she can't state for sure what happened in

2   that particular point, because that AUSA has left the case.

3             Later on there -- he -- Mr. Curley mentioned a

4   period in 2018. Again, I would have to go back and double

5   check against the affidavit dates, but Agent Beverly

6   mentioned I know in one paragraph that she was preparing for

7   a trial during one month, and, therefore, had limited

8   bandwidth to work on this case in that month.

9             Now, Mr. Curley also mentioned something about

10   January, February of 2019. Though, again, I would have to

11   double-check, that to me rings a bell as to when the

12   government was shut down. And that would also possibly have

13   caused an impact. So I'm not sure that my dates match with

14   the dates that he's mentioning, but they may well. And

15   regardless, it's really not the point to nitpick about

16   whether we did something in every single week. I think Agent

17   Beverly's affidavit shows the U.S. was continuously,

18   diligently, and much more than in some other investigations,

19   working hard to ferret out the truth of the investigation and

20   whether there was fraud that the U.S. should act upon.

21             Now, Mr. Curley also essentially implied that the

22   U.S. somehow admitted that we were only doing targeted

23   document review in December of 2019. That is not what Agent

24   Beverly's affidavit says in my recollection. I think her

25   affidavit says that she believes that when Mr. Ehrlinspiel

1    was at the office, the government was doing reviews; however,

2    she can't verify that because those people are no longer at

3    the office.  So she can't -- there's just no way for us to

4    verify that.  And we can't say something that we can't verify

5    in a sworn affidavit.

6           In addition, I think it is significant that the

7    affidavit explains that the U.S., as soon as I got in the

8    case -- and I'm sure there was review going on before, but we

9    just can't vouch for it -- when I entered the case in

10    approximately the spring -- I think April of 2018, I

11    immediately negotiated for search terms with Mr. Curley

12    because email production had not begun.  And following all of

13    that the first emails were produced -- I believe the last

14    email production, which was the largest email production, was

15    produced in May of 2019.

16           Now, once we got that email production, that

17    allowed us to do a lot more analysis, because, as the Court

18    surely knows, emails can contain a lot of helpful information

19    for an investigation.

20           Now, once we got that, the U.S. acted very quickly

21    to issue the civil investigative demands for testimony, which

22    were served I believe on July 9th.  So within about five

23    weeks we got approval for the testimony to be taken.  And

24    also in June of 2019, the U.S. served a civil investigative

25    demand for testimony to Pinnacle Bank so we could get

1  additional check evidence in terms of the kickback

2  allegations.  In other words, checks from SEES to

3  optometrists who were referring patients.

4        In addition, I wanted to respond to Mr. Curley's

5  argument that the government has used one-sided discovery

6  under the seal.

7        The Government was not taking one-sided discovery

8  during the first phase of this case, or at any phase, because

9  we haven't been in the -- discovery phase (indiscernible)

10  yet.  But rather, the U.S. was investigating the relators'

11  allegations for the purpose of making an intervention

12  decision.  That is exactly what the statute allows us to do.

13  And what tools did we use -- because the Court may recall

14  that you asked Agent Beverly to say what investigative tools

15  we used -- we used civil investigative demands, which are a

16  statutorily authorized tool under the False Claims Act.  And,

17  in fact, that's called an investigative tool by the Sixth

18  Circuit in the *U.S. v Markwood* case, which is at 48 F.3d 969

19  from 1995.  And it states that Congress has given the

20  Department of Justice a particular type of investigative

21  tool, the False Claims Civil Investigative Demand, to enable

22  it to investigate whether there is a basis for remedying a

23  false claim made against the United States.  And it goes on

24  to state, a false claims civil investigative demand may be

25  issued to any person having information relevant to a false

claims investigation.  So there is simply no argument that we were misusing our investigative tools.  We were using the investigative tools that we are allowed to utilize under the statute.  And we continued our investigation up until the date in February 2020 when we had enough information to intervene and ask the Court for leave to intervene.

Now, Mr. Curley also argued that all of the evidence in our investigation was always publicly available. The U.S. begs to differ.  The U.S. -- first, just to remind the Court that we have consented to waiving the public disclosure bar.  And that isn't because we think that that would result in the dismissal of the complaint, but, rather, this is a case in which the U.S. thinks there's an important public interest at stake, and we have absolute and unfettered authority to consent to waiving that bar, and we have done so.  So it's essentially a moot point that Mr. Curley is raising.

