# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

UNITED STATES OF AMERICA )
AND STATE OF TENNESSEE *ex rel.* )
JEFFREY H. LIEBMAN AND )
DAVID M. STERN, M.D., ) **Case No. 3:17-CV-902**
 )
 **Plaintiffs/Relators,** )
 )
v. )
 ) **Judge William L. Campbell, Jr.**
METHODIST LE BONHEUR )
HEALTHCARE, *et al.*, ) **Magistrate Judge Barbara D.**
 ) **Holmes**
 **Defendants.** )
 )

## WEST'S RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION TO INTERVENE

4813-3502-1564

# TABLE OF CONTENTS

PAGE

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  PROCEDURAL HISTORY AND BACKGROUND ................................................... 2

III. ARGUMENT ........................................................................................................ 11

    a.   The United States Failed to Provide Any Evidentiary Basis for its Alleged Good Cause to Intervene ................................................................... 16

    b.   The United States Lacks "Good Cause" Because It Failed to Investigate and Prosecute This Action In a Timely Manner .................................... 20

    c.   Permitting the United States to Intervention Here Would Evicerate the Intent of the FCA Seal and Incentivize Improper Behavior ......................... 24

    d.   Relators' Consent is Not Dispositive in Establishing Good Cause to Intervene ......................................................................................................... 24

    e.   Intervention at this Late Stage Would Unfairly Prejudice West and Significantly Delay This Action ................................................................. 25

IV.  CONCLUSION ................................................................................................... 29

4813-3502-1564

i

# **TABLE OF AUTHORITIES**

**Federal Court Opinions**                                                                                                                   **Page(s)**

*Chesbrough v. VPA, P.C.*,
  655 F.3d 461 (6th Cir. 2011) ................................................................... 18

*Com. Benefits Grp., Inc. v. McKesson Corp.*,
  326 F. App'x 369 (6th Cir. 2009) ....................................................... 22, 23

*Griffith v. Conn, No. 11-cv-157*,
  2016 WL 3156497 (E.D. Ky. Apr. 22, 2016) ...................................... 25, 26

*Michigan Exp., Inc. v. U.S.*,
  374 F.3d 424 (6th Cir. 2004) ................................................................... 21

*Ridenour v. Kaiser–Hill Co.*,
  397 F.3d 925 (10th Cir. 2005) .................................................... 13, 14, 15

*Sharpe ex rel. U.S. v. Americare Ambulance, No. 8:13-cv-1171*,
  2017 WL 2986258 (M.D. Fla. July 13, 2017) ................................... 27, 29

*U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr., No. 6:09-cv-1002*,
  2011 WL 4480846 (M.D. Fla. Sept. 27, 2011) ................................. 16, 17

*U.S. ex rel. Drennen v. Fresenius Med. Care Holdings, Inc., No. 09-cv-10179*,
  2017 WL 1217118 (D. Mass. Mar. 31, 2017) ................................... 24, 25

*U.S. ex rel. Hall v. Schwartzman*,
  887 F. Supp. 60 (E.D.N.Y. 1995) ...................................................... 15, 26

*U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*,
  912 F. Supp. 2d 618 (E.D. Tenn. 2012) .................................................. 6

*U.S. ex rel. Roberts v. Sunrise Senior Living, Inc., No. 05-cv-3758*,
  2009 WL 499764 (D. Ariz. Feb. 26, 2009) ............................................ 26

*U.S. ex rel. Ross v. Indep. Health Corp., No. 12-cv-299S*,
  2021 WL 3492917 (W.D.N.Y. Aug. 9, 2021) ................................... 25, 26

*U.S. ex rel. Stone v. Rockwell Intern. Corp.*,
  950 F. Supp. 1046 (D. Colo. 1996) ................................................... 16, 17

*U.S. ex rel. Tyson v. Amerigroup Ill., Inc., No. 02-cv-6074*,
  2005 WL 2667207 (N.D. Ill. Oct. 17, 2005) .......................................... 17

4813-3502-1564

i

**United States Code**

31 U.S.C. § 3730 ................................................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 9 ............................................................................................................... 18

Fed. R. Civ. P. 11 ............................................................................................................. 10

Fed. R. Civ. P. 24 ............................................................................................................. 25

Fed. R. Civ. P. 56 ................................................................................................... 18, 20, 21

4813-3502-1564

# I.  PRELIMINARY STATEMENT

The West Clinic, PLLC ( "West")[1] submits this Response in Opposition to the United States' Motion to Intervene for Good Cause (the "Motion" or "U.S. Mot."). The United States' misguided attempt to intervene in this action is either an improper attempt to avoid this Court's clear ruling on the FCA seal in this action, or a result of a slipshod and lackluster investigation that either missed, ignored, or failed to apprehend key facts the United States now claims give rise to "good cause." In either case, the United States[2] has failed to comply with both the letter and the spirit of the time restrictions set forth in the False Claims Act ("FCA"), 31 U.S.C. §§ 3730(b)(2), (4), has abused the seal in this action, has failed to show "good cause" required to intervene at this late juncture, and its intervention would unfairly prejudice West, particularly after West has been dismissed from this action by both the United States and Relators. In seeking to intervene, the United States has altogether ignored persuasive precedent from this District where Chief Judge Crenshaw denied a separate attempt by the United States to intervene in a markedly similar FCA action earlier this year. The United States' Motion fails to even mention this decision and its clear direction regarding the evidentiary showing necessary to support the a "good cause motion" to intervene in an FCA action. Regardless of whether this was on purpose or by oversight, the United States' Motion lacks merit and should be denied.

---

[1] Relators named several "West" entities and individuals as defendants in their *qui tam* complaint. West's settlement released all claims against four West entities and individuals—The West Clinic, PLLC (a/k/a The West Clinic, LLC), West Partners, LLC, Lee Schwartzberg, M.D., and Erich Mounce. In its Motion, the United States did not identify which West entities it intends to add as defendants. Counsel for the United States confirmed to West's counsel prior to filing its Motion that the United States did not intend to intervene against any West individuals.

[2] The United States is the only government entity that seeks to intervene in this action. While the State of Tennessee engaged in an investigation while the *qui tam* complaint was under seal, filed a notice with the Court in September 2019 that it had not yet completed its investigation, and informed the Court as late as September 21, 2021 that it expected to follow the United States (D.E. 190, at 17:1-7), it has declined to sign on to the United States' Motion.

4813-3502-1564

1

## II.   PROCEDURAL HISTORY AND BACKGROUND

This action has been pending for over four years. During that time, it was sealed for over two years, the United States sought four extensions of the seal, the operative complaint has been amended three times, it has been reassigned, and West has been dismissed as a party with the consent of the United States. As such, the procedural history of this action is important to the Court's determination about whether the United States possesses "good cause" to intervene pursuant to 31 U.S.C. § 3730(c)(3). The United States' Motion glosses over much of what this Court must consider as part of any "good cause" analysis. That information is set forth below.

