## PROFESSIONAL SERVICES AGREEMENT

This AGREEMENT (the "Agreement") is entered into this 9th day of August 2011, by and between HEALTHCARE APPRAISERS, INC. (hereinafter referred to as "HAI") and JONES DAY (hereinafter referred to as "Firm") on behalf of its client, METHODIST LE BONHEUR HEALTHCARE ("System"), for the purpose of Firm engaging HAI to provide professional services to Firm as described below.

### GENERAL TERMS

In addition to the terms set forth below, this Agreement is subject to the terms set forth on Exhibit A attached hereto, all of which are deemed to be incorporated herein.

Firm is retaining the services of HAI as of the date of this Agreement as an independent contractor and consultant solely to assist Firm in providing legal advice to Client with respect to the Services, as such term is defined below. HAI is providing this assistance at the direction of Firm, and in furtherance of this assistance, may speak, correspond or meet with employees of System and others as may be necessary.

HAI understands that all communication between HAI and Firm or System, either oral or written, as well as any materials or information developed or received by HAI pursuant to this arrangement, are intended to be made or prepared for purposes of assisting Firm in rendering legal advice to System and in anticipation of potential disputes and/or litigation between System and third parties, including, without limitation, the Internal Revenue Service ("IRS") and the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG"), and thus are protected by applicable legal privileges, and are intended to be and remain confidential. Therefore, all such communications will be treated by HAI as confidential and subject to the attorney-client privilege and attorney work-product doctrine. Additionally, all materials, documents and information provided to or created by HAI in connection with this engagement shall be deemed covered by the attorney-client and attorney work-product doctrine, and their disclosure by HAI is strictly prohibited unless specifically authorized by System. HAI's obligation to keep information confidential will survive termination of this Agreement.

It is understood that only Firm and System have the right to assert or waive the attorney-client privilege and/or the attorney work-product doctrine, not HAI. Therefore, if HAI receives a request from a third party (including subpoena, summons or discovery demand in litigation) calling for the production of information protected by the attorney-client privilege and/or work-product doctrine, HAI shall promptly notify Firm and System.

To the extent permitted by law, it is intended and agreed that any communications made to HAI by Firm or System in connection with this engagement shall be privileged and that any such communications shall be made to facilitate communications between Firm and System and to aid Firm in rendering legal advice to System and in anticipation of potential disputes and/or litigation between System and third parties, including, without limitation, the IRS and OIG. HAI, therefore, shall not divulge to anyone any communication (or part or substance thereof) received from Firm or System in connection with HAI's work pursuant to this Agreement, except at the express and specific direction of Firm or in compliance with a final order of a court of appropriate jurisdiction after HAI has given Firm and System any and all opportunities to raise all legal objections available in opposition to such an order and Firm and/or System have exhausted their appellate rights with respect to said order.

*Engagement Letter MLBHC 001*

Page 1 of 5

Confidential                                                                                                           MLH_179140

## DESCRIPTION OF SERVICES

System is comprised of seven (7) hospitals, multiple home health agencies and outpatient clinics that serve the Mid South, and collectively represent one of the largest hospital systems in the country. Client is contemplating the acquisition of various assets of a large oncology practice (the "Group"), comprised of up to six (6) clinical sites. Subsequent to a successful transaction, System desires to enter into a management arrangement with the Group, whereby the Group will assist Client in managing its comprehensive inpatient and outpatient oncology services line, including up to six (6) clinical Sites. Firm engages HAI to perform the following services (the "Services").

HAI will provide a report (the "Report") to Firm that will set forth HAI's determination of the fair market value ("FMV") range of compensation payable by System to the Group under the oncology management arrangement described above. The Report will provide a summary of the management arrangement and will set forth a fair market value range based upon the specific facts and circumstances. The Report will describe the reference data and other factors contributing to HAI's determination of the FMV range.

Firm and System acknowledge that in connection with the Services, HAI is not anticipating the need to conduct onsite management interviews; however, HAI reserves the right to conduct on site interviews to the extent such interviews are, in HAI's opinion, necessary in order to arrive at HAI's opinion of value.

