*Privileged Attorney-Client Communication*
*Attorney Work Product*

*Draft - For discussion purposes only.*



# Methodist Le Bonheur Healthcare

## Analysis of Management Arrangement:

## Oncology Services

Prepared by:
HealthCare Appraisers, Inc.
75 NW 1st Avenue, Suite 201
Delray Beach, FL 33444
(561) 330-3488

February 2012



EXHIBIT
19  7-18-22
Moun ce

Confidential

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

## Table of Contents

Overview and Summary Opinion...................................................................... 2

Definitions................................................................................................. 6

Description of Agreement and Background/Market Information ............................ 7

Governing Assumptions and/or Reliance on Client Representations ...................... 19

Analysis.................................................................................................... 21

Conclusion ................................................................................................ 35

Appraiser's Certification............................................................................... 36

<u>Exhibits</u>

**Exhibit A – The Management Services**
**Exhibit B – Selected Codes Subject to the Management Services**
**Exhibit C – Performance Improvement Initiatives**
**Exhibit D – The Joint Commission Principles for the Construct of Pay-for-**
           **Performance Programs**
**Exhibit E – The Scoring Algorithm**

*Valuation Report MLBHC001*

Confidential

MLH_027863

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

## Analysis of Management Arrangement:
## Oncology Services (the "Agreement")

### Overview and Summary Opinion

| | |
|---|---|
| **Prepared For:** (Engaging Entity) | Jones Day ("Client") on behalf of its clients (i) Methodist Le Bonheur Healthcare (the "Health System")[1] and Methodist Healthcare-Memphis Hospitals ("Hospitals" and each individually "Hospital")[2] |
| **Project Contacts:** | • Tom Dutton, Partner, Jones Day <br> • Jeff Kapp, Partner, Jones Day <br> • Eric Mounce, CEO, West Clinic, PC[3] <br> • Jeff Lockridge, PricewaterhouseCoopers (the "Consultant")[4] |
| **Intended Users of Report:** | (i)  Client; <br> (ii)  The Health System; <br> (iii)  Hospitals; and <br> (iv)  As required, Federal and State regulatory agencies. |
| **Prepared By:** (Appraisal Firm) | **HealthCare Appraisers, Inc.** ("HAI," "our" or "we") <br> 75 N.W. 1st Ave., Suite 201 <br> Delray Beach, FL 33444 <br> Telephone: (561) 330-3488   Facsimile: (561) 330-3266 <br> www.healthcareappraisers.com |

---

[1] The Health System is a health care delivery system organized for the primary purpose of supporting and extending the health and welfare ministries of the Memphis, Arkansas and Mississippi Annual Conferences of The United Methodist Church and is the sole member of Methodist Healthcare-Memphis Hospitals ("Hospitals").

[2] Hospitals own and operate four acute care hospitals in the Memphis area, including Methodist University, Methodist South Hospital, Methodist North Hospital, Methodist Le Bonheur Germantown (collectively "Hospitals") and, although a part of Methodist Healthcare-Memphis Hospital, Le Bonheur Children's Hospital, a pediatric acute care hospital facility, is not included as a part of the Agreement.  In addition, Fayette Hospital, a Tennessee nonprofit corporation, and Methodist Extended Care Hospital, a Tennessee nonprofit corporation, are also part of the Health System's healthcare delivery system.  Hospitals also include several provider-based clinic locations, including at 100 Humphreys Blvd., Memphis, Tennessee, 1588 Union Avenue, Memphis Tennessee, 7668 South Airways Blvd., Southaven, Mississippi, 240 Grandview Drive, Brighton, Tennessee, and 1500 West Poplar Avenue, Suite #304, Collierville, Tennessee (the "Cancer Center Sites").

[3] At Client's request, some of the data required for the analysis described herein was provided by West Clinic.

[4] At Client's direction, some of the data gathering process was coordinated through Health System's Consultant.

*Valuation Report MLBHC001*

Confidential

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 3 of 81 PageID #: 4093

MLH_027864

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

| | |
|---|---|
| **Signatory/Lead Appraiser:** | Scott M. Safriet, MBA, AVA, Partner |
| **Contributing Appraisers:** | Ann S. Brandt, PhD, Partner |
| **Valuation Date:** | February [21], 2012 |
| **Expiration Date of Valuation:** | We believe that this FMV analysis can be relied upon through February 28, 2014 |
| **Valuation Assignment:** | Arrangement with West Clinic, PC (the "Manager"), to provide management services related to the Health System's inpatient and outpatient oncology programs (the "Service Line"). |
| **Purpose of Valuation:** | The purpose of this report is (i) to determine whether the Agreement is commercially reasonable; and (ii) to establish the range of values that constitutes fair market value ("FMV"), as defined below, for the Agreement. |
| **Definition of Value:** | FMV as defined by the International Glossary of Business Valuation Terms, subject to limitation by current healthcare regulations, as described further herein. |
| **Definition of Commercial Reasonableness:** | Definition provided by the Stark regulations found at 69 Fed. Reg. 16093 (2004). |
| **Parties to the Arrangement:** | (i)  The Health System;[5] and<br>(ii)  The Manager<br><br>For purposes of this analysis, the Health System, Hospitals and the Manager may be referred to collectively as the "Parties." |
| **Key Terms of Subject Agreement or Arrangement:** | The Health System and the Manager propose to enter into an *exclusive* arrangement under which the Manager will provide certain management services (the "Management Services") including operations oversight, evaluation, education, physician liaison, and performance improvement services to the health System's Service Line. |
| **Opinion of Commercial Reasonableness:** | Based upon the analysis described herein, **HAI determined that the Agreement is commercially reasonable.** |
| **FMV Opinion:** | Based upon the analysis described herein, **HAI determined that the FMV of the Management Fee (*i.e.*, the Base Management Fee _and_ the Incentive Management Fee as defined herein)** |

[5] On behalf of Methodist Hospitals and the Cancer Center Sites.

*Valuation Report MLBHC001*

Confidential

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 4 of 81 PageID #: 4094

MLH_027865


|  | ranges from $2,316,000 to $3,255,000 per year. Furthermore, we believe that the Base Management Fee should generally be no higher than 60% of the Management Fee. |
|---|---|
| **Results of Market Approach:** | A market approach yielded a range of $4,362,000 to $6,107,000 per year. |
| **Results of Income Approach:** | Considered but not performed, as discussed in the *Selection of Valuation Approach* section below. |
| **Results of Cost / Build-Up Approach:** | A cost approach yielded a range of $1,292,000 to $1,829,000 per year. |
| **Basis for FMV Opinion:** | Our FMV opinion is based on a blending of the Cost and Market Approaches, as described further herein. |
| **Basis for Commercial Reasonableness Opinion:** | Our commercial reasonableness opinion is based on HAI's determination that the business purpose of the transaction is consistent with the regulatory definition of "commercially reasonable," as detailed further herein, and based on:<br><br>(i)     Observations of similar arrangements in the marketplace; and<br><br>(ii)    HAI's independent and informed judgment with respect to this particular arrangement. |
| **Specific Limiting Conditions and/or Opinion Qualifications:** | • While it is assumed that the Agreement will be evidenced by a written agreement between the Parties, only a draft version of the agreement was available, and HAI reviewed this document in connection with the analysis herein. Necessarily, this report reflects only such terms and provisions as disclosed therein and described to HAI by Client, the Health System, Hospitals, the Manager and the Consultant.<br>• In connection with our analysis herein, HAI considered that no additional relevant information could be gleaned through a site visit. Accordingly, no such site visit was conducted. |
| **General Limiting Conditions and/or Opinion Qualifications:** | • This report sets forth a *range* of FMV, and we assume that the Health System will exercise reasonable operational diligence in selecting the appropriate compensation value from within (or below) the FMV range for inclusion in the Agreement.<br>• This report does not consider events or transactions occurring after the date hereof. HAI has no obligation to update the report unless specifically engaged by Client, the Health System or Hospitals to do so.<br>• *No aspect of this report should be construed as providing any* |

*Valuation Report MLBHC001*

Confidential

MLH_027866


|  |  | *legal interpretation, advice or conclusions with respect to the Agreement.* HAI assumes that the arrangement described herein is in full compliance with all applicable federal, state, and local regulations and laws unless the lack of compliance is stated, defined, and considered in the report; provided, however, that HAI acknowledges that the Health System has engaged HAI to provide an independent third party appraisal of the compensation paid under the Agreement to support financial and operational planning and to comply with law. |
|  |  | • The analysis contained in this report applies only to the arrangement described herein and does not take into consideration any other arrangements or relationships Hospitals or the Health System may have with the Manager or its physicians.[6] |
|  |  | • Our report is based on historical and prospective financial and operational information provided to us by the Health System and/or other third parties. Had we audited or reviewed the underlying data, matters may have come to our attention which would have resulted in our using amounts which differ from those provided. Accordingly, we take no responsibility for the underlying data presented or relied upon in this report. |

---

[6] HAI was informed by Client that in addition to the Agreement described herein, there are other arrangements, including possible employment arrangements with the Manager's physician group. HAI was not provided with any information about these other arrangements and necessarily, did not consider any aspect of such possible arrangements within the scope of the FMV analysis herein.

*Valuation Report MLBHC001*

Confidential



*Draft - For discussion purposes only.*

## Definitions

The term "fair market value" is generally defined as the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[7]

For purposes of this valuation, the general definition must be limited to comport with current healthcare regulations, which may significantly modify its applicability. Therefore, as used herein, the term "fair market value" is defined as the value in arm's-length transactions, consistent with the general market value. In the context of the Agreement, "general market value" means the compensation that would be included in a service agreement as the result of *bona fide* bargaining between well informed parties to the agreement who are not otherwise in a position to generate business for the other party.[8]

As used herein, the term "commercially reasonable" is defined as an arrangement that would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician of similar scope and specialty, even if there were no potential business referrals between the parties.[9]

---

[7] International Glossary of Business Valuation Terms
[8] 42 CFR §411.351 (as set forth by the Centers for Medicare and Medicaid Services or "CMS" with respect to physicians' referrals to health care entities with which they have financial relationships). Furthermore, this definition is consistent with similar fair market value guidance related to the Anti-Kickback Statute (42 U.S.C. §1320a-7b) and with the definition relied upon by the Internal Revenue Services. See, for example, "OIG Supplemental Compliance Program Guidance for Hospitals" at *70 F.R. 4866 (January 31, 2005)*, and see Treas. Reg. 53.4958 et seq.
[9] This definition is based on guidance provided by CMS in the preamble to the Stark II Phase II regulations at *69 F.R. 16093 (March 26, 2004)*, and is consistent with guidance provided in the "OIG Supplement Compliance Program Guidance for Hospitals" at *70 F.R. 4866 (January 31, 2005)*.

*Valuation Report MLBHC001*

Confidential

MLH_027868



*Draft - For discussion purposes only.*

**Description of Agreement and Background/Market Information**

Methodist Le Bonheur Healthcare (*e.g.,* the Health System), is a 1,700-bed faith-based healthcare system located in western Tennessee. The Health System owns and operates seven hospitals (*e.g.,* Hospitals), a broad range of outpatient centers and clinics, multiple home health agencies, and a growing network of physician practices. Hospitals include (i) Methodist University Hospital, a 661-bed comprehensive acute care hospital, located in Memphis, that serves as the major academic campus for the University of Tennessee Health Science Center; (ii) Methodist South Hospital, a 156-bed acute care hospital serving south Memphis and north Mississippi; (iii) Methodist North Hospital, a 246-bed acute care hospital serving residents of Raleigh-Bartlett, Frayser, Millington and Tipton Counties; (iv) Methodist Le Bonheur Germantown Hospital, a 309-bed acute care hospital located in Germantown; (v) Methodist Fayette Hospital, a 46-bed community hospital serving the residents of Somerville; (vi) Methodist Extended Care Hospital, a 36-bed acute care hospital that focuses on the treatment of long term patients,[10] located within Methodist University Hospital; and (vii) Le Bonheur Children's Hospital, a 255-bed comprehensive pediatric medical center located in Memphis.[11] Furthermore, the Health System and its Hospitals, include several provider-based clinic locations, including (i) Collierville; (ii) Desoto; (iii) Humphries; (iv) Midtown; and (v) Brighton (*i.e.,* the Cancer Center Sites), that together with the Health System provide a wide range of inpatient, outpatient and clinic oncology services (*i.e.,* the Service Line).

In partnership with its medical staffs, the Health System's mission is to collaborate with patients and their families and to be the leader in providing high quality, cost-effective patient and family-centered care, in a manner which supports the health ministries and Social Principles of The United Methodist Church, to the benefit of the communities served.

The Health System is affiliated with the University of Tennessee, the University of Memphis, Health Choice, the Medical Education and Research Institute and the Memphis Bioworks Foundation. It is one of the largest hospital systems in the country and has been named as one of the 2009 Top 100 Integrated Healthcare Networks by SDI.[12]

---

[10] Patients that are medically stable but require intense, regular medical attention.

[11] Although a part of the Health System, Le Bonheur Children's Hospital *is not* included as a part of the arrangement described herein.

[12] SDI is a healthcare analytics organization that provides innovative services that help the healthcare industry solve a wide range of business challenges through the measurement of all aspects of the healthcare system and industry performance.

*Valuation Report MLBHC001*

Confidential    Case 3:17-cv-00902    Document 257-7    Filed 08/23/22    Page 8 of 81 PageID #: 4098    MLH_027869



*Draft - For discussion purposes only.*

Notwithstanding the above listed accomplishments, the Health System and its physicians agree that opportunities exist for improvement in the overall quality, efficiency and effectiveness of the Service Line. Additionally, the Health System and the physicians agree that the realization of these objectives will require a significant commitment on the part of the involved physicians.

## Management Services

As a means of achieving desired operational and quality improvements in the provision of the Service Line services, the Health System and Hospitals desire to engage the services of the Manager to provide management and performance improvement services for and on behalf of its Hospitals, Cancer Center Sites and such other off-campus oncology care sites as may in the future be operated under the license of or managed by any of Hospitals with respect to the Service Line.

Upon its formation, the Manager will enter into an *exclusive*[13] management arrangement with the Health System and Hospitals under which it will provide management and performance improvement services for and on behalf of the Health System and Hospitals with respect to the Service Line. According to the Health System and as outlined in the Agreement, the Manager will operate the Service Line in furtherance of the Health System's mission to collaborate with patients and their families to be the leader in providing high quality, cost-effective patient- and family-centered care. The Manager will provide senior level management, day-to-day oversight and performance improvement services to the Service Line.[14] Furthermore, the Manager will provide advice to the health System and Hospitals regarding the utilization, training and clinical expertise of non-physician clinical personnel working in support of patient services within the Service Line, so as to improve the efficiency of services and enhance the delivery of patient care.[15] **Exhibit A** outlines the duties and responsibilities (*i.e.*, the Management Services) of the Manager. The Manager will focus its Management Services on selected DRGs, diagnosis codes and procedure codes identified in **Exhibit B.**

The initial term of the Agreement commenced on January 1, 2012 (the "Effective Date"). With respect to the managed locations that are located on property that has been financed

---

[13] The arrangement is intended to be *exclusive* such that the Manager will provide management services exclusively to the Health System and Hospitals unless otherwise approved in writing by the Health System, and the Health System and Hospitals will exclusively retain the Manager to provide management services.

[14] According to the Agreement, the Service Line will include the following: inpatient, outpatient, and clinic services at the Managed Sites, including hospitalist services for oncology inpatients.

[15] We note that under the Agreement, the Manager's physicians will not be compensated for any clinical services provided, as the Agreement solely relates to the provision of administrative and managerial services.

*Valuation Report MLBHC001*

Confidential

MLH_027870



*Draft - For discussion purposes only.*

or refinanced with proceeds from bonds, the interest of which is exempt from tax pursuant to Section 103 of the Code ("Bond-Financed Locations"), the initial term of the Agreement will continue through December 31, 2016. With respect to the managed locations that are not located on Bond-Financed Locations, the initial term of the Agreement will continue through December 31, 2018. Notwithstanding the foregoing, the Health System will have the right to terminate the Agreement with respect to the managed locations that are located on Bond-Financed Locations, without cause or penalty, effective as of December 31, 2014 upon sixty (60) days' prior written notice to Manager. It is anticipated that the Agreement will be renewed by a written agreement of the Parties prior to the end of the initial term and each successive term. Notwithstanding the ultimate term of the Agreement, the analysis herein is only valid for a two-year period.

The Parties intend that the service location within each Cancer Center Site, where technical services are provided, will at all times be operated as an outpatient department of the Health System and Hospitals. Accordingly, the Health System and Hospitals will have the authority to take such actions as are reasonably necessary to operate each Cancer Center Site as an integral and subordinate part of the Health System and Hospitals under their licensure and governance. Unless and until the Health System and Hospitals otherwise direct, the professional services provided at the Cancer Center Sites will be provided and billed as a hospital clinic site and not provided or billed as a provider-based location of the Health System or Hospitals. Professional services to patients of each Hospital will be rendered only by individuals who are members of that Hospital's medical staff whose privileges permit them to practice medicine in the appropriate specialty. All individuals who render professional services at a Health System Hospital will be instructed by the Manager to do so in accordance with and pursuant to the requirements of the applicable Hospital's policies, rules and regulations, the medical staffs' bylaws and governing documents, and in accordance with the requirements of all licensing and accrediting bodies and any bodies involved in the programs in which Hospitals participate.

The Manager will be compensated for the Management Services via a base management fee (the "Base Management Fee"), with the potential to earn incentive compensation (the "Incentive Management Fee"), and together with the Base Management Fee, the "Management Fee")[16] based upon the achievement of pre-defined objective measurement criteria (the "Performance Improvement Initiatives") as detailed in **Exhibit C**.

---

[16] It is the Parties' understanding and belief that the amount to be paid as compensation under the Agreement constitutes "Reasonable Compensation" within the meaning of Section 162 of the Internal Revenue Code of 1986, as amended (the "Code"). The Manager acknowledges that the Health System and each Hospital is required to operate in a manner consistent with that of an organization described in Section 501(c)(3) of the Code and as such is prohibited from paying for the services that the Manager provides more than Reasonable Compensation under Section 162 of

Confidential    Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 10 of 81 PageID #: 4100   MLH_027871



The Health System and Hospitals have agreed to pay the Manager a Base Management Fee of $1,953,000 per year. The Base Management Fee will be paid in twelve (12) equal monthly installments by the 15th business day of each month commencing in January, 2012 and continuing on the 15th business day of each succeeding month through the end of the term of the Agreement. Furthermore, the *maximum* aggregate amount of the Incentive Management Fee "eligible to be earned" by the Management Company during the first term year of the Agreement will be $1,302,000.

As an aspect of the Management Services, the Manager will endeavor to make certain focused quality, operational and new program development improvements with respect to the Health System's Service Line. The specific performance targets will include the following:

(a) **Quality of Service Initiatives** – The Manager will be entitled to earn quality of service incentive compensation ("QSIC") if the Manager manages the Service Line in a manner which meets or exceeds certain quality of service benchmarks. Said performance benchmarks are the following:

    (1) Multidisciplinary / Multimodality Planning and Collaboration;

    (2) Outpatient Care Plan Compliance;

    (3) Improvement / Maintenance of QOPI Measurements;

- Staging documented within one (1) month of first office visit;
- Chemotherapy treatment summary process completed within three (3) months of chemotherapy end; and
- Appropriate documentation prior to administration of ESAs.

    (4) Screening for Clinical Research Eligibility.

