IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JEFFREY H. LIEBMAN and DAVID M. STERN, M.D., <br><br>Plaintiff-Relators, <br><br>v. <br><br>METHODIST LE BONHEUR HEALTHCARE and METHODIST HEALTHCARE-MEMPHIS HOSPITALS, <br><br>Defendants. | Case No.: 3:17-cv-00902 <br><br>District Judge William L. Campbell, Jr. <br><br>Magistrate Judge Barbara D. Holmes |

**METHODIST'S RESPONSES TO THE UNITED STATES'
INTERROGATORIES DIRECTED TO DEFENDANTS**

Under Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Methodist Le Bonheur Healthcare and Methodist Healthcare – Memphis Hospitals (collectively referred to as "Methodist") hereby provide responses to the United States' First Set of Interrogatories ("Interrogatories") as follows:

**GENERAL OBJECTIONS**

1. Methodist objects to each Interrogatory to the extent it is overly broad, unduly burdensome, seeks information that is not relevant to the claims or defenses of any party and is contrary to the proportionality requirement set forth in Fed. R. Civ. P. 26(b) or Methodist's discovery obligations under Fed. R. Civ. P. 33. Without limitation, this objection relates to the following definitions or instructions as used in the Interrogatories:

   a. "Defendants." The Interrogatories define "Defendants" as "Methodist Le Bonheur Healthcare and Methodist Healthcare – Memphis Hospitals, together with their

successors, predecessors, subsidiaries, affiliates, branches, divisions, locations, offices, groups, operations, and units; and each of Defendants' present or former officers, directors, employees, agents, contractors, and representatives." The Interrogatories instruct that "[t]hese Interrogatories call for the production of all responsive information in the possession, custody or control of Defendants." Such a definition and instruction would require an unreasonable and exhaustive search for information that would exceed the scope of permissible requests under Fed. R. Civ. P. 26 and 33 and would impose an undue burden on Methodist. For purposes of responding to the Interrogatories, Methodist has conducted a reasonable inquiry of the data sources in Methodist's possession, custody, and control that are most likely to yield the relevant and responsive information, in accordance with the proportionality standard set forth in Fed. R. Civ. P. 26(b).

      b.    "West." The Interrogatories define "West" as "the West Clinic, P.C. n/k/a The West Clinic, PLLC, including parents, subsidiaries, affiliates, predecessors, successors, and any counsel, agents, consultants, lawyers or anyone authorized to act on West's behalf." Such a definition would require an unreasonable and exhaustive search for information that would exceed the scope of permissible requests under Fed. R. Civ. P. 26 and 33 and would impose an undue burden on Methodist. Methodist will interpret "West" to mean the West Clinic, P.C. n/k/a The West Clinic, PLLC.

    2.    Methodist objects to United States' Interrogatories seeking information for the time period from "January 1, 2010 to the present." That time period both pre-dates and post-dates the time period of the contractual affiliation between Methodist and West Clinic ("West") that forms the subject of the litigation and the time period of discovery that governed during litigation with Relators prior to intervention by the United States.

3. Methodist objects to each Interrogatory to the extent it requests information that is protected by the attorney-client privilege, the work-product doctrine, and other applicable privileges and exceptions to discovery.

3. Methodist objects to each Interrogatory to the extent it seeks information outside of its possession, custody, or control.

4. Methodist objects to each Interrogatory to the extent it is unreasonably cumulative or duplicative or seeks information obtainable from some other source that is more convenient, less burdensome, or less expensive.

5. Methodist objects to each Interrogatory to the extent it purports to impose any obligations on Methodist that exceed the scope of permissible discovery under the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Middle District of Tennessee, or orders entered by the Court in this matter. Methodist will respond to each Interrogatory consistent with its obligations under the applicable rules and the orders of the Court.

6. The specific objections to each Interrogatory are in addition to the General Objections set forth in this section, and the General Objections are set forth here to avoid duplication and repetition of restating them for each discovery response. These General Objections form a part of each discovery response. Therefore, the absence of a reference to a General Objection in response to a particular Interrogatory does not constitute a waiver of any General Objection with respect to that Interrogatory. All responses are made subject to and without waiver of the General Objections and specific objections set forth in each response.

7. Discovery in this matter is ongoing. The responses that follow are based on information now available to Methodist, and made upon a reasonable search and inquiry.

3

Case 3:17-cv-00902 Document 257-10 Filed 08/23/22 Page 3 of 17 PageID #: 4211

Methodist reserves the right at any time to revise, supplement, correct, or clarify those responses and any objections in a manner consistent with the Federal Rules of Civil Procedure.

