# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* JEFFREY H. LIEBMAN and DAVID M. STERN, M.D., | ) ) ) ) | Case No.: 3:17-cv-00902 |
| Plaintiff-Relators, | ) ) | JUDGE CAMPBELL MAGISTRATE JUDGE HOLMES |
| v. | ) ) | |
| METHODIST LE BONHEUR HEALTHCARE and METHODIST HEALTHCARE-MEMPHIS HOSPITALS, | ) ) ) ) | |
| Defendants. | ) ) | |

## THE UNITED STATES' SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO THE UNITED STATES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, the United States of America hereby objects and responds to Defendants' First Set of Interrogatories to the United States, dated June 15, 2022 (the "Interrogatories"). The United States' objections and responses are based upon the information presently available to the United States following a reasonable investigation to date. The United States expressly reserves the right to modify, supplement, or amend its objections and responses, including to reflect information that discovery or further investigation may disclose, and to do so subject to any applicable objection, privilege, or other protection from disclosure.

## GENERAL OBJECTIONS

1.      The United States objects to the Interrogatories to the extent they purport to impose obligations on the United States that is beyond what is required by the Federal Rules of Civil Procedure or the Local Rules of this Court.

2.      The United States objects to the Interrogatories to the extent that they call for the production of information that is publicly available.

3.      The United States objects to the Interrogatories to the extent they call for the production of information exclusively in the possession, custody or control of Defendants, already produced by Defendants to the United States, or already produced in this action.

4.      The United States objects to the definition of "Government" and "You" in the Interrogatories to the extent they purport to require the United States to gather and review information in the possession or custody of any agency, office, employee, agent, representative, officer, or contractor of either the Legislative Branch or the Judicial Branch, or of Executive Branch components beyond the Department of Health and Human Services, including its Office of Inspector General, the Centers for Medicare and Medicaid Services, and the Civil Division, Commercial Litigation Branch (Fraud Section) of the United States Department of Justice and the Civil Division of the Office of the United States' Attorney for the Middle District of Tennessee on the grounds that they are unduly burdensome and overbroad and seek information not relevant to the claims or defenses in this action and disproportionate to the needs of this case.

5.      The United States objects to the Interrogatories to the extent they seek information that is privileged and to providing a privilege log, which is burdensome.

6.     The United States objects to the definition of "Employee" to the extent it purports to include independent contractors or individuals who otherwise are not in an employer-employee relationship.

7.     The United States objects to the definition of "West Cancer Center", which is not a term defined in any contract and to the extent it purports to be limited to the "Methodist Adult Oncology Service Line," which appears to be a variation on a defined term in the Management Services/Performance Improvement Agreement ("MSA").

## SPECIFIC OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1**:

Identify and describe each and every false claim You allege that Defendants submitted, including identification and/or description of:
   a. The date on which the claim was submitted;
   b. The services for which payment was claimed, including relevant patient name(s), dates of service, and CPT codes;
   c. The basis on which you contend the claim was false;
   d. Every person involved in the submission of the claim and his/her relevant acts or omissions'
   e. The date and amount of any payment made to Defendants for the submitted claim; and
   f. The damages associated with each claim and the basis for that calculation.

**RESPONSE**:

The United States objects to this Interrogatory on the ground that it is unduly burdensome and seeks information that is in the possession of Methodist, not proportional to the needs of the case and more easily obtained from the claims data.   Subject to and without waiving its objections, the United States responds as follows:

Under the Anti-Kickback Statute ("AKS"), damages are measured by the false claims are the claims Defendants submitted or caused to be submitted to Medicare that were obtained through Methodist's unlawful relationship with West.   The time period the claims were submitted

3

commences on January 1, 2012 through December 31, 2018. Given the number of claims at issue, the United States refers to the claims data produced in this action by the United States and West, which is already in the possession of Methodist. The total amount of reimbursement for the tainted Medicare claims from outpatient referrals that were obtained through the relationship with West is over $300 million, and the total amount of inpatient claims is over $50 million. In addition, the United States will seek damages arising from tainted referrals for drug prescriptions, including chemotherapy, ordered by the West physicians for Medicare patients. In accordance with the FCA, the United States is entitled to treble damages and statutory penalties for the tainted claims and reserves its right to supplement this response as discovery progresses in accordance with the Federal Rules and Local Rules.

