# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA and the STATE OF TENNESSEE ex rel. JEFFREY H. LIEBMAN and DAVID M. STERN, M.D. )
)
)
)
Plaintiff, )
)
v. )
)
METHODIST LE BONHEUR )
HEALTHCARE, METHODIST )
HEALTHCARE-MEMPHIS HOSPITALS, )
)
Defendants. )

Case No. 3:17-CV-00902

District Judge William L. Campbell, Jr.

Magistrate Judge Barbara D. Holmes

---

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BASS, BERRY & SIMS PLC
Brian D. Roark
J. Taylor Chenery
Taylor M. Sample
Hannah E. Webber
150 Third Avenue South, Suite 2800
Nashville, TN 37201

AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Salcido
(Admitted Pro Hac Vice)
2001 K Street, N.W.
Washington, DC 20006

*Attorneys for Defendants Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals*

# TABLE OF CONTENTS

I.      BACKGROUND ON CANCER CARE IN MEMPHIS ................................................... 1

II.     METHODIST ............................................................................................................ 2

III.    THE WEST CLINIC ................................................................................................ 4

IV.     CREATION OF WEST CANCER CENTER .............................................................. 5

V.      FAIR MARKET VALUATIONS ............................................................................... 12

VI.     AFFILIATION AGREEMENTS ................................................................................ 15

        A.      Asset Purchase Agreement ("APA") ................................................... 15

        B.      Leased Employee and Administrative Services Agreement ("LEA") ................... 17

        C.      Professional Services Agreement ("PSA") ............................................. 19

        D.      Management Services/Performance Improvement Agreement ("MSA") ............. 21

VII.    OPERATION OF WEST CANCER CENTER ........................................................... 23

        A.      The West Clinic Assumed Management of the Cancer Center. ............................ 24

        B.      Methodist's Payments under the Affiliation Agreements were Fair Market
                Value. ................................................................................................... 39

VIII.   ACHIEVEMENTS OF WEST CANCER CENTER ................................................... 44

        A.      West Consistently Achieved Its Performance Incentives. .................................. 45

        B.      The Cancer Center Achieved Numerous Accreditations. ................................... 47

        C.      The West Physicians Referred Their Patients Based on Independent Professional
                Judgment. ............................................................................................. 53

IX.     UNWIND OF WEST CANCER CENTER ................................................................. 55

X.      RELATORS ............................................................................................................. 58

XI.     LITIGATION PROCEEDINGS AND DISCOVERY .................................................. 59

Case 3:17-cv-00902   Document 322   Filed 04/14/23   Page 2 of 69 PageID #: 5672

Pursuant to Local Rule 56.01(b), Defendants Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals (collectively, "Methodist") respectfully submit that there is no genuine dispute as to the following facts related to Defendants' Motion for Summary Judgment, filed contemporaneously herewith.

## I.    BACKGROUND ON CANCER CARE IN MEMPHIS

1.    Prior to 2012, cancer care in Memphis was severely disjointed and suffered from a lack of collaboration between providers.  (SUMF Ex. 1, Declaration of Todd Tillmanns, MD ("Tillmanns Decl.") ¶ 5); (SUMF Ex. 2, Declaration of Sylvia Richey, MD ("Richey Decl.") ¶ 7); (SUMF Ex. 3, Declaration of Matthew Ballo, MD ("Ballo Decl.") ¶ 7); (SUMF Ex. 4, Declaration of David Portnoy, MD "Portnoy Decl.") ¶ 6); (SUMF Ex. 5, Declaration of Michael Berry, MD ("Berry Decl.") ¶ 5); (SUMF Ex. 51, Deposition of Michael Ugwueke ("Ugwueke Dep.") 26:21–26:23); (SUMF Ex. 50, Deposition of Gary Shorb ("Shorb Dep.") 19:19–23); (SUMF Ex. 53, Deposition of Lee Schwartzberg ("Schwartzberg Dep.") 167:17–168:16.)

**RESPONSE:**


2.    Patients often received oncology and ancillary services from different providers at different institutions, requiring them to travel across the community many times over to receive portions of their treatment.  This process was a result of the lack of integrated cancer care available in Memphis prior to 2012.  (SUMF Ex. 2, Richey Decl. ¶ 7); (SUMF Ex. 3, Ballo Decl. ¶ 7); (SUMF Ex. 5, Berry Decl. ¶ 5); (SUMF Ex. 47, Deposition of Erich Mounce ("Mounce Dep.") 389:5–10.)

**RESPONSE:**

1

3.      Patients also traveled outside Memphis to receive necessary aspects of their treatment that were not available in Memphis. (SUMF Ex. 47, Mounce Dep. 159:15–160:6, 550:25–551:15.)

**RESPONSE:**

4.      Uninsured patients often went without preventative care and presented to emergency rooms for care when a cancer became noticeable or late stage.  (SUMF Ex. 47, Mounce Dep. 474:18–475:6.)

**RESPONSE:**

5.      "Patient care and outcomes suffered as a result of that fragmentation and lack of specialization."  (SUMF Ex. 4, Portnoy Decl. ¶ 6.)

**RESPONSE:**

## II.     METHODIST

6.      Methodist is a faith-based, not-for-profit health system that has served Memphis and the Mid-South for more than 100 years. (Dkt. No. 235 ("Compl.") ¶ 78); (Dkt. No. 242 ("Answer") ¶ 78.)

**RESPONSE:**

7.      Methodist is a $2 billion healthcare system.  (SUMF Ex. 50, Shorb Dep. 54:10, 111:6.)

**RESPONSE:**

8.      In 2010, Methodist operated numerous acute care hospitals that provided care to patients from across the Mid-South.  (Compl. ¶¶ 14–15, 78); (Answer ¶¶ 14–15, 78.)

2

**RESPONSE:**

9.      Before 2012, cancer care at Methodist lacked standardized order sets or protocols for tracking tumor types; patient-specific treatment plans; standardized discharge criteria; inpatient chemo order sets; end-of-life or palliative care tracking; dedicated oncology inpatient unit or tumor board for its Germantown Hospital; and sufficiently capable surgical oncologists.  (SUMF Ex. 34, PwC Baseline Assessment at 16, 26); (SUMF Ex. 49, Deposition of Chris McLean Volume I ("McLean Dep. Vol. I") 146:4–148:4.)

**RESPONSE:**

10.      Methodist desired to create a cancer center that would be designated as a National Cancer Institute Comprehensive Cancer Center ("NCI designation"), which is awarded to cancer programs that meet rigorous standards for multi-disciplinary, research-focused care.  (SUMF Ex. 6, Declaration of Gary Shorb ("Shorb Decl.") ¶ 4); (SUMF Ex. 49, McLean Dep. Vol. I 39:12–20, 174:8–15.)

**RESPONSE:**

11.      Methodist wanted to be known more broadly in the region for its cancer care.  In 2006, Methodist hosted Dr. Joseph Simone, who had achieved NCI designation for several cancer centers, including St. Jude Children's Hospital, to consult on creating a center and achieving NCI designation.  (SUMF Ex. 6, Shorb Decl. ¶¶ 3, 5.)

**RESPONSE:**

3

12. Prior to 2010, Methodist was working with the Boston Baskin Cancer Group to develop the University of Tennessee Cancer Institute. This group lacked the size and sophistication by itself to help Methodist achieve NCI designation. (SUMF Ex. 50, Shorb Dep. 19:19–20:9); (SUMF Ex. 47, Mounce Dep. 139:5–10.)

**RESPONSE:**

III. **THE WEST CLINIC**

13. Prior to affiliating with Methodist, The West Clinic ("West") was the preeminent oncology practice in Memphis with nearly thirty doctors in various specialties. (Compl. ¶ 16); (Answer ¶ 16); (SUMF Ex. 21, 2011 ECG FMV at MLH_024746); (SUMF Ex. 6, Shorb Decl. ¶ 7.)

**RESPONSE:**

14. West also felt strongly that, given Memphis's size and unique cancer pathology, the city needed a comprehensive cancer center to make it easier to recruit outside talent, grow sub-specialties, increase coordination among providers, and expand the specialization of oncologists, which would, in turn, improve patient care outcomes, and survival rates for cancer patients. (SUMF Ex. 1, Tillmanns Decl. ¶ 5); (SUMF Ex. 4, Portnoy Decl. ¶ 6); (SUMF Ex. 5, Berry Decl. ¶ 5.)

**RESPONSE:**

15. West physicians believed that partnering with Methodist would allow them to streamline care into a one-stop shop for all patients in need of cancer treatment by combining

4

specialties and services like radiology, radiation oncology, medical oncology, and surgical capabilities. (SUMF Ex. 2, Richey Decl. ¶ 7.)

**RESPONSE:**


16.    This consolidation of services into a single service line would bring the cancer center more in line with other NCI-designated cancer centers, such as the University of Texas MD Anderson Cancer Center in Houston. (SUMF Ex. 3, Ballo Decl. ¶ 7.)

**RESPONSE:**


17.    From the West physicians' perspective, the main purpose of an affiliation with Methodist was to integrate cancer care in the community and to create an NCI-designated cancer center. (SUMF Ex. 4, Portnoy Decl. ¶ 6); (SUMF Ex. 3, Ballo Decl. ¶ 11); (SUMF Ex. 1, Tillmanns Decl. ¶ 6); (SUMF Ex. 55, Deposition of Bradley Somer ("Somer Dep.") 155:11–16); (*see also* SUMF Ex. 47, Mounce Dep. 387:11–16.)

**RESPONSE:**


**IV.    CREATION OF WEST CANCER CENTER**

18.    In the fall of 2010, West issued a Request for Proposal ("RFP") to multiple Memphis-area health systems, including Methodist, stating that it was looking to enter into a "strategic alliance" with a Memphis-based hospital system to "promote standardization of services, and improve the quality, efficiency and operations of the Hospital's medical oncology . . . services, potentially access all of the Hospital's sites of care" and to create a comprehensive cancer program. (Compl. ¶ 96); (Answer ¶ 96); (SUMF Ex. 19, West RFP); (SUMF Ex. 50, Shorb Dep. 20:18–20);

5

(SUMF Ex. 47, Mounce Dep. 396:22–397:5); (SUMF Ex. 4, Portnoy Decl. ¶ 5); (SUMF Ex. 2, Richey Decl. ¶ 6.)

**RESPONSE:**

19.     Under the model laid out in West's RFP, West proposed entering into an affiliation with a health system that would include:

a)  **Convert Clinics to Provider-Based:** West would convert eligible practice sites (referred to as "Cancer Center Sites") to provider-based outpatient departments of the Hospital, where all technical services would be billed under the Hospital's provider numbers as Hospital services.

b)  **Asset Purchase:** The Hospital would purchase, lease, or assume current leases of the Cancer Center Sites from West for fair market value, and would purchase from West, at fair market appraised value, the furniture, fixtures and equipment at the Cancer Center Sites.

c)  **Employment of Mid-Levels:** The Hospital would employ all or certain of the mid-level clinicians currently employed by West at substantially similar compensation rates and with the Hospital's standard employee benefit package. These mid-level clinicians would thereafter by co-managed by West under a Co-Management Agreement with the Hospital.

d)  **wRVU based Professional Services Agreement:** The parties would enter into a Professional Services Agreement, under which the West providers would be exclusive providers of professional oncology services at the Cancer Center Sites. The Hospital would pay West on an aggregate wRVU basis at a mutually agreeable rate based on historical financials and fair market valuations.

e)  **Leased Employees:** The Hospital would enter into a Leased Employee Agreement, under which West would provide all reception, clerical, billing and collection, administrative and support staff necessary for the Cancer Center Sites, including an allocable portion of the time of West's Senior Management. West would retain some administrative space at its main location and would provide certain administrative and management support service with respect to the Cancer Center Sites and staff from that location. West would also serve as the Hospital's billing and collection agent, and would bill in the Hospital's name and under the Hospital's provider numbers for all physician and ancillary services performed by West at the Cancer Sites. All collections would belong to the Hospital.

