UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* LIEBMAN *et al.*,<br><br>    Plaintiffs-Relators,<br><br>      v.<br><br>METHODIST LE BONHEUR<br>HEALTHCARE, *et al.*,<br><br>    Defendants. | Case No. 3:17-CV-00902<br><br>DISTRICT JUDGE CAMPBELL<br><br>MAGISTRATE JUDGE HOLMES |

**UNITED STATES' OPPOSITION TO DEFENDANTS'**
**MOTION TO EXCLUDE PROPOSED TESTIMONY OF EXPERT TIMOTHY SMITH**

I.      **INTRODUCTION**......................................................................................... **1**

II.    **SUMMARY OF TIMOTHY SMITH'S QUALIFICATIONS**..................................... **3**

III.   **ARGUMENT**................................................................................................ **4**

   **A.**  **OVERVIEW OF ADMISSIBILITY OF EXPERT TESTIMONY**.................................... **4**

   **B.**  **OVERVIEW OF METHODIST'S ARGUMENTS**..................................................... **6**

   **C.**  **OPINION 1 PROPERLY ADDRESSES THE NOTICE TO METHODIST FROM ITS OWN VALUATIONS**............................................................................................... **6**

   **D.**  **OPINION 1 EXPLAINS CRITICAL TECHNICAL EVIDENCE THAT WILL ASSIST THE TRIER OF FACT**.................................................................................................. **9**

   **E.**  **OPINION 2 IS NOT TESTIMONY ON INTENT AND LEGAL STANDARDS**............................ **15**

   **F.**  **OPINION 3 FOLLOWS THE SAME METHODOLOGY AS METHODIST'S OWN VALUATION CONSULTANTS**............................................................................................. **20**

IV.   **CONCLUSION**.......................................................................................... **25**

i

The United States respectfully opposes the Methodist Defendants' motion to exclude portions of the United States' expert Timothy Smith's proposed testimony. *See* ECF No. 328.

## I. INTRODUCTION

Mr. Smith's expert report is 99 pages long and contains more than 30 expert opinions regarding Methodist's so-called implicit "partnership"[1] and payments to the West Clinic ("West") physicians. *See* ECF No. 328-1. Methodist's motion challenges only three of those opinions, designated by Methodist as Opinions 1, 2, and 3.[2]

With respect to Opinion 1, Methodist's principal argument is that Mr. Smith improperly uses the phrase, "Methodist knew or should have known" that its fair market valuations "did not match the terms of the PSA [Professional Services Agreement] and MSA [Management Services Agreement] as written and as implemented." Methodist claims that this is an attempt to opine on matters of intent and states of mind. But this is simply not so. Rather, Mr. Smith's report addresses **over 20 separate ways** in which Methodist's payments and arrangements with West were contrary to the conditions and parameters of its own valuation opinions. **Methodist had notice of such valuations and yet proceeded to pay West in violation of its own valuations.** Mr. Smith's Opinion 1 addresses that notice to Methodist.

With respect to Opinion 2, Methodist objects to Mr. Smith's use of the word "financial mindset" and "sharing mindset" in his report when discussing Methodist's strategy to share drug

---

[1]     Methodist and West leaders have both called their relationship a "partnership," yet the actual contractual terms between them do not comply with the legal requirements for a partnership. Hospital systems generally cannot legally enter into revenue-sharing "partnerships" with referring physicians under federal laws, including the Stark laws and the Anti-Kickback Statute.

[2]     In its supporting brief, Methodist repeatedly refers to having obtained the advice of counsel on the deal. For the reasons stated in the United States' motion to strike and/or preclude Methodist's advice of counsel defense in its summary judgment filings, the Court should also not consider such allegations in ruling on the motion to exclude portions of Mr. Smith's testimony. *See* ECF Nos. 343-44.

profits with the prescribing West physicians. Contrary to Methodists' assertions, this portion of Mr. Smith's report also does not opine about the intent or states of mind of any Methodist executive or employee. Nor is Mr. Smith's opinion that "Methodist's sharing of its pre-deal economic analysis with West amounted to a discussion about the value of referrals and how the parties would benefit from those referrals" a legal conclusion or legal opinion. Rather, Mr. Smith is offering his opinion based on industry standards and practices, which he is eminently qualified to do given his experience as a leading expert in the healthcare industry for 28 years. Federal case law fully endorses expert testimony based on industry practices, and Mr. Smith's use of the word "sharing mindset" is simply his way of describing the compensation model in which Methodist shared and distributed a portion of the drug profits with prescribing physicians contrary to industry practices.

Methodist also argues that evidence of a hospital system agreeing to share drug profits with prescribing physicians "is not relevant" under the AKS. Yet federal case law confirms that such evidence is highly relevant to the core prohibitions of that statute.

With respect to Opinion 3, Methodist argues that Mr. Smith's methods are "unreliable" in calculating the amount of Methodist's overpayments to the West physicians under the Professional Services Agreement ("PSA"). Yet the truth is that his methodology is the same as that employed by Methodist's own valuation consultant, ECG, which examined the ratios between West physicians' compensation and their professional collections.[3] Methodist's challenge is not a proper challenge to Mr. Smith's methodology under Rule 702.

Even if the Court should give credence to any of Methodist's three concerns, such challenges would bear on the weight of the evidence but not its admissibility.

---

[3]    The term "professional collections" is a physician productivity metric that is commonly used in the healthcare industry. It measures the collections received for the professional component of services personally provided by a physician.

## II.     SUMMARY OF TIMOTHY SMITH'S QUALIFICATIONS

Mr. Smith is the principal of TS Healthcare Consulting, providing a wide range of healthcare valuation and consulting services. He has over 28 years of experience in the healthcare industry, including healthcare valuation and transaction advisory roles, with a focus on physician-related transactions and determining fair market value ("FMV") for regulatory compliance purposes. *See* ECF No. 328-1 at 4-5.

