UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* LIEBMAN, *et al*, | ) | |
| | ) | Case No. 3:17-CV-00902 |
| Plaintiffs-Relators, | ) | |
| | ) | JUDGE CAMPBELL |
| v. | ) | MAGISTRATE JUDGE HOLMES |
| | ) | |
| METHODIST LE BONHEUR | ) | |
| HEALTHCARE, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**THE UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE PROPOSED TESTIMONY OF EXPERT LUCY CARTER**

I.     INTRODUCTION ................................................................................................. 1

II.    RESPONSE TO METHODIST'S "FACTUAL BACKGROUND" ................................ 2

III.   SUMMARY OF LUCY CARTER'S QUALIFICATIONS .......................................... 2

IV.    ARGUMENT ....................................................................................................... 3

   A.   OVERVIEW OF ADMISSIBILITY OF EXPERT TESTIMONY ................................... 3

   B.   MS. CARTER IS A HIGHLY QUALIFIED EXPERT UNDER THE STANDARDS ESTABLISHED
        BY THE SIXTH CIRCUIT ...................................................................................... 5

   C.   MS. CARTER MAY PROPERLY TESTIFY AS TO HEALTHCARE INDUSTRY STANDARDS
        AND PRACTICES ................................................................................................. 7

   D.   MS. CARTER IS NOT OFFERING OPINIONS OUTSIDE HER AREA OF EXPERTISE ............. 8

   E.   MS. CARTER IS NOT OFFERING OPINIONS REGARDING THE LEGAL EFFECT OF A
        CONTRACT OR CONTRACT INTERPRETATION ........................................................ 10

   F.   METHODIST'S ATTACKS ON MS. CARTER'S METHODOLOGY ARE MISGUIDED ............ 11

      1.  Ms. Carter Followed the Same Methodology as Methodist's Own Valuation
          Consultant in Examining the Compensation to Collections Ratios for West Oncologists
          ............................................................................................................... 11

      2.  Ms. Carter's Opinion that Methodist Made Duplicate Payments to West for the
          Nurse Practitioners ................................................................................... 17

i

3.   Ms. Carter Opinion that Methodist Overpaid West by $2.4 Million in Excess of the Asset Valuation ........................................................................... 18

4.   Ms. Carter's Opinion that Methodist Overpaid West for Wings Personnel ......... 18

5.   Ms. Carter's Opinion that West Received Rent for Subleased Oral Pharmacy Space ....................................................................................................... 19

6.   The Issue of West Not Becoming Employees of Methodist .................................... 20

7.   The Issue of West Not Investing in the Cancer Center .......................................... 20

V.   CONCLUSION .............................................................................................................. 21

# I.    INTRODUCTION

The United States submits this opposition to the Methodist Defendants' motion to exclude the United States' expert Lucy Carter's proposed testimony.  *See* ECF No. 324.  Methodist challenges Ms. Carter's three major overall opinions: (1) "Methodist and [West] business arrangements were *outside the course of normal healthcare industry practice* and *the parties did not materially comply with the terms and requirements of the business integration agreements*;" (2) "Methodist made *excessive payments* to [West] that were *not in compliance with the integration agreements* and were *outside the course of normal healthcare industry practice*;" and (3) "Methodist allowed [West] to continue to operate businesses in Methodist's space *outside the terms of the agreements and the course of normal industry practice*."  *See* ECF No. 324 at 1.

Methodist argues that "Ms. Carter's Opinions 1-3 should be struck because (1) she is unqualified to opine on the 'course of normal healthcare industry practice' for a multi-hospital affiliation with a large oncology physician practice involving a system-wide oncology service line at multiple hospitals and outpatient locations and to opine on areas of fair market valuation and oncology service line practice outside of her purported expertise; (2) she impermissibly opines on her interpretation of contractual provisions and obligations of parties; and (3) her opinions are not the product of reliable principles and methods and thus would not be helpful to a factfinder."  *Id.* at 2.

As discussed below, Ms. Carter is a highly qualified expert under the standards established by the Sixth Circuit, she is not offering opinions regarding the legal effect of any contracts or contract interpretation, and her opinions are based on the methodology endorsed by Methodist's valuation consultants and the conditions and terms of the contracts between Methodist and West.

1

Even if the Court should give credence to any of Methodist's concerns, such challenges would bear on the weight of the evidence for the jury's determination but not its threshold admissibility.

## II.     RESPONSE TO METHODIST'S "FACTUAL BACKGROUND"

Methodist includes a long factual background that they present as undisputed facts about the deal. In actuality, the United States has disputed nearly all of these so-called undisputed facts. *See* ECF No. 345. Further, Methodist's facts include references to advice of counsel on the deal. For the reasons addressed in the United States' motion to strike and/or preclude the advice of counsel defense in summary judgment filings, the Court should similarly disregard those allegations here. *See* ECF Nos. 343-44.

