# EXHIBIT 1

# UNITED STATES of AMERICA

## vs

# METHODIST LE BONHEUR HEALTHCARE, et al.

## 30(b)(6)

# MICHAEL PETRON

# January 18, 2023



Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

Page 9

1  A    For topic 2. And I see the same with respect to
2  topic 3.
3  Q    Okay. And what do you understand that you are
4  testifying about today?
5  A    I understand that my testimony centers on the
6  summary nature of which I put together certain pieces of
7  analysis related to this case.
8  Q    What have you summarized in connection with this
9  case?
10 A    Certain pieces of claims data.
11 Q    What claims data have you summarized?
12 A    I'll put it into two categories. West data and
13 Methodist data.
14 Q    And what is the summary that you have prepared?
15 What is it summarizing, if you know?
16 A    It's summarizing the data, so the data is
17 voluminous. I have taken that data and created summaries
18 of that data, and that's what it's done.
19 Q    Okay. And do you have any understanding as to
20 what those summaries purport to show or purport to be?
21 A    I mean, I do. I understand the methodology
22 behind which I created them, so yes.
23 Q    But what is it that has been summarized? I
24 understand that you have summarized some Medicare claims,
25 but what's the scope -- or what is it that you have been

Page 10

1  asked to do that you're testifying about today?
2  A    I have been asked to summarize, I think, two
3  sets of data that I've created three specific summaries
4  for. An outpatient summary, an inpatient summary related
5  to Methodist, bucket 1. And then what I would call a Part
6  B summary related to West.
7  Q    So three summaries, in total, an outpatient and
8  inpatient summary for Methodist, and then you also did a
9  summary of data for the West Clinic?
10 A    I did.
11 Q    Okay. And how did you know what it was that you
12 were supposed to summarize?
13 A    I was instructed by counsel.
14 Q    Counsel for the United States?
15 A    Correct.
16 Q    Is that Ms. Sweet?
17 A    Correct.
18 Q    Have you had conversations with other counsel
19 for the United States beyond Ms. Sweet? And I don't want
20 to you go into what those conversations may have been, but
21 what I'm asking is, have you had conversations with other
22 counsel for the United States beyond Ms. Sweet?
23 A    Related to this matter, right?
24 Q    Right.
25 A    I don't recall any. It doesn't mean -- it

Page 11

1  doesn't mean no. I just don't recall any.
2  Q    Sure. Have you had conversations with counsel
3  for Relators in this case?
4  A    Not that I recall.
5  Q    Did you -- for the three summaries that you
6  prepared, in what form did you -- do those summaries exist?
7  A    Form. Can you be more specific? What do you
8  mean by form?
9  Q    Sure. You noted that did you three different
10 summaries, correct?
11 A    Correct.
12 Q    So those summaries, are they -- is that an Excel
13 file? Is it a Word document report? Was there any report
14 prepared for the summaries that you conducted? And in what
15 form do they exist?
16 A    So the document that you have there, that I have
17 in my folder that was the output is an Excel file, but the
18 Excel file is, again, a summary of work that was done in
19 another program.
20 Q    And what program was it done in?
21 A    SAS, S-A-S.
22 Q    And what is SAS?
23 A    SAS is a statistical analytical software that I
24 use frequently.
25 Q    What is SAS used for?

Page 12

1  A    Tons and tons of things. I use it primarily for
2  data analysis. Statistics, sampling, some visualization
3  exercises.
4  Q    And you used SAS in connection with the work
5  that you did in this case?
6  A    Correct.
7  Q    How did you use SAS to prepare the summaries
8  that you did for this case?
9  A    SAS is a program that allows you to manipulate
10 and query data, so I used it as such.
11 Q    And what data did you manipulate and query in
12 connection with this case?
13 A    Those two buckets that I spoke about earlier,
14 the West data and the Methodist data.
15 Q    How did you come to have that data?
16 A    Counsel provided the data.
17 Q    That's Ms. Sweet?
18 A    Correct.
19 Q    In what format was that data provided?
20 A    I believe the original formats were multiple
21 Excel files.
22 Q    Okay. And what did those Excel files contain --
23 or did they contain Medicare claims data?
24 A    Correct.
25 Q    Was it Medicare claims data for Methodist and

Page 13

1 West?
2  A   Correct.
3  Q   Okay. You took the Medicare claims data
4 relating to Methodist and West that you received from
5 counsel for the government, and then put that into SAS,
6 S-A-S?
7  A   Correct.
8  Q   Is SAS software that anyone can have access to
9 and use?
10  A   If they pay SAS, they can, yes. I don't think
11 SAS would turn away your business, but it's not free ware.
12 So it's not something that you can just go online and use.
13  Q   It's software that can be obtained if you pay
14 for it?
15  A   Correct.
16  Q   And then for -- if someone has SAS, then is it
17 pretty straightforward, in terms of how to put in this data
18 and then query it and manipulate it?
19  A   I'm sorry, you'll have to be -- define pretty
20 straightforward for me. Because that's -- I mean, that's
21 in the eye of the beholder, right?
22  Q   Yeah, I'm not -- I'm not familiar with SAS. And
23 so I was just trying to get an understanding of, is it
24 something that any person can use, or is it something that
25 you need some specialized knowledge to know how to use SAS?

Page 14

1  A   You would need to understand how to use SAS to
2 use SAS.
3  Q   Okay.
4  A   And just to be clear, you couldn't -- if you,
5 for instance, Mr. Roark, don't know SAS, you could not sit
6 down today with no knowledge, no book, no information, and
7 it be present. You couldn't do that. It's not in the same
8 vein of a Microsoft Office product, where there are buttons
9 and things. It's a coding -- it's a coding exercise.
10  Q   And hypothetically, I may even struggle with the
11 Microsoft Office products, but that's neither here nor
12 there.
13  A   I'm not surprised to hear that.
14  Q   How is it that you know how to use SAS to query
15 or manipulate data?
16  A   I'll give you the short answer. I have an
17 undergraduate degree in economics, double major in
18 economics and statistics. I have one master's degree in
19 statistics. And I have used SAS since I entered
20 undergraduate school, so I've been using it for 25 years.
21  Q   Okay. What was the output that you have from
22 your use of SAS in this case?
23  A   That exhibit.
24  Q   Okay. Let me hand you what I've marked as
25 Exhibit 250.

