# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JEFFREY H. LIEBMAN and DAVID M. STERN, M.D., <br><br> Plaintiff-Relators, <br><br> v. <br><br> METHODIST LE BONHEUR HEALTHCARE and METHODIST HEALTHCARE-MEMPHIS HOSPITALS, <br><br> Defendants. | Case No.: 3:17-cv-00902 <br><br> JUDGE CAMPBELL <br> MAGISTRATE JUDGE HOLMES |

## UNITED STATES' SUPPLEMENTAL INITIAL DICLOSURES

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, the United States of America provides the following Initial Disclosures.

The United States makes these Initial Disclosures based upon the information currently available to the agencies that have been involved in the investigation of the allegations contained in its Complaint in Intervention, including the United States Department of Justice, the Department of Health and Human Services, the Centers for Medicare & Medicaid Services, and Medicare Administrative Contractors. The United States notes that discovery in this matter is ongoing. It reserves its right to supplement these Initial Disclosures as discovery proceeds and as required by the Federal Rules of Civil Procedure.

These Initial Disclosures are made without waiving the United States' rights at any subsequent time to object based upon evidentiary bases such as competency, privilege, relevance, materiality, hearsay, or other established grounds to the use of such information or documents.

The United States also expressly reserves and maintains for trial any and all objections it may have as to the relevancy, materiality, or propriety of the discovery of any evidence.

**I.      Rule 26(a)(1)(A)(i)**

Pursuant to Rule 26(a)(1)(A)(i), the United States identifies the following individuals as having information relevant to support the claims asserted against defendants Methodist Le Bonheur Healthcare ("MLH") and Methodist Healthcare-Memphis Hospitals ("MHMH") (collectively, "Methodist" or "Defendants") in this action, as set forth below:

(1) Donna Abney, the former COO of Methodist, who has knowledge about Methodist's decision to enter into a transaction with non-party the West Clinic, P.C. n/k/a The West Clinic, PLLC ("West") and the services West purported to and/or did provide to Methodist under the various agreements;

(2) Alison Apple, former Methodist Chief Pharmacy Officer, who has knowledge regarding the pharmacy operations at Methodist and any interplay with those of West;

(3) Dr. Matthew T. Ballo, a West provider, who has information about the services he provided to Methodist during the relevant time period and the source of his compensation;

(4) Scott Baum, M.D., a West Clinic partner, who has knowledge about the relationship between Methodist and West during the relevant time period;

(5) Christopher Bell, a Methodist employee during the relevant time period, who has knowledge of Methodist's savings as a result of its participation in the 340B Discount Drug Program;

(6) Curtis Bernstein, a partner at Pinnacle Healthcare Consulting, who has knowledge about the fair market valuation opinions provided to West;

2

(7) Ann Brandt, a former partner at HealthCare Appraisers, Inc., who has knowledge about the fair market valuation opinions provided to Methodist and West, who now is with Intellego Health;

(8) Bill Breen, Methodist's Senior Vice-President of Physician Alignment during the relevant time period, who has knowledge about the relationship between Methodist and West;

(9) Michael Choukas, whose company provided the fair market value opinion for ACORN Research, LLC ("ACORN"), who has knowledge about that opinion, the roles of Methodist and West in connection with ACORN, and the business of ACORN generally;

(10) Chris Collins, an ECG Management Consultant during the relevant time period, who has knowledge of the fair market value opinion related to the Professional Services Agreement between Methodist and West;

(11) Ron Davis, the former CFO of West, who has knowledge about the information provided to obtain fair market valuation opinions in connection with West's transaction with Methodist, the amount of compensation West paid to its providers, and the overall financial information of West during the relevant time period;

(12) Karen Ellis, a West employee during the relevant time period, who has knowledge about the finances of Methodist and West and support for payments during the relevant time period;

(13) Moon Fenton, M.D, a former West Clinic partner, who has knowledge about the services provided by West to Methodist during the relevant time period and the payment for such services;

(14) Lynn Field, the CLO of Methodist, who has knowledge about Methodist's decision to enter into the transaction with West and the relationship between Methodist and West during the relevant time period;

(15) Larry Fogarty, the Vice President Supply Chain Management for Methodist during the relevant time period, who has knowledge of Methodist's savings as a result of its participation in the 340B Drug Pricing Program;

(16) Linda Haynes, a Methodist employee during the relevant time period, who has knowledge of Methodist's finances during the relevant time period;

(17) Chuck Lane, the current CFO of Methodist and former CFO of Methodist's University Hospital, who has knowledge about Methodist's finances, the amount of money exchanged between Methodist and West during the course of the transaction, the amount of profits Methodist realized from the transaction with West, and the end of Methodist's relationship with West;

