## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **JEFFREY H. LIEBMAN and DAVID M. STERN, M.D.,** | ) ) ) ) | **Civil Case No.: 3:17-cv-00902** |
| **Plaintiff,** | ) ) | **District Judge William L. Campbell, Jr.** |
| **v.** | ) ) | **Magistrate Judge Barbara D. Holmes** |
| **METHODIST LE BONHEUR HEALTHCARE** and **METHODIST HEALTHCARE-MEMPHIS HOSPITALS,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## DEFENDANTS' REPLY TO
## THE UNITED STATES' COUNTER-STATEMENT OF MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.01(d), Defendants Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals (collectively, "Methodist") submit this Reply ("CSOF Reply") to the United States' Counter-Statement of Material Facts. (Dkt. No. 346 at 204–224, the United States' "CSOF".) The government's CSOF contains numerous deficiencies and improprieties in violation of Fed. R. Civ. P. 56 and Local Rule 56.01 to which Methodist raises various objections in both the General Objections and specific objections below. Given the numerous deficiencies in the government's CSOF, the Court should disregard it.

## INTRODUCTORY STATEMENT & GENERAL OBJECTIONS

1.      Many assertions in the CSOF are not supported by the cited evidence, not supported by competent evidence, or not supported by any record evidence at all. Methodist objects that this violates Rule 56(c)(1), which requires a party asserting that the record demonstrates a genuine

dispute of material fact to "support the assertion by [ ] citing to particular parts of materials in the record," and Local Rule 56.01(c), which requires that each purportedly-disputed and material fact asserted by the non-movant be set forth "with specific citations to the record supporting the contention that such fact is in dispute." Such citations must be to materials that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Where the United States fails to support its assertions, they cannot create a genuinely disputed fact and should be disregarded by the Court. *See* Fed R. Civ. P. 56(c)(1)(B); *see also Kilpatrick v. HCA Human Res., LLC,* 2022 WL 866258, at *2 (M.D. Tenn. Mar. 22, 2022) (Campbell, J.) ("[T]he Court will disregard . . . statements for which there is no citation to the record.")

2.     Some paragraphs in the CSOF reflect argumentation by the government, rather than material facts, including characterizations of documents or testimony not supported by the record evidence, impermissible testimony by counsel for the government offered without personal knowledge and/or legal conclusions. Methodist objects that such statements are not material facts at all as required by Rule 56(c) and Local Rule 56.01(c) and require no response, and that the Court should disregard such argument of counsel. *See Kilpatrick*, 2022 WL 866258, at *1–2 (in responding to defendant's objection that the plaintiff is "injecting argument instead of opposing facts," holding that "the Court will disregard all argument [and] characterization of documents"); *McLemore v. Gumucio*, 619 F. Supp. 3d 816, 826 (M.D. Tenn. 2021) (finding that if a statement is "an assertion of something that is not a fact at all (but rather, say, an opinion or a legal principle), the statement is not properly included in a Rule 56.01 statement"). Such statements are not properly supported by declarations. *See* Fed. R. Civ. P. 56(c)(4) (noting that a declaration used to oppose a motion must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *see*

2

*also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Legal conclusions are not "facts" for purposes of summary judgment. *See* L.R. 56.01(c); Fed. R. Civ. P. 56(a); *McLemore*, 619 F. Supp. 3d at 826; *Bridgeport Music, Inc. v. WB Music Corp*., 2006 WL 903737, at *2 n.3 (M.D. Tenn. Apr. 6, 2006), *aff'd*, 508 F.3d 394 (6th Cir. 2007) ("Response[s] to statement of undisputed facts are not the place for legal argument."); *Turner v. Nat'l Ass'n of Letter Carriers Branch No. 27*, 2022 WL 807378, at *5 n.17 (W.D. Tenn. Feb. 11, 2022), *report and recommendation adopted*, 2022 WL 801555 (W.D. Tenn. Mar. 15, 2022) ("Whether or not the accusation was false is a legal conclusion and thus irrelevant to establishing the undisputed facts.").

3.     In some paragraphs, the government cites expert reports or declarations not based on personal knowledge as record evidence for underlying asserted facts, despite the fact that these assertions (i) constitute opinions and not facts; (ii) are not made based on personal knowledge; and/or (iii) do not comply with Rule 702 and are not admissible. Methodist objects that this is not competent evidence to survive summary judgment, and the Court should disregard these assertions. *See* L.R. 56.01(c); Fed. R. Civ. P. 56(a)-(c); Fed. R. Evid. 702 (governing admissibility of expert testimony); Fed. R. Evid. 703 (noting that "an expert may base an *opinion* on *facts* or data in the case") (emphasis added); *Kilpatrick*, 2022 WL 866258, at *1-2; *Assurance Co. of Am. v. Cont'l Dev. & Constr., Inc.,* 2009 WL 1616760, at *12 (M.D. Tenn. June 8, 2009), *aff'd*, 392 F. App'x 472 (6th Cir. 2010) ("Simply having experts restate general facts and announce legal conclusions without any analysis does not create a genuine issue of material fact.") (citation omitted)); *Portwood v. Montgomery Cnty*., 2014 WL 6871516, at *7 (M.D. Tenn. Dec. 5, 2014) (noting that Rule 56(c)(4) requires declarations at summary judgment to be "made on personal knowledge" and finding that "[a]n expert opinion offered at the summary judgment stage is held

3

to the same standard as other declarations, as well as to Federal Rule of Evidence 702, which governs the admissibility of expert testimony").

4.      Some paragraphs in the CSOF contain alleged facts that are based on inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Fed. R. Evid. 802 (providing that hearsay is not admissible); *Jarvis v. Hickman Cnty. Jail Med. Staff*, 2014 WL 2515167, at *6 (M.D. Tenn. May 27, 2014) (noting party "must submit admissible evidence to defeat a motion for summary judgment" and holding that "hearsay cannot be considered on a motion for summary judgment") (citing *Southerland v. Mich. Dep't of Treasury,* 344 F.3d 603, 620 (6th Cir. 2003)).

5.      Some paragraphs in the CSOF contain alleged facts that are based on a declaration that contradicts a previous sworn statement without sufficient explanation. Such evidence cannot create a genuine issue of material fact. *See* L.R. 56.01(c); Fed. R. Civ. P. 56(c)(1); *Cleveland v. Pol'y Mgmt. Sys. Corp*., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity.").

6.      Some paragraphs include purported facts that are not material to Methodist's Motion for Summary Judgment. (Dkt. No. 320, "Defendants' Motion".) Local Rule 56.01(c) allows the non-movant to provide "a concise statement of any additional facts that the non-movant contends are material" and for which there is a genuine issue of fact. A fact is material only "if its existence or non-existence will affect the outcome of the lawsuit." *McLemore*, 619 F. Supp. 3d at 823. Methodist objects to the inclusion of purported facts in the government's CSOF that are not material.

7.     Local Rule 56.01 permits a non-movant to file only a responsive statement of *disputed* facts it contends preclude granting summary judgement. *See* L.R. 56.01(c)(3). Methodist objects that the government has instead submitted "some key points and additional evidence" (CSOF at 204) that are not genuinely-disputed material facts.    Numerous of the asserted facts in the CSOF are plainly not disputed, and the Court may ignore the government's CSOF on this ground. *Anderson v. McIntosh Const., LLC*, 2014 WL 2207924, at *2 (M.D. Tenn. May 28, 2014), *aff'd*, 597 F. App'x 313 (6th Cir. 2015) ("[N]otwithstanding specific warnings from this court in recent cases, [plaintiff]'s counsel filed a statement of *undisputed* material facts, even though Local Rule 56.01 does not permit that type of submission. Instead, Local Rule 56.01(c) permits a plaintiff to file a responsive statement of *disputed* facts in an effort to avoid the grant of summary judgment. For this reason alone, [plaintiff's] statement of facts may be ignored.").

8.     In some paragraphs, the government cites generally to a document or multiple documents without any pincite or other indication as to which document or which portions of lengthy documents it is citing to support the purported fact, making it difficult to respond accurately. *North v. Cnty. of Cuyahoga*, 2017 WL 3065502, at *1 n.1 (N.D. Ohio July 19, 2017). Methodist objects that this violates Rule 56(c)(1)(A), which requires a party to support a factual assertion by citing to "*particular* parts of materials in the record," (emphasis added) and Local Rule 56.01(c), which requires a party to support each fact "with *specific* citations to the record[.]" (emphasis added). *See Gohl v. Livonia Pub. Sch.*, 134 F. Supp. 3d 1066, 1077 (E.D. Mich. 2015) ("Global, generic citations to multiple-page exhibits . . . without specific pinpoint citations to guide the court's review are inadequate to . . . withstand a summary judgment motion.") (citation and subsequent history omitted).

9. Some paragraphs in the CSOF contain multiple alleged facts in the same numbered paragraph. Methodist objects that this violates Local Rule 56.01(c), which requires each purportedly disputed fact in a CSOF to be "set forth in a separate, numbered paragraph." Methodist has endeavored to respond to each individual fact separately where necessary.

10. Methodist objects that no response to headings supplied by the government is required, as these are not statements of disputed material fact under Rule 56 or Local Rule 56.01. Methodist has omitted the headers from this Reply for clarity of reading.

11. These General Objections are in addition to specific objections to particular asserted facts below. Methodist has endeavored to make all applicable specific objections below, but these General Objections form a part of each response as applicable. For the Court's convenience, tables outlining these General Objections are provided at **Exhibit 12**.

12. Given the numerous deficiencies and improprieties in the government's CSOF, the Court should disregard the government's CSOF in its entirety. *See, e.g., Anderson*, 2014 WL 2207924, at *2 ("Moreover, even if the court were inclined to consider it, Anderson's statement of facts is largely composed of (1) immaterial information, (2) facts that are not in dispute, (3) facts that are redundant of information already provided by the defendants in support of their motion, and/or (4) 'facts' that blatantly mischaracterize the record. A responsive statement of facts is designed to assist the court in identifying record evidence that establishes a genuine dispute of material fact. This submission does no such thing, and it is not incumbent upon the court to mine the 51–paragraph submission for nuggets of information that conceivably comply with the letter and spirit of Local Rule 56.01. For all of these reasons, the court will not consider the plaintiff's responsive statement of facts in ruling on the motion.").

## RESPONSES TO UNITED STATES' ADDITIONAL FACTS

1.      Prior to doing the deal with West, Methodist did not have dedicated oncology outpatient locations. Some oncology inpatient services were provided at the University, but it did not have a dedicated inpatient oncology unit in other hospital location. ECF No. 323-34.

**RESPONSE:** Undisputed for the purpose of ruling on summary judgment only.

2.      At the time, oncology practices that were faced with increasing costs and declining reimbursements began partnering with hospitals that could capitalize on the 340B Program, which would allow hospitals to realize millions in savings, which then could be funneled back to the physicians through various contractual arrangements. ECF No. 323-34; 323-64.

**RESPONSE:** The assertions that hospitals "realize millions in savings" under the 340B program by partnering with oncology practices and that such savings "then could be funneled back to the physicians through various contractual arrangements" are not supported by the cited evidence as required by Rule 56(c), are self-serving characterizations, and are immaterial to Defendants' Motion. (General Objection "GO" Nos. 1, 2, 6.)

The remainder of the paragraph is undisputed for the purpose of summary judgment only, but immaterial to Defendants' Motion. (GO No. 6.)

3.      Methodist was not able to access the revenues and savings associated with West's patients absent doing the deal proposed by West, which included acquiring the West clinic locations under the APA, and agreeing to compensate West for professional services at rates that exceeded its pre-deal collections under the PSA, employing and leasing almost all of its staff and assuming the bulk of its overhead and expenses, as well as entering into a management agreement whereby Methodist paid West to manage its own patients. ECF Nos. 323-11-14; 323-34.

7

**RESPONSE:** Undisputed that Methodist compensated West for professional services pursuant to the parties' Professional Services Agreement ("PSA"), but disputed that Methodist "agree[d] to compensate West" "at rates that exceeded its pre-deal collections[.]" Such language does not appear in the PSA, and the parties agreed that all compensation would be consistent only with fair market value. (Dkt. No. 323, Index of Exhibits to Statement of Undisputed Material Facts ("SUMF"), Ex. 11, PSA §§ 5.1–5.3.)

