# EXHIBIT 2

# UNITED STATES of AMERICA

## vs.

# METHODIST LE BONHEUR HEALTHCARE, et al.

---

# ERICH MOUNCE

## July 18, 2022

---



**Jeannie Chaffin, LCR**

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

1  A.  Methodist Healthcare.
2  Q.  Okay.  Did the parties -- sorry.  Strike
3  that.
4       Did Methodist and The West Clinic
5  understand that there would be an increase in
6  referrals to the Methodist Hospital system
7  following the transaction?
8       MR. THOMAS:  Object to the form.
9       THE WITNESS:  I can't testify to what
10 Methodist Healthcare understood.  But none of
11 us were looking for an increase of referrals to
12 the Methodist Healthcare system.  We were
13 working to build a much better cancer program
14 that provided more services.
15 BY MS. SWEET:
16 Q.  Did you track the referrals to Methodist
17 following the transaction?
18 A.  I did not track referrals.
19 Q.  You didn't track it on a daily basis?
20 A.  I did not track referrals.
21      MS. SWEET:  I'd like to mark as
22 Exhibit 8 an e-mail from Erich Mounce to
23 David Deas and Chris McLean dated February 1st,
24 2012, bearing production number 1255 -- MLH --
25 sorry -- underscore 125552.

1       (WHEREUPON, the above-mentioned
2  document was marked as Exhibit 8.)
3  BY MS. SWEET:
4  Q.  Have you seen this document before?
5  A.  It's an e-mail from me to David Deas.  I
6  don't recall specifically the e-mail, but you
7  have presented it to me.
8  Q.  Okay.  Any reason to believe that you did
9  not send this e-mail?
10 A.  No, ma'am.
11 Q.  Are you requesting a report of referrals
12 in this document?
13      MR. THOMAS:  Objection.  Form.
14 Document speaks for itself.
15      (Reporter clarification.)
16      THE WITNESS:  I believe what this
17 was, was, this was me asking for an
18 understanding of what was being provided on the
19 report Methodist was providing us.  So I was
20 asking for a clarification on what the report
21 included.
22 BY MS. SWEET:
23 Q.  Why were you tracking referrals?
24      MR. ROARK:  Object to the form.
25      MR. THOMAS:  Object to the form.

1  Mischaracterizes testimony.
2       THE WITNESS:  Again, I'm not tracking
3  referrals.  These are tracking admissions at
4  all of the facilities, which include outpatient
5  facilities.
6  BY MS. SWEET:
7  Q.  It says the report is pulling all
8  patients who were in a Methodist Hospital for
9  the previous day that have a West Clinic
10 clinician as the admitting, attending,
11 referring, or consulting physician.
12      Do you see that?
13 A.  I do see that.
14 Q.  Does that entail a referral from a West
15 Clinic physician to a Methodist Hospital?
16 A.  No.  What I'm saying is, this report is
17 pulling all patients who were from -- and so
18 I'm telling him this is the report.  And in
19 reality what it was, it was also calculating
20 the admissions or patients visiting the breast
21 center and the admissions of patients visiting
22 the outpatient centers.
23      So I'm asking for clarifications.
24 And that's why I'm saying you need a full list
25 of our physicians to make sure that we are

1  capturing all of that information so we can
2  monitor the volume of the services that are
3  coming in.
4  Q.  Why were you only monitoring The West
5  Clinic physicians?
6  A.  What else would I monitor?
7  Q.  Would the management services agreement
8  limit the services that were being managed to
9  only West Clinic patients?
10 A.  Well, I think the better answer to that
11 is, I was monitoring all of the physicians that
12 were referring patients to every hospital.  And
13 we were also seeing a report for every cancer
14 program and every cancer patient that was
15 admitted to the Methodist system.
16 Q.  That's not what it says here.  It says
17 The West Clinic physicians.  It doesn't say
18 every physician that referred a patient to
19 Methodist, right?
20      MR. THOMAS:  Objection.  Document
21 speaks for itself.  Mischaracterizes testimony.
22      THE WITNESS:  Again --
23      MS. SWEET:  Stop with the speaking
24 objections.
25      THE WITNESS:  Again, I'm saying my

Case 3:17-cv-00902 Document 309-3 Filed 06/02/22 Page (of 13 PageID #: 12916   109...112
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1 takes six months to a year.  So we always
2 wanted to build an oncology hospitalist
3 program, but we started out with rotating docs,
4 then NPs.  And then on the high volume
5 hospitals, we actually hired doctors that were
6 specifically for that.
7 Q.    And when you did the hospitalist plan,
8 that was not limited to Methodist?  That was
9 work that you were working on for the West
10 Clinic in other locations and for other
11 hospitals, correct?
12 A.    We did it at other hospitals, that's
13 correct.  But it was driven by Methodist first.
14 And we saw that it worked.  And it really
15 changed the care.  And so then we added one at
16 Baptist.
17 Q.    And how much time did you spend
18 developing the hospitalist program?
19 A.    I don't recall how much time.  But I
20 think it was developed over the course of
21 years.  And I think that it's -- it was
22 important for us to always make sure that
23 patients had good care across any cancer
24 program.  So when we did it at Germantown and
25 University Hospital, we felt we had to do it at

