# EXHIBIT 3

# UNITED STATES of AMERICA

## vs

# METHODIST LE BONHEUR HEALTHCARE, et al.

## CHRIS MCLEAN

## August 11, 2022



Terri Beckham, RPR, RMR, CRR

Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

1  A.   All of the billing employees in the cancer
2  service line were leased to Methodist.
3  Q.   Was the person responsible or people
4  responsible for West payroll leased to Methodist?
5  A.   The -- yes.
6  Q.   Did West -- do you know who that person was?
7  A.   No.
8  Q.   Did Methodist pay West -- strike that.
9       Did West reimburse Methodist for any amounts
10 for the payroll person or persons to handle the
11 West payroll as opposed to a Methodist item?
12 A.   Yes, through our reconciliation process, we
13 did pick up the personnel cost center that would
14 have had those people in it and allocated a
15 percentage of the costs of everybody in that cost
16 center to charge West.
17 Q.   What was this reconciliation process?
18 A.   The reconciliation process was a process to
19 receive payment from West Clinic, P.C. for any
20 activities that were done with our people, because
21 keep in mind all the leased employees were
22 effectively ours, or facilities that related to
23 those people with -- to capture cost for any time
24 and effort that they were spending on non-Methodist
25 activities, cancer center service line activities.

1  Q.   How is that reconciliation done?
2  A.   So do you want me to start from how we -- how
3  we developed it and then how it was done going --
4  what do you mean by how was it done?
5  Q.   You did the reconciliation.  What was done?
6  I have zero understanding of the --
7  A.   Okay.
8  Q.   -- reconciliation process.
9  A.   Okay.  So let's start at the start.  So right
10 after we entered into this agreement, we knew that
11 we needed to bill them back for activities.  We
12 identified those activities and billing was the
13 largest one, but then you had some overhead people
14 and overhead cost that we needed to bill back also.
15      So I actually started the process.  I went
16 through the budgets we initially prepared for 2012,
17 identified specific cost centers where clearly --
18 and we had back and forth on, you know, who was
19 doing what.  So identify cost centers -- that
20 included people -- that could or should be doing
21 part of their time for non-Methodist activities.
22      I pulled or developed a process, and I
23 outlined it in writing that I gave to West early
24 on, is this is what I'm planning to do.  Then I
25 proposed the exact amount, the exact process, and

1  the exact formula that we would use.
2       I sent that proposed formula to them.  They
3  agreed to it.  And then we followed that formula on
4  a consistent basis throughout the term of the
5  agreement.
6  Q.   Did you look at the document that you're
7  referring to in preparation for this deposition?
8  A.   I refreshed my memory on some of the details
9  that supported that calculation in advance of this
10 deposition.
11 Q.   What was the formula that you used?
12 A.   So for billing, we pulled all the billing
13 cost centers together and we did it on a basis of
14 cash collections.  So cash collections for Methodist
15 activity, cash collections for non-Methodist
16 activity.  Initially it was just Corinth, but it
17 expanded over time as they added other sites.
18      And we took a percentage.  So we thought
19 that was the most logical way, so if 12 percent of
20 the -- and also we were collecting the rolled AR,
21 so we had to charge them for that.
22      So if the percentage of collections for
23 non-Methodist business was 12 percent, we basically
24 took 12 percent of the billing operation, and that
25 was part of it.

1       Then I went through and identified overhead
2  areas where people like Erich were, Ron were,
3  personnel were, the controller was, and I just
4  didn't pull those individuals, I pulled everybody
5  that were in those cost centers under the belief
6  they may have used other people to help them.
7       And based on a study and a look at the
8  detail cost, we came up with an estimated
9  percentage that we think covered that.
10      Now, anybody could argue that some of the
11 costs that were in there probably weren't related.
12 For instance, advertising that was done was in
13 there, and I was still charging a percentage of
14 that out.  But we knew that some may be too high
15 and some may be too low, but I felt, you know,
16 based on these type of allocations I've done, this
17 cost center in total times the percentage of
18 non-Methodist would yield a reasonable answer for
19 the overhead allocation.
20      Over the seven years, it was over
21 $8 million, so it was over a million dollars a year
22 on average that we charged them through this
23 process.
24 Q.   And that was for personnel time and overhead?
25 A.   Yes.

