EXHIBIT 5

# UNITED STATES of AMERICA

## vs

# METHODIST LE BONHEUR HEALTHCARE, et al.

---

## DAVID STERN, M.D.

## September 26, 2022

---



**Julie Lyle, RMR, LCR, CRR, RPR**

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

1 valuation.
2 BY MR. ROARK:
3 Q. And what -- what was the purpose of getting
4 the fair market valuation?
5 A. The purpose was --
6        MR. VROON: Object -- let me just object
7 to form.
8        THE WITNESS: The purpose was I
9 wanted -- again, I was a State -- my paycheck said
10 on it the "State of Tennessee," and I was their
11 representative. So I wanted to be sure that what I
12 was paying was within the bounds of what was
13 considered appropriate for those positions. I paid
14 very large salaries, and I wanted to be certain that
15 those salaries were still within range.
16 BY MR. ROARK:
17 Q. If you paid within the bounds of what was
18 considered appropriate, did that mean that the --
19 the compensation complied with applicable laws, from
20 your standpoint?
21        MR. VROON: Object to form.
22        THE WITNESS: As far as I was informed
23 by the counsel I worked with, because I'm not a
24 lawyer, that was always one of the important
25 considerations.

1 BY MR. ROARK:
2 Q. All right. So for -- and to be specific,
3 while you were at University of Tennessee, was the
4 main health system partner Methodist?
5 A. Yes, it was.
6 Q. And so for the comments that you made earlier
7 that the health system would be involved in setting
8 the compensation for the -- the UT physicians, that
9 would mean that Methodist would be involved in
10 setting compensation for physicians who worked in
11 UTMP, ULPS, or UTMG?
12 A. No. Methodist was involved in setting the
13 clinical component of the compensation in ULPS and
14 UTMP. University Clinical Health was the
15 independent practice plan. It was the -- it's what
16 succeeded UTMG. That was the plan that I was
17 chairman of the board and ran independently, so that
18 was separate. And UTROP was the -- Regional One
19 Health had the major say in.
20 Q. Regional One Health is a different health
21 system in Memphis?
22 A. Yes, it is.
23 Q. Okay. For -- during the time that you were
24 executive dean at the University of Tennessee, other
25 than Dr. Eason and the comments you made about his

1 compensation, did you have concerns about the
2 compensation that was being paid to any other UT
3 physicians?
4 A. So it depends what you mean by "UT
5 physicians," because the West Clinic considered
6 themselves, when they had the inclination, to be
7 University of Tennessee physicians. I had no role
8 in their compensation whatsoever.
9     There were other situations like that as well
10 where they really weren't under my auspices, and
11 that would be a neurosurgical practice. And the
12 neurosurgical practice, called Semmes Murphey, I
13 wasn't involved in setting their compensation, and I
14 wasn't aware of their compensation.
15 Q. And I appreciate you saying that.
16     So to try to make my question specific, then,
17 for the physicians where you are involved in setting
18 the compensation, so for UTMP, for example, did you
19 have any concerns about the amount of compensation
20 that was being paid to any UTMP doctors?
21 A. Only to Eason that was a part of that. I was
22 not concerned about other doctors.
23     And I should say, to my recollection. You
24 know, there were 80 or 90 doctors in these things,
25 and I really don't recall -- I recall maybe the

1 outliers now, but I don't recall the details.
2 Q. In addition to serving as executive dean, at
3 some point while you were in Methodist, did you also
4 take on a role with Methodist?
5 A. Yes, I did.
6 Q. And what was that role?
7 A. The title of the role was executive vice
8 president of medical affairs.
9 Q. Is that set forth at the top of the second
10 page of your CV?
11 A. Yes, it is.
12 Q. And that's a role that you held from 2012
13 through 2016, correct?
14 A. No. That's a title that I held during that
15 period.
16 Q. That's a -- were you in the position of
17 executive vice president of medical affairs at
18 Methodist from 2012 through 2016?
19 A. Yes, I was.
20 Q. Okay. How did that role come about?
21 A. That role was a result of the affiliation
22 agreement between the University, but that role was
23 exceedingly problematic. My job description was
24 never clarified. I wrote it, and Methodist would
25 never agree to a job description. So I had the

