EXHIBIT 12

**EVIDENTIARY OBJECTIONS TO THE UNITED STATES' COUNTER-STATEMENT OF MATERIAL FACTS ("CSOF")**

## I.      Summary Table of Objections

| General Objection ("GO") | Applicable Standard | Paragraphs in Violation |
|---|---|---|
| 1. The assertion is not supported by the cited evidence, not supported by competent evidence or not supported by any record evidence at all. | Each disputed fact "must be set forth . . . with *specific citations to the record supporting the contention* that such fact is in dispute." M.D. Tenn. Loc. R. 56.01(c) (emphasis added); *see also* Fed. R. Civ. P. 56(c)(1)-(2) (requiring a party, if supporting their assertion with evidence, to "cit[e] to particular parts of materials in the record" and noting "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"). As such, a party may not deny facts without citing to supporting evidence. *Kilpatrick v. HCA Human Res., LLC*, 2022 WL 866258, at *1-2 (M.D. Tenn. Mar. 22, 2022) (Campbell, J.) (in response to defendant's objection that plaintiff's statement of undisputed material fact ("SUMF") response "denies facts without citing to any part of the record to support his position, or in some cases without any cite to the record at all," holding that "the Court will disregard . . . statements for which there is no citation to the record"). | CSOF ¶¶ 2, 3, 4, 5, 6, 7, 8, 9, 11, 13, 14, 16, 18, 19, 20, 23, 26, 27, 30, 31, 32, 33, 34, 37, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 52, 53, 54, 57, 59, 60, 61, 62, 64, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 78, 79, 80, 81. |
| 2. The government impermissibly injects argument instead of opposing facts by, rather than citing to facts, (i) offering characterizations of material in the record in the form of unsupported conclusions and opinions; (ii) characterizing material in the record or testifying without personal knowledge; and/or (iii) making legal conclusions. | The non-movant's response is limited to a "concise statement of any additional *facts* that the non-movant contends are material." M.D. Tenn. Loc. R. 56.01(c) (emphasis added). *See also* Fed. R. Civ. P. 56(a), (c)(2) (noting that a party must assert that a material "*fact* . . . is genuinely disputed," that "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence") (emphasis added). As such, a party must not "inject[] argument instead of opposing facts." *Kilpatrick*, 2022 WL 866258, at *1-2 (holding that "the Court will disregard all argument [and] characterization of documents"); *McLemore v. Gumucio*, 619 F. Supp. 3d 816, 826 (M.D. Tenn. 2021) (finding that if a statement is "an assertion of something that is not a fact at all (but rather, say, an opinion or a | CSOF ¶¶ 2, 3, 4, 7, 9, 11, 13, 16, 20, 25, 26, 29, 30, 33, 34, 35, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 52, 57, 59, 60, 63, 64, 68, 72, 79, 80, 81. |

| General Objection ("GO") | Applicable Standard | Paragraphs in Violation |
|---|---|---|
| | legal principle), the statement is not properly included in a Rule 56.01 statement").<br><br>A declaration used to oppose a motion must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").<br><br>A legal assertion is not a "fact." *See* M.D. Tenn. Loc. R. 56.01(c); Fed. R. Civ. P. 56(a); *McLemore*, 619 F. Supp. 3d at 826; *Bridgeport Music, Inc. v. WB Music Corp.*, 2006 WL 903737, at *2 n.3 (M.D. Tenn. Apr. 6, 2006), *aff'd*, 508 F.3d 394 (6th Cir. 2007) ("Response[s] to statement of undisputed facts are not the place for legal argument."); *Turner v. Nat'l Ass'n of Letter Carriers Branch No. 27*, 2022 WL 807378, at *5 n.17 (W.D. Tenn. Feb. 11, 2022), *report and recommendation adopted*, 2022 WL 801555 (W.D. Tenn. Mar. 15, 2022) ("Whether or not the accusation was false is a legal conclusion and thus irrelevant to establishing the undisputed facts."). | |
| 3. The government cites expert reports or declarations as record evidence underlying asserted facts, despite the fact that these assertions (i) constitute opinions and not facts; (ii) are not made based on personal knowledge; and/or (iii) do not | The non-movant's response is limited to a "concise statement of any additional *facts*." M.D. Tenn. Loc. R. 56.01(c) (emphasis added); *see also* Fed. R. Civ. P. 56(a)-(c); Fed. R. Evid. 703 (noting that "an expert may base an *opinion* on *facts* or data in the case") (emphasis added); *Kilpatrick II*, 2022 WL 866258, at *1-2 (in response to defendant's objection that plaintiff's SUMF response "injects argument instead of opposing facts," holding that "the Court will disregard all argument"); *Assurance Co. of Am. v. Cont'l Dev. & Const., Inc.*, 2009 WL 1616760, at *12 (M.D. | CSOF ¶¶ 8, 26, 32, 40, 41, 44, 66, 67, 69, 70, 71, 72, 73, 74, 75, 76, 78, 79, 80, 81. |

| General Objection ("GO") | Applicable Standard | Paragraphs in Violation |
|---|---|---|
| comply with Rule 702 and are not admissible. | Tenn. June 8, 2009), *aff'd*, 392 F. App'x 472 (6th Cir. 2010) ("Simply having experts restate general facts and announce legal conclusions without any analysis does not create a genuine issue of material fact.") (internal citation omitted).<br><br>An affidavit or declaration must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Portwood v. Montgomery Cnty., Tenn*., 2014 WL 6871516, at \*7 (M.D. Tenn. Dec. 5, 2014) (noting that Rule 56(c)(4) requires declarations at summary judgment to be "made on personal knowledge" and finding that "[a]n expert opinion offered at the summary judgment stage is held to the same standard as other declarations").<br><br>"A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). *See also* Fed. R. Evid. 702; *Portwood*, 2014 WL 6871516, at \*7 ("An expert opinion offered at the summary judgment stage is held . . . to Federal Rule of Evidence 702, which governs the admissibility of expert testimony."). | |
| 4. The assertion is based on inadmissible hearsay. | "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see also* Fed. R. Evid. 802 (providing that hearsay is not admissible); *Jarvis v. Hickman Cnty. Jail Med. Staff*, 2014 WL 2515167, at \*6 (M.D. Tenn. May 27, 2014) (noting that party "must submit admissible evidence to defeat a motion for summary judgment" and holding that "hearsay cannot be considered on a motion for summary judgment") (citing | CSOF ¶¶ 61, 62. |

3

| General Objection ("GO") | Applicable Standard | Paragraphs in Violation |
|---|---|---|
| | *Southerland v. Mich. Dep't of Treasury*, 344 F.3d 603, 620 (6th Cir. 2003)). | |
| 5. A declaration that contradicts a previous sworn statement without sufficient explanation does not create a genuine issue of material fact. | A party must demonstrate the existence of a genuine dispute of material fact. M.D. Tenn. Loc. R. 56.01(c)(1); Fed. R. Civ. P. 56(c)(1). "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). | CSOF ¶¶ 9, 10, 62, 67. |
| 6. The assertions are not material to the motion for summary judgment. | The non-movant may only provide additional facts "that the non-movant contends are *material*." M.D. Tenn. Loc. R. 56.01(c) (emphasis added); *McLemore v. Gumucio*, 619 F. Supp. 3d 816, 823 (M.D. Tenn. 2021) (finding that a fact is material only if its "existence or non-existence will affect the outcome of the lawsuit"). | CSOF ¶¶ 2, 9, 10, 11, 12, 15, 17, 19, 20, 26, 27, 30, 31, 33, 34, 35, 36, 41, 42, 43, 44, 45, 46, 47, 49, 50, 52, 53, 54, 55, 57, 63, 64, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 78, 81. |
| 7. The government cites to facts that are otherwise undisputed. | The purpose of filing a response to a party's SUMF is to "demonstrate[e] that the fact is disputed." M.D. Tenn. Loc. R. 56.01(c)(3); *see also Anderson v. McIntosh Constr., LLC*, 2014 WL 2207924, at *2 (M.D. Tenn. May 28, 2014), *aff'd*, 597 F. App'x 313 (6th Cir. 2015) ("[N]otwithstanding specific warnings from this court in recent cases, [plaintiff]'s counsel filed a statement of undisputed material facts, even though Local Rule 56.01 does not permit that type of submission. Instead, Local Rule 56.01(c) permits a plaintiff to file a responsive statement of disputed facts in an effort to avoid the grant of summary | CSOF ¶¶ 11, 12, 13, 15, 17, 19, 20, 21, 22, 23, 24, 29, 30, 38, 45, 48, 56, 58, 59, 65. |