Further, as the affidavit shows, the U.S. did a lot of investigation that was not publicly available.  All of the information that we acquired in the form of testimony, documents, witness interviews, that is not simply available by doing a Google search.  It just isn't.

Now, I also want to address something that when Mr. Curley argues that the United States has misused -- I can't quote all his words -- but when he argues that this is

1    -- has the worst facts than any other case in the country,

2    and that somehow the fact that there's no case that he can

3    cite saying that there's no good cause to intervene here

4    doesn't matter, that's not the case.  We have very strong

5    evidence and facts showing that we had investigated this case

6    as thoroughly as we could and as fast as we could.  We tried

7    to get to a point where we could decide by the Court's

8    intervention decision [sic], but we simply weren't there yet.

9           I wanted to also remind the Court of the Sixth

10   Circuit decision in *United States versus Health*

11   *Possibilities*, which is at 207 F.3d 335, a 2000 decision --

12   the year 2000 decision.  And although that case was about a

13   different context, not in a leave to intervene context, the

14   Sixth Circuit (indiscernible) Congress has a manifest desire

15   to ensure that the Government retains significant authority

16   to influence the outcome of *qui tam* actions even when it

17   decides not to intervene.

18           The Sixth Circuit there also stated that the

19   Government can intervene for good cause at any time in the

20   litigation.  Of course, there's Supreme Court cases that say

21   this, too.  And, in general, I think it is very clear that

22   far from being the situation in which the U.S. sat idly and

23   did nothing, the U.S. has reflected in the 16 pages of facts

24   that were attested to by Agent Beverly the U.S. was

25   diligently investigating and we were not taking one-sided

1  discovery.  We were using the lawful investigative tools that

2  are available to us.

3          In light of all this, the U.S. believes that the

4  affidavit supports the magistrate judge's recommendation that

5  the Court find good cause to intervene and that there is no

6  undue prejudice.  And her ruling cites many decisions that

7  favor granting a motion to intervene in these circumstance.

8  And on the other hand, the defense has not cited one case

9  that has facts -- that cites denying a motion for leave to

10  intervene.  Because we sit here today where discovery has not

11  begun, where there's a significant public interest at stake,

12  and where the U.S. is trying to take in -- take our proper

13  role by stepping into the relators' shoes and take over this

14  litigation by litigating it as the real party in interest, we

15  believe that it is appropriate for the Court to respectfully

16  please (indiscernible) the magistrate judge's recommendation

17  with the one addendum that, of course, you consider these

18  affidavits.

19          Thank you very much, Your Honor.

20          THE COURT:  All right.  Mr. Bangle.

21          MR. BANGLE:  I have nothing more to add, Your

22  Honor.

23          Thank you.

24          THE COURT:  Okay.  Well, as I said before we

25  started, I've reviewed the file and updated my memory from

1   when we were here before.  Also, I've studied the two

2   affidavits that were filed by the State of Tennessee and the

3   United States and considered those.  And I -- and the -- and

4   I appreciate the effort of all the lawyers in making argument

5   today.  So I'm going to go ahead and rule on the motion to

6   intervene.

7        The Complaint alleging violations of the False

8   Claim Act was filed on April the 7th, 2017, Document Number

9   1.  From the date of filing until August 9, 2019, the State

10  of Tennessee and the United States requested and received

11  multiple extensions of time to decide whether or not to

12  intervene in this case.

13       On August 9, 2019, they made a decision and

14  notified the Court in a joint notice that they would not

15  intervene, Document Number 41.  The Court unsealed the

16  Complaint for service of process on defendants, who filed a

17  motion to dismiss, Document Number 54, that is ripe for

18  decision.

19       The Court has delayed resolution of the pending

20  motion to dismiss because the United States filed a motion to

21  intervene six months after giving notice of its decision not

22  to intervene, on February 10, 2020, Document Number 65.  The

23  State of Tennessee then joined the motion to intervene on

24  February the 24th, 2020, Document Number 72.  And both the

25  State of Tennessee and the United States allege that there's

good cause to grant the motions to intervene.

The magistrate judge recommended that the motions to intervene should be granted, Document Number 84. The defendants timely filed objections to the magistrate's report and recommendation. And the Court has considered and studied the parties' briefs in regards to those objections.

Further, the State of Tennessee and the United States have supplemented the factual record that was not before the magistrate judge in the form of the affidavits I'm going to be discussing.