Relator Jeffrey Liebman filed this *qui tam* action on May 30, 2017. (D.E. 1). The Complaint named The West Clinic, West Cancer Center (collectively the "West Defendants"), Methodist Le Bonheur Healthcare, UT Methodist Physicians, LLC,[3] Methodist Healthcare—Memphis Hospitals (collectively the "Methodist Defendants"), and John Does 1-100. Relators'[4] allegations centered around a relatively common co-management arrangement between West and Methodist. As is typical in such arrangements, the complaint alleged that Methodist and West entered into a series of agreements: a Management Services Agreement ("MSA") whereby West agreed to provide certain management services to Methodist's adult oncology service line, a Professional Services Agreement ("PSA") whereby Methodist agreed to pay West physicians compensation fixed to the wRVUs those physicians worked, and a Leased Employee Agreement ("LEA") whereby Methodist leased West's non-clinical employees, who in turn provided services for Methodist's

---

[3] UT Methodist Physicians, LLC was ultimately dropped as a named defendant in this action, and Relators added four individual named defendants in the Second Amended Complaint.

[4] While the original *qui tam* action was filed by a single relator, Jeffrey Liebman, he was joined by a second relator upon filing of the Second Amended Complaint in December 2019. Dr. David Stern was added as a relator at that time. Jeffrey Liebman and Dr. David Stern are referred to herein as "Relators."

4813-3502-1564

2

adult oncology service line. In sum and substance the initial complaint alleged that these various agreements violated both the Stark law ("Stark") and Anti-Kickback Statute ("AKS") because West did not provide the services required under those agreements and/or because Methodist compensated West too much for the services that were provided.

Following the filing of the initial *qui tam* complaint on May 30, 2017, the United States moved for its first extension of the seal on July 28, 2017. (D.E. 10). As is typical in this District, the United States requested six additional months. Chief Judge Crenshaw—then assigned to this action—granted that motion, extending the seal six months, to January 28, 2018. (D.E. 12). During this six month period, neither West nor Methodist were contacted, served any subpoena or civil investigatory demand, or otherwise asked to provide any documents or information to the United States as part of its investigation. On January 19, 2018, the United States moved for a second six-month extension of the seal to July 30, 2018 (D.E. 15), which Chief Judge Crenshaw again granted. (D.E. 17).

On May 24, 2018, almost a year after this action was initiated, Relator filed his first amended complaint. (D.E. 20). Because none of the Defendants were aware of this action and had not yet been served, Relator required no permission to file his amended complaint. Finally, on June 13, 2018, for the first time, and more than a year after this action was filed, the United States sought documents and information from one of the Defendants, in the form of a civil investigative demand ("CID") directed to Methodist. That CID sought, *inter alia*, documents related to Methodist's arrangement with West, including the MSA, PSA, and LEA. The United States did not seek any documents from West, however, and West remained unaware of the existence of the *qui tam* or the United States' investigation.

On July 26, 2018, the United States filed a third motion to extend the seal, requesting that it be extended a further six months, until January 28, 2019, (D.E. 21), which Chief Judge Crenshaw granted. (D.E. 25). Around that same time, West became aware of the CID that had been served on Methodist, and engaged the undersigned counsel. Finally, in September 2018, the United States reached out to undersigned counsel. Counsel for West and the United States spoke on September 21, 2018. (Decl. of Andrew Solinger, ¶ 2, Exhibit A ("Solinger Decl.")). During that call, counsel for the United States informed West's counsel that West was not a target of the United States' investigation, but rather an entity that had information the United States was interested in. (*Id.*). West agreed to provide the information sought by the United States without the need for a CID, and that same day the United States sent West's counsel a letter detailing the information requested. (*Id.*). On September 26, 2018, the United States informed the Court that the undersigned law firm represented the West Defendants,[5] confirming that "the [West Defendants] and its counsel are not aware of the existence of the *qui tam*." (D.E. 27).

On January 28, 2019, the United States moved for a short extension of the seal until March 4, 2019, because of a 34-day lapse of appropriations, (D.E. 28), which was granted on February 1, 2019. (D.E. 32). On January 31, 2019, the United States sought a partial lift of the FCA seal on this action, which was granted. (D.E. 30). Then, on February 25, 2019, counsel for West met with counsel for the United States who, for the first time, informed West that it was a named defendant in this action. During that same meeting, counsel for the United States told West's counsel that the United States believed that the Court would not look favorably on further extensions of the seal. (Solinger Decl. ¶ 4). From these discussions, it became apparent that the United States believed the Court was concerned about the pace of its investigation. (*Id.*). During this meeting, counsel for

---

[5] This was presumably done in deference to Chief Judge Crenshaw's standing recusal policy.

4813-3502-1564

4

the United States asked if West would consent to a further extension of the seal. (*Id.* ¶ 4). West requested to view the complaint before responding, and was provided with a redacted copy. (*Id.*). After considering the United States' request, West stated that it took no position on any further extension of the seal. (*Id.*).[6]

On March 4, 2019, the United States filed its fourth request to extend the seal. (D.E. 35). Unlike the United States' prior requests, Chief Judge Crenshaw did not immediately grant this motion, but instead ordered a status conference which occurred on March 15, 2019. (D.E. 37). Following that conference, the Court extended the seal until September 3, 2019, but informed the United States it would be the last such extension. (March 3, 2019 Minute Entry). In June 2019, for the first time, the United States sought the formal assistance of Relators' counsel in connection with its investigation, entering into a protective order that allowed it to share documents and information produced by Defendants, (D.E. 40), which the Court granted in due course. (D.E. 42).

Ultimately, against the backdrop of its slow moving, and apparently snake-bit investigation, the United States informed the Court that it would not be intervening in this action. (D.E. 45). While § 3730(b)(4) of the FCA provides two options for the United States—either intervene or decline intervention—the United States chose a third. Despite more than *27 months* of investigation, and collection of more than 150,000 pages of documents, the United States explained to the Court that it was "not intervening at this time" and despite being provided over two-years more than provided for by the FCA and no-furthered by this Court, that "the United States had not yet completed its investigation" and that "[its] investigation will continue." (D.E.

---

[6] Presumably the United States memorandums in support of its multiple requests to extend the seal contain information that may be relevant to the Court's "good cause" analysis. Those pleadings remain sealed, however, and West is unaware of their content. To the extent the Court believes they are relevant, or considers them, West respectfully requests they be unsealed and that West be allowed to file supplemental briefing addressing their content.

45). That same day, Relators filed a motion for a status conference. (D.E. 46). After that conference, the Court granted Relators three additional months to file their Second Amended Complaint before this action was unsealed.[7] (D.E. 47). On December 13, 2019, Relators filed a Second Amended Complaint and added Dr. David Stern as an additional relator. (D.E. 59). As with the prior complaints, the theory of liability in the Second Amended Complaint remained the same: that the co-management arrangement between Methodist and West violated the AKS and Stark.[8] Thus all the agreements, statutes, and theories of liability that were the subject of the Government's 27-month investigation also remained the same. On December 19, 2019, the Court ordered Relators' complaint unsealed, allowing Relators to take control of the litigation pursuant to 31 U.S.C. § 3730(b)(4). On January 15, 2020, undersigned counsel for West entered an appearance (D.E. 62), and on January 16, 2020, Chief Judge Crenshaw recused, and this action was subsequently reassigned. (D.E. 71).