*System and Firm acknowledge that in no event will the Services provided by HAI be deemed to constitute legal advice or the rendering of legal services.*

## FEES

Although billing statements may be transmitted to Firm, System shall be solely and directly responsible for the payment of HAI's fees hereunder. The fees for the Services, *excluding* direct out-of-pocket expenses as discussed below, will be $23,000 (the "Professional Fees"), $11,000 of which will be payable to HAI upon execution of the Agreement. ***Firm and System understand and agree that HAI will not commence any Services until the initial retainer payment is received.*** Thereafter, HAI will submit one or more progress invoices to System generally reflecting the stage of completion of the Services as of each invoice date. The Professional Fees are based upon HAI's understanding of the scope of the Services as represented by Firm and/or System and as described above under "Description of Services." To the extent that the scope of the Services changes materially, HAI will contact Firm and System to determine what impact, if any, such material scope change has on the Professional Fees. In particular, the Professional Fees quoted above do not include any additional services requested by Firm or System that were not reasonably anticipated by HAI, including without limitation any requests requiring significant additional review and analysis after HAI has issued a substantially complete draft version of the Report, such as subsequent review of materially revised transaction terms. In addition, Firm and System understand that lengthy delays in providing information required by HAI to complete its analysis may result in an increase in fees.

Given the complexity of the transaction, HAI generally will not commence preparation of the written draft Report until receipt of a copy of the final transaction documents. Nevertheless, Firm and System understand and agree that the Professional Fees quoted above assume that HAI is only obligated to prepare a written draft Report based on its then current understanding of the terms of the arrangement at the time the written Report is requested by Firm. In the event the parties subsequently change the terms of their arrangement (regardless of whether the changes occur before or after the written draft Report is actually delivered to Firm), Firm and System understand and agree that ***additional fees will be required*** for any material modifications to the written draft Report that are required by the changes to the arrangement. Any such additional fees will be billed at HAI's hourly rates as described herein.

*Engagement Letter MLBHC 001*

Page 2 of 5

If unanticipated additional services of the type described above are requested by Firm or System after HAI issues a draft version of the Report, HAI will bill System on an hourly basis at HAI's then current hourly rates (which for calendar year 2011 are as follows: $460 per hour for Partners; $375 per hour for Directors; $325 per hour for Senior Associates; and $250 per hour for Analysts). In the event that Firm and/or System terminates the engagement prior to the completion of the Services, System agrees to pay HAI for time incurred up to the time of such termination notice at HAI's then current hourly rates.

In addition to the Professional Fees, System will reimburse reasonable out-of-pocket costs incurred by HAI in connection with the Services. HAI will bill System for such out-of-pocket expenses. For purposes of this Agreement, out-of-pocket costs shall include but not be limited to travel, conference call fees (e.g., AT&T fees), express mail delivery, photocopying, and any other expenses reasonably associated with the provision of the Services. HAI estimates that out-of-pocket expenses will not exceed $250. Out-of-pocket expenses in excess of $250 shall be subject to approval by System.

To protect HAI's independence, HAI reserves the right to withhold delivery of the final, signed report until all outstanding invoices have been paid. Balances outstanding after thirty (30) days will have a service charge added at the rate of 1.5 percent per month or part thereof. All costs relating to collection of these fees will also be the responsibility of System, including, but not limited to, attorney fees, collection agency fees, etc.

If HAI is requested or compelled to produce documents or testify with regard to the services rendered in this engagement, System shall reimburse HAI for all costs, including those for preparing written and oral responses, attorney fees, travel time, court or deposition time, meetings or hearings, and expenses incurred.

### REPORT DELIVERY DATE

HAI will provide a summary of its preliminary finding on or about ten business days after receipt of materially all data requested by HAI in connection with the Services. The written Report will follow on or about two (2) weeks thereafter.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

| "Firm" | "HAI" |
|---|---|
| **Jones Day**<br>325 John H. McConnell Blvd., #600<br>Columbus, OH 43216 | **HealthCare Appraisers, Inc.**<br>75 NW 1st Ave, Suite 201<br>Delray Beach, FL 33444 |

BY: _[signature]_

Print: Jeffrey L. Kopp
Title: Partner

BY: _[signature]_

Print: Scott Safriet
Title: Partner

*AGREED and ACCEPTED:*

"System"

**Methodist Le Bonheur Healthcare**
1211 Union Avenue
Memphis, TN 38104

BY: _[signature]_

Print: Chris McLean
Title: CFO

*Engagement Letter MLBHC 001*

Case 3:17-cv-00902  Document 257-6  Filed 08/23/22  Page 4 of 5 PageID #: 4089
Confidential                                                                                                      MLH_179143

EXHIBIT A to Professional Services Agreement
by and between HealthCare Appraisers, Inc. and
Firm dated 8/9/11

1. **COMMITMENT TO COOPERATE** – Firm and System acknowledge their intent to cooperate in good faith with HAI pursuant to achieving the successful completion of the Services. Firm and System will promptly provide HAI with the specific financial and technical information requested by HAI necessary to provide the Services. Firm and System agree to accept or return calls from HAI promptly; assist HAI to the extent reasonably necessary to coordinate completion of the Services; and respond on a timely basis to requests for discussions and information. If necessary, Firm and System will instruct their accountants or other outside consultants to cooperate with HAI.