---

the Code. The Parties intend that the payment of compensation under the Agreement will be consistent with the tax-exempt purposes of the Health System and each Hospital under Section 501(c)(3) of the Code, and the Manager agrees that in no event will the Health System pay more than amounts that are considered Reasonable Compensation under Section 162 of the Code. In the event of a change or clarification of the relevant provisions of the Code that, in the legal opinion of nationally recognized counsel, makes the amount of compensation to be paid under this Agreement not Reasonable Compensation under the Code, the Parties agree to modify the terms of the Agreement in order to comply with such changes.

*Valuation Report MLBHC001*

Confidential

MLH_027872



*Draft - For discussion purposes only.*

(b) **Operational Efficiency Initiatives** – The Manager will be entitled to earn operational efficiency incentive compensation ("OEIC") if the Manager manages the Service Line in a manner which meets or exceeds certain operational efficiency benchmarks. Said operational efficiency benchmarks are the following:

    (1) Integration of Services Across All Sites of Care—Outpatient Oncology Services; and

    (2) Timely Communication with Referring Physicians.

(c) **New Program Development Initiatives** – The Manager will be entitled to earn new program development incentive compensation ("NPDIC") if the Manager manages the Service Line in a manner which meets or exceeds certain new program development benchmarks. Said new program development benchmarks are the following:

    (1) Concierge / Patient Navigator Program Planning; and

    (2) Joint Commission / Provider-Based Outpatient Services Requirements.

The Performance Improvement Initiatives and their associated compensation will be reviewed on an annual basis. Changes to the Performance Improvement Initiatives will be adopted and compensation adjustments made, if any, based on the mutual written agreement of the Manager and the Health System. Any such new Performance Improvement Initiatives will be memorialized in an amendment to the Agreement executed by the Parties. Development of and payment for the Performance Improvement Initiatives are subject to the following conditions:

(a) The Manager (and its affiliated physicians) will not, as a result of the Incentive Management Fee, withhold, limit or reduce items or services that would otherwise be provided to any Service Line patient, or otherwise stint in the provision of care to any Service Line patient;

(b) The Manager (and its affiliated physicians) will not, as a result of the Incentive Management Fee, refer, direct or steer any Service Line patient to a different site of service (or unit of a Hospital) than the Manager (and its affiliated physicians) would otherwise have used in the absence of the Incentive Management Fee;

(c) The Manager (and its affiliated physicians) will not, as a result of the Incentive Management Fee, "cherry-pick" Service Line patients to be treated in the

*Valuation Report MLBHC001*

Confidential

MLH_027873



*Draft - For discussion purposes only.*

> Service Line based on their favorable health condition (and anticipated cost of their care), insurance status, or ability to pay;

(d) The Manager (and its affiliates) will not, as a result of the Incentive Management Fee, increase Service Line patient referrals to any Hospital or Cancer Center Site, or the use of items or services covered by any governmental or commercial health care payment plan or program than would otherwise have been the case in the absence of the Incentive Management Fee; and

(e) The Manager (and its affiliates) will not, as a result of the Incentive Management Fee, discharge or transfer any Service Line patient sooner than would otherwise have been the case in the absence of the Incentive Management Fee.

The Manager, the Health System and Hospitals acknowledge and agree that it is not their intention to limit or reduce items or services to patients. Instead, the intention is to improve the quality and efficiency of the Service Line services provided to the Health System's patients.

In conjunction with the Health System and Hospitals, the Manager will establish an operating committee (the "Operating Committee"). The Operating Committee will be responsible for *directing* and *overseeing* the performance of the Manager's duties under the Agreement. Furthermore, the Operating Committee will function as the forum for collaboration between the Manager, the Health System and Hospitals in the operation and improvement of the Service Line.[17]

The Operating Committee will consist of seven members. Four members of the Operating Committee will be physicians affiliated with the Manager who are appointed by the Manager and who provide management services to the Service Line. Three members of the Operating Committee will be appointed by the Health System. The Parties may increase the size of the Operating Committee by mutual agreement. Notwithstanding, if the Health System wishes to assign Operating Committee functions to physicians who are not affiliated with Manager,[18] separate operating committees will be established. If two Operating Committees are created, all of the physician members of the Operating Committee for the Cancer Center Sites and "first opportunity sites"[19] will

---

[17] However, it should be clear that the Operating Committee and its participants function *solely* in an oversight capacity, and will not perform (nor be responsible for) any of the Management Services that are the responsibility of the Manager.

[18] So that those physicians can perform such functions at locations other than the Cancer Center Sites pursuant to other agreements the Health System may have with the physicians.

[19] According to the Agreement, the physician practice has exercised a right of first opportunity pursuant to Section 10 of the Professional Services Agreement. HAI was not provided a copy of

Page 12

Confidential

MLH_027874



*Draft - For discussion purposes only.*

be affiliated with Manager and the Agreement will be amended to account for two Operating Committees (*e.g.,* each Operating Committee will meet and function separately). The act of (i) a majority of the Manager representatives; and (ii) a majority of the Health System members on the Operating Committee present at a meeting at which a quorum exists will be the act of the Operating Committee.

**The Manager**

The Manager, which is solely owned by physicians and under ultimate oversight of the Health System and Hospitals, will be responsible for coordinating the overall management and performance improvement of the Service Line at Hospitals, the Cancer Center Sites, and such other off-campus oncology care sites as may in the future be operated under the license of or managed by the Health System or any Hospital for which the Manager provides professional services (collectively the "Managed Sites"). To the extent applicable, the Manager will operate in a manner consistent with the terms and conditions of the Agreement and all applicable federal, state laws, and local statutes, rules, and regulations.

The Manager will perform Management Services in accordance with: (i) the applicable Hospital and medical staff bylaws, and governing documents; (ii) directives of the Health System's Board of Directors, the Operating Committee and the Service Line Administrator (the "Administrator"),[20] and (iii) the approved budget of applicable Hospital. The Operating Committee will annually review the performance and consider the retention of the Administrator. The removal of the Administrator will be subject to the approval of the Operating Committee. The appointment of any subsequent Administrator will be made following the recommendation of the Manager, and will be subject to the approval of the Operating Committee. The initial Administrator will be Erich Mounce.

Furthermore, the Manager's authority will be subject to the overall direction and reserve powers of the Hospitals' Board of Directors, and the chief executive officer of the Manager will report to the chief executive officer of the Health System or his/her designees. The Manager's medical directors will report to the chief medical officer of the Health System or other officer designated by the Health System's Chief Executive Officer.

---

this Professional Services Agreement, and it is only reference in this report in terms of the scope of the Operating Agreement functions.

[20] The initial Administrator will be Erich Mounce. Our analysis assumes, that (i) the Administrator will be paid as an expense from the Base Management Fee; and (ii) the Administrator will be compensated at a rate as deemed to be *consistent with* FMV.

*Valuation Report MLBHC001*

Confidential

MLH_027875



*Draft - For discussion purposes only.*

Within the first year of its engagement, the Manager will develop and implement detailed work plans (the "Work Plans") for each performance improvement standard identified in **Exhibit C**, as well as for the delivery of the general Management Services identified in **Exhibit A**. According to the Agreement, each of the Work Plans will, *at a minimum*, include the following:

(a)   The methodology to be used to attain the performance improvement, including any staff training and/or educational components required for the methodology;

(b)   The measurement tool to be utilized;

(c)   The physicians and staff to be targeted/involved in effecting the performance improvement;

(d)   The individual or committee responsible for the performance improvement;

(e)   The documentation to be generated and/or collected; and

(f)   The mechanism to monitor and coordinate physician resources within the Service Line to ensure patient safety and operational efficiency in pursuit of the performance standard.

The Manager will assist the Operating Committee in periodically reviewing the effectiveness of the Work Plans on the Service Line and recommend to the health System any changes which need to be made to such Work Plans. All Work Plans, and any changes thereto, will be submitted to the Operating Committee for its approval and then to the Health System for its approval.

The Manager will have the responsibility of determining what medical directors are necessary to improve the quality, efficiency, and effectiveness of the Service Line and what qualified physicians will serve in such medical director positions. The Service Line medical directors will at all times be physicians employed by the Manager, and the Manager will determine whether and to what extent to compensate each medical director.[21] The Manager will compensate the medical directors as an expense from the Base Management Fee, and only on the basis of the services they perform, including the

---

[21] Provided that any such compensation will be paid as an expense from the Base Management Fee, and consistent with fair market value without taking into consideration the volume or value of referrals or other business the medical directors may generate for the Health System, its affiliates or Hospitals.

*Valuation Report MLBHC001*

Confidential

MLH_027876



tasks and responsibilities undertaken.[22]  The Parties agree that the initial medical director positions will be:

- Medical Director of the Adult Oncology Service Line – The Manager will engage the services of a qualified physician associated with the Manager and acceptable to the Health System to serve as the Medical Director of the Service Line; and

- Assistant Medical Director of the Adult Oncology Service Line - The Manager will engage the services of a qualified physician associated with the Manager and acceptable to the Health System to serve as the Assistant Medical Director of the Service Line.

The Manager will assist the applicable Hospital in overseeing and managing all Service Line clinical staff other than physicians, nurse practitioners and physician assistants employed by Manager, who provide services in connection with the Service Line (the "Service Line Employees") and assist the Health System and each Hospital in its recruitment, hiring, termination, discipline, reprimand, and establishment of terms of employment for Service Line Employees.  The Manager's authority with respect to the Service Line Employees[23] will include (i) assisting the Health System and Hospitals in defining the scope of job duties and responsibilities and (ii) advising the Health System and Hospitals regarding all decisions concerning the hiring, firing, promotion and compensation of the Service Line Employees; and (iii) advising the Operating Committee on issues concerning open positions, employee turnover and new hires.  The Manager's authority will be subject to the overall authority and direction of the Board of Directors of Hospitals. The CEO of the Manager will report to the CEO of the Health System or his/her designees.  As of the Effective Date, the Parties agree that the initial Service Line Employees will consist of the following positions:

(a)  Oncology personnel involved with the Service Line;

(b)  Nursing staff involved with the Service Line;

(c)  Hospitalists involved in the Service Line; and

(d)  Other clinical staff involved with the Service Line.

---

[22] This documentation will be maintained by the Manager and made available to the Health System and its Hospitals upon request.  HAI was not requested to provide a separate FMV opinion with regard to these medical director positions.

[23] Such authority is subject to the Health System or the applicable Hospital's human resource policies and procedures, the parameters of the approved operating budget of the applicable Hospital.

*Valuation Report MLBHC001*

Confidential    Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 16 of 81 PageID #: 4106   MLH_027877


Within the parameters of the approved budgets, the Manager will establish, implement and monitor staffing by the Service Line Employees and establish scheduling protocols for the Service Line. Any recommendations for Service Line Employee corrective action for staff will be referred to the Administrator or the chief executive officer of the Health System (or his/her designee) for action in accordance with the applicable Hospital's human resource policies and/or the terms of the Leased Employee and Administrative Services Agreement between the Parties.[24] Any adjustments made in the scope of the initial staffing will be based on the mutual written agreement of the Manager, the Health System and Hospitals.

**Health System and Hospitals**

As the sole owner of the Service Line, the Health System and Hospitals delegate to the Manager that authority necessary (i) to effectively deliver the required Management Services; (ii) to make certain focused operational and quality improvements with respect to the Oncology Service Line; and (iii) to attain the performance improvement goals set forth in the Agreement. However, the Manager's authority will be subject to the overall direction and reserve powers of the Boards of Directors of the Health System and Hospitals, and the Manager's CEO will report to the CEO of the Health System or his/her designees. To the extent there is any dispute as to the extent of Hospitals' authority, such dispute will be finally settled by the CEO of the Health System after consultation with the Medical Director of the Oncology Service Line.

The Parties intend that the location within each Cancer Center Site where technical services are provided will at all times be operated as, and will be considered to be, an outpatient department of Hospitals. Accordingly, Hospitals will have the authority to take, and may take, such actions as are reasonably necessary to operate each facility as an integral and subordinate part of Hospitals under their licensure and governance. Unless and until Hospitals otherwise direct, the professional services provided at Cancer Center Sites will be provided and billed as a hospital clinic site and not provided or billed as a provider-based location of Hospitals. Professional services to patients of each Hospital will be rendered only by individuals who are members of a Hospital's Medical Staff whose privileges granted to them by the applicable Hospital permits them to practice medicine in the appropriate specialty. All individuals who render professional services at a Hospital will be instructed by the Manager to do so in accordance with and pursuant to the requirements of the applicable Hospital's policies, rules and regulations, the Medical Staffs' bylaws and governing documents, and in accordance with the requirements of all

---

[24] HAI was not provided with information regarding the Leased Employee and Administrative Services Agreement, and therefore, did not consider it within the framework of the analysis described herein.

*Valuation Report MLBHC001*



*Draft - For discussion purposes only.*

licensing and accrediting bodies and any bodies involved in the programs in which Hospitals participate.

In carrying out its obligations under the Agreement, the Manager recognizes that there are certain decisions that shall be made only by or with the approval of Hospitals or as applicable, the Health System. Except as otherwise provided herein, the Manager will be responsible for the implementation of the decisions of Hospitals and/or the Health System and for conducting those activities set forth in the Agreement. No act will be taken, sum expended, or obligation incurred by the Manager on behalf of Hospitals and/or the Health System with respect to a matter within the scope of any of the following decisions ("Major Decisions") affecting the Service Line, unless such decisions have been approved by Hospitals and/or the Health System. Such decisions include the following:

(a) Change in the licensure of any of the Service Line.

(b) Adoption of the annual operating and capital budgets and any material changes to such budgets.

(c) Material changes in the scope of the Service Line.

(d) Adoption of Hospitals' charges for the Service Line.

(e) Negotiation, execution and implementation of managed care contracts pertaining to the Service Line.

(f) Transactions involving the Manager and any related and affiliated parties.

(g) Adoption of or approval of material changes to credentialing policies or protocols.

(h) Adoption of or approval of material changes to Hospitals' and/or the Health System's quality assurance plan as applied to the Service Line.

(i) Marketing and promotion of the Service Line, or use of Hospitals' or the Health System's name in the promotion of the Manager's activities.

(j) Paying bonuses or other incentives to Hospitals' employees in connection with such employees' contributions to the objectives set forth in the Agreement.

(k) Adoption of specific performance goals and standards other than those set forth in **Exhibit C.**

*Valuation Report MLBHC001*

Confidential

MLH_027879

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

The Manager will assist the Health System and Hospitals and, as applicable, their affiliates, by providing advice and/or recommendations regarding the employment, hiring, appointment and/or termination of the administrative, managerial, and clinical staff for the Service Line. One or more of such individuals will serve in a liaison capacity to the Manager as designated by Hospitals with the approval of the Manager. Such individuals will be employees of a Hospital and will be compensated thereby. As of the Effective Date, such liaison positions will include the chief executive officer of the Health System and designees thereof. The Manager will have input to the annual evaluations of these individuals utilizing such forms as Hospital uses for other management personnel. Hospitals will have the exclusive authority to hire, discharge, and establish terms of employment for all of its employees who work in the Service Line; provided that reasonable recommendations of Manager with respect to such employment matters will not be unreasonably disapproved by the Health System or Hospitals.

Hospital-specific duties with respect to employees will include, but not be limited to: (i) ultimate responsibility for all human resource issues, including scope of job duties and responsibilities for its employees; (ii) ultimate responsibility for hiring, firing and promotion of its employees; (iii) maintaining all payroll functions, including establishing and administering all employee benefit plans for its employees; and (iv) determining wages and terms and conditions of employment for its employees.

Furthermore, the applicable Hospital will appoint physicians who are actively involved in the Manager's operations to the "Physician Integration Task Force" and such other hospital-based committees as agreed upon by the Hospitals and the Manager.

The Manager recognizes that the Health System and Hospitals will at all times exercise control over the assets and operation of the Service Line, and the Manager will perform the functions described in the Agreement in accordance with the governing documents of the Hospitals, their respective mission, philosophy, policies and procedures and their medical staff bylaws and governing documents. By entering into the Agreement, the Hospitals delegate to the Manager that authority necessary to provide the required Management Services and performance improvement services. However, neither the Health System nor Hospitals delegate to the Manager any of the powers, duties, or responsibilities required to be retained by Hospitals under law (including all certificates and licenses issued under authority of law for operation of the Service Line) and the governing documents of Hospitals. The Manager's authority will at all times remain subordinate to the overall direction and control of the Health System and each Hospital's board of directors and chief executive officer or his/her designees. Hospitals will be the holder of all licenses, accreditation certificates, and contracts which each Hospital obtains and will be the "provider" within the meaning of all third party contracts for the Service Line.

*Valuation Report MLBHC001*

Confidential
MLH_027880



*Draft - For discussion purposes only.*

**Governing Assumptions and/or Reliance on Client Representations**

Governing assumptions are defined as those assumptions directly related to the specific assignment, which, if found to be false, could alter our opinions or conclusions.

In preparing its analysis hereunder, HAI relied upon the following governing assumptions and/or representations made by Client:

- HAI relied on Client's, representation that the terms of the Agreement will remain consistent with the terms of the draft agreement provided to HAI for review as part of this valuation.[25]  In the event that the terms of the Agreement differ there from in any material respect, our findings herein may be affected.

- In preparing its analysis hereunder, HAI assumed that no aspects of the Management Services are being provided by any other person or entity other than as described herein (*e.g.,* the Health System and Hospitals' representatives on the Operating Committee ***cannot provide any*** of the Management Services delegated to the Manager).

- HAI's analysis assumes that with respect to the performance objectives as described in **Exhibit C**, *where applicable*, such measures are only intended to reward the Manager for substitution of "lower cost clinically equivalent cost items."  In other words, the Manager will not be rewarded for withholding any item, and will only be rewarded if substitute items are clinically equivalent, and where there is no diminution in quality of care.

- The Health System and Hospitals identified an initial need for two physicians to be compensated for medical director services related to the ongoing management needs of the Service Line.  The Health System and Hospitals represented, and our analysis assumes, that (i) the medical directors will be paid as an expense from the Base Management Fee; and (ii) the medical directors will be compensated for a specified number of monthly hours and rate as deemed to be *consistent with* FMV.[26]

- The Health System and Hospitals identified a need for a Service Line Administrator (*i.e.,* the Administrator).  The Health System and Hospitals represented, and our analysis assumes, that (i) the Administrator will be paid as an

---

[25] As previously mentioned, HAI reviewed the Management Services Agreement/Performance Improvement Agreement (*i.e.,* the Agreement).

[26] HAI was not requested to render a separate FMV opinion applicable to these two medical director positions.

*Valuation Report MLBHC001*

Confidential

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 20 of 81 PageID #: 4110
MLH_027881



*Draft - For discussion purposes only.*

expense from the Base Management Fee; and (ii) the Administrator will be compensated at a rate as deemed to be *consistent with* FMV.[27]

- The Health System represented that its obligation to pay the Manager is not dependent its receipt of payment for services from patients or payors.

- The Health System represented that projected annual net revenue for the Service Line, as measured using an "average" of 2010 actual net revenue and *annualized* 2011 net revenue (*i.e.,* Jan-July), is approximately $145,180,000.

- The Health System and Hospitals represented they will provide, at their own expense, non-physician clinical personnel directly involved in the delivery of patient care for the Service Line.

- HAI's analysis assumes that all physicians providing the Management Services are employees and/or owners of the Manager.

Except as described above and with respect to the general facts and circumstances of the Agreement as set forth in other sections herein, HAI did not rely on any additional governing assumptions in the performance of the analysis and the development of conclusions.