## INTERROGATORIES

1. Identify all payments Methodist made directly or indirectly to West from 2011 through 2019, with the yearly totals for each amount and basis for such payments.

**ANSWER:** Methodist objects to this Interrogatory on the grounds that the term "payments Methodist made directly or indirectly to West" is vague and ambiguous. Methodist will interpret this Interrogatory as seeking information about Methodist transmitting payments to West. Methodist further objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case. Methodist has produced documents and information establishing the amounts paid to West pursuant to the Professional Services Agreement ("PSA"), Management Services Agreement ("MSA"), Asset Purchase Agreement ("APA"), and Leased Employee and Administrative Services Agreement ("LEA") (collectively, "Affiliation Agreements") and as reflected in the Closing Statement related to Methodist's investment in and loan to ACORN Research, LLC ("ACORN"). To separately specify "the basis" for each individual payment over a nine-year time period would be extraordinarily burdensome and not proportional to the needs of the case. Methodist further objects to this Interrogatory as cumulative and duplicative of Relators' Interrogatories. Subject to and without waiving those objections, Methodist states that it has produced documents reflecting payments to West at MLH_117278, MLH_117280 – MLH_117287, and MLH_000664.

2. Identify any actions Methodist took to confirm the support for the payments identified in response to Interrogatory No. 1, including any internal or external audits concerning

4

such payments, and the support for such payments. If no actions were taken, provide an explanation as to why Methodist paid millions of dollars to West without conducting any audits.

**ANSWER:** Methodist objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case. Identifying "any actions" Methodist took to confirm support for payments made under the Affiliation Agreements asks Methodist to identify actions taken on a daily or near daily basis over a time period of more than seven years. Methodist further objects to this Interrogatory on the grounds that the phrase "actions Methodist took to confirm support for the payments" is vague and ambiguous. Methodist will interpret this Interrogatory as seeking information about general actions that Methodist took to confirm that West was performing its obligations under the parties' Affiliation Agreements. Methodist further objects to this Interrogatory as not relevant or reasonably related to the claims in the Complaint in Intervention ("Complaint") to the extent it implies that failing to "confirm the support" for a fair market value payment constitutes a violation of the False Claims Act or Anti-Kickback Statue. Subject to and without waiving those objections, Methodist states as follows:

The amount of compensation that Methodist paid to West under the parties' agreements and the amount of Methodist's investment in and loan to ACORN were based on payment amounts that fell within ranges determined through independent fair market value opinions.

For payments made pursuant to the PSA, Methodist's accounting department reviewed information submitted by West regarding the wRVUs associated with the clinical services that the West physicians provided and made payments based on the wRVU conversion rates by physician specialty that had been agreed upon by the parties.

For payments made pursuant to the LEA, Methodist's accounting department reviewed payroll and other supporting documentation submitted by West and reimbursed West on a pass-through basis.

For part of the payment made under the APA, Methodist reviewed the inventory prepared by HORNE Health Care Services and paid West for the items on the inventory according to the amounts in the HORNE report.

For payments made under the MSA, Methodist reviewed documentation and information presented by West throughout the course of the MSA regarding West's management of the adult oncology service line. Methodist was in daily or nearly daily contact with West through emails, phone calls, and meetings about the services that West provided. Methodist and West leadership met weekly for strategy and update meetings. Methodist and West employees met regularly through a number of different bodies to discuss the development and management of Methodist's adult oncology services line, including, but not limited to, the Cancer Center Executive Council, the Cancer Center Operating Committee, the Commission on Cancer Committee, and the Methodist University Hospital Senior Leadership Council. The Methodist Board of Directors held quarterly meetings at which West leadership gave detailed presentations and produced written reports related to the development and management of the adult oncology service line. Subcommittees of the Methodist Board received reports from West about specific issues.

A portion of the payments made by Methodist to West for management services were tied to West meeting certain quality, efficiency, and programmatic benchmarks and milestones. Methodist monitored West's performance against those benchmarks and milestones through regular meetings and presentations to various committees, including the Operating Committee.

Methodist frequently reviewed business and work plans submitted by West as well as periodic reports from West regarding the adult oncology service line's performance and West's achievement of performance benchmarks and milestones that had been established. Methodist confirmed that West consistently met or exceeded those benchmarks and milestones. Methodist further confirmed West's performance through the numerous accreditations, memberships, and certifications that the West Cancer Center achieved through West's management of the adult oncology service line.