**INTERROGATORY NO. 2**:

Identify and describe all unlawful remuneration, in cash or in kind, that you allege Defendants offered, paid, or received, including:
    a. The date on which such remuneration was offered, paid, or received;
    b. The amount and/or form of such remuneration, its estimated fair market value, and the basis for your valuation;
    c. The basis on which you contend the offer, payment, or receipt of the remuneration was unlawful;
    d. Every person involved in the offer, payment, or receipt of such remuneration, and his/her relevant acts or omissions.

**RESPONSE**:

The United States objects to this Interrogatory on the grounds that it is unduly burdensome, seeks information that calls for a legal conclusion, seeks fair market value information that is either not relevant to the consideration of remuneration under the AKS or not in the United States' possession, is not proportional to the needs of the case, and seeks factual information already in the possession of Methodist.

4

Subject to and without waiving its objections, the United States refers to both West's and Methodists' responses to Interrogatories that identify the amounts Methodist paid to West under the Affiliation Agreements during the course of the parties' relationship. The United States also states that Methodist provided West remunerations as follows:

a. Methodist Gave West Free Office Space/Overhead, and
   Paid For West's Employees To Perform Work For West

Methodist allowed West to continue to operate itself out of the same locations that it sold under the Asset Purchase Agreement ("APA") or that Methodist otherwise purchased during the relationship without any documented payment for rent or overhead. For example, in December 2011, Methodist paid West under the APA for certain outpatient locations, including the 100 N. Humphreys Blvd. location that West continued to use as its principal place of business for several years following the deal. Similarly, when West changed its principal place of business to the 7945 Wolf River location in 2016, which it eventually purchased from Methodist at the conclusion of the parties' relationship in February 2019, Methodist also did not have any formal agreement that required West to pay any rent for this space. To the extent Methodist claims some sort of year-end reconciliation or true up, the record is clear that this was an informal process that cannot be substantiated. The parties also did not obtain any fair market value opinion for the use of the space or conduct any commercially reasonable negotiations to determine the amount that West should have paid for the use of such space.

Additional remuneration is found in the tens of millions of dollars that Methodist contributed to benefit West through the Cancer Mission Support Funds, which among other things were used to pay for the salaries of certain West's physicians and to develop the Margaret West Comprehensive Breast Center, which funds West used to grow its own business. West and Methodist never amended their various contractual agreements to add the Wolf River location as

5

a Cancer Center Site under the MSA, the Leased Employees Agreement ("LEA") or the Professional Services Agreement ("PSA"). Methodist's investment to build this location as part of the "West Cancer Center" inured to the benefit of West, which legally assumed the name in 2015 and occupied the space as its principal place of business beginning in 2016. West did not have any lease or other formal agreement with Methodist for West's use of such space, including for use that was wholly unrelated to Methodist.

Lawyers for West identified the need for a leaseback for dual use assets, which is evidenced through an email commenting on the APA and LEA on which Lynn Field, internal counsel for Methodist, was copied. Yet, there was never any formal agreement that allowed West to continue using the 100 N. Humphreys location or any others that were sold to or owned by Methodist or for West to reimburse Methodist for full-time leased employees who were doing work for West. Mr. Mounce confirmed that West did not sell all its assets, and still conducted substantial West business at outpatient locations that Methodist purchased, including determining and paying compensation to and payroll for West's employees, submitting wRVUs to Methodist, the negotiation and discussion of incentives under the MSA, obtaining purported fair market value opinions throughout the relevant time period, and acquiring additional West locations, all of which were of value to West and should not have been reimbursed by Methodist pursuant to any agreement.

Moreover, the January 23, 2013 letter from Methodist's Director of Corporate Audit Services, which identified concerns with a lack of documentation for and payments between Methodist and West in connection with the relationship overall, makes no mention of any payment regarding the dual use of assets under the APA and is vague as to how the issues identified concerning reimbursement of leased employees for non-Methodist matters would be calculated.

6

There also is no documentation to show how much time was spent by West employees in space that Methodist purchased handling matters for West, as opposed to Methodist.