6

f) **Medical Directors:** West's Medical Directors and Chief Medical Officer would become the Hospital's Medical Directors for the Cancer Center Sites.

g) **Leadership Integration:** The Hospital would place representatives of West in leadership positions and on governing bodies to ensure a system-wide emphasis on collaboration.

h) **Co-Management of Service Line:** The Parties would enter into a Service Line Co-Management Agreement under which the Hospital and West would collaboratively co-manage the Hospital's oncology service line at the Cancer Center Sites and other mutually agreeable locations.

    i. The purpose of the agreement would be to improve quality, efficiency, and operation of the Service Line.

    ii. The parties would create an Operating Committee for the Service Line that would be comprised of equal members of West and the Hospital.

    iii. West would be actively involved in co-managing all aspects of the Service Line, but the Hospital would retain ultimate responsibility for the operation of the Service Line and Cancer Center Sites.

    iv. Under the agreement, the Hospital would pay West (a) a fair market appraised, fixed "base" fee, and (b) fair market appraised, "incentive bonus" amounts, contingent upon the satisfaction of pre-determined quality, efficiency and operational improvements that would be reset periodically to assure continuous improvement.

i) **Unwind:** At the expiration of the affiliation, West would repurchase Cancer Center Sites and FFE at then-appraised fair market value, terminate relevant leases, reassign staff, and the Hospital would provide reasonable assistance in transitioning back to private practice.

(SUMF Ex. 47, Mounce Dep. 394:15–395:10, 413:10–13); (SUMF Ex. 19, West RFP.)

    **RESPONSE:**


20.     This affiliation structure proposed by West was common throughout the industry and was based on other similar transactions. (SUMF Ex. 47, Mounce Dep. 395:3–14, 413:10–414:10); (SUMF Ex. 64, Journal of Oncology Practice.)

    **RESPONSE:**

7

21.     West engaged the firm of Foley & Lardner, LLP to draft the deal structure based on its experience constructing similar affiliations, including the cancer center affiliation at the University of Pittsburgh Medical Center.  (SUMF Ex. 47, Mounce Dep. 394:15–395:10; 413:10–19.)

**RESPONSE:**


22.     West was interested in partnering with Methodist in particular due to its nonprofit status and focus on providing community care, which West believed would afford it additional opportunities to address treatment disparity.  (SUMF Ex. 47, Mounce Dep. 404:11–407:7); (SUMF Ex. 53, Schwartzberg Dep. 170:3–7); (SUMF Ex. 54, Deposition of Kurt Tauer ("Tauer Dep.") 161:2–162:12.)

**RESPONSE:**


23.     West did not take into account the level of compensation the parties responding to the RFP would pay because the amount, subject to a fair market value assessment, would be the same.  (SUMF Ex. 47, Mounce Dep. 407:8–409:18.)

**RESPONSE:**


24.     Methodist was interested in pursuing an affiliation with West because it was the preeminent oncology practice in Memphis, it was a leader not just locally but regionally and nationally in cancer care and research, and it could bring the same breadth and quality of West service to the population served by Methodist.  (SUMF Ex. 6, Shorb Decl. ¶ 7.)

**RESPONSE:**

25.     West and Methodist shared the same vision for integrated cancer care and believed the integration would facilitate talent acquisition and lead to development of a comprehensive cancer center that could become a regional destination for state-of-the-art cancer care.  Methodist saw partnering with West as a way to bring the breadth and quality of West's services to the patient population served by Methodist.  (SUMF Ex. 6, Shorb Decl. ¶¶ 6–8); (SUMF Ex. 50, Shorb Dep. 19:19–23); (SUMF Ex. 21, 2011 ECG FMV at MLH_024745); (SUMF Ex. 49, McLean Dep. Vol. I 39:12–20); (SUMF Ex. 53, Schwartzberg Dep. 176:18–177:2); (SUMF Ex. 54, Tauer Dep. 156:6–157:18); (SUMF Ex. 47, Mounce Dep. 618:4–619:4); (SUMF Ex. 1, Tillmanns Decl. ¶ 5); (SUMF Ex. 2, Richey Decl. ¶ 7); (SUMF Ex. 4, Portnoy Decl. ¶ 6); (SUMF Ex. 3, Ballo Decl. ¶ 11); (SUMF Ex. 48, Deposition of Chuck Lane ("Lane Dep.") 151:19–24; 197:22–199:24.)

**RESPONSE:**


26.     On or around December 22, 2010, Methodist responded to West's RFP.  (SUMF Ex. 7, Declaration of Chris McLean ("McLean Decl.") ¶3); (SUMF Ex. 20, RFP Response.)

**RESPONSE:**


27.     West accepted Methodist's response (over responses from Tenet and Baptist) because it gave West the most flexibility.  The amount Methodist would compensate West was not a factor in this decision, as West understood independent fair market valuators would set the compensation after the parties closed the transaction.  (SUMF Ex. 47, Mounce Dep. 404:11–408:24); (SUMF Ex. 2, Richey Decl. ¶ 18.)

**RESPONSE:**

9

28.    Methodist engaged Jones Day as its counsel to assist in the creation and execution of the various agreements that would form the cancer center because Jones Day was a national firm with deep experience creating other, similar cancer center affiliations.  (SUMF Ex. 6, Shorb Decl. ¶ 10.)

**RESPONSE:**


29.    Foley & Lardner and Jones Day drafted the affiliation agreements that were ultimately executed by the parties. (SUMF Ex. 7, McLean Decl. ¶ 4); (SUMF Ex. 53, Schwartzberg Dep. 20:6–8); (SUMF Ex. 47, Mounce Dep. 119:21–25, 425:13–18.)

**RESPONSE:**


30.    In July 2011, Methodist engaged PricewaterhouseCoopers ("PwC") to assist the parties in creating the formal co-management structure. (SUMF Ex. 6, Shorb Decl. ¶ 11.)

**RESPONSE:**


31.    PwC had significant experience creating similar structures and transactions between physician groups and hospitals across the country. (SUMF Ex. 6, Shorb Decl. ¶ 11); (SUMF Ex. 47, Mounce Dep. 413:10–415:18); (SUMF Ex. 52, Deposition of Scott Safriet ("Safriet Dep.") 20:7–16); (SUMF Ex. 49, McLean Dep. Vol. I 138:12–139:8.)

**RESPONSE:**


10

32.     Methodist and West considered engaging an experienced consulting firm extremely important because it ensured the affiliation was created by experts who knew the best way to "actually reach and build an integrated oncology program between a community oncology clinic and a hospital-based oncology program." (SUMF Ex. 47, Mounce Dep. 413:10–415:7); (SUMF Ex. 6, Shorb Decl. ¶ 9.)

**RESPONSE:**

33.     PwC conducted a baseline assessment of Methodist's current oncology service line and the potential strengths and weaknesses of an alliance with West.  (SUMF Ex. 34, PwC Baseline Assessment.)  As part of the baseline assessment, PwC gathered data and information from both parties, "did a review, toured facilities, and talked to people." (SUMF Ex. 47, Mounce Dep. 426:9–21.)

**RESPONSE:**

34.     The baseline assessment concluded with a recommendation that Methodist and West "pursue a path of integration via a Management Service Agreement [("MSA")]."  (SUMF Ex. 34, PwC Baseline Assessment at 55.)

**RESPONSE:**

35.     Over the course of several months, PwC facilitated meetings (called "Steering Committee meetings") of the parties to create the management structure for the cancer center, including discussing the goals of the co-management agreement and the expected responsibilities of West to manage the oncology service line.  (SUMF Ex. 6, Shorb Decl. ¶ 12); (SUMF Ex. 47,

11

Mounce Dep. 424:24–425:2); (SUMF Ex. 39, Steering Committee Meeting #1); (SUMF Ex. 40, Steering Committee Meeting #2); (SUMF Ex. 2, Richey Decl. ¶ 9.)

**RESPONSE:**

36. PwC was also heavily involved in assisting the parties in crafting the MSA, including the initial performance incentives. (SUMF Ex. 6, Shorb Decl. ¶ 13); (SUMF Ex. 47, Mounce Dep. 425:24–426:8, 433:25–434:3); (SUMF Ex. 2, Richey Decl. ¶ 9.)

**RESPONSE:**

37. During these months, from July 2011 through December 2011, the parties negotiated the terms of several agreements, referred to as the "Affiliation Agreements," to create the West Cancer Center. (SUMF Ex. 6, Shorb Decl. ¶ 14); (SUMF Ex. 47, Mounce Dep. 31:21–32:7.)

**RESPONSE:**

V. **FAIR MARKET VALUATIONS**

38. The understanding in negotiating the Affiliation Agreements was that the payments would be based on fair market value opinions conducted by outside valuation firms. (SUMF Ex. 47, Mounce Dep. 443:9–24); (SUMF Ex. 49, McLean Dep. Vol. I 22:2–5; 260:4–6); (SUMF Ex. 56, Deposition of Chris McLean Volume II ("McLean Dep. Vol. II") 147:18–21); (Shorb Dep. 88:15–16; 118:7–10.)

**RESPONSE:**

12

39.     Methodist informed West that it would only pay compensation supported by fair-market value opinions. And, discussions "revolved around fair market value, always."  (SUMF Ex. 49, McLean Dep. Vol. I 264:10–17); (SUMF Ex. 47, Mounce Dep. 444:8–14).

**RESPONSE:**


40.     West "understood that Methodist's payment of professional and management fees [was] subject to fair-market value opinions" and "expected and understood that West would be paid fair market value for management and professional services provided by the West physicians."  (SUMF Ex. 2, Richey Decl. ¶ 18.)

**RESPONSE:**


41.     Upon obtaining a fair market value range, the parties would negotiate payment amounts within that range, in reliance on the valuators' opinions.  (SUMF Ex. 47, Mounce Dep. 443:15–24, 444:8–14; 605:24–606:9.); (SUMF Ex. 50, Shorb Dep. 118:7–10, 131:25–132:2); (SUMF Ex. 49, McLean Dep. Vol. I 264:15–17.)

**RESPONSE:**


42.     During the affiliation, Methodist's payment of management fees and professional fees was always within a range provided by an outside valuator.  (SUMF Ex. 50, Shorb Dep. 132:1–2); (SUMF Ex. 56, McLean Dep. Vol. II 130:9–12.)

**RESPONSE:**

13

43. In obtaining fair market value opinions, the parties never limited the questions the fair market valuators could ask and supplied all information the evaluators requested. (SUMF Ex. 47, Mounce Dep. 595:3–598:18.)

**RESPOINSE:**

44. Once the relevant information was provided, the parties expected that valuators would use the information to calculate a range of fair market values. (SUMF Ex. 47, Mounce Dep. at 601:4–12.)

**RESPONSE:**

45. During the affiliation, Methodist believed that all compensation paid by Methodist to West under the Affiliation Agreements was fair market value and that the Affiliation Agreements complied with the law. (SUMF Ex. 6, Shorb Decl. ¶ 15); (SUMF Ex. 7, McLean Decl. ¶ 5.)

**RESPONSE:**

46. Methodist's expert witness in this litigation, Mr. Todd Mello, conducted the only retrospective analysis of the management and professional fees that confirmed the compensation paid was consistent with fair market value. (*See generally* SUMF Ex. 8, Declaration & Report of Todd Mello ("Mello Decl. & Report").)

**RESPONSE:**

14

47.     Mr. Mello's expert analysis revealed that West *earned less* under the PSA than it had been earning in independent practice prior to the affiliation.  (SUMF Ex. 8, Mello Decl. & Report at 11.)

**RESPONSE:**


48.     During the affiliation, total adult oncology service line revenue exceeded $1.6 billion, with approximately $224 million allocated to physician professional fees and $1.455 billion subject to management under the MSA.  (SUMF Ex. 8, Mello Decl. & Report at 44.)

**RESPONSE:**


49.     Mr. Mello's expert analysis revealed that similar management arrangements resulted in management fees of between 2.28% and 4.42% of revenue, while West earned between 1.58% and 2.28% during the affiliation.  (SUMF Ex. 8, Mello Decl. & Report at 14.)  Additionally, even taking into account any alleged "errors" in the contemporaneous valuations asserted by the government's expert, Mr. Mello concluded that the amount of payments still fell within fair market value.  (SUMF Ex. 8, Mello Decl. & Report at 14–15.)