His industry experience includes more than 14 years with the Hospital Corporation of America ("HCA") where he designed and managed HCA's FMV compliance program for business and compensation valuations as part of the company's corporate integrity agreement with the United States during the 2000s. While working at HCA, he reviewed hundreds of business and compensation valuations for a wide spectrum of transactions with a focus on healthcare regulatory compliance. He served as a leading executive within HCA on matters of FMV and was regularly consulted on complex and difficult transactions. He also personally negotiated numerous physician practice acquisition and divestiture transactions and was highly involved in drafting the transaction documents. In addition, he served as an ethics and compliance officer in his role as a developer of physician transactions at HCA. *Id.*

For the past 14 years, Mr. Smith has been a practicing professional business and compensation valuator, working exclusively in the healthcare industry with a focus on FMV for compliance purposes. He holds the Accredited in Business Valuation ("ABV") credential from the American Institute of Certified Public Accountants ("AICPA"), along with being a certified public accountant in two states (Oklahoma and Texas). *Id.* He is the editor and principal author of the leading textbook, *The Complete Guide to Fair Market Value Under the Stark Regulations* and the co-editor and contributing author of *BVR/AHLA Guide to Valuing Physician Compensation*

3

*and Healthcare Service Arrangements*, the industry's most widely referenced textbook on healthcare compensation. *Id*. at 4-5, 69-74.

Mr. Smith regularly speaks and writes for major industry organizations, including, the AIPCA, the American Health Lawyers Association ("AHLA"), the Health Care Compliance Association ("HCCA"), the American Association of Provider Compensation Professionals ("AAPCP"), the Medical Group Management Association ("MGMA"), the National Association of Certified Valuation Analysts ("NACVA"), and Business Valuation Resources ("BVR"). *Id*. at 75-80. He is currently the chair of the Certified in Provider Compensation Valuation ("CPCV") credential committee for the AAPCP. *Id*. at 5. Mr. Smith has published extensively in the field of physician compensation. *Id*. at 69-74.

Methodist does not challenge Mr. Smith's qualifications to serve as an expert in this case. The United States simply highlights his credentials and experience here for the Court.

## III. ARGUMENT

### A. Overview of Admissibility of Expert Testimony

Rule 702 and the Supreme Court's analysis in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony. Under Rule 702, "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008) (citations omitted) (quoting FED. R. EVID. 702).

"The Rule 702 inquiry is a flexible one and its focus must be solely on principles and methodology, not on the conclusions they generate." *Superior Prod. P'ship*, 784 F.3d 311, 323 (6th Cir. 2015) (quoting *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526 (6th Cir. 2014). "[A] determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *In re Scrap Metal*, 527 F.3d at 529. A "court must be sure not 'to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee's notes, 2000 amend.).

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30. "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir.1993)).

"[R]ejection of expert testimony is the exception, rather than the rule and we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal*, 527 F.3d at 530 (6th Cir. 2008) (internal quotations omitted). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998) (quoting *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984)).

"A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel." *Burgett v. Troy-Bilt LLC*, 579 Fed. Appx. 372, 376-377 (6th Cir. 2014).

5

"'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

## B. Overview of Methodist's Arguments

As previously noted, Mr. Smith's 99-page report contains over 30 expert opinions regarding Methodist's implied "partnership" and payments to the West physicians. Methodist's motion challenges only the following three of those 30+ opinions:

> (1) "Methodist knew or should have known that the valuations did not match [ ] the terms of the [Professional Services Agreement ("PSA")] and [Management Services/ Performance Improvement Agreement ("MSA")] as written and as implemented and [ ] the facts and circumstances. Methodist had a clear duty to review these assumptions in the valuations but failed to do so at a systematic level. Had the valuations matched the terms and facts and circumstances, the FMV ranges for the PSA and MSA would have been lower," (Expert Rep. of Tim Smith ("Smith Rep.") at 10) (attached as Ex. A); *see also id.* at 38-43.)

> (2) "Methodist's sharing of its pre-deal economic analysis with West amounted to a discussion about the value of referrals and how the parties would benefit from those referrals." (*Id.* at 10; *see also id.* at 47-48.)

> (3) "Methodist prepared an inaccurate FMV 'triggers' calculation in 2013, resulting in an invalid reliance on the 2011 ECG Valuation for 2014 and 2015. This calculation indicated overpayments of $7.7 and $6.8 million respectively for the specialty of hematology/oncology based on ECG's criteria." (*Id.* at 9; *see also id.* at 18-22.)

Methodist designates these three opinions as Opinion 1, Opinion 2, and Opinion 3. As explained below, these challenges are all misplaced.

## C. Opinion 1 Properly Addresses Notice to Methodist from Its Own Valuations

Methodist's principal argument against Smith's Opinion 1 is that he improperly uses the phrase, "Methodist knew or should have known" that the fair market valuations "did not match the terms of the PSA and MSA as written and as implemented." As previously stated, Mr. Smith's report addresses more than 20 separate ways in which Methodist's payments and arrangements

with West were contrary to the conditions and parameters of its own valuation opinions. Methodist does not challenge any of Mr. Smith's specific substantive opinions regarding Methodist's violations of its own valuation opinions.[4] It simply objects to his word choice.

In focusing on the phrase "knew or should have known," Methodist's motion lifts this phrase from its proper context to attack an opinion that Mr. Smith does not actually offer. At his deposition on March 21, 2023, Mr. Smith already confirmed that he is not offering opinions about the state of mind or intent of any Methodist executive or employee. *See* ECF No. 327-2 ("Smith Dep.") 291: 9-11. Rather, he is addressing the parameters and conditions of Methodist's own valuations and the fact that those valuations provided notice to Methodist of its compliance violations. In this context, the phrase "knew or should have known" means no more than that Methodist had notice. And notice is a fact question for the jury to consider with the assistance of the parties' expert opinions addressing highly technical financial and clinical metrics.