## III.     SUMMARY OF LUCY CARTER'S QUALIFICATIONS

Ms. Carter has 46 years of experience in public accounting, specializing in healthcare including hospital acquisitions of physician practices and physician compensation. ECF No. 324-1 (Carter Report) at 11-12. Since 1977, she has provided extensive tax, audit, management consulting, compliance, reimbursement, and physician compensation services primarily to hospital systems and physician practices. *Id.*

She is currently the Chief Financial Officer ("CFO") of Tennessee Orthopaedic Alliance effective December 20, 2022. *Id.* From 2015 through 2022, she was a partner and Practice Leader of the Healthcare Industry Group at KraftCPAs, PLLC, one of the largest certified public accounting firms in Tennessee with more than 275 employees and offices in Nashville, Chattanooga, Columbia, and Lebanon.

Ms. Carter graduated from the University of Tennessee in 1977 with a degree in Business Administration/ Accounting and obtained her CPA Certificate in March of 1979. *Id*. at 11.

2

She is the co-author of the books *AICPA Guide to Medical, Dental, and Other Healthcare Practices* and *Physician's Compensation: Measurement, Benchmarking, and Implementation* and numerous articles appearing in The Journal of Accountancy, Healthcare Financial Management, and Nashville Medical News.[1] She has been recognized as one of the area's Top 100 Health Care Leaders by the Nashville Business Journal.

## IV.     ARGUMENT

### A. Overview of Admissibility of Expert Testimony

Federal Rule of Evidence 702 and the Supreme Court's analysis in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. Under Rule 702, "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements.  First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'  Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'  Third, the testimony must be reliable."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008) (citations omitted) (quoting Fed. R. Evid. 702).

"The Rule 702 inquiry is a flexible one and its focus must be solely on principles and methodology, not on the conclusions they generate."  *Superior Prod. P'ship*, 784 F.3d at 323 (internal citations omitted) (quoting *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526 (6th Cir. 2014) (quoting *Daubert*, 509 U.S. at 595)).  "[A] determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion." *In re Scrap Metal*, 527 F.3d 517, 529 (6th Cir. 2008).  A "court must be sure not 'to exclude an expert's

---

[1]     Ms. Carter's CV lists publications within the last ten years.  ECF No. 324-1 at 12.  Her publications are more extensive over her 46-year career.

testimony on the ground that the court believes one version of the facts and not the other.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee's notes, 2000 amend.)

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30 (6th Cir. 2008). "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 801 (6th Cir. 2000) (quoting *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir.1993)).

"[R]ejection of expert testimony is the exception, rather than the rule and we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal*, 527 F.3d at 530 (6th Cir. 2008) (quotation marks omitted). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.,* 151 F.3d 500, 516 (6th Cir. 1998) (quoting *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984)).

"A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel." *Burgett v. Troy-Bilt LLC*, 579 Fed. Appx. 372, 376-377 (6th Cir. 2014). "'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).

4

## B. Ms. Carter is a Highly Qualified Expert under the Standards Established by the Sixth Circuit

Methodist's lead argument is that Ms. Carter "lacks the qualifications necessary to render her opinions and her opinions will thus not assist this Court." ECF No. 325 at 10. Methodist claims that Ms. Carter lacks qualifications to opine on a "multi-hospital affiliation with an oncology physician practice consisting of more than thirty physicians involving a system-wide, $1.6 billion oncology service line at multiple hospitals and outpatient locations under five agreements." *Id.* at 12. But Methodist's arguments to minimize Ms. Carter's qualifications are misleading.

The core issue in this case is physician compensation, and Ms. Carter has over 40 years of experience in that field. She has extensive experience consulting and advising hospital systems larger than Methodist regarding their compensation arrangements with physicians. ECF No. 325-3 at 32:1-48:22. Methodist claims that Ms. Carter was an employee of KraftCPAs. ECF No. 325 at 6. Yet as Methodist knows, she was not an employee, but rather a partner at Kraft and the Practice Leader of its Healthcare Industry Group from 2015 through 2022. Kraft is one of the largest certified public accounting firms in Tennessee with more than 275 employees and offices in Nashville, Chattanooga, Columbia, and Lebanon.

During her 46-year career focused on healthcare, Ms. Carter has performed extensive physician compensation consulting for hospital systems and physician practices, including hospital systems acquiring physician practices. ECF No. 325-3 at 32:1-48:22. For example, she has handled extensive valuation work for Ascension Saint Thomas hospital system's acquisitions of various physician practices and operations of integrated physician practices. *Id.* at 37:3-42:24. Ascension Saint Thomas operates 13 hospitals in Middle Tennessee and is part of Ascension, one of the largest non-profit hospital systems in the United States with almost 140 hospitals in 19 states. *See* About Ascension, *available at* https://about.ascension.org/about-us (last visited May

24, 2023). She has also consulted on other major acquisitions of physician practices by private equity. ECF No. 325-3 at 42:3-48:22. With over 40 years of experience as a leading healthcare consultant and CPA in Tennessee, Ms. Carter is highly qualified to testify as an expert in this case.