Page 15

1        (Exhibit No. 250 was marked for identification.)
2        BY MR. ROARK:
3  Q   And, Mr. Petron, what is Exhibit 250?
4  A   Exhibit 250 is the summary of my analyses. And
5 I also want to be clear for the record, too, I speak in the
6 first person when I'm testifying, but I do have folks at my
7 company that assist me in doing this analysis. And they
8 did in this case as well.
9  Q   For the analysis that you did that's Exhibit
10 250, you're saying that this isn't something you did
11 completely by yourself?
12  A   Correct.
13  Q   Who assisted you in preparing Exhibit 250?
14  A   Two individuals, Tom Vitlo, V-I-T-L-O, and
15 Michael Woosley, W-O-O-S-L-E-Y.
16  Q   And who do you work for?
17  A   I work for a company named Stout, S-T-O-U-T.
18  Q   How long have you worked for Stout?
19  A   Since February 1st, 2014.
20  Q   What is your position with Stout?
21  A   I have two titles, two positions. I'm a
22 co-president of our disputes, claims, and investigations
23 practice, and I'm a managing director. So one of them is a
24 leadership role, and one of them is a client service role.
25  Q   Okay. And what is it that you -- what are the

Page 16

1 services that you perform on behalf of Stout -- for Stout
2 for clients?
3  A   I perform a variety of things related to either
4 accounting, finance, statistics, data. I would serve as a
5 summary witness, like I am today. I can serve as an expert
6 witness on a variety of topics. I help companies through
7 internal investigations. I can -- and have done
8 remediation plans, monitorships. Any sort of forensic
9 accounting, data analytics. It runs a breadth of different
10 things.
11  Q   And Mr. Vitlo and Mr. Woosley also work for
12 Stout?
13  A   Correct.
14  Q   And you referenced your background and training
15 that allows you to use SAS to query or manipulate data. Do
16 they have similar backgrounds and experience that allows
17 them to do that as well?
18  A   They do.
19  Q   What did Mr. Vitlo and Mr. Woosley do, in
20 particular, in terms of preparing Exhibit 250?
21  A   Well, I know they were responsible for uploading
22 the data into SAS. They would have been, under my
23 direction, creating the analysis, so I would say the
24 day-to-day coding of the analysis.
25        I would then review the analysis and the output,

Page 17

1 and you know, it's an iterative process. And so there
2 would be some back and forth there. I don't remember
3 precisely who took the information from SAS and created
4 these documents, but I was definitely involved in the
5 creation of the documents.
6    Q    You supervised the work that Mr. Vitlo and
7 Mr. Woosley did?
8    A    I did.
9    Q    When you say that they would have handled the
10 day-to-day coding, what coding would go have been involved
11 in preparing this analysis?
12    A    All of the coding, right?  So it's not -- again,
13 SAS is not an Office product, so you don't point and click.
14 You type a code.  So in order to do anything with the data,
15 you have to type code.  And so they would be primarily in
16 the day-to-day operations of typing that code to the
17 specifications that we need.
18    Q    And is that an example of what you said, to be
19 able to use SAS, you have to have knowledge and experience
20 to how to use the product, which would include knowing how
21 to -- what codes to enter?
22    A    Right.  SAS -- SAS is our -- is our way to
23 efficiently handle lots of data.  I'm assuming you'll
24 eventually pull up the Excel files.  You could get to the
25 same answers using the Excel files, and pointing and

Page 18

1 clicking and sorting and filtering.  That, to me, is not
2 the most efficient way to do it.  So SAS is just our way in
3 which to analyze the data.  One of numerous ways.  There
4 are many, many, many different types of software that you
5 can use.
6    Q    Okay.  And what specifically would have been
7 coded to develop the analysis that is -- we see in Exhibit
8 250?
9    A    I'm sorry, can you be a little -- can you ask
10 that a different way?
11    Q    Could you explain in more detail what Mr. Vitlo
12 and Mr. Woosley would have done to create the analysis
13 that's Exhibit 250?
14    A    So I guess the steps of the process are, we get
15 the data in Microsoft Excel version.  There is a process of
16 importing that data into SAS.  There is a process of
17 analyzing that data in SAS.  And then a third process of
18 getting the output from SAS.  So each of those three
19 things, I would say major steps, there are substeps.  You
20 know, there are subtasks that have to be done.
21    Q    All right.  Was there -- would there have been a
22 query -- what would have caused the particular output to
23 emerge for the analysis that was done here?
24    A    They -- so step 2 is what we're talking about,
25 right?  There would be a variety of coded language that

Page 19

1 gets to this ultimate answer.  And so we try to describe
2 what that coding looks like to a non-coder in the footnotes
3 in the sources of the exhibits.
4    Q    All right.  And that's -- what's listed as the
5 notes and sources of Exhibit 250?
6    A    Correct.
7    Q    All right.  And is Exhibit 250 -- I think it's a
8 six-page document.  Is this the report or output that you
9 prepared for this case?
10    A    This is what was prepared for this case, yes.
11    Q    Okay.  For purposes of your testifying here
12 today as the 30(b)(6) witness, is there any other report or
13 summary that you prepared that you'll be relying on beyond
14 Exhibit 250?
15    A    No.
16    Q    And you talked about earlier that government
17 counsel provided Microsoft Excel claims files to you for
18 purposes of the analysis, correct?
19    A    Correct.
20    Q    And I want to understand whether there is --
21 what other information from any other sources you may have
22 used in conducting the analysis.  Was it necessary for you
23 to rely on other sources, beyond the claims information
24 that the government provided?
25    A    No.

Page 20

1    Q    All right.  And just to establish for the
2 record, have you spoken with anyone from West or Methodist
3 in preparing this analysis?
4    A    I have not.
5    Q    Have you or Mr. Vitlo or Mr. Woosley ever worked
6 for Methodist or West Clinic?
7    A    Not that I know of.
8    Q    Were you involved in the underlying submission
9 of any of the claims that are summarized in Exhibit 250?
10    A    You -- to clarify, the underlying submission,
11 meaning the medical -- the act of the provider submitting
12 to Medicare the claim in the first instance?
13    Q    Correct.
14    A    No, I was not.  At least not that I recall.
15    Q    You talked about that you've worked for Stout
16 since 2014.  And that -- have you worked -- whether it was
17 for Stout or not, have you generally worked in the same
18 industry since you've completed your education?
19    A    I have.
20    Q    Have you ever worked for a Medicare
21 administrative contractor?
22    A    I have not.
23    Q    Were you involved in the government's processing
24 of any of the claims that are summarized in Exhibit 250?
25    A    No.

1  I didn't create any report. This is the extent of what we
2  created.
3    Q   And you're saying this is not a report? I may
4  be getting hung up on the words.
5    A   When I hear the -- well, when I hear -- when I'm
6  sitting in a deposition, and I hear the word "report," I
7  think of a Rule 26 disclosure. So I would not consider
8  this a Rule 26 disclosure.
9    Q   Okay. What word would you use to refer to
10 Exhibit 250, then?
11   A   I would refer to it, in the legal parlance, as a
12 1006 exhibit.
13   Q   You would refer to it as a summary?
14   A   Yes.
15   Q   So would it be fair to say that the summary
16 includes all paid claims from 2012 through 2018, where one
17 of the 86 physicians is listed as the attending physician?
18   A   I would -- for the first page of 250, for
19 outpatient coded claims, I would agree with that, with the
20 small caveat that I know that only 80 of the 86 are in
21 there.
22   Q   Okay.
23   A   So whether or not the six that are not, there
24 are claims that I don't know about, I can't speak to that.
25 I can only speak to the information I have.