(18) Relator Jeffrey H. Liebman, a former Methodist employee, who has knowledge about the nature of this lawsuit and certain factual allegations in the Complaints;

(19) Jeffrey Lockridge, a partner at Pricewaterhouse Coopers LLP ("PwC"), who has knowledge about the services provided to Methodist in connection with the transaction with West and throughout the relevant time period;

(20) Thomas Maher III, a Methodist employee during the relevant time period, who has knowledge of Methodist's finances and the impact of Methodist's relationship with West on Methodist's finances;

(21) Chris McLean, the former CFO of Methodist, who has knowledge about Methodist's decision to enter into a transaction with West, as well as the for-profit

4

investment in ACORN, the services West provided to Methodist under the various agreements; and the profits Methodist realized as a result of the transaction with West, Methodist's participation in and profits from the 340B Drug Pricing Program, and the amount of money exchanged between Methodist and West during the course of the transaction, among other topics;

(22) Erich Mounce, former CEO of West, who has knowledge about the transaction between West and Methodist, the fair market valuation opinions West received, the referrals West provided to Methodist and other hospitals before and after the transaction, and the services provided and payments West received under the Management Services/Performance Improvement Agreement, West's business unrelated to Methodist during the relevant time period, among other topics;

(23) Jon Peters, an employee of AnovoRx during the relevant time period, who has knowledge of the savings Methodist realized through the 340B Drug Pricing Program, the management fee for the pharmacy, funds wired to Methodist/West and the revenue, prescriptions and profit Methodist and/or West realized from the 340B program;

(24) Cheryl Prince, a West employee leased to Methodist during the relevant time period, who has knowledge about West's provision of services to Methodist under the various agreements;

(25) Dr. Sylvia Richey, a West provider, who has knowledge of West's transaction with Methodist and the referrals to Methodist and other hospitals during the relevant time period;

(26) Scott Safriet, a partner at HealthCare Appraisers, Inc., who has knowledge about the fair market valuation opinions provided to Methodist and West;

5

(27) Dr. Lee Schwartzberg, the former Medical Director of the West Cancer Center, who has knowledge about the impetus for West's transaction with Methodist, the relationship between Methodist and West during the course of the transaction, the termination of that relationship, West's business opportunities that were separate from Methodist, and the services expected and provided to Methodist under the various agreements during the relevant time period, among other things;

(28) Gary Shorb, the former President of Methodist, who has knowledge about the negotiation of, and provision of services made pursuant to, the agreements between Methodist and West, Methodist's investment in ACORN, the partnership or other relationship between Methodist and West during the relevant time period, among other topics;

(29) Dr. Brad Somer, a West provider, who has knowledge about West's decision to enter into the transaction with Methodist, the services West provided under the various agreements, and the referrals West providers made to Methodist and other hospitals during the relevant time period;

(30) Bobby Stamper, a former employee of Altegra Health and Pinnacle Healthcare Consulting, who has knowledge about the fair market valuation opinions provided to Methodist and West;

(31) Relator David M. Stern, M.D, who has knowledge about the nature of this lawsuit, certain factual allegations in the Complaints, and the arrangement between West, Methodist and the University of Tennessee Health Science Center;

(32) Dr. Kurt Tauer, the Secretary for West during the relevant time period, who has knowledge about the impetus for West's transaction with Methodist, the relationship

6

between Methodist and West during the course of the transaction, the termination of that relationship, West's business opportunities that were separate from Methodist, and the services expected and provided to Methodist under the various agreements, and the referrals West providers made to Methodist and other hospitals during the relevant time period among other things;

(33) Gail Thurmond, M.D., Methodist's Senior Vice President of Clinic Effectiveness and the former Chief Medical Information Officer, who has knowledge about the reporting structure of the various Chief Medical Officers and Medical Directors at Methodist's hospital and outpatient locations and knowledge about the relationship between Methodist and West;

(34) Dr. Todd Tillmanns, a West provider, who has knowledge about the relationship between Methodist and West and referrals of West providers to Methodist and other hospitals during the relevant time period;

(35) Monica Wharton, the Executive Vice President and Chief Administrative Officer of Methodist, who has knowledge about the relationship between Methodist and West during the relevant time period;

(36) Michael Ugwueke, the CEO of Methodist, who has knowledge about the relationship between Methodist and West, payments Methodist made to West, and concerns about continuing the transaction with Methodist absent a new arrangement, among other things;

(37) The Chief Executive and Chief Operating Officers of each Methodist hospital not already identified herein during the years 2011 through the present, who have

knowledge of oncology services provided at the respective hospitals and management of the oncology service line at the respective hospitals;