Undisputed that Methodist employed and leased most West staff and assumed overhead and expenses, but the government's characterization as to the "bulk" of overhead and expenses should be disregarded. (GO Nos. 1, 2.)

Undisputed that Methodist paid West pursuant to a management agreement ("MSA"), but the government's self-serving characterization that West managed its own patients should be disregarded. (GO Nos. 1, 2.)

The remainder of this assertion is not supported by the cited evidence as required by Rule 56(c), is unsupported by a specific citation to the record among the five multi-page documents cited, and is characterization of counsel. (GO Nos. 1, 2, 8.)

4.      By doing a deal with West, Methodist obtained West's outpatient referrals and also incentivized West to send its inpatients to Methodist since it would be paid at higher rates than what it would otherwise have received in professional collections.  ECF Nos. 323-11; 323-19 and 323-20; 323-34; 323-64.

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c), is unsupported by a specific citation to the record among the five multi-page documents cited, and is characterization by the government of documents that speak for themselves. (GO Nos. 1, 2, 8.) To the extent a response is required, it is disputed. The undisputed proof is that West

physicians made referrals based on the best interest of their patients and factors unrelated to compensation from Methodist. (SUMF Ex. 1, Tillmanns Decl. ¶ 24); (*Id.* Ex. 2, Richey Decl. ¶ 29); (*Id.* Ex. 3, Ballo Decl. ¶ 28); (*Id.* Ex. 4, Portnoy Decl. ¶ 19); (*Id.* Ex. 4, Berry Decl. ¶ 17); (*Id.* Ex. 53, Schwartzberg Dep. 267:18–269:11); (*Id.* Ex. 55, Somer Dep. 234:25–236:2); (*Id.* Ex. 54, Tauer Dep. 247:17–250:9.) Whether West's professional collections would have been higher absent the affiliation is pure speculation by the government that is not based on personal knowledge. (GO No. 2.)

5.      Methodist knew that if it acquired West's clinic locations and converted them to Methodist hospital-owned provider-based locations, West would necessarily refer its patients to Methodist for treatment at these locations, as the patients would be simply continuing to go their physicians for treatment in the same places that West had been treating them. Ex. GG (McLean Dep. Vol. II) at 68:19-69:1.

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) To the extent a response is required, it is disputed. The cited testimony merely states that the patients who received drugs through the 340B Program were Methodist's patients, but also patients of the physicians in that the patients would say they were being treated by individual physicians. (Dkt. No. 346, Response to Statement of Undisputed Material Facts ("RSOF") Ex. GG, McLean Dep. Vol. II 68:19–69:1.) Mr. McLean's testimony did not address West's future referral patterns or the location of patients' treatment. The undisputed proof is that West physicians made referrals based on the best interest of their patients and factors unrelated to compensation from Methodist. (SUMF Ex. 1, Tillmanns Decl. ¶ 24); (*Id.* Ex. 2, Richey Decl. ¶ 29); (*Id.* Ex. 3, Ballo Decl. ¶ 28); (*Id.* Ex. 4, Portnoy Decl. ¶ 19); (*Id.* Ex. 4, Berry Decl. ¶ 17); (*Id.*

Ex. 53, Schwartzberg Dep. 267:18–269:11); (*Id.* Ex. 55, Somer Dep. 234:25–236:2); (*Id.* Ex. 54, Tauer Dep. 247:17–250:9.)

6.      As a result, Methodist would be able to obtain the collections associated with facility, lab, technical and ancillary fees, as well as chemotherapy and other drugs relating to West's patients for which Methodist could then bill Medicare and other insurers. Methodist's pre-deal internal documents show that it considered how much it would profit from converting the sites to provider-based locations. Sweet Decl., Ex. 30 (Profit on Provider Based Location).

**RESPONSE:** The assertion in the first sentence is not supported by any record evidence as required by Rule 56(c). (GO No. 1.) Further, it is disputed that Methodist treated "West's patients." Mr. McLean testified that the patients were Methodist's patients. (RSOF Ex. GG, McLean Dep. Vol. II 68:19–69:1.) The PSA and APA explained that Methodist would acquire the medical records and be the treating provider. (SUMF Ex. 11, PSA § 3.7); (APA § 1.2(d).)

The second sentence is not supported by the cited evidence as required by Rule 56(c) (GO No. 1), which evidence does not analyze or calculate any "profit."

7.      In selling its clinic locations, West would be losing collections associated with the technically [sic] and facility component, instead would be limited to professional collections. To offset this loss, West would need some other way to increase its revenue by finding a hospital that had the financial ability to pay West through the other agreements, such as a professional services agreement and a management agreement. This is why it was important for West to choose a hospital that could participate in the 340B Program. Ex. I (Shorb Dep.) at 71:2-6.

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c) and includes characterization by the government and testimony of counsel as to West's alleged needs and wants. (GO Nos. 1, 2.) The only citation to the record for this paragraph is Gary

Shorb's deposition, where Shorb testified, "340B pricing was an opportunity to invest in the service line, that's correct." (RSOF Ex. I, Shorb Dep. 71:2–6.) Shorb did not testify to, and the government provides no other citation to the record for, any of the claims in this paragraph.

8. Methodist's internal documents also show that it intended to share the savings realized from the 340B Program with West. Methodist even told West how much money it expected to make from the deal, which, as the United States' expert Tim Smith stated, is not standard industry practice. ECF No. 328-1.

**RESPONSE:** This assertion is not supported by record evidence as required by Rule 56(c). (GO No. 1.) The government does not cite any "internal documents" or other evidence that "show that it intended to share the savings realized from the 340B Program with West." The government cites only to its expert's entire report for an opinion that is not based on personal knowledge and that is inadmissible under Rule 703. (*See* Dkt No. 328, Motion to Exclude Proposed Testimony of Timothy Smith.) (GO Nos. 3, 8.) To the extent a response is required, it is disputed. (CSOF Reply Ex. 1, Lane Dep. 53:5–11); (CSOF Reply Ex. 2, Mounce Dep. 184:21–185:19); (CSOF Reply Ex. 3, McLean Dep. Vol. I 130:5–131:1 ("Methodist paid the West Clinic, P.C. under the management services agreement, the professional services agreement, the asset purchase agreement. . . . So there was no payments made related to the outpatient pharmacy.")); (CSOF Reply Ex. 4, Somer Dep. 102:21–103:19; 276:16–277:6.)

9. During the deal negotiations and subsequently, Methodist expressed a willingness to use the 340B Program savings, which it referred to as the "lift" to compensate physicians in exchange for their referrals. Stern. Decl. ¶¶ 10-20 & Ex. 2. For example, in considering a subsequent relationship with another clinic, Methodist's CEO Shorb stated: "I am committed to 100 percent of [the] Jones [Clinic] [savings of $1.0-$1.3 million in 340B dollars] going to lift."

Sweet Decl., Ex. 77 (Shorb email to Mounce re: Dinner with Schwartzberg as of 07/10/15). And Methodist in fact did compensate West more because of the 340B Program savings its was able to realize through West's referrals. Liebman Decl., ¶ 53.

**RESPONSE:** The first sentence is not supported by the cited evidence required by Rule 56(c). (GO No. 1.) Methodist further objects that statements in Stern's declaration that contradict his sworn testimony cannot create a genuinely-disputed fact. (GO No. 5.) Stern testified that he did not know the compensation arrangement between Methodist and West. (CSOF Reply Ex. 5, Stern Dep. 65:24–66:2.) To the extent a response is required, it is disputed that 340B savings were referred to as the "lift" to compensate physicians in exchange for their referrals. The "lift" referred to an "agreement with the University of Tennessee to provide additional payments to them for support of education, research, and clinical expertise growth for the cancer service line." (CSOF Reply Ex. 3, McLean Dep. Vol. I 82:23–83:9); (*see also* CSOF Reply Ex. 2, Mounce Dep. 185:20–186:1); (CSOF Reply Ex. 1, Lane Dep. 88:19–89:1.) It is also disputed that Methodist expressed a willingness to compensate physicians in exchange for their referrals. (RSOF Ex. G, McLean Dep. Vol. I 45:2–12.)

The government's interpretation of this document and characterization of bracketed alterations to the quotation in the second sentence should be disregarded. (GO No. 2.) To the extent a response is required, it is undisputed for the purpose of summary judgment only that the email contains this quote in the second sentence, but it is immaterial to Defendants' Motion. (GO No. 6.)

The third sentence is not supported by competent record evidence as required by Rule 56(c). (GO No. 1.) The government's vague characterization of compensating West "more" should be disregarded. (GO No. 2.) Statements in Liebman's declaration that contradict his sworn

12

testimony cannot create a genuinely-disputed fact. (GO No. 5.) Liebman testified that he did not know how Methodist compensated West under the affiliation agreements. (CSOF Reply Ex. 6, Liebman Dep. 71:6–12.) He also denied that Dr. Schwartzberg discussed moving referrals due to an increase in compensation. (*Id.*, Liebman Dep. 73:6–8.) To the extent a response is required, it is disputed. (CSOF Reply Ex. 3, McLean Dep. Vol. I 130:5–131:1.)

10.     Chris McLean told Mr. Liebeman [sic] that "he had calculated drug profits under the 340B Program from the West physicians' referrals and how to use those new profits to move the main focus of the cancer service line to Germantown where the West physicians preferred to practice. Germantown is the wealthier suburb of Memphis. McLean boasted that this strategy was the way to incentivize the doctors to join with Methodist, make more money, and move away from the urban campus to the wealthiest suburb with higher reimbursement rates from more cancer patients with commercial insurance and Medicare coverage."  Liebman Decl., ¶ 28

**RESPONSE:** Methodist objects that statements in Liebman's declaration that contradict his sworn testimony cannot create a genuinely disputed fact. (GO No. 5.) Liebman testified: "I don't know how West received their funds" under the 340B drug pricing program. (CSOF Reply Ex. 6, Liebman Dep. 123:4–8); (*see also id.* 120:20–22 ("I'm not an expert on 340B funding.").)

To the extent a response is required, it is undisputed that Germantown is a wealthier suburb of Memphis, but it is immaterial to Defendants' Motion. (GO No. 6.)

The remainder of the assertion is disputed but immaterial to Defendants' Motion. (GO No. 6.) Methodist wanted to partner with West to bring West's quality to the population served by Methodist. (SUMF Ex. 6, Shorb Decl. ¶ 7–8.) West was interested in partnering with Methodist due to its nonprofit status and focus on community care and opportunities to address treatment disparities. (SUMF Ex. 47, Mounce Dep. 404:11–407:7); (SUMF Ex. 53, Schwartzberg Dep.

170:3–171:24); (SUMF Ex. 54, Tauer Dep. 161:2–162:12.) 340B savings were "a piece of the puzzle" for earning NCI-designation and would be used "to fund our vision for a comprehensive cancer center and investments we were going to need to make in talent, in facilities, et cetera." (SUMF Ex. 49, McLean Dep. Vol I 173:10–174:15); (*see also* CSOF Reply Ex. 3, McLean Dep. Vol. I 185:20–186:9.) Services were not reduced at Methodist's downtown locations or moved to Germantown. (CSOF Reply Ex. 2, Mounce Dep. 526:11–527:15.)

11.     This is precisely why it was a key factor for West in bringing its business to any hospital was whether the hospital could utilize the 340B Program that would allow the hospital to realize significant savings.  Methodist was the only hospital that West approached that could participate in the 340B Program.  Sweet Decl., Ex. 9 (Baptist, Methodist and Tenet Responses Pros and Cons).

**RESPONSE:** The first sentence is not supported by the evidence cited as required by Rule 56(c). (GO No. 1.) Methodist further objects that this sentence is a self-serving characterization of counsel made without personal knowledge. (GO No. 2.) The second sentence is undisputed for the purpose of summary judgment only, but it is immaterial to Defendants' Motion. (GO Nos. 6, 7.)

12.     Methodist also knew that West has historically been aligned with Baptist, which it knew was not participating in the 340B Program and referred most of its patients to Baptist for inpatient needs.  ECF No. 323-34; Ex. G (McLean Dep. Vol. I) 42:21-44:17.