1 Baptist as well because we didn't move any
2 patients from Baptist.  And we had lots of
3 patients at Baptist, and we wanted to have the
4 same care there.
5 Q.    And so the work that you were doing on
6 that while you were a leased employee, that was
7 part of that reconciliation that you submitted?
8 A.    It wasn't me that was doing the work.
9       MR. ROARK:  Object to the form.
10       THE WITNESS:  It was physicians.
11 BY MS. SWEET:
12 Q.    Physicians that were doing -- no.  In
13 developing the hospitalist plan?
14 A.    Yes, ma'am.
15 Q.    So the West physicians developed the
16 hospitalist plan that you presented?
17 A.    I presented it, that's correct.  But it
18 was worked on by a committee of physicians that
19 developed the hospitalist and how they would --
20 how they would fit into a hospital, how they
21 would see all patients, how it would work, what
22 care plans they would use, and how they would
23 discharge the patients back to where they work.
24 Q.    Who was on the committee?
25 A.    I don't recall.  But I am sure that Kurt

1 and Lee were.  I would have to -- I just don't
2 recall.
3 Q.    If Kurt and Lee were doing work on a
4 hospitalist plan as part of the management
5 services agreement and it also touched on other
6 hospitals that were not Methodist, how is that
7 addressed in terms of the compensation that
8 West received from the base management?
9       MR. THOMAS:  Object to the form.
10       MR. ROARK:  Objection to form.
11       THE WITNESS:  I don't -- I don't
12 believe it is.  I believe that we were working
13 on building a better cancer program.  And
14 Methodist wanted us to build a better cancer
15 program across the city of Memphis.
16 BY MS. SWEET:
17 Q.    So I understand your approach and your
18 discussion about building a better cancer
19 program for Memphis -- for the Memphis area.  I
20 get that.  I'm not here to talk about that.
21 I'm here to talk about the agreements and what
22 you were paid to do under the agreement.  Or
23 what West was paid to do under the agreements.
24       So my question now is, the management
25 services agreement required West to perform

1 certain services on behalf of Methodist and
2 were paid to do that on behalf of Methodist.
3 So if somebody was performing a management
4 service that wasn't limited to just Methodist,
5 was that backed out of the base management fee
6 in any way?
7       MR. ROARK:  Object to the form.
8       MR. THOMAS:  Objection to form.
9 Asked and answered.
10       THE WITNESS:  Methodist hired us to
11 manage an oncology service line.  That's how we
12 looked at it.  The documents were put in place
13 to help guide that.  And we built a cancer
14 service line.  And it was for outpatient
15 services, too.  So we were admitting patients
16 to Baptist Hospitals from an outpatient setting
17 to an inpatient setting.  So as part of that
18 management structure, we were to manage cancer
19 patients that were in the West Cancer Center.
20 BY MS. SWEET:
21 Q.    Was the margin from the 340B program
22 directed back into the cancer program?
23       MR. THOMAS:  Objection to form.
24       MR. ROARK:  Object to the form.
25       THE WITNESS:  I never looked at it as

Case 3:17-cv-00902-Document 389-2 Filed 06/02/22 Page (of 151) PageID #: 12917   181..184
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

1 the margin specific to 340B. I looked at it as
2 the margin for the cancer service line.
3 BY MS. SWEET:
4 Q. Okay. So the next page, page 24. It
5 says -- big bullet point -- says we are a 340B
6 provider. And a small dash underneath it says
7 all margin is redirected back to the cancer
8 program?
9 A. Yes, that's what it says.
10 Q. What was the margin?
11 A. The margin for the entire service line.
12 Q. So what went into making the margin?
13 A. So it would have been outpatient
14 services, inpatient services, chemotherapy,
15 imaging. So, you know, CAT scans, MRIs.
16 Surgical services. Clinical trials.
17 Pathology. Radiology, which I said.
18 Histology. All of the pieces that make up a
19 cancer program.
20 Q. What is the lift?
21 A. The lift is something that the University
22 of Tennessee described as the money that
23 Methodist Healthcare took out of the margin and
24 delivered to the University of Tennessee to
25 help build the academic and the physicians in