Case 3:17-cv-00902 Document 399-3 Filed 06/02/22 Page 3 of 11 PageID #: 12929
Elite-Brentwood Reporting Services     (615) 595-0073     29..32
www.EliteReportingServices.com

Page 33

1  Q.   What about office space?
2  A.   So for separate identified lease space, such
3  as we had the billing office and many of the finance
4  overhead people in a specific lease space, I pulled
5  the full lease and then used the percentage.
6  Q.   What about Wolf River?
7  A.   Well, Wolf River wasn't a leased space, it
8  was an owned space by us, so --
9  Q.   Did West pay any money to Methodist to
10 operate any business out of Wolf River?
11 A.   In the overhead allocation process, we didn't
12 have a specific line for Wolf River, although there
13 were items like maintenance contracts and
14 maintenance expenses in the overhead cost center
15 they got a piece of.
16      But as far as did we say an imputed lease
17 for Wolf River is X, this amount of time for the
18 people in Wolf River?  We did not.  Those were very
19 minor amounts, and given the overall process we
20 came up with, we thought that it yielded a good
21 answer in total, knowing that you're never going to
22 be identifying specific costs.
23      So they may have been charged for some costs
24 that they could claim was not theirs.  Some of
25 these that were difficult to do, we didn't do.  But

Page 34

1  the overall process and the overall answer we think
2  is a reasonable way to compensate Methodist for
3  non-Methodist activities.
4  Q.   By "we" you mean you -- what do you mean by
5  "we"?
6  A.   Well, I developed it and West Clinic, P.C.
7  agreed to it.
8  Q.   Okay.  Did any outside party review the
9  reconciliation process and the methodology to
10 confirm that it was a reasonable method?
11 A.   By "outside party" who do you mean?
12 Q.   A third party.  An auditor, for example.
13 A.   No.
14 Q.   Did any internal auditor review your
15 reconciliation process and formula?
16 A.   I had Darryl Arbor go in to do an internal
17 audit.  I may have shown that to him, but I'm not
18 sure.
19 Q.   Okay.  During the course of the seven years,
20 did you change the methodology for the
21 reconciliation process at all?
22 A.   It changed each year on the collection side
23 based on the ratio of collections.  So that was an
24 annual change.
25      But the overall philosophy and areas of

Page 35

1  overhead costs that we used did not change.  The
2  cost in those overhead areas obviously increased
3  dramatically over time.
4  Q.   Do you know what percentage of time
5  Mr. Mounce would work on West matters that were
6  unrelated to Methodist?
7  A.   No.
8  Q.   Did you ever have any discussions with
9  Mr. Mounce about how much time he was spending on
10 business for West as opposed to Methodist?
11 A.   No, but when I initially set up the formula,
12 I had discussions of who potentially would be doing
13 other things, which I used to come up with the
14 percentage.
15      So in the initial process, I did have those
16 discussions.  On a year in and year out?  No.
17 Q.   Did your reconciliation process take into
18 account work that West might be doing to build the
19 business of West that was unsuccessful?
20      MR. ROARK:  Object to the form.
21      THE WITNESS:  In my opinion and
22 expertise, I believe it did.
23 BY MS. SWEET:
24 Q.   What is your basis for that?
25 A.   I -- one of the things I have done in

Page 36

1  healthcare is cost allocations for my entire 30-year
2  career and understand the way to do cost
3  allocations.
4       And philosophically and my experience says
5  don't try to get into the details because you'll
6  get overwhelmed.  Pull a big bucket of costs that
7  should cover everything and come up with a
8  percentage that should cover all of those factors
9  that are in there at a reasonable level.
10      So that was my logic for answering that way
11 and doing it this way.
12 Q.   So if West was attempting to acquire an
13 additional location that did not pan out, was that
14 captured at all in your reconciliation, the time
15 spent on doing that?
16 A.   In my opinion, yes.
17 Q.   In your opinion?
18 A.   In my opinion, yes.
19 Q.   Did Methodist pay West more under the
20 professional services agreement than -- I'm sorry.
21 Strike that.
22      Prior to the transaction with West, did
23 Methodist pay West physicians for their
24 professional services through a wRVU rate?
25 A.   Repeat that, please.

Case 3:17-cv-00902 Document 399-3 Filed 06/02/22 Page (4 of 11) PageID #: 12930
Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com
33..36

Page 41

1  ability to pay their copays and deductibles.
2       You could have commercial insurance that's
3  really bad commercial insurance and you've got a
4  $10,000 deductible that you don't have the ability
5  to pay, so I wouldn't count all commercial patients
6  as patients with means.
7       And then obviously you've got the uninsured,
8  which don't have means. You have Medicaid, which
9  is even people poorer than the uninsured, you've
10 got to be -- to have really low income, you know.
11      And then you have Medicare patients, some of
12 who have secondary, who have the ability to pay
13 their coinsurance and copays.
14      And you have other low income Medicare that
15 don't have the ability to -- where you can get the
16 Medicare payment but you can't collect the copay
17 and deductible.
18      So when you define "means," I kind of break
19 it into the pieces. And it's not only do you have
20 insurance, but do you have insurance and are you
21 able to pay the part that insurance doesn't pay?
22      So it's a complicated definition, but that's
23 how I looked at it and how I used the definition.
24 Q.   Okay. And at the time that Methodist entered
25 into the transaction with West, did Methodist expect