Case 3:17-cv-00902 Document 209-5 Filed 06/02/23 Page 3 of 8 PageID #: 12947
Elite-Brentwood Reporting Services (615) 329-9935
www.EliteReportingServices.com
37..40

1 effect that Methodist was buying referrals?
2 A.   That started in 2011 when I first heard the
3 deal.  So when I was absolutely first hired -- would
4 have been around April 2011 -- it was presented to
5 me, as the new dean, and my two key superiors were
6 Shorb and Schwab, that they had the most wonderful
7 Cancer Center opportunity, and that opportunity was
8 made possible by the ability to be able to buy the
9 referrals of Methodist and to use 340B profits to
10 make it so that they could afford to sustain a
11 Cancer Center, which would be done by dividing the
12 340B profits among the University, the physicians of
13 the West Clinic, and of Methodist.
14 Q.    From your standpoint, how did Methodist buy
15 referrals from West?
16 A.   From my standpoint, Chris McLean made very
17 clear to me that he expected an increase of
18 200 million in the Methodist budget as a result of
19 referrals coming in from West, which had gone to
20 Baptist and to other places, and part of the West
21 deal was they were incentivized to bring those
22 referrals to Methodist, and they were incentivized
23 because that was part of the compensation scheme.
24 Q.    What was the compensation scheme?
25 A.   I don't know, but it was highly incentivized

1 towards the West Clinic.  I was never shown the
2 details of it.
3 Q.    If you don't know what the compensation
4 scheme was, then how do you know it was incentivized
5 towards Methodist?
6 A.   I know because the docs made clear that -- to
7 me, that bringing referrals there -- and let me give
8 you an example.  There was a physician, Sandeep
9 Samont, that was a head-and-neck surgeon that
10 divided his head-and-neck referrals between Baptist
11 and Methodist.  Erich Mounce and Lee Schwartzberg
12 specifically said, Send all the referrals to
13 Methodist.  This advantages how we do our PSA, and
14 this is part of the Cancer Center for -- these are
15 referrals that are brought to us.
16 Q.    When did Erich Mounce and Lee Schwartzberg
17 say to Dr. Sandeep, Send all these referrals to
18 Methodist?
19 A.   I don't know they said it to Sandeep, but
20 they might have because he felt under pressure.
21 They definitely said it to me and asked me to
22 communicate it to him.
23 Q.    Dr. Schwartzberg and Erich Mounce asked you
24 to communicate to Dr. Sandeep that he should bring
25 cases to Methodist?

1 A.   Correct.
2 Q.    When did Erich Mounce and Dr. Schwartzberg
3 ask you to do that?
4 A.   I don't know the date but --
5 Q.    What was the setting?
6 A.   Oh, there were many settings.  I had
7 individual meetings with them.  Could have been
8 before.  I don't know the setting.
9 Q.    I'm asking specifically about the comment
10 that you referred to that Erich Mounce and
11 Dr. Schwartzberg asked you to go have a conversation
12 with Dr. Sandeep.  Was that during a meeting that
13 you had with Erich Mounce and Dr. Schwartzberg?
14 A.   Yes, it was.
15 Q.    Where did that meeting take place?
16 A.   I can't -- I don't recall.
17 Q.    But it was in person?
18 A.   Yes, it was in person.
19 Q.    Was it in your office?
20 A.   I don't think so.
21 Q.    And when -- when did this take place?
22 A.   It took place before Sandeep Samont left.  So
23 Sandeep Samont felt under pressure and
24 uncomfortable, and he left and he went to
25 Northwestern University.