4

| General Objection ("GO") | Applicable Standard | Paragraphs in Violation |
|---|---|---|
| | judgment. For this reason alone, [plaintiff's] statement of facts may be ignored."). | |
| 8. The government cites generally to a document or multiple documents without any pincite or other guidance as to which document or which portions of lengthy documents it is citing. | A party must cite to *specific* or *particular* parts of materials. *See* M.D. Tenn. Loc. R. 56.01(c) (requiring "specific citations to the record"); Fed. R. Civ. P. 56(c)(1) (requiring citations to "particular parts of materials"). *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) ("Judges are not like pigs, hunting for truffles that might be buried in the record.") (internal citation and quotation marks omitted); *Gohl v. Livonia Pub.* Sch., 134 F. Supp. 3d 1066, 1077 (E.D. Mich. 2015), *aff'd sub nom. Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672 (6th Cir. 2016) ("Global, generic citations to multiple-page exhibits . . . without specific pinpoint citations to guide the court's review are inadequate to . . . withstand a summary judgment motion.") (citation omitted). | CSOF ¶¶ 3, 4, 8, 26, 27, 31, 32, 37, 40, 41, 44, 47, 50, 57, 66, 67. |
| 9. The same paragraph contains numerous purported facts. | Each fact must be set forth in a "separate, numbered paragraph." M.D. Tenn. Loc. R. 56.01(c). | CSOF ¶¶ 20, 26, 43, 45, 47, 64, 67, 68. |

## II. Table of Additional Facts to Which Methodist Objects

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 2** | At the time, oncology practices that were faced with increasing costs and declining reimbursements began partnering with hospitals that could capitalize on the 340B Program, <u>which would allow hospitals to realize millions in savings, which then could be funneled back to the physicians through various contractual arrangements.</u> ECF No. 323-34; 323-64. | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 7.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of materials in the record. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| | <u>At the time, oncology practices that were faced with increasing costs and declining reimbursements began partnering with hospitals that could capitalize on the 340B Program,</u> which would allow hospitals to realize millions in savings, which then could be funneled back to the physicians through various contractual arrangements. ECF No. 323-34; 323-64. | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 8. |
| **CSOF ¶ 3** | Methodist was not able to access the revenues and savings associated with West's patients absent doing the deal proposed by West, which included . . . <u>assuming the bulk of its overhead and expenses</u>. . . ECF Nos. 323-11-14; 323-34. | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 8.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of materials in the record. *Id.* |
| | Methodist was not able to access the revenues and savings associated with West's patients absent doing the deal proposed by West, which included . . . entering into a management agreement | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 8. |

---

[1] Where applicable, the portion(s) of the fact generating an objection are <u>underlined</u>. Portions of a paragraph that are not relevant to a particular objection may be omitted, as indicated by ellipses.

**EVIDENTIARY OBJECTIONS TO THE UNITED STATES' COUNTER-STATEMENT OF MATERIAL FACTS ("CSOF")**

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 3** | whereby Methodist paid West <u>to manage its own patients</u>. <u>ECF Nos. 323-11-14; 323-34.</u> | **GO No. 2:** This is not a fact, but rather the government's improper characterization of materials in the record. *Id.* |
| | Methodist was not able to access the revenues and savings associated with West's patients absent doing the deal proposed by West, which included acquiring the West clinic locations under the APA, and agreeing to compensate West for professional services at rates that exceeded its pre-deal collections under the PSA, employing and leasing almost all of its staff and assuming the bulk of its overhead and expenses, as well as entering into a management agreement whereby Methodist paid West to manage its own patients. ECF Nos. 323-11-14; 323-34. | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 8.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of materials in the record. *Id.*<br><br>**GO No. 8:** The government cites generally to a document without any pincite or other guidance as to which portion of the lengthy document it is citing. Reply at 8. |
| **CSOF ¶ 4** | <u>By doing a deal with West, Methodist obtained West's outpatient referrals and also incentivized West to send its inpatients to Methodist since</u> it would be paid at higher rates than what it would otherwise have received in professional collections. <u>ECF Nos. 323-11; 323-19 and 323-20; 323-34; 323-64.</u> | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 8-9.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of materials in the record. *Id.*<br><br>**GO No. 8:** The government cites generally to multiple documents without any pincite or other guidance as to which document or which portions of lengthy documents it is citing. *Id.* |
| | By doing a deal with West, Methodist obtained West's outpatient referrals and also incentivized West to send its inpatients to Methodist <u>since it would be paid at higher rates than what it</u> | **GO No. 2:** This is not a fact, but rather speculative testimony by the government that is not based on personal knowledge. Reply at 9. |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | would otherwise have received in professional collections. ECF Nos. 323-11; 323-19 and 323-20; 323-34; 323-64. | |
| **CSOF ¶ 5** | Methodist knew that if it acquired West's clinic locations and converted them to Methodist hospital-owned provider-based locations, West would necessarily refer its patients to Methodist for treatment at these locations, as the patients would be simply continuing to go their physicians for treatment in the same places that West had been treating them. Ex. GG (McLean Dep. Vol. II) at 68:19-69:1. | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 9–10. |
| **CSOF ¶ 6** | As a result, Methodist would be able to obtain the collections associated with facility, lab, technical and ancillary fees, as well as chemotherapy and other drugs relating to West's patients for which Methodist could then bill Medicare and other insurers. . . . | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 10. |
| | Methodist's pre-deal internal documents show that it considered how much it would profit from converting the sites to provider-based locations. Sweet Decl., Ex. 30 (Profit on Provider Based Location). | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 10. |
| **CSOF ¶ 7** | In selling its clinic locations, West would be losing collections associated with the technically and facility component, instead would be limited to professional collections. To offset this loss, West would need some other way to increase its revenue by finding a hospital that had the financial ability to pay West through the other agreements, such as a professional services agreement and a management agreement. This is why it was important for West to choose a hospital that could participate in the 340B Program. Ex. I (Shorb Dep.) at 71:2-6. | **GO No. 1:** These assertions are not supported by the cited evidence. Reply at 10–11. |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 7** | To offset this loss, West <u>would need some other way</u> to increase its revenue by finding a hospital that had the financial ability to pay West through the other agreements, such as a professional services agreement and a management agreement. <u>This is why it was important</u> for West to choose a hospital that could participate in the 340B Program. . . . | **GO No. 2:** These are not facts, but rather improper characterization and speculative testimony by the government that is not based on personal knowledge. Reply at 10–11. |
| **CSOF ¶ 8** | Methodist's <u>internal documents</u> also <u>show that it intended to share the savings realized from the 340B Program with West</u>. . . . ECF No. 328-1. | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 11. |
| | Methodist's internal documents also show that it intended to share the savings realized from the 340B Program with West. Methodist even told West how much money it expected to make from the deal, which, as the United States' expert Tim Smith stated, is not standard industry practice. ECF No. 328-1. | **GO No. 3:** The government cites to an expert report (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. Reply at 11.

**GO No. 8:** The government cites generally to a document without any pincite or other guidance as to which portion of the lengthy document it is citing. *Id.* |
| **CSOF ¶ 9** | During the deal negotiations and subsequently, Methodist expressed a willingness to use the 340B Program savings, which it referred to as the "lift" to compensate physicians in exchange for their referrals. <u>Stern. Decl. ¶¶ 10-20 & Ex. 2.</u> . . . | **GO No. 1:** This assertion is not supported by the cited evidence. Reply at 12.

**GO No. 5:** This statement contradicts the declarant's sworn testimony. *Id.* |
| | During the deal negotiations and subsequently, <u>Methodist expressed a willingness to use the 340B Program savings</u>, which it referred to as the "lift" to compensate physicians in exchange | **GO No. 2:** The interpretation of an email and bracketed alterations are not facts, but rather the |

9

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 9** | for their referrals. Stern. Decl. ¶¶ 10-20 & Ex. 2. <u>For example</u>, in considering a subsequent relationship with another clinic, Methodist's CEO Shorb stated: "I am committed to 100 percent of [the] Jones [Clinic] [savings of $1.0-$1.3 million in 340B dollars] going to lift." Sweet Decl., Ex. 77 (Shorb email to Mounce re: Dinner with Schwartzberg as of 07/10/15). . . . | government's improper characterization of materials in the record. Reply at 12. |
| | . . . .For example, in considering a subsequent relationship with another clinic, Methodist's CEO Shorb stated: "<u>I am committed to 100 percent of [the] Jones [Clinic] [savings of $1.0-$1.3 million in 340B dollars] going to lift</u>." Sweet Decl., Ex. 77 (Shorb email to Mounce re: Dinner with Schwartzberg as of 07/10/15). . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 12. |
| | . . . .And Methodist in fact did compensate West more because of the 340B Program savings its was able to realize through West's referrals. <u>Liebman Decl., ¶ 53</u>. | **GO No. 1:** This assertion is not supported by competent record evidence. Reply at 12–13.<br><br>**GO No. 5:** This statement contradicts the declarant's sworn testimony. *Id.* |
| | . . . .And Methodist in fact did compensate West <u>more</u> because of the 340B Program savings its was able to realize through West's referrals. . . . | **GO No. 2:** This is not a fact, but rather the government's improper and ambiguous characterization of materials in the record. Reply at 12–13. |
| **CSOF ¶ 10** | Chris McLean told Mr. Liebeman that "he had calculated drug profits under the 340B Program from the West physicians' referrals and how to use those new profits to move the main focus of the cancer service line to Germantown where the West physicians preferred to practice. Germantown is the wealthier suburb of Memphis. McLean boasted that this strategy was the | **GO No. 5:** This statement contradicts the declarant's sworn testimony. Reply at 13.<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* at 13–14. |