Specifically, to assist the Court's consideration of the motions to intervene, the Court held oral argument on September 30, 2020, and ordered the State of Tennessee and the United States submit, under seal, affidavits to detail its investigation so that the Court has a factual or evidentiary basis to determine if they have carried their burden of establishing good cause to intervene, Document Number 92.

The two Government entities did so by filing on October the 26th, 2020, the affidavits of Angela B. Beverly, and Phillip Cicero, Documents Number 99 and 100. And after reviewing those affidavits, the Court set this date for a final argument and hearing on the pending motions. The pending motions to intervene are before the Court and ripe for a decision.

1           So, the Court's analysis of the pending motions

2    begins with the bright line created on August 9, 2019, when

3    the governments filed a joint notice that they would not

4    intervene in this case, Document 41.  This is important.

5    Because in determining whether Tennessee and the United

6    States have good cause to intervene now, the Court need only

7    focus on what good cause basis to intervene came to light

8    after August 9, 2020 [sic].

9           The affidavit of Beverly is helpful to isolate the

10   precise factual basis for the motions to intervene.  The

11   affidavit of Mr. Cicero, Document 99, is not as helpful due

12   to his limited involvement in the investigation that

13   primarily focussed on before August 9, 2019 (see Cicero

14   affidavit paragraph 3, Document 99).

15          Beverly's affidavit explains that after August 9,

16   2020, Tennessee and the United States continued their

17   investigations that consisted of three sets of witness

18   interviews.

19          She explains to the Court, one, on August 15,

20   2019, an unnamed former practice development manager of

21   defendants was interviewed.  That, quote, added to our

22   collective understanding, end quote, of Defendants'

23   recruitment and money spent for recruitment of optometrists

24   at recruiting events (Beverly affidavit paragraph 51).

25          Two, in September 2019, along with Assistant U.S.

1   Attorney McIntire, interviewed a nondefendant ophthalmologist
2   who, quote, expressed several concerns, end quote, about
3   defendants engaging in, quote, potentially unnecessary
4   cataract surgeries, end quote (Beverly affidavit at 52).

5           And, three, in November of 2019, four patients of
6   defendants were interviewed, but their, quote, memories
7   varied as to how much they recalled, end quote (Beverly
8   affidavit at paragraph 55).

9           Beverly also outlines that after August 9, 2019,
10  the United States and the State of Tennessee requested,
11  collected, and reviewed data and documents that she details
12  as follows:

13          One, in September and December of 2019, data and
14  documents were requested from Safeguard, which is the CMS
15  data contractor, on a number of referrals made by defendants
16  and nondefendant physicians, which the United States, quote,
17  planned to use to calculate the percentage of beneficiaries,
18  end quote, from those two groups of physicians (Beverly
19  affidavit at paragraphs 53 and 56).

20          Safeguard provided the data requested in January
21  of 2020, that the U.S. -- United States used to, quote,
22  perform analysis of optometrists referral patterns to
23  determine whether there were any differences between their
24  referrals, end quote, to defendants and nondefendant
25  providers (Beverly affidavit at paragraph 57).

Two, also in January of 2020, the United States requested billing code data for cataract surgeries from TennCare, that was provided on February the 14th, 2020 (Beverly affidavit at paragraph 57) which the Court notes is after the United States filed its motion to intervene on February 10, 2020.

In any case, these interviews and documents and data requests comprise the entire universe of the United States' and Tennessee's ongoing investigation after August 9, 2020. From August 9 -- after August 9, 2019.

From August 9, 2019, until February 10, 2020, Ms. Beverly tells the Court, under oath, that the focus of the -- the focus of, quote, the investigation was to look for and identify evidence of kickbacks, other than and in addition to comanagement arrangement alleged in the Complaint filed in 2017 (Beverly affidavit at paragraph 58).

Ms. Beverly then states that from, quote, August 9, 2019, through February 10, 2020, the investigation obtained, quote, new and sufficient evidence to demonstrate a pattern of kickbacks from defendants referring optometrists that resulted in the submission of false claims to Medicare and TennCare, end quote, paragraph 59. She then gives a conclusory summary of the, quote, types of kickbacks, end quote, the investigation uncovered, and, quote, the key things that pushed our conclusions forward and beyond what we

knew as of August 8th, 2019, end quote (Beverly affidavit at 60 and 61).

The United States and Tennessee acknowledged that it has the burden to present, quote, new and sufficient evidence, end quote, to establish good cause for their motions to intervene. They rely almost solely on the Beverly affidavit, although the Court placed no limitations on the evidence it could offer to establish good cause.