In January 2020, within a month after taking over prosecution of this action on behalf of the United States, Relators approached West about the prospect of quick settlement. (Solinger Decl. ¶ 5). Relators informed counsel for West that they viewed Methodist as the deeper pocket, and believed that a settlement with West would assist them in prosecuting the action and reaching

---

[7] The memoranda supporting the United States' repeated requests to extend the FCA seal remain under seal, as requested by the United States. (D.E. 60). As such, West has no knowledge of what the United States claims it learned through its initial investigation that warranted "good cause" to extend the seal for 27 months. As such, should the Court deem these submissions to be relevant to its decision in deciding the United States' Motion, West respectfully requests that these materials, which were filed several years ago, are unsealed in order to provide West the ability to compare their contents and representations to the United States' present Motion and assertions about "new and additional" evidence. *See U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, 912 F. Supp. 2d 618, 626 (E.D. Tenn. 2012) (denying United States' motion to keep nearly the entire docket under seal in an FCA case, after the United States moved to intervene).

[8] Relators' SAC removed allegations related to physician employment agreements between Methodist and certain employed physicians that are unrelated to West and have apparently been abandoned by both Relators and the United States.

4813-3502-1564

6

a quicker resolution with Methodist. (*Id.*). As a result, counsel for West and Relators began settlement discussions, which continued for several months.

Meanwhile, on March 9, 2020, Defendants, including West, filed motions to dismiss the Second Amended Complaint. (D.E. 79-82). While those motions were pending, the Parties proceeded with extensive civil discovery. Relators served discovery requests on Defendants, including 91 requests for production directed to West. (Solinger Decl., ¶ 7). Because of the ongoing settlement discussions, with the consent of Relators, West only responded to Relators' first request for production, producing 48,553 pages of documents consisting of those that had been previously produced to the United States. (*Id.*). At no time was the United States actively engaged in any aspect of discovery. Nor did the United States seek continued information from West.

While discovery was proceeding, counsel for Relators and West continued conversations and negotiations relating to settlement and dismissal of West from the action. During these discussions, counsel for Relators informed West that they were discussing the prospect of West's settlement with the United States, whose consent was required for any dismissal of West pursuant to § 3730(b)(1). Relators' counsel also informed West that the United States *would not consent* to any settlement where West did not pay some amount to the United States and the State of Tennessee in connection with its settlement. West and Relators eventually agreed to the sum of $2,600,000, to be split between damages paid to the United States and State of Tennessee, and Relators fees and costs pursuant to 31 U.S.C. 3730(d)(2). Relators and the United States reached a separate agreement that the amount would be split equally; $1,300,000 to the United State and the State of Tennessee to settle the FCA claims, and $1,300,000 to Relators' counsel as statutory costs and fees.

Prior to executing the settlement, however, West remained concerned about the status of the United States' investigation. To that end, counsel for West contacted counsel for the United States, speaking several times. During these calls, the United States stated it was unwilling to dismiss its claims against West with prejudice, but that based on its investigation it had no present intent to intervene. During one of those calls, on January 14, 2020, counsel for the United States stated that it was only "monitoring" the litigation, not actively investigating. (Solinger Decl., ¶ 6). Nine months later, on October 6, 2020, during the height of West's settlement negotiations with Relators and the United States, counsel for the United States unequivocally stated that "this is not a case where there is an active investigation." (*Id.* ¶ 9). In discussing its "no decision" declination (D.E. 45) and subsequent involvement in the action, counsel for the United States explained that in its view, sometimes a "no decision" declination (like the type filed in this action) "functions more as a declination, and that's kinda what's happened here." (*Id.*). In essence, counsel for the United States confirmed what West had been told all along by the United States, that its "no decision" decision in September 2019 functioned as a declination and the United States was no longer investigating the matter.

Following that call, and during the course of settlement discussions, this action was covered in the local Memphis press. In connection with that coverage, the press officer for the U.S. Attorney's Office for the Middle District of Tennessee was quoted in numerous media publications, stating that the United States was "monitoring" and "evaluating" the case. (*Id.* ¶ 10). Because these public statements were at odds with what West was told by counsel for the United States, counsel for West *again* contacted counsel for the United States on October 16, 2020. (*Id.*). On that phone call, counsel for the United States *once again* stated that "nothing has changed since [Chief] Judge Crenshaw unsealed the case, " i.e. the United States was not actively investigating.

(*Id.*). On a subsequent call that same day, counsel for the United States unequivocally stated that "we [the United States] are not actively investigating." (*Id.* ¶ 10-11). Based on these multiple, clear assurances, West entered into the Settlement Agreement on January 28, 2021. (*Id.* ¶ 12). As part of its settlement, West paid $1,300,000 "in settlement to the United States and the State of Tennessee," and agreed to cooperate with the Relators' investigation in exchange for dismissal from the action. (*See* Settlement Agmt., § 6(a), attached as <u>Exhibit B</u>).

Following the entry of the Settlement Agreement, Relators requested limited documentation from West, and conducted five interviews with current and former West employees. (Solinger Decl. ¶ 13). On March 19, 2021, Relators filed a motion for leave to file the Third Amended Complaint, (D.E. 154), which the Court granted on May 12, 2021. (D.E. 168). In the Third Amended Complaint, Relators alleged that the MSA was a sham, that West senior leadership confirmed that they did not provide inpatient management at the Methodist hospitals, and that compensation paid to West under the PSA exceeded professional collections for West physicians.

Following filing of the Third Amended Complaint, counsel for the United States contacted counsel for West, noting the allegations in the Third Amended Complaint about West senior management "confirming" that no management services were provided at Methodist hospitals. West's counsel repeatedly explained to counsel for the United States that the allegations in the Third Amended Complaint that unspecified members of "West senior management" had "confirmed" that no management services were provided, were plainly inaccurate and wholly unsupported by any responses from any West personnel who had been interviewed by Relators. (Solinger Decl. ¶ 15). West's counsel explained that multiple attorneys representing West were present at the interviews, and their notes directly contradicted the allegations in the Third Amended

Complaint. (*Id.*).[9] West's counsel was clear in speaking with both Relators' counsel and counsel for the United States that these allegations were false and did not accurately reflect the interviews that Relators conducted.

Nonetheless, counsel for the United States informed West's counsel that the United States was restarting its investigation and was seeking to interview West senior management.[10] The United States then conducted its own interviews of current and former West senior management. On June 22 and 23, 2021, the United States interviewed two senior West physicians and West's former Chief Executive Officer. (Solinger Decl. ¶ 17). During these recorded interviews,[11] counsel for the United States repeatedly asked about the new allegations in the Third Amended Complaint, and was consistently told that Relators' allegations were incorrect. (*Id.*).

West provided documents to Relators and the United States pursuant to the spirit of the settlement agreement, which required its cooperation.[12] At no time during this ongoing cooperation did the United States tell West that it intended to intervene. In fact, counsel for the United States informed West that they believed Methodist would settle, rather than face the prospect of Government intervention, and therefore did not expect to have to actively litigate this action. Indeed, it was not until July 1, 2021, after these interviews, that the United States first informed

---

[9] To emphasize how unsupported those statements were, West's counsel informed counsel for the United States that it believed these allegations may violate Rule 11. Of course, at the time West was not a party to this action, and was unable to raise any Rule 11 concerns or whether the fee-shifting provision in 31 U.S.C. § 3730(d)(4) of the FCA should be applied.

[10] Initially, counsel for the United States sought to sit in on scheduled interviews between Relators' counsel and additional West physicians and management. Soon thereafter, the United States made its own requests to interview West senior management, including physicians, as well as certain former Methodist employees.

[11] Despite these interviews being recorded and presumably transcribed, the United States did not attach any excerpts to its Motion. Such a decision speaks volumes.