2. **NATURE OF AGREEMENT** - Except as otherwise provided herein, nothing contained in this Agreement shall create any relationship of agency, partnership, employment or joint venture between HAI, Firm or System. HAI, Firm and System are independent contractors and no one party shall exercise control over the performance of another party hereunder. HAI does not provide legal advice and by providing the Services, including the issuance of any reports, makes no assurances whatsoever about System's compliance with any laws whatsoever.

3. **CONFIDENTIAL INFORMATION** - During HAI's engagement under this Agreement information regarding System will be shared with HAI (the "Confidential Information"). During the term of this Agreement and thereafter, HAI shall hold such Confidential Information in confidence and shall not, sell, transfer, publish, disclose, display or otherwise make available to any third party the Confidential Information or related materials without the express written consent of System.

4. **HAI LIABILITY** - HAI (or its officers, directors, employees, shareholders and agents) shall have no liability to Firm or System or their affiliates with respect to the Services other than its obligation to provide the Services and prepare and deliver the Report.

5. **GOVERNING LAW-VENUE** - The parties hereto stipulate that this Agreement shall be governed by the Laws of the State of Florida. All services performed pursuant to this Agreement will be deemed to have been performed in Palm Beach County, Florida and any disputes shall be adjudicated in a legal venue of competent jurisdiction in Palm Beach County, Florida

6. **REPORT** - The parties hereby acknowledge and agree that HAI is an independent appraiser, and that this appraisal is being performed by HAI for the exclusive use of Firm and System and the exclusive purpose set forth in the Description of Services section of this Agreement.

7. **REPRESENTATIONS AND WARRANTIES** – Each party represents and warrants that it is not an Excluded Provider For purposes of this Section, the term "Excluded Provider" means a person or entity that either (1) has been convicted of a crime related to health care, or (ii) is currently listed by a federal agency as debarred, excluded or otherwise ineligible for participation in federally funded programs (including without limitation federally-funded health care programs such as Medicare and Medicaid).

8. **HIPAA REQUIREMENTS** – Each party agrees to comply with the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. § 1320d ("HIPAA") and any current and future regulations promulgated thereunder including without limitation the federal privacy regulations contained in 45 C.F.R. Parts 160 and 164 (the "Federal Privacy Regulations"), the federal security standards contained in 45 C.F.R. Part 142 (the "Federal Security Regulations"), and the federal standards for electronic transactions contained in 45 C.F.R. Parts 160 and 162, all collectively referred to herein as "HIPAA Requirements." HAI agrees not to use or further disclose any Protected Health Information (as defined in Federal Privacy Regulations) or Individually Identifiable Health Information (as defined in 42 U.S.C. Section 1320d), other than as permitted by HIPAA Requirements and the terms of this Agreement. Each party will make its internal practices, books, and records relating to the use and disclosure of Protected Health Information available to the Secretary of Health and Human Services to the extent required for determining compliance with the Federal Privacy Regulations. Unless specifically requested by HAI and reasonably necessary in the performance of the Services hereunder, Firm and System agree not to provide Individually Identifiable Health Information to HAI. If such information is provided, HAI will enter into a HIPAA-compliant subcontractor agreement with Firm.

9. **GENERAL TERMS** - This Agreement supersedes all prior agreements, either oral or written, and sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and cannot be changed, modified or terminated except upon written amendment executed by a duly authorized officer of each party. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument. If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provisions or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction. The terms of this Agreement, including those set forth in Paragraphs 2, 3, 4, 5, 6. 7, 8 and 9 of this Exhibit A, shall survive the expiration or termination of this Agreement, regardless of the reason for expiration or termination. All official notices required hereunder by any party to this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, to the official address listed below the signatures of the parties to this Agreement. This Agreement shall be binding on the parties, their successors and assigns. This Agreement may not be voluntarily assigned, in whole or in part by any party, without the prior written consent of the other party or parties. HAI is an equal opportunity employer. HAI will not provide any service: (a) that discriminates on the basis of age, race, marital status, disability, color, sex, religion or national origin; or (b) that is in violation of any federal or state anti-discrimination law. The captions appearing in this Agreement are intended only as a matter of convenience and for reference and in no way define, limit or describe the scope and intent of this Agreement or any of the provisions hereof. The forbearance or neglect by any party to insist upon the performance of this Agreement, or any part thereof, shall not constitute a waiver of any rights or privileges.

*Engagement Letter MLBHC 001*

Case 3:17-cv-00902 Document 257-6 Filed 08/23/22 Page 5 of 5 PageID #: 4090

Confidential MLH_179144