---

[27] HAI was not requested to render a separate FMV opinion applicable to the Administrator position

*Valuation Report MLBHC001*

Confidential

MLH_027882



*Draft - For discussion purposes only.*

**Analysis**

### Commercial Reasonableness of the Agreement

*With respect to the Base Management Fee,* healthcare entities, including hospitals, ambulatory surgery centers and physician practices, routinely engage organizations to provide medical and/or administrative aspects of a wide variety of programs. Such organizations are typically regarded as having a high degree of administrative ability and technical expertise within a particular area, whereas it would be difficult for the healthcare entity to achieve the same degree of expertise and efficiency without a significant investment in infrastructure. Areas of outsourcing include the routine non-medical operational needs, ranging from contract negotiations to legal and financial services as well as specialized services such as risk management and human resources support. In our observations, such arrangements provided as a comprehensive basket of services are oftentimes based on a fixed percentage of net revenue of the service line being managed.[28]

HAI is aware of numerous entities which provide management services to ambulatory surgical centers ("ASCs"). These companies range from large publicly traded entities (*e.g.,* AmSurg, and NovaMed) to privately held companies such as Ambulatory Surgical Clinic of America, National Surgical Care, Symbion Healthcare and United Surgical Partners International. In light of the observations discussed above, as well as our experience with ASC management arrangements, HAI believes that (i) the utilization of the Manager for the purpose of providing the Management Services to manage the Service Line, as well as (ii) payment of the Base Management Fee by the Health System to the Manager are both commercially reasonable.

*With respect to the Incentive Management Fee,* the Health System and Hospitals desire to establish a more comprehensive management arrangement through the coordination of efforts and the use of appropriate incentives among the physicians involved in providing Service Line services. A key aspect of this effort involves the ability to provide associated physicians with performance-based compensation for the achievement of predefined goals and objectives rather than just the traditional hourly compensation associated with medical directorships.

The Health System and Hospitals propose a series of Performance Improvement Initiatives that take into account quality of service and operational efficiency benchmarks and indicators to evaluate compensation, if any, pursuant to the Incentive Management Fee.

---

[28] Net revenue is defined as net collections.

*Valuation Report MLBHC001*

Confidential

MLH_027883



*Draft - For discussion purposes only.*

In considering the commercial reasonableness of this portion of the Agreement, HAI notes the following significant observations:

- The services provided within the Service Line represent a significant operating unit with projected annual net revenue of approximately $145 million.

- Within the scope of the Health System's Service Line, opportunity exists for enhancement of patient care through the identification of, and compliance with, "best practices" that address quality of care, increased patient satisfaction and increased operational efficiencies.

- Pay-for-performance programs[29] seek to improve healthcare quality and stem rising healthcare costs by rewarding efficiency and effectiveness through the monitoring and reporting of treatment patterns and health outcomes. These programs generally base a portion of physician payment on quantitative measures including, patient care process measures, outcomes and patient satisfaction. As part of our research, the efficacy of pay-for-performance programs is demonstrated in early results from the national Bridges to Excellence program.[30] Results indicate that financial incentives can motivate change, that improved care processes result in increased patient visits and that high quality care does not have to mean higher costs (*e.g.,* participating physicians who had been recognized as providing high quality care, actually delivered care at 15%-20% lower cost than non-participating physicians).[31]

- Non-healthcare business enterprises regularly establish incentive compensation programs in order to achieve various desired objectives. We believe that such arrangements, if properly structured, can be very significant in aligning parties' incentives and rewarding appropriate performance.

- In order to achieve desired clinical and operational objectives in the delivery of Service Line services, HAI believes that including the physicians who provide these services as part of the management team will prove to be an effective

---

[29] Pay-for-performance programs for the federal government and the private sector are in various stages of development and implementation. The Centers for Medicare & Medicaid Services (CMS), the Medicare Payment Advisory Commission (MedPAC) as well as health plans and large employers are supporting pay-for-performance programs.

[30] The Bridges to Excellence program is a multilateral effort of employers, health plans and patients that offers financial incentives to physicians who improve the quality of care they provide.

[31] Bridges to Excellence 2005. BTE: Program Evaluation [Online]. Available: http://www.bridgestoexcellence.org/pdf/BTE-Program-Evaluation-7-26-06.pdf [accessed 03/28/2007]

*Valuation Report MLBHC001*

Confidential

MLH_027884



*Draft - For discussion purposes only.*

strategy. Since the identified physicians are in private practice, and since successful coalescence of the physician participants requires the involvement of numerous physicians across multiple Hospitals and Cancer Center Sites, we believe that the option of the Health System and/or Hospitals employing all of the required physicians is neither feasible nor desirable.

- In considering the reasonableness of incorporating incentive measures into the Agreement, we also note that The Joint Commission recently introduced a set of principles to guide the development and refinement of pay-for-performance programs. The Joint Commission believes that these programs should be credible, minimize unintended negative consequences, and be ethically sound. The alignment of these financial incentives to promote high quality care must be patient-focused across the board and aligned with clinical outcomes. The Joint Commission states the goal of pay-for-performance programs should be to align reimbursement with the practice of high quality, safe health care. These programs should be based on metrics which are evidence-based, valid, risk-adjusted and reliable. Above all, programs should be designed to bring about behavior changes that result in high quality health care that is delivered on a consistent basis. The principles are further disclosed in **Exhibit D** attached hereto.

In light of the observations discussed above, HAI believes that the Incentive Management Fee, payable in the event of the achievement of pre-determined criteria, is commercially reasonable. Further, we believe the health System and Hospitals have relatively wide latitude in the identification and selection of those appropriate metrics that best respond to quality and operational improvement opportunities within the Service Line. As part of our analysis, HAI reviewed such metrics to confirm that they appeared reasonable and appropriate. Based upon our experience and knowledge of service line management agreements, we may have proposed adjustments to the incentive metrics, their payout thresholds and their relative weightings, and/or made adjustments in the calculation of our FMV range, in connection with forming our opinion as to the commercial reasonableness of the Agreement.

Confidential

MLH_027885



*Draft – For discussion purposes only.*

**Selection of Valuation Approach**

Generally, the widely recognized valuation approaches applicable to business enterprises and/or assets are also applicable to service agreements under appropriate circumstances. The valuation approaches applicable to the valuation of service agreement, such as the Agreement, include:

1. Income Approach;
2. Cost Approach; and
3. Market Approach.

The appropriate valuation methodology related to any specific asset is dependent upon the facts and circumstances applicable to that asset as of a particular point in time. Following is a discussion of the primary valuation methodologies and HAI's determination of the applicability of each to the Agreement.

**Income Approach.** Defined according to the American Society of Appraisers ("ASA") as "a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount."

**Cost Approach.** The Cost Approach is based upon the Principle of Substitution; *i.e.,* the premise that a prudent individual will pay no more for a property than he/she would pay to acquire a substitute property with the same utility. In the case of the Agreement, the Hospitals' alternative (and hence cost) is to employ all of the required staff and provide the service "in house" or to arrange for a variety of independent contractual relationships.

**Guideline (or Market) Approach.** Defined according to the ASA as "a general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold," or in the case of intangible assets, comparable transactions of comparable intangible assets in the marketplace. Similar to a Cost Approach, a Market Approach is based upon the Principle of Substitution.

*Based upon the facts and circumstances surrounding the Agreement, we determined that the most reasonable and appropriate methodologies to determine the FMV of the Agreement include both a Market Approach and a Cost Approach.*

*Valuation Report MLBHC001*

Confidential

MLH_027886



*Draft - For discussion purposes only.*

### *FMV Analysis*

As discussed above, the Base Management Fee is an annual fee paid on a monthly basis for the delivery of specified Management Services identified in **Exhibit A**. In theory, the FMV of the Base Management Fee could be established by assessing the required number of work hours needed to provide the Management Services, multiplied by a FMV hourly rate. However, as with most management services and/or service arrangements, the exact number of required work hours and delineation of required job positions cannot reasonably be determined in advance. Most management arrangements we have observed in the marketplace are not based upon actual underlying time to establish the management fee. Notwithstanding the foregoing, however, as set forth below, HAI believes that an approach wherein we use benchmark data for hypothetical medical directorship positions is reasonable in establishing an alternative means to determine the FMV of the Management Services.

### **Management Fee - Cost Approach**

As set forth above, the first valuation methodology that HAI considered applicable to the Management Services is a cost approach, or a "replacement cost" methodology. We believe that a possible alternative to the Agreement is the Health System's hypothetical opportunity to engage (either as employees or as independent contractors) medical directors to manage its comprehensive Service Line offerings.

Giving consideration to the number of medical directors that might reasonably be required to provide the Management Services to the Service Line we note the following key factors:

- As measured by its projected annual net revenue of approximately $145 million, the Service Line services constitute a very sizable business organization.

- The diversity of service offerings and the number of service locations in combination with the complexity of clinical operations and the volume of procedures require significant coordination among numerous physicians, hospitals, Cancer Center Sites and a myriad of operational details. As noted above, the achievement of operational and clinical objectives require the active involvement of the physicians who are involved in the delivery of the services.

The determination of the amount of a physician's time required to provide medical director services is dependent upon a variety of factors including the number of locations, the size of each of the locations, the complexity of services being provided and the number of procedures performed. In consideration of these factors, HAI consulted

*Valuation Report MLBHC001*

Confidential

MLH_027887



*Draft - For discussion purposes only.*

benchmark data for medical director hours and compensation.[32] This benchmark data indicated that given the size of the Health System's Service Line, coupled with the expected duties to be performed, six part-time[33] medical directors would be reasonably required to manage daily operations and provide needed oversight to manage Hospital's Service Line, with a buildup of approximately 6,602 hours. However, the calculation of this Cost Approach does not imply that the resulting hours required to complete the Management Services will be equal to 6,602. In other words, the actual performance of medical director duties could require more or less hours. Our FMV analysis is only concerned that the Management Services listed in **Exhibit A** are completed in their entirety in order for the Manager to receive the entire Base Management Fee.

In order to determine the appropriate compensation for the medical directors, HAI understands that compensation earned by a physician in his or her specialty practice of medicine may not be directly comparable to the compensation for medical directorship duties. However, unlike physician compensation data, very little survey information exists related directly to medical director compensation arrangements. Further, medical director relationships are diverse, making comparisons among arrangements difficult. Finally, a potential drawback in looking solely to existing medical director arrangements as a basis for establishing FMV is that some of these relationships may contain an overcompensation bias (*i.e.*, providers and physicians may, willfully or otherwise, establish arrangements that tend towards providing compensation for referrals).

Based on the foregoing, HAI believes that in the context of the medical directorship positions, the Health System would need to identify appropriately experienced clinicians as well as individuals with the skills and experience necessary to perform other non-clinical duties (*i.e.,* consistent with the Management Services as described herein). HAI notes that the Manager will be responsible for managing the Service Line across multiple Hospitals and Cancer Center Sites. As such, its services are available to diverse communities of patients.

---

[32] *The Medical Director Survey: 2011 Report*; Integrated Healthcare Strategies 2011
[33] The six part-time medical directors (or series of physicians each providing a portion of these identified medical director duties) would devote a total of approximately 6,602 hours to managing the Service Line across the Hospitals and their Cancer Center Sites. Based on 2009 MGMA data for the median number of hours worked per week (2011 data is not available) and 2011 MGMA data for the median number of weeks worked per year by physicians specializing in: (i) hematology/oncology (two medical oncology medical directors): 40 hours/week, 46 weeks/year; (ii) diagnostic radiology and radiation oncology: 40 hours/week, 44 weeks/year; (iii) interventional radiology: 35 hours/week, 44 weeks/year; and (iv) cancer center management: 40 hours/week, 46 weeks/year, the six part-time medical directors would equal approximately 3.8 FTEs.

*Valuation Report MLBHC001*

Confidential

MLH_027888


*Draft - For discussion purposes only.*

Accordingly, the methodology used within the framework of HAI's cost approach is based upon the examination of the market value compensation as determined by physician salary survey data and subject to certain adjusting factors. While compensation earned by a physician in his or her specialty practice of medicine is not directly comparable to the FMV of compensation for medical directorship duties, this methodology provides an objective benchmark as a basis for further adjustment. *In particular, the methodology applied herein to aid in valuing medical director duties is not intended to establish an "opportunity cost" related to professional services.*[34]

In developing the appropriate compensation range, HAI elected to review and rely upon available, published sources of administrative compensation data as provided by the *Medical Director Survey: 2011 Report*[35] to determine the lower end of the range for the medical director compensation. To determine the top end of the range for medical director compensation, for the reasons referenced above, and where applicable, HAI elected to use the "midpoint" of the MGMA compensation data[36] and market data as provided by the Medical Director Survey.

The following **Table 1** provides a summary of the analysis used to determine the cost associated with the use of the medical director positions to manage the Health System's Service Line. HAI recognizes that the medical directorships used in this analysis *may not* represent the "actual" medical directorship(s) deployed by the Manager. Furthermore, the cost approach deployed in this analysis is based on a benchmark framework for managing similar service lines in the absence of a management arrangement. Therefore, it is not meant to represent the actual requirements identified within the Agreement. Further, the provision of certain "minimum" hours in the Agreement will have no impact on whether the Manager is eligible to receive the entire Management Fee, provided that

---

[34] We note that CMS guidance in the preamble to the Stark II Phase III provides that "…the fair market value of administrative services may differ from the fair market value of clinical services." *72 F.R. 51016 (September 5, 2007)*.

[35] As published by Integrated Healthcare Strategies ("IHS"). In consideration of the size and complexity of the Health System's Service Line (as indicated by anticipated net revenue), benchmark data at: (i) the "midpoint" of the 75th and 90th percentiles was used to determine the number of hours required by the two medical oncology medical directors and the diagnostic radiology medical director; (ii) the 75th percentile was used to determine the number of hours required by the Cancer Center medical director and the radiation oncology medical director; and (iii) the "midpoint" of the 50th and 75th percentiles was used to determine the number of hours required by interventional radiology medical director.

[36] HAI reviewed available cash compensation value for the positions/medical specialties anticipated to be filled by the six part-time medical directors. Such data was obtained from the *MGMA Physician Compensation and Production Survey, 2011 Report Based on 2010 Data* for the 75th percentile, a commonly used benchmark percentile in the determination of appropriate FMV compensation values.

*Valuation Report MLBHC001*

Confidential    Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 28 of 81 PageID #: 4118   MLH_027889



*Draft – For discussion purposes only.*

(i) all of the Management Services are provided, and (ii) all incentive metrics are achieved.

### Table 1: Summary of Cost Approach Using Medical Director Data

| Service Offering | Hours Worked Per Year | Integrated Healthcare Strategies ("IHS") Medical Director Survey | | | | MGMA Compensation Survey 75th Percentile | Midpoint of IHS and MGMA | Upper End of the Range Annual Compensation |
| | | 75th Percentile[37] | | 90th Percentile | | | | |
| | | Hourly Rate | Annual Compensation | Hourly Rate | | Hourly Rate | Hourly Rate | |
| Diagnostic Radiology[38] | 1,428 | $175 | $249,900 | $209 | | $334 | $272[39] | $387,702 |
| Medical Oncology[40] | 1,452 | $200 | $290,400 | $262 | | $282 | $272 | $394,944 |
| Medical Oncology | 1,452 | $200 | $290,400 | $262 | | $282 | $272 | $394,944 |
| Interventional Radiology[41] | 684 | $211 | $144,324 | $305 | | $288 | $297 | $202,806 |
| Cancer Center Management[42] | 1,006 | $200 | $201,200 | $262 | | $282 | $272 | $273,632 |
| Radiation Oncology[43] | 580 | $200 | $116,000 | $239 | | $364 | $302 | $174,870 |
| **TOTAL** | **6,602** | | **≈ $1,292,000** | | | | | **≈ $1,829,000** |

---

[37] Lower end of the range for the cost approach, calculated by multiplying the number of hours worked per year by the IHS hourly rate at the 75th percentile.

[38] Number of hours and hourly rate for diagnostic radiology are based on data for – Radiology.

[39] *e.g.,* hourly compensation for the diagnostic radiology medical director: $209 (IHS hourly rate at the 90th percentile) + $334 (MGMA hourly compensation at the 75th percentile grossed up for benefits)/2 = $272 per hour.

[40] HAI included two part-time medical oncology medical directors due to the large size of the sub-service line (average of 2010 actual and 2011 annualized net revenue of approximately $108.5 million). Number of hours and hourly rate for medical oncology are based on data for – Cancer Center/Oncology.

[41] Since the IHS Medical Director Survey does not provide data for interventional radiology, HAI elected to use data for interventional cardiology as a reasonable proxy to determine the number of hours and hourly rate for interventional radiology.

[42] Number of hours and hourly rate for cancer center management are based on data for – Cancer Center/Oncology.

[43] Number of hours and hourly rate for radiation oncology are based on data for – Radiation Therapy/Radiation Oncology.

*Valuation Report MLBHC001*

Confidential

MLH_027890



*Draft - For discussion purposes only.*

In consideration of the attributes of the Management Services in comparison to the referenced medical directorships, the Cost Approach would yield an FMV for the Management Fee that ranges from approximately $1,292,000 to $1,829,000 per year.

**Market Approach**

HAI identified a number of management arrangements involving various providers and management organizations. One common type of management arrangement whereby significant market data is available involves the management of ambulatory surgery centers ("ASCs") by professional management companies. Generally the ASC management companies provide comprehensive management services, with recognition that the services do not include services that typically require the involvement of physicians.

HAI conducted a survey of eighteen national or regional ASC management companies. Our survey indicated that management fees ranged from 3.5% to 7% of collections, with the majority of ASC companies charging between 5% and 7% of collections.[44] However, the vast majority of such arrangements involve the existence of a fulltime onsite manager who is compensated by the ASC, thereby effectively raising the total management fees to levels higher than 7%. In addition, the management fees quoted are often related to management services provided in connection with equity ownership.

HAI also identified a number of other management arrangements involving such programs as respiratory care, bariatric surgery, substance abuse and eating disorders, radiology, and physical therapy. The management fees associated with such programs was observed to range from 6% to 35% of net revenue.[45] In considering the applicability of these arrangements to the Agreement, we note that several of the comparison arrangements include clinical staffing services (which accounts for arrangements with fees as high as 35%, for example). However, we believe that these other arrangements are less comparable to the Management Services than the ASC management arrangements.

In order to compare the Management Services to be provided by the Manager to those services provided by ASC management arrangements where the management fees are known, HAI created a "scoring algorithm" which assigns a point value and weighting factor to each specific identified task (details of the scoring algorithm are provided in

---

[44] One company reported that it does not charge a management fee; instead, it contributes services deemed to be of equal value to services contributed by the physicians. One company reported a management fee percentage of "less than 4%."

[45] Such arrangements may not be based upon designated percentages of net revenue. However, HAI converted each arrangement to a percentage of net revenue equivalent basis in order to facilitate comparisons.

*Valuation Report MLBHC001*

Confidential

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 30 of 81 PageID #: 4120

MLH_027891

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

**Exhibit E).** Our scoring algorithm captures and evaluates 39 primary tasks, to which we add additional tasks, as appropriate, unique to the Agreement.[46] The result is a comprehensive listing of services that are typically provided by management companies, such that HAI established a "baseline" listing from which to make "normalizing" adjustments to the available management fee percentages in developing a range applicable to the Agreement.

As the next step, each identified task was evaluated in terms of the following to develop a "score" for the Agreement:

- Importance of the task – Each task was "evaluated" based on the complexity and anticipated time commitment required. Subsequently, using a proprietary methodology as developed by HAI, each task was then ranked on an ordinal scale of measurement by order of importance.