In 2013, Methodist audited West's operations in relation to some of its obligations under the Affiliation Agreements. Methodist's audit included, but was not limited to, understanding how Methodist and West accounted for leased employees, including reimbursement of hours spent on non-Methodist projects; documenting the process for determining the monthly compensation for wRVUs; verifying and documenting the detailed process for billing and monitoring professional and technical fees to patients; verifying the internal controls over patient receivables and cash collections; and verifying and documenting the reconciliation controls regarding revenue and cash balances between West and Methodist. Methodist and West created an overhead allocation process to ensure that Methodist did not pay West for work not related to the parties' affiliation.

Methodist has identified the preceding actions in a good-faith attempt to identify its methods of confirming support for payments to West. During the parties' seven-year affiliation, however, Methodist may have taken additional such actions. This response does not limit the types of actions that Methodist took to confirm support for payments it made to West.

3. Identify any agreements, arrangements or understandings between Methodist and West that would allow West to continue to operate the business of West out of locations that West

7

Case 3:17-cv-00902   Document 257-10   Filed 08/23/22   Page 7 of 17 PageID #: 4215

sold to Methodist in 2011, including any agreements, arrangements or understandings regarding rent.

**ANSWER:** Methodist objects to this Interrogatory on the grounds that the undefined term "the business of West" is vague and ambiguous. Methodist will interpret that term to refer to the independent business of West Clinic. Methodist further objects to this Interrogatory on the grounds that it is based on the false pretense that Methodist "allow[ed] West to continue to operate the business of West out of locations that West sold to Methodist in 2011." Locations where West operated prior to the parties' affiliation were not "sold" to Methodist. Methodist and West did enter into an Asset Purchase Agreement and a Leased Employee and Administrative Services Agreement, the terms of which speak for themselves. To the extent that leased employees or assets sold to Methodist were used by West for non-affiliation or pre-affiliation work, the parties agreed at the time that they entered into the affiliation for West to reimburse Methodist for such expenses.

    4.    State the monthly census totals of adult oncology cancer patients for each Methodist location covered by the Management Services/Performance Improvement Agreement ("MSA") between Methodist and West, including any amendments thereto, from January 1, 2011 to February 20, 2022.

**ANSWER:** Methodist objects to this Interrogatory on the grounds that the undefined term "monthly census totals of adult oncology cancer patients" is vague and ambiguous. Methodist will interpret that phrase to refer to the total number of patients who received oncology services in a location included in the MSA in a specific month. Methodist further objects to this Interrogatory as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant or

reasonably related to the claims in the Complaint. Providing this information would require identifying every adult patient who received oncology services in a location included in the MSA for a time period of more than eleven years. Subject to and without waiving those objections, Methodist states as follows:

Methodist did not track the number of patients who received oncology services in a location included in the MSA in a specific month. Methodist has produced data reflecting claims submitted and reimbursement provided for patients who received oncology services at a location included in the MSA at MLH_178913 – MLH_179070.

5. Identify any non-privileged presentations, conferences, speeches or meetings that Foley & Lardner LLP ("Foley") gave to Methodist or which anyone from Methodist attended.

**ANSWER:** Methodist objects to this Interrogatory as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant or reasonably related to the claims in the Complaint. This Interrogatory is not limited by topic or subject matter**.** Methodist further objects that the phrase "non-privileged presentations, conferences, speeches or meetings that Foley & Lardner LLP ("Foley") gave to Methodist or which anyone from Methodist attended" is vague, ambiguous, and confusing. Foley cannot give a conference or meeting to Methodist. Subject to and without waiving those objections, Methodist states as follows:

Methodist is not aware that any Methodist employees attended a presentation or speech given by Foley relating to any matter that is relevant to any of the allegations in the Complaint.

6. Identify the yearly amount of Methodist's gross and net profits and revenues from the adult oncology service line as defined in the MSA, including from the 340B Discount Drug Program, from 2011 through 2019.