Methodist has never identified to the United States at any time any specific amounts that West reimbursed Methodist in any manner for the dual use of office space and leased employees.

b. Methodist Paid West More Under The PSA
Than West Paid For Physician Compensation

Based on the latest information Methodist provided in its Interrogatories and the invoices for wRVUs paid by Methodist to West, Methodist also paid the West oncologists approximately $60 million in excess of their professional collections over the time period 2012-2018. Methodist also separately paid for benefits and other costs that West otherwise would have covered for its employees. In addition, the overall amount West paid to its physicians as compensation was less than the amount Methodist paid to West under the PSA.

c. Under The MSA, Methodist Paid West To Manage Itself

The amounts Methodist paid to West under the MSA also constituted remuneration. Prior to the deal, West provided much of same base management services for the business of West without compensation. As Mr. Mounce testified, absent the MSA, West would not otherwise have been paid for these services. Given that West kept no time records or specific documentation concerning the base management services, and Methodist asked for no support, there is no evidence to show exactly what West did, let alone specifically who provided management services, to comply with the MSA and for which Methodist paid West millions of dollars in base management fees. Methodist also paid West the full amount for base management from 2012 through 2018 even though West admitted that it never satisfied all of the terms for base management in the MSA, including that West never managed all the locations in the MSA for the entire time period. Further, despite the fact that West had not provided all of the management

7

services in the MSA for 2012 and 2013, including a lack of any annual report, in 2014 Methodist agreed to -- and did -- pay West $1 million more for the purported management services.

And since West never paid its Medical Directors or Administrator from the base management fees of the MSA (and Mr. Mounce could not have been paid from the MSA in any event), which the fair market value opinion expressly assumed, the base management fees went directly to West as remuneration.

### d. Methodist Paid West Multiple Times For The Same Services

Finally, there was an overlap in payments for the same services among the various agreements, which constitutes remuneration. Methodist paid West under the LEA for much of the work West purportedly was doing under the MSA. Specifically, Erich Mounce and Cheryl Prince dealt with most of the planning and implementation of the management services, as Mr. Mounce clearly testified. Time spent on committees, particularly those that also involved Methodist, was not to be reimbursed under the MSA. In addition, with respect to Dr. Matthew Ballo, who Mr. Mounce testified provided management services under the MSA, Methodist also indirectly paid his salary, which was funded in part from the Cancer Mission Support Funds provided by Methodist. In addition, given the sheer number of wRVUs for which West was paid, particularly for Drs. Schwartzberg, Tauer and Ballo, Methodist was double-paying under the PSA and MSA for the hours spent on purported management services, as it would be impossible for the physicians to work as many hours as needed to achieve the wRVUS and do the extensive management services required under the MSA. Notably, West did not maintain any documentation to support what work was done for the wRVUs or the MSA tasks, despite the contractual requirements, nor did Methodist request any documentation.

The United States reserves the right to further supplement its response.

**INTERROGATORY NO. 3**:

Identify every instance in which you allege any person recommended or referred a patient to Defendants in violation of the Anti-Kickback Statute, including:

    a. The name of the person or persons who made the referral or recommendation;
    b. The name of the patient who was recommended or referred to Defendants;
    c. The date on which the recommendation or referral was made:
    d. The date on which Defendants provided services to the patient:
    e. The nature of the services Defendants provided to the patient;
    f. The specific remuneration that you allege induced or was intended to induce the recommendation or referral; and
    g. The basis for your allegation that such remuneration did or was intended to induce the recommendation or referral.

**RESPONSE:**

The United States objects to subparts f. and g. in Interrogatory No. 3, which constitute separate interrogatories and are unduly burdensome, not proportional to the needs of the case and purport to impose on obligation on the United States to tie a specific payment of remuneration to each referral, which is not an element of an AKS claim. *See* Response to Interrogatory No. 1, which claims constitute the referrals of West provider to Methodist during the relevant time period.

**INTERROGATORY NO. 4**:

Identify and describe all damages that You claim; include an itemized statement of any particular damages claimed and any supporting calculations and/or computations.

**RESPONSE:**

*See* Response to Interrogatory No. 1.

**INTERROGATORY NO. 5**:

Identify every person who participated in each unlawful scheme that You allege and describe his or her role in the alleged scheme.

**RESPONSE:**

The United States objects to this Interrogatory on the grounds that it is premature, unduly burdensome and not proportional to the needs of the case. Further, the United States has not stated

9

any claim for conspiracy in this action. Subject to and without waiving its objections, the United States refers to its Initial Disclosures and reserves the right to supplement its response.