**RESPONSE:**


VI.    **AFFILIATION AGREEMENTS**

     A.     **Asset Purchase Agreement ("APA")**

50.     Under the APA, MLH paid $6,657,397.49 on January 27, 2012, and executed a promissory note for $3,880,000, which was paid on December 18, 2012, to purchase the fixed assets (such as CT scanners, chemotherapy chairs, and exam room tables), leasehold improvements, EMR, supply and pharmaceutical inventory at five of West's clinic locations,

15

which became known as the "Cancer Center Sites."  (SUMF Ex. 13, APA); (SUMF Ex. 32, APA Promissory Note); (SUMF Ex. 33, APA Sources & Uses); (SUMF Ex. 49, McLean Dep. Vol. I 63:8–64:4); (SUMF Ex. 47, Mounce Dep. 26:3–10.)

**RESPONSE:**

51.     Methodist engaged HORNE Healthcare Service to conduct a valuation of fixed assets, leasehold improvements, and inventory at the West locations to be converted to Cancer Center Sites.  (SUMF Ex. 31, 2011 Horne FMV.)  The parties agreed that Methodist would pay West—and indeed, Methodist did pay West—the amount Horne determined to be fair market value for those assets it valued.  (SUMF Ex. 56, McLean Dep. Vol. II 147:17–21.)

**RESPONSE:**

52.     Methodist also purchased certain meaningful use payments, deposits, liabilities, fees, and agreements relating to the cancer services provided at those five locations under the APA. (SUMF Ex. 13, APA); (SUMF Ex. 33, APA Sources & Uses); (SUMF Ex. 49, McLean Dep. Vol. I 63:8–64:4); (SUMF Ex. 8, Mello Decl. & Report at 20.)

**RESPONSE:**

53.     The APA did not include any payments for use of the West name or for "goodwill." (SUMF Ex. 49, McLean Dep. Vol. I 267:6–268:17.)

**RESPONSE:**

54.   The APA also provided that support nurses, lab techs, radiology techs, and hospitalists working at the Cancer Center Sites would become Methodist employees.  (SUMF Ex. 13, APA at § 6.4(a).)

**RESPONSE:**


**B.     Leased Employee and Administrative Services Agreement ("LEA")**

55.   Under the LEA, Methodist leased administrative, management, and other non-physician personnel from West for the purpose of "providing services related to the operation of the Cancer Center Sites."  (SUMF Ex. 7, McLean Decl. ¶ 6); (SUMF Ex. 14, LEA.)  During the affiliation, West Clinic submitted bi-weekly payroll invoices to Methodist to cover the specific employees leased by Methodist.  (SUMF Ex. 7, McLean Decl. ¶ 7.)

**RESPONSE:**


56.   Methodist paid these employees on a pass-through basis, meaning West was not paid any additional fees above the salary and benefit amounts that went directly to these non-clinical employees.  (SUMF Ex. 7, McLean Decl. ¶ 7); (SUMF Ex. 47, Mounce Dep. 400:11–16; 456:20–25); (SUMF Ex. 63, Expert Deposition of Tim Smith ("Smith Expert Dep.") 118:22–119:3.)

**RESPONSE:**


57.   Purchasing the assets under the APA and leasing the West employees to Methodist under the LEA was done in order to convert the five Cancer Center Site locations to hospital-based outpatient departments of Methodist.  (SUMF Ex. 47, Mounce Dep. 55:19–56:13.)  After the

17

transfer of assets, West's former clinic locations became outpatient locations of Methodist hospitals.  (*See* SUMF Ex. 11, PSA at § 3.)

**RESPONSE:**


58.     Certain of West's clinic locations outside the Methodist service area remained only West locations and were not part of the parties' affiliation under the APA or LEA.  (SUMF Ex. 47, Mounce Dep. 20:14–17, 45:20–46:5, 79:7–14); (SUMF Ex. 7, McLean Decl. ¶ 8.)

**RESPONSE:**


59.     As of January 1, 2012, the leased employees began performing billing and collection, clerical, administrative, and other services for Methodist under the LEA.   However, some of the leased employees also continued to perform some duties for West's non-Methodist locations that were not part of the APA or LEA.  Some leased employees also continued to perform billing and collection services for claims that pre-dated the start of the affiliation.  (SUMF Ex. 47, Mounce Dep. 52:16–53:7); (SUMF Ex. 49, McLean Dep. Vol. I 29:9–25, 266:12–24); (SUMF Ex. 7, McLean Decl. ¶ 8.)

**RESPONSE:**


60.      Prior to the start of the affiliation, the parties reached an agreement under which Methodist would seek reimbursement from West for the allocated costs of leased employees and assets used by West for the non-Methodist locations and collection of pre-affiliation accounts receivable.  (SUMF Ex. 7, McLean Decl. ¶ 9); (SUMF Ex. 49, McLean Dep. Vol. I 29:17–25,

18

107:23–109:11); (SUMF Ex. 56, McLean Vol II. Dep. 7:8–23); (SUMF Ex. 8, Mello Decl. & Report at 25.)

**RESPONSE:**

61.     At the end of each year, Methodist would document these costs allocated to West and seek reimbursement for the same.  (SUMF Ex. 47, Mounce Dep. 79:16–80:4); (SUMF Ex. 49, McLean Dep. Vol. I 29:17–25); (SUMF Ex. 56, McLean Dep. Vol II. 7:8–23, 8:18–22); (SUMF Ex. 41, Overhead Allocation 2012-2017); (SUMF Ex. 42, Overhead Allocation 2012-2018); (SUMF Ex. 43, Email regarding Overhead Allocation.)

**RESPIONSE:**

62.     Over the course of the affiliation, West paid approximately $8.2 million for these dual-use assets and leased employees. (SUMF Ex. 49, McLean Dep. Vol. I 32:20–25, 191:6–11); (SUMF Ex. 41, Overhead Allocation 2012-2017); (SUMF Ex. 42, Overhead Allocation 2012-2018.)

**RESPONSE:**

**C.     Professional Services Agreement ("PSA")**

63.     Under the PSA, West provided professional physician services for Methodist's Adult Oncology Service Line, and Methodist paid West a professional services fee equal to the aggregate number of work relative value units ("wRVUs")[1] performed by West's physicians and

---

[1] A work relative value unit ("wRVU") is a standard unit of measurement of the time, skill, training, and intensity required of a physician to provide a given service.  (Compl. ¶ 131.)

19

their assistants.  (SUMF Ex. 11, PSA at § 5.1); (SUMF Ex. 50, Shorb Dep. 175:12–23); (SUMF Ex. 63, Smith Expert Dep. 83:2–7.)

**RESPONSE:**


64.     Methodist paid a specific rate per wRVU performed by each of West's specialties, including:  Hematology/Oncology,  Gynecology  Oncology,  Radiology,  Endocrinology, Hospitalists, and Pain Management.  (SUMF Ex. 11, PSA at MLH_000064.)

**RESPONSE:**


65.     Methodist counsel engaged ECG Management Consultants to work in coordination with Jones Day to conduct a valuation and set the fair market value wRVU rates.  (SUMF Ex. 7, McLean Decl. ¶ 19); (*see* SUMF Ex. 21, 2011 ECG FMV.)

**RESPONSE:**


66.     The parties agreed that Methodist would pay West the amount of compensation determined by ECG to be FMV.  (SUMF Ex. 56, McLean Dep. Vol. II 147:17–21.)

**RESPONSE:**


67.     The PSA incorporated the wRVU rates set by ECG as Schedule 5.1.  (SUMF Ex. 7, McLean Decl. ¶ 22) (*Compare* SUMF Ex. 11, PSA at MLH_000064, *with* SUMF Ex. 21, 2011 ECG FMV at MLH_024762.)  Throughout the affiliation, Methodist paid West using the rates that ECG had opined were fair market value.  (SUMF Ex. 7, McLean Decl. ¶ 20.); (SUMF Ex. 56, McLean Dep. Vol. II 147:17–21.)

**RESPONSE:**

68.     The parties also drafted a comprehensive plan for the cancer center, which was included as Exhibit B of the PSA.  (SUMF Ex. 11, PSA at MLH_000026.)  The plan described the parties' goals and intent related to developing a comprehensive cancer center, stating that the overarching goal of the University of Tennessee, Methodist, and the West Clinic was "some day [to] be to in a position to formally apply for an NCI designated status with the National Cancer Institute."  (SUMF Ex. 11, PSA at MLH_000029); (SUMF Ex. 47, Mounce Dep. 386:21–387:21.)

**RESPONSE:**


69.     Methodist paid West in the aggregate for its professional services, but West did not inform Methodist how it compensated its individual physicians. (SUMF Ex. 49, McLean Dep. Vol. I 22:17–19, 305:24–306:6, 307:10–17); (SUMF Ex. 50, Shorb Dep. 175:12–23.)

**RESPONSE:**


**D.      Management Services/Performance Improvement Agreement ("MSA")**

70.     Under the MSA, West agreed to provide management of the oncology services rendered at Methodist Hospitals and Cancer Center Sites.  (SUMF Ex. 12, MSA at § 1.2.)

**RESPONSE:**


71.     Methodist's outside counsel, Jones Day, engaged Healthcare Appraisers, Inc. ("HAI") to determine whether the proposed management agreement was commercially reasonable and to provide a fair market value range for the management fees to be paid under the MSA. (SUMF Ex. 24, HAI Engagement Letter); (SUMF Ex. 49, McLean Dep. Vol. I 201:1–17); (SUMF Ex. 52, Safriet Dep. 19:17–18, 22:22–23:6.)

21

**RESPONSE:**

72.     The parties agreed that Methodist would pay West the amount of compensation determined by HAI to be fair market value for the management services developed by PwC. (SUMF Ex. 56, McLean Dep. Vol. II 147:17–21); (*see* SUMF Ex. 47, Mounce Dep. 445:2–:18.)

**RESPONSE:**

73.     HAI opined that the fair market value for management fees to be provided under the MSA was $3,255,000.  (SUMF Ex. 7, McLean Decl. ¶ 10); (SUMF Ex. 25, 2012 HAI FMV.)

**RESPONSE:**

74.     Under the model proposed by the West Clinic in its Request for Proposal, the parties anticipated that a portion of the management fees would be provided at a fixed rate to compensate the West Clinic for managing the Service Line, and the remaining portion of the fees would be allocated to performance incentive bonuses that could be earned by West for achieving certain metrics and milestones.  (SUMF Ex. 47, Mounce Dep. 427:6–23; 428:21–429:8); (SUMF Ex. 49, McLean Dep. Vol. I 118:7–22); (SUMF Ex. 19, West RFP.)

**RESPONSE:**

75.     The parties adopted HAI's FMV range and set the management fee at $3,255,000 with 60% allocated to base management, and placing 40% at risk to be achieved through satisfaction of agreed-upon performance metrics.  (SUMF Ex. 25, 2012 HAI FMV); (SUMF

Ex. 12, MSA); (SUMF Ex. 49, McLean Dep. Vol. I 295:4–9); (SUMF Ex. 47, Mounce Dep. 98:2–8, 358:3–5); (SUMF Ex. 52, Safriet Dep. 164:3–9.)

**RESPONSE:**


76.     Beyond the initial valuations, the parties also had the PSA and MSA revalued by independent third-party valuators throughout the course of the affiliation.  (*E.g.*, SUMF Ex. 27, Email with Altegra FMV); (SUMF Ex. 28, 2016 Pinnacle FMV); (SUMF Ex. 30, 2017 Pinnacle FMV); (SUMF Ex. 22, 2016 ECG FMV); (SUMF Ex. 22, 2016 ECG Rad Onc FMV.)

**RESPONSE:**


77.     The compensation that Methodist paid West under the APA, PSA, and MSA was within fair market value ranges determined by outside valuation experts.  (SUMF Ex. 47, Mounce Dep. 443:1–5); (SUMF Ex. 51, Ugwueke Dep. 259:9–14); (SUMF Ex. 50, Shorb Dep. 117:17–19.)