In addressing the notice that Methodist's own valuations provided to its executives, a jury may reach its own conclusions about Methodist's intent in paying West physicians in violation of its own valuations. "Rule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state." *United States v. Richard*, 969 F. 2d 849, 854-855 (10th Cir. 1992) (citing *United States v. Dunn*, 846 F. 2d 761, 762 (D.C. Cir. 1988) ("It is only as to the last step in the

---

[4] As discussed below under Opinion 3, Methodist only challenges Mr. Smith's calculation of Methodist's overpayments under the methodology of Methodist' own valuation consultant ECG which focused on the "central" metric of the physician compensation to collections ratios. Methodist does not challenge Mr. Smith's opinion that Methodist paid the West oncologists millions of dollars above the oncologists' professional collections. Methodist only challenges Mr. Smith's specific calculation as to the amount of the overpayments. This challenge is fully addressed below under Opinion 3.

inferential process---a conclusion as to the defendant's actual mental state---that Rule 704(b) commands the expert to silent.")); *see also United States v. Foster*, 939 F. 2d 445, 454 (7th Cir. 1991) (testimony "merely assisted the jury in coming to a conclusion as to [defendant's] mental state; it did not make that conclusion for them"). "Expert testimony expressly stating an opinion as to the defendant's state of mind at the time of the offense is barred by rule 704(b)." *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir. 1988). "But this prohibition does not require the exclusion of expert testimony that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on this ultimate issue, and instead 'le[aves] this inference for the jury to draw.'" *United States v. Augustin*, 661 F.3d 1105, 1123 (11th Cir. 2011) (per curiam) (quoting *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir. 1988)).

The three primary cases that Methodist relies on are all distinguishable. In *MAR Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 786 (N.D. Ohio 2013), the court ruled that an expert "may testify that [defendant's] actions are inconsistent with industry standards" and "may even testify that a person with similar experience in [defendant's] position would have known the industry standard and acted accordingly." *Id.* The court in *MAR* simply restricted the expert from making "conclusory statements regarding [defendant's] actual state of mind." *Id.* In this case, Mr. Smith is not offering any "conclusory statements" regarding the actual state of mind of Methodist executives. As approved by the court in *MAR*, he will testify that Methodist's actions are inconsistent with industry standards and a hospital system with similar experience in Methodist's position would have known the industry standards and the FMV valuation's warnings and conditions and acted accordingly. Similarly, in *CMI-Trading, Inc. v. Quantum Air, Inc.*, 98 F. 3d 887, 890 (6th Cir. 1996), the court simply held that an expert's opinion regarding whether the parties "*intended*" to enter a lending relationship or a joint venture relationship was not

admissible." *Id.* In this case, Mr. Smith has not offered any opinion about anyone's intentions. Finally, in *U.S. ex rel. Bawduniak v. Biogen Idec, Inc*., 2022 U.S. Dist. LEXIS 120549 (D. Mass. July 8, 2022), the court held: "To be sure, an expert may opine on industry standards and what constitutes deviations from such standards. But an expert may not then opine on [defendant's] intent in light of any alleged non-conformance with standards." *Id.* at *8-9. "While Relator's experts may opine about standards and alleged non-conformance with such standards from which a jury might infer intent, the experts may not offer their opinions as to what inferences can be drawn." *Id*. at 9. In this case, Mr. Smith will testify about industry standards, Methodist's own FMV valuations, and Methodist's violations of industry standards and its own valuations from which a jury might infer intent. But he is not offering opinions as to Methodist's intent or state of mind. His opinions fully comply with the courts' rulings in *Bawduniak*, *CMI*, and *MAR*.

### D. Opinion 1 Explains Critical Technical Evidence That Will Assist the Trier of Fact

Methodist also vaguely argues that Mr. Smith's Opinion 1 is based on "speculative assumptions" and "unreliable methods unreliably applied" and "is useless in assisting the trier of fact to understand, through the application of specialized expertise, the evidence."

Ignoring for the moment the unsupported attack on Mr. Smith's methodology, Methodist is also plainly off-base in suggesting that Mr. Smith's Opinion 1 will not assist the trier of fact in assessing whether Methodist's payments to West violated the conditions of its own FMV opinions. And federal courts have repeatedly recognized the importance of evidence of warnings or notice that a defendant received prior to proceeding with an illegal course of conduct.

In *United States ex rel. Drakeford* v. *Tuomey*, the Fourth Circuit addressed the admissibility of a consulting attorney's warnings to a hospital system "that it would be very hard to convince the government that a contract that paid physicians 'substantially above even their collections,

much less their collections minus expenses,' would constitute fair market value." 792 F.3d 364, 377 (4th Cir. 2015). "According to [the attorney consultant], compensation arrangements under which the contracting physicians are paid in excess of their collections were "basically a red flag to the government." *Id.* The Fourth Circuit found the importance of such testimony to the government's case "self-evident" and "compelling." *Id.*

Similarly, the Eleventh Circuit refused to exclude expert testimony as what the defendants were "told about the legality of their scheme" in *United States v. Gish*, 518 Fed. Appx. 871, 875 (11th Cir. 2013). The Eleventh Circuit distinguished such testimony from "what defendants thought about that advice" or "any other state of mind they might have had at time." *Id.* ("Expert evidence that supports an inference as to the defendants' intent or other state of mind is not barred so long as it leaves that inference to the jury to draw.").

Courts within this Circuit have reached similar conclusions. For example, in *Schall v. Suzuki Motor of America, Inc.*, a product liability case, the court permitted plaintiff's expert to testify as to "what [defendant] knew and when it knew it to assist a jury in understanding whether Defendants' actions were reasonable." 2020 WL 1159757 at *5 (W.D. Ky. Mar. 10, 2020); *see also In re Yamaha Motor Corp. Rhino ATV Prod. Liab. Litig.*, 816 F. Supp. 2d 442, 459 (W.D. Ky. 2011) (specifically permitted expert to testify as to "what Yamaha knew and when.").