Methodist attempts to argue that Ms. Carter must have experience consulting on hospital-oncologist alliances factually and financially identical to the transactions between Methodist and West. But that is not the law of the Sixth Circuit. Ms. Carter offers her expert opinions from her extensive specialized experience in the field of physician compensation, which is the focus of her testimony in this case. But even if she had only general knowledge, an expert's lack of experience in a particular subject matter does not render her unqualified so long as her general knowledge in the field can assist the trier of fact. *See Surles ex rel. Johnson v. Greyhound Lines, Inc.,* 474 F.3d 288, 293–94 (6th Cir.2007) ("It is of little consequence to questions of admissibility that Martin lacked expertise in the very specialized area of commercial bus line threat assessment); *Dilts v. United Grp. Servs., LLC,* 500 F. App'x 440, 446 (6th Cir. 2012) ("An expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact."); *First Tenn. Bank Nat'l Ass'n v. Barreto,* 268 F.3d 319, 333 (6th Cir.2001) (expert's unfamiliarity with some specific aspects of the subject at hand "merely affected the weight and credibility of [the] testimony, not its admissibility"); *Smith v. BMW N. Am., Inc.,* 308 F.3d 913, 919 (8th Cir.2002) (finding abuse of discretion when the district court *excluded* testimony of an expert witness qualified in a general field merely because that witness lacked expertise more specialized and more directly related to the issue at hand); *Morales v. American Honda Motor Co*. 151 F.3d 500, 516 (6th Cir. 1998) (reasoning that "the jury was free to give [an expert's] testimony as much credence as it felt the testimony deserved, particularly in light of Defendant's cross-examination exposing [his] lack of familiarity with the given

topics"); *Davis v. Combustion Eng'g, Inc*., 742 F.2d 916, 919 (6th Cir. 1984) ("Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify.").

### C. Ms. Carter May Properly Testify as to Healthcare Industry Standards and Practices

After attacking her qualifications, Methodist next argues that Ms. Carter has not identified "what industry standards serve as the foundation of her opinion." ECF No. 325 at 13. Methodist cites two cases from New York regarding industry standards to support its position. In *Grdinich v. Bradlees*, 187 F.R.D. 77, 81-82 (S.D.N.Y. 1999), the court found that "there really are no so-called 'industry standards'" for stacking merchandise at a department store. But in contrast to the facts in *Grdinich*, there are extensive industry practices, standards, and publications regarding hospital-physician relationships and physician compensation, and Ms. Carter's consulting career has focused on these fields for over 40 years. Both of Methodist's experts address customary healthcare industry practices, and neither expert suggests that there are no standards in the healthcare industry. *See generally* ECF No. 323-8 (Mello Expert Decl. and Report); ECF No. 323-9 (Russo Expert Decl. & Report). Methodist also cites *In re Rezulin Prods. Liab. Litig*., 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004). Yet in that case, the proposed experts "admitted that their opinions concerning purported ethical standards are based on their personal, subjective views." *Id.* at 543. There is no such admission in this case by the experts for the United States.

Methodist's arguments are also contrary to federal case law which endorses expert testimony based on industry practices. *See, e.g.*, *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir. 1991) ("Moreover, Fed. R. Evid. 702 permits expert testimony comparing conduct of

parties to the industry standard"); *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 219 (3d Cir. 2006) (expert's testimony regarding industry practices would be probative of entity's scienter at time of agreement); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 461 (9th Cir. 1986) (expert testimony regarding industry standards are "highly relevant and far from prejudicial" and the "trial judge apparently confused these rules with federal law, as to which federal judges are the authority. Not being civil law, these rules were proper matters for expert testimony. Exclusion was an abuse of discretion"). "Expert testimony on industry standards is common fare in civil litigation." *Levin v. Dalva Bros.*, Inc., 459 F.3d 68, 79 (1st Cir. 2006) (citing *Ford v. Allied Mut. Ins. Co.*, 72 F.3d 836, 841 (10th Cir. 1996); *Vann* v. *City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *TCBY Sys., Inc. v. RSP Co., Inc.*, 33 F.3d 925, 928 (8th Cir. 1994)).

### D. Ms. Carter Is Not Offering Opinions Outside Her Area of Expertise

Methodist next argues that Ms. Carter "testifies outside her area of expertise" in opining that Methodist made overpayments to West physicians. Methodist argues:

> Ms. Carter asserts that Methodist paid West "in excess of the valuation opinion obtained from ECG" because their compensation-to-collections ratio exceeded 1.10. (Carter Rep. at 8 (Opinions 1(d)(iv) and 2(e), above).) But it is clear from the record that this assertion stems from Ms. Carter's erroneous conclusion that the MGMA median "trigger calculation" represents fair market value. (*See* Carter Dep. 221:14-222:12.)