1    Q   Okay. Are you being compensated for the -- your
2  testimony here today?
3    A   I am.
4    Q   And are you being compensated for the work that
5  you have done on this matter?
6    A   Yes.
7    Q   And you referenced earlier reviewing -- that you
8  may have reviewed interrogatory answers in this lawsuit.
9  What did you do to prepare for your deposition today?
10   A   I reviewed some interrogatory responses. I
11 reviewed our work. I had a discussion with counsel. And
12 I've had a few discussions with the two individuals that
13 are on my staff.
14   Q   Okay. When you say that you reviewed your work,
15 would that have entailed reviewing anything beyond Exhibit
16 250?
17   A   I reviewed the code again.
18   Q   Where did you go to review the code?
19   A   In the computer, like, you know, where this
20 document is for me, so in a file structure, all that stuff.
21   Q   And is that something that you would have pulled
22 up through SAS?
23   A   Correct.
24   Q   Okay. So you reviewed not just the report
25 itself, but the underlying work that went into preparing

1  the report?
2    A   Right. I reviewed the data. I reviewed the
3  code. The output. So again, think about the three steps,
4  right? I reviewed those three steps. I had discussions
5  with counsel. I think I looked at the -- I think I looked
6  at the original complaint, too.
7    Q   Okay. Anything beyond that?
8    A   Not that I recall.
9    Q   And you said that you reviewed the interrogatory
10 answers. Did you assist in preparing any of the
11 interrogatory answers?
12   A   Not that I recall. I mean, I believe this
13 information was put into an interrogatory.
14   Q   Okay.
15   A   So I guess the answer to the question is yes.
16   Q   Okay.
17   A   But it's not like I was narrative in writing
18 interrogatories.
19   Q   Now, you're aware that the information -- the
20 numbers that you provided in Exhibit 250 then went into the
21 government's interrogatory answers in this case?
22   A   That's my understanding.
23   Q   Exhibit 250 is called summary of damages. Did
24 you do anything to conclude or make any kind of
25 determination about whether a particular claim would

1  constitute False Claims Act damages or not, or did you just
2  calculate the dollar values of claims according to the
3  parameters that you had set forth earlier?
4        MS. SWEET: Objection. Are you asking him
5  whether he made a legal conclusion about the False Claims
6  Act damages in this case?
7        MR. ROARK: His report is called summary of
8  damages.
9        BY MR. ROARK:
10   Q   And I'm just trying to understand why,
11 Mr. Petron, you called it summary of damages. From what
12 you testified, it sounded like that you did a summary of
13 claims. And I just want to make sure I understand what
14 determinations you made in connection with this case.
15       MS. SWEET: If -- I mean, if you can answer the
16 question without providing a legal conclusion or giving
17 advice of counsel, I think we are pretty clear, he has
18 looked at the claims data and this report is a summary of
19 the claims data. He is not testifying on causation. He is
20 not testifying on any of the legal elements for False
21 Claims Act violations. And it says it was prepared at the
22 direction of counsel. So I think you know the answer to
23 your question. If you want to rephrase it in a little
24 different way, that would -- may be helpful.
25       BY MR. ROARK:

Page 33

1  Q   I don't know if I can rephrase it. It's that
2  your report is called summary of damages. And my question
3  is, did you do anything, beyond totaling claims, to reach
4  any kind of conclusions about whether amounts would be
5  damages or not in this case?
6       MS. SWEET: Objection to form.
7       THE WITNESS: Again, what is or is not a damage
8  pursuant to some liability theory is a legal conclusion
9  that I did not draw.
10      BY MR. ROARK:
11  Q   Okay.
12  A   I would say it's -- I had to take a few extra
13 steps with respect to the West data to get to the analysis
14 that I've presented here. Again, whether or not that's
15 damages or not, that's not -- that's not my realm. I
16 understand the distinction. I have served as a damages
17 expert, but I am merely presenting facts.
18  Q   You're presenting summary totals of claims that
19 you calculated according to certain parameters?
20  A   Correct.
21  Q   All right. And I touched on this before, but
22 let me ask this one more time, just to make sure I
23 understand your answer. Beyond the government providing
24 you with the names of the 86 West physicians, were you
25 provided with any other information relating to those

Page 34

1  physicians?
2  A   The claims data.
3  Q   Okay. And anything beyond the claims data?
4  A   Not that I recall.
5  Q   I mean, information relating to what particular
6  type of doctor that the particular physician may have been?
7  A   I believe some of that's in the claims data.
8  And I obviously had some under -- general understanding of
9  it from reviewing the complaint. But I think the spirit of
10 your question is, no, I did not -- I don't have any other
11 independent research or any other information.
12  Q   Right. Or did it factor into how you did the
13 analysis, how the doctors were compensated by West, or what
14 services the doctors had performed or not?
15      MS. SWEET: Objection, asked and answered. And
16 the first part, objection to form.
17      THE WITNESS: No.
18      BY MR. ROARK:
19  Q   Okay. If you go back to Exhibit 249. Under --
20 on page 3, topic number 2. On topic number 2, if you go
21 down to the second part of the third line, I do understand
22 that today you're testifying about the date and amount of
23 any payment made to Defendants for the submitted claim. Do
24 you see that?
25  A   Correct. I see that, yes.

Page 35

1  Q   Okay. And is that consistent with your
2  understanding, that you are testifying today about the date
3  and amount of payments made to Defendants for the submitted
4  claims?
5  A   I am. I think the nuance I draw in my mind is
6  the words before that, right, that you assert a false --
7  Q   Right.
8  A   I'm not asserting anything.
9  Q   Okay.
10  A   So whether one of these parties is asserting it,
11 that's for -- not for me.
12  Q   Okay.
13  A   But I am obviously talking about the date, the
14 amount, and the payments made to the Defendants for
15 submitted claims, for sure.
16  Q   Okay. And then the next clause, the factual
17 basis and methodology by which you assert any claim to be
18 false, you're not testifying about that, correct?
19  A   Not to the extent that it falls outside of the
20 parameters that I've discussed.
21  Q   You're not getting into whether payments that
22 Methodist made to West, whether that resulted in the
23 submission of false claims or not?
24  A   I don't believe that's a question for me, no.
25      MS. SWEET: Brian, I can state for the record,

Page 36

1  he is not going to be talking about causation. That is a
2  question of law, and he is not here to talk about
3  causation. He is not here to talk about legal conclusions.
4       He is here to speak about the facts underlying
5  the claims data that was submitted. That's it. It's a
6  very narrow topic. He's -- I think the law is clear on the
7  measure of damages in a kickback case as tainted claims.
8  These are the tainted claims that the United States is
9  alleging. He is not talking about legal conclusions about
10 causation, or anything else having to do with that.
11      MR. ROARK: Okay. I'm still going to need to
12 ask him questions about -- so that we have it on the record
13 from him, on what he is testifying about.
14      MS. SWEET: Sure.
15      BY MR. ROARK:
16  Q   Mr. Petron, the next clause is, the persons who
17 are responsible for paying such claims. I take it, you're
18 not offering testimony about who the underlying persons
19 were who processed the claims at issue here?
20      MS. SWEET: Are you asking him who at Medicare
21 processed each and every one of these thousands and
22 thousands of claims, or are you asking if it was just
23 Medicare?
24      BY MR. ROARK:
25  Q   I'm asking if -- I'm trying to understand what