(38) The Chief Medical Officers at each Methodist hospital during the years 2011 through the present, including Robin Womedu, Paul Douthitt, who have knowledge about the oncology services provided at such hospitals and management of the oncology service line at the respective hospitals;

(39) Current and former Methodist personnel not otherwise identified above who had responsibilities relating to the oncology service line during the relevant time period, including Dr. Khaled and Dr. Eastman;

(40) Current and former Methodist personnel, agents or consultants who were involved in compliance for the transaction, including support for the payments to West under the various agreements, including Darryl Arbor and KPMG;

(41) Current and former West providers, medical directors, administrative personnel, and executives who may have knowledge about the services West provided or was supposed to provide to Methodist, as well as West's referrals to Methodist and other hospitals during the relevant time period;

(42) Counsel for West during the relevant time period, including attorneys at Foley & Lardner LLP, including Michael Blau and Alexis Bortniker, who have knowledge about physician-hospital alignment structures and the transaction between Methodist and West specifically;

(43) Counsel for Methodist during the relevant time period, including attorneys from Jones Day and Bass, Berry & Sim, PLC, who have knowledge about the negotiation of and entering into the various agreements between Methodist and West in 2011 and the

process to unwind, alter or terminate the relationship between Methodist and West beginning in 2018 and concluding at the end of February 2019;

(44) Current and former Baptist providers, medical directors, administrative personnel, and executives who may have knowledge about the services West at Baptist, as well as West's referrals to Baptist during prior to, during and following West's relationship with Methodist;

(45) Current and former UTHSC providers, medical directors, administrative personnel, and executives who may have knowledge about the relationship between and among Methodist, West and UTHSC, including Steve Schwab;

(46) Current and former PwC employees not otherwise identified above, who provided consultant services in connection with the Methodist-West transaction and the proposed friendly PC;

(47) Current and former employees of Horne Health Care Services, who provided valuation services to Methodist or West during the relevant time period, including for the transactions between Methodist and West in 2011 and 2018, as well as any valuation of West's pharmacy operations;

(48) Current and former individuals from AnovoRx, who have information about the 340B savings Methodist realized as a result of the unlawful relationship with West and information about the pharmacies operating at the locations in the Asset Purchase Agreement and potentially 7945 Wolf River Boulevard, Germantown, TN;

(49) Other individuals who may be knowledgeable about the tainted claims and unlawful referrals for which Medicare reimbursed Methodist and West during the course of the parties' relationship, as well as the patients West referred to Methodist that previously

were referred to Baptist, and the claims Methodist submitted relating to the 340B Drug Pricing Program, including the consultants Methodist used to provide answers to certain interrogatory responses about the amount of professional collections, such as BRG, that it has failed to disclose in detail to date;

(50) Kenneth P. Barrett, the HHS Special Agent who verified the United States' Responses to Methodist's Interrogatories;

(51) Michael Petron, who will act as a summary fact witness for the United States as to the Medicare Part A and B damages the United States intends to seek at trial relating to the voluminous false claims at issue, who may be contacted through counsel for the United States;

(52) Industry experts to be identified;

(53) Individuals listed in the Initial Disclosures and Interrogatory Responses of the other parties in this action, including any intervening party;

(54) Individuals identified by any deposition witness not otherwise expressly identified herein;

(55) Individuals identified in the Relators' Complaints not otherwise expressly identified herein.

Except as otherwise stated herein, the above individuals may be contacted through their respective counsel or at the addresses noted on prior Initial Disclosures provided in this action.

## II. **Rule 26(a)(1)(A)(ii)**

Pursuant to Rule 26(a)(1)(A)(ii), the United States discloses the following documents:

1.      Documents Defendants and West provided to the United States in the course of the investigation that preceded the filing of this lawsuit. Such documents are already in the possession of Defendants.

2.      Documents produced in the course of this litigation. Such documents are already in the possession of Defendants.

3.      Claims data relating to the amounts billed by Defendants to Medicare and amounts paid by Medicare where the attending provider was associated with West. Defendants already are in possession of this information, and this data already has been produced in this action. This data also is located in databases maintained by the Centers for Medicare and Medicaid Services.

4.      Claims data relating to the 340B Drug Pricing Program that Methodist would not otherwise have been able to participate in absent the unlawful relationship with Methodist. This data is in possession of Methodist, who has provided information as to the savings realized through the program but refuses to provide the underlying source data.

5.      Claims data for Baptist where the attending provider was associated with West. This data is in possession of non-party West and also is located in databases maintained by the Centers for Medicare and Medicaid Services and has been produced in this action.