**RESPONSE:** Undisputed for the purpose of Defendants' Motion only, but immaterial. (GO Nos. 6, 7.)

13.     Another means of compensating West was through an investment in ACORN, as reflected in the June 3, 2011 Letter of Intent between Methodist and West.  Compl. ¶ 107; Answer ¶ 107.

14

**RESPONSE:** Undisputed that Methodist made an investment in ACORN, (GO No. 7), but Methodist objects to the government's self-serving characterization of the investment as "another means of compensating West," which is not supported by the cited evidence as required by Rule 56(c), is a legal conclusion, and should be disregarded. (GO Nos. 1, 2.)

14.  Methodist's internal documents show that it expected revenues to increase from $1.25 billion to $1.45 billion with the West transaction.  Methodist's then CEO Shorb predicted that the impact of the deal to both Methodist and West would result in a financial impact of $17.79 million, with $10.784 million of that amount going to Methodist. Ex. I (Shorb Dep.) at 89:9-90:12; Sweet Decl., Ex. 76 (Mounce Email to Somer re: Co-Management, as of 9/15/15).

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c) and should be disregarded. (GO No. 1.) The government has not cited to any of "Methodist's internal documents." The cited testimony by Mr. Shorb does not include any "prediction" he made regarding the financial impact of the transaction, but rather reflects Mr. Shorb reading numbers, as characterized by counsel, from an unidentified document. The cited email likewise does not reflect the asserted numbers or any predicted financial impact of the affiliation and does not support this paragraph.

15.  Prior to the affiliation, the parties anticipated that the savings from the 340B Program would be $15 million.  Stern Decl. ¶ 18 & Ex. 2.  Methodist initially intended to divide the savings equally among Methodist, West and UTHSC, who was a partner in the vision that Methodist had to one day create an NCI-designated cancer.  However, it ultimately only gave UTHSC $5 million, even though Mr. McLean testified that the amount of savings approached $50 million in one year alone.  ECF No. 235 ("Complt.") ¶ 328; ECF No. 242 ("Answer") ¶ 328

**RESPONSE:** Undisputed for the purpose of summary judgment only, but immaterial to Defendants' Motion. (GO Nos. 6, 7.)

16.     Methodist also knew how much West expected to be compensated for doing the deal and the amount it expected to receive during the course of the affiliation.   *See, e.g.*, Sweet Decl. Ex. 20 (Mounce email to McLean re: HAI of 09/29/11) ("numbers we have sold to our shareholders").

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c) and includes improper characterization of an email and testimony by counsel without personal knowledge. (GO Nos. 1, 2.) The cited evidence discusses only the initial co-management fee and other hypothetical compensation prior to the transaction.   To the extent a response is required, it is disputed. The record evidence is clear that the parties expected the compensation arrangement only to be consistent with fair market value. (SUMF Ex. 47, Mounce Dep. 443:9–24); (SUMF Ex. 49, McLean Dep. Vol. I 22:2–5; 260:4–6); (SUMF Ex. 56, McLean Dep. Vol. II 147:17–21); (SUMF Ex. 50, Shorb Dep. 88:15–16; 118:7–10); (*see also* Dkt. No. 322, SUMF ¶¶ 19, 23, 27, 38–41, 66, 67, 75–77.)

17.     When Methodist obtained a preliminary estimate of the management fee at $3.362 million in September 2011, Chris McLean noted that it was about $1 million too low.  Sweet Decl. Ex. 17 (McLean email to Mounce re: HAI of 09/26/11).

**RESPONSE:** Undisputed but immaterial to Defendants' Motion. (GO Nos. 6, 7.)

18.     Mr. McLean and Mr. Mounce then worked together to ensure that West would receive the total amount to which Methodist agreed.  Sweet Decl. Ex. 17 (McLean email to Mounce re: HAI of 09/26/11).  ("I know you [Chris McLean] and Gary have committed to getting us there on the dollars and our lawyers seem to think that we can get there without a compliance issue.").

16

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) The cited document does not contain this quotation. To the extent a response is required, it is disputed. Mr. McLean testified that he disagreed with this statement. (SUMF Ex. 49, McLean Dep. Vol. I 263:22–264:5 ("That was never a commitment we made. We committed to following fair market value opinions.").)

19.     As part of the deal with West, on December 8, 2011, Methodist, through its subsidiary for-profit arm, Ambulatory Operations, Inc., invested $7 million into ACORN, which Dr. Schwartzberg founded in 2002 and acted as its President and Chief Medical Officer at the time of the transaction. ACORN's affiliation with Methodist and West is noted in the vision for the West Cancer Center set out in the attachment to the PSA.  Compl. ¶ 184; Answer ¶ 184.

**RESPONSE:** Undisputed for the purpose of summary judgment only, but immaterial to Defendants' Motion. (GO Nos. 6, 7.)

20.     Under the terms of the deal, Methodist paid $3.5 million in cash as a capital contribution, and a $3.5 million loan. Methodist was aware that $3.5 million in cash would be used by ACORN to pay back debt owed to Dr. Schwartzberg personally and to West as a company. Compl. ¶¶ 187-188; Answer ¶ 187-188; Sweet Decl. Ex. 15 (ACORN Closing Statement).  There was no legitimate business reason for Methodist to invest in ACORN, and the work that ACORN was supposedly doing was not in furtherance of the goals of non-profit institutions or creating an NCI-designated cancer center, as Dr. Stern participated on the ACORN Board, has attested.  Stern. Decl., ¶¶ 94-111.  The ACORN investment (which later became known as Vector) was simply another means of paying West a kickback to get to the deal terms that West wanted.  *Id*.

**RESPONSE:** Undisputed as to the first sentence. (GO No. 7.)

17

The second sentence is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) To the extent a response is required, it is disputed. Methodist answered denying that it contributed $3.5 million to Dr. Schwartzberg and West. (Answer ¶ 188.) The cited evidence reflects the correct payees and amounts from Methodist's investment. (Sweet Decl. Ex. 15, ACORN Closing Statement.)

Disputed as to the third sentence, but immaterial to Defendants' Motion. (GO No. 6.) Witnesses testified to the reasons for the investment in ACORN. (CSOF Reply Ex. 2, Mounce Dep. 420:2–423:19); (CSOF Reply Ex. 7, Shorb Dep. 185:24–186:10.) Statements in Stern's declaration that contradict his sworn testimony cannot create a genuinely disputed fact. (GO No. 5.) Stern previously testified that he did not have concerns regarding ACORN at the time he began serving on its board. (CSOF Reply Ex. 5, Stern Dep. 184:8–14.) Stern testified that the CRO business's international proposals were "fine." (*Id.* 189:13–19.)

The fourth sentence is a legal conclusion to which no response is required. (GO No. 2.)

Methodist objects that this paragraph contains at least four purported facts. (GO No. 9.)

21.     Under the LEA, Methodist paid West over $100 million during the course of the deal. Compl. ¶ 128; Answer ¶ 128.

**RESPONSE:** Undisputed. (GO No. 7.)

22.     Under the PSA, from 2012 through 2018, Methodist paid West over $280 million. Compl. ¶ 137; Answer ¶ 137.

**RESPONSE:** Undisputed. (GO No. 7.)

23.     During the duration of the MSA from 2012 to 2018, Methodist paid West over $27 million, approximately $13 million of which was for Base Management Fees.  Compl. ¶ 156; Answer ¶ 156.

**RESPONSE:** Undisputed that Methodist paid West over $27 million during the duration of the MSA from 2012 to 2018. (GO No. 7.)

The assertion that approximately $13 million of the total MSA payment was for Base Management fees is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) Methodist answered specifically denying this (Answer ¶ 156), and the government offers no proof to support this fact.

24.     Under the APA, from 2012 through 2018, Methodist paid West $10,537,397.49. Compl. ¶ 124; Answer ¶ 124.

**RESPONSE:** Undisputed. (GO No. 7.)

25.     As Methodist has admitted, the payments under the LEA, PSA, APA, and MSA constitute remuneration.  Sweet Decl., Ex. 65 (Methodist's CID Responses) at No. 4.

**RESPONSE:** This is a legal conclusion that should be disregarded. (GO No. 2.) To the extent a response is required, it is disputed that Methodist "admitted" its payments constituted remuneration under the AKS. In the cited evidence, Methodist set forth "payments made under the agreements" with West. (Sweet Decl. Ex. 65, Methodist's CID Responses at No. 4.)

26.     The parties had little concern for the specifics of the deal documents that ultimately were entered into for the Methodist-West affiliation, and the documents contain inconsistent and overlapping terms.  For example, Methodist leased West's NPPAs under the LEA, but West could also be reimbursed for the NPPAs under the PSA.  Methodist confirmed that it did pay West for the NPPAs, which is reflected in the payroll records produced, Sweet Decl., Ex. 27 (2012 payroll records).  And the United States' expert opined that there is evidence that Methodist also paid West under the PSA for professional services attributable to the NPPAs.  Methodist never took any steps to confirm that the wRVUs were not attributable to work personally performed by the NPPAs.

This resulted in a double-payment of millions of dollars to West from 2012 through 2017. ECF No. 328-1.

**RESPONSE:** The first sentence is not supported by any record evidence as required by Rule 56(c), is a self-serving characterization, and should be disregarded. (GO Nos. 1, 2.) To the extent a response is required to the first sentence, it is disputed. (*See* Dkt. No. 322, SUMF ¶¶ 21, 28–32, 36–37.)

The remainder of the paragraph is unsupported by a specific citation to the record as required by Rule 56(c). (GO No. 1.) The government cites to its expert's report for opinion testimony that is not based on personal knowledge and is not competent evidence to demonstrate the asserted facts at the summary judgment stage. (GO No. 3.) It does not even cite to a specific portion of the lengthy expert report. (GO No. 8.)

This paragraph is also not material because the Complaint does not allege that Defendants double paid for NPPAs, nor did the government identify payments for NPPAs as a type of remuneration in response to Methodist's discovery requests asking the government to identify any unlawful remuneration. (GO No. 6.) The paragraph also is replete with the government's interpretation of documents for which it never sought testimony from any witness. (GO No. 2.) Finally, Methodist objects that this paragraph contains at least six purported facts. (GO No. 9.)

27.     In another example, the hospitalists fall under the PSA but also were employed by Methodist. ECF No. 323-11 & 323-13; Sweet Decl., Ex. 27. The United States did not attempt to calculate any double-payment as a result of this duplication, as there already is ample evidence of remuneration.

**RESPONSE:** The first sentence is not material because the Complaint does not claim that Defendants double paid for hospitalists, nor did the government identify payments for hospitalists

as a type of remuneration in response to Methodist's discovery requests asking the government to identify any unlawful remuneration. (GO No. 6.) To the extent a response is required, it is undisputed that hospitalists fell under the PSA. The assertion that hospitalists were employed by Methodist is not supported by any evidence as required by Rule 56(c). (GO No. 1.) Although the APA discusses that Methodist would *offer* employment to certain hospitalists, the cited evidence does not reflect employment of any hospitalists, much less hospitalists who were covered by the PSA. (SUMF Ex. 13, APA §6.4(a).)

The second sentence is a legal conclusion that should be disregarded. (GO No. 2.) Further, it is not supported by any evidence as required by Rule 56(c). (GO No. 1.)

This paragraph also is unsupported by a specific citation to the record as required by Rule 56(c). (GO No. 8.) The PSA (Dkt. No. 323-11) is a 73-page agreement. The APA (Dkt No. 323-13) is a 489-page agreement. The single LEA payroll detail (Sweet Decl. Ex. 27) is a 133-page document.

28.     ((Intentionally Left Black)

**RESPONSE:** Intentionally left blank.

29.     Pursuant to the APA, Methodist paid West $10,537,397.49.  Compl. ¶ 124; Answer ¶ 124.  Methodist has admitted that the payments under the APA constitute remuneration.  Sweet Decl., Ex. 65 (Methodist's CID Responses) at No. 4.

**RESPONSE:** Undisputed as to the first sentence. (GO No. 7.)

The second sentence is a legal conclusion that should be disregarded. (GO No. 2.) To the extent a response is required, it is disputed that Methodist "admitted" its payments constituted remuneration under the AKS. Methodist set forth "payments made under the agreements" with West. (Sweet Decl. Ex. 65, Methodist's CID Responses at No. 4.)