1 the program.
2 Q. How much money was that per year?
3 A. To my recollection, Dr. Stern demanded
4 $5 million every year to go to Methodist
5 Healthcare.
6 Q. Was any of that $5 million used to fund
7 anything that West Clinic was doing?
8     MR. THOMAS: Objection to form.
9     THE WITNESS: The -- I think the
10 better way for me to answer is what -- how I
11 viewed the process. And this is what I believe
12 happened.
13     Methodist Healthcare delivered a
14 monthly amount to the University of Tennessee.
15 It actually went to the University of
16 Tennessee. Then when we recruited doctors or
17 built a new program, the University of
18 Tennessee would then pay for that. Like, if we
19 hired Korn Ferry to recruit somebody. Or if we
20 hired a researcher. Or if we were
21 transitioning and bringing in a brand new
22 doctor. The University of Tennessee would pay
23 for that out of the funds that Methodist gave
24 it.
25     They would also then work on the

1 establishment of a statewide clinical trial
2 program. The funds went through that. Looking
3 at new tools. Surgical devices. All of those
4 things went through UT, and then UT wrote the
5 check based on what the cancer council approved
6 or didn't approve.
7 BY MS. SWEET:
8 Q. And so UT would then sometimes write a
9 check for a West employee to cover their
10 salary, a portion of that salary?
11 A. Not that I recall.
12 Q. What about Dr. Ballo? How was he paid?
13 A. Dr. Ballo was paid through three
14 different pots of money. He was paid
15 predominantly as a West Clinic provider. So
16 I'm going to say 60 or 70 percent of his
17 salary. He was then paid 10 or so percent as
18 being the medical director of the radiation
19 oncology program at Methodist Healthcare. And
20 then he was paid to develop a radiation
21 oncology education program for the University
22 of Tennessee. So there was three buckets in
23 his contract.
24 Q. And so did some of the money come from
25 this $5 million?

1 A. The teaching piece I believe did.
2 Q. Okay. Did he provide management
3 services?
4 A. Yes, he did.
5 Q. Was he paid for those management services
6 as part of his salary?
7 A. All the dollars that came into any
8 provider for clinical services went into a big
9 pool and then was divided up. So it was never
10 specific management dollars go to him. Or just
11 like I said with Lee or Kurt, they came into a
12 giant pool, and then the doctors were paid
13 based on their contractual relationship with
14 their comp model.
15 Q. So Methodist was paying the University of
16 Tennessee, who then in turn paid --
17 A. Him that portion.
18 Q. -- that portion?
19 A. Yeah.
20 Q. Including -- which could have also gone
21 towards his management services?
22     MR. THOMAS: Objection to form.
23     MR. ROARK: Objection to form.
24     THE WITNESS: No. Because they wrote
25 him a check directly.

Case 3:17-cv-00902 Document 389 Filed 06/03/22 Page 5 of 13 PageID #: 12918    185..188
Elite-Brentwood Reporting Services (615)595-0073
www.EliteReportingServices.com

1    (WHEREUPON, the above-mentioned
2 document was marked as Exhibit 27.)
3    MS. SWEET: I'm standing up so I can
4 move faster. Sorry.
5 BY MS. SWEET:
6 Q.   Do you recall this e-mail?
7 **A.   No.**
8 Q.   In the bottom e-mail, in the first page,
9 Mr. Davis says he's very concerned that the
10 numbers do not reflect the additional services
11 in revenue since the last valuation?
12 **A.   That is what it says.**
13 Q.   And it says, appears you came back with
14 the same numbers that we received previously.
15    And Mr. Spurlin indicates that he's
16 basing it off of the 242 million in revenues
17 that was confirmed.
18    Does this refresh your recollection
19 as to why West might have sought a different
20 valuation for 2017?
21 **A.   Not at all.**
22    MS. SWEET: Mark as Exhibit 28 West's
23 responses to the Government's interrogatories,
24 GOV000345 to 355.
25 ///

1    (WHEREUPON, the above-mentioned
2 document was marked as Exhibit 28.)
3 BY MS. SWEET:
4 Q.   Have you seen this document before?
5 **A.   I'm sure I have seen it before.**
6 Q.   Can you turn to the last page?
7 **A.   Certificate of compliance?**
8 Q.   Yeah.
9    Is that your signature?
10 **A.   It is.**
11 Q.   Okay. Does that refresh your
12 recollection that you verified these
13 interrogatory responses?
14 **A.   I -- it certainly is a document that I**
15 **reviewed and executed a notary document on.**
16 Q.   Turn to page 6. In the bottom it lists
17 the amounts that Methodist paid West for
18 management of the oncology service line at all
19 Methodist Hospitals from 2012 through 2017.
20 **A.   I see that.**
21 Q.   Okay. And these numbers are correct to
22 the best of your knowledge?
23 **A.   To the best of my knowledge at that time.**
24 Q.   Okay. So then, I think, as we talked
25 about earlier, the base management fee was paid