Page 42

1  that the patients with means -- there would be more
2  patients with means coming to Methodist for cancer
3  care?
4       MR. ROARK: Object to the form.
5       THE WITNESS: So the answer is no,
6  because we already had commercial contracts that
7  directed many of them. So there was steerage that
8  we were getting even without the West deal.
9       For some of the Medicare or commercial
10 plans that didn't have steerage, again, I go back to
11 what we said, we were going to build a better cancer
12 service line, and we expected it to attract more
13 patients. We expected to attract more patients with
14 means, and we expected -- and we were going to work
15 hard to attract more patients without means.
16      So we were looking to serve the entire
17 community, both means and without means. And if we
18 did it right, we hoped that it would lead to more
19 patients coming for a better service.
20 BY MS. SWEET:
21 Q.   At the time that Methodist entered into a
22 contractual relationship with West in 2011, was it
23 aware that West physicians had referred more
24 patients to Baptist for inpatient services than to
25 West?

Page 43

1  A.   We didn't run specific numbers. We did know
2  historically they were closer tied to Baptist in
3  their history. And the cancer group that we were
4  working with, UTCI, was more closely related to us.
5       So we knew the general market layout. We
6  didn't know the specific -- or we didn't pull up
7  the specific volumes.
8  Q.   Did the amount of West inpatient referrals to
9  Methodist increase in 2012 as compared to the number
10 of inpatient referrals in 2011?
11 A.   So that is something we didn't routinely run.
12 Looking back and preparing for this testimony, I did
13 see where there were some specific reports that were
14 run over time that tracked that. And looking back
15 on those reports, it did go up.
16      At the time, that wasn't something that we
17 were tracking, but on a -- but on a non-routine
18 basis, those reports were pulled and I can see that
19 the volume from West did change.
20      At the same time, what's missing from there
21 is UTCI moved from us to Baptist, so I've never
22 calculated, but I would -- it could be that UTCI
23 referrals went down.
24      It's always -- there's so many factors going
25 in, you know, volume numbers, but did the West

Page 44

1  numbers go up? Based on the reports I've seen
2  preparing for this, it did.
3  Q.   Okay. And did the West numbers also go up
4  from -- in 2013 over 2012?
5  A.   There was a report that Ron ran that had each
6  of the years -- I can't -- that I reviewed. I think
7  it did, but I'm not certain. I'd have to go back
8  and look at that to be sure.
9  Q.   And do you think from 2014, was there almost
10 a double increase from the numbers in 2011?
11 A.   I don't remember that. I'd have to see
12 specific numbers, but I don't remember that.
13 Q.   Okay. Did the amount of West referrals to
14 Baptist decrease in 2012 as compared to 2011?
15 A.   For inpatients?
16 Q.   Yes.
17 A.   From that report, yes.
18 Q.   Okay. At the time that Methodist entered
19 into a contractual relationship with West in 2011,
20 was Methodist aware that it could be a violation of
21 the Anti-Kickback Statute to pay physicians in
22 exchange for referrals?
23      MR. ROARK: Object to the form.
24      THE WITNESS: Can you repeat that?
25 ///

Case 3:17-cv-00902 Document 399-3 Filed 06/02/22 Page 5 of 11 PageID #: 12931
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com
41..44

Page 81

1 THE WITNESS: What do you mean by
2 "principal place of business"?
3 BY MS. SWEET:
4 Q. For purposes of entering into contracts?
5     MR. ROARK: Object to the form.
6 BY MS. SWEET:
7 Q. Signature blocks. Medicare.
8     MR. ROARK: Same objection.
9 THE WITNESS: So let me answer it how I
10 can know to answer it.
11     Were there some administrative types at
12 Wolf River, such as Erich, that had an office? Yes.
13 Were other administrative individuals at other
14 locations? Yes. So that's -- that's all I know how
15 to answer that.
16 BY MS. SWEET:
17 Q. Did West pay Methodist any amount of rent for
18 space at Wolf River?
19 A. I could answer, again, I'm going to go back
20 to how we did a reconciliation process, what was
21 included and why we thought it was reasonable.
22     So the answer would be the same answer I've
23 already given.
24 Q. Okay. There was no -- there was no lease
25 between Methodist and West with respect to office