1 Q.    What type of physician was he?
2 A.   He was a head-and-neck cancer surgeon.
3 Q.    Had you recruited him?
4 A.   No.  But I'd become a very strong advocate
5 for him because head-and-neck cancer was important
6 in the underserved population, and he was a very
7 effective clinician and wanted to grow the
8 enterprise, an academic enterprise, around him.
9 Q.    Was it important to you to be able to provide
10 services to the underserved population?
11 A.   Very important to me.
12 Q.    Is that something that was accomplished
13 through the Methodist-West affiliation?
14 A.   From my perspective, not to the extent that
15 it could have been.
16 Q.    But it was accomplished to some extent?
17       MR. VROON:  Object to form.
18       THE WITNESS:  I don't know exactly the
19 numbers, so I can't comment on what actually
20 happened.  But I'm aware that there was not an
21 emphasis on what was happening downtown.  Downtown
22 where I worked with Methodist University Hospital,
23 that was a focal point for treating uninsured
24 patients, as was North and -- Methodist North and
25 South, but I didn't know as much about those

Case 3:17-cv-00902 Document 222-5 Filed 06/02/23 Page 65 of 299 PageID 12948
Elite-Brentwood Reporting Services   (615) 329-9919
www.EliteReportingServices.com   65..68

1 Breen --
2 A.    Yes.
3 Q.    -- in 2011 where Bill said to you that the
4 fair market range had come back about $500,000 too
5 short.
6 A.    Right, for -- and it was a -- Bill Breen said
7 it, but it was in some meeting setting.  It was not
8 a private setting.
9 Q.    Do you know one way or the other whether
10 anything was done to make up for the $500,000
11 difference from what the fair market value opinion
12 had been expected to be?
13 A.    I know that when Bill Breen said that, others
14 at the meeting said they would find a way to be able
15 to make that up.
16 Q.    And, Dr. Stern, do you know if there was
17 anything that was done to make that up?
18 A.    I don't know.  I was not --
19 Q.    Okay.
20 A.    -- a part of the financial discussion.
21 Q.    All right.  And then you said that -- you
22 said they talked about getting fair market value
23 opinions and going to different firms.
24        Who are you talking about making that
25 comment?

1 A.    Gary Shorb and Chris McLean.
2 Q.    What was the setting for this?
3 A.    The setting was, We don't know how we're
4 going to be able to find fair market value for the
5 level of salary that we're paying to West going
6 forward.
7 Q.    I'm sorry.  By "setting," where did this
8 conversation take place?
9 A.    Gary Shorb's office.
10 Q.    And who was present for this?
11 A.    I just remember Chris McLean, Gary, and
12 myself, but there could have been other people
13 there.
14 Q.    Do you -- for the arrangements that were put
15 in place between Methodist and West, did you have
16 any involvement in getting the fair market value
17 opinions?
18 A.    I did not.
19 Q.    Did you provide any data or underlying
20 financial information as part of those fair market
21 value opinions?
22 A.    No, I did not.
23 Q.    Did you receive drafts or get to provide any
24 input on the fair market value opinions?
25 A.    I was not shown anything related to their

1 compensation.  I was told about it because those
2 involved, including Gary Shorb, thought it was two
3 standard deviations off.
4 Q.    What was -- could you explain what you mean
5 by that?
6 A.    It was very high.  They were being paid a lot
7 of money.  And they wanted these referrals, and they
8 could support it because of the -- the increased
9 revenue from the referrals and the 340B.  But it was
10 an unconscionable sum of money, is the impression
11 they gave me.
12 Q.    That was the impression that --
13 A.    Shorb gave me.
14 Q.    And what did Gary Shorb say about that?
15 A.    He felt that the 3 million to each, to
16 Schwartzberg and to Tauer, and the fact that the
17 West Clinic partners all earned in excess of
18 1 million -- between 1 1/2 and 2 1/2 million -- that
19 that was really too much money for folks to make,
20 that really should not be something that was born.
21 But that was the deal, and they wanted the deal to
22 go.
23        And it was said to me a few times, as with
24 the investment in Vector, it was the cost of doing
25 business with West.