10

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | way to incentivize the doctors to join with Methodist, make more money, and move away from the urban campus to the wealthiest suburb with higher reimbursement rates from more cancer patients with commercial insurance and Medicare coverage." Liebman Decl., ¶ 28 | |
| **CSOF ¶ 11** | This is precisely why it was a key factor for West in bringing its business to any hospital was whether the hospital could utilize the 340B Program that would allow the hospital to realize significant savings. . . . Sweet Decl., Ex. 9 (Baptist, Methodist and Tenet Responses Pros and Cons). | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 14.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of materials in the record and testimony of government counsel made without personal knowledge. *Id.* |
| | . . . .Methodist was the only hospital that West approached that could participate in the 340B Program. Sweet Decl., Ex. 9 (Baptist, Methodist and Tenet Responses Pros and Cons). | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 14.<br><br>**GO No. 7:** This fact is plainly undisputed. *Id.* |
| **CSOF ¶ 12** | Methodist also knew that West has historically been aligned with Baptist, which it knew was not participating in the 340B Program and referred most of its patients to Baptist for inpatient needs. ECF No. 323-34; Ex. G (McLean Dep. Vol. I) 42:21-44:17. | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 14.<br><br>**GO No. 7:** This fact is plainly undisputed. *Id.* |
| **CSOF ¶ 13** | Another means of compensating West was through an investment in ACORN, as reflected in the June 3, 2011 Letter of Intent between Methodist and West. Compl. ¶ 107; Answer ¶ 107. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 15.<br><br>**GO No. 2:** This is not a fact, but rather a legal conclusion advanced by the government. *Id.* |

11

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | Another means of compensating West was through an <u>investment in ACORN, as reflected in the June 3, 2011 Letter of Intent between Methodist and West.</u> Compl. ¶ 107; Answer ¶ 107. | **GO No. 7:** This fact is plainly undisputed. Reply at 15. |
| **CSOF ¶ 14** | <u>Methodist's internal documents</u> show that it expected revenues to increase from $1.25 billion to $1.45 billion with the West transaction. Methodist's then CEO Shorb <u>predicted</u> that the impact of the deal to both Methodist and West would result in a financial impact of $17.79 million, with $10.784 million of that amount going to Methodist. <u>Ex. I (Shorb Dep.) at 89:9-90:12; Sweet Decl., Ex. 76 (Mounce Email to Somer re: Co-Management, as of 9/15/15).</u> | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 15. |
| **CSOF ¶ 15** | Prior to the affiliation, the parties anticipated that the savings from the 340B Program would be $15 million. Stern Decl. ¶ 18 & Ex. 2. Methodist initially intended to divide the savings equally among Methodist, West and UTHSC, who was a partner in the vision that Methodist had to one day create an NCI-designated cancer. However, it ultimately only gave UTHSC $5 million, even though Mr. McLean testified that the amount of savings approached $50 million in one year alone. ECF No. 235 ("Complt.") ¶ 328; ECF No. 242 ("Answer") ¶ 328 | **GO No. 6:** These assertions are not material to the motion for summary judgment. Reply at 16.<br><br>**GO No. 7:** These facts are plainly undisputed. *Id.* |
| **CSOF ¶ 16** | Methodist also knew how much West expected to be compensated for doing the deal and the amount it expected to receive during the course of the affiliation. *See, e.g.*, Sweet Decl. Ex. 20 (Mounce email to McLean re: HAI of 09/29/11) ("numbers we have sold to our shareholders"). | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 16.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of an email in the record and testimony of government counsel made without personal knowledge. *Id.* |

Case 3:17-cv-00902   Document 399-12   Filed 06/02/23   Page 13 of 45 PageID #: 13000

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 17** | When Methodist obtained a preliminary estimate of the management fee at $3.362 million in September 2011, Chris McLean noted that it was about $1 million too low. Sweet Decl. Ex. 17 (McLean email to Mounce re: HAI of 09/26/11). | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 16. <br><br> **GO No. 7:** This fact is plainly undisputed. *Id.* |
| **CSOF ¶ 18** | Mr. McLean and Mr. Mounce then worked together to ensure that West would receive the total amount to which Methodist agreed. <u>Sweet Decl. Ex. 17 (McLean email to Mounce re: HAI of 09/26/11). ("I know you [Chris McLean] and Gary have committed to getting us there on the dollars and our lawyers seem to think that we can get there without a compliance issue.").</u> | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 17. |
| **CSOF ¶ 19** | As part of the deal with West, on December 8, 2011, Methodist, through its subsidiary for-profit arm, Ambulatory Operations, Inc., invested $7 million into ACORN, which Dr. Schwartzberg founded in 2002 and acted as its President and Chief Medical Officer at the time of the transaction. ACORN's affiliation with Methodist and West is noted in the vision for the West Cancer Center set out in the attachment to the PSA. Compl. ¶ 184; Answer ¶ 184. | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 17. <br><br> **GO No. 7:** These facts are plainly undisputed. *Id.* |
| **CSOF ¶ 20** | Under the terms of the deal, Methodist paid $3.5 million in cash as a capital contribution, and a $3.5 million loan. Methodist was aware that $3.5 million in cash would be used by ACORN to pay back debt owed to Dr. Schwartzberg personally and to West as a company. Compl. ¶¶ 187-188; Answer ¶ 187-188; Sweet Decl. Ex. 15 (ACORN Closing Statement). . . . | **GO No. 7:** These facts are plainly undisputed. Reply at 17. |
|  | . . . .Methodist was aware that $3.5 million in cash would be used by ACORN to pay back debt owed to Dr. Schwartzberg personally and to West as a company. Compl. ¶¶ 187-188; | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 18. |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | Answer ¶ 187-188; Sweet Decl. Ex. 15 (ACORN Closing Statement). . . . | |
| | . . . .There was no legitimate business reason for Methodist to invest in ACORN, and the work that ACORN was supposedly doing was not in furtherance of the goals of non-profit institutions or creating an NCI-designated cancer center, as Dr. Stern participated on the ACORN Board, has attested. Stern. Decl., ¶¶ 94-111. . . . | **GO No. 5:** This statement contradicts the declarant's sworn testimony. Reply at 18.<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| | . . . . The ACORN investment (which later became known as Vector) was simply another means of paying West a kickback to get to the deal terms that West wanted. *Id.* | **GO No. 2:** This is not a fact, but rather the government's legal conclusion. Reply at 18. |
| | Under the terms of the deal, Methodist paid $3.5 million in cash as a capital contribution, and a $3.5 million loan. Methodist was aware that $3.5 million in cash would be used by ACORN to pay back debt owed to Dr. Schwartzberg personally and to West as a company. Compl. ¶¶ 187-188; Answer ¶ 187-188; Sweet Decl. Ex. 15 (ACORN Closing Statement). There was no legitimate business reason for Methodist to invest in ACORN, and the work that ACORN was supposedly doing was not in furtherance of the goals of non-profit institutions or creating an NCI-designated cancer center, as Dr. Stern participated on the ACORN Board, has attested. Stern. Decl., ¶¶ 94-111. The ACORN investment (which later became known as Vector) was simply another means of paying West a kickback to get to the deal terms that West wanted. *Id.* | **GO No. 9:** This paragraph contains at least four purported facts. Reply at 18. |
| CSOF ¶ 21 | Under the LEA, Methodist paid West over $100 million during the course of the deal. Compl. ¶ 128; Answer ¶ 128. | **GO No. 7:** This fact is plainly undisputed. Reply at 18. |

14

**EVIDENTIARY OBJECTIONS TO THE UNITED STATES' COUNTER-STATEMENT OF MATERIAL FACTS ("CSOF")**

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 22** | Under the PSA, from 2012 through 2018, Methodist paid West over $280 million. Compl. ¶ 137; Answer ¶ 137. | **GO No. 7:** This fact is plainly undisputed. Reply at 18. |
| **CSOF ¶ 23** | During the duration of the MSA from 2012 to 2018, Methodist paid West over $27 million, <u>approximately $13 million of which was for Base Management Fees</u>. Compl. ¶ 156; Answer ¶ 156. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 19. |
| | <u>During the duration of the MSA from 2012 to 2018, Methodist paid West over $27 million</u>, approximately $13 million of which was for Base Management Fees. Compl. ¶ 156; Answer ¶ 156. | **GO No. 7:** This fact is plainly undisputed. Reply at 19. |
| **CSOF ¶ 24** | Under the APA, from 2012 through 2018, Methodist paid West $10,537,397.49. Compl. ¶ 124; Answer ¶ 124. | **GO No. 7:** This fact is plainly undisputed. Reply at 19. |
| **CSOF ¶ 25** | As Methodist has admitted, the payments under the LEA, PSA, APA, and MSA constitute remuneration. Sweet Decl., Ex. 65 (Methodist's CID Responses) at No. 4. | **GO No. 2:** This is not a fact, but rather the government's legal conclusion. Reply at 19. |
| **CSOF ¶ 26** | The parties had little concern for the specifics of the deal documents that ultimately were entered into for the Methodist-West affiliation, and the documents contain inconsistent and overlapping terms. . . . | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 20.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization and testimony without personal knowledge. *Id.* |
| | The parties had little concern for the specifics of the deal documents that ultimately were entered into for the Methodist-West affiliation, and the documents contain inconsistent and overlapping terms. For example, Methodist leased West's NPPAs under the LEA, but West could also be reimbursed for the NPPAs under the PSA. Methodist confirmed that it did pay West for the NPPAs, which is reflected in the payroll records produced, Sweet | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 20.<br><br>**GO No. 2:** This paragraph contains extensive testimony from the government without personal knowledge. *Id.* |