A fair reading of Beverly's affidavit does not support a finding that after August 9, 2019, the United States and the State of Tennessee investigation found new evidence after that date, or as a result of the totality of its investigation.

Indeed, the United States and Tennessee's tepid submission does not come close to establishing the good cause necessary to intervene and take control of the litigation nearly three years after the original complaint was filed, and more than six months after the Court set a final deadline for intervention that was extended six times.

The witness interviews after August 9, 2019, were unremarkable. Beverly identifies three groups of interviews: The interview with defendants' unnamed practice development manager offered nothing new or different because Beverly says it only added to their existing, quote, collective understanding, end quote, of defendants' recruitment process.

Given that this unnamed witness mainly added to what was
already known, it could hardly be new evidence.  The second
interview with an unnamed, unrelated, nondefendant
optometrist -- ophthalmologist disclosed his, quote,
concerns, end quote, about defendants, and, quote, concerns,
end quote, about possible unnecessary eye surgeries.  Given
that this unnamed witness had no relationship with
defendants, his unsupported concerns is about all he could
offer.  And those concerns can hardly constitute new
evidence.

      Finally, the third group of interviews involved
defendants' patients.  Here, Beverly admits those interviews
added nothing, because those patients could not recall much
about their experience with defendants referring
optometrists.  Thus, the witness interviews taken
individually or considered together fall way short of
supporting Beverly's conclusion of new and sufficient
evidence of a pattern of kickbacks by defendants.

      The document and data requests and analysis
described by Beverly fair no better.  Tennessee and the
United States requested and reviewed data and documents from
Safeguard and TennCare, both of which are agencies of either
the United States or the State of Tennessee.  So their data
and documents have been readily available to each long before
August 9, 2019.

And as noted above, some of the TennCare data was received after the United States had already filed its motion to intervene.

Beverly offers no explanation about how or why their post-August 9, 2019, data and document requests and reviews were different from, or even added insight into, data and documents reviewed before August 9, 2020.

Most problematic to the Court is that the data and document requests and reviews, as described by Beverly, simply don't support that this information constitutes new and sufficient information of a pattern of kickbacks, or the type of kickbacks to support Beverly's conclusion in paragraph 60.

Beverly concludes there that Safeguard and TennCare provided data and documents that establish a pattern of kickbacks, but Beverly offers no explanation of how Tennessee and the United States reached that conclusion: What analytical methods were applied to the data to support that conclusion?  Who did the data analysis?  Or why the data analysis is reliable so that the Court understands and should accept and give weight to this unknown process?

Instead, it does appear that the State of Tennessee and the United States simply expect the Court to trust them because they say there is, quote, new and sufficient evidence.  This, the Court will not do.

1          The Court notes reference to settlement
2    discussions between the parties.  And the Court finds it
3    inconceivable, if not illogical, that parties would engage in
4    settlement discussions without having a full understanding of
5    the strengths and weaknesses of their case.  Indeed, to do
6    less would be almost an act of malpractice.

7          Also, during the argument, reference has been made
8    to the government's engaging in painstaking analysis, but the
9    Court sees none of that in the Beverly affidavit.  Reference
10   to damage evidence, again, not in the Beverly affidavit, and
11   damage estimates.

12         The Court can only rely upon what's properly
13   before it.  The lack of new evidence after August 9, 2019,
14   appears to be no surprise to the United States or Tennessee,
15   because they appear to admit that the, quote, entire second
16   investigative phase period, end quote, from August 9, 2019,
17   to February 10, 2020, focused on more, not new evidence of
18   kickbacks.

19         Beverly concedes that evidence of kickbacks was in
20   hand on August 9, 2019, when the United States and Tennessee
21   decided not to intervene.  She states that the investigation
22   was seeking evidence of kickbacks, quote, other than, and in
23   addition to, the comanagement arrangement -- comanagement,
24   end quote, arrangements that were identified in the
25   complaint, paragraph 58.

 1          While the logic of the government's investigation

 2     strategy is unclear on this record, it is the opinion of the

 3     Court that the governments have failed on this record to

 4     establish new evidence to justify a good cause finding to

 5     support the motions to intervene.

 6          So the report and recommendation, Document 84, is

 7     vacated.  The objections thereto, Document 85, are sustained.

 8     And the motions to intervene in Document 65 and 72 are

 9     denied.  And the Court's going to enter an order to that

10     effect.