[12] As a practical matter, West could not effectively turn down the United States requests because the United States and Relators (with whom West had agreed to cooperate after entering into the Settlement Agreement based on assurances from the United States) were acting in concert.

4813-3502-1564

10

West that there was a possibility it would attempt to intervene and add West as a defendant. (Solinger Decl. ¶ 18). In response, West requested to make a presentation to the United States to substantively respond to its theories of the case at that time. (*Id.* at 19). West prepared an extensive presentation to the United States to respond to the theories of liability that it had articulated to West, namely that (1) West did not perform sufficient management services under the MSA, and (2) West's compensation under the PSA violated the AKS because the compensation-to-collections ratio was too high. (*Id.*). On September 13, 2021, the day of West's scheduled presentation to the United States, counsel for the United States informed West the United States had arrived at an *entirely new* theory of liability (*Id.* ¶ 20), the theory that now purports to be the United States' primary theory for which it states that it intends to file an "early motion for a partial summary judgment."[13] (D.E. 190, at 8:23-24).

Thus, more than eight months after West settled with Relators and paid $1,300,000 to the United States in settlement of its claims, and after West was dismissed by Relators with prejudice and with the knowledge and consent of the United States, the United States now seeks to intervene in this action and bring West back as a defendant.

### III. ARGUMENT

Relators brought this action pursuant to the FCA, which provides that a private citizen may bring a civil action for false claims submitted to the United States "for the person and for the

---

[13] The United States cannot credibly claim that any of the factual predicates for this new theory of liability were recently discovered. The intricate details of the arrangement, including copies of the MSA, PSA, and LEA were produced to the United States by both West and Methodist in the early stages of the United States' "investigation" in 2018 and 2019. The compensation amounts, including amounts paid to West, was similarly provided to the United States very early in its initial investigation. The fair market value opinions underlying these agreements were also produced very early in the United States' under-seal investigation. None of the *facts* are new. The only thing that is "new and additional" about the United States' second-phase investigation is its novel legal *theory* that has no support in fact or law.

4813-3502-1564

11

United States Government." 31 U.S.C. § 3730(b)(1). In a *qui tam* action under the FCA, the action is "brought in the name of the Government." *Id.* The FCA requires the relator to serve the Government with a copy of the *qui tam* complaint and "substantially all material evidence and information" relator possesses regarding the alleged fraud. *Id.* § 3730(b)(2). After the relator files the *qui tam* complaint, it remains under seal for 60 days. *Id.* The Government has 60 days to "elect to intervene and proceed with the action." *Id.* However, the Government may seek an extension of the seal in order to obtain additional time to investigate a relator's allegations. *Id.* § 3730(b)(3). Such an extension requires a showing of "good cause." *Id.* Before expiration of the seal—whether the original 60 days or the extended seal period provided by the court—the Government must decide to take one of *two* actions:[14] "(A) proceed with the action, in which case the action shall be conducted by the Government; or (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4). The FCA does not provide for the type of "no decision" declination the United States filed here.

Congress placed great importance on the efficient resolution of *qui tam* cases, finding that in the "vast majority" of cases, the 60-day investigation period is sufficient time for the United States to review relator's complaint, investigate the allegations, and make a decision on how to proceed. *See* S. Rep. No. 99-345, 99th Cong., 2d Sess. 24, 1986 U.S.C.C.A.N. 5266, 5289-90. The Senate Judiciary Committee, in reviewing amendments to the FCA, clearly "intend[ed] that courts *weigh carefully* any extensions on the period of time in which the Government has to decide whether to intervene and take over the litigation." *Id.* (emphasis added). While it may have become

---

[14] The Government also has the ability to dismiss the *qui tam* action under § 3730(c)(2)(A), a decision that is further discussed in the Department of Justice's "Granston Memo" issued on January 10, 2018.

4813-3502-1564

more common, nothing in the FCA or its legislative history supports the United States seeking multiple extensions of the seal for more than two years, much less allowing Relators to take discovery and litigate the same claims for two more years, before seeking to re-appear and intervene, having either conducted a shadow investigation for those intervening two years, or failed to take any steps to continue to evaluate its claims.

The legislative history of the amendments to § 3730 indicates that the purpose of late intervention is to allow the United States to intervene if new evidence, discovered after the first sixty (60) days of litigation, escalates the "magnitude or complexity of the fraud," causing the United States to reevaluate its initial assessment of the case. *Ridenour v. Kaiser–Hill Co.*, 397 F.3d 925, 933 (10th Cir. 2005) (citing S. Rep. No. 99–345, 1986 U.S.C.C.A.N. 5266, 5291-92). The United States does not allege that any of the "new and additional" evidence it purports to have discovered expands on the magnitude or complexity of the alleged fraud. Instead, the United States contends that it narrows the scope of the case. (U.S. Mot., pp. 7-8).

This Court recently faced a delayed intervention by the United States in an FCA action, with facts and posture that were markedly and materially similar to this action. In *U.S. ex rel. Odom, et al. v. Southeast Eye Specialists, PLLC, et al.*, No. 3:17-cv-689 (M.D. Tenn.) ("*SEES*"), relators filed a *qui tam* complaint in April 2017, one month before the *qui tam* complaint in this action. Both *SEES* and this action were assigned to Chief Judge Crenshaw.[15] The arc of that action almost parallels what occurred here—the key difference being the shocking delay that has occurred

---

[15] It is notable that both actions were simultaneously pending before Chief Judge Crenshaw and that he ordered the United States in both actions to make an intervention decision within one month of one another. The present action was only transferred to this Court because Chief Judge Crenshaw recused himself from cases involving West's counsel's law firm. Had Chief Judge Crenshaw not transferred this case, he would be deciding this Motion in the shadow and context of his prior ruling in *SEES*.

here between when the United States informed the Court it could not make a decision on intervention and when it sought to re-enter the action.

*SEES* was filed in April 2017. After a 28-month investigation in *SEES,* Chief Judge Crenshaw ordered the United States to make an intervention decision no later than August 9, 2019. In response, like here, the United States notified the Court that it was "not intervening at this time," using the exact same language that appears in the United States' notice in this action from September 3, 2019. (D.E. 45). Just as here, the *SEES* relators proceeded to litigate the action in the name of the United States, and as here, the *SEES* defendants filed a motion to dismiss. That is where the cases diverge, however. Shortly after the *SEES* defendants filed their motion to dismiss, and six months after informing the Court it was unable to make a decision on intervention, the United States sought to intervene, filing a perfunctory motion, asserting it possessed "good cause."

At two separate hearings on that motion, Chief Judge Crenshaw made a number of observations, findings, and holdings that ring true here. Following the United States' motion to intervene, Chief Judge Crenshaw determined that in connection with such a motion the United States must submit documentation in support of its motion to intervene, evidencing the "good cause" that it alleges supports its intervention. (*SEES* Sept. 30, 2020 Hrg. Tr., 9:19-25, attached as Exhibit C). As Chief Judge Crenshaw noted, "the Court needs some evidentiary basis to exercise its discretion," and then ordered the United States to file declarations or affidavits from Government investigators including extensive detail on the history of the investigation, significant events, investigative tools, and the "evidentiary findings" from the second phase of the investigation. (*Id.*, at 22:15-25:4). The United States complied with that order, filing affidavits from two investigators, after which the court held a second hearing to adjudicate the United States' motion to intervene and assess whether it had good cause to intervene.

4813-3502-1564

14

In assessing the United States' "good cause" to intervene, the *SEES* court noted that it "need only focus on what good cause basis to intervene came to light *after*" the United States filed its notice of its decision not to intervene. (*SEES* Feb. 24, 2021 Hrg. Tr., 34:6-8, attached as <u>Exhibit D</u>) (emphasis added). Chief Judge Crenshaw found that the United States' subsequent investigation only included "three sets of witness interviews" as well as "request[s], collect[ion], and review[ ] [of] data and documents . . . ." (*Id.*, at 34:17-18, 35:10-11). Because the United States "has the burden to present . . . 'new and sufficient evidence,'[16] . . . to establish good cause for their motions to intervene," the court held that the United States' "tepid submission [did] not come close to establishing the good cause necessary to intervene and take control of the litigation nearly three years after the original complaint was filed, and more than six months after the Court set a final deadline for intervention that was extended six times." (*Id.*, at 37:3-19). In *SEES*, the United States' second-phase investigation related to "data and documents [that had] been readily available to [the Government] long before" it made its initial intervention decision. (*Id.* at 38:23-25). Because the United States engaged in settlement discussions with the *SEES* defendants, Chief Judge Crenshaw determined that it was "inconceivable, if not illogical, that parties would engage in settlement discussions without having a full understanding of the strengths and weaknesses of their case." (*Id.* at 40:1-6). He went on to state that "to do less would be almost an act of malpractice." (*Id.*).

Against this backdrop, the United States now seeks to intervene in the action. Yet despite seeking to intervene almost two years after informing the Court that it was unable to make a

---

[16] "New and sufficient evidence" must, logically, be something that the Government learned after making its initial intervention decision, that was not available or apparent at that time. *See, e.g., U.S. ex rel. Hall v. Schwartzman*, 887 F. Supp. 60, 62 (E.D.N.Y. 1995) (granting Government's motion to intervene because, "since its initial decision to decline intervention as of right, [the Government] has uncovered information suggesting that the scope of the alleged fraud is more extensive than it originally anticipated, and . . . the *qui tam* plaintiffs have sought its assistance to investigate and prosecute the action.")

4813-3502-1564

15

decision, despite conflicting statements to the Court and West about whether it was actually conducting any investigation during the interceding time, and despite allowing its claims against West to be dismissed, the United States has failed to provide *any* evidentiary support that it possesses the necessary "good cause." The only statements in the United States' Motion are generalized references to "new evidence" that it claims give rise to "good cause." These are insufficient based on this Court's ruling in *SEES* and the majority of other decisions addressing what the government must show to meet the "good cause" standard of 31 U.S.C. § 3730(c)(3).

### a. The United States Failed to Provide Any Evidentiary Basis for its Alleged Good Cause to Intervene

The United States carries the burden to establish good cause. Because the Court must exercise discretion in deciding whether good cause exits, the United States must provide it with some evidentiary basis for the Court to exercise its discretion. *See U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-cv-1002, 2011 WL 4480846 (M.D. Fla. Sept. 27, 2011) (attaching and repeatedly citing to an affidavit from DOJ Civil Frauds Trial Attorney regarding the investigation in the United States' motion to intervene); *U.S. ex rel. Stone v. Rockwell Intern. Corp.*, 950 F. Supp. 1046 (D. Colo. 1996) (filing a declaration from a DOJ Civil Division Trial Attorney describing the "information obtained during discovery in the claims court case and made available to him by counsel for [relator] [and which the United States considered] important to the decision to intervene"); *SEES* Sept. 30, 2020 Hrg. Tr., 22:15-18 (noting that "the Court needs some evidentiary basis to exercise its discretion"). In other cases in which the United States sought to belatedly intervene in an FCA action, it supported its motion with some evidentiary basis besides perfunctory statements from counsel. Here, in contrast, the United States has submitted nothing.

While the "good cause" standard is inherently flexible, Chief Judge Crenshaw identified five topics he believed must be addressed by the United States in any affidavits it files supporting

4813-3502-1564

16

its claim of "good cause": (1) the history of the investigation, including the goals of the investigation and each investigative tool used; (2) a description of the progression of the investigation, including significant events and milestones; (3) the focus on progression of the investigation after the United States elected not to intervene, including a "time period chronology," list of findings and conclusions; (4) an identification of each investigative tool utilized by the United States, such as document review, data analysis, witness interviews, and CID testimony and document productions; and (5) evidentiary findings from the period after the United States elected not to intervene, including "what information the investigation uncovered during this period of time." (*SEES* Sept. 30, 2020 Hrg. Tr., 23:10-25:4); *see also, Halifax*, 2011 WL 4480846 (attaching to motion to intervene an affidavit from DOJ Civil Frauds Trial Attorney); *Rockwell*, 950 F. Supp. 1046 (relying on declaration from DOJ Civil Division trial attorney). These sorts of requirements are not new. In other cases the United States attached multiple exhibits, providing to the court the precise new and additional evidence it purported supported its late intervention. *See, e.g.*, *U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, No. 02-cv-6074, 2005 WL 2667207 (N.D. Ill. Oct. 17, 2005) (attaching seven documents and four declarations obtained in the United States' second-phase investigation).

Here, the United States' Motion is devoid of any evidentiary basis or support other than perfunctory statements about generalized and unspecified "new and additional" evidence. This inexplicable lack of support runs contrary to the evidentiary support that Chief Judge Crenshaw held was necessary in connection with such a motion, and is nonsensical given what has transpired since the United States began requesting additional information in May of this year. For example, during the course of its under-seal investigation, the United States never conducted a single interview that any of the Defendants are aware of. But since July 2021, it has conducted five

4813-3502-1564

17

interviews of key West and Methodist personnel, all of whom were known to the United States at the outset of this litigation. Each of these interviews was recorded. (Solinger Decl. ¶ 17). Yet despite claiming that "new and additional evidence was obtained" during those interviews that "supported the allegations of FCA violations under the AKS," the United States fails to offer any specifics to support its claims. (U.S. Mot., pp. 3-4). With its access to recordings of these interviews, it should be a simple matter to provide the detail required in *SEES* and the other decisions it cites in support of its Motion. (U.S. Mot., pp. 6-7).

The kind of detail required in *SEES* and provided by the United States in other instances is axiomatic with the nature of this action. Any claims the United States brings must be pled with specificity under Rule 9(b), in part, to protect defendants from spurious accusations of fraud that lack factual support. *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) ("The heightened pleading standard is also designed to prevent 'fishing expeditions,' to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters."). Because of the United States' failure to provide any evidentiary basis for its Motion, Defendants have been forced to respond to what amounts to spurious accusations by the United States, which, even though unsupported, still have a severe and deleterious impact on West's ongoing operations.[17]

---

[17] Further to this point, the United States informed the Court in its Motion and at the September 21, 2021 status conference that it believes it will be able to quickly move for summary judgement on some of its claims. If the United States believes it can meet the requirements of Rule 56, it should be well aware of what evidence it would use to support such a motion. At the very least it should be a simple task to categorize that evidence into what is "new" and what was known to the United States prior to September 2019, when it declined to intervene.

4813-3502-1564

18

Even more troubling, the only specific "new and additional" evidence that the United States points to are publicly available presentations that the attorney who represented West[18] in connection with the arrangement gave at industry conferences, which the United States claims support a finding of scienter. (U.S. Mot., pp. 4, 8). Putting aside the absurdity of its claim that public statements made by West's prior counsel more than 10 years ago, at public conferences (including at least one attended by senior DOJ leadership overseeing all FCA investigations and prosecutions) could give rise to "knowing and willful" conduct under the AKS, the United States utterly fails to address how this evidence could be "new and additional." As the United States made clear, these are *publically available statements*. (U.S. Mot., p. 4 (referring to "repeated public statements that spanned over five years")). Evidence that the United States could have found with a simple Google search four years ago is not "new and additional." The United States does not explain to the Court why it was apparently unable to find this information during the course of its initial investigation. Even if it did, that explanation would likely raise troubling questions about the nature of the United States' investigation.

---

[18] In its Motion, the United States wrongly claims that the attorney who made these public statements was "the counsel who structured the transaction and provided legal advice to *both* West and Methodist throughout the over seven years of the arrangement, [and] repeatedly made public statements that identified how the overall transaction structure presented irreducible AKS risk, including that one purpose was to induce referrals." (U.S. Mot., p. 8) (emphasis added). Counsel for both West and Methodist have *repeatedly* informed the United States what professional advisors (including law firms) represented each party in structuring the arrangement. As the United States has been told *multiple times*, West and Methodist each engaged separate counsel. At no time did the attorneys who represented West *ever* represent or provide "advice" to Methodist relating to this arrangement. These facts have been confirmed by documentary evidence produced by the parties and the testimony of witnesses interviewed by the United States and Relators. It is beyond troubling, and highly inappropriate, that the United States has chosen to make statements *which it knows to be inaccurate* based on everything it has learned from the documents that have bene produced to it and the recent interviews it conducted, and everything it has been told by counsel for West and Methodist.

4813-3502-1564

19

The United States has not directed the Court to any "new" evidence that could assist it in demonstrating "good cause," nor has it provided any evidentiary basis on which this Court could rely in making a good cause determination. What evidence it has identified raises troubling questions about the nature of the United States investigation. Its Motion should be denied on this basis alone.

### b. The United States Lacks "Good Cause" Because It Failed to Investigate and Prosecute This Action In a Timely Manner

Even if the United States can meet its burden to show new evidence, it cannot establish "good cause" because of its significant delay between when it filed its "no decision" declination (September 3, 2019) and when it took affirmative steps to learn of the supposedly new evidence (May 2021). Here, the United States has either failed to accurately represent the state of its investigation to the Court, or misled West as to the timing and nature of that investigation. In September 2019, when the United States was faced with a deadline to make an intervention decision, it notified the Court that it had "not completed its investigation" and that its "investigation will continue." (D.E. 45, p. 1). Four months later, on January 14, 2020, just a month after Relators' complaint was unsealed, counsel for the United States told counsel for West that the litigation was now in Relators' hands and "whatever Relators decide to do with it, that's on them." (Solinger Decl. ¶ 6). United States' counsel stated that the United States was only going to "monitor" the case. (*Id.*). Then, on October 16, 2020, in the midst of West's settlement discussions with Relators and the United States, counsel for the United States once again told West's counsel that the United States was merely "monitoring" the action and was "not actively investigating." (*Id.* ¶ 10). As part of that same conversation, counsel for the United States stated that its "no-decision" decision

functioned "more as a declination" in this case.[19] (*Id.* ¶ 9). In two separate phone calls on October 16, 2020, counsel for the United States repeated these statements, making it abundantly clear that it was not actively investigating anything, and had effectively declined intervention. (*Id.* ¶ 10). Based on these repeated assurance from counsel for the United States that the investigation of West had ceased, West proceeded with settlement discussions and agreed to enter into the Settlement Agreement.[20]

The United States fails to address any of this in its Motion. In fact, the Motion tends to suggest just the opposite, that the United States has been actively investigating all along. (*See* U.S. Mot., p. 8 ("[T]he United States was continuing to investigate the AKS allegations after the Court unsealed the case.")). If that is the case, and the United States has in fact been actively investigating this action since December 2019, then the United States' representations to West, which induced West to settle, were negligently or recklessly inaccurate and, for the reasons set forth in West's

---

[19] The mere fact that the United States apparently believes that there are different types of "no decision" declinations calls into question the accuracy of its representations in this case and others in this district where it has filed similar "no decision" declinations. Here, despite informing the Court and the press that it "was continuing to investigate," the United States apparently sat on its hands and did nothing. That type of behavior is not what was contemplated by Congress in providing for the FCA seal, and unfairly prejudices West and other putative defendants who are forced to live with public statements by the United States that are apparently inaccurate.

[20] As set forth in West's contemporaneously filed Motion to Enforce the Settlement Agreement, if the United States truly was "investigating" these allegations since declining to intervene in September 2019, then the statements of the United States' counsel were either negligent or reckless. If that is the case, then the United States should be estopped from adding West as a party to this action, and the terms of the Settlement Agreement should be enforced against the United States. *See Michigan Exp., Inc. v. U.S.*, 374 F.3d 424, 427 (6th Cir. 2004) (noting that the Government engages in affirmative misconduct when it "intentionally or recklessly misleads the claimant"). Based on divergence between the United States' representations to the Court and its statements to West's counsel, it is unclear what the United States actually did between September 2019 and May 2021. The United States cannot have it both ways, however. It either delayed investigating the allegations in this case for over a year (and was not candid with this Court when it said its investigation was "continuing") or misled West. The only way to assess these issues if for the United States to provide a clear description of what it did, as the Court demanded in *SEES*.

4813-3502-1564

21

Motion to Enforce the Settlement Agreement, should be enforced against the United States. If, on the other hand, the United States actually ceased any active investigation as early as December 2019, then it calls into question whether the United States has acted diligently such that it can show "good cause" to intervene. *See Com. Benefits Grp., Inc. v. McKesson Corp.*, 326 F. App'x 369, 376 (6th Cir. 2009) (holding that the district court did not abuse its discretion in finding that a plaintiff failed to show "good cause" where "the factual basis for the new claims existed at the beginning of the lawsuit"). What is clear is that the United States owes both West and this Court an explanation of the true nature of its "investigation" following the filing of its "no decision" declination in September of 2019. (*See SEES* Sept. 30, 2020 Hrg. Tr., 23:10-25:4 (requiring the United States to address the focus on progression of the investigation after the United States elected not to intervene, including a "time period chronology")).

Second, even if the United States has not failed to act diligently, it is unable to show why it could not have asserted its new theory of liability based on evidence already in its possession or readily available to it during its under-seal investigation. In June and July of this year, the United States interviewed five current and former senior executives from both West and Methodist. (Solinger Decl., ¶ 17). These witnesses were key figures in negotiating, establishing, and operating the arrangement between Methodist and West and were well known to the United States during the pendency of its initial investigation. Indeed, all five witnesses were specifically referenced in Relators' First Amended Complaint filed in May 2018, and four of the five witnesses interviewed by the United States were named defendants in the Second Amended Complaint.

The United States' current theory, as explained to West's counsel both in writing and in phone calls prior to the United States filing its Motion, is that the arrangement between Methodist and West violated the AKS because "Methodist paid West remuneration -- one purpose of which

4813-3502-1564

22

was to induce referrals . . . ." (Solinger Decl. ¶ 22). The second part of the United States' new theory is that "the personal services safe harbor [does not save] this arrangement for multiple reasons, one of which is that the aggregate compensation is not set in advance." (*Id.*). This "new" theory, however, is not based on any "new and additional" evidence that the United States has learned since September 2019. The United States has known since day one that Methodist paid remuneration to West. The precise details of that remuneration were well-known to the United States several years ago, as it was the central focus of the CID and letter request. Similarly, the fact that the "aggregate compensation [was] not set in advance," was similarly well known to the United States because the MSA and PSA were produced to the United States pursuant to the CID and letter request, and Defendants both produced voluminous records showing the compensation paid by Methodist to West over the course of the arrangement. Finally, the United States was well aware that as a result of the arrangement the volume of referrals to Methodist increased. The only thing that is *new* is the United States' *legal conclusion* that this arrangement violates the AKS, not the factual predicates or evidentiary basis for this assertion. The United States' failure to cobble together this new legal theory until two months before the close of discovery does not give rise to good cause. *See Com. Benefits Grp.*, 326 F. App'x at 376 (affirming lack of "good cause" where "the factual basis for the new claims existed at the beginning of the lawsuit"). The documents produced to the United States while this action was under seal provided the United States all the information it needed to arrive at this new *theory*. The United States' choice to sit on its hands for 27 months before arriving at a legal theory of liability it could have formulated years ago does not rise to "good cause."

### c. Permitting the United States to Intervention Here Would Evicerate the Intent of the FCA Seal and Incentivize Improper Behavior

Permitting the United States to intervene in this action would also incentivize similar shell-game and delay tactics in future FCA cases. Aside from undermining the FCA's clear statutory scheme, such an outcome would provide a perverse incentive for the United States to issue a "no decision" declination (as it did here), preview the defendants' case and litigation strategy (as it did here), conduct a shadow investigation or piggy-back off of a relator's investigation (as it did here), and then use those post-declination findings to intervene and plead around any deficiencies in the claims. This type of conduct renders the FCA's investigatory seal provisions meaningless, and will only further delay the ultimate adjudication of FCA actions. The seal is of little import if the United States can pause its investigation for years and then re-appear based on vague and unspecified "new and additional evidence" and present new theories of liability on the eve of the close of discovery. Under such a rubric, there would be little point to making an intervention decision within the statutory timeframe. The United States would always defer making an intervention decision until after it reviewed relators' handling of the case and defendants' defenses to the claims. This effective end-around the FCA's seal provisions should not be permitted.

### d. Relators' Consent is Not Dispositive in Establishing Good Cause to Intervene

The United States asserts that Relators' consent to intervention "is a principal consideration in finding good cause." (U.S. Mot., pp. 2, 6-7). However, nothing in the text of the FCA supports this contention. In fact, one court specifically rejected the notion that a relator's consent is material to a finding of good cause. *See U.S. ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*, No. 09-cv-10179, 2017 WL 1217118, at *5 n.2 (D. Mass. Mar. 31, 2017). In *Drennen*, the court explained that giving weight to a relator's consent to Government intervention "would virtually eliminate the 'good cause' requirement" altogether, noting that "a relator may assent [to

intervention] for any reason[21] or no reason at all." *Id.* Instead, courts should consider "whether intervention would be unduly prejudicial to the defendant or would cause undue delay." *Id.* at *9; *see also* Fed. R. Civ. P. 24(a)(3).[22]

### e. Intervention at this Late Stage Would Unfairly Prejudice West and Significantly Delay This Action

Courts addressing intervention under § 3730(c)(3) must consider "whether intervention would unfairly prejudice the relator or the defendant." *U.S. ex rel. Ross v. Indep. Health Corp.*, No. 12-cv-299S, 2021 WL 3492917, at *2 (W.D.N.Y. Aug. 9, 2021). The "good cause" standard "requires balancing the government's justifications for untimely intervention against any possible prejudice to the relators and defendants caused by such intervention. If the government's justification outweighs any prejudice to the other parties, then the government has shown 'good cause' to intervene." *Griffith v. Conn*, No. 11-cv-157, 2016 WL 3156497, at *3 (E.D. Ky. Apr. 22, 2016). In *Griffith*, the court found that the United States provided "several justifications for why the Court should allow its untimely intervention." *Id.* The United States' justifications included that its motion to intervene was based on "new evidence" that was specifically identified in the motion, and that the United States "remained an active participant in this case since it declined to intervene," including filing briefs in the underlying action. *Id.* In *Griffith*, the defendants "admit[ted] that intervention will not prejudice them . . . as little discovery ha[d] occurred in the case up to [that] point." *Id.* at *4. Furthermore, the United States was closely involved in the

---

[21] Relators are incentivized to consent to Government intervention for a multitude of reasons that have nothing to do with whether the Government has good cause to intervene. For example, if the Government is successful in intervening, it can use its greater resources and tools, increased leverage, and improved access to claims data and information in the litigation, all of which improve a relator's likelihood of recovering his or her "bounty" upon successful judgment or settlement.

[22] Notably, in *SEES*, the relators "strongly consent[ed] to government intervention," and yet the court did not cite or note that consent in denying the United States' motion to intervene. (*SEES* Feb. 24, 2021 Hrg. Tr., 14:22-24).

4813-3502-1564

25

litigation even after electing not to intervene and "notified the defendants that its investigation was ongoing, so intervention [would] not cause the defendants any unfair surprise." *Id.* None of that is present here.

Courts considering this questions have looked to various guideposts in the arc of litigation, including whether any of the defendants had filed an answer to the relator's *qui tam* complaint. *See U.S. ex rel. Roberts v. Sunrise Senior Living, Inc.*, No. 05-cv-3758, 2009 WL 499764, at *1 (D. Ariz. Feb. 26, 2009) (finding no prejudice where the defendants did not oppose Government intervention, none of the defendants had filed an answer, and formal discovery had not yet occurred). Similarly, where formal discovery has not yet commenced, a finding of prejudice to the defendants is less likely. *See id.*; *U.S. ex rel. Ross v. Indep. Health Corp.*, No. 12-cv-299S, 2021 WL 3492917, at *3 (W.D.N.Y. Aug. 9, 2021) (granting United States' motion to intervene where the case was "procedurally in its infant stages, with discovery not having yet commenced"). Where a defendant is aware that the United States' investigation is continuing and future intervention is possible, courts have found there is no unfair surprise and defendants are not prejudiced. *See Schwartzman*, 887 F. Supp. at 62 (noting that the United States informed the court and defendants at an initial conference when relators took control of the litigation "that the Government contemplated intervention in this action," thereby putting defendants on notice of its intentions and continued involvement in the action); *Griffith*, 2016 WL 315497, at *4 ("[T]he government has continued its involvement in this case and notified the defendants that its investigation was ongoing, so intervention will not cause the defendants any unfair surprise."). Here, the United States seeks to intervene with less than two months before the close of discovery, five months after the filing of a *third* amended complaint, eight months after allowing West to be dismissed, and well after dispositive motions have been fully briefed.

4813-3502-1564

26

Similarly, where intervention by the United States would not affect existing case deadlines and trial schedule, or otherwise delay the litigation, courts are more likely to grant the United States' motion to intervene. *See Sharpe ex rel. U.S. v. Americare Ambulance*, No. 8:13-cv-1171, 2017 WL 2986258, at *2 (M.D. Fla. July 13, 2017). In *Sharpe*, the court noted that "almost a full year of discovery remains," meaning that "intervention at this relatively early stage of the proceeding will not cause undue delay or prejudice." *Id.* Notably, the court granted "the United States' motion to intervene *on the proviso that the dispositive motion and trial deadlines will not be moved*. Because the timeframe for litigation remains the same, again, the Court determines there will be no undue delay." *Id.* (emphasis added). Here, should the United States' Motion be granted, the established schedule of this action will be discarded. In short, any intervention by the United States will unfairly prejudice West, will delay this action, and will force the Court to address matters that all parties believed were resolved by West's settlement.

First, there is no question West will be unfairly prejudiced. Two years have passed since the United States declined to intervene in this action. During that time, and as a direct result of actions undertaken with the approval of the United States, West has not meaningfully participated in this litigation. Shortly after filing a motion to dismiss, West was approached by Relators' counsel about settlement. As a result of those ongoing discussions—which were known to and *condoned* by the United States—West did not engage in any meaningful discovery. Eventually West and Relators entered into the Settlement Agreement, which was approved by, and directly benefited the United States. As a result of that settlement, West agreed to withdraw its then-pending motion to dismiss. These facts alone are sufficient to show prejudice to West. But it gets worse. Unlike *Griffith* and *Schwartzman*, where the United States informed the parties that its investigation was ongoing, the United States provided the opposite assurance, telling West that it

had effectively declined this action, did not have present intention to intervene, that its plan was to observe from the outside, that it was "not actively investigating," and that the it saw "some value in settlement here." (Solinger Decl. ¶ 11).[23] West acted in reliance on those assurances, and made the decision to withdraw from this litigation rather than continue to defend itself. Every indication offered to West suggested that this action had been put to bed. Even after expressing a renewed interest in this action in May 2021, the United States did not inform West that it intended to re-add it as a defendant until July 1, 2021. (Solinger Decl. ¶ 18). Based on these facts, it would be beyond prejudicial to allow the United States to now intervene and drag West back in.

It would also be prejudicial to West to allow the United States to intervene and add it as a defendant, given the status and schedule of this action. Unlike in *Griffith, Roberts*, and *Ross*,[24] this case has significantly progressed since West was dismissed. Relators and the Methodist Defendants have engaged in wide-ranging discovery, none of which included West. Relators have filed a Third Amended Complaint, and Methodist has filed a renewed motion to dismiss that complaint, which is currently before the Court. West would have to play catchup to everything that has occurred in the nine months since it was dismissed.

Further, unlike in *Sharpe*, intervention by the United States would necessarily cause undue delay, including a significant extension of discovery, new deadlines for dispositive motions, and

---

[23] The first time the United States informed West that if it intervened in this action it would add West, occurred during a phone call between counsel for the United States and counsel for West on July 1, 2021, (Solinger Decl. ¶ 18), which comports with the United States' statement to this Court that discussions about intervention were "a lot more recent, in the past few weeks." (D.E. 190, at 13:21-23).

[24] The United States' reliance on *Ross* is misplaced. First, it claims the *Ross* decision supports its motion. It does not. Second, it claims Ross is "the most recent case to address good cause." (U.S. Mot, p. 10). While it may be the most recent case in the whole of the federal court system, it is not the most recent case in the Sixth Circuit, or even in this District, to address "good cause"—that case is *SEES*.

4813-3502-1564

28

almost certainly new trial dates. *See Sharpe*, 2017 WL 2986258, at *2 (conditioning grant of the United States' motion to intervene "on the proviso that" existing case deadlines remain unchanged). Here, discovery has proceeded for more than a year without West's involvement. West would require at least as much time in order to be placed on the same footing as Methodist.

In an apparent effort to distract the Court from the inescapable reality that its intervention in this matter will result in significant delay and additional discovery, the United States posits that its introduction of a new theory of liability will actually "narrow issues in dispute" and that it will be able to "clarify" the issues before the Court by filing an "early" motion for partial summary judgement. (U.S. Mot., p. 10). These assertions are untethered to reality. The introduction of a new and novel theory of liability surrounding the AKS will only increase discovery and motion practice and add additional delay to a case that has already been pending for four years.[25] Similarly, the United States could not file an "early" motion for summary judgement until after West has the opportunity to obtain discovery to defend itself. If the United States is allowed to intervene and add West, there will be additional and significant, delays in adjudicating this action.

## IV. CONCLUSION

For the foregoing reasons, West respectfully requests that this Court deny the Government's motion to intervene.


Dated this 22nd day of October, 2021.

---

[25] Even the United States is forced to admit that it is unsure if it can even establish all of the elements to prove an AKS violation. (*See* U.S. Mot., p. 10 ("United States contends that it will be able to establish *some*, if not all, of the elements to prove an AKS violation.") (emphasis added)). The reality is, at best, the United States' proposed intervention will only result in more discovery in this action as the United States tries (and likely fails) to discover facts it does not yet know or would be necessary to any summary judgement motion.

4813-3502-1564

Respectfully submitted,

/s/ John-David Thomas
John-David Thomas, TN BPR # 027582
Andrew F. Solinger, TN BPR # 036943
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
jd.thomas@wallerlaw.com
andrew.solinger@wallerlaw.com

*Attorneys for The West Clinic, PLLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2021, I emailed the Operations Manager to have electronically filed with the Clerk of the Court using the CM/ECF system and served the above via email upon:

Jerry E. Martin
David Rivera
Seth Hyatt
Barrett, Johnston Martin & Garrison, LLC
414 Union Street; Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com
drivera@barrettjohnston.com
shyatt@barrettjohnston.com

Bryan A. Vroon
Law Offices of Bryan A. Vroon, LLC
1380 West Paces Ferry Road
Suite 2270
Atlanta, GA 30327
bryanvroon@gmail.com

Edward D. Robertson, Jr.
Bartimus Frickleton Robertson & Rader, P.C.
109b East High Street
Jefferson City, MO 65101
crobertson@bflawfirm.com

*Attorneys for Relators*

Kara F. Sweet
U.S. Attorney's Office for the Middle District of Tennessee
110 Ninth Avenue South
Suite A961
Nashville, TN 37203
Kara.Sweet@usdoj.gov

*Attorney for the United States*

Scott M. Corley
W. Anthony Hullender

4813-3502-1564

31

Case 3:17-cv-00902   Document 197-1   Filed 10/22/21   Page 35 of 36 PageID #: 3033

Office of the Attorney General of Tennessee
PO Box 20207
Nashville, TN 37202
Scott.Corley@ag.Tn.Gov
Tony.Hullender@ag.Tn.Gov

*Attorneys for the State of Tennessee*


Brian D. Roark
Hannah E. Webber
J. Taylor Chenery
Taylor M. Sample
Bass, Berry & Sims
150 Third Avenue South
Suite 2800
Nashville, TN 37201
broark@bassberry.com
hannah.webber@bassberry.com
tchenery@bassberry.com
taylor.sample@bassberry.com

*Attorneys for Defendants Methodist Le Bonheur Healthcare, Methodist Healthcare-Memphis Hospitals, Chris McLean, and Gary Shorb*


/s/ John-David Thomas