- Determination of the degree, if at all, to which the identified tasks were included in the Agreement. The following three scoring categories were used:

  o **"X"** - task is included in the proposed Management Services;

  o **"X Limited"** – only *certain limited* duties of the task are included in the proposed Management Services; and

  o **"N/A"** – *none* of the duties of the task are included in the Management Services.

- A weighting factor was then assigned to each task based on the above identified categories. Included tasks (*i.e.,* those receiving an "X") received the highest weighting, partially included tasks (*i.e.,* those receiving an "X Limited") received a mid-range weighting and those tasks not included in the proposed Management Services (*i.e.,* those receiving a "N/A") received a weighting of 0.0.

- A weighted "score" for the Management Services was then determined by multiplying the point value associated with the task's importance by the applicable weighting factor.

---

[46] In the case of the Agreement, there were two additional tasks added to the 39 primary tasks on the baseline scoring grid.

*Valuation Report MLBHC001*

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 31 of 81 PageID #: 4121

Confidential

MLH_027892



*Draft - For discussion purposes only.*

As a result of the above calculations, and as detailed in **Exhibit E**, our analysis yielded a total point value of 106 for all 41 management tasks, and a *weighted score* of 98 applicable to the Management Services. This score indicated that for the tasks included in the Agreement, the Management Services achieved 92.5%[47] of the total points available.

As mentioned above, our research indicates that ASC management companies generally charge fees from approximately 5% to 7% of net revenue. Therefore, in order to determine a comparable value for the Management Services, HAI applied the results of the above-described scoring algorithm (*i.e.,* 92.5%) to the FMV range for ASC management fees. The results of this calculation yield a fee range for the Management Services from 4.62%[48] to 6.47%[49] of net revenue.

In reviewing these results, HAI believes that the identified range must be subject to a *discount* for the following reasons. First, the revenue size of the included Service Line services is significantly higher than the typical ASC that is subject to an outside management arrangement, thereby warranting a lower fee as a percentage of net revenue. Second, while it is difficult to make a direct comparable to the ASC arrangements, our research indicates that as revenue sizes grow, there is an increased likelihood that an ASC organization would discount its normal management fees in recognition of the fact that they are able to achieve certain economies in the arrangement. Therefore, in recognition of this and due to the nature of the Service Line (as well as the fact that the majority of net revenue is related to medical oncology, which may be inflated due to the cost of cancer drugs), HAI applies a certain degree of conservatism to our analysis by applying a 35% "discount" to calculated fee ranges for oncology management arrangements with net revenue ranging from approximately $125 million to $150 million. Therefore, the market approach calculations yielded an adjusted range of approximately 3.00%[50] to 4.21%[51] of net revenues.

Based upon projected annual net revenue from the Health System's Service Line of approximately $145,180,000 a 3.00% to 4.21% Management Fee equates to a range of approximately $4,362,000[52] to $6,107,000[53] per year.

---

[47] (98 /106) x 100
[48] .05 x 92.5%
[49] .07 x 92.5%
[50] 4.62% x 65%
[51] 6.47% x 65%
[52] $145,180,000 x 3.00% (any variation in values is due to rounding).
[53] $145,180,000 x 4.21% (any variation in values is due to rounding).

*Valuation Report MLBHC001*

Confidential

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 32 of 81 PageID #: 4122

MLH_027893

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

**Reconciliation of Market and Cost Approaches**

In summary, the methodologies described above yielded the following potential FMV ranges.

| | |
|---|---|
| Cost Approach | $1,292,000 to $1,829,000 per year |
| Market Approach | $4,362,000 to $6,107,000 per year |

In considering the outcomes of the two valuation approaches, we note the following. We believe that a Market Approach is generally preferable in valuing the Management Services. However, the Market Approach can be subject to certain limitations since there are no directly comparable market values. Furthermore, the projected annual net revenue used in the Market Approach analysis includes revenue associated with chemotherapy agents and the high cost of such drugs may serve to inflate the revenue associated with the actual services provided (*e.g.,* infusion). With respect to the Cost Approach, we note that the "build up" of the medical director time requirements does not value the services that will be contributed by the Health System through the Manager (since the valuation of such services would result in significant subjectivity) and necessarily, this approach likely somewhat "understates" the value of the services to be provided. In consideration of the two approaches, HAI elected to incorporate a degree of conservatism into our analysis by "double weighting" the Cost Approach for purposes of our final calculation.[54]

By considering each methodology, and *double weighing* the Cost Approach,[55] we believe that the FMV of the Management Fee ranges from $2,316,000[56] to $3,255,000 per year.[57]

While the range encompasses the *total* Management Fee (*i.e.,* both the Base Management Fee and the Incentive Management Fee), the Health System and Hospitals will predetermine the amount of the Base Management Fee. The Incentive Management Fee (which will be based upon achievement of the predetermined measures) will be subject to

---

[54] While HAI understands the complexity of managing cancer center services, we also understand that the net revenue used in the Market Approach analysis includes revenue associated with chemotherapy agents (75.3% of the total net revenue for the Service Line is associated with medical oncology). As such, since the high cost of drugs may serve to inflate the revenue associated with the services provided (*e.g.,* infusion, medical oncology), HAI believes that the Cost Approach provides a more accurate representation of the value of the Management Services.

[55] We believe that each of the valuation approaches is relevant in establishing the FMV of the Management Fee. However, we do not believe that conclusions should be drawn from either approach individually. Specifically, we believe that the FMV is greater than $1,292,000 (as established via the cost approach) but less than $6,107,000 (as established by the market approach).

[56] $(1,292,000 + 1,292,000 + 4,362,000)/3 ≈ $2,316,000

[57] $(1,829,000 + 1,829,000 + 6,107,000)/3 ≈ $3,255,000

Page 32

Confidential

MLH_027894



*Draft - For discussion purposes only.*

a maximum payout to be indicated by the Health System and Hospitals. While we believe that the Health System and Hospitals have significant discretion in establishing the proportion of the Management Fee payable as the Base Management Fee versus the Incentive Management Fee, we believe that the Health System's and Hospitals' election should remain within certain constraints. Specifically, of the total possible Management Fee established by the Health System and Hospitals, we believe that the Base Management Fee should generally be no higher than 60% and no lower than 40% of the total possible Management Fee. These constraints are based upon our observations in the marketplace of similar arrangements, and in our opinion, preserve the intent of the Health System with respect to the desired outcome of the Management Services.

**Test of Reasonableness**

As a test of reasonableness, HAI considered the estimated effective hourly compensation attributable to the efforts of the Physician Members at varying levels of payout of the Incentive Management Fee. As indicated in **Table 2** below, these payout levels contemplated outcomes ranging from (i) only the Base Management Fee is earned, to (ii) the maximum amount of the Incentive Management Fee is earned (in addition to the Base Management Fee). Our analysis in **Table 2** is based on the Health System and Hospitals establishing the Base Management Fee equal to 60%[58] of the Management Fee, as indicated in the Agreement. Furthermore, for the purposes of our test of reasonableness analysis described below, the Management Fee was established at the upper end of the FMV range established herein of $3,255,000 per year.

---

[58] The Base Management Fee of $1,953,000 equals 60% of the Total Management Fee of 3,255,000.

*Valuation Report MLBHC001*

Confidential

MLH_027895


### Table 2 – Evaluation of Effective Hourly Physician Compensation Rates

| Management Fee Attributable to the Manager | Percentage of Incentive Management Fee Achieved | | | | |
|---|---|---|---|---|---|
| | **0%** | **25%** | **50%** | **75%** | **100%** |
| Base Management Fee | $1,953,000 [59] | $1,953,000 | $1,953,000 | $1,953,000 | $1,953,000 |
| Incentive Management Fee | $-0- | $325,500 [60] | $651,000 | $976,500 | $1,302,000 |
| Total Management Fee | $1,953,000 | $2,278,500 [61] | $2,604,000 | $2,929,500 | $3,255,000 |
| Assumed Work Hours | 6,602 | 6,602 | 6,602 | 6,602 | 6,602 |
| Effective Hourly Rate[62] | $296 | $345 | $394 | $444 | $493 |

Upon review of the above information, if none of the incentive metrics were achieved, the Manager's physicians would receive the equivalent of $296 per hour. Similarly, if 100% of the incentive metrics were realized, the Manager's physicians would receive the equivalent of $493 per hour. In consideration of the comprehensive nature of the duties to be performed by the Manager, including with recognition the extent of the incentive metrics that would be realized, HAI does not believe that such levels of resulting hourly compensation appear unreasonable. [63]

---

[59] $3,255,000 x 60% = $1,953,000 is the total amount of the Base Management Fee and $1,302,000 ($3,255,000 x 40%) is the total amount of the Incentive Management Fee based on a 60/40 split between base and incentive compensation.

[60] *e.g.,* calculated as $1,302,000 x 25% = $325,500.

[61] *e.g.,* calculated as $1,953,000 + $325,500= $2,278,500

[62] The hourly rate is calculated by dividing the expected compensation by the total expected hours of 6,602 as listed in **Table 1**.

[63] As stated earlier, this table was developed solely as a "test of reasonableness," and does not imply that to be eligible to receive the Management Fee, that the Manager and its physicians must collectively perform *no less than* 6,602 hours each year.

*Valuation Report MLBHC001*

Confidential

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 35 of 81 PageID #: 4125

MLH_027896

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

**Conclusion**

Based upon the analysis described herein, **HAI determined that (i) the Agreement is commercially reasonable; and (ii) the FMV of the Management Fee (*i.e.*, the Base Management Fee <u>and</u> the Incentive Management Fee as defined herein) ranges from $2,316,000 to $3,255,000 per year**.

Furthermore, we believe that the Base Management Fee should generally be no higher than 60% of the Management Fee.

We believe that this FMV analysis can be relied upon through February 28, 2014.

*Valuation Report MLBHC001*

Confidential

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 36 of 81 PageID #: 4126

MLH_027897



*Draft - For discussion purposes only.*

**Appraiser's Certification**

The undersigned certifies that to the best of his knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. I, and the valuation firm I represent, have no present or prospective interest in the property or the contract that is the subject of this report and no personal interest with respect to the parties involved.
4. I, and the valuation firm I represent, have no bias with respect to the property or contract that is the subject of this report or to the parties involved with this assignment.
5. I, and the valuation firm I represent, hold ourselves out to the public as valuation experts; we perform valuation analysis on a regular basis; and we are qualified to evaluate the arrangement described herein.
6. My engagement in this assignment was not contingent upon developing or reporting predetermined results.
7. All of my material questions and requests for information related to this valuation assignment have been answered and resolved to my satisfaction. This report and its opinion of value have not been issued with any issue or question of material fact or data relating to the opinion of value's being unresolved or unanswered at the time of issuance of this report.
8. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of the report.
9. Ann S. Brandt, PhD assisted me in the appraisal of this Agreement.

Certified on behalf of HAI:

_____          Date: February [21], 2012

Scott M. Safriet, MBA, AVA
Partner

Confidential

MLH_027898

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

## Exhibit A – Management Services

The Manager will assist the Health System and Hospitals in operating the Service Line by providing the following general management services:

1.  Direct and coordinate the Service Line in accordance with recognized standards to promote quality and efficient care to be given to patients.

2.  Develop and update, in conjunction with the Health System on an annual basis, best practice standards for the Service Line, including, but not limited to, performance-based benchmarks and monitoring systems.

3.  Develop, implement and regularly update, in conjunction with the Health System, patient care (clinical) protocols, pathways and guidelines for the delivery of Service Line services and assure consistency with national best practice standards.

4.  Ensure that the Service Line adheres to the Health System's policies and procedures, applicable laws and regulations, accrediting body requirements and other regulatory compliance. Make recommendations regarding same.

5.  Assist as a liaison among administrative departments and committees as well as each Hospital's medical staff.

6.  Assist in strategic, financial and operational planning for future oncology-related services provided by Health System, as well as the development and operation of capital and operating budgets, with special regard to new technologies and equipment and management information systems.

7.  Develop and present, on at least a semi-annual basis, educational programs to physicians providing services within the Service Line, as detailed in the work plans referenced in the Agreement.

8.  Develop and present, on at least a semi-annual basis, educational and informational programs to community-based physicians, regarding the Service Line, physicians providing services within the Service Line and administrative processes.

9.  At the request of the Health System, assist in preparing for and responding to surveys conducted by governmental authorities and other accrediting bodies.

10. At the request of the Health System, assist in preparing for and responding to third-party payor audits concerning the medical necessity and/or quality of professional Service Line services as well as other government inquiries, including the compilation and timely delivery of all required documentation.

*Valuation Report MLBHC001*

Confidential

MLH_027899



11. At the request of the Health System, assist in the development of and the compliance and management of patient care programs and protocols in response to pay-for-performance programs of third-party payors, including Medicare and Medicaid.

12. Assist the Health System in the development, implementation and monitoring of programs and plans to reduce adverse events, including medication errors.

13. Provide recommendations regarding facilities management, equipment purchase and maintenance and supplies management.

14. Make recommendations regarding marketing efforts.

15. Make recommendations as to qualified personnel, including appropriate staffing complements.

16. Assist the Health System in negotiating, retaining and managing of services that may be furnished through contractual arrangements (*e.g.,* anesthesia services, radiology services, pathology services and other services as appropriate).

17. Assist in the management of expenses in relationship to fluctuation in revenues.

18. In conjunction with the Health System and Hospitals, develop, implement and, as appropriate, update and recommend additions and/or revisions in the administrative operating policies and procedures pertaining to the Service Line.

19. Assist the Health System in the development of community awareness and educational programs providing information regarding Service Line services and related topics of interest to community residents that result in a more satisfied referral base.

20. Assist the Health System by managing the Service Line quality and productivity in furtherance of and consistent with the objectives of the Agreement by:

    (a) Monitoring, evaluating and, as needed, restructuring delivery of care processes.

    (b) Evaluating job descriptions and realigning responsibilities as appropriate.

    (c) Establishing, monitoring and maintaining productivity standards.

21. Work with the Health System's staff to provide evidence of performance as may be reasonably requested by the Health System to include operational statistics, financial statements and productivity reports.

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 39 of 81 PageID #: 4129

Confidential                                                                                        MLH_027900



22. Assist the Health System in the development and implementation of patient care protocols for the delivery of the Service Line services, including protocols pertaining to the most appropriate setting for such services (*i.e.,* outpatient or inpatient), as such protocols may be referenced in the work plans referenced in the Agreement.

23. At the request of the Health System, assist in the establishment of fees for services and procedures provided within the Service Line to the extent permitted by law.

24. Perform such other services related to the efficient and effective delivery of quality oncology services as may be reasonably requested by the Health System.

25. The Manager will have the responsibility of determining what medical directors are necessary to improve the quality, efficiency, and effectiveness of the Service Line and, which qualified physicians will serve in such medical director positions. Furthermore, the Manager will determine to what extent to compensate each of the Service Line medical directors.[64] The Manager will enter into a written agreement with each medical director and will compensate all medical directors from the Base Management Fee, at a rate consistent with FMV, and only on the basis of documented time and effort expended in the provision of such services.

26. Within the first year of its engagement, the Operating Committee[65] will develop detailed work plans ("Work Plans") and begin to implement such plans for each performance improvement standard as set forth in **Exhibit C**, as well as for the delivery of the general Management Services, set forth in this **Exhibit A**. At a minimum, each Work Plan will include the following:

   (a) The methodology to be used to attain the performance improvement, including any staff training and/or educational components to such methodology.

   (b) The measurement tool to be utilized.

   (c) The physicians and staff that will be targeted/involved in effecting the performance improvement.

   (d) The individual or committee responsible for the performance improvement.

   (e) The documentation to be generated/collected; and

---

[64] Provided that compensation will be consistent with fair market value without taking into consideration the volume or value of referrals or other business that may be generated to the Health System or Hospitals.

[65] As described in the Agreement, the Operating Committee will be responsible for *directing* and *overseeing* the performance of Manager's duties under the Agreement. The Operating Committee, which includes the Health System participation, will **not** perform any of the management tasks for which the Managers are being exclusively compensated under the Agreement.

Page 39

Confidential

MLH_027901



(f)    The mechanisms to monitor and coordinate physician resources within the Service Line to ensure patient safety and operational efficiency in pursuit of the performance standard.

The Manager will assist the Operating Committee in periodically reviewing the effectiveness of the Work Plans with respect to the Service Line and recommend to the Health System any necessary changes to such Work Plans. All Work Plans and any changes thereto, will be submitted to the Operating Committee for its approval.

27.    Oversee and provide managerial guidance to the Health System regarding recruiting, hiring, terminating, disciplining, reprimanding and terms of employment for all clinical, non-physician employees or leased employees who provide services in connection with the Service Line (the "Service Line Employees") and assist the Health System in its recruitment, hiring, evaluation, termination, discipline, reprimand, and establishment of terms of employment for the Service Line Employees. The Manager's authority with respect to the Service Line Employees will be subject to the Health System's or the applicable Hospital's human resource policies and procedures and the parameters of the approved operating budget of the applicable Hospital. The Manager's authority with respect to the Service Line Employees will include: (i) assisting Hospitals in defining the scope of job duties and responsibilities; and (ii) advising Hospitals regarding all decisions concerning the hiring, firing, evaluation, promotion, and compensation of the Service Line Employees; and (iii) advising the Operating Committee on issues concerning open positions, employee turnover and new hires. The Manager will also establish and monitor staffing by the Service Line Employees and establish scheduling protocols for the Service Line.

28.    Evaluate and make recommendations to the Health System with respect to the subject matter of certain contracts, leases, and purchases pertaining to the Service Line, including:

(a)    Equipment, operating supplies and other materials and supplies which may be needed for the Service Line;

(b)    Outside services as may be necessary for the Service Line; and

(c)    Such maintenance and repairs as may be necessary to keep and maintain the Service Line in good working order and condition.

29.    Assist the Health System in the negotiation of reimbursement and fee payment methods with third party payors and/or state or federal agencies.

30.    Assist the Health System in complying with the standards and requirements of accrediting agencies, including, but not limited to, The Joint Commission and other

*Valuation Report MLBHC001*

Confidential

MLH_027902



applicable accreditations specific to the oncology-related services as requested by the Health System. The Manager will recommend any required changes in policies and protocols in an effort to ensure that the oncology-related services are provided in accordance with applicable federal, state and local laws, and applicable policies and procedures of the Health System, and in furtherance of the performance improvement initiatives set forth in the Agreement. The Manager will participate in the preparation for and conduct of accrediting surveys and other similar activities.

31. Assist the Health System in formulating, implementing, monitoring, and managing Hospital quality assurance, utilization review, educational and risk management programs for the Service Line.

32. Assist the health System in the development of educational training materials and training and educating employees assigned to the Service Line. The Manager will monitor and ensure that employees assigned to the Service Line receive training on at least a semi-annual basis. Such training and education will be related to, and foster improvements in, the overall quality, efficiency, and effectiveness of the Service Line as reflected in the Work Plans.

33. Assist the Health System in the credentialing process regarding appointments and re-appointments to the medical staffs of practitioners who provide professional services in connection with the Service Line through the evaluation of relevant data. In addition, the Manager will make recommendations to Health System's medical staff credentials committees regarding appointments and re-appointments to the medical staffs.

34. Working with the Health System, the Manager will design and seek to implement stipulated documentation, including, but not limited to, charts, forms, clinical notes and other documents for the Service Line, and will seek to ensure compliance with the Health System's documentation standards and processes.

35. Make recommendations to the Health System regarding the provision of information system hardware and software as may be necessary for the Service Line.

36. Not less often than quarterly, the Manager, through the Operating Committee and in conjunction with the Health System, will review and recommend changes to annual operating and capital budgets for the Service Line. Such budgets will set forth the estimated revenues and expenditures (capital, operating, and other) pertaining to the Service Line. Any such recommended budget changes will be subject to the ultimate approval of the board of directors of the applicable Hospital. Once approved, by board of directors, the Manager will in good faith use its best efforts to implement and manage the budgets within the approved parameters.

Page 41

Confidential     Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 42 of 81 PageID #: 4132   MLH_027903



37. Assist the Health System in the preparation of all reasonably necessary paperwork to allow the Health System to timely and accurately bill and collect all bills for services provided to Service Line patients of such Hospital. Such assistance will include, but not be limited to, training and educating physicians and staff as to correct documentation standards and, at the request of the Health System, assist Hospitals in establishing billing, receivables, credit and collection policies and procedures and provide oversight of such activities.

38. Assist the Health System in evaluating the physical facilities at the Cancer Center Sites (*e.g.,* site layout, space planning) to improve patient care, increase efficiency and improve patient and practitioner experience.

39. Engage in pre-bill review of the Service Line designated cases pursuant to the Health System's internal control processes for the Service Line. The Manager will also assist in the formation of such processes, which will include medical records reviews to ensure appropriate documentation is in place to support the billed services. The Parties expect that such reviews will be typically completed within one business day of a request.

40. Assist the Health System in the selection and criteria for clinical usage of chemotherapy drugs and supportive pharmaceutical agents and make recommendations with respect thereto. The Manager will employ the criteria of highest efficacy, lowest toxicity, and lowest cost to the process of making these recommendations.

41. To the extent reasonably required for the operation of the Service Line, and subject to the approval of the Health System, the manager will be entitled to retain or employ, and coordinate the services of, persons necessary or reasonably appropriate to carry out the Management Services set forth in the Agreement.

42. Assist in the preparation of, at the close of each month (or at other mutually agreeable times), certain operational and statistical reports in a form developed by the Manager and approved by the Operating Committee. These statements will reflect the operations of the Service Line for such time period, the work performed by the Manager, the medical director services provided, the formulation of, and/or measurements of compliance with, applicable performance standards, and such other information reasonably requested by the Health System.

43. Assist the Health System in the management of supply chain activities for the Service Line, including, as appropriate, (i) standardization of supplies; (ii) vendor management; and (iii) inventory management.

Page 42



*Draft - For discussion purposes only.*

44. Monitor and evaluate the use of intensive care services by Service Line patients of the Health System.

45. Monitor and evaluate patient, physician and staff satisfaction within the Service Line, and, as needed, develop, implement and manage programs and plans for improvement.

46. Maintain responsibility for overseeing the delivery of outpatient pre-procedure/visit communications with Service Line patients to ensure (i) all required paperwork and consents are completed; and (ii) Service Line patient's questions have been answered and patients are reasonably informed and prepared for the procedure or visit. The Manager will oversee the development of pre-procedure visit communications protocols for inpatients in the Service Line.

47. Assist the Health System in the provision of those case management activities necessary for the proper operation of the Service Line. The case management activities may include, but are not limited to, discharge planning, appointment scheduling, development of patient educational materials and discharge instructions, facilitating the ordering of appropriate services and supplies upon discharge, and the establishment, implementation and monitoring of a patient call-back process that meets applicable regulatory standards for Service Line patients.

48. Bring to the attention of the Health System any services that are discovered to be inefficient or inconsistent with the policies and procedures established by the Health System. The Health System will, in good faith, consider the Manager's recommendations to remedy such inefficiencies and inconsistencies

49. Assist in the oversight of the Health System's maintenance of patient medical records to be prepared for Service Line patients in accordance with applicable Health System policies and procedures as well as laws and regulations of any applicable accrediting agency.

50. Assist the Health System in the planning, implementation of, transition to, and coordination of the use of Manager's oncology specific electronic health record system ("EHR System"), and ensure the use of and access to the EHR System by physicians and employees assigned to the Service Line. On and after the Effective Date, the Parties will use Manager's EHR System at the Cancer Center Sites, and will interface the EHR System with Health System's IT systems as soon as possible after the Effective Date.

51. At all times during the term of the Agreement, the Manager will maintain, on behalf of the Health System accurate books and records of its activities relating to the Service Line.

Page 43

Confidential   Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 44 of 81 PageID #: 4134   MLH_027905



52. Maintain comprehensive insurance with minimum coverage amounts as may be reasonably agreed to by the Parties and such other coverages as may be reasonably requested by the Health System. Furthermore, as reasonably requested by the Health System, the Manager will provide the Health System with evidence of all coverages required under the Agreement. The Manager will promptly notify the Health System of any lapse in or material modification to the coverage required under the Agreement. The Health System will, within 10 days of its receipt of the Manager's invoice, reimburse the Manager for the  cost of securing and maintaining its comprehensive insurance coverage related to its provision of the Management Services.

Confidential



*Draft - For discussion purposes only.*

**Exhibit B – Selected Codes Subject to Management Services**

The following MS-DRG and ICD-9 Codes[66] will be subject to management by the Manager:

| Code | Description |
|------|-------------|
| 3 | ECMO OR TRACH W MV 96+ HRS OR PDX EXC FACE, MOUTH & NECK W MAJ O.R. |
| 11 | TRACHEOSTOMY FOR FACE,MOUTH & NECK DIAGNOSES W MCC |
| 25 | CRANIOTOMY & ENDOVASCULAR INTRACRANIAL PROCEDURES W MCC |
| 26 | CRANIOTOMY & ENDOVASCULAR INTRACRANIAL PROCEDURES W CC |
| 27 | CRANIOTOMY & ENDOVASCULAR INTRACRANIAL PROCEDURES W/O CC/MCC |
| 29 | SPINAL PROCEDURES W CC OR SPINAL NEUROSTIMULATORS |
| 40 | PERIPH/CRANIAL NERVE & OTHER NERV SYST PROC W MCC |
| 54 | NERVOUS SYSTEM NEOPLASMS W MCC |
| 55 | NERVOUS SYSTEM NEOPLASMS W/O MCC |
| 65 | INTRACRANIAL HEMORRHAGE OR CEREBRAL INFARCTION W CC |
| 69 | TRANSIENT ISCHEMIA |
| 71 | NONSPECIFIC CEREBROVASCULAR DISORDERS W CC |
| 74 | CRANIAL & PERIPHERAL NERVE DISORDERS W/O MCC |
| 85 | TRAUMATIC STUPOR & COMA, COMA <1 HR W MCC |
| 92 | OTHER DISORDERS OF NERVOUS SYSTEM W CC |
| 93 | OTHER DISORDERS OF NERVOUS SYSTEM W/O CC/MCC |
| 100 | SEIZURES W MCC |
| 101 | SEIZURES W/O MCC |
| 146 | EAR, NOSE, MOUTH & THROAT MALIGNANCY W MCC |
| 147 | EAR, NOSE, MOUTH & THROAT MALIGNANCY W CC |
| 148 | EAR, NOSE, MOUTH & THROAT MALIGNANCY W/O CC/MCC |
| 150 | EPISTAXIS W MCC |
| 157 | DENTAL & ORAL DISEASES W MCC |
| 158 | DENTAL & ORAL DISEASES W CC |
| 163 | MAJOR CHEST PROCEDURES W MCC |
| 164 | MAJOR CHEST PROCEDURES W CC |
| 166 | OTHER RESP SYSTEM O.R. PROCEDURES W MCC |
| 167 | OTHER RESP SYSTEM O.R. PROCEDURES W CC |
| 175 | PULMONARY EMBOLISM W MCC |
| 176 | PULMONARY EMBOLISM W/O MCC |
| 180 | RESPIRATORY NEOPLASMS W MCC |
| 181 | RESPIRATORY NEOPLASMS W CC |
| 186 | PLEURAL EFFUSION W MCC |
| 187 | PLEURAL EFFUSION W CC |
| 188 | PLEURAL EFFUSION W/O CC/MCC |
| 191 | CHRONIC OBSTRUCTIVE PULMONARY DISEASE W CC |
| 193 | SIMPLE PNEUMONIA & PLEURISY W MCC |

---

[66] The description and numbers of the MS-DRGs and ICD-9 codes are subject to change in accordance with Medicare law and policy.

Page 45



*Draft - For discussion purposes only.*

| | |
|---|---|
| 194 | SIMPLE PNEUMONIA & PLEURISY W CC |
| 195 | SIMPLE PNEUMONIA & PLEURISY W/O CC/MCC |
| 197 | INTERSTITIAL LUNG DISEASE W CC |
| 200 | PNEUMOTHORAX W CC |
| 202 | BRONCHITIS & ASTHMA W CC/MCC |
| 207 | RESPIRATORY SYSTEM DIAGNOSIS W VENTILATOR SUPPORT 96+ HOURS |
| 208 | RESPIRATORY SYSTEM DIAGNOSIS W VENTILATOR SUPPORT <96 HOURS |
| 234 | CORONARY BYPASS W CARDIAC CATH W/O MCC |
| 252 | OTHER VASCULAR PROCEDURES W MCC |
| 253 | OTHER VASCULAR PROCEDURES W CC |
| 264 | OTHER CIRCULATORY SYSTEM O.R. PROCEDURES |
| 281 | ACUTE MYOCARDIAL INFARCTION, DISCHARGED ALIVE W CC |
| 299 | PERIPHERAL VASCULAR DISORDERS W MCC |
| 300 | PERIPHERAL VASCULAR DISORDERS W CC |
| 301 | PERIPHERAL VASCULAR DISORDERS W/O CC/MCC |
| 308 | CARDIAC ARRHYTHMIA & CONDUCTION DISORDERS W MCC |
| 312 | SYNCOPE & COLLAPSE |
| 314 | OTHER CIRCULATORY SYSTEM DIAGNOSES W MCC |
| 315 | OTHER CIRCULATORY SYSTEM DIAGNOSES W CC |
| 316 | OTHER CIRCULATORY SYSTEM DIAGNOSES W/O CC/MCC |
| 327 | STOMACH, ESOPHAGEAL & DUODENAL PROC W CC |
| 329 | MAJOR SMALL & LARGE BOWEL PROCEDURES W MCC |
| 330 | MAJOR SMALL & LARGE BOWEL PROCEDURES W CC |
| 337 | PERITONEAL ADHESIOLYSIS W/O CC/MCC |
| 347 | ANAL & STOMAL PROCEDURES W MCC |
| 349 | ANAL & STOMAL PROCEDURES W/O CC/MCC |
| 353 | HERNIA PROCEDURES EXCEPT INGUINAL & FEMORAL W MCC |
| 356 | OTHER DIGESTIVE SYSTEM O.R. PROCEDURES W MCC |
| 357 | OTHER DIGESTIVE SYSTEM O.R. PROCEDURES W CC |
| 358 | OTHER DIGESTIVE SYSTEM O.R. PROCEDURES W/O CC/MCC |
| 371 | MAJOR GASTROINTESTINAL DISORDERS & PERITONEAL INFECTIONS W MCC |
| 372 | MAJOR GASTROINTESTINAL DISORDERS & PERITONEAL INFECTIONS W CC |
| 374 | DIGESTIVE MALIGNANCY W MCC |
| 375 | DIGESTIVE MALIGNANCY W CC |
| 376 | DIGESTIVE MALIGNANCY W/O CC/MCC |
| 378 | G.I. HEMORRHAGE W CC |
| 388 | G.I. OBSTRUCTION W MCC |
| 389 | G.I. OBSTRUCTION W CC |
| 390 | G.I. OBSTRUCTION W/O CC/MCC |
| 391 | ESOPHAGITIS, GASTROENT & MISC DIGEST DISORDERS W MCC |
| 392 | ESOPHAGITIS, GASTROENT & MISC DIGEST DISORDERS W/O MCC |
| 393 | OTHER DIGESTIVE SYSTEM DIAGNOSES W MCC |
| 394 | OTHER DIGESTIVE SYSTEM DIAGNOSES W CC |
| 395 | OTHER DIGESTIVE SYSTEM DIAGNOSES W/O CC/MCC |
| 417 | LAPAROSCOPIC CHOLECYSTECTOMY W/O C.D.E. W MCC |
| 418 | LAPAROSCOPIC CHOLECYSTECTOMY W/O C.D.E. W CC |
| 420 | HEPATOBILIARY DIAGNOSTIC PROCEDURES W MCC |

*Valuation Report MLBHC001*

Confidential

MLH_027908



| | |
|---|---|
| 423 | OTHER HEPATOBILIARY OR PANCREAS O.R. PROCEDURES W MCC |
| 435 | MALIGNANCY OF HEPATOBILIARY SYSTEM OR PANCREAS W MCC |
| 436 | MALIGNANCY OF HEPATOBILIARY SYSTEM OR PANCREAS W CC |
| 437 | MALIGNANCY OF HEPATOBILIARY SYSTEM OR PANCREAS W/O CC/MCC |
| 442 | DISORDERS OF LIVER EXCEPT MALIG,CIRR,ALC HEPA W CC |
| 443 | DISORDERS OF LIVER EXCEPT MALIG,CIRR,ALC HEPA W/O CC/MCC |
| 445 | DISORDERS OF THE BILIARY TRACT W CC |
| 454 | COMBINED ANTERIOR/POSTERIOR SPINAL FUSION W CC |
| 469 | MAJOR JOINT REPLACEMENT OR REATTACHMENT OF LOWER EXTREMITY W MCC |
| 478 | BIOPSIES OF MUSCULOSKELETAL SYSTEM & CONNECTIVE TISSUE W CC |
| 481 | HIP & FEMUR PROCEDURES EXCEPT MAJOR JOINT W CC |
| 490 | BACK & NECK PROC EXC SPINAL FUSION W CC/MCC OR DISC DEVICE/NEUROSTIM |
| 501 | SOFT TISSUE PROCEDURES W CC |
| 516 | OTHER MUSCULOSKELET SYS & CONN TISS O.R. PROC W CC |
| 542 | PATHOLOGICAL FRACTURES & MUSCULOSKELET & CONN TISS MALIG W MCC |
| 543 | PATHOLOGICAL FRACTURES & MUSCULOSKELET & CONN TISS MALIG W CC |
| 544 | PATHOLOGICAL FRACTURES & MUSCULOSKELET & CONN TISS MALIG W/O CC/MCC |
| 545 | CONNECTIVE TISSUE DISORDERS W MCC |
| 547 | CONNECTIVE TISSUE DISORDERS W/O CC/MCC |
| 552 | MEDICAL BACK PROBLEMS W/O MCC |
| 556 | SIGNS & SYMPTOMS OF MUSCULOSKELETAL SYSTEM & CONN TISSUE W/O MCC |
| 580 | OTHER SKIN, SUBCUT TISS & BREAST PROC W CC |
| 581 | OTHER SKIN, SUBCUT TISS & BREAST PROC W/O CC/MCC |
| 582 | MASTECTOMY FOR MALIGNANCY W CC/MCC |
| 597 | MALIGNANT BREAST DISORDERS W MCC |
| 598 | MALIGNANT BREAST DISORDERS W CC |
| 602 | CELLULITIS W MCC |
| 603 | CELLULITIS W/O MCC |
| 637 | DIABETES W MCC |
| 640 | NUTRITIONAL & MISC METABOLIC DISORDERS W MCC |
| 641 | NUTRITIONAL & MISC METABOLIC DISORDERS W/O MCC |
| 643 | ENDOCRINE DISORDERS W MCC |
| 644 | ENDOCRINE DISORDERS W CC |
| 660 | KIDNEY & URETER PROCEDURES FOR NON-NEOPLASM W CC |
| 669 | TRANSURETHRAL PROCEDURES W CC |
| 674 | OTHER KIDNEY & URINARY TRACT PROCEDURES W CC |
| 682 | RENAL FAILURE W MCC |
| 683 | RENAL FAILURE W CC |
| 684 | RENAL FAILURE W/O CC/MCC |
| 686 | KIDNEY & URINARY TRACT NEOPLASMS W MCC |
| 689 | KIDNEY & URINARY TRACT INFECTIONS W MCC |
| 690 | KIDNEY & URINARY TRACT INFECTIONS W/O MCC |
| 694 | URINARY STONES W/O ESW LITHOTRIPSY W/O MCC |
| 698 | OTHER KIDNEY & URINARY TRACT DIAGNOSES W MCC |

Confidential

MLH_027909



*Draft - For discussion purposes only.*

| | |
|---|---|
| 699 | OTHER KIDNEY & URINARY TRACT DIAGNOSES W CC |
| 728 | INFLAMMATION OF THE MALE REPRODUCTIVE SYSTEM W/O MCC |
| 734 | PELVIC EVISCERATION, RAD HYSTERECTOMY & RAD VULVECTOMY W CC/MCC |
| 735 | PELVIC EVISCERATION, RAD HYSTERECTOMY & RAD VULVECTOMY W/O CC/MCC |
| 736 | UTERINE & ADNEXA PROC FOR OVARIAN OR ADNEXAL MALIGNANCY W MCC |
| 737 | UTERINE & ADNEXA PROC FOR OVARIAN OR ADNEXAL MALIGNANCY W CC |
| 738 | UTERINE & ADNEXA PROC FOR OVARIAN OR ADNEXAL MALIGNANCY W/O CC/MCC |
| 739 | UTERINE,ADNEXA PROC FOR NON-OVARIAN/ADNEXAL MALIG W MCC |
| 740 | UTERINE,ADNEXA PROC FOR NON-OVARIAN/ADNEXAL MALIG W CC |
| 741 | UTERINE,ADNEXA PROC FOR NON-OVARIAN/ADNEXAL MALIG W/O CC/MCC |
| 742 | UTERINE & ADNEXA PROC FOR NON-MALIGNANCY W CC/MCC |
| 743 | UTERINE & ADNEXA PROC FOR NON-MALIGNANCY W/O CC/MCC |
| 744 | D&C, CONIZATION, LAPAROSCOPY & TUBAL INTERRUPTION W CC/MCC |
| 745 | D&C, CONIZATION, LAPAROSCOPY & TUBAL INTERRUPTION W/O CC/MCC |
| 746 | VAGINA, CERVIX & VULVA PROCEDURES W CC/MCC |
| 747 | VAGINA, CERVIX & VULVA PROCEDURES W/O CC/MCC |
| 748 | FEMALE REPRODUCTIVE SYSTEM RECONSTRUCTIVE PROCEDURES |
| 749 | OTHER FEMALE REPRODUCTIVE SYSTEM O.R. PROCEDURES W CC/MCC |
| 754 | MALIGNANCY, FEMALE REPRODUCTIVE SYSTEM W MCC |
| 755 | MALIGNANCY, FEMALE REPRODUCTIVE SYSTEM W CC |
| 756 | MALIGNANCY, FEMALE REPRODUCTIVE SYSTEM W/O CC/MCC |
| 757 | INFECTIONS, FEMALE REPRODUCTIVE SYSTEM W MCC |
| 758 | INFECTIONS, FEMALE REPRODUCTIVE SYSTEM W CC |
| 759 | INFECTIONS, FEMALE REPRODUCTIVE SYSTEM W/O CC/MCC |
| 760 | MENSTRUAL & OTHER FEMALE REPRODUCTIVE SYSTEM DISORDERS W CC/MCC |
| 761 | MENSTRUAL & OTHER FEMALE REPRODUCTIVE SYSTEM DISORDERS W/O CC/MCC |
| 782 | OTHER ANTEPARTUM DIAGNOSES W/O MEDICAL COMPLICATIONS |
| 804 | OTHER O.R. PROC OF THE BLOOD & BLOOD FORMING ORGANS W/O CC/MCC |
| 808 | MAJOR HEMATOL/IMMUN DIAG EXC SICKLE CELL CRISIS & COAGUL W MCC |
| 809 | MAJOR HEMATOL/IMMUN DIAG EXC SICKLE CELL CRISIS & COAGUL W CC |
| 810 | MAJOR HEMATOL/IMMUN DIAG EXC SICKLE CELL CRISIS & COAGUL W/O CC/MCC |
| 811 | RED BLOOD CELL DISORDERS W MCC |
| 812 | RED BLOOD CELL DISORDERS W/O MCC |
| 813 | COAGULATION DISORDERS |
| 823 | LYMPHOMA & NON-ACUTE LEUKEMIA W OTHER O.R. PROC W MCC |
| 824 | LYMPHOMA & NON-ACUTE LEUKEMIA W OTHER O.R. PROC W CC |
| 827 | MYELOPROLIF DISORD OR POORLY DIFF NEOPL W MAJ O.R. PROC W CC |
| 829 | MYELOPROLIF DISORD OR POORLY DIFF NEOPL W OTHER O.R. PROC W CC/MCC |
| 834 | ACUTE LEUKEMIA W/O MAJOR O.R. PROCEDURE W MCC |
| 835 | ACUTE LEUKEMIA W/O MAJOR O.R. PROCEDURE W CC |
| 836 | ACUTE LEUKEMIA W/O MAJOR O.R. PROCEDURE W/O CC/MCC |
| 837 | CHEMO W ACUTE LEUKEMIA AS SDX OR W HIGH DOSE CHEMO AGENT W MCC |
| 838 | CHEMO W ACUTE LEUKEMIA AS SDX W CC OR HIGH DOSE CHEMO AGENT |

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 49 of 81 PageID #: 4139

Confidential

MLH_027910



*Draft - For discussion purposes only.*

| | |
|---|---|
| 839 | CHEMO W ACUTE LEUKEMIA AS SDX W/O CC/MCC |
| 840 | LYMPHOMA & NON-ACUTE LEUKEMIA W MCC |
| 841 | LYMPHOMA & NON-ACUTE LEUKEMIA W CC |
| 842 | LYMPHOMA & NON-ACUTE LEUKEMIA W/O CC/MCC |
| 844 | OTHER MYELOPROLIF DIS OR POORLY DIFF NEOPL DIAG W CC |
| 846 | CHEMOTHERAPY W/O ACUTE LEUKEMIA AS SECONDARY DIAGNOSIS W MCC |
| 847 | CHEMOTHERAPY W/O ACUTE LEUKEMIA AS SECONDARY DIAGNOSIS W CC |
| 848 | CHEMOTHERAPY W/O ACUTE LEUKEMIA AS SECONDARY DIAGNOSIS W/O CC/MCC |
| 849 | RADIOTHERAPY |
| 853 | INFECTIOUS & PARASITIC DISEASES W O.R. PROCEDURE W MCC |
| 857 | POSTOPERATIVE OR POST-TRAUMATIC INFECTIONS W O.R. PROC W CC |
| 862 | POSTOPERATIVE & POST-TRAUMATIC INFECTIONS W MCC |
| 863 | POSTOPERATIVE & POST-TRAUMATIC INFECTIONS W/O MCC |
| 864 | FEVER |
| 867 | OTHER INFECTIOUS & PARASITIC DISEASES DIAGNOSES W MCC |
| 870 | SEPTICEMIA OR SEVERE SEPSIS W MV 96+ HOURS |
| 871 | SEPTICEMIA OR SEVERE SEPSIS W/O MV 96+ HOURS W MCC |
| 872 | SEPTICEMIA OR SEVERE SEPSIS W/O MV 96+ HOURS W/O MCC |
| 896 | ALCOHOL/DRUG ABUSE OR DEPENDENCE W/O REHABILITATION THERAPY W MCC |
| 897 | ALCOHOL/DRUG ABUSE OR DEPENDENCE W/O REHABILITATION THERAPY W/O MCC |
| 908 | OTHER O.R. PROCEDURES FOR INJURIES W CC |
| 914 | TRAUMATIC INJURY W/O MCC |
| 916 | ALLERGIC REACTIONS W/O MCC |
| 920 | COMPLICATIONS OF TREATMENT W CC |
| 921 | COMPLICATIONS OF TREATMENT W/O CC/MCC |
| 939 | O.R. PROC W DIAGNOSES OF OTHER CONTACT W HEALTH SERVICES W MCC |
| 940 | O.R. PROC W DIAGNOSES OF OTHER CONTACT W HEALTH SERVICES W CC |
| 945 | REHABILITATION W CC/MCC |
| 947 | SIGNS & SYMPTOMS W MCC |
| 948 | SIGNS & SYMPTOMS W/O MCC |
| 951 | OTHER FACTORS INFLUENCING HEALTH STATUS |
| 981 | EXTENSIVE O.R. PROCEDURE UNRELATED TO PRINCIPAL DIAGNOSIS W MCC |
| 982 | EXTENSIVE O.R. PROCEDURE UNRELATED TO PRINCIPAL DIAGNOSIS W CC |
| 988 | NON-EXTENSIVE O.R. PROC UNRELATED TO PRINCIPAL DIAGNOSIS W CC |
| 989 | NON-EXTENSIVE O.R. PROC UNRELATED TO PRINCIPAL DIAGNOSIS W/O CC/MCC |

*Valuation Report MLBHC001*

Confidential   Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 50 of 81 PageID #: 4140   MLH_027911

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft – For discussion purposes only.*

## OUTPATIENT

The following ICD-9 codes, together with all applicable J-codes and Q-codes, are for the Adult Oncology Service Line:

10021 - FNA without imaging
10022 - FNA with imaging
10060 - Vulvar Abscess I&D
10061 - Drng of Skin Abscess
10120 - Inc & Rem foreign bo
10140 - Drainage of Hema
10160 - Aspiration of absces
10180 - I&D, postop wound in
11005 - Debridement of skin
11100 - Skin Biopsy
11101 - Biopsy Skin
11200 - Removal of skin tags
11400 - Excision
11401 - Excision
11402 - Excision
11403 - Excision
11406 - Removal of Skin
11420 - Removal of Skin Lsn
11423 - Excision
11424 - Removal of Skin Lesi
11621 - Excise lesion .6 to
11622 - Excise Lesion 1.1-2
11624 - Excise lesion 3.1 to
13160 - Late Closure
14040 - Rhomboid Flap <10 cm
14041 - Rhomboid Flap >10 cm
15830 - Panniculectomy
19102 - Breast Biopsy
20206 - Muscle bx perc needl
20225 - Bone Bx
20500 - Injection of sinus
20501 - Injection Sinus Trac
20600 - Asp or inj sm-Joint
20982 - Ablation Bone Tumor
21550 - Bx Soft Tissue Neck
27040 - Bx of Soft Tissue
32020 - Insert Chest Tube
32405 - Lung Bx

Page 50

Confidential

MLH_027912



*Draft - For discussion purposes only.*

32421 - Thoracentesis US
32422 - Thoracentesis w/tube
32551 - Insert Chest Tube
32998 - Lung ablation
33010 - Pericardiocentesis
35471 - PTA, Renal or Viscer
35476 - Repair Venous Block
36005 - Inj, Venography
36010 - Catheter
36011 - Catheter Placement
36012 - Catheter Placement
36015 - Cath Plmt Pulm Arter
36160 - Aorta Access
36200 - Aorta Catheter
36215 - Place Catheter
36216 - Place Catheter
36217 - Place Catheter
36218 - Place Catheter
36245 - Place Catheter
36246 - Place Catheter
36247 - Place Catheter
36248 - Place Catheter
36410 - Venipuncture
36415 - Venipuncture
36416 - Venipuncture, finger
36500 - Ven Cath Organ Blood
36540 - Collection Blood Spe
36556 - Insert CVC
36558 - Insert Tunneled CV
36561 - PAC insert
36569 - PICC Insert
36576 - Rpr of central venou
36581 - Rplcmt central cvc
36582 - PAC Replacement
36584 - Replace PICC
36589 - Hickman Cath Removal
36590 - PAC removal
36591 - Collect Blood - Port
36592 - Collect Blood - PICC
36593 - Declot Vascular Dev
36597 - Reposition CVC
36598 - Inj of existing cva
37204 - Embolization

Page 51

Confidential

MLH_027913

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

37205 - Transcath Stent
37206 - Transcath Stent
37210 - Uterine Fibroid Embo
37617 - Abdomen Ligation
37620 - IVC Filter Plcment
37660 - Ligation of Veins
38220 - Bone Marrow Asp
38221 - Bone Marrow Bx
38500 - Excision Groin Node
38505 - Lymph node bx
38562 - PL & PALN Sampling
38570 - Node Sampling
38571 - PL Lymphadenectomy
38572 - PL lympaden + PA bx
38760 - ILND Superficial
38770 - PLN Dissect (50)
38780 - PL & PALN Dissection
38790 - Sentinel Node Inject
39499 - RFA-mediastinal node
39560 - Resect Diaphragm Sim
42320 - Drainage of abscess
42400 - Bx salivary gland
43246 - Place gastrostomy tu
43499 - Place Visicoil-GE Ju
43750 - PEG Tube
43760 - Change Gastro Tube
44005 - Lysis of Adhesions
44120 - Resect/Anastomo Sing
44121 - Resect/Anast Ea Addt
44130 - Enteroenterostomy
44139 - Mobilization of Sple
44140 - Colon Resect part w/
44143 - Part w/Colostomy w/H
44145 - Part w/Low Ant Anast
44160 - Part+Ileum+Anastomos
44180 - Laparoscopy enteroly
44310 - Ileostomy
44320 - Colostomy LOOP
44602 - Sm Bowel Perf Rpr Si
44603 - Perforation Rpr Mult
44604 - Perf Rpr w/o Colosto
44605 - Lg Bowel Perf Rpr w/
44700 - Omental J Flap

Page 52

Confidential

MLH_027914



*Draft - For discussion purposes only.*

44955 - Appendectomy Indicat
45126 - Pelvic Exenteration
45300 - Proctosigmoidoscope
45999 - Rectum, unlisted pro
46600 - Anal Colposcope 2.1
46606 - Anoscopy & Bx
46917 - Dest Anal lesion/las
46922 - Exc anal lesion
47000 - Liver Bx
47001 - Liver bx true cut at
47011 - Liver Abscess
47382 - Liver ablation
47399 - Hepatic Microwave Ab
47500 - Inject proc for PTC
47505 - Inj for T-tube chola
47510 - Biliary drainage cat
47511 - Biliary Stent
47525 - Change Bile Duct
47530 - Revision/reinsertion
47801 - Plcmt of choledochal
48102 - Pancreas bx
48511 - Ext Drg pseudocyst
49000 - Laparotomy
49002 - Reopening Laparotomy
49020 - Drain Abd Abscess
49021 - Peritoneal abscess
49041 - Drainage Retroperi
49061 - Retroperitoneal absc
49080 - Paracentesis US
49080S - Facility Fee
49081 - Paracentesis Subsequ
49180 - Abd retro/adrenal bx
49203 - Exc Ret/Intra Cyst<5
49204 - Exc Ret/Intrap 5-10
49205 - Exi Ret/Intrap >10 c
49250 - Umbilectomy
49255 - Omentectomy
49320 - Dx Laparoscope +bx
49321 - Laparoscopic Biopsy
49419 - Insert Abd Cath
49421 - Ins of intraperitone
49422 - Removal of cannula
49423 - Chg perc tube

Page 53



49424 - Abscessogram
49440 - Insert Gastro Tube
49440S - Place gastro tube pe
49450 - Replace Gastro Tube
49451 - Replace jej/duo tube
49465 - Inj gastro duoden je
49560 - Incision/ventral-red
49561 - Inc/ventral-incarcer
49568 - Hernia rpr w/mesh
49585 - Umbilical, reducible
49587 - Incarcerated
49999 - Q Pump Placement
50200 - Renal Bx
50386 - Rem ureteral stent
50389 - Rem of nephro tube
50390 - Antegrade pyelogram
50392 - Percutaneous Nephros
50393 - Drng or stent ureter
50394 - Nephrostogram
50395 - Dilatation of nephro
50398 - Nephrostomy tube cha
50592 - Renal Ablation
50715 - Ureterolysis (-50)
50780 - Ureteroneocystomy
50815 - Ureterocolon conduit
51040 - Cystotomy
51102 - Suprapubic catheter
51535 - Repair Ureter Lesion
51550 - Cystectomy part simp
51555 - Cystectomy partial c
51600 - Cystography
51610 - Inj for retrograde u
51701 - Cath, Urethra
51703 - Insert Bladder Cath
51705 - Chg cystostomy tube
51710 - Chg cystostomy tube
51720 - Intravesical chemo
51865 - Cystorrhaphy, compl
51880 - Closure of cystostom
52000 - Cystoscopy Dx
52005 - Cystourethroscopy
52204 - Cystoscopy w/biopsy
52282 - Cystoscopy w/stent

Page 54

Confidential

MLH_027916



*Draft - For discussion purposes only.*

52332 - Stent change (50)
55876 - Placement Dev-RT Gui
55920 - Placement of cath/ne
56501 - Destruction, Simple
56515 - Destruction Extensiv
56605 - Biopsy One Lesion
56606 - Biopsy Ea Add Lesion
56620 - Vulvectomy Simple Pa
56625 - Simple Complete
56630 - Rad Partial no ILND
56631 - Rad Partial+Uni ILND
56632 - Rad Partial+Bil ILND
56633 - Rad Complete no ILND
56634 - Rad Compl+Uni ILND
56637 - Rad Complet+Bil ILND
56740 - Bartholin Gland Exci
56820 - colpo vulva only 2.3
56821 - Col vulva w/bx 3.2
57023 - I&D Vag hematoma GYN
57061 - Destruction, Simple
57065 - Destruction Extensiv
57100 - Bx Simple Vag Mucosa
57105 - Biopsy extensive sut
57106 - Vaginectomy Partial
57107 - Partial Rad -nodes
57109 - Vaginectomy w/remova
57155 - T&O
57160 - Pessary Fitting&ins
57180 - Vag Packing Hemostas
57200 - Repair of Vaginal Wa
57320 - Ves fistul vag rpr
57400 - Vag Dilation und Ane
57410 - Pelvic Exam
57420 - Colpo vagina 2.5
57421 - Colp vag/cer w/bx5.4
57452 - Colpo of cervix 2.4
57454 - Col cx w/bx/ecc 3.8.
57455 - col cx w/bx 3.1
57456 - col cx c/ecc 2.8
57460 - col cx w/loop bx 4
57461 - col cx w/LEEP 5.3
57500 - Cervix Bx Single or
57505 - ECC alone

Confidential      Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 56 of 81 PageID #: 4146   MLH_027917



*Draft - For discussion purposes only.*

57513 - Cervix Laser Vaporiz
57520 - Cervix Conization
57522 - Cervix Conization LE
57530 - Trachelectomy
57531 - Rad trachelectomy
57540 - Cx stump Excision Ab
57555 - Excision cervical st
58100 - Endometrial Biopsy
58120 - D&C
58140 - Removal of Uter Lsn
58146 - Myomectomy
58150 - TAH w or w/o BSO
58200 - TAH BSO+pel & PA nod
58210 - Rad Hyst +PL/PA node
58240 - Exenteration
58260 - Vag Hysterectomy<250
58262 - Vag Hyst + BSO <250
58301 - Remove IUD
58353 - Endometrial Ablation
58545 - Lap myomectomy
58548 - RAH PL/PALND +-BSO
58552 - Vag Hyst + BSO <250
58555 - Hysteroscopy
58558 - Hysteroscopy D&C +po
58561 - Hysterosc + Myomecto
58563 - Hysteroscopy w/ablat
58570 - Robotic TH<250gm-BSO
58571 - Robotic TH<250gm+BSO
58572 - Robotic TH>250gm-BSO
58573 - Robotic TH>250gm+BSO
58660 - LOA
58661 - Remove tube + ovary
58662 - Laproscopy excis ova
58720 - BSO/USO
58805 - Drng of ovarian cyst
58823 - Pelvic Abscess
58825 - Transposition, Ovary
58925 - Ovarian Cystectomy
58943 -  USO PL&PALNS Bx Cyt
58950 - Ovar Stg BSO Omen
58951 - TAHBSO Omentum PL&PA
58952 - Ovar Debulk BSO Omen
58953 - TAH BSO Omentum

Confidential
Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 57 of 81 PageID #: 4147
MLH_027918

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

58954 - TAHBSO Omentec PL&PA
58956 - TAH BSO Omentum Mali
58957 - 2cdry cytodebulking
58958 - 2cdry cytodeblk node
58960 - Ov Stage 2nd look La
59870 - D&E (molar pregnancy
60100 - Thyroid Bx
60300 - Asp/Inj Thyroid Cyst
61070 - Ommaya Puncture
62270 - Lumbar Puncture
64402 - Inj Anes Facial Nerv
64420 - Nerve Block inj
64421 - Nerve Block Inj Mult
64483 - Nerve Blk Lumbar
64530 - Inj for Nerve Blck
64620 - Dest by Neuro agent
64680 - Dest by neurolytic
70250 - Skull x-ray
70450 - CT Head wo
70460 - CT Head  contrast
70470 - CT Head w/wo
70480 - CT Orbits wo
70481 - CT Orbits With
70482 - CTOrbits w/wo
70486 - CT Sinuses wo
70487 - CT Sinus with
70488 - CT Sinus w/wo
70490 - CT Neck Soft w/o
70491 - CT Neck Soft With
70492 - CT Neck Soft  w/wo
70496 - CTA Head
70498 - CTA Neck
70540 - MRI Orbit, face w/o
70542 - MRI Orbit Face with
70543 - MRI Orbit/Face/Neck
70544 - MRA Head
70546 - MRA Brain w & w/o
70547 - MRA Neck
70549 - MRA Neck w & w/o
70551 - MRI Brain w/o
70552 - MRI Brain with Contr
70553 - MRI Brain w & w/o
71010 - Chest One View

*Valuation Report MLBHC001*



*Draft – For discussion purposes only.*

71020 - CXR 2 views
71030 - Chest complete
71100 - Ribs Unilateral
71250 - CT Chest w/o contras
71260 - CT Chest  contrast
71270 - CT Chest w/wo
71275 - CTA Chest w &/or w/o
71550 - MRI Brachial Plexus
72040 - Cervical Spine
72050 - Cervical Spine Comp.
72070 - Thoracic Spine
72100 - Lumbar Spine 2 View
72110 - Lumbar Spine Complet
72125 - CT Cervical Spine wo
72127 - CT Cervical w/wo
72128 - CT Spine Thoracic
72130 - CT Thoracic w/wo
72131 - CT Lumbar Spine
72132 - CT Lumbar Spine
72133 - CT Lumbar Spine
72141 - MRI Cerv Spine w/o
72142 - MRI CervSpine contra
72146 - MRI Thor Spine w/o
72147 - MRI ThorSpine contra
72148 - MRI Lumbar Spine w/o
72149 - MRI Lumbar with Cont
72156 - MRI Spinal Canal w &
72157 - MRI Thoracic w & w/o
72158 - MRI Lumbar w & w/o
72170 - Pelvic X-ray
72190 - Pelvis Exam 2>Views
72191 - CTA Pelvis w & w/o
72192 - CT Pelvis w/o
72193 - CT Pelvis contrast
72194 - CT Pelvis w/wo
72195 - MRI Pelvis/hip w/o
72197 - MRI Pelvis w & w/o
72220 - Coccyx /Sacrum
73030 - Shoulder Complete
73060 - Humerous AP & Lat
73070 - Elbow Two Views
73080 - Elbow Complete
73090 - Forearm Two Views

Page 58

*Valuation Report MLBHC001*

Confidential
MLH_027920


73110 - Wrist Complete
73120 - Hand 2 Views
73130 - Hand Complete
73200 - CT Up Extremity  wo
73201 - CT Upper Extremity w
73202 - CT Up Extremity w/wo
73218 - MRI Upper Ext w/o
73219 - MRI upper Ext, other
73220 - MRI Upper arm w &w/o
73221 - MRI Shoulder
73223 - MRI Upper Ext w & w/
73500 - Hip unilateral
73510 - Hip Complete
73520 - Hips bilateral
73550 - Femur Two Views
73560 - Knee Two Views
73562 - Knee Three Views
73590 - Tibia Fibula Two Vws
73600 - Ankle Two Views
73610 - Ankle Complete
73620 - Foot AP and Lat
73630 - Foot Complete
73700 - CT Lower Ext. wo
73701 - CTLower Extremity w
73718 - MRI Low Ext no jnt
73720 - MRI Thigh
73721 - MRI L/E Joint w/o
73723 - MRI Lower Ext w & wo
74000 - KUB xray
74020 - Abdomen 4 View xray
74150 - CT Abd w/o contrast
74160 - CT Abd with contrast
74170 - CT Abdomen w/wo
74175 - CTA Abdomen w/wo
74176 - CT Abd/Pelvis w/o
74177 - CT Abd/Pelvis with
74178 - CT Abd/Pel w & w/0
74181 - MRCP
74183 - MRI Abdomen w & w/o
74185 - MRA abdomen w & w/o
74305 - Inj for T Tube S&I
74320 - Inj proc for PTC S&I
74420 - Urography retrograde

*Valuation Report MLBHC001*

Confidential

MLH_027921

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft – For discussion purposes only.*

74425 - Nephrostogram S&I
74430 - Cystography S&I
74475 - Perc Nephro S&I
74480 - Ureteral Cath S&I
74485 - Dilatation Nephro S&
75571 - Calcium Score
75572 - CTA Heart w/contrast
75574 - CTA cor art & bypass
75625 - Abdominal Aortogram
75630 - Abd Aortogram w/run
75635 - CTA Abdm Pel Run-off
75650 - Angio - Arch
75665 - Angio Car int uni
75671 - Angio car int bil
75680 - Angio car bil com
75685 - Angio vert cerv
75705 - Angio, spinal
75710 - Angio extremity uni
75716 - Angio extremity bil
75722 - Angio Renal Unilater
75726 - Visceral w-w/o flush
75736 - Angio Pelvic ea vess
75741 - Pulmonary, Unilatera
75756 - Artery Chest
75774 - Artery Each Vessel
75820 - Venography
75822 - Venography, bilat
75825 - Venography IVC
75827 - Venography SVC
75860 - Venography
75893 - Venous sampling
75894 - Embolization S&I
75898 - Follow up Angiogram
75940 - Placement Vein Filte
75960 - Intravascular Stent
75966 - Transluminal balloon
75978 - PTA Venous S&I
75980 - Biliary Drainage S&I
75982 - Biliary stent S&I
75984 - Nephro Tube Chg S&I
75989 - Abscess Drainage
76000 - PAC fluoro ck
76076 - Bone Density DualEng

*Valuation Report MLBHC001*

Confidential

MLH_027922



*Draft - For discussion purposes only.*

76080 - Sinus Tract Study S&
76380 - CT Limited Study
76536 - US SoftTiss.Neck/Thy
76604 - US Chest
76645 - US Breast
76700 - US Abdominal complet
76705 - US Abdomen ltd
76770 - US Retroperitoneal
76775 - US Retroperitoneal
76830 - US Transvaginal
76856 - US Pelvis (non OB)
76857 - US Pelvic lmtd
76870 - US Scrotum & Content
76872 - US Transrectal
76880 - US Extremity nonvasc
76881 - US Extremity, comple
76882 - US Extremity, limite
76937 - USG Guidance CVC
76942 - US guidance for need
76970 - USG Study Follow up
77001 - Fluoro Guide CVC
77002 - Fluroscopic needle
77003 - Lumbar Punc fluoro
77012 - CT Guidane for Bx
77013 - CT Guided Ablation
77014 - CT Guided placement
77080 - DEXA Bone Density
77081 - DEXA Bone/Append
77082 - Vertebral Fracture
77261 - Clinical Tx Plan: S
77262 - Clinical Tx Plan: I
77263 - Clinical Tx Plan: C
77280 - Simulation: Simple
77285 - Simulation: Intermed
77290 - Simulation: Complex
77295 - Simulation 3D
77300 - Basic Rad Dos Calc
77301 - IMRT Planning
77305 - Isodose Plan: S
77310 - Isodose Plan: Inter
77315 - Isodose Plan: Comple
77321 - Special Therapy Port
77326 - Brachy Isodose: S

Confidential

MLH_027923



*Draft - For discussion purposes only.*

77327 - Brachy Isodose: I
77328 - Brachy Iso Plan Comp
77332 - Treatment Devices S
77333 - Treatment Dev: Inter
77334 - Treatment Devices: C
77338 - Multi-leaf Device
77421 - Stereoscopic Guid
77427 - Weekly Treatment: 5
77431 - Short Course Tx
77432 - Stereotactic: 1 Tx
77435 - SRT Mgmt Body<5
77470 - Spec Tx Proc
77761 - Brachy Intra Simple
77778 - Brachy Interstit Com
77785 - HDR: 1 Channel
77786 - HDR: 2-12 Channels
77787 - HDR: >12 Channels
77789 - Brachy Surface App
77790 - Brachy Supervise Han
78608 - PET Scan of brain
78813 - PET Whole Body
78815 - PET w/CT
82570 - Creatinine Urine Ran
83540 - Iron, Serum
83550 - Iron TIBC
83735 - Magnesium
84155 - Protein Total
84165 - Protein Electro
85049 - Auto Plt Ct
85610 - Protime
85613 - Rus Vip Ven Diluted
85730 -   PTT
86147 - Anticardiolipin AB
86580 - TB Skin Test
88313 - DAPI nuclear stain
88346 - Imm. study, ea ant
88361 - IHC, using computer
90471 - Immunization Admin
90472 - ImmunizeAdmin,Ea add
90632 - Hepatitis A Vaccine
90646 - Hib Vaccine
90658 - Flu Vaccine
90701 - Diphtheria, tetanus

*Valuation Report MLBHC001*

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 63 of 81 PageID #: 4153

Confidential

MLH_027924



*Draft - For discussion purposes only.*

90732 - Pneumoccal Vaccine
90733 - Meningococcal Vac
90746 - Hep B Vac 20mcg/ml
90760 - IV Inf Hyd up to 1 h
90761 - IV Inf Hyd ea addtl
90765 - IV Inf, Therap 1 hr
90766 - IV Inf, Therap ea ad
90767 - IV Inf ea addtl seq
90768 - IV Inf Concurrent In
90772 - IM or SC Injection
90774 - IV Push Injection 1s
90775 - IV Push Inj, ea addt
93000 - EKG, w/intrep & rpt
93005 - EKG, tracing only
93799 - Cardiac Score
93880 - DS Extracranial arte
93925 - DS Lower Ext arts or
93926 - DSLower Ext Unil Lmt
93931 - DS upper ext arts or
93970 - DS ext veins inc res
93971 - US Upper/Lower Extr
93976 - DS art inflow/vein
93976 - DS Art inflo/vein-GI
93978 - DS aorta inferior ve
94640 - Inhalation Txmt
94664 - Inhalation, Demo
94760 - Oximetry, Single
96150 - Hlth & Bhvr
96151 - Hlth & Bhvr
96152 - Hlth & Bhvr
96153 - Hlth & Bhvr
96154 - Hlth & Bhvr
96155 - Hlth & Bhvr
96360 - IV Inf Hyd up to 1 h
96361 - IV Inf Hyd ea addtl
96365 - IV Inf, Therap 1 hr
96366 - IV Inf, Therap ea ad
96367 - IV Inf ea addtl seq
96368 - IV Inf Concurrent In
96372 - IM or SC Injection
96374 - IV Push Injection 1
96375 - IV Push Inj, ea addt
96401 - Chemo, IM/SubQ, non-

*Valuation Report MLBHC001*

Confidential

MLH_027925



*Draft – For discussion purposes only.*

96402 - Chemo, IM/SubQ Horm
96409 - Chemo, IV Push, Init
96411 - Chemo, IV Push, addt
96413 - Chemo, IV Inf, init
96415 - Chemo, IV Inf, addtl
96416 - Chemo, Initiation of
96417 - Chemo, Ea addtl seq
96445 - Chemo Peritoneal
96446 - Chemo-Peritoneal cav
96450 - Chemo, Into CNS
96523 - Port Flush only
96542- - Chemo Ommaya Tap
99000 - PAP Smear
99024 - Postop Visit
99070 - Admin Set
99144 - Consc Sedation 30 mi
99195 - Phlebotomy, Therap
99201 - New Patient Visit 1
99202 - New Patient Visit: 2
99203 - New Patient Visit: 3
99204 - New Patient Visit: 4
99205 - New Patient Visit: 5
99211 - Office Visit-Minimal
99212 - Follow-up Visit: 2
99213 - Follow-up Visit: 3
99214 - Follow-up Visit: 4
99215 - Follow-up Visit: 5
99217 - Discharge Day Mgmt
99218 - Obsv Care: 1
99219 - Obsv Care: 2
99220 - Obsv Care: 3
99221 - A1 Hosp Admit Low
99222 - A2 Hosp Admit Mod
99223 - A3 Hosp Admit High
99231 - V1 Sub Pat Care: Foc
99232 - V2 Sub Pat Care: Exd
99233 - V3 Sub Pat Care: Det
99234 - Obs/Hosp Same Date:1
99235 - Obs/Hosp Same Date:2
99236 - Obs/Hosp Same Date:3
99238 - DC1 Hosp Disch
99239 - DC2 Hosp Disch
99241 - CO1 Consult 1

*Valuation Report MLBHC001*

Confidential

MLH_027926

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

99242 - CO2 Consult 2
99243 - CO3 Consult 3
99244 - CO4 Consultation 4
99245 - CO5 Consult 5
99251 - C1 Hosp Consult 1
99252 - C2 Hosp Consult  2
99253 - C3 Hosp Consult  3
99254 - C4 Hosp Consult 4
99255 - C5 Hosp Consult 5
99291 - Crit Care, 30-74min
99292 - Crit Care addl 30min
99304 - Initial Nrsg Fac Lo
99305 - Initial Nrsg Fac Mod
99306 - Initial Nrsg Fac Hi
99307 - Sub SNF Visit- Focus
99308 - Sub SNF Visit-Expand
99309 - Sub SNF Visit-Detail
99315 - Nursing Fac Dschg
99316 - Nursing Fac Dischg
99355 - ProlongSvc Off+30min
99356 - Prolong Svc Inpt 1hr
99406 - Smoking Cess 3-10 mi
99407 - Smoking Cess >10 min
99999 - Admitted from Office

*Valuation Report MLBHC001*

Confidential

MLH_027927

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

**Exhibit C – Performance Improvement Initiatives**

The Manager will be entitled to incentive compensation (*i.e.,* the Incentive Management Fee) to the extent it can attain certain quality of service benchmarks, operational efficiency benchmarks, budgetary objectives and new program development benchmarks collectively the "Performance Improvement Initiatives"). The definition of each Performance Improvement Initiative is set forth in this **Exhibit C**. The Parties acknowledge and agree that it is not their intention to limit or reduce items or services to any of the Health System's patients. Instead, it is the Parties' intention to improve and, where appropriate, maintain the quality and efficiency of the Service Line.

The maximum aggregate amount of Incentive Management Fee eligible to be earned by the Manager during the first term year of the Agreement will equal $1,302,000.00. Beginning on the first anniversary of the Effective Date of the Agreement and on every anniversary date thereafter, the Parties will assess and make any necessary changes to the Incentive Management Fee as set forth in the Agreement. All such changes will be memorialized in an amendment to the Agreement executed by the Parties.

| Performance Standard | Available Incentive Compensation | Allocation % |
|---|---|---|
| **QSIC** | | |
| • Multidisciplinary / Multimodality Planning and Collaboration | $195,300 | 15% |
| • Outpatient Care Plan Compliance | $195,300 | 15% |
| • Improvement / Maintenance of QOPI Measurements | | |
|    o Staging documented within one (1) month of first office visit | $65,100 | 5% |
|    o Chemotherapy treatment summary process completed within three (3) months of chemotherapy end | $65,100 | 5% |
|    o Appropriate documentation prior to administration of ESAs | $65,100 | 5% |
| • Screening for Clinical Research Eligibility | $130,200 | 10% |
| **OEIC** | | |
| • Integration of Services Across All Sites of Care — Outpatient Oncology Services | $195,300 | 15% |

Page 66

*Valuation Report MLBHC001*

Confidential

MLH_027928



*Draft - For discussion purposes only.*

| Performance Standard | Available Incentive Compensation | Allocation % |
|---|---|---|
| • Timely Communication with Referring Physicians | $130,200 | 10% |
| **NPDIC** | | |
| • Concierge / Patient Navigator Program Planning | $130,200 | 10% |
| • Joint Commission / Provider-Based Outpatient Services Requirements | $130,200 | 10% |
| **TOTAL** | **$1,302,000** | **100.0%** |

I. **Performance Benchmarks**

A. **Quality of Service Incentive Compensation** – The Manager will be entitled to earn quality of service incentive compensation ("QSIC") if the Manager manages the Service Line in a manner which meets or exceeds certain quality of service benchmarks. The performance benchmarks are as follows:

(1) **Multidisciplinary/Multimodality Planning and Collaboration—Breast Oncology Surgery** – The Manager will be entitled to receive incentive compensation for the improvement of coordination of multidisciplinary/multimodality treatment planning and communication related to breast malignancies. The Manager will have six (6) months from the Effective Date to develop an agreed upon process and implementation plan and to implement the process. This will serve as a pilot population with planned expansion into other malignancies. Based on the protocol established in the first six (6) months of the initial term of this Agreement, the Manager will create, for Operating Committee approval, threshold levels for QSIC payout that correspond to the percentage of patients whose physicians completed all steps of the aforementioned protocol to improve coordination of multidisciplinary/multimodality treatment planning and communication related to breast malignancies. Performance of this metric will be measured and evaluated by the Operating Committee. The following table sets forth the milestones and targeted levels of the associated incentive compensation:

Page 67



*Draft - For discussion purposes only.*

| Milestone | Goal / Timeline | Allocation % | Payout Amount |
|-----------|-----------------|--------------|---------------|
| Development of process / protocol; Development of baseline performance and implementation of plan | Completed by June 30, 2012 | 50% | $97,650 |
| Measure and achieve improvement in percentage of patients whose physicians achieved protocol compliance | Months 7-12 from the Effective Date | 50% | $97,650 |

(2) **Outpatient Care Compliance** – The Manager will be entitled to receive incentive compensation related to the level of compliance with agreed upon standardized protocols. The objective of this initiative is for physicians to appropriately utilize standardized protocols based on national clinical established guidelines. Year 1 protocols will focus on four major cancer types: breast, colon, ovarian, and lung. Manager will have six (6) months from the Effective Date to (i) identify protocols, (ii) develop an implementation plan for standardized adoption and compliance monitoring, and (iii) implement and establish a baseline for future improvement. Based on the protocol established in the first six (6) months of the initial term of the Agreement, the Manager will create, for Operating Committee approval, threshold levels for QSIC payout that correspond to the percentage of patients whose physicians completed all steps of the aforementioned protocols. Performance of this metric will be measured and evaluated by the Operating Committee. The following table describes the milestones and targeted levels of associated QSIC:

| Milestone | Goal / Timeline | Allocation % | Payout Amount |
|-----------|-----------------|--------------|---------------|
| Development of process / protocol; Development of baseline performance and implementation of plan | Completed by June 30, 2012 | 50% | $97,650 |
| Measure and achieve improvement in percentage of patients treated using the protocols | Months 7-12 from the Effective Date | 50% | $97,650 |

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 69 of 81 PageID #: 4159

Confidential

MLH_027930

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

(3) **Improvement / Maintenance of QOPI Measures**[67] Manager will be entitled to receive incentive compensation based on the percent compliance with the following QOPI Measures:

(a) QOPI Measure #2 - Treatment staging within one (1) month of first office visit for the applicable measuring period. Performance will be measured based on the total number of eligible patients and the number of patients where the staging documentation has occurred:

| Metric | Current Performance | Goal | Incentive Earned, % | Payout Amount |
|---|---|---|---|---|
| Staging documented within one month of first office visit | 76% | 75%-80% | 25% | $16,275 |
| | | 80%-85% | 50% | $32,550 |
| | | 85%-90% | 75% | $48,825 |
| | | ≥90% | 100% | $65,100 |

(b) QOPI Measure #20 - Chemotherapy treatment summary process completed within three (3) months of chemotherapy end. Successful compliance with QOPI Measure #20 includes completion of QOPI Measures #17, 18, and 19 (i.e., if these three QOPI Measures are not achieved, QOPI Measure #20 will also not be achieved). Performance will be measured based on the total number of eligible patients and the number of patients where the treatment summary process has been completed:

| Metric | Current Performance | Goal | Incentive Earned, % | Payout Amount |
|---|---|---|---|---|
| Chemotherapy treatment summary process completed within 3 months of chemotherapy end | 0% | 25%-50% | 25% | $16,275 |
| | | 50%-75% | 50% | $32,550 |
| | | 75%-90% | 75% | $48,825 |
| | | ≥90% | 100% | $65,100 |

(c) QOPI Measure #32 – Create and maintain appropriate documentation prior to administration of erythropoiesis-stimulating agents (ESAs).

---

[67] References herein to the "QOPI Measures" are those measures established by the American Society of Clinical Oncology (ASCO) and set forth in the ASCO's Quality Oncology Practice Initiatives' Summary of Measures, Fall 2011, Last Updated: 8-1-11.

*Valuation Report MLBHC001*



*Draft - For discussion purposes only.*

Successful compliance with QOPI Measure #32 includes completion of QOPI Measures # 30 and 31 (*i.e.,* if these four QOPI Measures are not achieved, QOPI Measure #32 will also not be achieved). Performance will be measured based on the total number of eligible patients and the number of patients where appropriate documentation of ESA was obtained:

| Metric | Current Performance | Goal | Incentive Earned, % | Payout Amount |
|---|---|---|---|---|
| Appropriate documentation prior to administration of ESAs | 0% | 25%-50% | 25% | $16,275 |
| | | 50%-75% | 50% | $32,550 |
| | | 75%-90% | 75% | $48,825 |
| | | ≥90% | 100% | $65,100 |

(4) **Increase Number of Patients Screened for Clinical Research Trials-** The Manager will be entitled to receive incentive compensation for the development and implementation of a standardized process for screening oncology patients for enrollment in clinical trials. The Manager will have six (6) months from the Effective Date to develop a clinical trial screening (research) protocol/process and to implement the process and perform beta testing of the process. Based on the process established in the first six (6) months of the initial term of the Agreement, the Manager will create, for Operating Committee approval, threshold levels for QSIC payout that correspond to the percentage of patients whose physicians comply with the aforementioned process. Performance of this metric will be measured and evaluated by the Operating Committee. The following table sets forth the targeted levels of the associated incentive compensation::

| Milestone | Goal / Timeline | Allocation % | Payout Amount |
|---|---|---|---|
| Development of process / protocol; Development of baseline performance and implementation of plan | Completed by June 30, 2012 | 50% | $65,100 |
| Measure and achieve improvement in percentage of physicians complying with the process | Months 7-12 from the Effective Date | 50% | $65,100 |

Page 70

Confidential

MLH_027932



*Draft - For discussion purposes only.*

B.  **Operational Efficiency Incentive Compensation** - The Manager will be entitled to earn operational efficiency incentive compensation ("OEIC") if the Manager manages the Service Line in a manner which meets or exceeds certain operational efficiency benchmarks.  Said operational efficiency benchmarks are the following:

A.  **Integration of Patient Services Across All Sites of Care – Outpatient Oncology Services** - The Manager will be entitled to receive incentive compensation for the improved integration of outpatient adult oncology services across all sites of care.  The objective of this incentive is to identify priority patient services and programs (*e.g.,* electronic medical records access, electronic or integration of provider communication, social work, case management, financial counseling) and thereafter implement and expand such services and programs consistently throughout all outpatient sites of care for the Service Line.  The Manager will identify, develop and implement the priority patient services and programs. The services and programs will require approval of Health System prior to implementation, which approval will not be unreasonably withheld, conditioned or delayed.  Expected time for development and implementation of these new services and programs is 10 months from the Effective Date.   Additionally, over the course of first contract year, the Operating Committee will also use a portion of the Base Management Fee to review inpatient oncology services in preparation for integration in Year two of the arrangement.  The following table represents the incentive associated with this initiative:

| Operational Efficiency  Development Steps | Goal / Timeline | Allocation % | Payout Amount |
|---|---|---|---|
| Identify priority programs for development/expansion within outpatient services and develop business plan for Hospital approval | May 1, 2012 | 25% | $48,825 |
| Present business plan to Hospital and obtain approval of business plan for identified programs | June 1, 2012 | 15% | $29,295 |
| Develop the identified programs and prepare a plan for and participate in implementation of identified programs | August 1, 2012 | 25% | $48,825 |
| Open identified programs | October 31, 2012 | 25% | $48,825 |
| Provide end of year summary of operations, financial operations, | December 31, 2012 | 10% | $19,530 |

Confidential

MLH_027933


*Draft - For discussion purposes only.*

| Operational Efficiency Development Steps | Goal / Timeline | Allocation % | Payout Amount |
|---|---|---|---|
| suggestions for improvement, and plans to enhance/refine identified programs | | | |

B. **Timely Communication with Referring Physicians -** The Manager will be entitled to receive incentive compensation for the formalization of a process to regularly communicate with referring physicians. Potential interactions with referring physicians include: (i) communications thanking physician for the referral and sharing recommended plan of care for the referred patient within 30 days of referral; (ii) periodic courtesy updates on patient treatment progress (e.g., monthly, quarterly); (iii) invitations to attend when patient is discussed at Tumor Board; (iv) updates on new services available at Managed Sites; and (v) potential direct access or down streaming of medical oncology EMR. The Manager will have six (6) months from the Effective Date to develop an agreed upon process and implementation plan and to implement the process. Based on the process established in the first six (6) months of the initial term of the Agreement, the Manager will create, for Operating Committee approval, threshold levels for QSIC payout that correspond to the percentage of patients whose physicians comply with the aforementioned process. Performance of this metric will be measured and evaluated by the Operating Committee. The following table sets forth the targeted levels of the associated incentive compensation:

| Operational Efficiency Development Steps | Goal / Timeline | Allocation % | Payout Amount |
|---|---|---|---|
| Development of process / protocol; Development of baseline performance and implementation of plan | Complete by June 30, 2012 | 50% | $65,100 |
| Measure and achieve improvement in percentage of physicians complying with the process | Months 7-12 from the Effective Date | 50% | $65,100 |

C. <u>**New Program Development Incentive Compensation**</u> - The Manager will be entitled to earn new program development incentive compensation ("NPDIC") if the Manager manages the Service Line in a manner which meets or exceeds certain new program development benchmarks. Said new program development benchmarks are the following:

(1) **Concierge Medicine/Patient Navigator Program Development** – The Manager will be entitled to receive an incentive for exploring and making

Page 72



recommendations concerning the potential creation and development of a Concierge Medicine/Patient Navigator Program. As set forth in the timeline below, the Manager will have twelve (12) months from the Effective Date to (i) perform research and assess the usefulness of a Concierge Medicine/Patient Navigator Program, (ii) develop and present the business plan for Concierge Medicine / Patient Navigator Program to the Health System's leadership for approval, (iii) develop the implementation plan for the Concierge Medicine/Patient Navigator Program, including a timeline for implementation, and (iv) commence operation of the Concierge Medicine/Patient Navigator Program. The following table sets forth the targeted levels and the associated NPDIC:

| New Program Development Steps | Goal / Timeline | Allocation % | Payout Amount |
|---|---|---|---|
| Research and assessment of Patient Concierge / Navigator Program and develop business plan for Hospital approval | Complete by June 1, 2012 | 25% | $32,550 |
| Present business plan to Hospital and obtain Hospital approval of business plan | Complete by July 1, 2012 | 25% | $32,550 |
| Develop and submit to Hospital, final implementation timeline, marketing plan, staff training program, operations plan | October 1, 2012 | 25% | $32,550 |
| Open program | November 1, 2012 | 15% | $19,530 |
| Provide end of year summary of operations, financial operations, suggestions for improvement, and plans to enhance/refine services | December 31, 2012 | 10% | $13,020 |

(2) **Joint Commission / Provider-Based Outpatient Services Requirements** - The Manager will be entitled to receive an incentive for preparing to convert the locations at the Cancer Center Sites that are not provider-based to provider-based status and the resulting Joint Commission regulatory readiness. The Manager will have twelve (12) months from the Effective Date to (i) perform research and identify required modifications to operations and/or facilities, and (ii) present the recommendation(s) to the Health System leadership for consideration, and (iii) prepare for and conduct a mock survey. The following table sets forth the targeted levels and associated NPDIC:

Confidential

MLH_027935



*Draft – For discussion purposes only.*

| New Program Development Steps | Goal / Timeline | Allocation % | Payout Amount |
|---|---|---|---|
| Create Joint Commission Committee to understand changes involved in accreditation process; review and assess accreditation readiness; prepare summary of findings for Operating Committee | Complete by June 30, 2012 | 40% | $52,080 |
| Provide a written report outlining recommendation for changes and assist in implementation of recommendations in preparation for mock survey | Complete by October 31, 2012 | 25% | $32,550 |
| Conduct mock survey, analyze and provide Hospital with report that outlines mock survey results and makes recommendations for necessary corrections (if any) and improvement. | Complete by December 31, 2012 | 35% | $45,570 |

## II. Payment of Performance Improvement Initiatives Incentive Compensation

The Incentive Management Fee earned by achieving a milestone or completing a task will be payable within thirty (30) days after the Manager satisfactorily completes the milestone or task, as determined by the Operating Committee, and notifies the Health System of such completion. Unless otherwise specified in the Agreement, all other Incentive Management Fees will be earned and payable on an annual basis. The Health System will determine the amount of the Incentive Management Fee earned by the Manager in connection with the Management Services provided by the Manager during each term year, no later than sixty (60) days after the conclusion of such term year. The health System will pay the Manager the earned Incentive Management Fee no later than ninety (90) days after the conclusion of such term year.

*Valuation Report MLBHC001*

Confidential

MLH_027936

*Privileged Attorney-Client Communication*
*Attorney Work Product*



*Draft - For discussion purposes only.*

## Exhibit D – The Joint Commission Principles for the Construct of Pay-for-Performance Programs

A. The goal of pay-for-performance programs should be to align reimbursement with the practice of high quality, safe health care for all consumers.

- Payment systems should recognize the cost of providing care in accordance with accepted standards of practice and should guard against any incentives that could undermine the provision of safe, high quality care.

- Reward programs should encourage qualified clinical staff to accept patients where complexity, risk, or severity of illness may be considerations.

- Performance incentives should be aligned with professional responsibility and control.

B. Programs should include a mix of financial and non-financial incentives (such as differential intensity of oversight; reduction of administrative and regulatory burdens; public acknowledgement of performance) that are designed to achieve program goals.

- The type and magnitude of incentives should be tailored to the desired behavior changes. Rewards should be great enough to drive desired behaviors and support consistently high quality care.

- A sliding scale of rewards should be established to allow for recognition of gradations in quality of care, including service delivery.

- The reward structure should take into account the unique characteristics of a provider organization's mission.

C. When selecting the areas of clinical focus, programs should strongly consider consistency with national and regional efforts in order to leverage change and reduce conflicting or competing measurement. It is also important to attend to clinical areas that show significant promise for achieving improvements because they represent areas where unwarranted differences in performance have been documented.

D. Programs should be designed to ensure that metrics upon which incentive payments are based are credible, valid, and reliable.

- Quality-related program goals should be transparent, explicit, and measurable.

- Metrics should be evidence-based or, in the absence of strong science, be based on expert consensus.

- Metrics should be standardized, be risk-adjusted where appropriate, and have broad acceptance in the provider and professional community.

- Credible and affordable mechanisms to audit data and verify performance must be developed and implemented.

Page 75

Confidential    Case 3:17-cv-00902    Document 257-7    Filed 08/23/22    Page 76 of 81 PageID #: 4166    MLH_027937



*Draft - For discussion purposes only.*

- The measurement set should be constructed to fulfill program objectives with the minimum amount of measurement burden needed.

E. Programs must be designed to acknowledge the united approach necessary to effect significant change, and the reality that the provision of safe, high quality care is a shared responsibility between provider organizations and health care professionals.

- Incentive payments should be recognized systemic drivers of quality in units broader than individual provider organizations and practitioner groups and encourage improvement at these aggregate levels.

- Incentive programs should support team approaches to the provision of health care, as well as integration of services, overall management of disease, and continuity of care.

- Incentive programs should encourage strong alignment between practitioner and provider organization goals, while also recognizing and rewarding the respective contributions of each to overall performance.

F. The measurement and reward framework should be strategically designed to permit and facilitate broad-scale behavior change and achievement of performance goals within targeted time periods. To accomplish this, provider and practitioners should receive timely feedback about their performance and be provided the opportunity for dialogue when appropriate. Rewards should follow closely upon the achievement of performance.

G. Programs should reward accreditation, or have an equivalent mechanism that recognizes health care organizations' continuous attention to all clinical and support systems and processes that relate to patient safety and health care quality.

H. Incentive programs should support an interconnected health care system and the implementation of "interoperable" standards for collecting, transmitting, and reporting information.

I. Programs should incorporate periodic, objective assessment into their structure. The evaluations should include the system of payment and incentives built into the program design, in order to evaluate its effects on achieving improvements in quality, including any unintended consequences. The program and, where appropriate, its performance threshold should be re-adjusted as necessary.

J. Provisions should be made to invest in sub-threshold performers who are committed to improvement and are willing to work themselves or with assistance to develop and carry out improvement plans. Such investment should be made after considering both the potential for realistic gains in improvement relative to the amount of resources necessary to achieve that promise, and what is a reasonable timeframe for achieving program performance goals.

*Valuation Report MLBHC001*

Confidential

MLH_027938



*Draft - For discussion purposes only.*

## Exhibit E – The Scoring Algorithm

| | Generic Tasks Associated with Management Agreements | Full, Limited, N/A[1] | Weighted Total |
|---|---|:---:|:---:|
| 1 | Assist the hospitals by actively participating in hiring, evaluating and performing ongoing assessment of non-physician clinical employees responsible for providing services within the Oncology Service Line. | X | 3 |
| 2 | Assist the hospitals in developing and implementing Oncology Service Line staffing requirements and schedules for non-physician staff in order to ensure operational efficiency and quality patient care. | X | 2 |
| 3 | Monitor and coordinate physician resources within the Oncology Service Line to ensure patient safety and operational efficiency. | X | 2 |
| 4 | Assist the hospitals with its credentialing process regarding appointments and re-appointments to the Oncology Services services' staff by collecting, evaluating and verifying relevant data.  Make recommendations to hospitals regarding appointments and reappointments to the physician staff. | X | 2 |
| 5 | Assist the hospitals in implementing, monitoring and managing quality assurance and utilization review activities for the Oncology Service Line. | X | 3 |
| 6 | Maintain ongoing responsibility for managing Oncology Service Line quality and productivity  by: (i) Monitoring, evaluating and, as needed, restructuring delivery of care processes; (ii) Regularly evaluating job descriptions and realigning responsibilities as appropriate; (iii) Establishing, monitoring and maintaining productivity standards. | X | 3 |
| 7 | Develop and annually update best practice standards for the Oncology Service Line, including  performance-based benchmarks and monitoring systems. | X | 3 |
| 8 | Develop, implement and regularly update patient care (clinical) protocols, pathways and guidelines for the delivery of Oncology Service Line services, and assure consistency with national best practice standards. | X | 3 |
| 9 | Maintain responsibility for managing all pre-procedure/visit patient communication to ensure that (i) all required paperwork and consents are completed; (ii) patient questions are answered; and (iii) the patient is prepared for procedure or visit. | X | 3 |
| 10 | Oversee all aspects of case management activities for Oncology Service Line patients including, (i) discharge planning; (ii) appointment scheduling; (iii) development of patient educational materials and discharge instructions; and  (iv) ordering of appropriate services and supplies upon discharge.   As appropriate, oversee the development, implementation and monitoring of a patient call-back process that meets applicable regulatory standards for Oncology Service Line patients. | X | 3 |

Page 77

Confidential     Case 3:17-cv-00902   Document 257-7    Filed 08/23/22   Page 78 of 81 PageID #: 4168   MLH_027939

*Privileged Attorney-Client Communication*
*Attorney Work Product*

*Draft - For discussion purposes only.*



| Generic Tasks Associated with Management Agreements | Full, Limited, N/A[1] | Weighted Total |
|---|---|---|
| 11 Develop, implement and monitor programs and plans to reduce adverse events, including medication errors. | X Limited | 1.5 |
| 12 Monitor and evaluate the utilization of intensive care services for Oncology Service Line patients. | X | 1 |
| 13 Provide ongoing monitoring of patient, physician and staff satisfaction within the Oncology Service Line, and, as needed, develop, implement and manage programs and plans for improvement. | X Limited | 1.5 |
| 14 In coordination with the hospitals, develop, implement and, as appropriate, update administrative operating policies and procedures for the Oncology Service Line. | X | 3 |
| 15 Ensure the standardization of documentation across the entire Oncology Service Line, including, but not limited to, charts, forms and clinical notes. Ensure compliance with hospitals documentation standards and processes. | X | 2 |
| 16 Ensure that medical records are maintained in accordance with applicable law and regulation as well as any applicable governing or accrediting agency. | X Limited | 1 |
| 17 Provide pre-bill review of cases identified pursuant to the hospitals's internal control processes for medical records to ensure appropriate documentation is in place. | X | 2 |
| 18 Assist the hospitals in the preparation of all reasonably necessary paperwork to allow the hospitals to timely and accurately bill and collect for services provided to Oncology Service Line patients. | X | 3 |
| 19 Serve as a liaison with other hospitals clinical service lines and administrative departments through participation in hospital-wide committees and planning meetings. | X | 3 |
| 20 Participate in meetings with the hospitals, no less than quarterly, to review Oncology Service Line operations, identify issues, and, as appropriate, provide suggestions for improvement to Oncology Service Line operations. | X | 2 |
| 21 Assist the hospitals in strategic, financial and operational planning for future Oncology Service Line services and participate in the development of the Oncology Service Line capital and operating budgets. | X | 3 |
| 22 Prepare and provide to the hospitals, at the close of each month (or at other mutually agreeable times), operational and statistical reports in a form approved by the hospitals, which reflect (i) the operations of the Oncology Service Line for the identified time period; (ii) the work performed by the managers; and (iii) other information as requested by the hospitals. | X Limited | 1.5 |

Page 78

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 79 of 81 PageID #: 4169

Confidential

MLH_027940



*Draft - For discussion purposes only.*

| Generic Tasks Associated with Management Agreements | Full, Limited, N/A[1] | Weighted Total |
|---|:---:|:---:|
| 23 Assist the hospitals in the purchase and/or lease of all Oncology Service Line clinical supplies and equipment. | X | 2 |
| 24 Assist the hospitals in the management of supply chain activities for the Oncology Service Line, including, as appropriate, (i) the standardization of supplies; (ii) vendor management; and (iii) Inventory management. | X | 3 |
| 25 Monitor Oncology Service Line facilities and equipment and provide recommendations to the hospitals regarding maintenance issues and needed equipment upgrades. | X | 1 |
| 26 Assist the hospitals in complying with and managing third-party pay-for-performance programs related to the Oncology Service Line. | X | 2 |
| 27 Assist the hospitals in the management of Oncology Service Line expenses in relationship to fluctuation in revenues. | X | 3 |
| 28 Assist the hospitals in negotiating, retaining and managing services that may be furnished through contractual arrangements (e.g., anesthesia services, radiology services, pathology services, and other services as appropriate). | X | 3 |
| 29 Assist the hospitals in establishing fees for services and procedures provided within the Oncology Service Line. | X | 2 |
| 30 Assist the hospitals in negotiating reimbursement and fee payment methods with third-party payors and government entities. | X | 3 |
| 31 Establish billing, receivables, credit and collection policies and procedures and oversee such activity | X Limited | 1 |
| 32 At the request of the hospitals, assist in preparing for and responding to third party payor and government audits concerning the medical necessity and/or quality of professional Oncology Service Line services, including the compilation and timely delivery of all required documentation. | X | 2 |
| 33 Assist the hospitals to maintain the accreditation of the Oncology Service Line services (if the services are accredited) with the proper government agencies and acreditting organizations. | X | 3 |
| 34 Maintain responsibility for ensuring that the Oncology Service Line operates in compliance with all laws and regulations. | X | 3 |
| 35 Ensure Oncology Service Line staff and physician utilization of the hospitals's electronic health records system ("EHR"). If an electronic record is not yet purchased or implemented, manage Service Line staff and physician involvement and ensure cooperation with the hospitals in planning and implementing an EHR. | X | 3 |

*Valuation Report MLBHC001*

Confidential

MLH_027941



*Draft – For discussion purposes only.*

| Generic Tasks Associated with Management Agreements | Full, Limited, N/A[1] | Weighted Total |
|---|---|---|
| 36 Develop educational training materials for clinical (non-physician) and administrative staff providing services within the Oncology Service Line. Monitor, and ensure that clinical and administrative staff receive regularly scheduled training (at least semi-annually). | X Limited | 1.5 |
| 37 Develop and present regularly scheduled (at least semi-annually) educational programs to hospitals physicians providing services within the Oncology Service Line. | X | 3 |
| 38 Develop and present (at least a semi-annually) educational and informational programs to community-based physicians, regarding the Oncology Service Line's services, physicians and administrative processes. | X | 3 |
| 39 Work with the hospitals to develop community awareness and educational programs providing information regarding Oncology Service Line services and related topics of interest to community residents. | X | 2 |
| 40 Assist hospitals in the selection and criteria for clinical usage of chemotherapy drugs and supportive pharmaceutical agents and make recommendations with respect thereto. Manager will employ the serial criteria of highest efficacy, lowest toxicity, and lowest cost to the process of making recommendations. | X | 3 |
| 41 Assist MLH and the Methodist hospitals in evaluating the physical facilities at the managed sites (e.g., site layout, space planning) to improve patient care, increase efficiency and improve patient and practitioner experience | X | 3 |
| TOTALS | 106 | 98 |

92.5%

*Valuation Report MLBHC001*

Case 3:17-cv-00902   Document 257-7   Filed 08/23/22   Page 81 of 81 PageID #: 4171

Confidential

MLH_027942