9

**ANSWER:** Methodist objects to this Interrogatory on the grounds that "Methodist's gross and net profits and revenues from the adult oncology service line" is not defined in the MSA and is vague and ambiguous. Methodist further objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case. Methodist's "adult oncology service line as defined in the MSA" is defined to include "inpatient, outpatient, and clinic services" at Methodist's hospitals and the West Cancer Center Sites "including hospitalist services for oncology inpatients." The adult oncology service line is further defined to include the list of more than 200 MS-DRG codes and more than 660 ICD-9 codes that are attached as Exhibit A to the MSA. Methodist further objects to this Interrogatory on the grounds that the phrase "gross and net profits and revenues . . . from the 340B Discount Drug Program" is vague, confusing, and ambiguous. Methodist will interpret that phrase to refer to the difference in the price that Methodist would have paid for pharmaceuticals if it did not participate in the 340B Drug Pricing Program and the price that Methodist paid for pharmaceuticals as a participant in that Program. Methodist further objects to this Interrogatory as cumulative and duplicative of Relators' discovery requests. Subject to and without waiving those objections, Methodist states as follows:

Methodist has produced its hospitals' financial statements, which reflect revenue generated through oncology services provided at the hospitals. Although those financial statements do not state revenue "from the adult oncology service line as defined in the MSA," Methodist will not attempt to perform new, hindsight calculations related to revenue associated with all oncology services provided in its hospitals for a nine-year period.

With respect to the difference in the price that Methodist would have paid for pharmaceuticals if it did not participate in the 340B Drug Pricing Program and the price that it paid

10

as a participant in that Program, Methodist produced a report reflecting that difference in price to the United States in October 2018. *See* MLH_021184. Methodist produced an updated version of that report to Relators in September 2020. *See* MLH_111323.

7. Identify any monies Methodist received directly or indirectly from West from January 1, 2011 through December 31, 2019 and the basis for such monies.

**ANSWER:** Methodist objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks identification of every payment "received directly or indirectly" from West during a nine-year time period as well as the basis for each payment. Methodist further objects to this Interrogatory on the grounds that the undefined term "received directly or indirectly from West" is vague and ambiguous. Methodist will interpret this Interrogatory as seeking information about West transmitting payments to Methodist from 2011 through 2019 other than amounts billed and received by West for clinical services provided to patients. Subject to and without waiving those objections, Methodist states as follows:

Based on a reasonable search, Methodist has identified $19,039,231.40 in payments that it received from West from 2011 to 2019. Those payments were made as part of the overhead allocation process to ensure that Methodist did not pay West for work not related to the parties' affiliation, as reimbursement for payroll payments related to the University of Tennessee / West Institute for Cancer Research, and to reimburse Methodist for expenses that Methodist paid.

8. State the number of adult oncology patients referred to Methodist from West in yearly totals from 2010 through 2021 and the amount of reimbursements from any federal health care program or private insurer that Methodist received from such referrals.

**ANSWER:** Methodist objects to this Interrogatory on the grounds that the phrase "adult oncology patients referred to Methodist from West" contains undefined terms and is vague and ambiguous. Methodist will interpret this Interrogatory as seeking information about the number of patients that West physicians referred to a Methodist hospital to receive oncology services each year from 2010 through 2021. Methodist further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case because it seeks information that pre-dates the affiliation at issue by approximately two years and that post-dates the affiliation at issue by approximately three years. Methodist further objects to this Interrogatory on the grounds that is seeks information not relevant or reasonably related to the claims in the Complaint because it seeks information related to reimbursement by private insurers. Subject to and without waving those objections, Methodist states as follows:

Methodist did not track the number of patients that West physicians referred to a Methodist hospital to receive oncology services each year from 2010 through 2021. Methodist has produced data reflecting all claims submitted and reimbursement provided for oncology services provided at a Methodist hospital for patients referred by a West physician at MLH_178913 – MLH_179070.

9. Identify the source of the Cancer Mission Support Funds and the uses for such funds from 2011 through 2019.

**ANSWER:** Methodist objects to this Interrogatory on the grounds that the undefined term "source of the Cancer Mission Support Funds" is vague and ambiguous. Methodist will interpret this Interrogatory as seeking information about the formation of the Base Mission Support Fund effectuated through Methodist's Affiliation Agreement with the University of Tennessee ("UT"). Methodist further objects to this Interrogatory on the grounds that it seeks information outside

12

Methodist's possession, custody, or control because the Base Mission Support Fund was a payment that Methodist made to UT. To the extent this Interrogatory seeks information about how specific funds from the Base Mission Support Fund were allocated, Methodist further objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case as Methodist made periodic contractual payments to UT over the course of the seven-year affiliation. Subject to and without waiving those objections, Methodist states as follows:

The Base Mission Support Fund was created through the Fourth Amendment to Addendum A to the Amended and Restated Master Affiliation Agreement between UT and Methodist Healthcare – Memphis Hospitals. The Base Mission Support Fund was used to enhance coordination of resources to further grow and develop clinical, medical education, and research programs in oncology.

10. Identify the yearly wRVUs by provider that West submitted to Methodist during the entirety of the Professional Services Agreement.

**ANSWER:** Methodist objects to this Interrogatory as cumulative and duplicative of Relators' discovery requests. Subject to and without waiving those objections, Methodist states as follows:

Methodist produced to the United States in August 2018 invoices reflecting yearly wRVUs by provider that West submitted to Methodist. *See* MLH_001220; MLH_001254; MLH_001278; MLH_001302; MLH_001324 and MLH_001346; *see also* MLH_111599.

11. Identify any providers other than those employed or leased by Methodist who referred adult oncology patients to Methodist for inpatient treatment from 2011 through 2018 and the amount of reimbursements Methodist realized from such patients.

13

**ANSWER:** Methodist objects to this Interrogatory as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant or reasonably related to the claims in the Complaint. A request to identify "any providers other than those employed or leased by Methodist" includes all West physicians and all other providers not employed or leased by Methodist who referred a patient to Methodist during an eight-year time period. Methodist further objects that the phrase "referred adult oncology patients to Methodist for inpatient treatment" is vague and ambiguous. Methodist will interpret this Interrogatory as seeking the identity of physicians who referred patients to a Methodist hospital to receive inpatient oncology services from 2011 – 2018. Subject to and without waiving those objections, Methodist states as follows:

Methodist has produced data reflecting all claims submitted and reimbursement provided for patients who received inpatient oncology services at a Methodist hospital from 2011 through 2018 at MLH_178913 – MLH_179070.

12. Identify any providers other than those employed or leased by Methodist who treated patients at the outpatient locations in the Asset Purchase Agreement.

**ANSWER:** Methodist objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant or reasonably related to the claims in the Complaint. A request to identify "any providers other than those employed or leased by Methodist" includes both all West physicians and all other providers not employed or leased by Methodist who treated a patient. Methodist further objects to this Interrogatory on the grounds that "the outpatient locations in the Asset Purchase Agreement" is vague and ambiguous. Methodist will interpret this Interrogatory as seeking information about patients who received services at one of the Cancer Center Sites, as that term is defined in the Asset Purchase Agreement.

14

Methodist further objects to this Interrogatory on the grounds that it seeks information outside of Methodist's possession, custody, or control. Subject to and without waiving those objections, Methodist states as follows:

Methodist has produced data reflecting claims submitted for services provided to patients at the Cancer Center Sites at MLH_178913 – MLH_179070.

13. State the basis for Methodist's affirmative defense that "to the extent any alleged injuries or damages are the result of acts or omissions committed, in whole or in part, by any employee that was taken outside the scope of their duties and that was not authorized, condoned, or ratified by Methodist."

**ANSWER:** Methodist objects to this Interrogatory to the extent it characterizes the quoted language from Methodist's Answer to the Complaint in Intervention as an affirmative defense for which Methodist would bear the burden of proof. Subject to and without waiving those objections, Methodist states as follows:

The basis for Methodist's defense is that if a Methodist employee took action outside the scope of the employee's duties that was not authorized, condoned, or ratified by Methodist, Methodist is not liable for that action.

Dated: August 5, 2022

Respectfully submitted,

*/s/ J. Taylor Chenery*
Brian D. Roark
J. Taylor Chenery
Taylor M. Sample
Hannah E. Webber
BASS, BERRY & SIMS PLC

15

150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
broark@bassberry.com
tchenery@bassberry.com
taylor.sample@bassberry.com
hannah.webber@bassberry.com

Robert S. Salcido
(Admitted *Pro Hac Vice*)
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4095
rsalcido@akingump.com

*Attorneys for Defendants Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals*

**CERTIFICATE OF SERVICE**

       I hereby certify that a true and exact copy of the foregoing has been served on the following counsel via email on this the 5th day of August, 2022:

Bryan A. Vroon
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta, GA 30327
(404) 441-9806
bryanvroon@gmail.com

Jerry E. Martin
Seth Marcus Hyatt
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

Edward D. Robertson, Jr.
Bartimus Frickleton Robertson Rader PC
109 B East High Street
Jefferson City, MO 65101
(573) 659-4454
crobertson@bflawfirm.com

Kara F. Sweet
U.S. Attorney's Office (Nashville Office)
Middle District of Tennessee
110 Ninth Avenue, S
Suite A961
Nashville, TN 37203-3870
(615) 401-6598
kara.sweet@usdoj.gov

Wynn M. Shuford
U.S. Attorney's Office (Nashville)
719 Church Street
Suite 3300
Nashville, TN 37203
615-401-6601
Wynn.Shuford@usdoj.gov

                                                */s/ J. Taylor Chenery*