**INTERROGATORY NO. 6**:

Identify every person whom You allege willfully acted in violation of the Anti-Kickback Statute and describe the basis for your conclusion.

**RESPONSE:**

The United States objects to this Interrogatory on the grounds that it is premature, unduly burdensome and not proportional to the needs of the case. The United States further objects to the Interrogatory to the extent it seeks information unrelated to Defendants.

Subject to and without waiving its objections, the United States avers that the Methodist executives who were involved in negotiating and structuring the transaction with West, including Gary Shorb, Chris McLean, Donna Abney, and Lynn Field, have knowledge that the transaction violated the AKS for the reasons stated in response to Interrogatory No. 2. These individuals are and have been aware that Methodist paid remuneration to West in exchange for referrals from West's physicians. Subsequently, Michael Ugwueke, Chuck Lane and Monica Wharton obtained knowledge that Methodist's initial transaction with West violated the AKS and continued to allow Methodist to pay West in exchange for referrals, including for services rendered at Methodist locations that were not Cancer Center Sites under the original agreements or through any amendments lawfully made thereto.

The United States reserves the right to supplement its response to this Request.

**INTERROGATORY NO. 7**:

Identify every person whom You allege had actual knowledge of, was deliberately ignorant of, and/or recklessly disregarded any information related to the submission of false or fraudulent claims and describe the basis for your conclusion.

10

**RESPONSE:**

*See* Response to Interrogatory No. 6.

**INTERROGATORY NO. 8**:

Identify every instance in which You allege Defendants did not comport with relevant industry guidance, including but not limited to guidelines published by HHS-OIG or CMS.

**RESPONSE:**

The United States objects to this Interrogatory on the grounds that is overbroad in that it is not limited to the triable issues in this litigation, is unduly burdensome, not proportional to the needs of the case and is premature.

Subject to and without waiving its objections, the United States responds that from the initial conversations Methodist had with West concerning the proposed informal partnership through the end of the financial relationship between Methodist and West, Methodist was aware of the AKS and the industry guidance against partnerships between hospitals and physicians that related to financial arrangements that would violate the AKS.

The United States reserves its right to further supplement this response.

**INTERROGATORY NO. 9**:

Identify all rules, regulations, guidance, official publications, provider education materials, reports, and communications that You contend support your claims against Defendants.

**RESPONSE:**

The United States objects to this Interrogatory on the grounds that it seeks information already in the possession of Methodist or otherwise publicly available and is unduly burdensome and not proportional to the needs of the case. The United States further objects to this Interrogatory on the ground that it seeks a response on an issue that is not in dispute. Methodist has filed an

Answer in this action in which it has admitted that it is "fully aware of the requirements for participation in Medicare, including compliance with the AKS."

Subject to and without waiving its objections, the United States contends that Methodist violated the AKS and the FCA, which are the only relevant laws at issue in this action. The United States is not asserting that Methodist violated any guidance, education materials or other documents issued to the public concerning the AKS or the FCA.

**INTERROGATORY NO. 10**:

Identify all rules, requirements, or other statements of policy establishing substantive legal standards related to the following:

    a. Use of compensation formulas that base payment for professional services performed by physicians through a professional services agreement on wRVUs for professional services;

    b. the appropriate ratio of collections received for professional services performed by physicians to professional compensation for those services;

    c. the definition of fair market value as it relates to compensation paid for professional physician services;

    d. the definition of fair market value as it relates to compensation for management services;

    e. any prohibition on the use of the market approach as a method to determine fair market value;

    f. the consideration of service line revenue in the valuation of a management services agreement;

    g. any requirement for timesheets, or other similar documentation, to justify the payment of management fees under a management services agreement;

    h. the minimum term required for unwinding an affiliation between a physician practice group and health system.

**RESPONSE**:

The United States objects to this Interrogatory on the grounds that it seeks information that is not relevant to any material fact in dispute, is unduly burdensome and to the extent that it seeks information that is publicly available or otherwise already in Methodist's possession.

Subject to and without waiving its objections, the United States is not aware of any information responsive to this Interrogatory that would be relevant to this action. The United

12

States has alleged that Methodist has violated the AKS and the FCA. The United States is not relying on any sub-regulatory guidance or other laws as a basis for the claims asserted in this action. Further, whether a particular financial relationship between a hospital and physician group violates the AKS or FCA is a fact specific inquiry.

**INTERROGATORY NO. 11**:

Identify all sub-regulatory guidance related to paragraphs (a) through (h) in Interrogatory No. 10.

**RESPONSE**:

*See* Response to Interrogatory No. 10.

**INTERROGATORY NO. 12**:

Identify all individuals at HHS-OIG, CMS, or any Medicare Contractor involved in the review, approval, rejection, or modification of any advisory opinion related to the following:

a. the payment of wRVUs for professional services performed by physicians through a professional services agreement;
b. the appropriate ratio of collections received for professional services performed by physicians to professional compensation for those services;
c. the definition of fair market value as it relates to compensation paid for professional physician services;
d. the definition of fair market value as it relates to compensation for management services;
e. any prohibition on the use of the market approach as a method to determine fair market value;
f. the consideration of service line revenue in the valuation of a management services agreement;
g. any requirement for timesheets, or other similar documentation, to justify the payment of management fees under a management services agreement;
h. the minimum term required for unwinding an affiliation between a physician practice group and health system.

**RESPONSE**:

The United States objects to this Interrogatory on the grounds that it seeks information that is not relevant to any material fact in dispute and is unduly burdensome and not proportional to the needs of the case. The United States further objects to this Interrogatory on the ground that

advisory opinions are fact-specific and can only be relied on by the party seeking the specific advisory opinion.

Subject to and without waiving its objections, the United States is not aware of any individual with information responsive to this Interrogatory.

**INTERROGATORY NO. 13**:

Identify all individuals involved in the creation, planning, drafting, and implementation of any rules, regulations, or guidance identified in interrogatory No. 12.

**RESPONSE:**

*See* Response to Interrogatory No. 12.

**INTERROGATORY NO. 14**:

Identify and describe any pre-payment or post-payment review or audit conducted by HHS-OIG, CMS, or any of their contractors of any claims submitted by Defendants, including:
  a. Date of the review or audit;
  b. Basis for the review or audit;
  c. Persons involved in the review or audit;
  d. Results of the review or audit; and
  e. Actions taken as a result.

**RESPONSE:**

The United States objects to this Interrogatory on the grounds that it seeks information that is not relevant to any material fact in dispute, is unduly burdensome and not proportional to the needs of the case in that Methodist is a hospital with $2 billion in revenues and may have been subject to reviews or audits by various agencies and contractors during the relevant time period that have nothing to do with the issues in this litigation. To the extent that Methodist was reviewed or audited, these documents already are in Methodist's possession.

Subject to and without waiving its objections, the United States is in the process of confirming whether Methodist was audited by any governmental entity during the entirety of the time period relating to any issues in this litigation. The United States will supplement its response

14

to this Interrogatory once it has additional information and produce any documents that it relies on in supplementing its response.

**INTERROGATORY NO. 15**:

Identify all instances in which the Government has initiated a lawsuit, intervened in a *qui tam* action, or taken any other enforcement or punitive action against any provider related to any of the following:

    a.   the payment of wRVUs for professional services performed by physicians through a professional services agreement;

    b.   the appropriate ratio of collections received for professional services performed by physicians to professional compensation for those services;

    c.   the definition of fair market value as it relates to compensation paid for professional physician services;

    d.   the definition of fair market value as it relates to compensation for management services;

    e.   the use of the market approach as a method to determine fair market value;

    f.   the consideration of service line revenue in the valuation of a management services agreement;

    g.   any requirement for timesheets, or other similar documentation, to justify the payment of management fees under a management services agreement;

    h.   the minimum term required for unwinding an affiliation between a physician practice group and health system;

    i.   public statements by an attorney representing one party to a transaction regarding the risk of a particular transaction structure under the Anti-Kickback Statute.

**RESPONSE:**

       The United States objects to this Interrogatory on the grounds that it seeks information that is not relevant to any material fact in dispute, is unduly burdensome and to the extent that it seeks information that is publicly available or otherwise already in Methodist's possession. The United States further objects to this Interrogatory to the extent it seeks information that is privileged or protected from disclosure.

       Subject to and without waiving its objections, the United States responds that it is not aware of any public action it has taken against a hospital that it has determined has engaged in a lawful transaction with a physician group. Whether specific financial relationships between hospitals and physicians violate the AKS are fact specific, and the United States is not aware of any information

15

responsive to this Interrogatory that would be relevant to determining whether Methodist violated the AKS as alleged in this action.

**INTERROGATORY NO. 16**:

Identify all instances in which You contend Foley & Lardner LLP, or anyone else, communicated to Methodist that its affiliation with West Clinic to form the West Cancer Center presented risks of violating the Anti-Kickback Statute, including the name of the person communicating the risks, the person to whom the risks were communicated, the complete content of the communication containing the risks, the date of the communication, and any other persons involved in the communication.

**RESPONSE**:

The United States objects to this Interrogatory on the grounds that it is premature as fact discovery has not yet concluded and that the information is in Methodist's possession. The United States further objects on the ground that it is unduly burdensome and not proportional to the needs of the case. Subject to and without waiving its objections, the United States responds to this Interrogatory as follows:

Attorneys with the firm of Foley & Lardner LLP ("Foley"), including Michael Blau and Alexis Bortniker, gave presentations beginning in or about 2009 throughout the parties' relationship that management services agreements and professional services agreements may present "irreducible" risks of violating the AKS. Entities entering into such agreements cannot rely on a personal services safe harbor, because as Foley noted, the aggregate compensation was not set in advance and payment was based on the volume or value of referrals. Foley identified the need for a fair market value opinion to potentially help mitigate the risks, which would not, however, insulate the parties from government enforcement. The United States has produced the powerpoints from the presentations and articles referenced in its Complaint in Intervention. In addition, Foley produced materials from presentations that it identified West having attended. The United States has not yet been able to confirm whether Methodist or its counsel, Jones Day,

16

attended or were aware of any of Foley's public presentations prior to the close of the transaction in December 2011, but Methodist provided slides from one of such presentation during the investigative phase, and the information is in the public domain. In addition, Erich Mounce attended and participated in Foley's presentations throughout the course of the parties' relationship. Methodist leased Mr. Mounce under the LEA, and he was the Administrator under the MSA, and the CEO of the West Cancer Center, which Mr. Mounce testified was a partnership among West, Methodist and UT. Thus, Mr. Mounce's knowledge may be attributed to Methodist. The United States reserves the right to supplement its response.

**<u>INTERROGATORY NO. 17</u>**:

Identify all Government employees, including any government attorneys, auditors, policymakers, or contractors from any agency, including but not limited to CMS, HHS, HHS- OIG, the Department of Justice's Civil Division, or any United States Attorneys' Office, who attended any presentation, conference, seminar, meeting, or event in which any individual or group, including Michael Blau or any other attorney from Foley & Lardner LLP, presented or offered remarks on physician-hospital alignment or integration, including the use of professional services agreements, co-management models, management services agreements, asset purchases, provider-based conversion, or leased employees. For each, identify the date and contents of the presentation, and the position of the Government employee who attended.

**<u>RESPONSE</u>:**

The United States objects to this Interrogatory on the grounds that it is unduly burdensome and not proportional to the needs of the case, and it seeks information that has no relevance to the subject matter of, or any triable issue in, this litigation. Violations of the AKS are *per se* material to the United States.

Subject to and without waiving its objections the United States responds that Foley and the United States have produced information concerning Foley's presentations on physician-hospital alignment, as well as the specific structure that is relevant to the subject matter of this action. The

17

United States lacks sufficient information to identify attendees of Foley's presentations during the relevant time period.

**INTERROGATORY NO. 18**:

Identify all facts supporting your contention in paragraph 2 of the Complaint in Intervention that the creation of a "legal partnership" between Methodist and West Clinic "likely would have run afoul of regulatory requirements for participation in federal health care programs."

**RESPONSE:**

The United States objects to this Interrogatory on the grounds that is premature, unduly burdensome and not proportional to the needs of the case. Subject to and without waiving its objections, the United States refers to the presentations Foley gave that are in the production and the internal documents that Methodist has produced, including materials prepared by PwC. The United States reserves the right to supplement its response.

**INTERROGATORY NO. 19**:

Identify all facts supporting your contention in paragraph 238 of the Complaint in Intervention that "Methodist and West acknowledged to the United States that much of the management services required under the MSA did not occur in the first two years."

**RESPONSE:**

The United States refers to the statements made during the interviews of Dr. Kurt Tauer, Dr. Lee Schwartzberg, Erich Mounce, Gary Shorb and Chris McLean that West did not perform management services at Fayette or MECH and only performed management services at North and South if a West patient happened to end up at those locations. Methodist and West both told the United States that they focused on University and Germantown as far as inpatient management was concerned, and that West otherwise continued to support the locations that were the subject of the Asset Purchase Agreement and could be re-purchased pursuant to the Unwind Agreement.

18

The United States intends to supplement this response further after the close of fact discovery.

**INTERROGATORY NO. 20**:

Identify all facts supporting your contention in paragraph 337 of the Complaint in Intervention that the "movement to value-based care" and "deterioration of 340B Program" "came to fruition" and "lowered the amount of reimbursement" to Methodist.

**RESPONSE:**

The United States objects to this Interrogatory on the grounds that is premature, unduly burdensome and not proportional to the needs of the case.

Subject to and without waiving its objections, the United States responds that Methodist retained PwC in connection with its attempts to have West enter into a "friendly PC" or some other structure that would presumably resolve the AKS violations inherent in the relationship. PwC identified the movement to value-based care and concerns over the 340B program reducing the amount of savings to hospitals, which Methodist admitted in its answer. Any subsequent changes to the regulatory framework during the relevant time period are evinced by the reimbursement amounts Methodist received or expect to receive at that time.

The United States reserves the right to supplement its response.

**INTERROGATORY NO. 21**:

Identify all facts supporting your contention in paragraph 342 of the Complaint in Intervention that Dr. Michael Ugwueke "expressed regulatory concerns" to West Clinic related to the West Cancer Center affiliation.

**RESPONSE:**

The United States refers to West_0010944, which mentions a discussion on June 13, 2018 between Methodist and West, during which Methodist identified regulatory requirements that

19

would be a significant change from how the parties were operating.  The United States reserves

the right to supplement its response.


Dated: August 22, 2022

                                        MARK H. WILDASIN
                                        United States Attorney
                                        Middle District of Tennessee

                              By:     s/ Kara F. Sweet
                                        KARA F. SWEET
                                        WYNN M. SHUFORD
                                        Assistant United States Attorney
                                        United States Attorney's Office
                                        719 Church Street, Suite 3300
                                        Nashville, TN  37203
                                        Phone: (615) 736-5151
                                        kara.sweet@usdoj.gov
                                        wynn.shuford@usdoj.gov

                                        *Counsel for the United States*

## **VERIFICATION**

I declare under penalty of perjury that the United States' Responses to Defendants' First

Set of Interrogatories are true and correct to the best of my knowledge, information, and belief.


_____
Kenneth P. Barrett
Special Agent
Department of Health & Human Services
Office of the Inspector General

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2022, a true and correct copy of the foregoing was served via email to the following:

| | |
|---|---|
| Bryan A. Vroon<br>Law Offices of Bryan A. Vroon, LLC<br>1380 West Paces Ferry Road, Suite 2270<br>Atlanta, GA  30327<br>Email:  bryanvroon@gmail.com | Edward D. Robertson, Jr.<br>Bartimus, Frickleton & Robertson<br>715 Swifts Highway<br>Jefferson City, MO  65109<br>Email: crobertson@bflawfirm.com |
| Jerry E. Martin<br>David Rivera<br>Seth Marcus Hyatt<br>Barrett Johnston Martin & Garrison, LLC<br>Bank of America Plaza<br>414 Union Street, Suite 900<br>Nashville, TN  37219<br>Email: jmartin@barrettjohnston.com<br>Email: shyatt@barrettjohnston.com | Robert Salcido<br>(Admitted *Pro Hac Vice*)<br>Akin Grump Strauss Hauer & Feld LLP<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Email: rsalcido@akingrump.com |
| Brian D. Roark<br>J. Taylor Chenery<br>Taylor M. Sample<br>Hannah E. Webber<br>Bass, Berry & Sims PLC<br>150 Third Avenue South, Suite 2800<br>Nashville, TN 37201<br>Email: broark@bassberry.com<br>Email: tchenery@bassberry.com<br>Email: taylor.sample@bassberry.com<br>Email: hannah.webber@bassberry.com | |

s/ Kara F. Sweet
KARA F. SWEET
Assistant United States Attorney