**RESPONSE:**


## VII.     OPERATION OF WEST CANCER CENTER

78.     The parties initially referred to the cancer center as the "Tennessee Cancer Center," until the summer of 2013, when Methodist engaged an outside branding and marketing agency to consult on the best naming and branding for the center.  (SUMF Ex. 47, Mounce Dep. 462:20–463:5); (*see* SUMF Ex. 36, 2012 Strategic Presentation at 15 (referring to the affiliation as the "Tennessee Cancer Center" on January 27, 2012).)  The agency conducted name recognition surveys of the market, including potential patients, and recommended that the center be named "The University of Tennessee West Cancer Center, a Member of the Methodist Healthcare

23

Family." (SUMF Ex. 47, Mounce Dep. 462:20–463:13); (SUMF Ex. 44, June 12, 2013 Cancer Council Minutes); (SUMF Ex. 45, Aug. 14, 2023 Cancer Council Minutes); (SUMF Ex. 29, 2014 Annual Report (adopting name and logo).) The survey also revealed that West Clinic had the strongest brand recognition and best reputation for cancer care of the three organizations; therefore, the agency recommended that the operative name be the "West Cancer Center" and have the West feature as the main focus of the logo, while also leveraging the UT brand and appropriately incorporating Methodist's branding strategy. (SUMF Ex. 47, Mounce Dep. 462:20–463:13) (SUMF Ex. 44, June 12, 2013 Cancer Council Minutes); (SUMF Ex. 45, Aug. 14, 2023 Cancer Council Minutes.) From then on, the term "West Cancer Center" was used to refer to Methodist's oncology service line. (SUMF Ex. 47, Mounce Dep. 463:14–17.)

**RESPONSE:**

**A.** **The West Clinic Assumed Management of the Cancer Center.**

**1**. **West Clinic Physicians Were Integrated through Membership and Leadership of Governing bodies for the Methodist Oncology Service Line.**

79. The West Clinic began providing management services for Methodist immediately. at the outset of the affiliation. (SUMF Ex. 53, Schwartzberg Dep. 74:12–20, 191:20–24); (SUMF Ex. 54, Tauer Dep. 186:18–187:18.)

**RESPONSE:**

80. In accordance with the parties' business plan, members of West's leadership were immediately integrated into the Methodist system. (SUMF Ex. 54, Tauer Dep. 97:9–23.)

**RESPONSE:**

24

81.     Erich Mounce was named Senior Vice President of Methodist's Adult Oncology Service Line.  (SUMF Ex. 47, Mounce Dep. 84:20–25.)

**RESPONSE:**


82.     Dr. Schwartzberg and Dr. Tauer were named medical directors and given the titles of Center Director and Chief of Staff, respectively, for the Cancer Center.  (SUMF Ex. 47, Mounce Dep. 97:16–22, 402:20–403:18, 507:5–15); (SUMF Ex. 37, Schwartzberg Medical Directorship); (SUMF Ex. 38, Tauer Medical Directorship.)

**RESPONSE:**

83.     Drs. Schwartzberg and Tauer also attended Methodist's board meetings, Friday Strategy Meetings, and Kitchen Cabinet Meetings, among others.  (SUMF Ex. 47, Mounce Dep. 448:8–22, 532:8–20); (SUMF Ex. 54, Tauer Dep. 43:9–44:10); (SUMF Ex. 53, Schwartzberg Dep. 184:23–185:24.)

**RESPONSE:**

84.     Dr. Tauer served on the Methodist Board of Directors in a nonvoting capacity, and many West representatives attended Methodist's weekly Friday Strategy meetings.  (SUMF Ex. 47, Mounce Dep. 448:8–22, 518:6–13); (SUMF Ex. 54, Tauer Dep. 203:1–204:2); (SUMF Ex. 55, Somer Dep. 112:2–7, 247:11–14.)

**RESPONSE:**


85.     Other West physicians assumed management of the service line, as reflected by their membership and leadership of numerous quality, operational, and governance bodies for the

25

Cancer Center.  (SUMF Ex. 55, Somer Dep. 247:11–14); (SUMF Ex. 47, Mounce Dep. 517:25–521:12); (SUMF Ex. 54, Tauer Dep. 203:1–204:2, 205:14–19.)  Those bodies include:

**RESPONSE:**


86.     **The Cancer Council**:  The Cancer Council was formed as part of the Cancer Center Affiliation between Methodist, West Clinic, and UTHSC and included members from all three entities.  (SUMF Ex. 47, Mounce Dep. 237:8–18); (SUMF Ex. 54, Tauer Dep. 177:20–22.)

**RESPONSE**:


87.     The Cancer Council oversaw and facilitated the development of the Cancer Center and frequently discussed, among other things, the recruitment of qualified personnel, staffing, facilities, equipment, software and electronic medical records, budgeting, education and training, coordination of outside services, marketing, community awareness, disparity, and philanthropy. (SUMF Ex. 2, Richey Decl. ¶ 13); (SUMF Ex. 1, Tillmanns Decl. ¶ 9); (SUMF Ex. 3, Ballo Decl. ¶¶ 11, 13); (SUMF Ex. 53, Schwartzberg Dep. 112:2–17, 260:1–12.)

**RESPONSE:**


88.     **Operating Committee**:  The Operating Committee was formed pursuant to Section 2.2 of the MSA as a forum for collaboration between Methodist and West that provided oversight of the Service Line.  (SUMF Ex. 12, MSA at § 2.2); (SUMF Ex. 3, Ballo Decl. ¶ 9); (SUMF Ex. 2, Richey Decl. ¶ 18.)

**RESPONSE**:

89.     Among other things, the Operating Committee discussed Service Line staffing and the creation of new positions and programs, expense management and budgeting, facilities and equipment, third-party payers, and contract services.  (SUMF Ex. 47, Mounce Dep. 458:17–22); (SUMF Ex. 1, Tillmanns Decl. ¶ 13); (SUMF Ex. 2, Richey Decl. ¶ 18); (SUMF Ex. 3, Ballo Decl. ¶ 9.)

**RESPONSE:**


90.     Under the terms of the MSA, West was entitled to achieve Performance Bonuses for managing the Service Line in a manner that met or exceeded certain quality, efficiency, and programmatic benchmarks and milestones set by the Operating Committee each year.  (SUMF Ex. 47, Mounce Dep. 445:2–18); (SUMF Ex. 3, Ballo Decl. ¶ 9); (SUMF Ex. 1, Tillmanns Decl. ¶ 13.)

**RESPONSE:**


91.     The Operating Committee frequently reviewed business and work plans submitted by West Clinic as well as periodic reports from West regarding the Service Line's performance and West Clinic's achievement of performance benchmarks and milestones set by the Operating Committee.  (SUMF Ex. 56, McLean Dep. Vol. 117:22–118:22); (SUMF Ex. 47, Mounce Dep. 667:1–5); (SUMF Ex. 1, Tillmanns Decl. ¶ 13.)

**RESPONSE:**


92.     **Clinical Practice and Quality Committee**:  The CPQ Committee was formed by the West Cancer Center's medical directors, Drs. Lee Schwartzberg and Kurt Tauer, "to focus on

how do we raise the clinical bar and how do we focus on achieving our goals. Not only in the management agreement but our goals to [] increase the best patient care. (SUMF Ex. 47, Mounce Dep. 663:10–17.) In addition to Drs. Schwartzberg and Tauer, a "significant" amount of West physicians of different specialties normally attended the CPQ meetings, including Drs. Brad Somer, Sylvia Richey, Stephen Besh, Linda Smiley, Jason Chandler, Gregory Vidal and Arnel Pallera. (SUMF Ex. 47, Mounce Dep. 663:18–664:3.) West's chief nursing officer, chief operating officer, nurse practitioners, and other ancillary staff also attended. (SUMF Ex. 53, Schwartzberg Dep. 203:21–204:2.) The CPQ Committee exited prior to the affiliation, but the CPQ Committee held authority and responsibility for the clinical services provided by the Service Line, and frequently discussed, among other things, clinical best practices, standardized treatment protocols, care plans, pathways, and order sets; accreditation and third-party payer requirements and standards; Service Line policies and procedures; quality assurance, audits, and chart reviews; patient education and consent forms; case management, pre-procedure visits, medical records and documentation; therapeutic selection; intensive care services, adverse events, and utilization of appropriate sites of service within the Service Line. (SUMF Ex. 35, Feb. 2013 CPQ Minutes); (SUMF Ex. 53, Schwartzberg Dep. 204:4–17); (SUMF Ex. 3, Ballo Decl. ¶ 20); (SUMF Ex. 2, Richey Decl. ¶ 19); (SUMF Ex. 1, Tillmanns Decl. ¶ 17.) The CPQ Committee reviewed all of the things "you need for a cancer center." (SUMF Ex. 55, Somer Dep. 185:11–186:17.)

**RESPONSE:**


93. **Committee on Cancer**: The "CoC Committee" oversaw all disciplines and departments providing care and support services to cancer patients within the Service Line. The CoC Committee frequently discussed, among other things, Service Line policies and procedures;

28

accreditation requirements, standards, and compliance; Service Line strategic goals; facilities and equipment; sites of service policies; data management and reporting; quality improvement initiatives and clinical outcomes; and community outreach and awareness. (SUMF Ex. 1, Tillmanns Decl. ¶ 16); (SUMF Ex. 3, Ballo Decl. ¶ 21); (SUMF Ex. 55, Somer Dep. 239:10–244:7.)

**RESPONSE:**

94.     The CoC Committee, which was chaired by Dr. Somer, also enabled Methodist to become accredited by the American College of Surgeons. (SUMF Ex. 55, Somer Dep. 17:9–25); (SUMF Ex. 54, Tauer Dep. 194:12–22.)

**RESPONSE:**

95.     **Methodist University Hospital Senior Leadership Council:** Methodist University Hospital Senior Leadership Council ("SLC") was comprised of the clinical and administrative leaders of Methodist University Hospital. At SLC meetings, the West physicians discussed issues relating to oncology services provided at Methodist Hospitals, such as operating room and anesthesia inefficiencies, capacity issues, medical record policies, staffing, patient flow, and length of stay. The Council also provided updates on the Cancer Center Affiliation, such as updates on staffing, residents, fellows, clinical trials, the transplant program, and philanthropy efforts. (SUMF Ex. 1, Tillmanns Decl. ¶ 19); (SUMF Ex. 48, Lane Dep. 20:23–22:17.)

**RESPONSE:**

29

96.     **Oncology Pharmacy &Therapy Committee ("Oncology P&T Committee"):**
The Oncology P&T Committee oversaw appropriate pharmaceutical and therapeutic selections as
they related to the treatment of patients within the Service Line.  The Oncology P&T Committee
discussed, among other things, therapeutic selection, formulary requests, standardized policies and
procedures for chemotherapy infusion and medication management, standardized admission order
sets, chemotherapy order sets, supportive care order sets, and treatment pathways.  (SUMF Ex. 4,
Portnoy Decl. ¶ 8.)

   **RESPONSE**:


97.     **Cancer Disparity Committee**: The Cancer Disparity Committee worked with
Methodist's Congressional Health Network to increase community awareness and reduce the
disparity in cancer outcomes in Memphis.  This work included hosting trainings and a lecture series
for the church lay navigators and providing mammography screenings for underserved patient
populations in Memphis.  This committee reported its work to the Cancer Council.  (SUMF Ex.
54, Tauer Dep. 210:18–213:12.)

   **RESPONSE:**


98.     **Education Committee**: The Cancer Center Education Committee was responsible
for the internal, external, and professional educational programming for the Cancer Center.
(SUMF Ex. 55, Somer Dep. 159:11–161:20.)  This committee reported its work to the Cancer
Council.  (SUMF Ex. 1, Tillmanns Decl. ¶ 15.)

   **RESPONSE:**

30

99. **Programmatic Task Force:** The Programmatic Task Force was dedicated to strategically coordinating services and disciplines across the Service Line and reported its work to the Cancer Council. (SUMF Ex. 53, Schwartzberg Dep. 256:14–257:1.)

**RESPONSE:**


100. **Multidisciplinary Conferences:** West formed and managed multidisciplinary conferences during the Affiliation, which included drafting the appropriate work plans, policies and procedures, designating physician leaders, chairing the conferences, keeping the minutes, tracking attendance, and measuring participation of more than 800 conferences, for the following cancer specialties: Breast, Cutaneous, Gastrointestinal, Genitourinary, Gynecologic, Head & Neck, Lung, Malignant Hematology, Sarcoma, and Endocrine. (SUMF Ex. 5, Berry Decl. ¶ 10); (SUMF Ex. 4, Portnoy Decl. ¶ 7); (SUMF Ex. 2, Richey Decl. ¶ 22); (SUMF Ex. 1, Tillmanns Decl. ¶ 21); (SUMF Ex. 3, Ballo Decl. ¶ 20); (SUMF Ex. 55, Somer Dep. 171:9–174:9.) These conferences "measurably improved cancer care" by bringing together specialists from the Methodist service line and prospectively discuss difficult case. (SUMF Ex. 53, Schwartzberg Dep. 230:17–234:13.)

**RESPONSE:**


101. **New Programs / Leaders:** During the affiliation, the Cancer Center developed new programs, offered new services, and opened new departments in large part due to recruiting world-class physicians and researchers. (SUMF Ex. 1, Tillmanns Decl. ¶ 13); (SUMF Ex. 2, Richey Decl. ¶¶ 11, 25); (SUMF Ex. 4, Portnoy Decl. ¶ 17); (SUMF Ex. 5, Berry Decl. ¶ 11);

(SUMF Ex. 3, Ballo Decl. ¶ 9); (SUMF Ex. 47, Mounce Dep. 515:12–517:13; 573:10–574:25); (SUMF Ex. 51, Ugwueke Dep. 28:24–29:10.)

**RESPONSE**:


102.    For example, Dr. Sylvia Richey spent considerable time creating an Integrative Oncology Program for West Cancer Center to optimize health and quality of life for service line patients.  Dr. Richey secured funding by advocating for budget allocations from Methodist and personally securing community partnerships—such as partnerships with community fitness studios to offer free classes to service line patients, community acupuncturists to provide more immediate appointments to service line patients, and religious leaders to create counsel and prayer hotlines for service line patients.  (SUMF Ex. 2, Richey Decl. ¶ 12.)

**RESPONSE:**


103.    Once recruited, many of the West Clinic physicians became the Medical Directors or leaders of their departments, for which they assumed management responsibility and reported to the Center Director, Dr. Lee Schwartzberg.  (SUMF Ex. 3, Ballo Decl. ¶ 5); (SUMF Ex. 2, Richey Decl. ¶ 11); (SUMF Ex. 1, Tillmanns Decl. ¶¶ 19, 21); (SUMF Ex. 47, Mounce Dep. 515:12–516:21, 568:11–569:20.)

**RESPONSE:**


104.    For example, Dr. Ballo was recruited from MD Anderson to oversee Methodist's radiation oncology program.  (SUMF Ex. 3, Ballo Dec. ¶¶ 4, 5); (SUMF Ex. 47, Mounce Dep. 350:21–351:1, 353:25–354:11.)  Before he joined West, the radiation oncology program was led

32

by a committee consisting of Dr. Schwartzberg, Dr. Tauer, Dr. Holger Gieschen, and several other radiation oncologists. (SUMF Ex. 47, Mounce Dep. 351:9–352:8.)

**RESPONSE:**

105.    The West physicians also assisted Methodist in recruiting other specialists and ancillary providers, like a new chief pathologist. (SUMF Ex. Schwartzberg Dep. 53, 234:15–235:7.)

**RESPONSE:**

**2.    West Clinic Physicians Performed Substantial Management Services for the Methodist Oncology Service Line.**

106.    During the affiliation, West physicians "spent a significant amount of time" working to integrate the various providers and entities, including regularly providing input to Methodist regarding how the health system could better treat patients and develop a comprehensive service line. (SUMF Ex. 5, Berry Decl. ¶ 6.)

**RESPONSE:**

107.    West physicians developed programs for Methodist to quickly identify and transfer cancer patients from any Methodist facility to the oncology service line so that the patients received appropriate follow up care from oncologists. (SUMF Ex. 2, Richey Decl. ¶ 16.)

**RESPONSE:**

108.     West physicians helped create specific areas in Methodist emergency department waiting rooms for cancer patients given their compromised immune systems and susceptibility for high-risk infections.  (SUMF Ex. 2, Richey Decl. ¶ 16.)

**RESPONSE:**


109.     West physicians created electronic order sets and standardized care plans for all Methodist Emergency Department Physicians to use in treating cancer patients.  (SUMF Ex. 2, Richey Decl. ¶ 16); (SUMF Ex. 53, Schwartzberg, 190:22–191:19); (SUMF Ex. 4, Portnoy Decl. ¶ 8.)

**RESPONSE:**


110.     These changes to Methodist's emergency departments improved outcomes and survival rates for patients in the oncology service line.  (SUMF Ex. 2, Richey Decl. ¶ 16.)

**RESPONSE:**


111.     West physicians personally met with leadership at Methodist hospitals to streamline admissions, co-locate cancer patients, and ensure the oncology service line had sufficient resources to treat patients.  (SUMF Ex. 4, Portnoy Decl. ¶ 10.)

**RESPONSE:**


112.     West physicians developed—in accordance with recognized industry quality standards and national best practices—protocols, pathways, and guidelines for providing services

within the adult oncology service line, and regularly reviewed and updated these protocols, pathways, and guidelines as needed throughout the affiliation. (SUMF Ex. 5, Berry Decl. ¶ 7.)

**RESPONSE:**


113. West physicians reviewed thousands of care plans during the affiliation. Reviewing just one care plan took hours of work in order to review the current protocol, look at recommendations, and determine what was missing and what needed to change, resulting in thousands of hours devoted to creating, reviewing, updating, and monitoring compliance with standardized care plans. (SUMF Ex. 2, Richey Decl. ¶ 20); (SUMF Ex. 55, Somer Dep. 186:18–23.)

**RESPONSE:**


114. West physicians also worked to bring Methodist's oncology service line care plans into compliance with requirements of commercial insurers such as CIGNA and Blue Cross. (SUMF Ex. 53, Schwartzberg Dep. 211:1–18.)

**RESPONSE:**


115. West physicians "dedicated significant time and attention" to modernizing Methodist's facilities and equipment, including dealing directly with vendors to preview, test, and select equipment, submitting plans for equipment to the Cancer Council and Methodist, personally meeting with architects on needs of physicians and patients relating to facility design, and dealing with payors to ensure Methodist would be able to seek reimbursement for use of advanced

35

equipment, such as linear accelerators.  (SUMF Ex. 3, Ballo Decl. ¶ 13); (SUMF Ex. 2, Richey Decl. ¶¶ 14,  15); (SUMF Ex. 5, Berry Decl. ¶ 13); (SUMF Ex. 1, Tillmanns Decl. ¶¶ 11–12.)

    **RESPONSE:**


116.    West physicians recommended a number of changes to the service line Electronic Medical Records ("EMR") system to ensure there were was complete and accurate documentation in the service line patients' medical records.  (SUMF Ex. 2, Richey Decl. ¶ 23.)

    **RESPONSE:**


117.    West physicians worked with Methodist to reallocate resources, such as physical therapy, art therapy, psychology and nutrition resources, specific to oncology service line patients. (SUMF Ex. 2, Richey Decl. ¶ 12.)

    **RESPONSE:**


118.    West physicians worked with hospital management to improve Methodist facilities by updating examination and waiting rooms, which resulted in improved patient and staff satisfaction as well as improved patient care. (SUMF Ex. 3, Ballo Decl. ¶ 14.)

    **RESPONSE:**


119.    West physicians oversaw the quality assurance programs within Methodist's oncology service line by meeting daily with service line staff to discuss caseloads, patient care, and quality programming.  (SUMF Ex. 3, Ballo Decl. ¶ 16.)

    **RESPONSE:**

120.    West physicians were "heavily involved in assisting Methodist in recruiting, staffing and evaluating physicians and staff" in Methodist's oncology service line.  (SUMF Ex. 3, Ballo Decl. ¶ 22.)

**RESPONSE:**


121.    West physicians developed and standardized the evaluation processes for physicians and nursing staff in the service line.  (SUMF Ex. 3, Ballo Decl. ¶ 23.)

**RESPONSE:**


122.    West physicians also worked to formalize nurse-centered training for Methodist's nurses through specific programming, such as symposiums, in-services, and other qualified continuing medical education—in addition to personally training Methodist's hospital oncology nurses on cancer-specific care practices for service line patients.  (SUMF Ex. 2, Richey Decl. ¶ 27); (SUMF Ex. 1, Tillmanns Decl. ¶ 15.)

**RESPONSE:**


123.    West physicians organized and hosted annual oncology conferences by determining topics to be discussed, recruiting presenters from other national cancer centers and giving remarks at the conferences.  (SUMF Ex. 3, Ballo Decl. ¶ 24); (SUMF Ex. 4, Portnoy Decl. ¶ 12.)

**RESPONSE:**

124. West physicians provided targeted education to primary care physicians, nurse practitioners and family care providers in the community and within Methodist's health system. (SUMF Ex. 2, Richey Decl. ¶ 26); (SUMF Ex. 4, Portnoy Decl. ¶ 13.)

**RESPONSE:**


125. West physicians participated in and made recommendations about marketing efforts for the adult oncology service line, including participating in community outreach and networking events on behalf of West Cancer Center. (SUMF Ex. 5, Berry Decl. ¶ 15); (SUMF Ex. 2, Richey Decl. ¶ 26); (SUMF Ex. 1, Tillmanns Decl. ¶ 22)

**RESPONSE:**


126. West physicians expanded Methodist's breast screening programs for women in Memphis. (SUMF Ex. 53, Schwartzberg Dep. 189:5–11.)

**RESPONSE:**


127. West physicians created a new lung cancer screening program for identifying early cases of lung cancer in Memphis. (SUMF Ex. 4, Portnoy Decl. ¶ 15.)

**RESPONSE:**


128. During the affiliation, the West Cancer Center tested thirty-five anti-cancer drugs that were later approved by the FDA, allowing Methodist patients access to medications before they were generally available to other patients. (SUMF Ex. 47, Mounce Dep. 616:22–617:25); (SUMF Ex. 4, Portnoy Decl. ¶ 16.)

**RESPONSE:**

129.  The cancer center performed Phase 1 clinical trials that West could not perform prior to the affiliation with Methodist because they required an affiliation with an inpatient unit. (SUMF Ex. 47, Mounce Dep. 644:16–646:9.)

**RESPONSE:**

130.  Methodist's leadership remained in constant coordination with West, meeting on a regular basis to discuss the day-to-day operations of the service line as well as the larger strategic initiatives, recruiting efforts, and community impact the cancer center was achieving.  (SUMF Ex. 49, McLean Dep. Vol. I 119:11–25; 142:1–10); (SUMF Ex. 47, Mounce Dep. 500:10–501:2, 532:2–7.)

**RESPONSE:**

131.  Together, Methodist and West created a cancer center that was a regional destination for cancer treatment with patients coming from Mississippi, Arkansas, and other counties in Tennessee.  (SUMF Ex. 47, Mounce Dep. 618:1–619:4.)

**RESPONSE:**

**B.  Methodist's Payments under the Affiliation Agreements were Fair Market Value.**

        **1.  Management Services Agreement**

132.  In December 2011, HAI issued a fair-market value range for the MSA between Methodist and West of up to $3,255,000.  (SUMF Ex. 7, McLean Decl. ¶ 10); (SUMF Ex. 26,

39

Email re MSA FMV.)  In 2012, HAI issued its fair-market value report, which confirmed the fair-market value range of up to $3,255,000.  (SUMF Ex. 25, 2012 HAI FMV.)

**RESPONSE:**


133.    In 2012 and in 2013, Methodist paid West Clinic less than $3,255,000 under the MSA.  (SUMF Ex. 7, McLean Decl. ¶ 11.)

**RESPONSE:**


134.    In 2014, Altegra Health issued a fair-market value opinion of the services provided under the MSA, which provided a fair-market value range of up to $4,870,000.  (SUMF Ex. 7, McLean Decl. ¶ 12); (SUMF Ex. 27, Email with Altegra FMV.)

**RESPONSE:**


135.    In 2014 and in 2015, Methodist paid West Clinic less than $4,870,000 under the MSA.  (SUMF Ex. 7, McLean Decl. ¶ 13.)

**RESPONSE:**


136.    In 2016, Pinnacle Healthcare Consulting issued a fair-market value opinion of the services provided under the MSA, which provided a fair-market value range of up to $4,740,000. (SUMF Ex. 7, McLean Decl. ¶ 14); (SUMF Ex. 28, 2016 Pinnacle FMV.)

**RESPONSE:**

137.    In 2016 and 2017, Methodist paid West Clinic less than $4,740,000 under the MSA. (SUMF Ex. 7, McLean Decl. ¶15.)

**RESPONSE:**


138.    In late 2017, Pinnacle Healthcare Consulting issued a fair-market value opinion of the services provided under the MSA, which provided a fair-market value range of up to $5,090,000. (SUMF Ex. 7, McLean Decl. ¶ 16); (SUMF Ex. 30, 2017 Pinnacle FMV.)

**RESPONSE:**


139.    In 2018, Methodist paid West Clinic less than $5,090,000.  (SUMF Ex. 7, McLean Decl. ¶ 17.)

**RESPONSE:**

140.    For each fair-market value opinion, the parties provided all relevant information and answered all relevant questions relating to the Service Line.  That included significant financial information, including information related to the services West had provided and expected to provide in the future.  (SUMF Ex. 47, Mounce Dep. 595:3–596:25.)

**RESPONSE:**


2.    **Professional Services Agreement**

141.    Each month during the affiliation, West Clinic provided a detailed breakdown of wRVUs performed by its physicians, for which Methodist paid the wRVU rate for that specialty. (SUMF Ex. 49, McLean Dep. Vol. I 58:17–60:6, 316:9–318:23); (SUMF Ex. 9, Declaration and Report of Greg Russo ("Russo Decl. & Report") at 5–6.)

**RESPONSE:**


142.     ECG provided its original fair-market value opinion in 2011.  (SUMF Ex. 21, 2011 ECG FMV.)

**RESPONSE:**


143.     In 2015, Methodist engaged ECG to conduct a new valuation of the professional services compensation.  Based on the results of that valuation, the parties adjusted the wRVU rates, with some increasing, some decreasing, and some remaining the same.  (SUMF Ex. 7, McLean Decl. ¶ 23); (SUMF Ex. 22, 2016 ECG FMV.)

**RESPONSE:**


144.     In 2012, the PSA was amended to add three breast surgeons from Breast Clinic of Memphis at a $65 per wRVU conversion rate, which was below the MGMA median wRVU of $67.64.  (SUMF Ex. 7, McLean Decl. ¶ 21.)

**RESPONSE:**


145.     In 2014, several radiation oncologists were added at a $65 per wRVU conversion rate.  (SUMF Ex. 7, McLean Decl. ¶ 22.)

**RESPONSE:**

146.     In 2016, ECG conducted a fair market value analysis of those specialties' wRVUs, and the parties adjusted the wRVUs based on the results.  (SUMF Ex. 7, McLean Decl. ¶ 24); (SUMF Ex. 23, 2016 ECG Rad Onc FMV.)

**RESPONSE:**

### 3.     Leased Employee Agreement

147.     Because Methodist did not purchase West Clinic locations located outside Methodist's service area, there was certain work and overhead expenses that some leased employees devoted to those locations, unrelated to the affiliation with Methodist.  (SUMF Ex. 7, McLean Decl. ¶ 8); (SUMF Ex. 56, McLean Dep. Vol. II 6:11–14:23); (SUMF Ex. 47, Mounce Dep. 43:9–14.)

**RESPONSE:**

148.     In order to account for this time and space, the parties estimated the amount of time and resources dedicated by certain departments to the non-affiliation related work, and then West Clinic paid Methodist based on those calculations.  (SUMF Ex. 47, Mounce Dep. 43:4–44:10, 56:7–19); (SUMF Ex. 7, McLean Decl. ¶ 9); (SUMF Ex. 56, McLean Dep. Vol. II. 10:10–11:8.)

**RESPONSE:**

149.     For example, beginning in 2012, the parties estimated that 5% of the time and resources dedicated by its clinical services, general administration, IT, senior management, finance, HR, transcription, phone operations, scheduling, and medical records departments were devoted to non-affiliation work, and 10% of West's billing departments' time and resources went

43

to non-affiliation work.  Applying these percentages to expenses incurred for those cost centers, West paid Methodist $662,510.  (SUMF Ex. 56, McLean Dep. Vol. II 8:7–18:18.)

**RESPONSE:**


150.    This true-up process took place each year, with West's payments to Methodist increasing each year to cover these costs, eventually reaching $1.9 million by 2018.  (SUMF Ex. 47, Mounce Dep. 43:22–44:10); (SUMF Ex. 42, Overhead Allocation 2012-2018.)

**RESPONSE:**


151.    During the course of the affiliation, West paid Methodist approximately $8.2 million to cover costs associated with West operations that did not benefit Methodist.  (SUMF Ex. 41, Overhead Allocation 2012-2017); (SUMF Ex. 42, Overhead Allocation 2012-2018); (SUMF Ex. 43, Email regarding Overhead Allocation); (SUMF Ex. 8, Mello Decl. & Report at 25.)

**RESPONSE:**


152.    The parties did not believe that anyone at West "was paid multiple times for the same services."  (SUMF Ex. 47, Mounce Dep. 344:2–10.)

**RESPONSE:**


## VIII.   ACHIEVEMENTS OF WEST CANCER CENTER

153.    The parties' affiliation improved cancer care.  (SUMF Ex. 1, Tillmanns Decl. ¶¶ 25–27); (SUMF Ex. 4, Portnoy Decl. ¶ 18); (SUMF Ex. 2, Richey Decl. ¶ 8); (SUMF Ex. 3, Ballo Decl. ¶ 27.)

44

**RESPONSE:**

**A.     West Consistently Achieved Its Performance Incentives.**

154.     For the first year of the affiliation, the parties worked with PwC to develop performance incentives for which the West Clinic could earn performance bonuses under the MSA.  (SUMF Ex. 47, Mounce Dep. 433:18–434:6.)

**RESPONSE:**

155.     The incentives were broken down into three categories: (1) Quality of Services, (2) Operational Efficiency, and (3) New Program Development.  (SUMF Ex. 47, Mounce Dep. 434:3–6); (SUMF Ex. 12, MSA at MLH_000129.)  These bonuses were to be paid in addition to the base management fees "if [West] manages the Service Line in a manner which meets or exceeds certain [quality, efficiency, and program development] benchmarks." (SUMF Ex. 49, McLean Dep. Vol I 118:1–22); (SUMF Ex. 25, 2012 HAI FMV.)

**RESPONSE:**

156.     Each year, West submitted for approval new metrics, goals, and milestones.  The goals were assigned specific timelines for completion, with appropriate corresponding bonus amounts that could be achieved periodically for achieving intervening milestones.  In order to achieve the bonus, West would periodically report its progress to the Operating Committee with supporting documentation.  The Operating Committee would evaluate the progress and determine whether to approve the work as completed.  If so, West would submit a detailed invoice for the corresponding amount earned.  (SUMF Ex. 47, Mounce Dep. 434:23–435:21, 445:10–18, 608:12–

45

21); (SUMF Ex. 46, Dec. 4, 2013 Ops. Committee Minutes); (SUMF Ex. 49, McLean Dep. Vol. I 118:1–22).

**RESPONSE:**


157.    West never achieved every performance incentive in a given year.  (SUMF Ex. 47, Mounce Dep. 435:15–16); (SUMF Ex. 8, Mello Decl. & Report at Ex. X.)

**RESPONSE:**


158.    Even where some incentives fell off the list, West "would continue to work on them no matter what."  (SUMF Ex. 49, Mounce Dep. 436:8–22.)

**RESPONSE:**


159.    During the seven year affiliation, through the work of the West physicians, the service line was able to develop treatment pathways protocols for treating various cancer types, increase compliance with standardized care plans and protocols; increase documentation within patient records; increase communication with other providers; improve patient satisfaction scores; improve staff feedback scores; reduce hospital admissions; reduce emergency department visits and admissions; reduce surgical-site infections; reduce central-line infections; reduce post-op infections; open an acute care clinic; create a patient-navigation program; create a survivorship program; create a genetics program; increase genetic testing; increase molecular testing; increase clinical trials;  and improve cancer survival outcomes for breast, lung, uterine, and colon cancers. (SUMF Ex. 2, Richey Decl. ¶ 28); (SUMF Ex. 4, Portnoy Decl. ¶ 17); (SUMF Ex. 1, Tillmanns Decl. ¶ 14.)

46

**RESPONSE:**

### B. The Cancer Center Achieved Numerous Accreditations.

160. During the affiliation, the Cancer Center achieved numerous accreditations, memberships, and certifications from nationally-recognized oncology organizations, which were rigorous, selective, and based upon compliance with the most comprehensive standards in the field, and achieving them was extremely time-intensive and required constant oversight by West. (SUMF Ex. 47, Mounce Dep. 624:4–625:12, 627:11–14); (SUMF Ex. 53, Schwartzberg Dep. 205:20–206:9); (SUMF Ex. 3, Ballo Decl. ¶ 19); (SUMF Ex. 4, Portnoy Decl. ¶ 14); (SUMF Ex. 5, Berry Decl. ¶ 12.)

**RESPONSE:**

161. These accreditations were verified by peer-review, on-site inspections. (SUMF Ex. 47, Mounce Dep. 624:10–625:12); (SUMF Ex. 53, Schwartzberg Dep. 207:5–24.) They required constant updating to ensure compliance, as accreditors would come back periodically to renew the accreditations. (SUMF Ex. 47, Mounce Dep. 430:25–431:20, 646:10–647:12, 657:9–658:8). Many of them were only possible through the Methodist/West affiliation, meaning Methodist and West could not have obtained them independently. (SUMF Ex. 53, Schwartzberg Dep. 206:10–23, 243:12–19); (SUMF Ex. 47, Mounce Dep. 557:21–558:8, 629:8–13, 653:7–655:14, 656:8–12.)

**RESPONSE:**

162. The West Cancer Center was one of only 26 members of the **National Comprehensive Cancer Network**, ("NCCN"), which is responsible for creating cancer care

47

regimens (chemotherapeutics) that were provided to cancer programs across the country and throughout the world. (SUMF Ex. 47, Mounce Dep. 629:22–630:8.) In addition, insurance companies used NCCN guidelines for treatment of patients nationwide. West Cancer Center doctors sat on various committees which developed these regimens. For example, Dr. Lee Schwartzberg sat on the breast cancer committee. Dr. Ari Vanderwalde, Dr. Sylvia Richey and Dr. Brad Somer, along with several other West Cancer Center doctors, sat on various NCCN committees creating the regimens and guidelines that would be used to provide cancer nationally and internationally. (SUMF Ex. 47, Mounce Dep. 619:14–620:17.)

**RESPONSE:**


163. The West Cancer Center was one of the first community cancer centers to be accredited by the **National Committee for Quality Assurance** ("NCQA") as a Level Three Medical Home or Specialty Medical Home. Level Three is the highest level awarded by the NCQA. West Cancer Center was one of only eight oncology providers nationwide to achieve that level of NCQA accreditation. (SUMF Ex. 47, Mounce Dep. 626:4–16.) In order for the NCQA to grant that accreditation to the West Cancer Center, NCQA audited both the services West Cancer Center provided and at the outcomes achieved. In performing this audit, NCQA was ensuring that West Cancer Center was providing a higher level of service and a higher quality of care. The NCQA accreditation focused on the full spectrum of care—both inpatient and outpatient care. (SUMF Ex. 47, Mounce Dep. 620:24–621:12, 621:25–622:6.) The NCQA also wanted to make sure the loop was being closed on referrals, meaning that patients were actually following up on what the doctors had ordered, e.g., scheduling a follow up visit with their primary care physician or having a CT scan or mammography done. In order to make sure patients took these steps, the

48

West Cancer Center had a team of people who would call patients and check to make sure appointments were made and follow-up was done. (SUMF Ex. 47, Mounce Dep. 623:10–624:3.) Every West Cancer Center physician would have been involved in the work necessary to achieve NCQA accreditation. Every physician had to adhere to the standards required for this accreditation. (SUMF Ex. 47, Mounce Dep. 627:11–627:21.) The NCQA accreditation came about as a result of the affiliation between Methodist and West. (SUMF Ex. 47, Mounce Dep. 629:8–13.)

**RESPONSE:**


164. The West Cancer Center was accredited by the **Quality Oncology Practice Initiative** ("QOPI"), which focused on specific care paradigms such as chemotherapy at the end of life, fertility training, making sure the regimens used were NCCN guidelines, and looking at referrals to palliative care. Like NCQA, the QOPI audited the West Cancer Center records to ensure that the Center was setting key benchmarks and milestones being used by academic medical centers and community medical centers. (SUMF Ex. 47, Mounce Dep. 621:13–24.) QOPI focused on both inpatient sites and outpatient sites from a clinical trial perspective and a care planning perspective. (SUMF Ex. 47, Mounce Dep. 631:6–11.)

**RESPONSE:**


165. Through the work of West physicians, Methodist was able to re-attain the **Foundation for the Accreditation of Cellular Therapy** ("FACT") accreditation, which Methodist had lost prior to the affiliation. (Mounce Dep. 633:1–11.) FACT accredited the bone marrow transplant program. (SUMF Ex. 47, Mounce Dep. 622:7–10.) In order to obtain FACT

49

accreditation, West physicians and clinical staff had to compile, review, synthesize and marshal data to provide to FACT.   (SUMF Ex. 47, Mounce Dep. 635:11–15.)

**RESPONSE:**


166.    Through the management services of West physicians, Methodist was also accredited by the **Commission on Cancer** ("COC"), an accreditation that was focused on the surgical oncologists.  Attaining COC accreditation required the facility to work to create a surgical environment that met certain cancer outcomes.  (SUMF Ex. 47, Mounce Dep. 637:18–24.)  The COC accreditation involved both inpatient and outpatient services.  (SUMF Ex. 47, Mounce Dep. 622:18–24.)  Acquiring the COC accreditation involved work from the physicians over and above the work they did treating patients.  The COC committee was chaired by Dr. Brad Somer and Dr. Martin Fleming.  (SUMF Ex. 47, Mounce Dep. 639:10–19.)

**RESPONSE:**


167.    The West Cancer Center was accredited by **Caris Life Sciences** ("Caris"), which provides molecular profiling, after becoming eligible by being accredited by the Commission on Cancer.  (SUMF Ex. 47, Mounce Dep. 642:8–17.)   Caris was looking for sites that provided adequate tissue sampling to enable trials and genetic profiling of patients.  In order to become a Caris site, West Cancer Center had to meet their criteria for volume and receive approval for its policies and procedures.  (SUMF Ex. 47, Mounce Dep. 641:14–25.)

**RESPONSE:**

168.     In order for Methodist to achieve **Joint Commission** accreditation, West Cancer Center inpatient and outpatient sites had to pass the Joint Commission's intensive review and audit. The process involved a weeklong survey with multiple surveyors auditing medical records and medical sites.  During the audit, Joint Commission surveyors interviewed personnel and reviewed pharmacy operations.  (SUMF Ex. 47, Mounce Dep. 622:11–24.)  As part of the management services West provided, it assisted Methodist in achieving Joint Commission accreditation.  West had a large number of Standard Operating Procedures ("SOPs") to implement for accreditation. To do so, West physicians first had to determine how they applied to the Cancer Center and then how to implement them.  (SUMF Ex. 54, Tauer Dep. 227:19–228:25.)  All of the West Cancer Center outpatient sites were required to meet the Joint Commission criteria.  (Mounce Dep. 649:8–17.)  Methodist required Joint Commission accreditation (or DNV-GL accreditation) in order to be able to treat Medicare and Medicaid patients.  (SUMF Ex. 47, Mounce Dep. 647:15–648:5.)

**RESPONSE:**

169.     In or around 2016, Methodist changed from Joint Commission accreditation to accreditation by **DNV-GL**.  DNV-GL had a different approach to accreditation and was much more hands on and more focused on the cancer care model.  This accreditation involved achieving standards in areas such as clinical, pharmacy, safety, hazardous materials, supply chain, security, physician credentialing, medical staff, house rules credentialing, medical staff applications, education, nursing criteria and many more.  (SUMF Ex. 47, Mounce Dep. 647:15–648:21.)  Just as they had to meet Joint Commission criteria, all of the West Cancer Center outpatient sites were required to meet the DNV-GL criteria.  A DNV-GL auditor visited every West Cancer Center site. (SUMF Ex. 47. Mounce Dep. 649:8–17.)

**RESPONSE:**

51

170.    West Cancer Center achieved accreditation by the **National Accreditation Program for Breast Centers** ("NAPBC").  NAPBC accreditation is extremely hard to obtain, as it requires a full service cancer center rather than one that is fragmented.  A full service center requires breast surgeons and radiologists to be in-house so that both can look at images in real time and decide whether a biopsy is needed.  (SUMF Ex. 47, Mounce Dep. 653:7–654:5.)  NAPBC accreditation required that the West Cancer Center demonstrate that patients had come back in for recommended repeat mammograms.  In addition, the Cancer Center also had to offer specific genetic tests.  Like other accrediting organizations, NAPBC conducted an audit of the breast center before issuing its seal of approval.  West Cancer Center did not achieve accreditation on its first attempt.  On the Cancer Center's second try, and after additional work, it was accredited by the NAPBC.  Once accreditation was achieved, the West physicians and management had to participate in an ongoing effort to maintain accreditation.  Some of the West Cancer Center physicians involved in doing this work included Dr. Michael Berry, Dr. Richard Fine, Dr. Roy Oswaks, Dr. Lee Schwartzberg and Dr. Greg Vidal.  (SUMF Ex. 47, Mounce Dep. 656:13–658:19); (SUMF Ex. 5, Berry Decl. ¶ 12.)

   **RESPONSE:**

171.    West Cancer Center also obtained **Accreditation for Program Excellence** by the American Society of Radiation Oncologists ("ASTRO APEx").  ASTRO Apex recognizes facilities that deliver safe and high-quality care to patients.  Specifically, it ensures that the accredited entity has developed and implemented quality assurances for all machines and personnel and has implemented satisfactory incident-reporting procedures. ASTRO Apex is

viewed as a national stamp of approval signifying the standard of care patients can expect from a radiation oncology department.  (SUMF Ex. 3, Ballo Decl. ¶ 19.)

**RESPONSE:**


172.    The West Cancer Center also participated in the **Centers for Medicare and Medicaid ("CMS") Oncology Care Model** pilot program, which would not have been possible without Methodist's infrastructure, and participated in other projects for payment mechanisms. (SUMF Ex. 47, Mounce Dep. 557:21–558:23.)

**RESPONSE:**


### C.    The West Physicians Referred Their Patients Based on Independent Professional Judgment.

173.    During the affiliation between Methodist and West, there was no requirement that the West physicians refer their patients to Methodist, nor were the West physicians "pressured or instructed by anyone at Methodist or West to refer [their] patients to a Methodist facility."  (SUMF Ex. 4, Portnoy Decl. ¶ 19); (*see also* SUMF Ex. 3, Ballo Decl. ¶ 28); (SUMF Ex. 2, Richey Decl. ¶ 29); (SUMF Ex. 53, Schwartzberg Dep. 268:9–269:11); (SUMF Ex. 54, Tauer Dep. 249:7–21); (SUMF Ex. 55, Somer Dep. 235:25–236:2.)

**RESPONSE:**


174.    Before the affiliation, many West physicians were already sending their patients to Methodist.  (*See e.g.,* SUMF Ex. 4, Portnoy Decl. ¶ 19.)

**RESPONSE:**

175.    During the affiliation, the West physicians retained privileges and continued to refer patients at other facilities.  (SUMF Ex. 5, Berry Decl. ¶ 3); (SUMF Ex. 55, Somer Dep. 234:4–12.)

**RESPONSE:**


176.    The West physicians did not remove their patients from other facilities if they were confident in the services provided at those facilities.  (SUMF Ex. 55, Somer Dep. 235:12–24.)

**RESPONSE:**


177.    West physicians used Methodist's facilities prior to the affiliation and have continued to do so even after the affiliation agreements expired.  (SUMF Ex. 4, Portnoy Decl. ¶ 19); (SUMF Ex. 1, Tillmanns Decl. ¶ 25); (SUMF Ex. 3, Ballo Decl. ¶ 28.)

**RESPONSE:**


178.    Before, during, and after the affiliation, the West physicians made their referral decisions on a patient-by-patient, service-by-service basis depending upon each physician's considerations of professional judgment, patient choice, physician expertise, where the patient had previously received services, payor requirements, availability of services and specialties, attainment of national accreditations and compliance with national guidelines, and quality. (SUMF Ex. 3, Berry Decl. ¶ 6); (SUMF Ex. 2, Richey Decl. ¶ 29); (SUMF Ex. 4, Portnoy Decl. ¶ 19); (SUMF Ex. 1, Tillmanns Decl. ¶ 24); (SUMF Ex. 3, Ballo Decl. ¶ 28); (SUMF Ex. 53, Schwartzberg Dep. 267:18–270:20); (SUMF Ex. 54, Tauer Dep. 248:3–250:11); (SUMF Ex. 55, Somer Dep. 235:12–24.)

54

**RESPONSE:**

179. The West physicians' decisions were "based on where [they] could be assured that [their] patient got the best care," and as a result of the affiliation, West had more control over the quality of the services being provided at Methodist. (SUMF Ex. 55, Somer Dep. 235:12–20); (SUMF Ex. 54, Tauer Dep. 249:22–250:11); (SUMF Ex. 2, Richey Decl. ¶¶ 8, 17); (SUMF Ex. 1. Tillmanns Decl. ¶¶ 25–26); (SUMF Ex. 5, Berry Decl. ¶¶ 5, 7); (SUMF Ex. 4, Portnoy Decl. ¶ 18.)

**RESPONSE:**

180. West's receipt of payments from Methodist through the affiliation "had no impact" on the West physicians' decisions regarding where to refer their patients and what services to order for their patients. (SUMF Ex. 53, Schwartzberg Dep. 268:9–17); (SUMF Ex. 3, Ballo Decl. ¶ 28); (SUMF Ex. 5, Berry Decl. ¶ 16); (SUMF Ex. 1, Tillmanns Decl. ¶ 24); (SUMF Ex. 2, Richey Decl. ¶ 29.)

**RESPONSE:**

IX.    **UNWIND OF WEST CANCER CENTER**

181. Under their original terms, the affiliation agreements were to expire at the end of 2018. (SUMF Ex. 11, PSA at § 6.1); (SUMF Ex. 12, MSA at § 4.1); (SUMF Ex. 14, LEA at § 1.1); (SUMF Ex. 15, UA at § 2.2.)

**RESPONSE:**

182. The parties had been renegotiating the affiliation for several years when West decided to terminate the relationship. (SUMF Ex. 51, Ugwueke Dep. 19:2–20:4, 59:6–18.)

**RESPONSE:**

183.     West's decision not to extend the affiliation was not financially motivated; rather, there was a difference in opinion over what the structure should look like and how it should be controlled.  (SUMF Ex. 47, Mounce Dep. 541:4–544:6.)

**RESPONSE:**

184.     According to Methodist CEO Dr. Michael Ugwueke, "[T]here [were] no compliance issues . . . related to the arrangement that [Methodist had] with West."  (SUMF Ex. 51, Ugwueke Dep. 160:25–161:4.)

**RESPONSE:**

185.     West never utilized the six-month without-cause termination provision, and instead let the agreements naturally expire.  (SUMF Ex. 47, Mounce Dep. 542:22–543:2.)

**RESPONSE:**

186.     The parties unwound the affiliation in February 2019.   (Compl. ¶¶ 16, 348); (Answer ¶¶ 16, 348.)

**RESPONSE:**

187.     West took back over the Cancer Center Sites, (Mounce Dep. 544:7–18), and purchased the outpatient clinic real estate at 7945 Wolf River Boulevard for $51 million. (Compl. ¶ 348); (Answer ¶ 348); (SUMF Ex. 51, Ugwueke Dep. 233:2–6); (SUMF Ex. 16, 2019 Real Estate

PSA.) West paid an additional $16 million for equipment, furniture, fixture, machinery, vehicle, instructions, inventory, supplies, and other services. (Compl. ¶ 348); (Answer ¶ 348); (SUMF Ex. 10, Declaration of Brian Roark ("Roark Decl.") ¶ 2); (SUMF Ex. 17, 2019 APA.)

**RESPONSE:**


188.    The amount paid by West to purchase the assets was based on fair market value opinions obtained by the parties. (SUMF Ex. 47, Mounce Dep. 544:19–25.)

**RESPONSE:**


189.    After the affiliation, West physicians have continued to refer patients to Methodist based on their professional judgment of their patients' best interests. (SUMF Ex. Berry Decl. ¶ 16); (Tillmanns Decl. ¶ 25); (Ballo Decl. ¶ 28); (Portnoy Decl. ¶ 19); (Richey Decl. ¶ 29); (Somer Dep. 234:4–24.)

**RESPONSE:**


190.    After the affiliation, Methodist and West went back to their pre-affiliation status as independent organizations both serving cancer patients, with an ongoing relationship based on the continued referrals of West's patients to Methodist as needed and with West physicians maintaining credentials on Methodist's medical staff. (*See e.g.* SUMF Ex. 5, Berry Decl. ¶ 16); (SUMF Ex. 1, Tillmanns Decl. ¶ 25); (SUMF Ex. 3, Ballo Decl. ¶ 28); (SUMF Ex. 4, Portnoy Decl. ¶ 19); (SUMF Ex. 2, Richey Decl. ¶ 29); (SUMF Ex. 55, Somer Dep. 234:4–12.)

**RESPONSE:**

**X.     RELATORS**

191.     Relator Jeffrey Liebman served as CEO of one of Methodist's hospitals from 2014 to 2017.  (Compl. ¶ 19); (Answer ¶ 19.)  Liebman had received a final written warning about his employment at Methodist in January 2017, and he filed this lawsuit a few months later.  (SUMF Ex. 58, Deposition of Jeffrey Liebman ("Liebman Dep.") 159:24–160:2); (*see also* Dkt. No. 1.)

**RESPONSE:**


192.     Liebman did not know how Methodist compensated West physicians or how any physician's compensation changed during the affiliation.  (SUMF Ex. 58, Liebman Dep. 130:5–21.)  He also did not have personal knowledge about the unwinding of the affiliation, having left in 2017.  (SUMF Ex. 58, Liebman Dep. 175:6–12.)

**RESPONSE:**


193.     Relator David Stern was Executive Dean of the University of Tennessee Health Science Center ("UTHSC"), with which Methodist has been affiliated.  (Compl. ¶¶ 20, 82); (Answer ¶¶ 20, 82.) During the affiliation, he served as a UTHSC representative on the Cancer Council, the oversight body of West Cancer Center.  (Compl. ¶ 20); (Answer ¶ 20.)

**RESPONSE:**


194.     He was removed from his role as Dean in 2017.  (SUMF Ex. 57, Deposition of David Stern ("Stern Dep.") 110:18–112:8.)  He was subsequently placed on administrative leave and then terminated from another leadership position at UTHSC.  (SUMF Ex. 57, Stern Dep. 125:23–126:9.) Stern retired from UTHSC in 2019.  (SUMF Ex. 57, Stern Dep. 134:11–22, 137:20–138:18.)

58

**RESPONSE:**

195.    Stern never saw the MSA and likewise had no personal knowledge of the unwinding of the affiliation. (SUMF Ex. 57, Stern Dep. 233:18–234:8.)

**RESPONSE:**

196.    Relators settled their claims against West on January 28, 2021 for $1.3 million, plus an additional $1.3 million in Relators' attorneys' fees.  (Dkt. No. 145-2.)  The government approved this settlement. (*Id.*)

**RESPONSE:**

## XI.    LITIGATION PROCEEDINGS AND DISCOVERY

197.    After the government was permitted to intervene in the case, on June 15, 2022 Methodist issued Interrogatories to the United States.  (Dkt. No. 271-1.)  The government initially responded to Methodist's Interrogatories on July 25, 2022.  (SUMF Ex. 10, Roark Decl. ¶ 3); (SUMF Ex. 65, July 25, 2022 US Int. Resp.)

**RESPONSE:**

198.    Methodist requested through an interrogatory that the government identify all unlawful remuneration that it contended Methodist offered, paid, or received.  (Dkt. No. 271-1 at Int. No. 2.)

**RESPONSE:**

59

199.    The government amended its response to Methodist's Interrogatory No. 2 on December 19, 2022 (SUMF Ex. 10, Roark Decl. ¶ 4); (SUMF Ex. 66, Dec. 19, 2022 US Int. Resp. at 8–9); on January 25, 2023 (SUMF Ex. 10, Roark Decl. ¶ 5); (SUMF Ex. 67, Jan. 25, 2023 US Int. Resp. at 8–9); and on February 10, 2023 (SUMF Ex. 68, Feb. 10, 2023 US Int. Resp. at 8–9.) In its February 10, 2023 response to Interrogatory No. 2, the government identified the following four alleged acts constituting remuneration: (1) "Methodist allowed West to continue to operate itself out of the same locations that it sold under the Asset Purchase Agreement ('APA') or that Methodist otherwise purchased during the relationship without any documented payment for rent or overhead;" (2) Methodist "paid the West oncologists approximately $60 million in excess of their professional collections over the time period of 2012-2018;" (3) prior "to the deal, West provided much of same base management services for the business of West without compensation;" and (4) Methodist "paid West under the LEA for much of the work West purportedly was doing under the MSA." (SUMF Ex. 68, Feb. 10, 2023 US Int. Resp. at 8–9.)

**RESPONSE:**


200.    Methodist also requested through an interrogatory that the government identify the claims it alleges to be false, including the basis on which the government contends the claims are false. (Dkt. No. 271-1 at Int. No. 1.)  The government responded:

> Under the Anti-Kickback Statute ('AKS'), damages are measured by the false claims are the claims Defendants submitted or caused to be submitted to Medicare that were obtained through Methodist's unlawful relationship with West. The time period the claims were submitted commences January 1, 2012 through December 31, 2018. . . . Given the number of claims at issue, the United States refers to the claims data produced in this action[.]

(SUMF Ex. 68, Feb. 10, 2023 US Int. Resp. at 3–4.)

**RESPONSE:**

60

201. On August 19, 2022 Methodist served a Notice of Deposition upon the United States pursuant to Federal Rule of Civil Procedure 30(b)(6) seeking testimony regarding: "For each CLAIM that YOU identify as false, the factual basis and methodology for YOUR determination that the CLAIM resulted from any alleged kickback." (SUMF Ex. 10, Roark Decl. ¶ 6); (SUMF Ex. 69, US 30(b)(6) Notice at 5.) The government designated Mr. Michael Petron, an outside consultant, who is not an employee of the government, to testify on this topic. (SUMF Ex. 70, US Objections to 30(b)(6) Notice at 4–5.)

**RESPONSE:**

202. Mr. Petron was provided a claims dataset by counsel for the United States that included claims associated with 86 West physicians, and he calculated the total amount reimbursed for all claims submitted by those physicians. (SUMF Ex. 59, Deposition of United States' Designee Michael Petron ("Petron 30(b)(6) Dep.") at 105:2–6.)

**RESPONSE:**

203. Mr. Petron could not explain how the list was compiled, (SUMF Ex. 59, Petron 30(b)(6) Dep. 108:12–16), what payments any of the 86 physicians might have received to influence their referrals, (*id.* 103:16–19), whether the physicians were referring to Methodist before the affiliation began, (*id.* 104:10–15), or whether they were employed by or shareholders of West during the entire period for which claims were gathered. (*id.* 106:22–107:6.)

**RESPONSE:**

204.    Mr. Petron had no factual basis to explain how alleged kickbacks paid by Methodist to West caused the submission of any of the claims in the dataset he used to calculate damages. (SUMF Ex. 59, Petron 30(b)(6) Dep.103:11–15.)   Mr. Petron testified that he understood the relationship between Methodist and West violated the law, "so all of the claims are a result of the relationship."  (*Id.* 101:15–24.)

**RESPONSE:**


205.    On January 16, 2023, Methodist served an Amended Notice of Deposition upon the United States pursuant to Federal Rule of Civil Procedure 30(b)(6) seeking testimony regarding its contention that "'there was no evidence to show what exactly West did, let alone specifically who provided management services' given that 'West kept no time records or specific documentation concerning the base management services, and Methodist asked for no support.'" (SUMF Ex. 71, Amended US 30(b)(6) Notice at 6.)   The government designated Mr. Timothy Smith, who is not an employee of the government, to testify on this topic.  (SUMF Ex. 72, US Objections to Amended 30(b)(6) Notice at 5–7.)

**RESPONSE:**


206.    Mr. Smith acknowledged that the government had issued no laws or regulations requiring that time records or any proof of services be kept to comply with the Anti-Kickback Statute.  (SUMF Ex. 61, Deposition of United States' Designee Tim Smith ("Smith 30(b)(6) Dep.") 28:1–16.)

**RESPONSE:**

207.    Mr. Smith testified that as the United States' 30(b)(6) witness, he had not been provided with documents produced by Methodist and West evidencing services provided, such as minutes of meetings of the CPQ Committee, the Commission on Cancer, the Clinical Leaders Council, the Education Committee; what work West did to achieve various accreditations for the cancer center; or whether West had performed various services such as standardizing admission and discharge protocols, recruiting surgical oncologists and transplant physicians, standardizing surgical equipment tools, or reduced ED visits.  (SUMF Ex. 61, Smith 30(b)(6) Dep. 55:14–65:25.)

**RESPONSE:**


208.    On January 16, 2023, Methodist served an Amended Notice of Deposition upon the United States pursuant to Federal Rule of Civil Procedure 30(b)(6) seeking testimony regarding its contention that Methodist "provided West free office space 'without any documented payment for rent or overhead' and 'did not obtain any fair market value opinion for the use of space' including any guidance you have issued stating that specified documentation must exits to comply with the AKS or that a fair market opinion must be conducted to comply with the AKS."  (SUMF Ex. 71, Amended US 30(b)(6) Notice at 6.")  The government designated Ms. Lucy Carter, who is not an employee of the government, to testify on this topic.  (SUMF Ex. 72, US Objections to Amended 30(b)(6) Notice at 5–7.)

**RESPONSE:**


209.    Ms. Carter testified that the government has not issued any guidance requiring that a fair market value opinion be conducted to comply with the AKS.  (SUMF Ex. 60, Deposition of United States' Designee Lucy Carter ("Carter 30(b)(6) Dep.") 52:9–55:9.)

**RESPONSE:**

210.    Ms. Carter testified that the government does not mandate any particular approach for determining rent or overhead calculations in order to be compliant with the AKS. (SUMF Ex. 60, Carter 30(b)(6) Dep. 53:11–15.)

**RESPONSE:**

211.    The government produced two expert witnesses, both whom expressly disclaimed that they were opining on the fair-market value of any alleged remuneration in the case. (SUMF Ex. 63, Smith Expert Dep. 56:17–25, 59:15–24); (SUMF Ex. 62, Expert Deposition of Lucy Carter ("Carter Expert Dep.") 51:5–9.)

**RESPONSE:**

212.    Methodist's expert witness opined that the compensation paid to West under the MSA and PSA was consistent with fair market value. (SUMF Ex. 8, Mello Decl. & Report at 8, 10–15.)

**RESPONSE:**

213.    The government does not prescribe any particular methodology for calculating the fair market value of compensation. (SUMF Ex. 63, Smith Expert Dep. 128:25–129:4, 130:16–131:4, 134:3–7); (SUMF Ex. 60, Carter 30(b)(6) Dep. 53:23–54:20.) Nor does the government forbid the use of a market approach for calculating fair market value. (Dkt. No. 312 at 2–3, 5–6, 10 (RFA No. 4).)

**RESPONSE:**

214.    The government has not published any rule or guidance regarding the relationship between physician compensation and physician collections.  (SUMF Ex. 60, Carter 30(b)(6) Dep. 62:5-63:3); (*see also* Dkt. No. 312 at 2–3, 5–6, 10 (RFA No. 4).)

**RESPONSE:**

DATED this the 14th day of April, 2023.

Respectfully submitted,

*/s/ Brian D. Roark*
Brian D. Roark
J. Taylor Chenery
Taylor M. Sample
Hannah E. Webber
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
broark@bassberry.com
tchenery@bassberry.com
taylor.sample@bassberry.com
hannah.webber@bassberry.com

Robert S. Salcido
(Admitted *Pro Hac Vice*)
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4095
rsalcido@akingump.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served on the following counsel via the Court's CM/ECF email notification system on this the 14th day of April, 2023:

Bryan A. Vroon
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta, GA 30327
(404) 441-9806
bryanvroon@gmail.com

Jerry E. Martin
Seth Marcus Hyatt
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

Edward D. Robertson, Jr.
Bartimus Frickleton Robertson Rader PC
109 B East High Street
Jefferson City, MO 65101
(573) 659-4454
crobertson@bflawfirm.com

Kara F. Sweet
Wynn M. Shuford
U.S. Attorney's Office
Middle District of Tennessee
719 Church Street
Suite 3300
Nashville, TN 37203
(615) 401-6598
kara.sweet@usdoj.gov
wynn.shuford@usdoj.gov

*/s/ Brian D. Roark*