Similar to the facts in *Tuomey*, on the eve of the implied "partnership" between Methodist and West, Methodist's consultants at ECG Management Consultants ("ECG") warned Methodist that payments to West that were not commensurate with their professional collections would exceed fair market value and would violate ECG's valuation opinion. *See* ECF No. 323-21 at 22. In Fall 2011, Methodist hired ECG to issue a valuation opinion on Methodist's payments to West physicians for clinical services under the PSA. *See* ECF No. 257-8 (ECG Engagement). In October

2011, ECG issued a valuation opinion premised on the "central condition" that the compensation to collections ratios for the respective physician specialties must not exceed 5 percentage points of the MGMA[5] national median.[6] For example, the national median compensation to collections ratio for oncologists was 1.10 in 2012.[7] Under ECG's valuation opinion, the compensation to collections ratio for West oncologists could not exceed 1.15. ECF No. 323-21 at 21-22.

The ECG opinion repeatedly states that it is based on the central premise that Methodist would compensate the West physicians at levels commensurate with their productivity as measured by their professional collections. "We believe that in principle, physicians should receive compensation that is generally commensurate with their productivity (in terms of professional collections), as productivity remains the primary driver of compensation nationally." ECF No. 323-21 at 11. "In conducting this analysis, we emphasize the principle that physicians should receive compensation that is generally commensurate with their productivity (in terms of professional collections)…" *Id*. at 17. "For physicians with high collections, we generally consider

---

[5]     Each year Medical Group Management Association ("MGMA") surveys medical practices nationally to obtain the most recent physician compensation and production data. The MGMA Physician Compensation and Production Surveys are leading benchmarking resources for physician compensation in the United States. The annual MGMA Surveys are based on physician compensation and productivity data in the prior year.

[6]     According to MGMA Surveys, the national median compensation to collections ratio for hematologists/oncologists was 1.10 in 2011, 1.10 in 2012, 1.13 in 2013, 1.10 in 2014, 1.24 in 2015, 1.43 in 2016, 1.22 in 2017, and 1.34 in 2018.

[7]     The national median compensation to collections ratio for oncologists at 1.10 reflects the fact that oncologists are generally paid at levels commensurate with their professional collections, however, private practice oncology groups can increase their compensation through chemotherapy drug profits and other ancillary services. For example, West physicians testified that prior to the implicit "partnership" with Methodist, their compensation pool included approximately $20 million in annual chemotherapy drug profits. After the "partnership" with Methodist, the West Clinic sites became outpatient departments of the Methodist system and Methodist billed and collected drug charges and could not legally share the drug profits with the referring West physicians under the Anti-Kickback Statute. Yet Methodist used disguised channels to share drug profits with the West physicians and one of those channels was paying West oncologists at levels tens of millions above their professional collections.

amounts paid at the median of an imputed compensation-to-collections benchmark to be consistent with FMV, because it indicates what a physician's compensation is in relation to his/her collections and is consistent with that of his/her peers within the specialty on a percentage of collections basis." *Id.* at 20.

As a check for compliance with this central premise, the ECG opinion required Methodist to verify the compensation to collections ratios for each West specialty at the end of 2013. Methodist failed to do that—and about that there is no dispute.

Despite ECG providing an opinion that repeatedly stated the West physicians should be paid at levels commensurate with their professional collections, **Methodist proceeded to pay the West oncologists at levels approximately $60 million above their professional collections between 2012-2018.** *See* ECF Nos. 352-8 at 22-24; 353-2 at 22-24. The ECG valuation put Methodist on notice of the upper limit of permissible compensation; when Mr. Smith states that Methodist had notice ("knew"), he relies on ECG's report to Methodist and other extensive evidence from Methodist's own valuations. *See* ECF No. 328-1 (Smith Report) at 38-40.

Methodist argues that Mr. Smith's opinion that "had the valuations matched the terms and facts and circumstances, the FMV ranges for the PSA and the MSA would have been lower…rests on a speculative assumption and is based on unreliable methods, unreliably applied." ECF No. 327 at 24. But Methodist ignores the fact that Mr. Smith followed the same methodology used by Methodist's FMV consultants and applied this methodology to corrected data based on the actual facts. The only "speculative assumption" that Methodist identifies is Mr. Smith's calculation of the "ECG trigger" overpayment addressed below in his Opinion 3.

Mr. Smith's report identifies the specific assumptions of the valuations contrary to the actual facts. ECF No. 328-1 at 38-40. Following the same methodology prescribed in each of

Methodist's valuation reports, he calculates the impact of these corrections on the FMV calculations. For example, Mr. Smith's report analyzes the valuations and the payments made under the PSA for 2012 through 2017, demonstrating that Methodist paid West for wRVUs that West-employed nurse practitioners performed while at the same time, Methodist reimbursed West for the salaries and benefit cost of these nurse practitioners, thereby creating a financial windfall for West. *Id*. at 52 (Report Ex. 1). In other words, Mr. Smith identified and quantified Methodist making duplicative payments to West for the same services. He similarly identified and quantified duplicative payments for nonclinical or administrative services in the 2015 and 2016 ECG PSA Valuations. *Id*. at 61-63 (Report Ex. 7 & 8).

Methodist's motion suggests that Mr. Smith must develop his own valuation to offer the expert opinion that eliminating duplicative payments would result in a lower FMV. That is erroneous. It is not necessary to perform a separate valuation to reach the fundamental conclusion that FMV does not include duplicative payments. Moreover, it is not necessary to prepare a separate valuation to conclude that FMV opinions would necessarily be lowered to remedy the problem of duplicative payments.

Mr. Smith's report identifies and quantifies overpayments made for the base management services resulting from Methodist not following the FMV range as clearly specified in the 2014 Altegra MSA Valuation, 2016 Pinnacle MSA Valuation, and the 2017 Pinnacle MSA Valuation. *Id*. at 35-36. For this opinion, Mr. Smith's methodology is simply reading the clear and explicit language of Methodist's own underlying valuations and comparing this language to the actual payments Methodist made to West, finding them to exceed the FMV range in the valuations.

Methodist's motion takes the nonsensical position that it is "speculative" and "unreliable" for Mr. Smith to opine that Methodist paid more than an FMV opinion on which Methodist is

relying for compliance purposes. Further, Methodist contends that a separate valuation must be prepared for an expert to conclude that the specified FMV range, as explicitly stated in a valuation report from another valuator, be followed and adhered to by the party relying on that valuation, and that the payments made would need to be lowered to comply with that valuation.

Mr. Smith further explained his methodology through extensive citations of the language of the subject valuation reports. He cites the explicit limitations and qualifications for each valuation report on which Methodist relied. *Id*. at 38-40. These limitations and qualifications include statements about the assumed terms of the agreements and certain facts and circumstances. He then compares these assumed conditions to the actual practices of the parties during the period of 2012 to 2017. *Id*.

Methodist argues that a FMV opinion cannot be evaluated or critiqued unless a valuator prepares his or her own independent valuation. But this claim does not comport with generally accepted valuation practice. The guidance given to credential holders of the Accredited in Business Valuation ("ABV") from the American Institute of Certified Public Accountants ("AICPA") for reviews and critiques of valuations in a litigation context is that a valuation analyst can correct an opposing expert's analysis for any reason and indicate corrected values. Memorandum from Robert Reilly, AICPA Valuation Standards Subcommittee, April 29, 2008, Subject: "SSVS and Critiques of Opposing Expert Valuations." *See* Ex. A. The analyst is not required to develop his or her own valuation opinion to critique and correct the valuation of another. Mr. Smith holds the ABV credential, and he follows this guidance.

Finally, Methodist's argument that "only a handful of areas" are corrected does not address the fact that these areas resulted in reductions in the FMV calculations by millions of dollars based on the same methodology used in the valuation reports that Methodist used and relied on. The

inaccuracies detailed in Mr. Smith's report were major and material to the FMV determinations of Methodist's own valuations.

### E. Opinion 2 Is Not Testimony on Intent and Legal Standards

Methodist next challenges what it designates as Mr. Smith's Opinion 2:

(2) "Methodist's sharing of its pre-deal economic analysis with West amounted to a discussion about the value of referrals and how the parties would benefit from those referrals." (*Id*. at 10; *see also id.* at 47-48.)

Mr. Smith's Opinion 2 addresses "smoking gun" communications between Methodist's former Chief Financial Officer ("CFO") Chris McLean and West's senior leaders at the end of their lengthy negotiations over the financial terms of their "partnership."

*In July of 2010, eighteen months before their implied partnership began*, Methodist executives and West physicians began exchanging emails and data regarding the projected profits from West's cancer drug prescriptions if Methodist *could obtain* the drugs at discounted rates under the 340B Program. Methodist and West leaders determined that projected 340B profits would be more than $16 million from West's prescriptions. ECF No. 328-1 at 46-48. In other words, the parties discussed revenue and projected profits from West's referrals of drug prescriptions *for many months before finalizing the financial terms in August of 2011*.

At the end of their negotiations, in August of 2011, Methodist CFO McLean prepared an Excel spreadsheet that confirmed how the 340B drug profits generated by West's prescriptions would be divided. *See* Ex. B. On August 17 and 18, 2011, McLean circulated a copy of this spreadsheet to West's leaders. *See* Ex. C. McLean listed the "340B drug savings" under the tab "Financial Impact." *See* Ex. B. The term "340B drug savings" means drug profits. The total "financial impact" listed was $17.79 million and 340B drug profits represented $16.62 million or 93 percent of this total "financial impact." *Id.* Then under a separate tab labeled "Impact on Each

Organization," McLean listed how the $17.790 million "financial impact" would be divided between Methodist and West. *Id.*. West would receive $7.006 million and that amount was listed as "West Clinic Impact." Methodist would receive $10.784 million and that amount is listed as "Total Methodist Margin." *Id.* McLean further showed the $7.006 million in 340B drug profits distributed to West as the basis for projecting "West Clinic physician salary and benefits" increasing from $33.556 million in a "normalized year" to $40.562 million under the "new svc arrangement." *Id.* The 340B drug profits were not simply a source of funding for Methodist to pay West. Rather, Methodist and West had a specific understanding and agreed calculation about how 340B drug profits would be divided between them.

Under the AKS, sharing drug profits with physicians who prescribe those drugs is a kickback under that statute's prohibition against paying "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person— to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b); *see* ECF No. 345 (discussing meaning of remuneration in AKS). The Eleventh Circuit found criminal violations of the AKS when a specialty pharmacy paid a portion of drug profits to individuals who referred patients to the pharmacy. *United States v. Vernon*, 723 F. 3d 1234 (11th Cir. 2013). One of the defendants argued on appeal that she was not a physician who could "refer" patients to the pharmacy within the meaning of the AKS. The Eleventh Circuit rejected that argument, holding "the plain language of the statute is not limited to payments to physicians who prescribe medication." *Id.* at 1254. The Eleventh Circuit recognized that "commission" payments of drug profits to either physicians or non-physicians who refer the patients constitute violations of the AKS.

Methodist tries to contort this damning evidence to prevent Mr. Smith from using such evidence in his expert opinions. Specifically, Methodist objects to Mr. Smith's use of the terms "financial mindset" and "sharing mindset" in his report when discussing Methodist's documented strategy and compensation model for sharing drug profits with the prescribing West physicians. But Mr. Smith is not offering opinions about the state of mind or intent of any Methodist executive or employee. Nor is he offering any interpretation of emails as suggested by Methodist's motion; McLean's emails say what they say and no interpretation is needed. He is simply discussing that West and Methodist were "sharing" this financial information pre-deal.

Mr. Smith's statement that "Methodist's sharing of its pre-deal economic analysis with West amounted to a discussion about the value of referrals and how the parties would benefit from those referrals" is not a legal conclusion about Methodist violating the AKS. At his deposition, Mr. Smith already confirmed that he is not a "legal expert." *See* Ex. D (Smith Dep.) 33: 21-23. Rather, he offers his opinion about healthcare industry standards, based on his 28 years of his professional experience, including designing and managing HCA's FMV compliance program.

At the outset of his Report, Mr. Smith states his qualifications in the healthcare industry as the bases of his opinions. In the single paragraph of his Report using the phrase, "'bright' line in terms of transactional compliance for federal regulatory purposes," Mr. Smith begins the paragraph stating, "As a former compliance officer…." He is clearly testifying from his extensive personal experience in the healthcare industry regarding industry standards and is not proposing to offer the jury conclusions on matters of law.

Federal case law fully endorses expert testimony based on industry practices. *See, e.g.*, *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir. 1991) ("Moreover, Fed. R. Evid. 702 permits expert testimony comparing conduct of parties to the industry standard"); *Berckeley*

*Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 219 (3d Cir. 2006) (expert's testimony regarding industry practices would be probative of entity's scienter at time of agreement); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 461 (9th Cir. 1986) (expert testimony regarding industry standards are "highly relevant and far from prejudicial" and the "trial judge apparently confused these rules with federal law, as to which federal judges are the authority. Not being civil law, these rules were proper matters for expert testimony. Exclusion was an abuse of discretion"). "Expert testimony on industry standards is common fare in civil litigation." *Levin v. Dalva Bros.*, Inc., 459 F.3d 68, 79 (1st Cir. 2006) (citations omitted).

Methodist also argues that Mr. Smith's Opinion 2 regarding Methodist sharing drug profits with the prescribing West physicians is "not relevant and threatens to confuse or mislead the jury." ECF No. 325 at 18. Methodist additionally argues that "whether an arrangement takes into account the 'volume or value of referrals' is not a standard for purposes of the AKS." *Id.* However, the United States has already briefed the relevant standards under the FCA and AKS in its opposition to Methodist's summary judgment motion, *see* ECF No. 345, and Methodist's argument about volume or value of referrals here is misleading and beside the point. The arrangement between Methodist and West physicians included a professional services contract and management services contract. The AKS regulations provide a "safe harbor" for personal services and management contracts if all seven of the regulatory requirements are met. One of these seven requirements is that "aggregate compensation paid to the agent over the term of the agreement is set in advance, **is consistent with fair market value in arms-length transactions** and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs." 42. C.F.R. §1001.952(d)(emphasis added).

Here, Methodist has not asserted any safe harbor defense. *See* ECF No. 345 at 33. This is significant for a hospital system with teams of attorneys and consultants structuring the "partnership" with West physicians that led to hundreds of millions of dollars in payments to referring physicians and hundreds of millions of dollars in Medicare claims. Methodist attempts to exploit its admitted failure to fit into any safe harbor by claiming its agreement to share drug profits with West physicians is not relevant to any "standard for purposes of the AKS."

But despite Methodist's contortions, evidence of a hospital system agreeing to share drug profits with referring physicians is ***highly*** relevant under the AKS. In *United States v. Southeast Eye Specialists*, 570 F. Supp. 3d 561, 570 (M.D. Tenn. 2021), Chief Judge Crenshaw recognized that the Third, Fifth, Seventh, Ninth, and Tenth Circuits "are in accord" in holding that if one purpose of payments to physicians was to induce referrals, then the AKS is violated. *Id.* In *United States v. Napper*, 2021 WL 4992651, at *53 (M.D. Tenn. October 27, 2021), Judge Trauger recognized "courts have held that a payment made for the purpose of inducing a referral can violate the AKS, 'even if the payments were also intended to compensate for professional services.'" *Id.* (quoting *United States v. Borrasi*, 639 F. 3d 774. 782 (7th Cir. 2011) and *United States v. Greber*, 760 F. 2d 68, 72 (3d Cir. 1985). "Indeed, it is common for AKS violations to occur alongside legitimate medical business activities; kickback schemes are only successful insofar as they are able to embed themselves within the vast, lucrative universe of ordinary healthcare services and payments." *Id.*; *see also* ECF No. 345 at 28-29 (discussing one purpose rule).

Mr. Smith's expert opinions regarding a hospital system sharing drug profits with the referring physicians are relevant to the ultimate issue in this case, but that fact does not preclude his opinions. Rule 704(a) establishes that "[a]n opinion is not objectionable just because it embraces an ultimate issue." "Its adoption abolished the so-called 'ultimate issue rule' which

proscribed opinion testimony that ostensibly invaded the province of the jury." *Haney v. Mizell Memorial Hospital*, 744 F.2d 1467, 1473 (11th Cir. 1984); *see also Johnson Group, Inc. v. Beecham, Inc*., 952 F.2d 1005, 1007 (8th Cir. 1991) ("An expert witness may give opinion testimony if it will assist the trier of fact to understand the evidence or determine a fact in issue. Fed. R. Evid. 702. Such opinion testimony is not inadmissible merely because it embraces an ultimate issue to be decided by the trier of fact").

### F. Opinion 3 Follows the Same Methodology as Methodist's Own Valuation Consultants

Finally, Methodist challenges Opinion 3, which Methodist describes as follows:

> (3) "Methodist prepared an inaccurate FMV 'triggers' calculation in 2013, resulting in an invalid reliance on the 2011 ECG Valuation for 2014 and 2015. This calculation indicated overpayments of $7.7 and $6.8 million respectively for the specialty of hematology/oncology based on ECG's criteria." (*Id*. at 9; *see also id.* at 18-22.)

Methodist argues that "Mr. Smith's calculation in Opinion 3 of an 'overpayment' based on the difference between compensation actually paid under the PSA and compensation paid were the compensation-to-collections ratio set in relation to the 2011 MGMA median is based on speculative assumptions and unreliable methods, and the analytical gap between his data and conclusions is too great." ECF No. 327 at 20.

Although Methodist argues Mr. Smith's methods here are "unreliable," Methodist fails to inform the Court that Mr. Smith's methodology leading to his Opinion 3 is the same as Methodist's own valuation consultant ECG used in examining the ratio between West physicians' compensation and their professional collections. *Compare* ECG Report, ECF No. 323-21 at 19-22 *with* Smith Report, ECF No. 328-1 at 15-18. "The Rule 702 inquiry is a flexible one and its focus must be solely on principles and methodology, not on the conclusions they generate." *Superior Prod. P'ship*, 784 F.3d at 323 (internal citations omitted) (quotations omitted). The

methodology of physician compensation-to-collections ratios is well-established and standard in the healthcare industry for valuating physician compensation.

Methodist has a long history of attempting to manipulate this powerful evidence. As discussed above, despite ECG providing an opinion that repeatedly stated the West physicians should be paid at levels commensurate with their professional collections, **Methodist proceeded to pay the West oncologists at levels approximately $60 million above their professional collections between 2012-2018.** *See* ECF No. 346 (RSOF) ¶¶ 47, 214.

Mr. Smith's Opinion 3 provides a calculation of how much Methodist paid the West oncologists above their professional collections. In performing this calculation, Mr. Smith used the professional collections verified as accurate by Methodist in discovery. To understand Mr. Smith's calculations, a brief review of the history of this issue is important. The ECG opinion required Methodist to verify the compensation to collections ratios for each West specialty at the end of 2013. Methodist failed to do that. Instead, mid-way through 2013 in June, Methodist and West leaders falsely manipulated both the numerator and denominator of the compensation to collections ratio to reach a calculation that was ostensibly under the threshold allowed by ECG. *See* generally Ex. E (June 2013 meeting minute notes). In June 2013, Methodist and West leaders used the amount of $18.49 million as the oncologists' professional collections for 2012. *Id.* Yet in discovery Methodist repeatedly changed its answers about the amount of West's professional collections and ultimately admitted that the West oncologists' professional collections were $16.74 million in 2012, **not** $18.49 million. ECF No. 352-2 at 22-23.

With respect to compensation for the oncologists in 2012, Methodist and West leaders used the bogus number of $21.07 million. *See* Ex. E at 12. This number was nearly $3 million below their actual compensation of $23.93 million. The compensation could be easily determined and

verified by Methodist executives who received and paid the invoices from West each month. Each invoice itemized the amounts billed for the West oncologists. Yet Methodist executives chose to use a compensation number $3 million less than the amounts that they knew were paid.

While Methodist and West manipulated the numbers to reach a compensation to collections ratio of "1.14" or conveniently .01 below the ECG threshold, the actual compensation to collections ratio was 1.43 in 2012 and 1.48 in 2013. ECF No. 328-1 at 60. In 2012 and 2013, Methodist paid the West oncologists at levels approximately $9.62 million above the thresholds authorized by the ECG valuation opinion. *Id.* After Methodist's manipulation of financial data in June 2013, Methodist's executives continued approving payments for West oncologists at levels millions of dollars above their professional collections. Despite the requirement in ECG's valuation opinion that Methodist obtain a new valuation opinion at the end of 2013, Methodist failed to do so and did not obtain any new valuation opinion until 2016 when it went back to ECG and engineered a new valuation opinion that ignored Methodist's ongoing payments millions of dollars above the West oncologists' professional collections. *See* ECF No. 346 (CSOF) ¶ 67.

On September 1, 2021, Methodist answered an interrogatory with the amounts of the West oncologists' professional collections. Then on October 20, 2021, Methodist changed its answers and served "Supplemental Responses" with different professional collections for each of the years 2012-2018. Then on July 14, 2022, Methodist served "Amended Supplemental Responses" and changed their answers, yet again, regarding the amounts of professional collections for West oncologists. ECF No. 353-2 at 22-23. At his deposition, Methodist's former CFO McLean admitted that Methodist's responses to the interrogatories regarding West's professional collections changed by $19.7 million dollars. Ex. F (McLean Dep.) Vol I. 338: 10-15.

Methodist's "Amended Supplemental" responses in effect admitted that the professional collections used by Methodist/West executives at their meeting in June 2013 to address compliance with ECG's valuation opinion were inaccurate and inflated. Methodist's "Amended Supplemental Responses" also in effect admitted that during the years 2012-2018, **Methodist paid the West oncologists at levels approximately $60 million above their professional collections.** ECF No. 353-2 at 22-24 (stating collections amounts); *see* ECF No. 346 (RSOF) ¶¶ 47, 214 (describing overpayment approximately of $60 million and the basis for that number).

Over six months after the close of discovery,[8] Methodist submitted an "expert" report of Gregory Russo in which he provides new and different amounts for the West physicians' professional collections for each of the years 2012-2018. His Report begins with the statement:

> I have been retained by Bass, Berry & Sims PLC ("Counsel") on behalf of its clients Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals (collectively, "Methodist"), to analyze data whereby I could identify the total collections and professional collections associated with The West Clinic, PLLC ("West") and its practitioners.

ECF No. 323-9 at 3.

Despite having already provided verified answers in discovery regarding the amounts of West oncologists' professional collections, Methodist retained an expert witness to calculate different amounts that would only be disclosed months after fact discovery ended. Even under Mr. Russo's new calculations, Methodist's payments to the West oncologists were still nearly $60 million above their professional collections. *Compare* ECF. No. 323-9 at 13 (Russo Table 6 – Actual and Estimated Professional Collections) (purporting to show somewhat higher collections than previously disclosed by Defendant) with ECF No. 353-2 at 22-24. Then, on March 1, 2023,

---

[8] The Seventh Case Management Order confirms that fact discovery "closed on September 23, 2022. (Dkt. 298, p. 2).

Methodist yet again amended its answers to Relator's interrogatory to match the amounts of West's professional collections Mr. Russo's report.  *See* ECF No. 352-8 at 22-23.

In his Report, Mr. Smith used the amounts of professional collections provided by Methodist in their "Amended Supplemental Responses" during the discovery period.  Thus, Mr. Smith's calculations of Methodist's overpayments are based on the exact amounts of professional collections that Methodist certified were accurate after twice amending their original answers during discovery. Yet after Mr. Smith submitted his report on February 21, 2023, on March 1, 2023, Methodist changed their answers about the amounts of West professional collections yet again. ECF No. 352-8 at 22-23.

Methodist feigns confusion about "how the calculations that Mr. Smith performed support his conclusion."[9] Methodist argues that "it is still not possible for a trigger calculation in 2013 to generate overpayments in 2012."  ECF No. 327 at 22. The presumption of Methodist's argument is that Methodist was free to pay West whatever it wished in 2012 and the compensation to collections ratio emphasized by ECG did not matter in 2012.  This presumption is contrary to the core opinions of ECG's valuation.  The ECG opinion repeatedly states that it is based on the central premise that Methodist would compensate the West physicians at levels commensurate with their productivity as measured by their professional collections.   "We believe that in principle, physicians should receive compensation that is generally commensurate with their productivity (in terms of professional collections), as productivity remains the primary driver of compensation nationally." ECF No. 323-21 at 12.  "In conducting this analysis, we emphasize the principle that

---

[9]     Methodist feigns confusion about the single "typo" in Mr. Smith's summary section of his report regarding the calculation of the overpayment.  But the discussion section of Mr. Smith's report and the Exhibits do not have this typo, and Mr. Smith has already addressed this harmless typo in detail.

physicians should receive compensation that is generally commensurate with their productivity (in terms of professional collections)…" *Id.* at 18. "For physicians with high collections, we generally consider amounts paid at the median of an imputed compensation-to-collections benchmark to be consistent with FMV, because it indicates what a physician's compensation is in relation to his/her collections and is consistent with that of his/her peers within the specialty on a percentage of collections basis." *Id.* at 21.

Methodist also argues that Mr. Smith's calculations of Methodist's payments above the West oncologists' professional collections and "Mr. Smith's opinion rest[] on a speculative assumption about what constitutes fair market value." ECF No. 327 at 23. Methodist again ignores its own valuation opinion from ECG that repeatedly states that its report addresses the FMV of Methodist's payments to West and the "central" condition of ECG's opinion about FMV is the physicians' compensation-to-collections ratio. ECF No. 323-21 at 22. The methodology of examining the compensation-to-collections ratio is not a "speculative assumption" by Mr. Smith. As stated by ECG, "[t]he reported benchmark of physician compensation-to-collections ratio is central in the determination of this FMV opinion…" *Id.*

## IV.    CONCLUSION

The United States respectfully submits that Methodist's motion to exclude certain portions of Mr. Smith's proposed testimony should be denied in its entirety.

Respectfully submitted,

HENRY C. LEVENTIS
United States Attorney
Middle District of Tennessee

By:      s/ Ellen Bowden McIntyre
ELLEN BOWDEN MCINTYRE, BPR #023133
WYNN M. SHUFORD
Assistant United States Attorneys

United States Attorney's Office
719 Church Street, Suite 3300
Nashville, TN  37203
Phone: (615) 736-5151
ellen.bowden2@usdoj.gov
wynn.shuford@usdoj.gov

*Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2023, a true and correct copy of the foregoing was served via email to the following:

| | |
|---|---|
| Bryan A. Vroon<br>Law Offices of Bryan A. Vroon, LLC<br>1380 West Paces Ferry Road, Suite 2270<br>Atlanta, GA 30327<br>Email: bryanvroon@gmail.com | Edward D. Robertson, Jr.<br>Bartimus, Frickleton & Robertson<br>715 Swifts Highway<br>Jefferson City, MO 65109<br>Email: crobertson@bflawfirm.com |
| Jerry E. Martin<br>David Rivera<br>Seth Marcus Hyatt<br>Barrett Johnston Martin & Garrison, LLC<br>Bank of America Plaza<br>414 Union Street, Suite 900<br>Nashville, TN 37219<br>Email: jmartin@barrettjohnston.com<br>Email: shyatt@barrettjohnston.com | Robert Salcido<br>(Admitted *Pro Hac Vice*)<br>Akin Grump Strauss Hauer & Feld LLP<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Email: rsalcido@akingrump.com |
| Brian D. Roark<br>Anna M. Grizzle<br>J. Taylor Chenery<br>Taylor M. Sample<br>Hannah E. Webber<br>Bass, Berry & Sims PLC<br>150 Third Avenue South, Suite 2800<br>Nashville, TN 37201<br>Email: broark@bassberry.com<br>Email: agrizzle@bassberry.com<br>Email: tchenery@bassberry.com<br>Email: taylor.sample@bassberry.com<br>Email: hannah.webber@bassberry.com | Andrew F. Solinger, Esq.<br>HOLLAND & KNIGHT LLP<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>Email: Andrew.solinger@hklaw.com |
| John-David H. Thomas, Esq.<br>Barnes & Thornburg, LLP<br>827 19th Avenue, Suite 930<br>Nashville, TN 37203<br>Email: jd.thomas@btlaw.com | |

s/ Ellen Bowden McIntyre
ELLEN BOWDEN MCINTYRE
Assistant United States Attorney