Methodist's argument stems from one objective – to prevent the jury from hearing testimony about Methodist paying the West oncologists tens of millions of dollars above their professional collections[2] despite the explicit warnings of its own valuation consultant.

---

[2]     The term "professional collections" is a physician productivity metric that is commonly used in the healthcare industry. It measures the collections received for the professional component of services personally provided by a physician.

Methodist criticizes Ms. Carter for concluding that the compensation to collections ratio is relevant to "fair market value" ("FMV"). Yet Methodist's criticism is contrary to the core findings of Methodist's own valuation report. *See generally* ECF No. 323-21 (ECG Valuation Report).

The ECG opinion repeatedly states that it is based on the "central" condition that Methodist would compensate the West physicians at levels commensurate with their productivity as measured by their professional collections. "We believe that in principle, physicians should receive compensation that is generally commensurate with their productivity (in terms of professional collections), as productivity remains the primary driver of compensation nationally." *Id.* at 11. "In conducting this analysis, we emphasize the principle that physicians should receive compensation that is generally commensurate with their productivity (in terms of professional collections)…" *Id.* at 17. "For physicians with high collections, we generally consider amounts paid at the median of an imputed compensation-to-collections benchmark to be consistent with FMV, because it indicates what a physician's compensation is in relation to his/her collections and is consistent with that of his/her peers within the specialty on a percentage of collections basis." *Id.* at 20. ECG's valuation opinion repeatedly states that its report addresses the FMV of Methodist's payments to West and the "central" condition of ECG's opinion about FMV is the physicians' compensation-to-collections ratio. *Id.* at 21.

The methodology of examining the compensation-to-collections ratio is not a "speculative assumption" or "erroneous conclusion" by Ms. Carter. The ratio is the "central" methodology of Methodist's own valuation consultant. As stated by ECG, "[t]he reported benchmark of physician compensation-to-collections ratio is central in the determination of this FMV opinion…" *Id.*

**E. Ms. Carter Is Not Offering Opinions regarding the Legal Effect of a Contract or Contract Interpretation**

Methodist claims that Ms. Carter "purports to offer opinions regarding her own contractual interpretation of the affiliation agreements without linking those interpretations to expertise in clarifying or defining terms of art, science or trade in the contracts she purports to interpret." ECF No. 325 at 16. Methodist cites cases for the proposition that "experts may not testify as to the legal effect of a contract" and "the interpretation of a contract is an issue of law." But Ms. Carter is not offering any opinion as to the legal effect of a contract. In fact, she already confirmed that she is not offering any "opinions in this case relating to legal interpretation." ECF No. 325-3 (Carter Dep.) at 30:8-10. Her report also states: "I do not have opinions on legal issues related to liability." ECF No. 324-1 at 2.

In challenging Ms. Carter's opinion that Methodist made duplicative payments to West regarding the nurse practitioners, Methodist argues that her opinion rests "almost entirely" on a "clearly erroneous legal interpretation" of a provision in the PSA. But once again, Methodist's argument is misleading. Her report states in pertinent part:

> The nurse practitioners and physician assistants were leased to Methodist and paid by Methodist under the LEA. I understand from the Expert Report of Timothy Smith, that from 2012 through 2017, Methodist also paid TWC for 65,759 wRVUs (reference expert report by Timothy Smith) generated by nurse practitioners and a physician assistant. Methodist paid TWC for these nurse practitioners and physician assistant at the rate of the medical oncologists' wRVUs, which was $145 per wRVU. The excess lease payments totaled $10 million. (Exhibit VII)

*Id*. at 9. In other words, Methodist paid West for wRVUs that West-employed nurse practitioners performed while at the same time, Methodist reimbursed West for the salaries and benefit costs of these nurse practitioners, thereby creating a financial windfall for West. *Id*. at 8-9. Through detailed forensic accounting analyses of payroll records and itemized invoices, the United States' experts identified and quantified Methodist making duplicative payments to West for the same

services.  Ms. Carter's opinion is not based on any "legal interpretation" of a contract as Methodist argues to the Court.  Rather, her opinion is based on the fundamental position that duplicative payments are overpayments that exceed the FMV ranges provided by Methodist's own valuation consultants.

Methodist also argues that "in numerous instances, Ms. Carter rests her opinion entirely on interpretations of contractual provisions rather than on industry custom, which constitutes impermissible opinion testimony."  ECF No. 325 at 18.  But in reality, Ms. Carter is offering her opinion that fundamental healthcare industry practices require parties to follow the terms of a contract when relying on FMV valuation opinions based on assumptions from those contractual terms.  There is nothing controversial or novel about this opinion based on her 46 years of experience in the healthcare industry.

## F.  Methodist's Attacks on Ms. Carter's Methodology Are Misguided

In the final section of Methodist's motion, Methodist claims that Ms. Carter's opinions are "not the product of reliable methods, reliably applied."  ECF No. 325 at 21.  Methodist identifies seven opinions that "should be struck."  Each of these seven "opinions" is addressed below.

### 1.  Ms. Carter Followed the Same Methodology as Methodist's Own Valuation Consultant in Examining the Compensation to Collections Ratios for West Oncologists

Methodist claims that Ms. Carter's opinion that Methodist paid "amounts under the PSA in excess of the valuation opinion obtained from ECG" should be struck.   However, Methodist fails to inform the Court that Ms. Carter's methodology is the same as Methodist's own valuation consultant ECG which examined the ratio between West physicians' compensation and their professional collections. "The Rule 702 inquiry is a flexible one and its focus must be solely on principles and methodology, not on the conclusions they generate." *Superior Prod. P'ship*,

784 F.3d at 323 (internal citations omitted) (quoting *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526 (6th Cir. 2014) (quoting *Daubert*, 509 U.S. at 595)). The methodology of physician compensation-to-collections ratios is well-established and standard in the healthcare industry for valuations of physician compensation.

As discussed above, despite ECG providing an opinion that repeatedly stated the West physicians should be paid at levels commensurate with their professional collections, **Methodist proceeded to pay the West oncologists at levels approximately $60 million above their professional collections between 2012-2018.** ECF No. 324-1 at 8, 20. Ms. Carter provides a calculation of how much Methodist paid the West oncologists above their professional collections. In performing this calculation, Ms. Carter used the professional collections verified as accurate by Methodist in discovery. *Id*. at 20.

Methodist quibbles over whether Ms. Carter should apply the national median compensation to collections ratio for each year. But according to MGMA Surveys, the national median compensation to collections ratio for hematologists/oncologists was 1.10 in 2011, 1.10 in 2012, 1.13 in 2013, 1.10 in 2014, 1.24 in 2015, 1.43 in 2016, 1.22 in 2017, and 1.34 in 2018. No matter which year of the national median compensation to collections is applied, Methodist still paid West oncologists tens of millions of dollars above their professional collections and tens of millions of dollars above the national median compensation to collections ratios. And this is properly an argument for the weight of her testimony at trial, not its threshold admissibility.

To understand Ms. Carter's calculations, a brief review of the history on this issue is important. The ECG opinion required Methodist to verify the compensation to collections ratios for each West specialty at the end of 2013. Methodist failed to do that, ECF No. 328-1 at 18-20, and Methodist does not argue to the contrary in any of its briefs. Instead, mid-way through 2013 in

June, Methodist and West leaders falsely manipulated both the numerator and denominator of the compensation to collections ratio to reach a calculation that was ostensibly under the threshold allowed by ECG. *See generally* ECF No. 367-1 (June 2013 meeting minute notes and attachments).

In June 2013, Methodist and West leaders used the amount of $18.49 million as the oncologists' professional collections for 2012. *Id.* Yet in discovery Methodist repeatedly changed its answers about the amount of West's professional collections and ultimately admitted that the West oncologists' professional collections were $16.74 million in 2012, **not** $18.49 million. ECF. No. 352-2 at 22-23. With respect to compensation for the oncologists in 2012, Methodist and West leaders used the bogus number of $21.07 million. *See* ECF No. 367-1 at 12. This number was nearly $3 million below their actual compensation of $23.93 million. The compensation could be easily determined and verified by Methodist executives who received and paid the invoices from West each month. Each invoice itemized the amounts billed for the West oncologists. Yet Methodist executives chose to use a compensation number $3 million less than the amounts that they knew were paid.

After their manipulation of financial data in June 2013, Methodist's executives continued approving payments for West oncologists at levels millions of dollars above their professional collections. Despite the requirement in ECG's valuation opinion that Methodist obtain a new valuation opinion at the end of 2013, Methodist failed to do so and did not obtain any new valuation opinion until 2016 when it went back to ECG and engineered a new valuation opinion that ignored the elephant in the room – Methodist's ongoing payments millions of dollars above the West oncologists' professional collections. *See* ECF No. 346 (U.S. Counter-Statement of Material Facts), ¶¶ 67.

In August 2021, Relators served their First Interrogatories to Methodist with specific questions about the professional collections for West oncologists in each of the years 2012-2018. Originally in response to Relators' Interrogatory No. 7, on September 1, 2021, Methodist stated the amounts of the West oncologists' professional collections. Then on October 20, 2021, Methodist changed its answers and served "Supplemental Responses" with different professional collections for each of the years 2012-2018. Then on July 14, 2022, Methodist served "Amended Supplemental Responses" and changed their answers, yet again, regarding the amounts of professional collections for West oncologists. ECF No. 353-2 at 22-23. At his deposition, Methodist's former CFO Chris McLean admitted that Methodist's responses to the interrogatories regarding West's professional collections changed by $19.7 million dollars. ECF No. 367-3 (McLean Dep. Vol I.) 338: 10-15.

Methodist's "Amended Supplemental" responses in effect admitted that the professional collections used by Methodist/West executives at their meeting in June 2013 to address compliance with ECG's valuation opinion were inaccurate and inflated. Methodist's "Amended Supplemental Responses" also in effect admitted that during the years 2012-2018, **Methodist paid the West oncologists at levels approximately $60 million above their professional collections.** ECF No. 353-2 at 22-24 (stating collections amounts); *See* ECF No. 346 (U.S. Responses to Statement of facts), ¶¶ 47, 214 (describing overpayment approximately of $60 million and the basis for that number).

Then over six months after the close of discovery,[3] Methodist submitted an "expert" report of Gregory Russo in which he provides new and different amounts for the West physicians'

[3] The Seventh Case Management Order confirms that fact discovery "closed on September 23, 2022. ECF No. 298 at 2.

professional collections for each of the years 2012-2018. Mr. Russo's Report begins with the statement:

> I have been retained by Bass, Berry & Sims PLC ("Counsel") on behalf of its clients Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals (collectively, "Methodist"), to analyze data whereby I could identify the total collections and professional collections associated with The West Clinic, PLLC ("West") and its practitioners.

ECF No. 323-9 at 3.

Despite having already provided verified answers in discovery regarding the amounts of West oncologists' professional collections, Methodist retained an expert witness to calculate different amounts that would only be disclosed months after the discovery period ended. But even under Mr. Russo's new calculations, Methodist's payments to the West oncologists were still nearly $60 million above their professional collections. *Compare* ECF. No. 323-9 at 13 (Russo Table 6 – Actual and Estimated Professional Collections) (purporting to show somewhat higher collections than previously disclosed by Defendant) with ECF No. 353-2 at 22-24 (Amended Supplemental Interrogatory Responses).

In addition, six months after the close of discovery, on March 1, 2023, Methodist has, yet again, amended its answers to Relator's First Interrogatories and changed its answers regarding the amounts of West's professional collections to match Mr. Russo's report and opinions. *See* ECF No. 352-8 at 22-23.

In her Report, Ms. Carter used the amounts of professional collections provided by Methodist in their "Amended Supplemental Responses" during the discovery period. Thus, Ms. Carter's calculations of Methodist's overpayments are based on the exact amounts of professional collections that Methodist certified were accurate after twice amending their original answers during discovery. Yet *after* Ms. Carter submitted her report on February 21, 2023, on March 1,

2023, Methodist changed its answers about the amounts of West professional collections yet again. ECF No. 352-8 at 22-23.

Now, Methodist argues that Ms. Carter may not offer opinions about Methodist's overpayments to West oncologists at levels tens of millions of dollars above their professional collections, because she is "not qualified to opine on fair market value." ECF No. 325 at 16. Methodist is attempting to prevent Ms. Carter from assisting the jury in understanding the technical financial data on the highly relevant issue of the oncologists' compensation to collections ratios. To offer such opinions, she need not conduct an independent fair market valuation. Rather she is addressing the warnings and notice Methodist received from its own valuation consultants.

Methodist is off base in suggesting that Ms. Carter's opinion will not assist the trier of fact in assessing whether Methodist's payments to West violated the conditions of its own FMV opinions. And federal courts have repeatedly recognized the importance of evidence of warnings or notice that a defendant received prior to proceeding with an illegal course of conduct.

In *U.S. ex rel. Drakeford v. Tuomey*, the Fourth Circuit addressed the admissibility of a consulting attorney's warnings to a hospital system "that it would be very hard to convince the government that a contract that paid physicians 'substantially above even their collections, much less their collections minus expenses,' would constitute fair market value." 792 F.3d 364, 377 (4th Cir. 2015). "According to [the attorney consultant], compensation arrangements under which the contracting physicians are paid in excess of their collections were "basically a red flag to the government." *Id.* The Fourth Circuit found the importance of such testimony to the government's case "self-evident" and "compelling." *Id*.

Similarly, the Eleventh Circuit refused to exclude expert testimony as to what the defendants were "told about the legality of their scheme" in *United States v. Gish*, 518 Fed. Appx.

871, 875 (11th Cir. 2013). The Eleventh Circuit distinguished such testimony from "what defendants thought about that advice" or "any other state of mind they might have had at time." *Id.* ("Expert evidence that supports an inference as to the defendants' intent or other state of mind is not barred so long as it leaves that inference to the jury to draw.").

Courts within this Circuit have reached similar conclusions. For example, in *Schall v. Suzuki Motor of America, Inc.*, a product liability case, the court permitted plaintiff's expert to testify as to "what [defendant] knew and when it knew it to assist a jury in understanding whether Defendants' actions were reasonable." 2020 WL 1159757 at *5 (W.D. Ky. Mar. 10, 2020); *see also In re Yamaha Motor Corp. Rhino ATV Prod. Liab. Litig.*, 816 F. Supp. 2d 442, 459 (W.D. Ky. 2011) (specifically permitted expert to testify as to "what Yamaha knew and when.").

Similar to the facts in *Tuomey*, on the eve of the implied "partnership" between Methodist and West, Methodist's consultants at ECG warned Methodist that payments to West that were not commensurate with their professional collections would exceed fair market value and would violate ECG's valuation opinion.

### 2. Ms. Carter's Opinion that Methodist Made Duplicate Payments to West for the Nurse Practitioners

As discussed above, Methodist paid West for wRVUs that West-employed nurse practitioners performed while at the same time, Methodist reimbursed West for the salaries and benefit cost of these nurse practitioners, thereby creating a financial windfall for West. ECF No. 324-1 at 9. Ms. Carter identified and quantified Methodist making duplicative payments to West for the same services.

Ms. Carter's opinion is not based on any "erroneous interpretation" of the PSA as Methodist argues. Rather, her opinion is based on the fundamental position that duplicative payments are overpayments that exceed the fair market value ranges provided by Methodist's own

valuation consultants. Methodist quibbles with Ms. Carter's calculation and evaluation of whether all of the nurse practitioners generated wRVUs. Methodist is free to cross-examine Ms. Carter at trial on this point, and none of Methodist's challenges now should bar Ms. Carter's opinion on this critical issue that will assist the trier of fact in understanding Methodist's duplicate payments to West.

### 3. Ms. Carter Opinion that Methodist Overpaid West by $2.4 Million in Excess of the Asset Valuation

At her deposition, Ms. Carter stated her opinions that Methodist failed to obtain a valuation of its meaningful use payments to West and Methodist failed to require West to repay the meaningful use balance of payments owed back to Methodist the end of 2014 as required by the Asset Purchase Agreement. ECF No. 325-3 (Carter Dep.) at 175:2-9.[4] Methodist now attempts to impeach Ms. Carter with arguments that West actually did repay some of the meaningful use overpayments back to Methodist – albeit belatedly. Such questions go to the weight, but not admissibility of, Ms. Carter's opinion, which is based on fundamental industry practices to obtain appropriate valuations before making payments to physicians and to timely require refunds of overpayments.

### 4. Ms. Carter's Opinion that Methodist Overpaid West for Wings Personnel

Wings Cancer Foundation was a separate organization with employees unrelated to the Methodist oncology service line. Nevertheless, West billed Methodist for the salaries and benefits of Wings employees under the Leased Employee and Administrative Services Agreement with

---

[4] The meaningful use payments were an incentive program whereby CMS paid physicians for achieving certain metrics related to electronic health records. ECF No. 325-3 (Carter Dep.) at 177:1-5.

Methodist. Thus, Methodist made payments to West for personnel who were not leased to Methodist.

Methodist now apparently claims that West reimbursed Methodist for these improper payments. But Methodist's sloppy accounting – not Ms. Carter's report – has created this controversy. Methodist counsel showed Ms. Carter some accounting records from one quarter of 2014 and apparently attempts to argue that for the entire 8-year duration of the affiliation with West, West repaid Methodist for these improper payments. Methodist does not challenge the methodology of Ms. Carter's opinion on this fundamental point that Methodist should not pay West for personnel who are not leased to Methodist. Thus, Methodist's challenge only relates to the weight and not admissibility of this testimony.

### 5. Ms. Carter's Opinion that West Received Rent for Subleased Oral Pharmacy Space

The controversy over this issue stems from Methodist's own failure to enter a sublease with West for dual use assets as required by the Asset Purchase Agreement ("APA"). Methodist also failed to obtain an FMV for the dual use assets that were to be subleased by West as required by the APA. ECF No. 324-1 at 6.

Methodist's former CFO McLean claims that he did an informal annual "reconciliation" process regarding West's "dual use" assets, however, this process was contrary to the APA's requirement that Methodist and West enter into a separate lease agreement and obtain an independent FMV.[5]

---

[5]     Under the APA, "Certain of Seller's assets are used in the operation of the Practice at Cancer Center Sites and at other locations of Seller or for cardiology or general practice administration purposes ('Dual Use Assets'). Buyer will lease all Dual Use Assets to Seller at fair market value terms pursuant to a separate lease agreement between Seller and Buyer." ECF No. 323-13 at 6 ¶ 2.4. Despite this contractual requirement, Methodist never obtained a fair market

The methodology of Ms. Carter's opinion on this point is based on the contractual terms between the parties and the fundamental requirement for Methodist to have a separate sublease with West for dual use assets and obtain a fair market valuation. Methodist does not challenge that methodology, but simply argues that its informal reconciliation process was sufficient. Methodist's argument again is not a proper challenge to Ms. Carter's methodology and is instead an issue for the weight of her testimony at trial.

### 6. The Issue of West Not Becoming Employees of Methodist

Methodist challenges Ms. Carter's supposed opinion that West not becoming employees of Methodist "was outside the course of normal healthcare industry practices." ECF No. 325 at 24. Yet Ms. Carter did not offer that opinion. Her report simply states, "Where a hospital and physician practice integrate it often involves physicians becoming employees of the hospital." ECF No. 324-1 at 6. Thus, Methodist's argument on this issue is moot.

### 7. The Issue of West Not Investing in the Cancer Center

Finally, Methodist challenges Ms. Carter's supposed opinion that the PSA and MSA "are outside the course of normal industry healthcare practice because they do not require West to provide 'any financial investment' in the Cancer Center." ECF No. 325 at 24. But again, Ms. Carter did not offer that opinion. Her report simply states that the MSA and PSA did not require West to provide any financial investment to achieve the vision of the cancer center. ECF No. 324-1 at 6-7. In this section of her report, she lists numerous examples of Methodist not complying with the requirements of the contracts with West, including the following:

- Methodist failed to enter into a sublease with West for dual use assets as required by the Asset Purchase Agreement.

opinion regarding West's dual use assets. Nor did Methodist enter into a separate lease agreement with West regarding dual use assets.

- Methodist failed to obtain a fair market valuation for the dual use assets that were to be subleased by West.
- Methodist failed to amend the MSA to remove sites for which West did not provide management services.
- Methodist failed to amend the MSA or PSA to include additional locations where West provided services.
- Methodist failed to pay West in compliance with the central condition of the ECG valuation.
- Methodist failed to obtain fair market valuations for the amounts paid the Administrator and Medical Directors under the MSA.
- Methodist failed to obtain fair market valuations for employees leased from West to Methodist.
- Methodist failed to obtain a separate lease for employees leased by Methodist to West.
- Methodist failed to require West to keep any time records of management services.
- Methodist allowed West to set its own benchmarks for performance incentives under the MSA without any clinical input from Methodist.
- Methodist allowed West to approve payments Methodist made to West for performance incentives.

*Id*. at 6-7. None of these opinions is based on Methodist not requiring West to invest in the cancer center.

## V.    CONCLUSION

The United States respectfully submits that Methodist's Motion to exclude portions of Ms. Carter's proposed testimony should be denied in its entirety.

Respectfully submitted,

HENRY C. LEVENTIS
United States Attorney
Middle District of Tennessee

By:    s/ Ellen Bowden McIntyre
ELLEN BOWDEN MCINTYRE, BPR #023133
WYNN M. SHUFORD
Assistant United States Attorneys
United States Attorney's Office
719 Church Street, Suite 3300
Nashville, TN  37203
ellen.bowden2@usdoj.gov
wynn.shuford@usdoj.gov
*Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2023, a true and correct copy of the foregoing was served via email to the following:

| | |
|---|---|
| Bryan A. Vroon<br>Law Offices of Bryan A. Vroon, LLC<br>1380 West Paces Ferry Road, Suite 2270<br>Atlanta, GA  30327<br>Email:  bryanvroon@gmail.com | Edward D. Robertson, Jr.<br>Bartimus, Frickleton & Robertson<br>715 Swifts Highway<br>Jefferson City, MO  65109<br>Email: crobertson@bflawfirm.com |
| Jerry E. Martin<br>David Rivera<br>Seth Marcus Hyatt<br>Barrett Johnston Martin & Garrison, LLC<br>Bank of America Plaza<br>414 Union Street, Suite 900<br>Nashville, TN  37219<br>Email: jmartin@barrettjohnston.com<br>Email: shyatt@barrettjohnston.com | Robert Salcido<br>(Admitted *Pro Hac Vice*)<br>Akin Grump Strauss Hauer & Feld LLP<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Email: rsalcido@akingrump.com |
| Brian D. Roark<br>Anna M. Grizzle<br>J. Taylor Chenery<br>Taylor M. Sample<br>Hannah E. Webber<br>Bass, Berry & Sims PLC<br>150 Third Avenue South, Suite 2800<br>Nashville, TN 37201<br>Email: broark@bassberry.com<br>Email: agrizzle@bassberry.com<br>Email: tchenery@bassberry.com<br>Email: taylor.sample@bassberry.com<br>Email: hannah.webber@bassberry.com | Andrew F. Solinger, Esq.<br>HOLLAND & KNIGHT LLP<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>Email: Andrew.solinger@hklaw.com |
| John-David H. Thomas, Esq.<br>Barnes & Thornburg, LLP<br>827 19th Avenue, Suite 930<br>Nashville, TN 37203<br>Email: jd.thomas@btlaw.com | |

s/ Ellen Bowden McIntyre
ELLEN BOWDEN MCINTYRE
Assistant United States Attorney