Case 3:17-cv-00902 Document 395-1 Filed 06/02/22 Page 7 of 15 PageID #: 12768
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com                33..36

Page 45

1  Q   As part of the summary that you prepared, this
2  is the main source data that you relied on, correct?
3  A   Correct.
4  Q   Do you have -- as part of preparing your
5  summary, do you have any understanding as to how this data
6  was collected in the form where it could be provided to
7  you?
8  A   I do, yes.
9  Q   And what's your understanding in that regard?
10 A   So the -- I'll just speak about this document,
11 because I think different pieces of it get created by
12 different people.
13     So my understanding of the process is, the
14 government, the investigating agency, whether that be an
15 OIG somewhere, DOJ itself, some other stakeholder can put
16 in what's called an RFI, a Request for Information.  That
17 Request for Information, which is identified there in row
18 five, RFI-210816-00008, would be a request to, in this
19 particular instance, SGS, SafeGuard Services, to produce
20 data pursuant to whatever parameters that request outlined.
21 In this -- so you just stop me whenever you want me to
22 stop, so -- because I'll just -- I'll just keep talking.
23 Q   Let's stop on -- it says -- at the bottom, it
24 says that this is prepared by SGS data analyst DP.  What is
25 SGS?

Page 46

1  A   It is a contractor.
2  Q   And what does SGS stand for?
3  A   SafeGuard Services.
4  Q   How is it that you know that?
5  A   Years of working.
6  Q   Okay.  What does SafeGuard Services do?
7  A   SafeGuard Services -- I believe SafeGuard -- is
8  it a MAC or a PSC.  I forget.  I think SafeGuard is a ZPIC
9  or a PSC, so they have a function -- I'm sure that a person
10 from Medicare would say I have this all wrong.  But my
11 general understanding of this is that SafeGuard Services
12 plays the role of, in general, sort of fraud prevention and
13 detection and investigation.
14     They are divided into zones across the country.
15 And so they are responsible for assisting law enforcement
16 and other stakeholder agencies in doing their sort of main
17 functions post -- not always post adjudication, but in
18 their main sort of fraud, waste, and abuse work.
19 Q   So SGS is a government contractor?
20 A   It is.
21 Q   Is it your understanding that SGS pulled the CMS
22 claims files that we're looking at in Exhibit 253?
23 A   That's my understanding.
24 Q   It says at the bottom, prepared by SGS data
25 analyst DP.  Do you know what data analyst DP is referring

Page 47

1  to?
2  A   I believe it's referring to an individual.
3  Q   Do you know who that individual is?
4  A   I do not.
5  Q   But you think DP is the initials of the actual
6  person who pulled the data?
7  A   Correct.
8  Q   Did you -- in connection with the summary that
9  you have prepared here, did you speak with anyone at SGS as
10 to how they pulled the data?
11 A   I did not.
12 Q   I take it, you didn't supervise the creation of
13 the CMS claims files?
14 A   I did not.
15 Q   Did you, Mr. Petron, take any steps to verify
16 whether SGS pulled the data correctly?
17 A   I did not.
18 Q   Do you know, one way or the other, whether SGS
19 pulled the data correctly?
20 A   I haven't audited their process, so I can't say
21 that I know with certainly, one way or the other.
22 Q   And you noted we looked at -- you referred to
23 row 5 that refers to the RFI, Request for Information?
24 A   Yes.
25 Q   Over on the left-hand side, what's WMM or UCM?

Page 48

1  A   To be honest, I do not -- not that I'm never not
2  honest, but I forget what those acronyms stand for.  I can
3  tell you what I think they mean, though, which is the first
4  number, I believe, is the internal SGS tracking code.  And
5  then the second number is their version to track the RFI.
6  So you'll see that first at WMM number, I believe that's
7  the number that's then on the electronic files themselves,
8  so I think it's an internal SGS mechanism to -- for their
9  work streams.
10 Q   And is the way that you know that from your
11 experience having worked with data like this before?
12 A   Exactly.
13 Q   At the top, under source statement, it says,
14 claim records included in this extract are those that were
15 made available to us by CMS OnePI Portal All Claims
16 Universe.  Where it says, made available to us, do you know
17 who the "us" is?
18 A   I assume the "us" refers to SGS.
19 Q   And I guess, if it's not an assumption, do you
20 know, one way or the other, who the "us" is here?
21 A   I guess, technically, I don't know.  It's my
22 belief that the "us" is SGS, because I have some
23 understanding of what the CMS OnePI Portal is.  But it's an
24 assumption.
25 Q   What is the CMS OnePI Portal?

Page 49

1  A    It is the mechanism by which SGS and others
2 accesses the Medicare claims data.
3  Q    And what do you mean when you say a mechanism by
4 which they access it?
5  A    I used that word particularly. It's a very --
6 it's a complicated process, but -- how much time do you
7 want to spend on this? It's the way that -- it's the way
8 that people can access the Medicare claims data.
9  Q    When you say people, I mean, is it something --
10 could I access the Medicare claims data through the CMS
11 OnePI Portal?
12  A    Theoretically, given, you know, permissions,
13 right, if you had a reason to have permission to that
14 portal, then, yes, you could. You, as a private citizen,
15 with no access, you could not.
16  Q    Is it another specialized kind of software, like
17 the SAS software you mentioned before?
18  A    No. Well, this is where it gets complicated.
19 The portal is -- OnePI is a front-end interface that I
20 actually believe it sits on SAS, to be all things, but this
21 is why it gets super complicated.
22  Q    Well, let me ask -- I think I'm following that
23 it's -- it would be complicated to explain in very much
24 detail.
25       MS. SWEET: How about let's ask him -- I'm okay

Page 50

1 with you asking him if he has ever personally accessed the
2 OnePI All Claims Universe in connection with the Methodist
3 case, personally. If he hasn't, then let's move on.
4       BY MR. ROARK:
5  Q    Did you -- and I think you've covered -- you
6 were not involved in pulling or supervising the pull of the
7 CMS data files. Is that right?
8  A    That's right.
9  Q    Okay. But you did use and rely on these data
10 files in preparing your summary, right?
11  A    I did.
12  Q    So let me ask, then, for the CMS OnePI Portal,
13 for that data that you used, what claims are included in
14 it?
15       MS. SWEET: You mean --
16       MR. ROARK: And, Kara, let me -- I'm going to
17 stop you. I think that's a -- unless you want to object to
18 the question, I think it's a fair question to ask him.
19       BY MR. ROARK:
20  Q    What claims are included in the OnePI Portal?
21  A    So what claims are included in Exhibit 253 or
22 what claims are in the portal?
23  Q    What claims are in the portal? If the
24 information for Exhibit 253 was being taken out of the
25 portal, I'm trying to get an understanding of, does it

Page 51

1 include all claims or is it some subset of claims?
2  A    So the portal, as the name implies, is a --
3 let's just call it -- it's a pipe, okay? And the pipe
4 accesses the data. And the data that the pipe can get at
5 is all claims, I believe -- and when I say all claims, I
6 mean, let's just stick to what's at issue here, which is
7 Part A and Part B.
8       It is all inpatient, outpatient Part A and Part
9 B, to my understanding. And I believe it dates back to
10 2006, but I could be mistaken. They are constantly --
11 there is archival processes. I forget exactly what you can
12 is get at with respect to the timing of when a claim is in
13 there, but it's everything.
14  Q    For Exhibit 253 that was prepared by SGS, what
15 is the date that this data was prepared?
16  A    You know, it's not on here, but I believe it
17 is -- so looking at Exhibit 251, if I'm looking at my
18 version of -- call it Exhibit 251, I believe the date
19 modified is the date of the pull of the data. I don't
20 recall when that is, but I -- my memory is, it's back in
21 2021.
22  Q    Okay.
23  A    2021 sometime.
24  Q    Okay. But it's not listed on Exhibit 253
25 itself?

Page 52

1  A    I don't see it, and that actually somewhat
2 surprises me.
3  Q    Where it says -- under the source statement, it
4 says, it is important to note that the database is
5 periodically updated to reflect activity over time. What
6 do you understand that to mean?
7  A    What the words mean together, which is the
8 database, i.e. the Medicare claims data, is updated.
9  Q    It can continue to change as claims are paid or
10 adjusted?
11  A    Or submitted, right. I mean, so the database is
12 -- it's not a production database, as in it's where the
13 adjudication process is happening. But it is a repository
14 that is updated, based upon that adjudication process.
15  Q    It refers to -- the source statement refers to
16 the time frame, the billing provider NPI, the billing
17 provider name, the attending provider NPI, the attending
18 provider name. Do you know what query SGS used to pull
19 back this data?
20  A    I have not, with my own eyes, seen their OnePI
21 query, but I have a very good understanding, based upon my
22 own work of what they did to get this data, yes.
23  Q    You've got a good understanding of what query
24 they would have used?
25  A    Yes.

Case 3:17-cv-00902 Document 395-1 Filed 06/02/22 Page 9 of 15 PageID #: 12770
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com    49..52

Page 53

1  Q   And what query would they have used?
2  A   They would have used a query with this criteria.
3  Q   Okay. It lists that they queried for 66
4  attending providers. Do you see that?
5  A   I just noticed something. Can I pause that
6  question? I know you want me to answer the questions, but
7  just while it's fresh in my mind. I think the data was
8  pulled on August 13th, 2021.
9  Q   Okay. Where is that?
10  A   So if you look at row 8 in the time frame, you
11  see dates of service, or DOS, right, which is 1-11 to 2012,
12  and then paid dates. So it's my understanding that the
13  general practice in such a request as this would be to get
14  the paid dates all the way through to the most recent paid
15  date that you could. And so that's that date.
16       And if we looked at all of these documents,
17  these source statements from the other files, if they all
18  said August 13th, 2021, I would feel very comfortable
19  saying that's the day it was pulled.
20  Q   Okay. Thank you. To go back to my previous
21  question, you said that you think you're familiar with what
22  query SGS would have used. And then I asked, this refers
23  to the query being limited to 66 attending providers. Do
24  you see that?
25  A   I do.

Page 54

1  Q   You referenced -- your summary references that
2  you used 86 providers. Did you use 20 additional providers
3  beyond what SGS used in its query?
4  A   All right. You'll correct me. I'm going to
5  answer what I think you're asking, okay? So I didn't query
6  the data. So when you say, I used something, I didn't use
7  the list of 86, which is the last three pages of Exhibit
8  250, to do anything. So that wasn't my role.
9       Part of the reason I included that list was, is
10  I went through these files. I believe some of these files,
11  it doesn't even say 66 attending. It says, list of
12  attending or list of NPIs. It's very ambiguous. Let's say
13  that. And so I wanted to make sure I had the list, so that
14  I could compare, and make sure I understood what was
15  happening. I don't -- I'll tell you what I believe and
16  what I know. They're different things, I guess.
17       What I believe is, that SGS was given a list of,
18  I think, 90 providers. When they queried this time period,
19  we're talking about an expansive time period, right, 10
20  years, right? That for this time period, 2011 through
21  2012, the query that was run against the 90 NPIs only
22  resulted with of 66 NPIs during the time period.
23       So when they say the attending provider NPI, 66
24  attending providers, I don't believe there was ever a list
25  of 66. I believe that's a function of the output of the

Page 55

1  list of 90 and what was available. But I don't know that,
2  because I haven't gone in and actually looked at their
3  query. I don't have the ability to do that.
4  Q   Okay. What's the difference, then, in where
5  your Exhibit 250 refers to 86, but the CMS claims file
6  refers to 66? What's the reason for the difference in the
7  two numbers?
8  A   I will speculate. I mean, I already did
9  speculate. It's that in this time period, all of them
10  weren't billing as attending physicians at Methodist.
11  We're talking about the list of 90 NPIs the government
12  provided to me, it is, in my mind -- again, I'm in the
13  realm of speculation -- I highly doubt that West had 90
14  doctors from January 1st, 2011 through December 31st, 2021.
15  The same 90. It never changed. That's not the way this
16  works. So my speculation is that during this time period,
17  '11 to '12, the data only had 66 of the 90.
18      MS. SWEET: When you get to a good point, I
19  actually need a break.
20      BY MR. ROARK:
21  Q   Let me ask a couple more questions. And if this
22  is going to be a longer answer, just tell me and we'll
23  stop. I'm not following that even though the CMS -- the
24  CMS claims file is a broader time period than the shorter
25  time period in your report, correct?

Page 56

1  A   Are you saying the produced documents, or are
2  you saying the data that the data was -- are you saying --
3  the OnePI Portal has access to a broader set of data, or
4  are you saying the data sets contain a longer time period
5  than what I documented?
6  Q   I think I'm following. So you're explaining
7  that Exhibit 253 is limited to 2011 to 2012. And that over
8  that period of time, there may have only been 66 attending
9  providers, correct?
10  A   I am speculating that the result of the query
11  where there was a query of 90 NPIs in the attending
12  physician field only returned 66 NPIs. I could be wrong
13  about that. The government could have provided SGS and
14  said, we, the government, know that between 2011 and 2012,
15  these 66 are there. That is unclear to me. And I'm
16  speculating about what the result, and how that happened.
17      MR. ROARK: Okay. Let's stop here and take a
18  break.
19      VIDEO OPERATOR: Off the record at 10:37. This
20  is the end of media unit number 1.
21      (Recess.)
22      VIDEO OPERATOR: On the record at 10:54. This
23  is the beginning of media unit 2 in the testimony of
24  Michael Petron.
25      BY MR. ROARK:

Case 3:17-cv-00902 Document 395-1 Filed 06/02/23 Page 10 of 15 PageID #: 12771
Elite-Brentwood Reporting Services (615) 595-0073    53..56
www.EliteReportingServices.com

Page 89

1  Q   Right, I understand that there is numerous
2  things that could be pulled from the data. And what my
3  question is, is one of the things that you have pulled to
4  date, not in the future, in terms of something you could
5  do, but is something that you have pulled to date, the
6  number of claims at issue here?
7  **A   I don't believe I pulled it in any way.**
8  Q   Do you know if SGS did anything in its analysis
9  as it built its query to make sure that the same claim
10 wasn't repeated multiple times?
11 **A   It's my understanding that they took all final**
12 **action claims, so that that would not be an issue.**
13 Q   Okay. But do you know specifically what QC or
14 not that SGS would have done on the claims files it pulled
15 together?
16 **A   I have not spoken with anybody at SGS or audited**
17 **their process about what they do.**
18 Q   For the physicians -- for the West physicians
19 that you included in your analysis, is it correct that your
20 analysis would have included any claims associated with
21 that physician for the entirety of 2012 until 2018?
22 **A   I believe so, as long as it was billed pursuant**
23 **to the West billing NPI, right? Yes, billing provider NPI.**
24 **If a West physician were to bill under a different NPI,**
25 **that data would not be here.**

Page 90

1  Q   Got it. And as you talked about before, it
2  would not have included claims prior to 2012, correct?
3  **A   Well, I have the data prior to 2012, but I did**
4  **not include it in my summary.**
5  Q   And that's what I'm asking. Your summary does
6  not include data prior to 2012 or subsequent to 2018?
7  **A   It does not.**
8  Q   For the West physicians that you included, did
9  you limit it further, based on the date that the doctor
10 worked for West?
11 **A   If the doctor did not work for West, then they**
12 **shouldn't be in this data set.**
13 Q   What about the Methodist data set?
14 **A   The Methodist data set. They would be in there.**
15 Q   Okay.
16 **A   In that relevant time period, yes.**
17 Q   Right. So if there was a physician who was in
18 the Memphis market and was performing services or referring
19 claims to Methodist, prior to the time that they went to
20 work for West, those numbers would have been included in
21 your analysis, correct?
22 **A   I guess it depends upon the facts and**
23 **circumstances of when that happened versus what I did.**
24 **There is -- as I understand the way that SGS pulled the**
25 **data, I'm not aware of them pulling it with a further**

Page 91

1  restriction on any dates.
2  Q   And you just relied on what SGS pulled, and you
3  did not further restrict it by dates, right?
4  **A   Correct. I did not. Yeah, I relied upon them,**
5  **and I did not further restrict it by dates.**
6  Q   But SGS did pull data going back to 2011, and
7  you didn't use that data, right?
8  **A   I did not use any claims from 2011.**
9  Q   Right.
10 **A   It's semantical. I had to use that data,**
11 **though, because it was in the combined data set with 2012.**
12 Q   And SGS's claims files also included claims for
13 services performed after 2018, correct, and you called
14 those out?
15 **A   I did.**
16 Q   But if there was a doctor who didn't start
17 working for West until 2014, but they were in the Memphis
18 market, they were referring claims to Methodist in 2012 and
19 2013, that doctor's claims would be captured in the totals
20 that you did, correct?
21 **A   That is theoretically possible. I don't know**
22 **that for a fact, but that is -- the way I understand the**
23 **data was pulled, that is possible.**
24 Q   Did the government provide to you the dates in
25 which the specific physicians worked for West?

Page 92

1  **A   No.**
2  Q   So would it impact your analysis if several --
3  if approximately 50 of the West physicians included in the
4  86 didn't start working for West until after January 2012?
5        MS. SWEET: Objection.
6        **THE WITNESS: I don't know.**
7        BY MR. ROARK:
8  Q   You don't know if it would impact your analysis
9  or not?
10 **A   No. You would have to give me the data, and I'd**
11 **have to see. I don't know.**
12 Q   Okay. Let me hand you what's been marked as
13 Exhibit 255.
14      (Exhibit No. 255 was marked for identification.)
15      BY MR. ROARK:
16 Q   Which is Bates numbered GOV00356 through GOV477.
17 **A   No, 405.**
18 Q   You're saying the last page is 405?
19 **A   I think you said something like 477 or**
20 **something.**
21      MS. SWEET: 455 is my last page. What is your
22 last page?
23      **THE WITNESS: 405.**
24      MS. SWEET: Do you want to take a look at this?
25      **THE WITNESS: I guess that's why we do that.**

Page 93

1  MS. BERGMAN: They're in groups of two.
2  THE WITNESS: 45, 46 -- 455.
3  MS. SWEET: I double side my stuff, for the
4  record.
5  THE WITNESS: Okay. I know I did 77 as well.
6  MR. ROARK: Let us get Kara a copy also.
7  MS. SWEET: You handed me back the one. I had
8  406 to 455 in that.
9  THE WITNESS: This is good. I'm going to keep
10 this.
11 MS. SWEET: I just need a full set. It's okay.
12 THE WITNESS: Yeah, we're good.
13 BY MR. ROARK:
14 Q    All right. So you've got Exhibit 255. It's a
15 longer document, but have you seen a document like this
16 before?
17 A    No.
18 Q    It is titled, enrollment record data report. Do
19 you see that, at the top of the first page?
20 A    I do.
21 Q    All right. It's a 122-page document, so it's a
22 long document. When a physician joined West Clinic, what
23 would it be necessary to do for that physician to be able
24 to -- for West to be able to bill Medicare for services
25 provided by that physician?

Page 94

1  A    I'm not an expert in the enrollment process.
2  Q    The data that you queried was for data that was
3  billed under the West Clinic NPI, is that right?
4  A    Again, not me, but SGS.
5  Q    Okay. Thank you. The data that SGS queried was
6  under the West Clinic NPI, is that right?
7  A    Correct.
8  Q    And it's the NPI that's listed as 1447276605?
9  A    Correct.
10 Q    All right. And I want to refer to -- if you
11 turn to the page that's Bates numbered 397. At the bottom
12 of page 397, do you see the reference to Dr. Nilesh Dubal.
13 It's N-I-L-E-S-H, D-U-B-A-L?
14 A    I do.
15 Q    And it refers to -- it says, received
16 reassignment effective date, April 19th, 2014. Do you see
17 that?
18 A    I do.
19 Q    Do you know, one way or the other, when
20 Dr. Dubal assigned his Medicare billing to West Clinic?
21 A    I do not.
22 Q    I'm going to represent to you that it was on or
23 about April 19th, 2014. What I'd like to look at, then,
24 is, Mr. Petron, was -- were claims for Dr. Dubal excluded
25 from your analysis prior to April 19th, 2014?

Page 95

1  A    I don't know, one way -- there was no further
2  exclusion than what we've already talked about. I don't
3  know that there are claims in there.
4  Q    Right.
5  A    But I did not take any steps, nor does it appear
6  to me that SGS took any steps to cabin off particular NPIs.
7  Q    SGS didn't limit the data they pulled by the
8  date that the physician worked for West?
9  A    I don't believe so. But again, that's -- I've
10 not gotten behind their process and seen their queries.
11 Q    And I would represent to you that from having
12 reviewed Exhibit 254, I would represent that it does
13 include claims for Dr. Dubal prior to April 2014, but is
14 that something that you could -- if you go through Exhibit
15 254, that you could look up and see?
16 A    I'm sorry, just --
17 MS. SWEET: Objection. What are you asking? I
18 don't think -- your representation is for the record.
19 Notwithstanding, we don't have any information in the
20 record, that I'm aware of, that talks about when Dubal
21 Nilesh -- where he was assigned before April 19th, 2014.
22 This is a reassignment. And there is a practice location
23 that's a different date. You haven't established anything,
24 I think, that would allow him to even give any testimony.
25 If you want him to pull up the data, and take a

Page 96

1  look to see if he shows up there, we can -- anybody can do
2  that, if that's how you want to use this deposition.
3  BY MR. ROARK:
4  Q    That's what I'd like, Mr. Petron, for you to do.
5  THE WITNESS: Pages?
6  MS. SWEET: 397.
7  BY MR. ROARK:
8  Q    My question is whether your analysis includes
9  claims from Dr. Dubal prior to April of 2014?
10 A    Okay. And what data set do you want me to look
11 up?
12 MS. BERGMAN: Look in the 2013 to '14. It
13 should also be open. It should be the middle one.
14 MS. SWEET: In the West data?
15 MS. BERGMAN: In the Methodist data.
16 MS. SWEET: Okay.
17 THE WITNESS: This --
18 MS. BERGMAN: That should be '13 to '14.
19 BY MR. ROARK:
20 Q    Mr. Petron, this is the CMS claims file for
21 Methodist Healthcare data, 2013 to 2014. I'll mark it as
22 Exhibit 256, an electronic copy of it.
23 (Exhibit No. 256 was marked for identification.)
24 THE WITNESS: Do you know if this 144 number is
25 his NPI?

Case 3:17-cv-00902 Document 395-1 Filed 06/02/23 Page 12 of 15 PageID #: 12773
Elite-Brentwood Reporting Services (615) 595-0073   93..96
www.EliteReportingServices.com

Page 101

1 Q So as part of the review that you did, did you
2 look at whether a particular claim resulted from any
3 alleged kickback or not?
4 A Again, I feel like we're into, like, legal
5 argument about what did or did not happen with respect to a
6 kickback, so I didn't perform any legal analysis. I mean,
7 am I answering --
8 Q I'm not asking for legal analysis. I'm just
9 trying to understand what you did. Did you look at whether
10 any of these claims -- did you attempt to connect that, or
11 tie any of these claims to alleged improper payments that
12 the government alleges Methodist was paying to West?
13 A I think that they all are. So maybe we're
14 talking past each other.
15 Q When you say that they all are, what do you mean
16 by that?
17 A Again, I'm not the lawyer, and I'm not making
18 legal conclusions. It's my understanding that their
19 relationship is what violates the law. And so all of the
20 claims are a result of the relationship. So therefore,
21 that's the -- so they are all connected. There is no --
22 there is no claim that is not connected, because but for
23 the illegal relationship -- you know, again, I don't want
24 to get into legal things. That's not my --
25 Q So how are you saying that any of these claims

Page 102

1 are as a result of the relationship?
2 MS. SWEET: Right. He's not. He's not
3 testifying on that. We've objected.
4 MR. ROARK: Kara, you're now testifying.
5 MS. SWEET: No, but we've objected.
6 MR. ROARK: I'm asking him questions. And if
7 you have an objection to the question --
8 MS. SWEET: He's not being putting forth as a
9 30(b)(6) to talk about legal conclusions.
10 MR. ROARK: He just testified to it. He just
11 testified fully about his view that all of the claims are
12 -- resulted from the allegations that you told him about.
13 I'm going to ask him all the questions I want about that.
14 MS. SWEET: No, he testified that -- what we all
15 know to be the case, is that the measure of damages in a
16 kickback case is the tainted claims. That's what he is
17 referring to. He is not talking about causation. He is
18 not a lawyer. It would be impermissible testimony to talk
19 about that, whether he was a fact witness or an expert
20 witness. He is not being offered for that purpose.
21 We have objected to your topics. We have told
22 you that he has been offered to testify as a summary fact
23 witness on damages. That is what he is testifying to, the
24 claims. He is not talking about, at trial or here today,
25 the causation aspect of anything. That is not what we have

Page 103

1 put forth.
2 BY MR. ROARK:
3 Q So, Mr. Petron --
4 MS. SWEET: It's Petron, also.
5 BY MR. ROARK:
6 Q Mr. Petron, Ms. Sweet is not the witness here
7 today. Ms. Sweet is not testifying. I'm unclear as to the
8 last answer that you gave. If I ask a question in a way
9 that you don't understand what I'm asking, then please let
10 me know, and I'll seek to clarify the question.
11 Are you offering any testimony today about
12 the -- whether kickbacks allegedly paid by Methodist to
13 West caused the submission of any of the claims in your
14 summary?
15 A I'm not.
16 Q Okay. Do you have any knowledge regarding what
17 payments any of these physicians received from West?
18 MS. SWEET: Objection, asked and answered.
19 THE WITNESS: I do not.
20 BY MR. ROARK:
21 Q Do you have any knowledge about whether any of
22 these physicians were employed by West or were shareholders
23 with West, or what their status with West was?
24 A I don't have specific information on that.
25 Q Do you have any information about whether these

Page 104

1 physicians were paid on an RVU basis, or paid on some other
2 grounds or basis?
3 A I think I read somewhere, at some point,
4 somebody was paid -- that doctors were paid on an RVU
5 basis. But again, that's just me reading background, me
6 reading interrogatories.
7 Q My question is, do you have knowledge about
8 that, beyond what you've read?
9 A No, I do not. I had no personal knowledge.
10 Q As part of your summary, did you look at whether
11 any of these physicians were referring patients to
12 Methodist before the affiliation began?
13 MS. SWEET: Objection.
14 THE WITNESS: I don't have any of that
15 information in the summary.
16 BY MR. ROARK:
17 Q Okay. The summary that you prepared, Exhibit
18 250, that we've looked at, in arriving at those numbers,
19 was it necessary for you or your team to do any
20 extrapolation?
21 MS. SWEET: Objection.
22 THE WITNESS: No.
23 BY MR. ROARK:
24 Q Was it necessary for you to do any kind of
25 statistical analysis in deriving the numbers?

Case 3:17-cv-00902 Document 395-1 Filed 06/02/23 Page 13 of 15 PageID #: 12774
Elite-Brentwood Reporting Services (615)595-0073
www.EliteReportingServices.com
101..104

Page 105

1   **A**   No.
2   Q   Would it be fair to say that for purposes of why
3 we are here today, as a 30(b)(6) witness, that the extent
4 of the work that you've done was to add up the dollar value
5 of certain claims according to parameters that were
6 provided to you by the government?
7   **A**   **I would agree.**
8   Q   And you didn't do anything to test or probe
9 whether those parameters were -- whether you agreed with
10 them or not. You accepted them and you used those
11 parameters, correct?
12   **A**   **If I -- if I'm -- I'll answer it this way, and**
13 **you tell me if it's not responsive, because I'm not sure.**
14 **I'm not providing an opinion here. I'm not providing an**
15 **opinion on whether or not the parameters of the assumptions**
16 **I used are accurate, or the correct ones, or incorrect**
17 **ones. I'm merely -- I'm merely using those as given to me.**
18   Q   I understand that you're not giving an opinion.
19 And I'm also trying to ask, you did not do work to test or
20 verify those parameters, correct?
21   **A**   **But test the parameters -- you can't test a**
22 **parameter.**
23   Q   You can test whether the 86 physicians that were
24 listed, whether they had ever been paid anything for work
25 that they were doing for Methodist. That's what I'm

Page 106

1 asking. Did you ever --
2   **A**   **You're asking if the parameters are correct.**
3   Q   Yes.
4   **A**   **And I think I've said numerous times now, that**
5 **that is not what I'm doing.**
6   Q   Okay.
7   **A**   **I'm not -- I'm being given the parameters, and**
8 **I'm using those parameters.**
9     MR. ROARK: Okay. Let's stop here and take a
10 break. And let me -- I'll look over at what else I have to
11 cover.
12     **THE WITNESS: I've got a hard stop at 2 o'clock.**
13     MR. ROARK: Understood. Let's go off the
14 record.
15     VIDEO OPERATOR: Going off the record at 12:23.
16 This is the end of media unit number 2.
17     (Recess.)
18     VIDEO OPERATOR: On the record at 12:40. This
19 is the beginning of media unit 3 in the testimony of
20 Michael Petron.
21     BY MR. ROARK:
22   Q   To pick up from where we were before the break,
23 if one of the West physicians that's included in your list,
24 if one of those West physicians stopped working for West
25 prior to December 31st, 2018, if that doctor continued to

Page 107

1 refer to Methodist after they stopped working for West,
2 then those claims would still be included in your analysis,
3 correct?
4   **A**   **They would, to the extent they are in the**
5 **Methodist piece, but they, then, would not in the West**
6 **piece.**
7   Q   Okay. If they stayed in -- if they continued to
8 refer patients to Methodist even after they stopped working
9 at West, then those claims would be captured in the
10 Methodist claims data, correct?
11   **A**   **Isn't that exactly what I just said? I just**
12 **want to make sure I'm not mishearing you. You're just**
13 **confirming what I just said.**
14   Q   I'm seeking to confirm what you just said.
15   **A**   **Okay. I was, like, did I miss a word in there**
16 **somewhere?**
17   Q   No.
18     MS. SWEET: Brian doesn't try to trap you, as
19 best as I know.
20     BY MR. ROARK:
21   Q   No tricks here. This is -- can tend to be
22 complicated, and I'm just trying to make sure I'm clear on
23 what you're saying.
24   **A**   **No, no, no, sorry I misunderstood. I heard it**
25 **back, and I was like, I think I just said that.**

Page 108

1   Q   I think that just means I did a good job.
2   **A**   **So I'll repeat it back now, to be clear. If a**
3 **West doctor stopped working in this relationship for**
4 **Methodist or West, I'm not sure who they worked for. But**
5 **if they stopped working, and they went somewhere else. And**
6 **then they still went to Methodist as an attending, that**
7 **data would be in the first two pages of my exhibit, what I**
8 **think is 250.**
9   Q   Right. It would be captured under either
10 Methodist Part A outpatient or Methodist Part A inpatient?
11   **A**   **Correct, depending upon how Methodist billed.**
12   Q   We've talked at length about the list of 86
13 physicians that are the last three pages of Exhibit 250.
14 Do you know how the government came up with that list of
15 physicians?
16   **A**   **I do not.**
17   Q   We covered earlier -- we went through topic
18 number 2 in the 30(b)(6) notice. I want to make sure that
19 I understand and appreciate what you did to prepare to
20 testify today about topic number 2.
21   **A**   **Well, I answered earlier. It's the same answer,**
22 **which is, I reviewed some interrogatories. I reviewed the**
23 **complaint. I reviewed the data. I reviewed our code and**
24 **obviously Exhibit 250.**
25   Q   You did not talk to --

Page 117

1  Q   Right.
2  A   You'd probably make more mistakes than would be
3  helpful, but someone with knowledge of computers and the
4  software, whatever it is, SAS or STATA, SQL, Python,
5  Access.  I mean, I could just go on, but you have to know
6  those things to do it.
7  Q   Okay.
8  A   But the steps are here.  That's why the
9  footnotes are here.  So that someone knows what fields to
10 use, what the parameters in those fields are, and then how
11 to match them.  That's --
12 Q   That's what you've laid out in your report?
13 A   That's what I've laid out.  Again, I would call
14 it exhibits.
15 Q   That's what you've laid out in Exhibit 250?
16 A   Yes.
17       MR. ROARK:  All right.  That's helpful.  That's
18 all that I have.
19       MS. SWEET:  Okay.  Nothing.
20       VIDEO OPERATOR:  Off the record at 12:57.  This
21 ends today's testimony.
22       (Whereupon, at 12:57 p.m., the taking of the
23 deposition ceased.)

Page 118

   I HEREBY CERTIFY that I have read this transcript of my
deposition and that this transcript accurately states the
testimony given by me, with the changes or corrections, if
any, as noted.

                    X

Subscribed and sworn to before me this       day of
              , 20      .

                    X
                    Notary Public

My commission expires:                          .

Page 119

C O N T E N T S
MICHAEL PETRON
WITNESS                                    EXAMINATION
by Mr. Roark                               6

E X H I B I T S
EXHIBIT NUMBER                             IDENTIFIED
Exhibit 248   Notice of Deposition Michael
              Petron                         7
Exhibit 249   Rule 30(b)(6) objection        7
Exhibit 250   GOV000891 Petron Summaries     15
Exhibit 251   List of Excel Electronic       40
Exhibit 252   Electronic Excel Methodist
              Healthcare and Methodist
              Hospitals 2011-2012            43
Exhibit 253   Part A Report                  44
Exhibit 254   Electronic West Clinic-PC data
              from 2012                      82
Exhibit 255   GOV000356 Enrollment Record;
              Summary                        92
Exhibit 256   Electronic CMS Claims File for
              Methodist Healthcare data
              2013-2014                      96

Page 120

CERTIFICATE OF NOTARY PUBLIC & REPORTER

I, SUSAN L. CIMINELLI, the officer before whom the
foregoing deposition was taken, do hereby certify that the
witness whose testimony appears in the foregoing deposition
was duly sworn; that the testimony of said witness was
taken in shorthand and thereafter reduced to typewriting by
me or under my direction; that said deposition is a true
record of the testimony given by said witness; that I am
neither counsel for, related to, nor employed by any of the
parties to the action in which this deposition was taken;
and, further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto, nor
financially or otherwise interested in the outcome of this
action.

                    [signature: Susan L. Ciminelli]

                    SUSAN L. CIMINELLI
                    Notary Public in and for the
                    District of Columbia

My Commission Expires:  November 30, 2026

Case 3:17-cv-00902  Document 395-1  Filed 06/02/23  Page 15 of 15 PageID #: 12776
Elite-Brentwood Reporting Services  (615) 595-0073   117..120
www.EliteReportingServices.com