6.      Publicly available rules, regulations, and CMS policies, procedures, and instructions governing Medicare Parts A, B and D, the 340B Drug Pricing Program, oncology services, partnership arrangements between physicians and hospitals, and provider-based locations.

7.      Medicare enrollment forms submitted Methodist and West (i.e., CMS Form 855A) and related instructions from CMS regarding the forms. These documents already are in the possession of Defendants.

11

8. Cost reports submitted by Methodist to Medicare. These documents already are in the possession of Defendants.

9. Documents that may be produced to the United States by Defendants and third parties in the course of this litigation.

10. Documents produced to the United States by Relators as part of their disclosure materials in this *qui tam* action.

## III. Rule 26(a)(1)(A)(iii)

Pursuant to Rule 26(a)(1)(A)(iii), and based upon information the United States has at this time, the United States discloses the following:

The United States' False Claims Act damages in this case are based upon the claims, cost reports and other attestations that Defendants knowingly submitted or caused to be submitted to Medicare while engaging in violations of the AKS and in fraudulently claiming that it had lawfully established provider-based hospital outpatient locations through which it submitted or caused to be submitted claims to Medicare. During the relevant time period, Medicare reimbursed Methodist $71,203,599 for inpatient services and $322,395,170 for outpatient services through West providers. Medicare also reimbursed $37,120,520 for West claims that have the same date of service as a Methodist Part A claim.

In addition, Methodist was able to obtain participate in the 340B Drug Pricing Program during the relevant time period for certain drugs as a result of the unlawful relationship with West. Absent that relationship, Methodist would not have been able to realize the savings associated with that program. As noted above, Methodist has, to date, refused to provide the underlying source data that will allow the United States to identify the precise claims at issue, and the United States is not in possession of sufficient information to be able to ascertain the precise claims at issue

12

absent such data. Therefore, the United States cannot yet ascertain the extent of the claims at issue. The United States notes that the information Methodist provided shows it realized over $500 million in savings from the 340B Drug Pricing Program during the relevant time period, including at a minimum, over $200 million directly attributable to the unlawful relationship with West, but Methodist refuses to provide the underlying source data for these figures. Thus, the United States notes that the amounts identified herein are only the savings based on the claims for which the United States seeks damages and not the actual amount of the claims submitted, which is far greater.

Pursuant to the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1), the amount of damages is trebled. The United States also is entitled to statutory penalties for each instance in which Defendants submitted or caused to be submitted a false claim to the United States.

**IV.** **Rule 26(a)(1)(A)(iv)**

None.

Dated: September 17, 2022

                                              Respectfully submitted,

                                              MARK H. WILDASIN
                                              United States Attorney
                                              Middle District of Tennessee

                                By:    s/ Kara F. Sweet
                                              KARA F. SWEET
                                              WYNN M. SHUFORD
                                              Assistant United States Attorney
                                              United States Attorney's Office
                                              719 Church Street, Suite 3300
                                              Nashville, TN 37203
                                              Phone: (615) 736-5151
                                              Email: kara.sweet@usdoj.gov

                                              *Counsel for the United States*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2022, a true and correct copy of the foregoing was served via email to the following:

| | |
|---|---|
| Bryan A. Vroon<br>Law Offices of Bryan A. Vroon, LLC<br>1380 West Paces Ferry Road, Suite 2270<br>Atlanta, GA 30327<br>Email: bryanvroon@gmail.com | Edward D. Robertson, Jr.<br>Bartimus, Frickleton & Robertson<br>715 Swifts Highway<br>Jefferson City, MO 65109<br>Email: crobertson@bflawfirm.com |
| Jerry E. Martin<br>David Rivera<br>Seth Marcus Hyatt<br>Barrett Johnston Martin & Garrison, LLC<br>Bank of America Plaza<br>414 Union Street, Suite 900<br>Nashville, TN 37219<br>Email: jmartin@barrettjohnston.com<br>Email: shyatt@barrettjohnston.com | Robert Salcido<br>(Admitted *Pro Hac Vice*)<br>Akin Grump Strauss Hauer & Feld LLP<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Email: rsalcido@akingrump.com |
| Brian D. Roark<br>Anna Grizzle<br>J. Taylor Chenery<br>Taylor M. Sample<br>Hannah E. Webber<br>Bass, Berry & Sims PLC<br>150 Third Avenue South, Suite 2800<br>Nashville, TN 37201<br>Email: broark@bassberry.com<br>Email: agrizzle@bassberry.com<br>Email: tchenery@bassberry.com<br>Email: taylor.sample@bassberry.com<br>Email: hannah.webber@bassberry.com | |

s/ Kara F. Sweet
KARA F. SWEET
Assistant United States Attorney