21

30.    Two million dollars of the amount paid under the APA was for "Meaningful Use" payments that West expected to receive in the future.  Yet, this was ultimately a loan that was only fully repaid after the affiliation ended and the litigation was known.  ECF No. at 323-8 at 21; ECF No. 324-1 at 7.

**RESPONSE:** Undisputed as to the first sentence. (GO No. 7.)

The second sentence is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) The evidence cited (SUMF Ex. 8, Mello Decl. & Report at 21 & Ex. XIV) shows that West paid $1,967,177 of this receivable during the course of the affiliation. The government's misleading characterization of these payments should be disregarded. (GO No. 2.) To the extent a response is required, it is undisputed for the purpose of summary judgment only but immaterial to Defendants' Motion. (GO No. 6.)

31.    Although Methodist supposedly purchased all of the assets at 100 N. Humphreys, ECF No. 323-13, and assumed the payments for the entirety of that location, Sweet Decl., Ex. 23, West continued to operate a pharmacy there for which it did not pay any rent to Methodist or remit any profits for at least one year.  On December 31, 2012, West sold that pharmacy - which Mr. McLean called a "closet" - for $4.9 million to AnovoRx, who Methodist engaged to provide management services for the pharmacy.  Sweet Decl., Exs. 51 & 70; Ex. G (McLean Dep. Vol. I) 76:13-78:11).

**RESPONSE:** Disputed that Methodist purchased *all* of the assets at 100 N. Humphreys. The cited evidence shows that Methodist purchased "*substantially* all" of the assets at this location, and that certain assets were excluded under APA. (SUMF Ex. 13, APA at 1 & §§ 2.1–2.3.) This paragraph also is unsupported by a specific citation to the record as required by Rule 56(c). (GO

No. 8.) Undisputed that Methodist assumed lease payments for the 100 N. Humphreys location when it was converted to a Cancer Center Site.

The assertion that "West continued to operate a pharmacy there for which it did not pay any rent to Methodist or remit any profits for at least one year" is not supported by any cited evidence as required by Rule 56(c). (GO No. 1.)

Undisputed as to the sale of the pharmacy to AnovoRx, undisputed as to McLean's testimony, and undisputed that Methodist engaged AnovoRx to provide pharmacy management services. However, it is disputed that Methodist engaged AnovoRx to provide management services to the same pharmacy business that West had sold, but it is immaterial to Defendants' Motion. (GO No. 6.) The cited evidence reflects that Methodist engaged AnovoRx to manage *Methodist's* outpatient pharmacy. (Sweet Decl. Ex. 51, AnovoRx Contract Pharmacy Management Agreement at 1 & §§ 1, 3.)

32.     As noted above, West never entered into any lease with Methodist for office space at the 100 N. Humphreys location it sold to Methodist under the APA, yet it continued to operate out of that location for years. The United States' expert has opined that this was not commercially reasonable. ECF No. 324-1.

**RESPONSE:** The first sentence is not supported by any record evidence as required by Rule 56(c). (GO No. 1.)

The second sentence is not supported by competent record evidence as required by Rule 56(c), as it constitutes an opinion in an expert report that is not based on personal knowledge and that is inadmissible under Rule 703, or even by the evidence cited. (GO Nos. 1, 3.) Methodist has moved to exclude the proposed expert opinions of Lucy Carter. (*See* Dkt. Nos. 324–325.) Regardless, Carter's expert report cited by the government (Dkt. No. 324-1) offers no opinion on

whether the arrangement was "commercially reasonable." Carter testified that she had not developed an opinion as to what amount West should have paid Methodist for the space being utilized and that she did not even know how large that space was. (CSOF Reply Ex. 8, Carter Expert Dep. 276:10–22.)

This paragraph also is unsupported by a specific citation to the record. (GO No. 8.)

33.     As noted above, when West moved its principal place of business to 7945 Wolf River Blvd in Germantown, which Methodist owned, Methodist never required West to pay any rent and never entered into a lease or even determined the fair market value for this location during the relevant time period.  In connection with the conclusion of Methodist's contractual relationship with West, Methodist eventually determined the building was valued at $70 million, but still never made any attempt to quantify how much West should have been paying for the use of this space as its principal place of business.  Sweet Decl., Ex. 74 (McLean Email to Ugwuke re: $70 Million as of 12/19/18).

**RESPONSE:** This assertion is not supported by record evidence as required by Rule 56(c). (GO No. 1.) It is also immaterial to Defendants' Motion. (GO No. 6.)  In the cited email, upon receipt of an appraisal of $19.2 million for some assets not identified in that exhibit, Dr. Ugwueke observed, "[W]e are talking *almost* $70 million total with the building." (Sweet Decl. Ex. 74, McLean Email of 12/19/2018 (emphasis added).) The government's characterization of this email should be disregarded. (GO No. 2.)

34.     Of course, West had been expanding its business and adding new locations throughout the parties' affiliation, as reflected in its Annual Reports.  Sweet Decl, Exs. 4, 36 & 38.

**RESPONSE:** This assertion is not supported by the evidence cited as required by Rule 56(c), is a self-serving characterization of annual reports that speak for themselves, and is

immaterial to Defendants' Motion. (GO Nos. 1, 2, 6.) To the extent a response is required, it is undisputed that West Clinic opened additional locations during the seven years of the parties' affiliation, but that is immaterial to Defendants' Motion.

35.     None of the Affiliation Agreements were ever amended to include the 7945 Wolf River Boulevard location.  Sweet Decl. Ex. 63 (Bass Ltr. to Foley of 10/17/18) ("7945 Wolf River Boulevard is not defined as a 'Cancer Center Site' in the Unwind Agreement"); Ex. 64 (Foley Ltr. to Bass of 10/19/18).

**RESPONSE:** The government's characterization of the terms of the Affiliation Agreements as requiring amendment to encompass the clinic cite at 7945 Wolf River Boulevard should be disregarded. (GO No. 2.) To the extent a response is required, it is disputed but immaterial. (GO No. 6.) The PSA specifically contemplated that the parties would relocate from the Humphreys space. (SUMF Ex. 11, PSA at §1.9 & MLH_000029.)

36.     When Methodist and West ended their relationship, Methodist took a position that West could not purchase the Wolf River location from Methodist under the Unwind Agreement. Sweet Decl. Ex. 63 (Bass Ltr. to Foley of 10/17/18) ("7945 Wolf River Boulevard is not defined as a 'Cancer Center Site' in the Unwind Agreement"); Ex. 64 (Foley Ltr. to Bass of 10/19/18).

**RESPONSE:** Disputed, but immaterial to Defendants' Motion. (GO No. 6.) At the end of the affiliation, West purchased from Methodist the real estate at 7945 Wolf River Boulevard and the equipment, furniture, fixture, machinery, vehicle, instructions, inventory, supplies, and other services. (Compl. ¶ 348); (Answer ¶ 348); (*see also* Dkt. No. 322, SUMF ¶ 187.)

37.     From the outset, Methodist had knowledge that it needed to enter into agreements concerning dual use assets to avoid regulatory issues.  ECF Nos. 323-13 and 323-14.

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) This paragraph also is unsupported by a specific citation to the record as required by Rule 56(c), but instead cites generally to the 489-page APA and 35-page LEA. (GO No. 8.) The APA addresses dual use assets (SUMF Ex. 14, APA § 2.3), but this alone does not support the government's characterization and legal conclusion as to Methodist's knowledge or any purported "regulatory issues" related to dual use assets. (GO No. 2.)

38. Methodist knew it could not pay West kickbacks in exchange for referrals. Ex. G (McLean Dep. Vol. I) 45:2-12.]

**RESPONSE:** Undisputed. (GO No. 7.)

39. In 2015, Methodist's internal counsel acknowledged that it was not proper to have employees leased to Methodist doing work for West without an agreement. Sweet Decl., Ex. 69 (Field email to McLean and Mounce of 03/30/15) ("To the extent that Sandra and her team are devoted to Methodist employees and the clinics that we operate under the Service Agreement, no problem. However, if Sandra and her team are involved in the hiring of West Clinic employees that will be leased by Methodist and West Clinic employees that are staffing the clinics that are not operated under the Service Agreement, we must have an agreement in place to cover this service to West and Methodist must be compensated for these services to avoid regulatory implications under Stark.").

**RESPONSE:** Undisputed that this paragraph correctly quotes from the cited email. The characterization or interpretation of the email by counsel is not supported by any record evidence and the government's characterization of what is "proper" is a legal conclusion to which no response is required and should be disregarded. (GO No. 2.)

40.    Methodist knew that the draft FMV opinion it obtained from HAI was based on incorrect assumptions, including that it was contrary to the terms of the LEA in that Erich Mounce would be paid as a leased employee and was not being paid by West as an expense of the base management fee, that West would not be providing management services at all the locations in the MSA, and that West was essentially being paid to manage its own patients. Yet Methodist used the top end of the range for the amount in the MSA.  Ex. D (Schwartzberg Dep.) at 78:6-11; 87:3-10; 104:3-22; Ex. G (McLean Dep. Vol. I) at 248:2-10, 249:1-14; Ex. A (Ugwueke Dep.) at 167:21-168:14; ECF No. 328-1 at 31-35; ECF No. 323-34.

**RESPONSE:**  The first sentence is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) It is undisputed that Mounce was a leased employee to Methodist under the LEA, which is what Schwartzberg, McLean, and Ugwueke testified in the cited deposition testimony. None of the cited testimony addresses any other supposedly "incorrect assumptions" in the HAI opinion or asserted in this paragraph. The PwC Baseline Assessment (SUMF Ex. 34) likewise does not support the government's characterizations. (GO No. 2.) To the extent a response is required to this portion of the assertion, it is disputed. McLean, who was Methodist's corporate designee under Rule 30(b)(6), testified that he did <u>not</u> understand HAI's valuation to require Erich Mounce be paid only as an expense from the base management fee. (CSOF Reply Ex. 3, McLean Dep. Vol. I 244:14–246:4); (SUMF Ex. 49, McLean Dep. Vol. I 260:12–261:5.) West physicians provided management services to all locations in the MSA. (SUMF Ex. 53, Schwartzberg Dep. 189:18–23; 210:5–15); (CSOF Reply Ex. 9, Tauer Dep. 18:17–21); (SUMF Ex. 55, Somer Dep. 174:10–175:1); (CSOF Reply Ex. 2, Mounce Dep. 184:10–19).

The statement that "West was essentially being paid to manage its own patients" is argument of counsel without any citations to the record as required by Rule 56(c). (GO Nos. 1, 2.)

27

To the extent a response to this unsupported statement is required, it is disputed. (CSOF Reply Ex. 4, Somer Dep. 179:5–17 ("Q: As a result of West entering into the management services agreement with Methodist, did that entail you having to perform work that you hadn't been doing prior to that agreement? A: Definitely, a lot of work.")); (SUMF Ex. 55, Somer Dep. 238:6–239:1 ("We had to build a lot of—we were building a big program, and that was an all-inclusive program. . . .").) The patients of West Cancer Center were Methodist patients. (SUMF Ex. 11, PSA § 3.11.)

Undisputed that the amount Methodist paid West under the MSA was at the top end of the fair market value range determined by HAI.

Opinion testimony derived from the Expert Report of Tim Smith (Dkt. No. 328-1), not based on personal knowledge, is not competent evidence to demonstrate the asserted facts at the summary judgment stage. (GO No. 3.) Methodist further objects this paragraph also is unsupported by a specific citation to the record as required by Rule 56(c). (GO No. 8.)

41. Although the Deal Agreements required Methodist to enter into a lease with West for its dual use employees at fair market value, this never occurred. The arrangement between Mr. McLean and Mr. Mounce in deciding to do something outside of the agreements was never vetted by a third party and is not based on any sound methodology. ECF No. 324-1.

**RESPONSE:** This assertion is not supported by competent record evidence as required by Rule 56(c). (GO No. 1.) Opinion testimony derived from the Expert Report of Lucy Carter (Dkt. No. 324-1) that is not based on personal knowledge and inadmissible under Rule 703 (*See* Dkt. No. 324) is not competent evidence to demonstrate the asserted facts at the summary judgment stage, and the government does not cite to a particular portion of her report. (GO Nos. 3, 8.) The statement that the agreement between McLean and Mounce was never "vetted" by a "third party" and is not based on any "sound methodology" is unsupported argument of counsel. (GO No. 2.)

To the extent a response is required, it is disputed but immaterial to Defendants' Motion. (GO No. 6.) McLean testified at length regarding the agreed process by which West repaid Methodist for dual use employees and assets, and the government offers no proof that those payments were not fair market value. (SUMF Ex. 49, McLean Dep. Vol. I 30:9–32:25); (SUMF Exs. 41–43, Overhead Allocation Spreadsheets); (SUMF Ex. 7, McLean Decl. ¶¶ 5-9); (*see also* Dkt. No. 322, SUMF ¶¶ 60–62.)

42.     From the outset, Methodist was aware that Mounce would continue to perform significant duties for West.  The parties advised the public that Mounce would "maintain his position with The West Clinic and take responsibility for Methodist's cancer service line, reporting directly to Gary Shorb."  Sweet Decl. Ex. 2.

**RESPONSE:** This assertion is not supported by competent record evidence as required by Rule 56(c). (GO No. 1.) The government cites to only what appears to be an unauthenticated webpage. To the extent a response is required, it is undisputed for the purpose of ruling on the motion for summary judgment only that Mounce continued to serve as CEO of West Clinic and also took responsibility for Methodist's oncology service line and reported to Gary Shorb, but immaterial to Defendant's Motion. (GO No. 6.)

43.     Under the MSA, the Operating Committee was tasked with oversight for the work that West was paid to do.  Yet it consisted of a majority of members that were West physicians (initially Drs. Schwartzberg, Tauer, Richey and Somer), who had oversight for themselves.  There were no Methodist physicians or clinical personnel on the Operating Committee, which initially included Methodist's CEO Gary Shorb and CFO Chris McLean, who negotiated the deal with West, and Vice President Donna Abney.  West's CEO Erich Mounce, who was leased to Methodist full time, and another West employee leased to Methodist full-time, Cheryl Prince, were the staff

tasked with management. Ms. Prince had principal responsibility for the performance criteria, which was her only job. Sweet Decl., Ex. 41 (Operations Committee Meeting Minutes 1/12/12).

**RESPONSE:** The first sentence is not supported by any record evidence as required by Rule 56(c), and Methodist objects to the characterizations of counsel. (GO Nos. 1, 2.) To the extent a response is required, the first sentence is undisputed.

Undisputed that Drs. Schwartzberg, Tauer, Richey and Somer were initial members of the Operating Committee. The statement that these doctors "had oversight for themselves" is a disputed characterization of counsel that is not supported by any record evidence as required by Rule 56(c). (GO Nos. 1, 2.)

Undisputed as to the third sentence, but immaterial to Defendant's Motion. (GO No. 6.)

The fourth sentence is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) It is undisputed that Mounce and Prince, who were leased employees, were management staff who attended Operating Committee meetings. But, the cited evidence does not support the assertion that they were "tasked with management." The government's interpretation of the document should be disregarded. (GO No. 2.)

The fifth sentence is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) The cited evidence states: "Performance based [management] criteria will be managed by the committee. The staff member with principal responsibility with these criteria will be Cheryl Prince." This does not support the assertion that this was Prince's "only job," nor that she was tasked with *performing* the performance based management tasks herself, as the government's characterization suggests. The next paragraph of the cited evidence discusses deciding who "needs to be on any of the performance based management responsibilities." (Sweet Decl. Ex. 41,

Operating Comm. Minutes 1/12/2012 at 3.) The government's interpretation of the document should be disregarded. (GO No. 2.)

None of the statements contained in this paragraph are material to Defendants' Motion. (GO No. 6.) Methodist also objects that this paragraph contains at least five purported facts. (GO No. 9.)

44.     Despite the fact that Mr. Mounce and Ms. Prince were performing much of the duties under the MSA on behalf of West and their salaries were paid by Methodist, Methodist never bothered to enter into any agreement to consider how much of their salaries should be reimbursed.  Rather, Mr. McLean and Mr. Mounce agreed to the cost allocation "bucket approach" Mr. McLean came up with.  ECF No. 324-1.

**RESPONSE:** The first sentence is not supported by competent record evidence as required by Rule 56(c) and is characterization of counsel and should be disregarded. (GO Nos. 1, 2.) Opinion testimony from the Expert Report of Lucy Carter (Dkt. No. 324-1) that is not based on personal knowledge and is inadmissible under Rule 703 (*see* Dkt. No. 324) is not competent evidence to demonstrate the asserted facts at the summary judgment stage, and the government does not cite to a specific section of the report.  (GO Nos. 3, 8.)

The second sentence is not supported by competent record evidence as required by Rule 56(c). (GO No. 1.) Opinion from the Expert Report of Lucy Carter (Dkt. No. 324-1) that is not based on personal knowledge is not competent evidence to demonstrate the asserted facts at the summary judgment stage. (GO Nos. 3, 8.) To the extent a response is required, it is disputed in part as to the second sentence. Mr. McLean testified at length regarding the agreement between Methodist and West by which West repaid Methodist for dual use employees, which included senior management such as Mounce and Prince. (CSOF Reply Ex. 3, McLean Dep. Vol. I 30:9–

34:7); (SUMF Exs. 41–43, Overhead Allocation Spreadsheets); (*see also* Dkt. No. 322, SUMF ¶¶ 60–62.) Undisputed that Mr. McLean described the allocation process as involving a "bucket approach," but immaterial to Defendants' Motion. (GO No. 6.)

45. The two West physicians that were the only Medical Directors appointed under the MSA had no idea that they had duties with respect to Methodist. Dr. Schwartzberg was not even present at the second meeting of the Operating Committee or Operations Committee, and neither was Mr. McLean. The lack of importance of the Base Management duties under the MSA is demonstrated in that it is not a focus of discussion beyond payment. Instead, the main focus of the Operating Committee was listed under "Old Business" as an update on 340B. The second item was identifying Dr. Schwartzberg and Dr. Tauer as Medical Directors under the MSA. Sweet Decl., Ex. 42 (Methodist and West Meeting Minutes of 02/12/2012).

**RESPONSE:** Methodist objects that this paragraph contains at least five purported facts. (GO No. 9.)

The first sentence is not supported by the cited evidence as required by Rule 56(c) and includes characterization of meeting minutes that speak for themselves and purported testimony of counsel. (GO Nos. 1, 2.)

Undisputed as to the second sentence, but immaterial. (GO No. 6.)

The third sentence is not supported by the cited evidence as required by Rule 56(c) and includes characterization of counsel regarding a single set of committee minutes, just two months into the affiliation. (GO Nos. 1, 2.) To the extent a response is required, it is disputed. Even the cited evidence notes that the next meeting would include "a status update of the performance based management criteria." (Sweet Decl. Ex. 42, Operating Comm. Minutes 2/9/2012 at 2 § III.C.) Admissible record evidence refutes the government's argument about the alleged "lack of

importance of the Base Management duties[.]" (SUMF Ex. 1, Tillmanns Decl. ¶ 26); (*Id.* Ex. 2, Richey Decl. ¶¶ 10, 17); (*Id.* Ex. 3, Ballo Decl. ¶ 27); (*Id.* Ex. 4, Portnoy Decl. ¶ 18); (*Id.* Ex. 5, Berry Decl. ¶ 5); (CSOF Reply Ex. 2, Mounce Dep. 183:3–184:19, 328:4–25.)

The fourth sentence is not supported by the cited evidence as required by Rule 56(c) and includes characterization of counsel regarding which items were the "main focus" compared to others in the minutes, to which no response is required. (GO Nos. 1, 2.) It is undisputed that an update on 340B approval was included under "Old Business." (*Id.* at 1 § III.A.)

Undisputed as to the fifth sentence. (GO No. 7.)

46.     The service line management proposal was supposed to have been attached as Exhibit A, but no such document was appended to the minutes.  Sweet Decl, Ex. 42 (Methodist and West Meeting Minutes 02/09/12).  Since West previously had not been providing any inpatient management services at any of the locations in the MSA, there should have been significant work done to develop a proposal.  None exists.

**RESPONSE:** Undisputed as to the first sentence, but immaterial to Defendants' Motion. (GO No. 6.)

The second and third sentences are not supported by any record evidence as required by Rule 56(c). (GO No. 1.) The characterization of meeting minutes and purported testimony of counsel lacking personal knowledge should be disregarded. (GO No. 2.) It is undisputed that West was not providing inpatient management services at Methodist prior to the affiliation.

47.     During the last two years of the MSA, the Operating Committee met only twice.  It had morphed into multiple names and was not clear that it had anything to do with confirming that West physicians, as opposed to leased employees, were doing the Base Management duties under the MSA for which it received 60% of the total compensation Methodist agreed to each year.  As

33

discussed *supra*, Methodist has not submitted any admissible evidence to show what work West did and who precisely did the work to justify the millions of dollars in base management fees for the entire seven years. The self-serving declarations are not sufficient, and it is belied by the fact that Mr. Mounce and Ms. Prince seem to have done most of the work, along with other leased employees, including Melissa Speer. *See, e.g.*, Sweet Decl. Exs. 35, 41-50, 67 (various meeting minutes) & ECF Nos. 323-44 to 323-46; Sweet Ex. 27 (2012 Payroll records); ECF No. 323-14. It is also entirely unclear that West physicians provided management services at all of the locations in the MSA, including University. No documentation was kept of what they had done, and the physicians had little role in University, as Mr. Liebman has attested. Liebman Decl. ¶¶ 57-63.

**RESPONSE:** Undisputed as to the first sentence that the Operating Committee met twice in 2017 and twice in 2018, but immaterial to Defendants' Motion. (GO No. 6.)

The remainder of this paragraph is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) This paragraph also is unsupported by a specific citation to the record as required by Rule 56(c), but instead cites generally to sixteen different multi-page documents. (GO No. 8.) Characterization of counsel, to which no response is required, should be disregarded. (GO No. 2.) Moreover, the name of the committee is immaterial to Defendant's Motion. (GO No. 6.)

It is undisputed that 60% of the total management fee paid was for base management services and 40% was the incentive management fee. To the extent a response is required to the government's improper argument that West did not perform management services as required under the MSA, it is disputed. The sworn testimony from West physicians reflects the management services they provided. (SUMF Ex. 1, Tillmanns Decl. ¶¶ 9, 11–13, 15, 17, 19, 21, 22) (*Id.* Ex. 2, Richey Decl. ¶¶ 11–13, 16, 18, 20, 22, 23, 25–27); (*Id.* Ex. 3, Ballo Decl. ¶¶ 5, 9, 11, 13, 14, 16, 20–22, 24); (*Id.* Ex. 4, Portnoy Decl. ¶¶ 7, 8, 10, 12, 15–17); (*Id.* Ex. 5, Berry Decl. ¶¶ 6, 7, 10,

11.) Multiple witnesses have also testified as to how West's management services applied to all locations covered under the contracts. (SUMF Ex. 49, McLean Dep. Vol. I 140:12–142:10); (SUMF Ex. 53, Schwartzberg Dep. 188:25–191:3.) Even the sporadic subset of minutes the government cited reflect management work by West physicians. (*See, e.g.,* Sweet Decl. Ex. 35 at III.A., IV.C.ii-iii.); (*Id.* Ex. 42 at III.B., III.D., IV.C.); (*Id.* Ex. 45 at III.A.b., IV.A.)

Methodist objects that this paragraph contains at least six purported facts. (GO No. 9.)

48. Methodist paid West the entire base management fee under the MSA from 2012 through 2018. ECF No. 323-49 at 204:2-5 ("And did Methodist pay the entire base fee to West through -- from 2012 through 2018? Yes.").

**RESPONSE:** Undisputed. (GO No. 7.)

49. After the initial incentives were set to obtain a purported fair market value opinion for the MSA, Methodist and West paid minimal attention. In fact, the incentives for 2013 were not approved until year end. For example, at the December 4, 2013 meeting of the "Operations Committee," the 2013 incentives under the MSA were approved, and the criteria for the 2014 incentives were approved without any specific deadlines or detailed and measurable milestones. Sweet Decl., Ex. 67.

**RESPONSE:** The first sentence is not supported by the cited evidence as required by Rule 56(c), is characterization of meeting minutes that speak for themselves and purported testimony of counsel lacking personal knowledge, and should be disregarded. (GO Nos. 1, 2.)

The second and third sentences are not supported by any record evidence as required by Rule 56(c). (GO No. 1.) To the extent a response is required, it is disputed but not material to Defendants' Motion. (GO No. 6.) Earlier milestones under the performance incentive metrics were invoiced and approved for payment throughout 2013. (Dkt. No. 322, SUMF ¶ 156.)

As to the third sentence, the characterization and argument of counsel that the performance incentives lacked detailed and measurable milestones should be disregarded. (GO No. 2.) To the extent a response is required, it is disputed. (*See* Sweet Decl. Ex. 67, 12/4/2013 Operations Comm. Minutes at 8–9.)

50.    As West could not automatically earn the incentives, the parties set attainable goals and that would not even be determined until mid to year end, with West setting and approving the goals and the payments of these incentives.   The parties agreed to the performance incentive components from 2014-2018 with no outside input or vetting or involvement of any Methodist clinical personnel.  *See, e.g.*, Sweet Decl. Exs. 35, 41-50, 67 (various meeting minutes) & ECF Nos. 323-44 to 323-46.

**RESPONSE:** The assertion that "the parties set attainable goals . . ." is not supported by the cited evidence as required by Rule 56(c) and is characterization of counsel, to which no response is required. (GO Nos. 1, 2.)

It is disputed that the performance incentives were not determined until mid to year end. The undisputed evidence shows that the parties set incentive metrics at year-end for the following year. For example, as described in CSOF ¶ 49, above, the parties set the 2014 incentive metrics at the end of 2013. (*See* Sweet Decl. Ex. 67, 12/4/2013 Operations Comm. Minutes at 8–9.)

Undisputed for the purpose of summary judgment only as to the second sentence, but immaterial to Defendant's Motion. (GO No. 6.)

This paragraph also is unsupported by a specific citation to the record as required by Rule 56(c), but instead cites generally to more than a dozen multi-page documents. (GO No. 8.)

51.    Methodist's current CFO acknowledged that West presented metrics to the Cancer Council that the Council then "agreed upon" when approving West's own incentive payments from

Methodist. Lane Dep. 136:14-137:24. In other words, West supplied the metrics used to determine its bonus from Methodist under the MSA. *Id*.

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) In particular, Methodist objects that the second sentence is characterization and argument of counsel, which is not supported by the quoted testimony of Chuck Lane and should be disregarded. (GO No. 2.) Lane testified that he was personally involved in approving one incentive *payment* to West under the MSA in 2017 or 2018. (ROSF Ex. J, Lane Dep. 136:8–13.) The cited testimony provides no evidence about the *adoption* of incentive metrics.

To the extent a response is required, it is disputed. As discussed above, the evidence conclusively establishes that the Operating Committee, which included Methodist representatives, adopted incentive metrics for West for the following year. *See supra*, CSOF ¶ 50. Methodist would then approve payment for the incentive fees *if* the performance metrics were achieved. (ROSF Ex. J, Lane Dep. 137:1–24 ("West Cancer team presented the metrics. There was a conversation in the room about whether we were in agreement that the metrics were met or not.") Methodist did not always approve payment in full of all available incentive management fee. (COSF Reply Ex. 2, Mounce Dep. 278:24–279:4 ("West did not always earn the full amount of the performance incentive")); (SUMF Ex. 47. Mounce Dep. 434:7–435:21 ("To my memory we never hit every single incentive.")); (*See also* Dkt. No. 322, SUMF ¶ 157.)

52. These milestones included publishing "annual reports" that were part of the base management duties under the MSA. Yet, no annual report was produced for 2012 or 2013. And all of the annual reports produced relate to the work of West – not limited to Methodist locations – and are marketing documents that a jury can conclude have nothing to do with the MSA requirements. Sweet Decl., Exs. 4, 36, 38; 71-73.

**RESPONSE:** These assertions are not supported by the cited evidence as required by Rule 56(c), and the characterization of counsel should be disregarded. (GO Nos. 1, 2.)

To the extent a response is required, it is disputed in part. It is undisputed that annual reports were a base management item, but it is disputed that the incentive metrics related to annual reports were merely duplicative. In two of the cited incentive fee invoices, the item related to an annual report required inclusion of specific data points beyond what is described in the MSA. (SUMF Ex. 12, MSA § 1.20); (Sweet Decl. Ex. 71 at § A.iv); (*Id.* Ex. 72 at § A.iii.) The third cited invoice (*Id.* Ex. 73) does not have a performance metric related to an annual report. Though the West Cancer Center did not produce a public Annual Report in 2012 or 2013 like it did in later years, West still reported to Methodist on the accomplishments of West Cancer Center. (*See* Dkt. No. 322, SUMF ¶¶ 91, 95, 97–99, 156.) The third sentence is also immaterial to Defendants' Motion and should be disregarded. (GO No. 6.)

53.    In October 2015, Methodist agreed to pay West an incentive payment of $52,650.00 to publish the 2014 Annual Report.  Sweet Decl., Ex. 71 (West Management Incentive Payment October 2015).

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) To the extent a response is required, it is undisputed that Methodist agreed to pay West an incentive payment of $52,650.00 for a performance metric relating to an annual report, but disputed that the payment was for an annual report alone. The payment was conditioned upon publication of an annual report that specifically included data about cancer types and drug studies, which necessarily required management work to generate, track and compile. (Sweet Decl. Ex. 71 at § A.iv.)  Nonetheless, this assertion is immaterial to Defendants' Motion. (GO No. 6.)

38

54. One of the 2016 incentives set and approved in July 2017 for which Methodist agreed to pay West related to publishing the 2016 Annual Report, which is Exhibit 36 to the Sweet Declaration. Sweet Decl., Ex. 72 (2017 West Management Incentive.)

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) To the extent a response is required, it is disputed in part, but immaterial to Defendants' Motion. (GO No. 6.)

It is undisputed that in July 2017 Methodist agreed to pay West an incentive payment for a performance metric relating to a 2016 annual report. It is disputed that this performance metric was *set* in July 2017. It is also disputed that the payment was for an annual report alone. The payment was conditioned upon publication of an annual report that specifically included data about specific cancer types and drug studies, which necessarily required management work to generate, track and compile. (Sweet Decl. Ex. 72 at § A.iii.)

55. West's 2018 Annual Report, which necessarily covers the time period during the MSA but was published in 2019 after the relationship with Methodist was terminated, fails to mention Methodist in any way. Sweet Decl., Ex. 4 (2018 Annual Report).

**RESPONSE:** Undisputed for the purpose of summary judgment only, but immaterial to Defendants' Motion. (GO No. 6.) Given that at the time the 2018 Annual Report was published the affiliation had unwound and West was then a "partner of OneOncology" (Sweet Decl. Ex. 4 at MLH_132640), it is immaterial if the 2018 annual report that it does not mention Methodist.

56. One of the 2015 incentive items for which Methodist paid West $11,250.00 was to complete the "integration of West MLH Culture - Center wide unfreeze." This was approved at the April 1, 2015 PSA Operating Committee meeting. Sweet Decl., Ex. 73 (April 2015 West Management Incentive Payment.)

**RESPONSE:** Undisputed. (GO No. 7.)

57.     These payments may be cloaked under the MSA, but it is far from clear that the payments were not simply kickbacks as opposed to for work done under that agreement.  The focus of the Operating Committee - under whatever name was used – was to further the work under the Expansion Plan that was attached to the PSA, which was supposed to be the document setting the agreement to compensate West for professional services.  The Expansion Plan had nothing to do with the work West could be paid for under the PSA.  ECF No. 323-11.

**RESPONSE:** This assertion does not state a material fact supported by record evidence as required by Rule 56(c), but rather is mischaracterization of documents and argument of counsel. (GO Nos. 1, 2.) The only evidence cited is the entire PSA, which in no way supports the government's self-serving characterization and argument of counsel. (GO Nos. 2, 8.) That the "Expansion Plan" is attached as Exhibit B to the PSA, as opposed to any other of the related affiliation agreements, is immaterial to Defendants' Motion. (GO No. 6.)

58.     When Methodist enrolled to submit claims electronically to Medicare, it certified that "it will submit claims that are accurate, complete and truthful."  Sweet Decl., Ex. 78 (EDI Agreement) at 8.

**RESPONSE:** Undisputed. (*See* GO No. 7.)

59.     The Medicare cost reports that Methodist signed and submitted to Medicare for each applicable year contained the following certification:  Sweet Decl., Ex. 79 (Methodist's Cost Reports).

**PART II – CERTIFICATION**
MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW.  FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED

THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULTCERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)

I HEREBY CERTIFY THAT I HAVE READ THE ABOVE STATEMENT AND THAT I HAVE EXAMINED THE ACCOMPANYING ELECTRONICALLLY FILED OR MANUALLY SUBMITTED COST REPORT AND THE BALANCE SHEET AND STATEMENT OF REVENUE AND EXPENSES PREPARED BY MEDOSIT H/C/ MEMPHIS HOSPT. (44-049) (PROVIDER NAME(S) AND NUMBER(S)) FOR THE COST REPORTING PERIOD BEGINNING 01/01/2013 AND ENDING 12/31/2013, AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS A TRUE, CORRECT AND COMPLETE STATEMENT PREPARED FROM THE BOOKS AND RECORDS OF THE PROVIDER IN ACCORDANCE WITH APPLICABLE INSTRUCTIONS, EXCEPT AS NOTED. I FURTHER CERTIFY THAT I AM FAMILIAR WITH THE LAWS AND REGULATIONS REGARDING THE PROVISION OF HEALTH CARE SERVICES, AND THAT THE SERVICES IDENTIFIED IN THIS COST REPORT WERE PROVIDED IN COMPLIANCE WITH SUCH LAWS AND REGULATIONS.

The above Medicare cost report was signed by Methodist's then CFO McLean. Methodist knew and expected to obtain referrals from West as part of the deal.

**RESPONSE:** This assertion is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) The government cited only one cost report signed June 9, 2014 despite asserting a fact related to "each applicable year." To the extent a response is required, it is undisputed for the purpose of summary judgment only that Methodist's cost reports contain the asserted language. It is also undisputed that McLean signed the one cited cost report. (GO No. 7.)

The last sentence is not supported by any record evidence at all as required by Rule 56(c). (GO No. 1.) The last sentence is self-serving testimony of counsel with no personal knowledge and should be disregarded. (GO No. 2.) To the extent a response is required, it is disputed. (SUMF Ex. 49, McLean Dep. Vol. I 39:2–40:2); (SUMF Ex. 53, Schwartzberg Dep. 267:18–269:11); (SUMF Ex. 55, Somer Dep. 234:25–236:2); (SUMF Ex. 54, Tauer Dep. 247:17–250:9.)

41

60.    Methodist's former CEO Shorb acknowledged that Methodist "would see more patients" through its alliance with West.  Ex. I (Shorb Dep.) at 71:7-14.

**RESPONSE:** This assertion is not supported by the cited testimony as required by Rule 56(c) and the characterization of counsel should be disregarded. (GO Nos. 1, 2.) CEO Shorb actually testified: "We recognized that if we changed the way cancer was delivered, if we recruited new physicians, if we improved the quality, if we improved the culture of West Clinic, that, yes, we would see more patients." (ROSF Ex. I, Shorb Dep. 71:10–14.)

61.    West began tracking the referrals immediately with a focus on the daily census for West physicians attending to patients at Methodist locations. Sweet Decl., Ex. 68 (Mounce Email to T Myers re West Methodist Hospital Census as of 02.21.2012; Liebman Decl., ¶¶ 12-14, 20.

**RESPONSE:** This assertion is not supported by the evidence cited as required by Rule 56(c). (GO No. 1.) The cited email correspondence is inadmissible hearsay (GO No. 4.) and does not support the government's characterization that "West began tracking referrals immediately." The cited statements from Liebman's declaration likewise do not support this assertion. To the extent a response is required, it is disputed. Mounce denied tracking referrals and explained that the cited email related to monitoring facility admissions and volume of services. (COSF Reply Ex. 2, Mounce Dep. 109:9–112:15.) Methodist's CFO Chuck Lane likewise denied that Methodist tracked referrals. (COSF Reply Ex. 1, Lane Dep. 67:22–68:15.) The cited testimony by Liebman states that *Methodist's* accounting system tracked volumes for "all physicians affiliated with the Methodist system" and that during his tenure with Methodist, he received "extensive historical and current financial data regarding inpatient admissions for every service line, including oncology." (Liebman Decl. ¶¶ 12-14, 20.)

62.     West expected to be paid for its referrals and the benefit Methodist saw through the 340B Program, and Methodist agreed to do so, paying West far above what similar physicians in the area were paid.  Stern Decl. ¶¶ 34-36 & Ex. 11; Liebman Decl., ¶¶ 67-70

**RESPONSE:** The assertion that "West expected to be paid for its referrals" is not supported by the evidence cited as required by Rule 56(c).  (GO No. 1.) None of the cited statements from Stern's or Liebman's declarations speak to whether West "expected to be" or was paid "for its referrals." The assertion that Methodist agreed to pay West "far above what similar physicians in the area were paid," is not also supported by the evidence cited as required by Rule 56(c).  (GO No. 1.) The statements of Dr. Sandeep Samant, who was not identified in the United States' initial disclosures and has provided no testimony in this case, are inadmissible hearsay and should be disregarded. (GO No. 4.) Statements in Liebman's and Stern's declarations that contradict their sworn testimony cannot create a genuinely-disputed fact and should be disregarded. (GO No. 5.) Neither have personal knowledge of West's or West physicians' compensation. (COSF Reply Ex. 6, Liebman Dep. 71:6–12); (COSF Reply Ex. 5, Stern Dep. 39:4–8, 65:24–66:2.)

To the extent a response is required, it is disputed. Admissible record evidence from witnesses with personal knowledge of the facts contradicts this assertion. (*See, e.g.,* COSF Reply Ex. 2, Mounce Dep. 109:9–14 ("[N]one of us were looking for an increase of referrals to the Methodist Healthcare system. We were working to build a much better cancer program that provided more services.")); (SUMF Ex. 53, Schwartzberg Dep. 267:18–269:11 ("Q. Did West ever solicit payments or remuneration from Methodist in exchange for referring patients to Methodist? A. Absolutely not.")); (SUMF Ex. 55, Somer Dep. 234:25–236:2); (SUMF Ex. 54, Tauer Dep. 247:17–250:9.)

63.     In May 2012, West CEO and dual Methodist employee Mounce emailed tracking information to Methodist employees, including CFO McLean, on referrals to "other [non-Methodist] centers." He noted that "we are on target to have about 150 referrals pushed elsewhere. Mounce also noted that West did "901 referrals to rad[iation] onc[ology]. I am not sure all of these could move but let's say 50-75% of them could." Mounce emailed Methodist employees, including its CFO McLean, that he was "pushing our doc[tor]s on the Medicare patients." Sweet Decl., Ex. 80 (Mounce email to McLean Re Referrals Radiation Oncology as of 05.13.2013)

**RESPONSE:** Undisputed for the purpose of summary judgment only that the email contains the quoted language, but immaterial to Defendants' Motion. (GO No. 6.) The government's interpretation and characterization of the email should be disregarded. (GO No. 2.)

64.     Methodist knew that the West referrals were increasing and that the referrals to Baptist were decreasing. Methodist acknowledged that the inpatient referrals from West doubled during the course of the affiliation. Sweet Decl., Ex. 75 (McLean email to T Haynes re: Oncology -Financial Statement as of 11/13/13); Ex. G (McLean Dep. Vol. I) at 1 42:21-44:17.) Methodist's internal documents show that the referrals that Methodist got from West were critical to Methodist's margins, and there were many discussions of Methodist management about how West was critical to Methodist's increased financial performance. Liebman Decl., ¶¶ 9, 17, 53 & Ex. 2. These outpatient and inpatient referrals were largely made up of Medicare patients, as West's referrals of Medicare patients to Baptist decreased and West referrals doubled. *Id.* ¶¶ 18, 20-22, 24., 26, 78 & Ex. 4. The increase in Methodist's financial performance from 2011 through 2018 is reflected in its financial statements, which show that revenues doubled. Sweet Decl., Ex. 7 (Methodist    Healthcare    Memphis    Tax    Filing    and    Audits)    *available    at*

https://projects.propublica.org/nonprofits/organizations/620479367 (identifying $1,339,545,048 for fiscal year 2011 to $2,232,575,542 for fiscal year 2018).

**RESPONSE:** Methodist objects that this paragraph contains at least seven purported facts. (GO No. 9.)

Undisputed for purposes of summary judgment only that Methodist knew West's referrals to Methodist were increasing. The statement that Methodist also knew that West's referrals to Baptist were decreasing is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) The cited testimony from McLean contradicts this statement. (CSOF Reply Ex. 3, McLean Dep. Vol. I 42:21–44:17 ("We didn't run specific numbers. We did know historically they were closer tied to Baptist in their history . . . So we knew the general market layout. We didn't know the specific – or we didn't pull up the specific volumes.").)

The assertion that Methodist acknowledged that "inpatient referrals from West doubled" during the affiliation is not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) None of the cited evidence contains any numbers or testimony about the number of "inpatient referrals" or by what margin any such referrals increased. The cited testimony from McLean contradicts this statement, providing that Methodist did not routinely track West inpatient referrals during the affiliation. (*Id.* ("At that time, that wasn't something that we were tracking, but on a [] non-routine bases, those reports were pulled and I can see that volume from West did change.").)

The assertion that Methodist's internal documents show that West's referrals were critical to Methodist's margins and that there were management discussions of West's impact on Methodist's financial performance is undisputed, but immaterial to Defendants' Motion. (GO No. 6.)

The assertion that West's referrals were "largely made up of Medicare patients," is undisputed for purposes of summary judgment only.

The assertion that "West's referrals of Medicare patients to Baptist decreased and West referrals doubled" is not supported by the cited evidence as required by Rule 56(c) and should be disregarded. (GO No. 1.)

The assertion that the increase in Methodist's financial performance is reflected in Methodist's financial statements is undisputed. Methodist objects to the government's characterization of the financial statements, which speak for themselves and are the best evidence of their content. (GO No. 2.)

65.     Methodist knew it could not pay West kickbacks in exchange for referrals.  Ex. G (McLean Dep. Vol. I) at 45:2-12.

**RESPONSE:** Undisputed. (GO No. 7.)

66.     Under the PSA, Methodist was paying West at rates that were high in the local market, and that did not satisfy the ratio of compensation to collections, for which Methodist let Erich Mounce sign off on.  The opinion it obtained from ECG did not take into account that Methodist was paying West for the NPPAs under the LEA, and then also under the PSA and at rates that were above fair market value.  ECF No. 328-1.

**RESPONSE:** The assertions in this paragraph are not supported by the cited evidence as required by Rule 56(c), and the government cites no record evidence that the rates Methodist was paying West were "high in the local market." (GO No. 1.) The government cites only to its expert's entire report, offered in support of an opinion made without personal knowledge, which is not competent evidence to demonstrate a fact at the summary judgment stage. (GO Nos. 3, 8.) To the extent a response is required, it is disputed.

46

Smith testified that the second sentence is not based on personal knowledge. (CSOF Reply Ex. 10, Smith Expert Dep. 70:13–71:4 ("Q. But the ECG report does not state explicitly one way or the other whether the RVU rates can be applied to services performed by NPPAs? A. Yeah, there's not a -- if you -- if by your question you mean, do they have this explicit statement, okay, there's no -- I did not see that explicit statement[.]"); *see also id.* 75:14–76:10.)

The second sentence is also not material because Complaint does not claim that Defendants double paid for NPPAs, nor did the government identify payments for NPPAs as a type of remuneration in response to Methodist's discovery requests asking the government to identify any alleged unlawful remuneration. (GO No. 6.)

67. The amount that Methodist paid West under the PSA for 2012 and 2013 did not satisfy the central condition as to the ratio of professional collections to wRVU payments that ECG identified in its 2011 [draft] opinion. But Methodist did not obtain a new FMV opinion for the PSA in 2014. Methodist continued to pay West under the PSA for 2014 and 2015 at the same rates that ECG identified in 2011. ECF No. 328-1. These rates were higher than the national 90th percentile and much higher than what other Memphis oncologists were being paid. Stern Decl. ¶¶ 37-46

**RESPONSE:** Methodist objects that this paragraph contains at least five purported facts. (GO No. 9.)

The first sentence is not supported by admissible evidence as required by Rule 56(c). (GO No. 1.) The government cites only to its expert's entire report with no further guidance to the Court, which, offered in support of an opinion not based on personal knowledge and inadmissible under Rule 703 (*see* Dkt. No. 328), is not competent evidence to demonstrate a fact at the summary

judgment stage. (GO Nos. 3, 8.) To the extent a response is required, it is disputed by Methodist's expert. (SUMF Ex. 8, Mello Decl. and Report, Rebuttal Opinion 1 at 19.)

The second and third sentences are undisputed but immaterial to Defendants' Motion. (GO No. 6.)

The last sentence is not supported by admissible evidence as required by Rule 56(c). (GO No. 1.) Methodist further objects that statements in Stern's declaration that contradict his sworn testimony cannot created a genuinely-disputed fact. (GO No. 5.) Stern testified that he had no personal knowledge of West physicians' compensation. (CSOF Reply Ex. 5, Stern Dep. 65:24–66:2.)

68. When the referrals from West to Methodist increased, West wanted to be paid more. Since it was already paid an amount under the PSA at rates that did not satisfy the central condition in ECG's fair market value opinion, the only other option was to increase the fees under the MSA. Methodist waited to pay West under the MSA in 2014 until a new FMV opinion was obtained, and Methodist and West opinion shopped and then used the highest range of FMV provided. Sweet Decl., Ex. 34 (Ulery email to Mounce of 04/10/14); Ex. 35 (Operations Committee Meeting Minutes of 06/04/14); ECF No. 323-27. As discussed throughout, the 2014 FMV Opinion did not take into account that West was already engaged to perform the services for two years and had failed to do many of the base management items at all of the locations in the agreement, and that leased employees were doing much of the day-to-day work, which was essentially managing West's own patients. The ratio of compensation to collections under the PSA for the 2012-2013 period was 1.45. Ex. I (Shorb Dep.) at 162:4-166:16; Sweet Decl., Exs 81 & 82 (West Invoices 2012 and West Invoices 2013).

48

**RESPONSE:** Methodist objects that this paragraph contains at least eight purported facts. (GO No. 9.)

The statements that "West wanted to be paid more," and that the PSA rates "did not satisfy the central condition of ECG's fair-market value opinion," and that the "only other option was to increase fees under the MSA" are self-serving characterizations and argument of counsel that are not supported by evidence as required by Rule 56(c). (GO Nos. 1, 2.) To the extent a response is required, they are disputed but are immaterial to Defendants' Motion. (GO No. 6.)

The statement that Methodist waited to pay West under the MSA in 2014 until a new FMV opinion was obtained is undisputed for the purpose of ruling on the motion for summary judgment only.

The statement that Methodist and West "opinion shopped" is a self-serving characterization of counsel that is not supported by evidence as required by Rule 56(c). (GO Nos. 1, 2.) The statement that Methodist and West "used the highest range of FMV provided" is also not supported by the cited evidence as required by Rule 56(c). (GO No. 1.) To the extent a response is required, it is disputed but immaterial to Defendants' Motion. (GO No. 6.) The cited evidence shows only that on April 10, 2014 Erich Mounce received a preliminary fair-market value range from HAI "from $2,726,000 to $3,763,000 per year, assuming an annual program size of approximately $192,456,000 in net revenue." (Sweet Decl. Ex. 34, Ulery Email at 1.) On June 2, 2014, Methodist and West obtained an opinion from Altegra Health stating that "The overall fair market value for all of the services under the Agreement ranges from $4.32 million to $4.87 million per year." (SUMF Ex. 27 at West_0018582.) On June 4, 2014, "[a]fter significant discussion," the Operating Committee "tabled the approval of the higher incentive management fee until Erich [Mounce] and Chris [McLean] could further study the impact of the oncology service line." (Sweet Decl. Ex. 35,

6/4/2014 Operations Comm. at MLH_025293.) In 2014 and 2015, Methodist paid West Clinic less than $4,870,000, which was the "highest" amount provided by either valuator, under the MSA. (SUMF Ex. 7, "McLean Decl." ¶ 13.)

The statements that "the 2014 FMV Opinion did not take into account that West was already engaged to perform the services for two years and had failed to do many of the base management items at all of the locations in the agreement, and that leased employees were doing much of the day-to-day work, which was essentially managing West's own patients," are statements of counsel that are not supported by evidence as required by Rule 56(c), are self-serving characterizations, and are immaterial, and should be disregarded. (GO Nos. 1, 2, 6.)

The statement that "the ratio of compensation to collections under the PSA for the 2012-2013 period was 1.45" is disputed but immaterial Defendants' Motion. (GO No. 6.) The ratio in 2012 was 1.24, and the ratio in 2013 was 1.28. (Sweet Decl. Ex. 16 at Interrogatories 7–10.)

69. Summary charts and calculations of the relevant Methodist Medicare claims data show that for the period of January 1, 2012 through December 31, 2018 ("approximate deal period"), Medicare paid Methodist $58,816,954 for inpatient services and $314,484,565 for outpatient services in which the attending physician was one of the 86 West medical providers at times within that period when they were employed by West. Declaration of Michael Petron, *filed contemporaneously herewith* ("Petron Decl."), ¶¶ 4, 9.

**RESPONSE:** The declaration of Michael Petron is not admissible, is not competent evidence to demonstrate a fact at the summary judgment stage, and should be disregarded.[1] (GO

---

[1] Whether considered as fact or expert testimony, Methodist has filed a Motion to Strike the Declaration of Michael Petron and for Sanctions contemporaneously herewith. As noted in that Motion, because the government has failed to follow Fed. R. Civ. P. 26 on properly designating Petron as an expert witness, failed to follow F.R.E. 1006 on putting forward summary evidence, and misled Methodist that Petron would offer no evidence of causation, the Court should strike

50

Nos. 1, 3.) Petron testified that he had no role in pulling or supervising the pulling of the claims data" on which his summary opinions rely. Nor did he verify the data he received from counsel, and he testified that any knowledge he had regarding the source of the underlying claims data was based on his assumptions. (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) To the extent a response is required, the assertions in this paragraph are disputed but immaterial to Defendants' Motion. (GO No. 6.)

70. Of the $58,816,954 paid to Methodist for inpatient services as described above, there were eight providers for which the Medicare data demonstrates that providers (1) increased the number of Medicare beneficiaries for whom they provided services at Methodist from the pre-deal period of 2011 versus the period during the deal and (2) decreased the number of Medicare beneficiaries for whom they provided services at Medicare from the pre-deal period of 2011 versus the period during the deal. The total inpatient Medicare payments to Methodist for these eight physicians is $21,573,431. *Id.* ¶¶ 11, 15.

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶ 69; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) To the extent a response is required, the amounts of reimbursement set forth in this paragraph are disputed but immaterial to Defendants' Motion. (GO No. 6.) The remaining assertions in this paragraph are undisputed for purposes of summary judgment only but also are immaterial to Defendants' Motion. (GO No. 6.)

71. The names of the eight physicians identified above are Drs. Jason Chandler, Linda Smiley, Todd Tillmans, Robert Johnson, Mark Reed, Kurt Tauer, Bradley Somer, and Gang Tian.

---

the Petron Declaration and exhibits. *See Auto Indus. Supplier Employee Stock Ownership Plan v. Ford Motor Co.*, 435 Fed. Appx. 430 (6th Cir. 2011) (refusing to consider summaries when none of proponent's witnesses could lay foundation for underlying documents).

*Id.* ¶¶ 11, 15, and Petron Decl. Ex. 3 (Summary Chart of Medicare Inpatient Claims by Attending Physician and Year).

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69, 70; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) To the extent a response is required, the assertions in this paragraph are undisputed for purposes of summary judgment only but also are immaterial to Defendants' Motion. (GO No. 6.)

72.    A snapshot of this data for Dr. Mark Reed shows the following:

**Chart 2 – Snapshot of Inpatient Claims for West Provider Mark Reed**

Mark Reed
(NPI #1477585347, Employed at West starting March 14, 2006)

| Year | Methodist Total Paid | Number of Beneficiaries at Methodist | Number of Beneficiaries at Baptist |
|------|------|------|------|
| 2011 | $ 14,361 | 2 | 85 |
| 2012 | 73,589 | 9 | 86 |
| 2013 | 150,236 | 14 | 63 |
| 2014 | 356,697 | 27 | 21 |
| 2015 | 283,421 | 21 | 15 |
| 2016 | 303,276 | 25 | 31 |
| 2017 | 376,383 | 36 | 11 |
| 2018 | 426,332 | 46 | 1 |
| 2019 | 549,852 | 44 | 2 |
| 2020 | 426,671 | 42 | 1 |
| 2021 | 282,996 | 21 | 1 |
| **Total** | $ 3,243,813 | | |
| **Deal Period** | $ 1,969,934 | | |

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–71; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) The assertion in this paragraph constitutes counsel's characterization of data set forth in Petron's Declaration, which speaks for itself and is the best evidence of its content. (GO No.2.) To the extent a response is required, the

52

amounts of reimbursement and beneficiaries set forth in this paragraph are disputed but immaterial to Defendants' Motion. (GO No. 6.)

73.     Of the $58,816,954 paid to Methodist for inpatient services as described above, there were three providers for which the Medicare data reflects that they increased the number of Medicare beneficiaries for whom they provided services at Methodist from the pre-deal period of 2011 versus the period during the deal with a minimal change in the number of beneficiaries they provided services to at Baptist in that period.  The total inpatient Medicare payments to Methodist for these three physicians is $9,295,683.  *Id*. ¶¶ 11, 15.

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–72; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) To the extent a response is required, the amounts of reimbursement set forth in this paragraph are disputed but immaterial to Defendants' Motion. (GO No. 6.) The remaining assertions in this paragraph are undisputed for purposes of summary judgment only but also are immaterial to Defendants' Motion. (GO No. 6.)

74.     The names of the three physicians identified above are Drs. Michael Martin, Stephen Besh, and Benton Wheeler. *Id*. ¶¶ 11, 15, and Petron Decl. Ex. 3 (Summary Chart of Medicare Inpatient Claims by Attending Physician and Year).

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–73; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) To the extent a response is required, the assertions in this paragraph are undisputed for purposes of summary judgment only but also are immaterial to Defendants' Motion. (GO No. 6.)

75. Of the $58,816,954 paid to Methodist for inpatient services as described above, there were 10 providers for which the Medicare data reflects that they "started their employment at West during the approximate deal period and serviced all or almost all patients at Methodist as compared to Methodist." The total inpatient Medicare payments to Methodist for these three physicians is $9,295,683. Petron Decl., ¶¶ 11, 15.

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–74; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) To the extent a response is required, the amounts of reimbursement set forth in this paragraph are disputed but immaterial to Defendants' Motion. (GO No. 6.) The remaining assertions in this paragraph are undisputed for purposes of summary judgment only but also are immaterial to Defendants' Motion. (GO No. 6.)

76. The names of the 10 physicians identified above are Drs. Ramakrishna Battini, Courtney Shires, Eric Wiedower, Fenton Moon, Gregory Vidal, Daniel Vaena, Ari VanderWalde, Adam ElNaggar, Majari Pandey, and Suhail Obaji. *Id.* ¶¶ 11, 15, and Petron Decl. Ex. 3 (Summary Chart of Medicare Inpatient Claims by Attending Physician and Year).

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–75; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) To the extent a response is required, the assertions in this paragraph are undisputed for purposes of summary judgment only but also are immaterial to Defendants' Motion. (GO No. 6.)

77.

**RESPONSE:** Intentionally left blank.

78.    Of the $314,485,565 paid to Methodist for outpatient services as described above, a summary chart lists the 86 West attending providers and shows the number of Medicare beneficiaries they saw at Methodist (and for which Medicare paid Methodist) during the approximate deal period as compared to the number of Medicare beneficiaries they saw at Baptist during the same period. Petron Decl., ¶¶ 9, 17-18 Ex. 4 (Summary Chart of Medicare Outpatient Claims and Beneficiary Counts by Attending Physician and Year).

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–76; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) To the extent a response is required, the assertions in this paragraph are disputed for purposes of summary judgment only but also are immaterial to Defendants' Motion. (GO No. 6.)

79.    A side-by-side comparison of the above outpatient summary chart reflects that there was an overall, large increase in the number of outpatient claims for which a West physician was an attending physician at Methodist as compared to at Baptist during the deal period, as compared to before the deal period in 2011. Petron Decl., ¶¶ 9, 17-18 Ex. 4 (Summary Chart of Medicare Outpatient Claims and Beneficiary Counts by Attending Physician and Year).

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–78; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) The assertions in this paragraph constitute counsel's characterization of Petron's purported summary chart, to which no response is required and which should be disregarded. (GO No. 2.)

80. The names of the West physicians on the above outpatient summary chart are listed on the chart itself. Petron Decl., ¶¶ 9, 17-18 Ex. 4 (Summary Chart of Medicare Outpatient Claims and Beneficiary Counts by Attending Physician and Year).

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–79; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) The assertions in this paragraph constitute counsel's characterization of Petron's purported summary chart, to which no response is required and which should be disregarded. (GO No. 2.)

81. A snapshot of this outpatient data for Dr. Lee Schwartzberg shows the following:

**Chart 4 – Snapshot of Outpatient Claims for West Provider Lee Schwartzberg**

Lee Schwartzberg
(NPI #1306878228, Employed at West starting September 1, 1993)

| Year | Methodist Total Paid | Number of Beneficiaries at Methodist | Number of Beneficiaries at Baptist |
|------|------|------|------|
| 2011 | $ 168,133 | 40 | 100 |
| 2012 | 2,296,096 | 310 | 125 |
| 2013 | 2,397,085 | 310 | 121 |
| 2014 | 2,546,794 | 310 | 90 |
| 2015 | 2,073,057 | 304 | 78 |
| 2016 | 2,144,019 | 323 | 73 |
| 2017 | 2,702,501 | 641 | 62 |
| 2018 | 1,647,977 | 635 | 46 |
| 2019 | 259,101 | 234 | 37 |
| 2020 | 9,690 | 37 | 18 |
| 2021 | 1,743 | 8 | 12 |
| Total | $ 16,246,196 | | |
| Deal Period | $ 15,807,530 | | |

**RESPONSE:** The declaration of Michael Petron is not competent evidence to demonstrate a fact at the summary judgment stage and should be disregarded. (GO Nos. 1, 3.) *See supra* ¶¶ 69–80; (CSOF Reply Ex. 11, Petron 30(b)(6) Dep. 47:8–50:11.) The assertion in this paragraph

56

constitutes counsel's characterization of data set forth in Petron's Declaration, which speaks for itself and is the best evidence of its content. (GO No. 2.) The referenced data also is immaterial to Defendants' Motion. (GO No. 6.)

Respectfully submitted,

*/s/ Brian D. Roark*
Brian D. Roark
J. Taylor Chenery
Taylor M. Sample
Hannah E. Webber
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293
broark@bassberry.com
tchenery@bassberry.com
taylor.sample@bassberry.com
hannah.webber@bassberry.com

Robert S. Salcido
(Admitted *Pro Hac Vice*)
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, DC 20006
(202) 887-4095
rsalcido@akingump.com

*Attorneys for Defendants Methodist Le Bonheur Healthcare and Methodist Healthcare-Memphis Hospitals*

57

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served on the following counsel via the Court's CM/ECF email notification system on this the 2nd day of June, 2023:

Bryan A. Vroon
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta, GA 30327
(404) 441-9806
bryanvroon@gmail.com

Jerry E. Martin
Seth Marcus Hyatt
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
(615) 244-2202
jmartin@barrettjohnston.com
shyatt@barrettjohnston.com

Edward D. Robertson, Jr.
Bartimus Frickleton Robertson Rader PC
109 B East High Street
Jefferson City, MO 65101
(573) 659-4454
crobertson@bflawfirm.com

Kara F. Sweet
Wynn M. Shuford
Ellen B. McIntyre
U.S. Attorney's Office
Middle District of Tennessee
719 Church Street
Suite 330
Nashville, TN 37203
(615) 401-6598
kara.sweet@usdoj.gov
wynn.shuford@usdoj.gov
ellen.bowden2@usdoj.gov

*/s/ Brian D. Roark*