1 in full for each of the years, but West did not
2 always earn the full amount of the performance
3 incentive?
4 **A.   Correct.**
5 Q.   Okay. So the number in 2013 increased
6 over 200,000 from 2012?
7 **A.   It appears so, yes.**
8 Q.   And in 2014 it increased 1.2 million from
9 2013?
10 **A.   It did.**
11 Q.   Okay. And then in 2015 it went down?
12 **A.   It did.**
13 Q.   Back up again in 2016?
14 **A.   Yes.**
15 Q.   And in 2017 -- the number for 2016 was
16 also lower than the number for 2014?
17 **A.   Correct.**
18 Q.   At the time of these interrogatories West
19 was in the process of -- on the next page -- of
20 compiling the payments for the leased employee
21 agreement?
22 **A.   That is what it says.**
23 Q.   Let me go back over this reconciliation
24 piece again.
25 **A.   Okay.**

1 Q.   Because I'm still struggling with it.
2    Did -- when the reconciliation
3 happened, how was the payment dealt with? Did
4 Methodist pay West back? Did West pay
5 Methodist back? What occurred?
6 **A.   West Clinic paid Methodist Healthcare**
7 **back for dollars that it perceived -- we**
8 **perceived, as a partnership, did not involve**
9 **the partnership sites.**
10 Q.   Did a check go, electronic payment?
11 **A.   Electronic payment for the first few**
12 **years, and then sometimes there was just a**
13 **deduction out of payments. And I -- you know,**
14 **I almost said housekeepers. The financial**
15 **people would deal with that and track it and**
16 **make the entries.**
17 Q.   Okay. So sometimes it might have just
18 been deducted from the amount that Methodist
19 owed to West?
20 **A.   Yes.**
21 Q.   Okay. So if it was an amount deducted,
22 then that should have been reflected -- was
23 that reflected, for example, in the amount for
24 the leased employee agreement, the total amount
25 that is paid?

Case 3:17-cv-00902 Document 309 Filed 06/03/22 Page 6 of 13 PageID #: 12919
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com
277..280

1      (WHEREUPON, the above-mentioned
2  document was marked as Exhibit 42.)
3      THE WITNESS:  Thank you.
4  BY MS. SWEET:
5  Q.   Did you prepare this document?
6  A.   I don't believe I did.  I don't -- I
7  don't remember, but I don't think so.
8  Q.   Do you know who did?
9  A.   It was either one of the genetic
10 counselors or actually Lee Schwartzberg who had
11 been working on building a genetic program.
12 Q.   This genetics program was developed in
13 conjunction with Methodist, correct?
14 A.   Yes, ma'am.
15 Q.   So Methodist had a role in this process?
16 A.   Yes, ma'am.
17 Q.   This was not something that Methodist --
18 or West itself did under the management
19 services agreement?
20 A.   I think West -- so Methodist Healthcare
21 had a genetic counselor only for breast genetic
22 testing at its site at University Hospital.
23 And we believed the genetic program needed to
24 be extended to all cancer types to the extent
25 possible.  And at all sites -- cancer center

1  sites.
2      So this was formally creating a
3  program that would allow the genetic counselors
4  to be at multiple sites and also look at the
5  genetic base of cancer, not just breast cancer.
6  And so to do that, we had to add genetic
7  counselors to it.  We had to incorporate some
8  of the Methodist Healthcare genetic team
9  already, which would have been the one that was
10 at the University Hospital breast center site.
11 And then decide how we were going to
12 incorporate those pieces forward.
13     And that's what this is doing.
14 Talking about what kind of history they need to
15 take, tailored screening recommendations, et
16 cetera, for those patients.
17 Q.   And this program was not limited to
18 Methodist?  There was -- it also involved
19 Baptist, correct?
20 A.   Again, I think that any patient that West
21 Clinic was seeing in an outpatient site had to
22 go through these or needed to have the
23 opportunity to have these tests.
24 Q.   Okay.  So this is testing that would be
25 performed by the hospitals?

1  A.   No, no.
2  Q.   No?  Testing that would be performed by
3  West?
4  A.   The genetic counselors actually had kits
5  that were done by a third party.  So the
6  genetic counselor -- the kit where you would
7  send the blood or the issue into a third party.
8  Q.   Who was billing for that?
9  A.   I don't believe that Methodist billed for
10 that.  I actually don't recall.
11 Q.   So whoever employed the genetic
12 counselors would bill?
13 A.   I will tell you --
14     MR. THOMAS:  Object to the form.
15     MR. ROARK:  Object to the form.
16     THE WITNESS:  I will tell you that I
17 don't believe that there was a lot of insurance
18 companies paying for genetic counseling.  And
19 so I can't remember who was billing for it.
20 But if you remember the Angelina Jolie thing
21 about not being able to get United Healthcare
22 insurance companies to pay for it, this was a
23 service that usually Methodist thought -- when
24 Methodist and West thought was good, whether it
25 was reimbursed or not.  A lot of the actual

1  companies that did the tests did it for free if
2  the patient couldn't pay.
3  BY MS. SWEET:
4  Q.   And, now, was this -- this was something
5  that when I interviewed you before, you touted
6  as one of the items under base management of
7  management services agreement.  And this is not
8  limited to items from Methodist, correct?
9      MR. ROARK:  Object to the form.
10     THE WITNESS:  Again, I think the
11 management agreement was about us building a
12 better cancer program.  So I touted genetic
13 counseling because you would want to have a
14 genetic counseling program by your cancer
15 provider as well.
16 BY MS. SWEET:
17 Q.   And was it your understanding that West
18 should be -- that Methodist should be paying
19 West for providing services just generally?
20     MR. THOMAS:  Objection to form.
21     MR. ROARK:  Object to the form.
22     THE WITNESS:  I believed that both
23 parties thought the management agreement was to
24 build a better cancer program for the citizens
25 of Memphis, Tennessee.

Case 3:17-cv-00902 Document 309-2 Filed 06/02/22 Page 7 of 13 PageID #: 12920
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com                                325..328

1          (Off-the-record discussions.)
2          THE REPORTER:  A rough draft will be
3  ready tonight.  So, Ms. Sweet, do you want a
4  copy?
5          MS. SWEET:  Yes, just e-mail it to
6  me.
7          THE REPORTER:  Everybody wants a
8  rough draft, correct?
9          MR. ROARK:  Yes.
10          MR. THOMAS:  Yes.
11          THE REPORTER:  Anyone who doesn't
12  want one?
13          (No verbal responses were heard.)
14          FURTHER DEPONENT SAITH NOT
15          (Proceedings concluded at 6:11 p.m.)
16
17
18
19
20
21
22
23
24
25

1                C E R T I F I C A T E
2
3  STATE OF TENNESSEE
4  COUNTY OF SUMNER
5       I, JEANNIE CHAFFIN, Licensed Court Reporter,
6  with offices in Portland, Tennessee, hereby certify
7  that I reported the foregoing video deposition of
8  ERICH MOUNCE, Volume I, by machine shorthand to the
9  best of my skills and abilities, and thereafter the
10  same was reduced to typewritten form by me.
11       I further certify that I am not related to any
12  of the parties named herein, nor their counsel, and
13  have no interest, financial or otherwise, in the
14  outcome of the proceedings.
15       I further certify that in order for this
   document to be considered a true and correct copy, it
16  must bear my original signature and that any
   unauthorized reproduction in whole or in part and/or
17  transfer of this document is not authorized, will not
   be considered authentic, and will be in violation of
18  Tennessee Code Annotated 39-14-104, Theft of
   Services.
19
20
21
22  JEANNIE CHAFFIN, LCR
   Elite Reporting Services
23  Associate Court Reporter and
   Notary Public State of Tennessee
24
   My Notary Commission Expires:  6/7/2025
25  LCR #169 - Expires:  6/30/2022

1              E R R A T A   P A G E
2       I, ERICH MOUNCE, having read the foregoing
   deposition, Pages 1 through 369, do hereby certify
3  said testimony is a true and accurate transcript,
   with the following changes (if any):
4
5  PAGE   LINE    SHOULD HAVE BEEN
6  _____ _____   _____
7  _____ _____   _____
8  _____ _____   _____
9  _____ _____   _____
10  _____ _____   _____
11  _____ _____   _____
12  _____ _____   _____
13  _____ _____   _____
14  _____ _____   _____
15  _____ _____   _____
16  _____ _____   _____
17  _____ _____   _____
18
19
20
21              _____
                     ERICH MOUNCE
22
23  _____
   Notary Public
24
   My Commission Expires: _____
25

Case 3:17-cv-00902 Document 389-2 Filed 06/03/22 Page 8 of 13 PageID #: 12921
Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com
369..371

# UNITED STATES of AMERICA

## vs

# METHODIST LE BONHEUR HEALTHCARE, et al.

---

## ERICH MOUNCE

## July 19, 2022

---



**Jeannie Chaffin, LCR**

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

1  A.   Some of West Clinic's physicians did.
2  Q.   Okay.  Why did West Clinic want to
3  include ACORN as part of the overall
4  transaction with Methodist?
5       MR. THOMAS:  Object to the form.
6       THE WITNESS:  The real reason was
7  because we needed to have clinical trials
8  continued through the cancer program.  And
9  especially inpatient clinical trials.  So
10 that's something that's really important,
11 especially as the science moved to
12 sophisticated CAR T administration and also
13 bone marrow transplant trials.  All of that was
14 inpatient.  And West -- Methodist Healthcare
15 really did not have any relationship with a CRO
16 for any inpatient oncology trials.
17      In addition, it was Methodist's
18 interest to have a tie to this because the
19 Le Bonheur Children's Hospital was also looking
20 at a research organization, not necessarily
21 oncology based.  But they didn't want to have
22 to reinvent the regulatory and the budgetary
23 pieces of that, you know.  So different drugs,
24 different clinical trials, but you have a whole
25 infrastructure that's built around that.  And

1  as we got into the relationship, there were
2  several meetings with data warehouse teams at
3  Le Bonheur on how we could work together.
4  Q.   At the time that Methodist and West
5  entered into the affiliation, UT was a part of
6  that as well; is that correct?
7  A.   The University of Tennessee became a part
8  of it towards the very end.  They weren't
9  really part of the negotiations.  Once we sort
10 of were close to executing the documents,
11 that's when Gary said bring UT in.
12 Q.   Did UT itself offer the CRO functions
13 that ACORN performed?
14      MS. SWEET:  Objection.
15      THE WITNESS:  They did not.
16 BY MR. ROARK:
17 Q.   Did UT benefit from being able to work
18 with ACORN?
19      MS. SWEET:  Objection.
20      THE WITNESS:  Yes.  So the University
21 of Tennessee operates under something called
22 SWOG trials, which is a different kind of
23 trial.  And they didn't have access to
24 outpatient clinical trials, especially phase 3
25 and phase 4.  So as of today, even today the

1  University of Tennessee uses the predecessor of
2  ACORN for a statewide research organization.
3  BY MR. ROARK:
4  Q.   Speaking more broadly, once you-all got
5  into the affiliation, what was the importance
6  to clinical research to the comprehensive care
7  center?
8  A.   Clinical research, as I think we talked
9  about yesterday and today, is the -- is the
10 only way cancer programs can stay invested in
11 giving the best care to their patients.  So
12 there's academic medical centers across the
13 country that spend huge amounts of money to do
14 that and not provide care.  And there's
15 community programs that really have to try and
16 keep up on all the drugs and research that's
17 coming up into the market.
18      So as I think I talked about earlier,
19 decades ago there was a lot fewer drugs.  Now,
20 there's new drugs coming on the market all the
21 time.  And having experience through the
22 clinical trials allows the physicians to
23 understand what these drugs can do and how they
24 can really make a difference.
25 Q.   Prior to entering into the affiliation

1  with Methodist, had West had access to clinical
2  trials?
3  A.   West Clinic did through ACORN, yes, sir.
4  Q.   Was it important to West in entering into
5  the affiliation that its access to those
6  clinical trials not go away or not be ignored?
7       MR. THOMAS:  Object to the form.
8       THE WITNESS:  It was imperative to
9  West.
10 BY MR. ROARK:
11 Q.   How does participating in clinical trials
12 impact patient care?
13 A.   Well, the easiest thing to say is the
14 patients wouldn't have to go elsewhere for a
15 clinical trial.  You know, in Memphis they
16 would have had to drive to Nashville, or they
17 would have had to go to MD Anderson or some
18 other big cancer center that provides clinical
19 research.
20      MS. SWEET:  Brian, Exhibits 51 and 52
21 have redactions on them.  I don't -- I don't
22 understand the basis for the redaction.
23 Appears to be a dollar amount.  Can we get
24 copies of these without redactions?
25      MR. ROARK:  They were produced by

Case 3:17-cv-00902-BP Document 382-2 Filed 06/02/20 Page 10 of 13 PageID #: 12923
Elite-Brentwood Reporting Services  (615) 595-0073    420..423
www.EliteReportingServices.com

1 oncology would be in an outpatient setting.  We
2 built it so the surgical oncologists would be
3 in the same building.  The infusion would be in
4 the same building.  And the medical oncologists
5 would be in the same building along with
6 imaging.  So not just radiation oncology,
7 imaging and lab.
8       So we were trying to duplicate that
9 Downtown when Methodist decided to add on to
10 the University Hospital and rebuild it.  A big
11 section of the first floor was reserved to be a
12 cancer center.
13 Q.   Did the -- were the West physicians
14 involved in discussions in providing input on
15 the build-out, how the Downtown cancer center
16 was going to be done?
17 A.   They were.
18 Q.   Which doctors?
19 A.   I'm not going to remember specifically.
20 But for sure Kurt and Lee.  Almost always
21 Sylvia.  Downtown we would have used
22 Jarvis Reed, Moon Fenton, and a bunch of other
23 physicians.  I just can't remember.
24       And Methodist built mock build-outs
25 of the rooms.  So, like, what the rooms would

1 look like, what the exam rooms would look like,
2 what the patient rooms would like, and what
3 some of the imaging suites would look like.
4       So Matt Ballo was a physician that
5 was intricately involved in the radiation
6 oncology piece.  Kurt Tauer and Brad Somer were
7 involved in the design of what the exam rooms
8 would look like.  Arnel Pallera.  And then on
9 top of that would be sort of the shared spaces
10 imaging.  So our radiologists were involved in
11 that, along with the MRPC radiologist, which
12 was Methodist Radiology.
13 Q.   From the time that these physicians spent
14 providing input on the build-out, could the
15 physicians bill RVUs for that time?
16 A.   No, sir.
17 Q.   For -- how was Methodist -- how was West
18 compensated for the time that the physicians
19 spent on work like that?
20 A.   Through the management fee.
21 Q.   For Mr. Liebman, was he involved in the
22 negotiations or the structuring of the original
23 affiliation agreements?
24 A.   He was not.
25 Q.   Do you know -- do you know when he

1 started at Methodist?
2 A.   It was at least a couple of years in.  I
3 can't remember exactly.  I know that there was
4 at least two other CEOs that I worked with
5 before.  So he was the third of five or six
6 that I remember at University Hospital.
7 Q.   And during the time period he was at
8 Methodist, he was -- his position was CEO of
9 Methodist University Hospital?
10 A.   Yes, sir.
11 Q.   Did West ever move cancer services away
12 from University Hospital to Germantown?
13 A.   I don't think we ever moved services.  I
14 think we were trying to enhance and duplicate
15 services.  So instead of just having head and
16 neck surgery at University, we wanted to also
17 have it at Germantown.  Same with GI surgery.
18 And also any kind of complex lung surgery.  So
19 Benny Weksler.  Could we do some of the lesser
20 complex patients at Germantown and not have to
21 do everything Downtown.
22 Q.   Was that impacted by any capacity issues?
23 A.   It was impacted by capacity issue and
24 also patient selection.  A lot of the patients
25 that lived in Germantown and East Memphis

1 didn't want to go to University Hospital,
2 right?  And so it was -- it was trying to
3 either create a subset of those services at
4 Germantown or create a better environment at
5 University Hospital, which we ended up doing
6 with the building of the second cancer center.
7 Q.   Okay.  And so it wasn't -- it was
8 creating services that were already in place at
9 University Hospital, creating those at another
10 location as well?
11 A.   Yes.  But we never, like, took services
12 away from any place.
13 Q.   You didn't take services away from
14 University and move them to Germantown?
15 A.   Correct.
16 Q.   Did Mr. Liebman ever raise any legal or
17 compliance concerns with you about the
18 Methodist West affiliation?
19 A.   No, sir.
20 Q.   Are you aware of his raising concerns
21 with anybody else?
22 A.   No, sir.
23 Q.   In the interactions and the one-on-one
24 meetings and all the strategy and group
25 meetings that you attended with him, did he

Case 3:17-cv-00902-JPM Document 388-2 Filed 06/02/23 Page 12 of 13 PageID #: 12924
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com
524..527

1  used by Methodist under the affiliation, did
2  that necessitate changes in the layout of the
3  chemotherapy suites?
4  **A.   It did on day one.**
5  Q.   Why?
6  **A.   Because hospital outpatient clinics have**
7  **a different set of regulations that require a**
8  **lot of different things.  In addition, Joint**
9  **Commission accreditation or any accrediting**
10 **body for CMS and Medicaid have different rules**
11 **and regulations for the safety of their**
12 **patients.**
13         **So I think I gave the example**
14 **yesterday.  West Clinic used to have chemo**
15 **chairs right next to each other, right?**
16 **Hospitals require they're 5 feet -- that**
17 **they're 5 feet apart in circumference.  They**
18 **also require a pharmacist at every pharmacy**
19 **mixing station.  Not a pharm tech.  They also**
20 **require specific life safety pieces, which is**
21 **with regard to how many patients are seen in a**
22 **specific section of the building, as well as**
23 **all the things like sprinklers and fire**
24 **extinguishers and safety programs around that.**
25         **In the lab they also required very**

1  **specific pieces in the lab that required**
2  **equipment to be spaced correctly, to have eye**
3  **washes that were there for agent reactions and**
4  **to have biohazard pieces that weren't addressed**
5  **in any community setting that I know of.**
6  Q.   Would the physicians provide input on
7  things like that about layout and where
8  specific things need to be located?
9  **A.   Of course they would.  Because nothing**
10 **drove the physicians more crazy than if they**
11 **couldn't find a biohazard place to put a**
12 **leftover needle or if the pharmacy had to waste**
13 **a drug and how you would set up the moving of**
14 **drugs from mixing room to the infusion room**
15 **because of timing around that.**
16 Q.   And do you know for that item, for
17 example, assisting MLH and the Methodist
18 Hospitals in evaluating the physical facilities
19 at the managed sites, do you know how that
20 factored into HealthCare Appraisers' valuation?
21 **A.   No, sir.**
22 Q.   Look at Exhibit 21.  This is the e-mail
23 dated December 24th, 2013, that Ms. Sweet asked
24 you questions about yesterday.  It goes through
25 the same HealthCare Appraisers' scoring matrix.

1  This time instead of 41 items, it has 39.  And
2  notes that additional tasks as necessary could
3  be added.
4         Do you know why for this valuation
5  there were 39 tasks listed as opposed to 41?
6  **A.   I do not.**
7  Q.   Do you know how the marking of these
8  various tasks at whether it was fully
9  performed, partially performed, or not
10 performed, do you know how that factored into
11 HealthCare Appraisers' valuation?
12 **A.   I do not.**
13 Q.   If you marked an item as partially
14 performed, was that indicating that West was
15 not carrying out some of its obligations under
16 the MSA?
17 **A.   As I -- as I spoke to yesterday, I don't**
18 **think it showed that we weren't carrying out.**
19 **It showed that we tried to carry it out and met**
20 **resistance or couldn't do the job that I felt**
21 **we needed to do to make it perfect.**
22 Q.   Or had to adjust in some way?
23         MS. SWEET:  Objection.
24         **THE WITNESS:  Correct.**
25 ///

1  BY MR. ROARK:
2  Q.   Did that mean that West was only
3  performing some of what it was being paid to
4  do?
5         MS. SWEET:  Objection.
6         **THE WITNESS:  No.  Because I think we**
7  **talked about forms yesterday.  I think we**
8  **worked on forms for seven years.  It was -- you**
9  **-- we actually had a forms committee chaired by**
10 **a doctor.  Dr. Schwartzberg also looked at**
11 **almost every single form.  And there's nothing**
12 **more aggravating than spending time on forms**
13 **from my perspective.  But especially because,**
14 **you know, you run into things that you don't**
15 **think should be an impediment, right?  And we**
16 **did that often on forms and some of the**
17 **processes that we talked about.**
18 Q.   Do you know if the HealthCare Appraisers'
19 scoring matrix in Exhibit 21 is tied exactly
20 into the West Cancer Center MSA?
21 **A.   I do not.**
22 Q.   Do you know if this is a generic scoring
23 matrix that HealthCare Appraisers uses for
24 every oncology co-management arrangement that
25 it does?

Case 3:17-cv-00902-BJD-PDB  Document 38-2  Filed 06/02/20  Page 12 of 13 PageID #: 12925
Elite-Brentwood Reporting Services        (615) 595-0073
www.EliteReportingServices.com        588..591

Page 700

1  please.
2      FURTHER DEPONENT SAITH NOT
3      (Proceedings concluded at 5:25 p.m.)

Page 702

1        C E R T I F I C A T E
2
3  STATE OF TENNESSEE
4  COUNTY OF SUMNER
5      I, JEANNIE CHAFFIN, Licensed Court Reporter,
6  with offices in Portland, Tennessee, hereby certify
7  that I reported the foregoing video deposition of
8  ERICH MOUNCE, Volume II, by machine shorthand to the
9  best of my skills and abilities, and thereafter the
10 same was reduced to typewritten form by me.
11     I further certify that I am not related to any
12 of the parties named herein, nor their counsel, and
13 have no interest, financial or otherwise, in the
14 outcome of the proceedings.
15     I further certify that in order for this
   document to be considered a true and correct copy, it
16 must bear my original signature and that any
   unauthorized reproduction in whole or in part and/or
17 transfer of this document is not authorized, will not
   be considered authentic, and will be in violation of
18 Tennessee Code Annotated 39-14-104, Theft of
   Services.
19
20
21
22  JEANNIE CHAFFIN, LCR
    Elite Reporting Services
23  Associate Court Reporter and
    Notary Public State of Tennessee
24
    My Notary Commission Expires:  6/7/2025
25  LCR #169 - Expires:  6/30/2024

Page 701

1        E R R A T A   P A G E
2      I, ERICH MOUNCE, having read the foregoing
   deposition, Pages 372 through 700, do hereby certify
3  said testimony is a true and accurate transcript,
   with the following changes (if any):
4
5  PAGE   LINE     SHOULD HAVE BEEN
6  _____ _____  _____
7  _____ _____  _____
8  _____ _____  _____
9  _____ _____  _____
10 _____ _____  _____
11 _____ _____  _____
12 _____ _____  _____
13 _____ _____  _____
14 _____ _____  _____
15 _____ _____  _____
16 _____ _____  _____
17 _____ _____  _____
18
19
20
21          _____
            ERICH MOUNCE
22
23 _____
   Notary Public
24
   My Commission Expires: _____
25

Case 3:17-cv-00902 Document 380-2 Filed 06/02/23 Page 13 of 13 PageID #: 12926
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com    700..702