Page 82

1 space; is that right?
2     MR. ROARK: Object to the form.
3     THE WITNESS: What do you mean by
4 "lease"?
5 BY MS. SWEET:
6 Q. A lease.
7 A. Do you mean a formal lease agreement that's
8 signed by parties? Is that what --
9 Q. Yes.
10 A. I'm help -- I'm trying to understand.
11 Q. Okay. I mean, I don't -- as a CFO and
12 someone with your background, I assume that you
13 understand what a lease is, right?
14     MR. ROARK: Object to the form.
15 BY MS. SWEET:
16 Q. Was there a lease between Methodist and West
17 with respect to office space?
18 A. No. There was not a lease, but there was a
19 reconciliation agreement that should have picked up
20 cost that covered those type of activities in the
21 methodology that we used in the overall allocation
22 that we came up with.
23 Q. What is the lift?
24 A. So that's a term that different people use at
25 various times over the course of the agreement. The

Page 83

1 most common use of it was we entered into a
2 contractual agreement with the University of
3 Tennessee to provide additional payments to them for
4 support of education, research, and clinical
5 expertise growth for the cancer service line.
6     To me that's -- everyone used the term
7 "lift," but to me it was -- it was a separate
8 contractual agreement with payments out of the
9 funds that we provided for a specific purpose.
10 Q. And what are the cancer mission support
11 funds?
12 A. Again, that's another term that was commonly
13 used for the same thing. Everybody has their own
14 terms.
15 Q. Okay. Do you have an understanding that the
16 cancer mission support funds came from revenues from
17 the service line?
18 A. No.
19 Q. Where did the cancer mission support funds
20 come from?
21 A. That was an agreement directly between
22 Methodist and UT to provide $5 million for specific
23 purposes.
24     And those payments continued after our
25 agreement with West ended. So that was a

Page 84

1 responsibility of Methodist's to pay it from
2 whatever funds they had to meet a contractual
3 obligation that we have with UT.
4 Q. And the $5 million, did those come -- did --
5 during the course of the relationship between
6 Methodist and West, did that come from revenues from
7 the adult oncology service line?
8 A. It came from Methodist.
9 Q. And where did the money come from from
10 Methodist for that cancer mission support funds?
11 A. It came from our overall financial position
12 and financial performance as a system.
13 Q. Are you going to say money is money? That's
14 what Mr. --
15 A. I am not going to say money is money. That's
16 a strange term to me also.
17     We had numerous agreements with UT to pay
18 for numerous things, and we paid them based on our
19 contractual responsibilities.
20 Q. Did you read the deposition transcript of
21 Mr. Lane's testimony?
22 A. I did.
23 Q. Okay. And he said "money is money," right?
24 A. I think you said it and he agreed and then
25 you all started using it, and it's just a bizarre

Case 3:17-cv-00902 Document 399-2 Filed 06/02/22 Page 6 of 11 PageID #: 12932
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com                    81..84

1 that?"
2         So, I mean, that's not surprising or
3 unusual.  Obviously the finance people were more
4 involved than the administrative people and the
5 administrative people were more involved than the
6 doctors.
7 BY MS. SWEET:
8 Q.    How did the West Clinic benefit financially
9 from the revenue for the oral pharmacy?
10 A.    West Clinic --
11         MR. ROARK:  Object to the form.
12         THE WITNESS:  -- PC?
13 BY MS. SWEET:
14 Q.    Yes.
15 A.    There was no -- that was our outpatient
16 pharmacy.  All the financial performance of that
17 came back to us.
18         Reporting back to the West Clinic, P.C. and
19 the physicians would -- I would hope would go back
20 and say, hey, these drugs are working.
21         And certain docs many times were using the
22 drugs outpatient, others weren't.  Educating the
23 entire group, changing practice plans to say
24 instead of giving, you know, outpatient chemo
25 infusion, which is more invasive, let's use this

1 drug and do it on an outpatient basis in these
2 doses from these manufacturers, that could have
3 been the key feedback that we wanted to continue to
4 occur and we saw occurring.
5 Q.    Did the cost savings that Methodist realized
6 from the oral pharmacy program impact the West
7 Clinic's financials?
8 A.    What do you mean by West Clinic's financials?
9 Are you asking whether we made a payment based on
10 the money that we made on the outpatient pharmacy?
11 The answer is no.
12 Q.    Was there -- did Methodist make any payment
13 indirectly based on the revenue from the oral
14 pharmacy program?
15 A.    So Methodist paid the West Clinic, P.C. under
16 the management services agreement, the professional
17 services agreement, the asset purchase agreement.
18 So those were the direct payments that we were
19 making.
20         We did reimburse specific expenses, like we
21 just went over -- that was part of the PSA -- that
22 they may have paid and then were reimbursing for
23 our expenses that we could have also paid directly.
24 It was just the way it went through.
25         So there was no payments made related to the

1 outpatient pharmacy.
2 Q.    Was the revenue for oral pharmacy program a
3 component of the fair market valuation in the
4 management services agreement --
5 A.    I'm not sure.
6 Q.    -- in 2014?
7 A.    I am not sure how that fair market value
8 appraisers took that for the management services
9 agreement.  I mean, we'd have to trace it back
10 through.
11         I don't remember, as I went back and read
12 it, whether that was in it or not, but, again, they
13 have a fair market approach, a cost approach.  They
14 have numerous ways that they did it, so I'm not
15 sure how it impacted their final fair market value
16 opinion.
17 Q.    Was the total revenue for the adult oncology
18 service line a component in the fair market
19 valuation?
20 A.    We produced various reports.  How the --
21 those reports were used by the appraisers, I am not
22 sure.
23         We were asked, clearly by this, to produce
24 that information, which we did.  And how the
25 appraiser used it, I am not sure, in reaching their

1 conclusion.
2 Q.    You've seen the fair market valuations,
3 correct?
4 A.    I've seen the various fair market valuations.
5 Q.    Do you understand that all of the valuations
6 reference an amount of revenue for the service line
7 that's being managed?
8         MR. ROARK:  Object to the form.
9         THE WITNESS:  I recognize that a market
10 value approach that uses revenue to help determine
11 one of their methodologies is something they did.
12 And so, yes, in each of the -- each of those, that
13 was an approach used in determining the valuations.
14 Each one did it differently --
15 BY MS. SWEET:
16 Q.    Okay.
17 A.    -- in how it was used.
18         But, yes, I do know total revenues.  What
19 they counted as total revenues based on what we
20 gave them, sitting here I can't remember.
21 Q.    Okay.  We'll go over some documents.
22 A.    Sure.
23         But, again, if you're asking me if I think
24 that's appropriate, keep in mind many times what we
25 did was stop doing outpatient chemo and start doing

Case 3:17-cv-00902 Document 399-3 Filed 06/02/22 Page 7 of 11 PageID #: 12933
Elite-Brentwood Reporting Services  (615) 595-0073
www.EliteReportingServices.com
129..132

Page 185

1  A.  But other --
2      MR. ROARK:  And -- go ahead.
3      THE WITNESS:  Sorry.
4  BY MS. SWEET:
5  Q.  Go ahead.
6  A.  Other than that, I think you have stated
7  correctly.
8      MR. ROARK:  Subject to the objections --
9      MS. SWEET:  Objections?  Okay.
10     MR. ROARK:  -- and clarifications that
11 we've raised.
12     MS. SWEET:  Okay.
13 BY MS. SWEET:
14 Q.  At your interview I believe you mentioned
15 that in one year Methodist realized a cost savings
16 of $50 million through the 340B discount drug
17 program as a result of the transaction with West?
18 A.  Yes.
19 Q.  Do you recall that?
20     Do you know the total amount of cost savings
21 under the 340B drug -- discount drug program
22 throughout the relationship between Methodist and
23 West?
24 A.  I do not, although -- I do not, because we
25 didn't measure it every year separately.  That's a

Page 186

1  difficult measurement to do.
2  Q.  Okay.  Do you have a ballpark number?
3  A.  No.  It grew from, you know, the 14,
4  15 million at first, and I think the 51 million was
5  2017 I saw as I went back through.
6      So, you know -- and it -- so you would have
7  to extrapolate that and add '18 into it, so I am
8  not sure.  I mean, it's not a number I have added
9  up.
10 Q.  Okay.  It's in the -- would you say it's in
11 the hundreds of millions?
12 A.  It would definitely exceed 100 million.  I'm
13 not sure it would exceed 200 million.
14 Q.  Okay.  What about the increase in revenues as
15 a result of patient referrals from West?  Do you
16 have a number for that amount --
17 A.  Okay.  What do you mean --
18     MR. ROARK:  Object to the form.
19 BY MS. SWEET:
20 Q.  -- that you can point to?
21 A.  -- by "patient referrals"?
22 Q.  So the inpatient referrals.
23 A.  The inpatient referrals.  Do I have a number
24 on what we collected?  Do I have a number on the
25 margin that we made?

Page 187

1  Q.  I can ask you the --
2  A.  What do you mean by do I have a number?
3  Q.  Sure.  I can ask you for the net profits.
4  A.  Net profits on inpatient by service line or
5  for groups is something we did not routinely do.
6  That is for various reasons.
7      So let me give you a little history and then
8  come back to why.
9  Q.  Okay.
10 A.  We could act -- we had decided
11 philosophically we were going to report our
12 profitability by physical location.  So even though
13 Methodist Hospital in Memphis was made up of a bunch
14 of different campuses, we had a different campus and
15 physical location for University, South, North,
16 Germantown, et cetera.
17     We had separate physical locations for the
18 outpatient cancer departments that we made
19 hospital-based, so it was very easy to report
20 profitability by physical location.
21     So I had request -- cardiac wanted to know
22 what that service line made.  OB wanted to know
23 what that service line made.  Erich at times wanted
24 to know what the cancer service line made.  I could
25 go down the list.

Page 188

1      And I thought that that was not how we
2  managed our organization.  It got into some theory
3  because you had to allocate fixed and semi-variable
4  cost, which is very difficult to do and various
5  methods of doing it.
6      So I philosophically said that's something
7  we don't need to be wasting our time on.  If it's
8  something we need in order to make a management
9  decision or to -- of any type, be it capital or
10 ongoing, we will do that, but to do it on an
11 ongoing basis, we're not going to do it.
12     So I historically did not ask or did not
13 receive inpatient profitability for West patients
14 or any other groups, Sutherland, any other group.
15 If there was a need for it and some special runs
16 were done, I would support doing that.
17     So, no, I do not have those numbers because
18 that was something that philosophically didn't make
19 sense to me, so I didn't request them.
20 Q.  Okay.  For Topic 5 here, any agreements,
21 arrangements or understandings with West that would
22 allow West to continue to operate out of locations
23 that were the subject of -- I'll use your -- I'll
24 use the objection and clarify it -- that were the
25 subject of the asset purchase agreement.

Case 3:17-cv-00902 Document 399-3 Filed 06/02/22 Page 8 of 11 PageID #: 12934
Elite-Brentwood Reporting Services  (615) 595-0073  185..188
www.EliteReportingServices.com

Page 241

1  all nurse practitioners for The West Clinic at the
2  locations outside of Corinth?
3  A.   I do not know for sure. I do know we made a
4  special look on the -- as we went into it that any
5  people working directly for Corinth did not show up
6  in the leased employees.
7  Q.   I presume West Clinic hired additional nurse
8  practitioners over the course of the relationship
9  with Methodist from 2012 through 2018?
10 A.   Were there more nurse practitioners in 2018
11 than there were in 2011? I don't know for sure.
12 Q.   You don't? Do you know whether there were
13 any nurse practitioners at any of the cancer center
14 sites that were not leased employees to Methodist?
15 A.   Repeat that one.
16 Q.   Do you know whether any of the nurse
17 practitioners at the cancer center sites --
18 A.   At our sites?
19 Q.   Yes. Were not -- were not a leased employee
20 to Methodist?
21 A.   Were --
22 Q.   Did they fall outside of the leased employee
23 arrangement? Were they an employee of West?
24 A.   So at each of the cancer sites, we had
25 Methodist employees and we had leased employees.

Page 242

1  Q.   Right.
2  A.   So did people at those sites not be part of
3  the leased employees? Absolutely, yes. Would they
4  have been on the Methodist payroll system? Yes.
5  Q.   Okay. You're not aware of any nurse
6  practitioner that Methodist did not reimburse -- it
7  gets complicated because of all the different
8  arrangements.
9      But all I'm really trying to understand is,
10 is there anybody that was outside of the agreement
11 that was a nurse practitioner that West had
12 responsibility for paying that Methodist didn't
13 reimburse or wasn't under the LEA?
14 A.   Again, that's --
15 Q.   You don't know?
16 A.   I don't know.
17 Q.   Okay. Is there anybody who would know the
18 answer to that question?
19 A.   The answer is I don't know. Obviously you
20 can look at the leased employees and it changed
21 payroll by payroll and see what's on there. Who was
22 not on there?
23 Q.   Yeah.
24 A.   I don't know who can answer that.
25 Q.   And here also on Exhibit B it lists the

Page 243

1  pharmacy technician, director of pharmacy operation,
2  and the pharmacist.
3      Were all of those individuals leased
4  employees to --
5  A.   I don't believe so.
6  Q.   Okay. You'd have to look at the payroll to
7  know?
8  A.   I'd have to look at the payroll, but I know
9  we made the decision who's leased and not leased --
10 the guiding principle was if you touched a patient,
11 you were on our payroll. If you did not touch a
12 patient, you were on the leased employees.
13     So those examples you just gave, I would
14 think, would show on our payroll, but I'm not sure.
15 Q.   Okay. I may or may not have copies of
16 payroll with me, but it's quite long, so...
17 A.   It is. It is.
18 Q.   Do you want to turn to Exhibit 19? It's
19 probably in the other binder, but maybe not.
20 A.   No, 19's in here.
21 Q.   Okay. It's just me that has them in the
22 wrong binders.
23 A.   Is 19 HealthCare Appraisers' --
24 Q.   Yes.
25 A.   -- 2012 report?

Page 244

1  Q.   It's the initial fair market valuation for
2  the management services agreement.
3  A.   And it's obviously got an exhibit from Erich
4  Mounce and an MLH Bates number on it.
5  Q.   Yes.
6  A.   Okay. So it's Exhibit 19 from -- first page
7  from Erich Mounce in MLH_027862. So I assume I'm on
8  the right one.
9  Q.   You are. And I'm trying to point you to the
10 right page that tells about the administrator being
11 paid from the base management fee.
12     Page 13, Bates No. 027875, footnote 20.
13 A.   I see the footnote.
14 Q.   Okay. Did you -- did Methodist ever tell HAI
15 that Mr. Mounce was a leased employee and being paid
16 directly by Methodist or indirectly by Methodist?
17 A.   So my understanding is we gave HIA -- HAI
18 copies of all the agreements, which would have
19 included the leased employee agreement, which would
20 have identified Erich Mounce as a leased employee,
21 is my understanding.
22 Q.   So your understanding is HAI should look
23 through the agreements and figure it out?
24      MR. ROARK: Object to the form.
25      THE WITNESS: My understanding is

Case 3:17-cv-00902 Document 399-3 Filed 06/02/22 Page 9 of 11 PageID #: 12935   241..244
Elite-Brentwood Reporting Services (615) 595-0073
www.EliteReportingServices.com

Page 245

1  information was provided to HAI that clearly
2  outlined that in the agreements.
3  BY MS. SWEET:
4  Q.   And your understanding was that you could
5  rely on a fair market value opinion that assumed
6  information that was contrary to what Methodist was
7  actually doing?
8       MR. ROARK:  Object to the form.
9       THE WITNESS:  I don't know what you're
10 asking.
11 BY MS. SWEET:
12 Q.   Sure you do.
13 A.   No, I don't.
14 Q.   I'm asking --
15      MR. ROARK:  Kara, that's argumentative.
16 BY MS. SWEET:
17 Q.   I'm asking whether it was fair for Methodist
18 to rely on a fair market value opinion that had an
19 assumption Methodist knew to be incorrect.
20      MR. ROARK:  Object to the form.
21      THE WITNESS:  So we relied on the
22 opinion that we got from HealthCare Appraisers in
23 total, including the entire report.
24      At the time we started this, they hadn't
25 even issued their report until February.  So as we

Page 246

1  finalized the agreements, this final written report
2  was not received until after -- it was received in
3  February of 2012, and the agreement went in place
4  late December 2011.
5  BY MS. SWEET:
6  Q.   You had a draft of the fair market value
7  opinion prior to entering into the management
8  services agreement, correct?
9  A.   No.
10 Q.   You did not have a -- Methodist did not
11 receive a draft of the fair market value opinion
12 prior to entering into the management services
13 agreement?
14 A.   No, correct.
15 Q.   How did Methodist determine what number to
16 put in the management services agreement?
17 A.   We received information from HAI,
18 specifically that are -- from them to our attorneys
19 that were put in the agreement.
20 Q.   Okay.  So Methodist counsel had a draft of
21 the fair market value opinion prior to Methodist
22 entering into the management services agreement?
23 A.   I don't know.
24      MR. ROARK:  Object to the form.
25 ///

Page 247

1  BY MS. SWEET:
2  Q.   You don't know?  You relied on what your
3  counsel told you that HAI indicated the fair market
4  value would be?
5       MR. ROARK:  Objection.
6  BY MS. SWEET:
7  Q.   Is that what your --
8       MR. ROARK:  Privilege.
9  BY MS. SWEET:
10 Q.   -- your testimony is?
11      MR. ROARK:  I -- Chris, you can't talk
12 about what discussions that you had with -- if you
13 had discussions with counsel about the HAI opinion,
14 I'm instructing you not to answer that.
15      THE WITNESS:  I can't answer it based on
16 instructions from my attorney.
17 BY MS. SWEET:
18 Q.   After you received the fair market value
19 opinion in February and noticed the footnote, did
20 you ever change the amount of money that you had
21 agreed to pay West under the management services
22 agreement?
23 A.   No.
24      MR. ROARK:  Objection, lacks foundation.
25 ///

Page 248

1  BY MS. SWEET:
2  Q.   Did you ever advise HAI that the -- that
3  Mr. Mounce was not being paid out of the base
4  management fee?
5  A.   Did I personally?
6  Q.   Yes.
7  A.   No.
8  Q.   Did anyone at Methodist?
9  A.   I don't know.
10      (Reporter asked for clarification.)
11 BY MS. SWEET:
12 Q.   What is your -- what is the basis for your
13 understanding that HAI received a copy of all of the
14 transaction documents?
15 A.   I'd have to go back and find that.  I know --
16 my understanding is with all the documents -- my
17 understanding --
18 Q.   Uh-huh.
19 A.   -- is all the documents were provided to both
20 ECG and HAI as part of both of their fair market
21 value opinions.  That is my understanding.
22      The basis for that is hard for me to
23 remember at this time.
24 Q.   Can you turn to footnote 24 on page 16?  Can
25 you read what that says out loud?

Case 3:17-cv-00902-Document 389-2 Filed 06/02/23 Page 10 of 11 PageID #: 12936
Elite-Brentwood Reporting Services  (615) 595-0073   245..248
www.EliteReportingServices.com

Page 337

1  dollar, but approximately how much lower were the
2  professional collections in Exhibit 71 than
3  Exhibit 70?
4  A.   Okay.  To do that I would need to do math,
5  which I'm willing to do if that's what you're
6  asking.
7  Q.   Yeah, that's what I'm asking.
8  A.   Okay.  Can I have a piece of paper?
9       MS. SWEET:  Do you want -- I was going
10 to say do you want -- do you have a calculator?
11      THE WITNESS:  If I'm ballparking, I'm
12 going to do it --
13      MS. SWEET:  Okay.
14      THE WITNESS:  -- in my head.
15      If we need to get a specific
16 calculation, I can do that too, if need be.
17      So just so you know, what I'm doing is
18 I'm going to compare answer 7 between the two for
19 those two categories and come up with a reasonable
20 estimate of the differences.
21      MS. SWEET:  You also have to do it for 9
22 as well.
23      MR. ROARK:  Right.
24 BY MR. ROARK:
25 Q.   It's 7 and 9.

Page 338

1  A.   7 and 9, correct.  Correct.  So let me figure
2  out a good way to do the math.
3       (Pause in proceedings.)
4       THE WITNESS:  I'll mess up you all's
5  books.
6       MS. SWEET:  He's writing on that?
7  That's okay.
8       MR. ROARK:  No, he just took out a page
9  from the exhibits so he can compare.
10      THE WITNESS:  Okay.  So I did make the
11 comparisons, each of those various schedules between
12 the two.  And I come up with around $19.7 million,
13 rounded, difference between the first set of
14 interrogatories and the second set of
15 interrogatories.  So that's the math I calculate.
16 BY MR. ROARK:
17 Q.   So the total estimated professional
18 collections in Exhibit 71 is about $19.7 million
19 lower than Exhibit 70?
20 A.   Yes, that's what I calculated.
21      MR. ROARK:  That's all that I have.
22      MS. SWEET:  Okay.
23      MR. VROON:  Are you talking about all
24 physicians --
25      MS. SWEET:  No, it's --

Page 339

1       MR. VROON:  -- or oncologists?
2       THE WITNESS:  I compared -- there's two
3  categories, 7 and 9.  I compared 7 --
4       MR. ROARK:  Hold on.  Mr. Vroon can't
5  ask you questions today.
6       MR. VROON:  I'm just trying to clarify,
7  because you didn't say whether it was calculating
8  No. 7 or No. 9, Brian.  I wanted to know.
9       MR. ROARK:  Kara clarified.  And I'm
10 happy to put it on the record.
11 BY MR. ROARK:
12 Q.   Mr. McLean, when you -- the numbers that
13 you're comparing, does that include the professional
14 collections from the answer to Interrogatory No. 7
15 and Interrogatory No. 9?
16 A.   Yes.
17      MR. ROARK:  All right.  That's all.
18      THE VIDEOGRAPHER:  We are going off the
19 record at 6:00 p.m.
20      FURTHER DEPONENT SAITH NOT
21      (Proceedings concluded at 6 p.m.)

Page 340

1                REPORTER'S CERTIFICATE
2
3  STATE OF TENNESSEE
4  COUNTY OF Davidson
5
6       I, Terri Beckham, RMR, CRR, and licensed
7  Court Reporter, with offices in Nashville,
8  Tennessee, hereby certify that I reported the
9  foregoing deposition of CHRIS MCLEAN by machine
10 shorthand to the best of my skills and abilities,
11 and thereafter the same was reduced to typewritten
12 form by me.  I am not related to any of the parties
13 named herein, nor their counsel, and have no
14 interest, financial or otherwise, in the outcome of
15 the proceedings.
16      I further certify that in order for this
   document to be considered a true and correct copy
17 it must bear my original signature, and that any
   unauthorized reproduction in whole or in part
18 and/or transfer of this document is not authorized
   will not be considered authentic, and will be in
19 violation of Tennessee Code Annotated 39-14-104,
   Theft of Services.
20
21      _____
22      Terri Beckham, RMR, CRR, LCR
        Elite-Brentwood Reporting Services
23      Notary Public State of Tennessee
24      My Notary Public Commission Expires 3/6/2026
        LCR 355 - Expires: 6/30/2024
25

Case 3:17-cv-00902 Document 399-2 Filed 06/02/23 Page 11 of 11 PageID #: 12937
Elite-Brentwood Reporting Services  (615) 595-0073  337..340
www.EliteReportingServices.com