1 Q.    Was the -- from your understanding, was the
2 compensation to West at a guaranteed amount per
3 year, or was it tied to how much work the physicians
4 did?
5        MR. VROON:  Object to form.
6        THE WITNESS:  I didn't know the details,
7 but I know that the West Clinic docs told me that
8 they were guaranteed an income at the
9 90th percentile or greater, but I didn't know the
10 parameters.  I was never shown that PSA or the
11 management services agreement.
12 BY MR. ROARK:
13 Q.    Okay.  Did you provide any input or feedback
14 on which fair market value firms were selected?
15 A.    No.  That's not my expertise.
16 Q.    The original management services agreement
17 between Methodist and West was valued by Healthcare
18 Appraisers.
19        Are you familiar with Healthcare Appraisers?
20 A.    I'm not -- no, I am not.
21 Q.    Okay.  And the MSA was subsequently valued by
22 Altegra Consulting and then Pinnacle Consulting.
23        Are you familiar with either one of them?
24 A.    No, I am not.
25 Q.    Okay.  I had asked you earlier about --

Case 3:17-cv-00902   Document 109-5   Filed 06/02/23   Page 5 of 8 PageID #: 12949
Elite-Brentwood Reporting Services   (615) 329-9191
www.EliteReportingServices.com        85..88

1  the dinner meetings with Sidney Vanderline or
2  whatever, they eventually put me out because I said
3  to them, I don't want to be part of the captive PC
4  where the West Clinic is going to control the
5  University physicians; their income is not going to
6  be revealed.  We're basically working for a
7  for-profit, and there's -- the vision for a cancer
8  center, of me hiring national figures, is not -- is
9  not taking place.
10      It's -- the visions weren't constant.  And my
11  way of thinking that what we submitted to the UT
12  trustees was truthful at the time, but that's not
13  how it was implemented.
14  Q.  Okay.
15  A.  It didn't get implemented that way.
16  Q.  But it was truthful at the time you made the
17  recommendation to the --
18  A.  The -- the --
19  Q.  Dr. Stern --
20  A.  Yes.
21  Q.  -- let me finish my question.
22      It was truthful at the time that you
23  recommended it to them?
24  A.  It was truthful that I wanted to form a
25  cancer center, and that was the document you

1  presented to me that must have been -- I must have
2  presented.  I wouldn't have presented something that
3  I thought was untrue.
4  Q.  Of course not.
5      At what point during the affiliation did you
6  start to have concerns that the underlying
7  arrangements were not legal?
8  A.  Like --
9      MR. VROON:  Object to the form.
10      THE WITNESS:  Let me just silence this
11  once and for all.  I'm not going to be able to pick
12  something up in -- in Asheville.
13      I began to have misgivings about it from
14  when I first heard about it in April of 2011, but it
15  wasn't until 2012 to 2013 when I became more aware
16  from more people because, as I said, I did not see
17  the actual MSA or PSA.  So what I knew is what I
18  heard about it from the -- Kurt Tauer, Lee
19  Schwartzberg, Chris McLean, Gary Shorb, Erich
20  Mounce.
21  BY MR. ROARK:
22  Q.  The conversations that you've referenced
23  earlier today?
24  A.  Yes.
25  Q.  As part of the transaction, did Methodist

1  also become part owner in ACORN or Vector?
2  A.  Yes.  So --
3  Q.  And, Dr. Stern --
4  A.  I'm sorry.
5  Q.  -- right now it was just, did they become an
6  owner.
7      The entity was at one point known as ACORN?
8  A.  Right.
9  Q.  And then is it correct that the name changed
10  to Vector?
11  A.  Yes, that's correct.
12  Q.  If I use "Vector" during our conversation,
13  does that make sense to you?
14  A.  Yes.
15  Q.  Okay.  At some point, were you asked to serve
16  on the Vector board?
17  A.  Yes.
18  Q.  Before being asked to serve on the board, did
19  you participate in any of the negotiations between
20  Methodist and West about the Vector investment?
21  A.  No.  I'd never heard of Vector.
22  Q.  Were you involved -- did you have any
23  involvement in the fair market value opinion that
24  was obtained relating to the Vector transaction?
25  A.  No, I did not.

1  Q.  At any point did -- separate from West Cancer
2  Center, at any point did Vector start working with
3  the University of Tennessee?
4  A.  My understanding is, in small ways, there was
5  some small projects, but not a big deal.
6  Q.  Were you involved in those projects?
7  A.  No, I was not.
8  Q.  Okay.  At some point during the time that you
9  were serving on the Vector board, did you start
10  having concerns about the Vector business?
11  A.  Yes, very strong concerns.
12  Q.  When did you begin to develop those concerns?
13  A.  I guess it was probably a year to two into
14  it.
15  Q.  Initially, when you first started serving on
16  the board, did you believe that it sounded like a
17  legitimate, promising business?
18  A.  It -- it sounded to me that there was nothing
19  wrong with the vision for it, and I knew that this
20  was something that Lee Schwartzberg, who fancied
21  himself to be an investigator, this was something
22  that was important to him.  So I thought maybe this
23  was something that would be of value.
24      (WHEREUPON, a document was marked as
25  Exhibit Number 237.)

Case 3:17-cv-00902   Document 205-5   Filed 06/02/23   Page 6 of 8 PageID #: 12950
Elite-Brentwood Reporting Services  (615) 329-9015
www.EliteReportingServices.com
181..184

1        So the actual -- their actual
2  involvement, it made sense for a CRO, but only if
3  they could -- if Lee Schwartzberg could bring unique
4  clinical trials that were special and they could go
5  into a clinic that was a research-organized clinic
6  that was a machine for really recruiting people.
7        The other thing to be mentioned is these
8  are very low-level clinical trials. They're
9  multisite, industrial clinical trials. Again, by
10 example, with Vanderbilt, these wouldn't count for a
11 Vanderbilt faculty member. These are not
12 investigator-initiated.
13       So it turned out that they were in a
14 very tricky part of the market, and they were trying
15 every approach to move it forward.
16       The international flavor was fine, but
17 it turned out that Lee Schwartzberg had no leverage
18 with any of these people, and nothing that Chukas
19 presented ever really happened. But I believed -- I
20 saw the constriction here of the resources. And I
21 think I referred to this in the last part of the
22 paragraph, "I thank you for the opportunities
23 involved." And it says "bigger might be better,"
24 but --
25       MR. VROON: Slow down, David. Slow

1  down.
2        THE WITNESS: -- it's a difficult issue
3  here.
4        So this begins to give you in a careful
5  way my reservations which were accumulating about
6  ACORN.
7  BY MR. ROARK:
8  Q.   You don't really express those reservations
9  in this email, do you, because -- let me finish my
10 question, please.
11 A.   Uhm-uhm.
12 Q.   You don't really express those reservations
13 in this email because instead you describe ACORN as
14 a nimble David among the large and clumsy Goliaths,
15 correct?
16       MR. VROON: Object to the form.
17       THE WITNESS: Again, you've taken out
18 one sentence. But what I see is I see it's a
19 balanced letter. And what you also can appreciate
20 is that I note some of the emails you showed me that
21 I wrote that my wife would beat me for saying
22 those things I didn't put in this letter.
23       I told Gary specifically at the board
24 meeting sometime between 2012 and 2013 that this was
25 a very poor investment. The CRO had no potential

1  whatsoever locally or nationally.
2        The -- they had another project, which
3  was patient-reported outcomes data that was based on
4  a woman that was a faculty member at Duke, and they
5  were hoping to sell the whole company to Flat Iron.
6  Well, she just jumped to Flat Iron and took, you
7  know, the project with her, and they had no
8  intellectual property. So on their important
9  project, they had no intellectual property.
10       On the CRO project, they had no angle.
11 The idea you're going to build a big clinical trial
12 infrastructure with UT that had almost no clinical
13 trials, that wasn't going to work. So as I looked
14 into this, it didn't work. And I said to Chris
15 McLean, who was on the board with me, I said, Now
16 that I've seen this, what were you guys thinking?
17 And he said it was a cost of doing business with the
18 West Clinic.
19 BY MR. ROARK:
20 Q.   Dr. Stern, I can only go by what I read in
21 the emails here. I guess I'm trying to follow up.
22       I can see how you describe ACORN in writing,
23 but what you're saying is that at meetings orally
24 you described it very differently than how you put
25 it in this email?

1  A.   Not at meetings.
2        MR. VROON: Object to the form.
3        THE WITNESS: I -- very carefully,
4  because, again, I needed to work with Lee
5  Schwartzberg in the Cancer Center, so I sent him,
6  which I'm sure you'll show me in a minute, a
7  complimentary email saying, You're dedicated to
8  this; I appreciate it.
9        But they couldn't deliver it, and I said
10 to Gary, Why have you invested in this? Doesn't
11 mean it's bad. It's a premature investment. It's
12 not something that I understand.
13       And feel free to ask Chris McLean. He
14 clearly said this is a cost of doing business with
15 the West Clinic.
16 BY MR. ROARK:
17 Q.   My question, Dr. Stern, is just why would you
18 represent your views of ACORN differently in writing
19 versus what you're now saying you said on the
20 meetings.
21 A.   Because it would -- this email --
22       MR. VROON: Give me a second.
23       Object to the form, Brian.
24       THE WITNESS: I'm sorry.
25       Because Gary would forward this email to

Case 3:17-cv-00902  Document 109-5  Filed 06/02/23  Page 7 of 8 PageID #: 12951
Elite-Brentwood Reporting Services   (615) 329-9015
www.EliteReportingServices.com          189..192

1  A.    I'd just as soon not.
2      But, you know, again, he was a young guy and
3  it was a complicated, difficult situation, and I
4  thought it would be safer for him to stay out of
5  corporate for the moment.
6  Q.    Did you think it was a mistake for him to
7  work for Michael Ugwueke?
8  A.    Well, that was corporate.  Going to corporate
9  was working for Ugwueke.
10      MR. ROARK:  Let's stop here and go off
11  the record.
12      VIDEO TECHNICIAN:  Going off the record
13  at 3:57 p.m.
14      (A recess was taken.)
15      VIDEO TECHNICIAN:  We are back on the
16  record at 4:15 p.m.
17      MR. ROARK:  No further questions from
18  us.
19      MR. VROON:  Okay.  Thank you, Brian.  No
20  questions.
21      MR. ROARK:  Thank you, Dr. Stern.
22      VIDEO TECHNICIAN:  The time is 4:15 p.m.
23  We are going off the record.  This will conclude
24  today's deposition.
25

1      FURTHER DEPONENT SAITH NOT
2      (Proceedings concluded at 4:15 p.m.)

1      E R R A T A   P A G E
2      I, DAVID STERN, M.D., having read the
foregoing deposition, pages 1 through 238, do hereby
3  certify said testimony is a true and accurate
transcript, with the following changes (if any):
4
5  PAGE  LINE      SHOULD HAVE BEEN
6  ____  ____      _____
7  ____  ____      _____
8  ____  ____      _____
9  ____  ____      _____
10 ____  ____      _____
11 ____  ____      _____
12 ____  ____      _____
13 ____  ____      _____
14 ____  ____      _____
15 ____  ____      _____
16 ____  ____      _____
17 ____  ____      _____
18 ____  ____      _____
19
20      _____
        DAVID STERN, M.D.
21
22 _____
Notary Public
23
My Commission Expires: _____
24
Reported by: JULIE K. LYLE, LCR
25

1      REPORTER'S CERTIFICATE
2
3  STATE OF TENNESSEE
4  COUNTY OF DAVIDSON
5
6      I, JULIE K. LYLE, Licensed Court
7  Reporter, with offices in Hermitage, Tennessee,
8  hereby certify that I reported the foregoing
9  deposition of DAVID STERN, M.D., by machine
10 shorthand to the best of my skills and abilities,
11 and thereafter the same was reduced to typewritten
12 form by me.  I am not related to any of the parties
13 named herein, nor their counsel, and have no
14 interest, financial or otherwise, in the outcome of
15 the proceedings.
16      I further certify that in order for this
document to be considered a true and correct copy,
17 it must bear my original signature, and that any
unauthorized reproduction in whole or in part
18 and/or transfer of this document is not authorized,
will not be considered authentic, and will be in
19 violation of Tennessee Code Annotated 39-14-104,
Theft of Services.
20
21
22
23 JULIE K. LYLE, LCR
Elite Reporting Services
24 Associate Reporter
Notary Public State of Tennessee
25
LCR #850 - Expires: 6/30/24

Case 3:17-cv-00902 Document 209-5 Filed 06/02/23 Page 8 of 8 PageID #: 12952
Elite Brentwood Reporting Services (865) 329-9919
www.EliteReportingServices.com
237..240