15

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | Decl., Ex. 27 (2012 payroll records). And the United States' expert opined that there is evidence that Methodist also paid West under the PSA for professional services attributable to the NPPAs. Methodist never took any steps to confirm that the wRVUs were not attributable to work personally performed by the NPPAs. This resulted in a double-payment of millions of dollars to West from 2012 through 2017. ECF No. 328-1. | **GO No. 3:** The government cites to an expert report (i) for an assertion that constitutes opinion and not fact and (ii) for an assertion that is not made based on personal knowledge. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.*<br><br>**GO No. 8:** The government cites generally to a document without any pincite or other guidance as to which portion of the lengthy document it is citing. *Id.*<br><br>**GO No. 9:** This paragraph contains at least six purported facts. *Id.* |
| **CSOF ¶ 27** | In another example, the hospitalists fall under the PSA but also were employed by Methodist. ECF No. 323-11 & 323-13; Sweet Decl., Ex. 27. . . . | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 20–21.<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.*<br><br>**GO No. 8:** The government cites generally to documents without any pincite or other guidance as to which documents or portions of lengthy documents it is citing. *Id.* |
| | . . . . The United States did not attempt to calculate any double-payment as a result of this duplication, as there already is ample evidence of remuneration. | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 21.<br><br>**GO No. 2:** This is not a fact, but rather the government's legal conclusion. *Id.* |

16

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 29** | Pursuant to the APA, Methodist paid West $10,537,397.49. Compl. ¶ 124; Answer ¶ 124. . . . | **GO No. 7:** This fact is plainly undisputed. Reply at 21. |
| | . . . . Methodist has admitted that the payments under the APA constitute remuneration. Sweet Decl., Ex. 65 (Methodist's CID Responses) at No. 4. | **GO No. 2:** This is not a fact, but rather the government's legal conclusion. Reply at 22. |
| **CSOF ¶ 30** | Two million dollars of the amount paid under the APA was for "Meaningful Use" payments that West expected to receive in the future. . . . | **GO No. 7:** This fact is plainly undisputed. Reply at 22. |
| | . . . . Yet, this was ultimately a loan that was only fully repaid after the affiliation ended and the litigation was known. ECF No. at 323-8 at 21; ECF No. 324-1 at 7. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 22.<br><br>**GO No. 2:** This is not a fact, but rather the government's misleading characterization of materials in the record. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 31** | Although Methodist supposedly purchased all of the assets at 100 N. Humphreys, ECF No. 323-13, and assumed the payments for the entirety of that location, Sweet Decl., Ex. 23, West continued to operate a pharmacy there for which it did not pay any rent to Methodist or remit any profits for at least one year. . . . Sweet Decl., Exs. 51 & 70; Ex. G (McLean Dep. Vol. I) 76:13-78:11). | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 23. |
| | . . . .On December 31, 2012, West sold that pharmacy - which Mr. McLean called a "closet" - for $4.9 million to AnovoRx, who | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 23. |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | Methodist <u>engaged to provide management services for the pharmacy</u>. . . . | |
| | Although Methodist supposedly purchased all of the assets at 100 N. Humphreys, <u>ECF No. 323-13</u>, and assumed the payments for the entirety of that location, <u>Sweet Decl., Ex. 23</u>, West continued to operate a pharmacy there for which it did not pay any rent to Methodist or remit any profits for at least one year. On December 31, 2012, West sold that pharmacy - which Mr. McLean called a "closet" - for $4.9 million to AnovoRx, who Methodist engaged to provide management services for the pharmacy. <u>Sweet Decl., Exs. 51 & 70</u>; Ex. G (McLean Dep. Vol. I) 76:13-78:11). | **GO No. 8:** The government cites generally to documents without any pincite or other guidance as to which documents or portions of lengthy documents it is citing. Reply at 23. |
| **CSOF ¶ 32** | As noted above, West never entered into any lease with Methodist for office space at the 100 N. Humphreys location it sold to Methodist under the APA, yet it continued to operate out of that location for years. . . . | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 23. |
| | . . . .The United States' expert has opined that this was not commercially reasonable. ECF No. 324-1. | **GO No. 1:** This assertion is not supported by competent evidence or the evidence cited. Reply at 23–24.<br><br>**GO No. 3:** The government cites to a portion of an expert report (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 8:** The government cites generally to a document without any pincite or other guidance |

18

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | as to which portions of the lengthy document it is citing. *Id.* |
| **CSOF ¶ 33** | As noted above, when West moved its principal place of business to 7945 Wolf River Blvd in Germantown, which Methodist owned, Methodist never required West to pay any rent and never entered into a lease or even determined the fair market value for this location during the relevant time period. In connection with the conclusion of Methodist's contractual relationship with West, Methodist eventually determined the building was valued at $70 million, but still never made any attempt to quantify how much West should have been paying for the use of this space as its principal place of business. Sweet Decl., Ex. 74 (McLean Email to Ugwuke re: $70 Million as of 12/19/18). | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 24.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of an email that speaks for itself. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 34** | Of course, West had been expanding its business and adding new locations throughout the parties' affiliation, as reflected in its Annual Reports. Sweet Decl, Exs. 4, 36 & 38. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 24–25.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of annual reports that speak for themselves. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 35** | None of the Affiliation Agreements were ever amended to include the 7945 Wolf River Boulevard location. Sweet Decl. Ex. 63 (Bass Ltr. to Foley of 10/17/18) ("7945 Wolf River Boulevard is not defined as a 'Cancer Center Site' in the Unwind Agreement"); Ex. 64 (Foley Ltr. to Bass of 10/19/18). | **GO No. 2:** This is not a fact, but rather the government's improper characterization of what is required with respect to amending agreements. Reply at 25. |

19

# EVIDENTIARY OBJECTIONS TO THE UNITED STATES' COUNTER-STATEMENT OF MATERIAL FACTS ("CSOF")

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | **GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 36** | When Methodist and West ended their relationship, Methodist took a position that West could not purchase the Wolf River location from Methodist under the Unwind Agreement. Sweet Decl. Ex. 63 (Bass Ltr. to Foley of 10/17/18) ("7945 Wolf River Boulevard is not defined as a 'Cancer Center Site' in the Unwind Agreement"); Ex. 64 (Foley Ltr. to Bass of 10/19/18). | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 25. |
| **CSOF ¶ 37** | From the outset, Methodist had knowledge that it needed to enter into agreements concerning dual use assets to avoid regulatory issues. ECF Nos. 323-13 and 323-14. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 26.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of agreements that speak for themselves, as well as testimony without personal knowledge and an improper legal conclusion. *Id.*<br><br>**GO No. 8:** The government cites generally to documents without any pincite or other guidance as to which documents or portions of lengthy documents it is citing. *Id.* |
| **CSOF ¶ 38** | Methodist knew it could not pay West kickbacks in exchange for referrals. Ex. G (McLean Dep. Vol. I) 45:2-12.] | **GO No. 7:** This fact is plainly undisputed. Reply at 26. |
| **CSOF ¶ 39** | In 2015, Methodist's internal counsel acknowledged that it was not <u>proper</u> to have employees leased to Methodist doing work for West without an agreement. Sweet Decl., Ex. 69 (Field email to McLean and Mounce of 03/30/15). . . . | **GO No. 2:** This is not a fact, but rather the government's legal conclusion and improper characterization of an email that speaks for itself. Reply at 26. |

20

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 40** | Methodist knew that the draft FMV opinion it obtained from HAI was <u>based on incorrect assumptions, including that it was contrary to the terms of the LEA in that</u> Erich Mounce would be paid as a leased employee and was not being paid by West as an expense of the base management fee, <u>that West would not be providing management services at all the locations in the MSA, and that West was essentially being paid to manage its own patients</u>. . . . Ex. D (Schwartzberg Dep.) at 78:6-11; 87:3-10; 104:3-22; Ex. G (McLean Dep. Vol. I) at 248:2-10, 249:1-14; Ex. A (Ugwueke Dep.) at 167:21-168:14; ECF No. 328-1 at 31-35; ECF No. 323-34. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 27–28.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of an assessment that speaks for itself. *Id.* |
| | Methodist knew that the draft FMV opinion it obtained from HAI was based on incorrect assumptions, including . . . that <u>West was essentially being paid to manage its own patients</u>. . . . | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 27.<br><br>**GO No. 2:** This is not a fact, but rather the government's unsupported testimony made without any personal knowledge. *Id.* |
| | Methodist knew that the draft FMV opinion it obtained from HAI was based on incorrect assumptions . . . <u>ECF No. 328-1 at 31-35; ECF No. 323-34.</u> | **GO No. 3:** The government cites to a portion of an expert report (i) for an assertion that constitutes opinion and not fact and (ii) for an assertion that is not made based on personal knowledge. Reply at 28.<br><br>**GO No. 8:** The government cites generally to a document without any pincite or other guidance as to which portions of a lengthy document it is citing. *Id.* |

21

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 41** | . . . . The arrangement between Mr. McLean and Mr. Mounce in deciding to do something outside of the agreements <u>was never vetted by a third party</u> and <u>is not based on any sound methodology</u>. ECF No. 324-1. | **GO No. 2:** This is not a fact, but rather the government's unsupported characterization of materials in the record. Reply at 28–29.<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
|  | Although the Deal Agreements required Methodist to enter into a lease with West for its dual use employees at fair market value, this never occurred. The arrangement between Mr. McLean and Mr. Mounce in deciding to do something outside of the agreements was never vetted by a third party and is not based on any sound methodology. ECF No. 324-1. | **GO No. 1:** This assertion is not supported by competent record evidence. Reply at 28–29.<br><br>**GO No. 3:** The government cites to a portion of an expert report (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 8:** The government cites generally to a document without any pincite or other guidance as to which portions of a lengthy document it is citing. *Id.* |
| **CSOF ¶ 42** | From the outset, Methodist was aware that Mounce would continue to perform significant duties for West. The parties advised the public that Mounce would "maintain his position with The West Clinic and take responsibility for Methodist's cancer service line, reporting directly to Gary Shorb." Sweet Decl. Ex. 2. | **GO No. 1:** This assertion is not supported by competent record evidence. Reply at 29. |
|  | . . . . The parties advised the public that Mounce would "maintain <u>his position with The West Clinic</u> and <u>take responsibility for</u> | **GO No. 6:** These assertions are not material to the motion for summary judgment. Reply at 29. |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | Methodist's cancer service line, reporting directly to Gary Shorb." Sweet Decl. Ex. 2. | |
| **CSOF ¶ 43** | Under the MSA, the Operating Committee was tasked with oversight for the work that West was paid to do. . . . | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 30.<br><br>**GO No. 2:** This is not a fact, but rather the government's characterization or purported testimony made without personal knowledge. *Id.* |
| | **CSOF ¶ 43:** . . . .Yet it consisted of a majority of members that were West physicians (initially Drs. Schwartzberg, Tauer, Richey and Somer), who had oversight for themselves. . . . | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 30.<br><br>**GO No. 2:** This is not a fact, but rather the government's unsupported characterization. *Id.* |
| | **CSOF ¶ 43:** . . . .There were no Methodist physicians or clinical personnel on the Operating Committee, which initially included Methodist's CEO Gary Shorb and CFO Chris McLean, who negotiated the deal with West, and Vice President Donna Abney. . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 30. |
| | **CSOF ¶ 43:** . . . .West's CEO Erich Mounce, who was leased to Methodist full time, and another West employee leased to Methodist full-time, Cheryl Prince, were the staff tasked with management. . . . Sweet Decl., Ex. 41 (Operations Committee Meeting Minutes 1/12/12). | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 30.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of meeting minutes that speak for themselves. *Id.* |

23

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 43** | **CSOF ¶ 43:** . . . .Ms. Prince had principal responsibility <u>for the performance criteria</u>, which was her <u>only job</u>.  Sweet Decl., Ex. 41 (Operations Committee Meeting Minutes 1/12/12). | **GO No. 1:**  This assertion is not supported by the evidence cited.  Reply at 30–31.<br><br>**GO No. 2:**  This is not a fact, but rather the government's improper characterization of meeting minutes that speak for themselves.  *Id.* |
|  | **CSOF ¶ 43:**  Under the MSA, the Operating Committee was tasked with oversight for the work that West was paid to do.  Yet it consisted of a majority of members that were West physicians (initially Drs. Schwartzberg, Tauer, Richey and Somer), who had oversight for themselves.  There were no Methodist physicians or clinical personnel on the Operating Committee, which initially included Methodist's CEO Gary Shorb and CFO Chris McLean, who negotiated the deal with West, and Vice President Donna Abney.  West's CEO Erich Mounce, who was leased to Methodist full time, and another West employee leased to Methodist full-time, Cheryl Prince, were the staff tasked with management.  Ms. Prince had principal responsibility for the performance criteria, which was her only job.  Sweet Decl., Ex. 41 (Operations Committee Meeting Minutes 1/12/12). | **GO No. 6:**  This assertion is not material to the motion for summary judgment.  Reply at 31.<br><br>**GO No. 9:**  This paragraph contains at least five purported facts.  *Id.* |
| **CSOF ¶ 44** | Despite the fact that Mr. Mounce and Ms. Prince were performing much of the duties under the MSA on behalf of West and their salaries were paid by Methodist, Methodist never bothered to enter into any agreement to consider how much of their salaries should be reimbursed. . . . ECF No. 324-1. | **GO No. 1:**  This assertion is not supported by competent record evidence.  Reply at 31.<br><br>**GO No. 2:**  This is not a fact, but rather the government's characterization and testimony of counsel.  *Id.*<br><br>**GO No. 3:**  The government cites to a portion of an expert report (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 8:** The government cites generally to an expert report without any pincite or other guidance as to which portions of a lengthy document it is citing. *Id.* |
| | . . . .Rather, Mr. McLean and Mr. Mounce agreed to the cost allocation "bucket approach" Mr. McLean came up with. ECF No. 324-1. | **GO No. 1:** This assertion is not supported by competent record evidence. Reply at 31–32.<br><br>**GO No. 3:** The government cites to a portion of an expert report (i) for an assertion that constitutes opinion and not fact and (ii) for an assertion that is not made based on personal knowledge. *Id.*<br><br>**GO No. 6:** The use of a "bucket approach" is not material to the motion for summary judgment. *Id.*<br><br>**GO No. 8:** The government cites generally to an expert report without any pincite or other guidance as to which portions of a lengthy document it is citing. *Id.* |
| **CSOF ¶ 45** | The two West physicians that were the only Medical Directors appointed under the MSA had no idea that they had duties with respect to Methodist. . . . Sweet Decl., Ex. 42 (Methodist and West Meeting Minutes of 02/12/2012). | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 32.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of meeting minutes that speak for themselves and |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 45** | | testimony of counsel lacking personal knowledge. *Id.* |
| | . . . . Dr. Schwartzberg was not even present at the second meeting of the Operating Committee or Operations Committee, and neither was Mr. McLean. . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 33. |
| | . . . . The lack of importance of the Base Management duties under the MSA is demonstrated in that it is not a focus of discussion beyond payment. . . . Sweet Decl., Ex. 42 (Methodist and West Meeting Minutes of 02/12/2012). | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 33.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of meeting minutes that speak for themselves and testimony of counsel lacking personal knowledge. *Id.* |
| | . . . . Instead, the <u>main focus</u> of the Operating Committee was listed under "Old Business" as an update on 340B. . . . Sweet Decl., Ex. 42 (Methodist and West Meeting Minutes of 02/12/2012). | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 33.<br><br>**GO No. 2:** This is not a fact, but rather the government's characterization of meeting minutes that speak for themselves and testimony of counsel lacking personal knowledge. *Id.* |
| | . . . . The second item was identifying Dr. Schwartzberg and Dr. Tauer as Medical Directors under the MSA. . . . | **GO No. 7:** This fact is plainly undisputed. Reply at 33. |
| | The two West physicians that were the only Medical Directors appointed under the MSA had no idea that they had duties with respect to Methodist. Dr. Schwartzberg was not even present at the second meeting of the Operating Committee or Operations Committee, and neither was Mr. McLean. The lack of importance | **GO No. 9:** This paragraph contains at least five purported facts. Reply at 32. |

26

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | of the Base Management duties under the MSA is demonstrated in that it is not a focus of discussion beyond payment. Instead, the main focus of the Operating Committee was listed under "Old Business" as an update on 340B. The second item was identifying Dr. Schwartzberg and Dr. Tauer as Medical Directors under the MSA. Sweet Decl., Ex. 42 (Methodist and West Meeting Minutes of 02/12/2012). | |
| **CSOF ¶ 46** | The service line management proposal was supposed to have been attached as Exhibit A, but no such document was appended to the minutes. Sweet Decl, Ex. 42 (Methodist and West Meeting Minutes 02/09/12). . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 33. |
| | . . . .Since West previously had not been providing any inpatient management services at any of the locations in the MSA, there should have been significant work done to develop a proposal. None exists. | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 33.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of meeting minutes that speak for themselves and unsupported testimony of counsel lacking personal knowledge. *Id.* |
| **CSOF ¶ 47** | During the last two years of the MSA, the Operating Committee met only twice. . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 34. |
| | . . . .It had <u>morphed into multiple names</u> and was not clear that it had anything to do with confirming that West physicians, as opposed to leased employees, were doing the Base Management duties under the MSA for which it received 60% of the total compensation Methodist agreed to each year. . . . | **GO No. 2:** This is not a fact, but rather unsupported testimony and characterization of counsel lacking personal knowledge. Reply at 35.<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |

27

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | . . . . It had morphed into multiple names and was not clear that it had anything to do with confirming that West physicians, as opposed to leased employees, were doing the Base Management duties under the MSA for which it received 60% of the total compensation Methodist agreed to each year. As discussed supra, Methodist has not submitted any admissible evidence to show what work West did and who precisely did the work to justify the millions of dollars in base management fees for the entire seven years. The self-serving declarations are not sufficient, and it is belied by the fact that Mr. Mounce and Ms. Prince seem to have done most of the work, along with other leased employees, including Melissa Speer. See, e.g., Sweet Decl. Exs. 35, 41-50, 67 (various meeting minutes) & ECF Nos. 323-44 to 323-46; Sweet Ex. 27 (2012 Payroll records); ECF No. 323-14. It is also entirely unclear that West physicians provided management services at all of the locations in the MSA, including University. No documentation was kept of what they had done, and the physicians had little role in University, as Mr. Liebman has attested. Liebman Decl. ¶¶ 57-63 | **GO No. 1:** These assertions are not supported by the evidence cited. Reply at 34–35.<br><br>**GO No. 2:** This paragraph is flooded with improper, unsupported testimony and characterization of counsel lacking personal knowledge. *Id.*<br><br>**GO No. 8:** The government cites generally to meeting minutes and other materials without any pincite or other guidance as to which documents or portions of lengthy documents it is citing. *Id.*<br><br>**GO No. 9:** This paragraph contains at least six purported facts. *Id.* at 35. |
| **CSOF ¶ 48** | Methodist paid West the entire base management fee under the MSA from 2012 through 2018. ECF No. 323-49 at 204:2-5 ("And did Methodist pay the entire base fee to West through -- from 2012 through 2018? Yes."). | **GO No. 7:** This fact is plainly undisputed. Reply at 35. |
| **CSOF ¶ 49** | After the initial incentives were set to obtain a purported fair market value opinion for the MSA, Methodist and West paid minimal attention. . . . Sweet Decl., Ex. 67. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 35.<br><br>**GO No. 2:** This is not a fact, but rather the government's improper characterization of meeting minutes that speak for themselves and |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | testimony of counsel lacking personal knowledge. *Id.* |
| | . . . . In fact, the incentives for 2013 were not approved until year end.  For example, at the December 4, 2013 meeting of the "Operations Committee," the 2013 incentives under the MSA were approved, and the criteria for the 2014 incentives were approved without any specific deadlines or detailed and measurable milestones. Sweet Decl., Ex.  67. | **GO No. 1:**  This assertion is not supported by any record evidence.  Reply at 35.<br><br>**GO No. 6:**  This assertion is not material to the motion for summary judgment. *Id..* |
| | For example, at the December 4, 2013 meeting of the "Operations Committee," the 2013 incentives under the MSA were approved, and the criteria for the 2014 incentives were approved without any specific deadlines or <u>detailed and measurable milestones</u>. Sweet Decl., Ex.  67. | **GO No. 2:**  This is not a fact, but rather the government's improper characterization of meeting minutes that speak for themselves and testimony of counsel lacking personal knowledge. Reply at 36. |
| **CSOF ¶ 50** | As West could not automatically earn the incentives, <u>the parties set attainable goals</u> and that would not even be determined until mid to year end, with West setting and approving the goals and the payments of these incentives. . . . *See, e.g.,* Sweet Decl. Exs. 35, 41-50, 67 (various meeting minutes) & ECF Nos. 323-44 to 323-46. | **GO No. 1:**  This assertion is not supported by the evidence cited.  Reply at 36.<br><br>**GO No. 2:**  This is not a fact, but rather the government's characterization of meeting minutes and other documents that speak for themselves and testimony of counsel lacking personal knowledge. *Id.* |
| | . . . . The parties agreed to the performance incentive components from 2014-2018 with no outside input or vetting or involvement of any Methodist clinical personnel. *See, e.g.,* Sweet Decl. Exs. 35, 41-50, 67 (various meeting minutes) & ECF Nos. 323-44 to 323-46. | **GO No. 6:**  This assertion is not material to the motion for summary judgment. Reply at 36. |

29

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | . . . . *See, e.g.*, Sweet Decl. Exs. 35, 41-50, 67 (various meeting minutes) & ECF Nos. 323-44 to 323-46. | **GO No. 8:** The government cites generally to documents without any pincite or other guidance as to which documents or portions of lengthy documents it is citing. Reply at 36. |
| **CSOF ¶ 51** | Methodist's current CFO acknowledged that West presented metrics to the Cancer Council that the Council then "agreed upon" when approving West's own incentive payments from Methodist. Lane Dep. 136:14-137:24. In other words, West supplied the metrics used to determine its bonus from Methodist under the MSA. *Id.* | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 37. |
| | . . . . In other words, West supplied the metrics used to determine its bonus from Methodist under the MSA. *Id.* | **GO No. 2:** This is not a fact, but rather the government's improper and misleading characterization of witness testimony and testimony of counsel lacking personal knowledge. Reply at 37. |
| **CSOF ¶ 52** | These milestones included publishing "annual reports" that were part of the base management duties under the MSA. Yet, no annual report was produced for 2012 or 2013. And all of the annual reports produced relate to the work of West – not limited to Methodist locations – and are marketing documents that a jury can conclude have nothing to do with the MSA requirements. Sweet Decl., Exs. 4, 36, 38; 71-73. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 38.<br><br>**GO No. 2:** These are not facts, but rather the government's characterization of annual reports and invoices that speak for themselves and testimony of counsel lacking personal knowledge. *Id.* |
| | . . . . And all of the annual reports produced relate to the work of West – not limited to Methodist locations – and are marketing documents that a jury can conclude have nothing to do with the MSA requirements. Sweet Decl., Exs. 4, 36, 38; 71-73. | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 38. |

Case 3:17-cv-00902   Document 399-12   Filed 06/02/23   Page 31 of 45 PageID #: 13018

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
|  |  |  |
| **CSOF ¶ 53** | In October 2015, Methodist agreed to pay West an incentive payment of $52,650.00 to publish the 2014 Annual Report. Sweet Decl., Ex. 71 (West Management Incentive Payment October 2015). | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 38.<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 54** | One of the 2016 incentives set and approved in July 2017 for which Methodist agreed to pay West related to publishing the 2016 Annual Report, which is Exhibit 36 to the Sweet Declaration. Sweet Decl., Ex. 72 (2017 West Management Incentive.) | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 39.<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 55** | West's 2018 Annual Report, which necessarily covers the time period during the MSA but was published in 2019 after the relationship with Methodist was terminated, fails to mention Methodist in any way. Sweet Decl., Ex. 4 (2018 Annual Report). | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 39. |
| **CSOF ¶ 56** | One of the 2015 incentive items for which Methodist paid West $11,250.00 was to complete the "integration of West MLH Culture - Center wide unfreeze." This was approved at the April 1, 2015 PSA Operating Committee meeting. Sweet Decl., Ex. 73 (April 2015 West Management Incentive Payment.) | **GO No. 7:** This fact is plainly undisputed. Reply at 40. |
| **CSOF ¶ 57** | These payments may be cloaked under the MSA, but it is far from clear that the payments were not simply kickbacks as opposed to for work done under that agreement. The focus of the Operating Committee - under whatever name was used – was to further the work under the Expansion Plan that was attached to the PSA, | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 40.<br><br>**GO No. 2:** This is not a fact, but rather the government's misleading characterization of the |

31

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 57** | which was supposed to be the document setting the agreement to compensate West for professional services. The Expansion Plan had nothing to do with the work West could be paid for under the PSA. ECF No. 323-11. | PSA, which speaks for itself, and unsupported argument of counsel lacking personal knowledge. *Id.*<br><br>**GO No. 8:** The government cites generally to the PSA without any pincite or other guidance as to which portions of the lengthy document it is citing. *Id.* |
| | The focus of the Operating Committee - under whatever name was used – was to further the work under the <u>Expansion Plan that was attached to the PSA, which was supposed to be the document setting the agreement to compensate West for professional services</u>. . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 41. |
| **CSOF ¶ 58** | When Methodist enrolled to submit claims electronically to Medicare, it certified that "it will submit claims that are accurate, complete and truthful." Sweet Decl., Ex. 78 (EDI Agreement) at 8. | **GO No. 7:** This fact is plainly undisputed. Reply at 40. |
| **CSOF ¶ 59** | The Medicare cost reports that Methodist signed and submitted to Medicare for <u>each applicable year</u> contained the following certification: Sweet Decl., Ex. 79 (Methodist's Cost Reports). . . . | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 41. |
| | The above Medicare cost report was signed by Methodist's then CFO McLean. . . . | **GO No. 7:** This fact is plainly undisputed. Reply at 41. |
| | . . . . Methodist knew and expected to obtain referrals from West as part of the deal. | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 41. |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | **GO No. 2:** This is not a fact, but rather the unsupported testimony of counsel with no personal knowledge. *Id.* |
| **CSOF ¶ 60** | Methodist's former CEO Shorb acknowledged that Methodist "would see more patients" through its alliance with West. Ex. I (Shorb Dep.) at 71:7-14. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 42.<br><br>**GO No. 2:** This is not a fact, but rather the government's misleading characterization of deposition testimony. *Id.* |
| **CSOF ¶ 61** | West began tracking the referrals immediately with a focus on the daily census for West physicians attending to patients at Methodist locations. Sweet Decl., Ex. 68 (Mounce Email to T Myers re West Methodist Hospital Census as of 02.21.2012; Liebman Decl., ¶¶ 12-14, 20. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 42.<br><br>**GO No. 4:** The assertion is based on inadmissible hearsay in the form of an email. *Id.* |
| **CSOF ¶ 62** | West expected to be paid for its referrals and the benefit Methodist saw through the 340B Program, and Methodist agreed to do so, paying West far above what similar physicians in the area were paid. Stern Decl. ¶¶ 34-36 & Ex. 11; Liebman Decl., ¶¶ 67-70 | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 43.<br><br>**GO No. 4:** The assertion is based on inadmissible hearsay in the form of statements by Dr. Sandeep Samant. *Id.*<br><br>**GO No. 5:** This statement contradicts Liebman's and Stern's sworn testimony. *Id.* |
| **CSOF ¶ 63** | In May 2012, West CEO and dual Methodist employee Mounce emailed tracking information to Methodist employees . . . Sweet Decl., Ex. 80 (Mounce email to McLean Re Referrals Radiation Oncology as of 05.13.2013). | **GO No. 2:** This is not a fact, but rather the government's misleading characterization of an email that speaks for itself. Reply at 44. |

33

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | In May 2012, Mounce emailed tracking information to Methodist employees, including CFO McLean, on referrals to "other [non-Methodist] centers."  He noted that "we are on target to have about 150 referrals pushed elsewhere.  Mounce also noted that West did "901 referrals to rad[iation] onc[ology].  I am not sure all of these could move but let's say 50-75% of them could."  Mounce emailed Methodist employees, including its CFO McLean, that he was "pushing our doc[tor]s on the Medicare patients."  Sweet Decl., Ex. 80 (Mounce email to McLean Re Referrals Radiation Oncology as of 05.13.2013) | **GO No. 6:**  These assertions are not material to the motion for summary judgment.  Reply at 44. |
| CSOF ¶ 64 | Methodist knew that . . . the referrals to Baptist were decreasing. . . . Sweet Decl., Ex. 75 (McLean email to T Haynes re: Oncology -Financial Statement as of 11/13/13); Ex. G (McLean Dep. Vol. I) at 1 42:21-44:17.). . . | **GO No. 1:**  This assertion is not supported by the evidence cited.  Reply at 45. |
| | . . . . Methodist acknowledged that the inpatient referrals from West doubled during the course of the affiliation.  Sweet Decl., Ex. 75 (McLean email to T Haynes re: Oncology -Financial Statement as of 11/13/13); Ex. G (McLean Dep. Vol. I) at 1 42:21-44:17.). . . | **GO No. 1:**  This assertion is not supported by the evidence cited.  Reply at 45. |
| | . . . . Methodist's internal documents show that the referrals that Methodist got from West were critical to Methodist's margins, and there were many discussions of Methodist management about how West was critical to Methodist's increased financial performance. . . . | **GO No. 6:**  This assertion is not material to the motion for summary judgment.  Reply at 45. |
| | . . . West's referrals of Medicare patients to Baptist decreased and West referrals doubled.  Id. ¶¶ 18, 20-22, 24., 26, 78 & Ex. 4. . . . | **GO No. 1:**  This assertion is not supported by the evidence cited.  Reply at 46. |

34

**EVIDENTIARY OBJECTIONS TO THE UNITED STATES' COUNTER-STATEMENT OF MATERIAL FACTS ("CSOF")**

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 64** | . . . . The increase in Methodist's financial performance from 2011 through 2018 is reflected in its financial statements, <u>which show that revenues doubled</u>. Sweet Decl., Ex. 7 . . . | **GO No. 2:** This is not a fact, but rather the government's improper characterization of financial statements that speak for themselves. Reply at 46. |
| | Methodist knew that the West referrals were increasing and that the referrals to Baptist were decreasing. Methodist acknowledged that the inpatient referrals from West doubled during the course of the affiliation. Sweet Decl., Ex. 75 (McLean email to T Haynes re: Oncology -Financial Statement as of 11/13/13); Ex. G (McLean Dep. Vol. I) at 1 42:21-44:17.) Methodist's internal documents show that the referrals that Methodist got from West were critical to Methodist's margins, and there were many discussions of Methodist management about how West was critical to Methodist's increased financial performance. Liebman Decl., ¶¶ 9, 17, 53 & Ex. 2. These outpatient and inpatient referrals were largely made up of Medicare patients, as West's referrals of Medicare patients to Baptist decreased and West referrals doubled. Id. ¶¶ 18, 20-22, 24., 26, 78 & Ex. 4. The increase in Methodist's financial performance from 2011 through 2018 is reflected in its financial statements, which show that revenues doubled. Sweet Decl., Ex. 7 (Methodist Healthcare Memphis Tax Filing and Audits) *available at* https://projects.propublica.org/nonprofits/organizations/620479367 (identifying $1,339,545,048 for fiscal year 2011 to $2,232,575,542 for fiscal year 2018). | **GO No. 9:** This paragraph contains at least seven purported facts. Reply at 45. |
| **CSOF ¶ 65** | Methodist knew it could not pay West kickbacks in exchange for referrals. Ex. G (McLean Dep. Vol. I) at 45:2-12. | **GO No. 7:** This fact is plainly undisputed. Reply at 46. |

35

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 66** | Under the PSA, Methodist was paying West at rates that were <u>high in the local market</u> . . . | **GO No. 1:** This assertion is not supported by any record evidence. Reply at 464. |
| | Under the PSA, Methodist was paying West at rates that were high in the local market, and that did not satisfy the ratio of compensation to collections, for which Methodist let Erich Mounce sign off on. The opinion it obtained from ECG did not take into account that Methodist was paying West for the NPPAs under the LEA, and then also under the PSA and at rates that were above fair market value. ECF No. 328-1. | **GO No. 3:** The government cites to a portion of an expert report (i) for an assertion that constitutes opinion and not fact and (ii) for an assertion that is not made based on personal knowledge. Reply at 46.<br><br>**GO No. 8:** The government cites generally to a document without any pincite or other guidance as to which portion of the lengthy document it is citing. *Id.* |
| | . . . . The opinion it obtained from ECG did not take into account that Methodist was paying West for the NPPAs under the LEA, and then also under the PSA and at rates that were above fair market value. . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 47. |
| **CSOF ¶ 67** | The amount that Methodist paid West under the PSA for 2012 and 2013 did not satisfy the central condition as to the ratio of professional collections to wRVU payments that ECG identified in its 2011 [draft] opinion. But Methodist did not obtain a new FMV opinion for the PSA in 2014. Methodist continued to pay West under the PSA for 2014 and 2015 at the same rates that ECG identified in 2011. ECF No. 328-1. . . . | **GO No. 1:** This assertion is not supported by competent evidence. Reply at 47.<br><br>**GO No. 3:** The government cites to an expert report (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.* at 47–48.<br><br>**GO No. 8:** The government cites generally to an expert report without any pincite or other |

36

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 67** | | guidance as to which portion of the lengthy document it is citing. *Id.* |
| | . . . . But Methodist did not obtain a new FMV opinion for the PSA in 2014. Methodist continued to pay West under the PSA for 2014 and 2015 at the same rates that ECG identified in 2011. ECF No. 328-1. . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 48. |
| | . . . . These rates were higher than the national 90th percentile and much higher than what other Memphis oncologists were being paid. Stern Decl. ¶¶ 37-46. | **GO No. 1:** This assertion is not supported by competent evidence. Reply at 48.<br><br>**GO No. 5:** This statement contradicts the declarant's sworn testimony. *Id.* |
| | The amount that Methodist paid West under the PSA for 2012 and 2013 did not satisfy the central condition as to the ratio of professional collections to wRVU payments that ECG identified in its 2011 [draft] opinion. But Methodist did not obtain a new FMV opinion for the PSA in 2014. Methodist continued to pay West under the PSA for 2014 and 2015 at the same rates that ECG identified in 2011. ECF No. 328-1. These rates were higher than the national 90th percentile and much higher than what other Memphis oncologists were being paid. Stern Decl. ¶¶ 37-46. | **GO No. 9:** This paragraph contains at least five purported facts. Reply at 47. |
| **CSOF ¶ 68** | When the referrals from West to Methodist increased, <u>West wanted to be paid more</u>. Since it was already paid an amount under the PSA at rates that <u>did not satisfy the central condition in ECG's fair market value opinion</u>, the <u>only other option was to increase the fees under the MSA</u>. . . . | **GO No. 1:** These assertions are not supported by any evidence in the record. Reply at 49.<br><br>**GO No. 2:** These are not facts, but rather the government's misleading characterization and unsupported argument of counsel lacking personal knowledge. *Id.* |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 68** | | **GO No. 6:** These assertions are not material to the motion for summary judgment. *Id.* |
| | . . . . Methodist and West opinion shopped . . . | **GO No. 1:** This assertion is not supported by any evidence in the record. Reply at 49.<br><br>**GO No. 2:** This is not a fact, but rather the government's misleading characterization and unsupported argument of counsel lacking personal knowledge. *Id.* |
| | . . . . Methodist and West . . . used the highest range of FMV provided. Sweet Decl., Ex. 34 (Ulery email to Mounce of 04/10/14); Ex. 35 (Operations Committee Meeting Minutes of 06/04/14); ECF No. 323-27. | **GO No. 1:** This assertion is not supported by the evidence cited. Reply at 49.<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| | . . . . As discussed throughout, the 2014 FMV Opinion did not take into account that West was already engaged to perform the services for two years and had failed to do many of the base management items at all of the locations in the agreement, and that leased employees were doing much of the day-to-day work, which was essentially managing West's own patients. . . . | **GO No. 1:** This assertion is not supported by any evidence in the record. Reply at 50.<br><br>**GO No. 2:** This is not a fact, but rather the government's misleading characterization and unsupported argument of counsel lacking personal knowledge. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| | . . . . The ratio of compensation to collections under the PSA for the 2012-2013 period was 1.45. . . . | **GO No. 6:** This assertion is not material to the motion for summary judgment. Reply at 50. |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | When the referrals from West to Methodist increased, West wanted to be paid more. Since it was already paid an amount under the PSA at rates that did not satisfy the central condition in ECG's fair market value opinion, the only other option was to increase the fees under the MSA. Methodist waited to pay West under the MSA in 2014 until a new FMV opinion was obtained, and Methodist and West opinion shopped and then used the highest range of FMV provided. Sweet Decl., Ex. 34 (Ulery email to Mounce of 04/10/14); Ex. 35 (Operations Committee Meeting Minutes of 06/04/14); ECF No. 323-27. As discussed throughout, the 2014 FMV Opinion did not take into account that West was already engaged to perform the services for two years and had failed to do many of the base management items at all of the locations in the agreement, and that leased employees were doing much of the day-to-day work, which was essentially managing West's own patients. The ratio of compensation to collections under the PSA for the 2012-2013 period was 1.45. Ex. I (Shorb Dep.) at 162:4-166:16; Sweet Decl., Exs 81 & 82 (West Invoices 2012 and West Invoices 2013). | **GO No. 9:** This paragraph contains at least eight purported facts. Reply at 49. |
| **CSOF ¶ 69** | Summary charts and calculations of the relevant Methodist Medicare claims data show that for the period of January 1, 2012 through December 31, 2018 ("approximate deal period"), Medicare paid Methodist $58,816,954 for inpatient services and $314,484,565 for outpatient services in which the attending physician was one of the 86 West medical providers at times within that period when they were employed by West. Declaration of Michael Petron, filed contemporaneously herewith ("Petron Decl."), ¶¶ 4, 9. | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 51.<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.* |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | **GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 70** | Of the $58,816,954 paid to Methodist for inpatient services as described above, there were eight providers for which the Medicare data demonstrates that providers (1) increased the number of Medicare beneficiaries for whom they provided services at Methodist from the pre-deal period of 2011 versus the period during the deal and (2) decreased the number of Medicare beneficiaries for whom they provided services at Medicare from the pre-deal period of 2011 versus the period during the deal. The total inpatient Medicare payments to Methodist for these eight physicians is $21,573,431. *Id.* ¶¶ 11, 15. | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 51.<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 6:** These assertions are not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 71** | The names of the eight physicians identified above are Drs. Jason Chandler, Linda Smiley, Todd Tillmans, Robert Johnson, Mark Reed, Kurt Tauer, Bradley Somer, and Gang Tian. Id. ¶¶ 11, 15, and Petron Decl. Ex. 3 (Summary Chart of Medicare Inpatient Claims by Attending Physician and Year). | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 52.<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 72** | A snapshot of this data for Dr. Mark Reed shows the following . . . | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 52. |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | **GO No. 2:** This is not a fact, but rather the government's improper characterization of data in a declaration that speaks for itself. *Id.*<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* at 53. |
| **CSOF ¶ 73** | Of the $58,816,954 paid to Methodist for inpatient services as described above, there were three providers for which the Medicare data reflects that they increased the number of Medicare beneficiaries for whom they provided services at Methodist from the pre-deal period of 2011 versus the period during the deal with a minimal change in the number of beneficiaries they provided services to at Baptist in that period. The total inpatient Medicare payments to Methodist for these three physicians is $9,295,683. *Id.* ¶¶ 11, 15. | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 53.<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 74** | The names of the three physicians identified above are Drs. Michael Martin, Stephen Besh, and Benton Wheeler. *Id.* ¶¶ 11, 15, and Petron Decl. Ex. 3 (Summary Chart of Medicare Inpatient Claims by Attending Physician and Year). | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 53.<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes |

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 75** | Of the $58,816,954 paid to Methodist for inpatient services as described above, there were 10 providers for which the Medicare data reflects that they "started their employment at West during the approximate deal period and serviced all or almost all patients at Methodist as compared to Methodist." The total inpatient Medicare payments to Methodist for these three physicians is $9,295,683. Petron Decl., ¶¶ 11, 15. | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 54.<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 76** | The names of the 10 physicians identified above are Drs. Ramakrishna Battini, Courtney Shires, Eric Wiedower, Fenton Moon, Gregory Vidal, Daniel Vaena, Ari VanderWalde, Adam ElNaggar, Majari Pandey, and Suhail Obaji. Id. ¶¶ 11, 15, and Petron Decl. Ex. 3 (Summary Chart of Medicare Inpatient Claims by Attending Physician and Year). | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 54.<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.* |

Case 3:17-cv-00902   Document 399-12   Filed 06/02/23   Page 43 of 45 PageID #: 13030

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| | | **GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 78** | Of the $314,485,565 paid to Methodist for outpatient services as described above, a summary chart lists the 86 West attending providers and shows the number of Medicare beneficiaries they saw at Methodist (and for which Medicare paid Methodist) during the approximate deal period as compared to the number of Medicare beneficiaries they saw at Baptist during the same period. Petron Decl., ¶¶ 9, 17-18 Ex. 4 (Summary Chart of Medicare Outpatient Claims and Beneficiary Counts by Attending Physician and Year). | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 55.<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |
| **CSOF ¶ 79** | A side-by-side comparison of the above outpatient summary chart reflects that there was an overall, large increase in the number of outpatient claims for which a West physician was an attending physician at Methodist as compared to at Baptist during the deal period, as compared to before the deal period in 2011. Petron Decl., ¶¶ 9, 17-18 Ex. 4 (Summary Chart of Medicare Outpatient Claims and Beneficiary Counts by Attending Physician and Year). | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 55.<br><br>**GO No. 2:** This is not a fact, but rather the government's characterization of materials in the record. *Id.*<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.* |

Case 3:17-cv-00902   Document 399-12   Filed 06/02/23   Page 44 of 45 PageID #: 13031

| CSOF Cite | Objectionable Language[1] | Objection(s) |
|---|---|---|
| **CSOF ¶ 80** | The names of the West physicians on the above outpatient summary chart are listed on the chart itself. Petron Decl., ¶¶ 9, 17-18 Ex. 4 (Summary Chart of Medicare Outpatient Claims and Beneficiary Counts by Attending Physician and Year). | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 56.<br><br>**GO No. 2:** This is not a fact, but rather the government's characterization of materials in the record. *Id.*<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.* |
| **CSOF ¶ 81** | A snapshot of this outpatient data for Dr. Lee Schwartzberg shows the following . . . | **GO No. 1:** This assertion is not supported by admissible evidence in the record. Reply at 56–57.<br><br>**GO No. 2:** This is not a fact, but rather the government's characterization of materials in the record. *Id.*<br><br>**GO No. 3:** The government cites to a portion of a declaration (i) for an assertion that constitutes opinion and not fact; (ii) for an assertion that is not made based on personal knowledge; and (iii) that constitutes inadmissible expert testimony under Rule 702. *Id.*<br><br>**GO No. 6:** This assertion is not material to the motion for summary judgment. *Id.* |

44