11          So, Mr. Dickstein and Mr. Curley, that takes the

12     Court to your pending motions to dismiss, which the Court

13     notes were filed and -- am I correct -- I guess, Mr. Curley,

14     that's been fully briefed?

15          MR. CURLEY:  Yes, Your Honor.

16          THE COURT:  Mr. Dickstein?

17          MR. DICKSTEIN:  Yes.  It has been, Your Honor.

18          THE COURT:  Okay.  So this is what the Court wants

19     you all to do now that we've got the motions to intervene out

20     of the way.

21          Recognizing everything that's before the Court, it

22     appears that the parties at this early stage of the

23     litigation know much about this case.  And what I'm going to

24     do is enter a motion -- I'm going to deny without prejudice

25     the pending motion to dismiss, because I'm going to also

order you all to proceed back to mediation.  It's up to you
all on whether you want to invite others, the State of
Tennessee and the United States, to participate.  You hold
the key to that.  But the Court's going to ask you all to get
together and talk.  Maybe today while you're here.  Identify
a mediator, identify a date for a mediation, and advise the
Court about when that's going to take place, so I know what's
going on.

            So I guess -- well, I'll just ask both of you.
What do you think is a reasonable time, Mr. Curley, for you
and Mr. Dickstein to get together, identify a mediator,
identify a date, and move forward?

            MR. CURLEY:  I suspected that the Court might ask
that question.  I was thinking about that in my mind.  I
think, given the current circumstances of the world, probably
six months would be necessary to -- to engage in the
mediation --

            THE COURT:  Oh, well let me stop.  I'm not -- I
just want to know who the mediator is going to be.  And I
want to know when it's going to be.

            MR. CURLEY:  I think we can probably within the
next two to three weeks identify that.

            THE COURT:  Yeah.  Mr. Dickstein?

            MR. DICKSTEIN:  That would work.  Sure.

            THE COURT:  Okay.  So today is February the 24th.

1　Can you all file --

2　　　　　MR. DICKSTEIN:  Judge, I might -- if I may?

3　　　　　THE COURT:  Sure.

4　　　　　MR. DICKSTEIN:  The concern is -- we can agree on

5　a mediator, I'm sure, quickly.  The question is the

6　availability of a mediator to secure a date.

7　　　　　THE COURT:  And that might go into the factor of

8　who you might hire.

9　　　　　MR. DICKSTEIN:  Correct.

10　　　　　THE COURT:  Because if they can't meet with you

11　until next year --

12　　　　　(Overlapping speech.)

13　　　　　THE COURT:  But you all -- you pick.  I'm not

14　going to dictate who you -- what you do.

15　　　　　So with that in mind -- but I would like to see

16　the mediation occur fairly promptly.

17　　　　　Okay.  How about if you all file a notice with the

18　Court on or about March 19, 2021.

19　　　　　MR. DICKSTEIN:  Identifying the mediator and a

20　date for mediation?

21　　　　　THE COURT:  That's right.

22　　　　　MR. CURLEY:  I think that would be fine, Your

23　Honor.

24　　　　　MR. DICKSTEIN:  That will work, Judge.

25　　　　　THE COURT:  All right.  So I'll enter an order to

```
 1   that point.
 2           Okay.  Mr. Dickstein, anything else the Court can
 3   do to be helpful?
 4           MR. DICKSTEIN:  I think -- I think we're in
 5   good shape -- good next step, Judge.
 6           THE COURT:  All right.  You've got a -- that's
 7   right.  Judge Newbern is, of course, always available.  And
 8   if for some reason you all can't agree on a mediator, I'm
 9   going to -- I'll just tell you, I'm going to send you to
10   Judge Newbern, but I can't believe you two can't talk and do
11   that.
12           All right.  Mr. Curley, anything more the Court
13   can do?
14           MR. CURLEY:  Nothing further, Your Honor.
15           THE COURT:  All right.  Thank you all.
16           (Court adjourned.)
17
18
19
20
21
22
23
24
25
```

REPORTER'S CERTIFICATE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on February 24, 2021, in the matter of UNITED STATES OF AMERICA and the STATE OF TENNESSEE ex rel, GARY ODOM and ROSS LUMPKIN v. SOUTHEAST EYE SPECIALISTS, PLLC, SOUTHEAST EYE SURGERY CENTER, LLC, and EYE SURGERY CENTER OF CHATTANOOGA, LLC., Case No. 3:17-cv-00689; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 44) is a true and accurate record of said proceedings.

This the 26th day of February, 2021.

/s/ Lise S. Matthews
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter